# EXHIBIT D



Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

(212) 790-9200 Tel
(212) 575-0671 Fax
www.cll.com

Richard S. Mandel
(212) 790-9291
rsm@cll.com

May 6, 2016

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

Mr. Joe Ely
P.O. Box 91479
Austin, Texas 78709

      Re:    Joe Ely Copyright Termination Notice

Dear Mr. Ely:

We represent UMG Recordings, Inc. ("UMG"), the successor to MCA Records, Inc. ("MCA"), and write with reference to your notice dated December 15, 2015 purporting to terminate UMG's rights in certain specified recordings containing your performances. As set forth in detail below, your attempt to terminate UMG's rights in and to these recordings under 17 U.S.C. § 203 is without legal or factual merit.

The 1976 Agreement

The first six works referenced in Schedule A of your termination notice were created pursuant to an August 26, 1976 agreement between you and MCA (the "1976 Agreement"). As a threshold matter, § 203 has no application to the 1976 Agreement because it was executed prior to January 1, 1978. By its clear terms, § 203 only permits termination of grants executed "on or after January 1, 1978." To the extent you are attempting to treat either the date of publication of the works or the date of creation of such works as being the date of execution, rather than the date the relevant agreement was signed, there is no basis for such a strained statutory interpretation. Based on the unambiguous meaning of the term, "executed" plainly refers to when the agreement was signed and not when the recordings were created or published. Neither the courts nor Congress has ever endorsed a contrary interpretation of the term "executed" that would fix such date based on the creation or publication of the work rather than the signing of the relevant agreement. Even the Copyright Office has recognized in its final rulemaking on the issue, 76 Fed. Reg. 32316 (June 6, 2011), that the definition of "executed" in § 203 "should be settled in the courts (or in Congress, if Congress accepts the Office's suggestion to enact legislation that will clarify the status of [such grants].)."

Even assuming for the sake of argument only that § 203 could apply to pre-1978 agreements, termination would nevertheless be inapplicable. As the statute itself recognizes, termination is not available with respect to works made for hire. Because the relevant contractual relationship pre-dates the effective date of the 1976 Copyright Act, the work-made-for-hire-status of the recordings is determined under the 1909 Copyright Act. See Roth v. Pritikin, 710 F.2d 934 (2d Cir.), cert. den, 464 U.S. 961 (1983) (1909 Act governed post-1978 work created under pre-1978 contract); Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 98 (2d Cir. 2002) (work for hire determination "turns on whether the relevant contract was entered into prior to January 1, 1978").

Under the 1909 Act, "in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done." Twentieth Century Fox Film Corp. v. Entm't Distrib., 429 F.3d 869, 877 (9th Cir. 2005) (quoting Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965)). Indeed, under the 1909 Act, there arose "an almost irrebuttable presumption that any person who paid another to create a copyrightable work was the statutory 'author' under the 'work for hire' doctrine." Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 158 (2d Cir. 2003) (citation omitted); Easter Seal Society for Crippled Children & Adults v. Playboy Enters., 815 F.2d 323, 327 (5th Cir. 1987) (same).

As the Second Circuit has noted, under the 1909 Act "[a] work is made at the hiring party's 'instance and expense' when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out. The right to direct and supervise the manner in which work is created need never be exercised." Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 635 (2d Cir. 2004). The recordings here were unmistakably made at the "instance and expense" of MCA, which contracted for the delivery of the recordings, approved and paid the budget for such recordings and had the right to approve such recordings as satisfactory.

In any event, even if the 1976 Act were controlling for purposes of determining the work made for hire status of the recordings made pursuant to pre-1978 agreements, the recordings would still constitute works made for hire. The Copyright Act defines a work made for hire as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1); see also 17 U.S.C. § 201(b) (under which "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright"). The Supreme Court held in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989), that whether a person created a work as an "employee within the scope of his or her employment" under the 1976 Act is to be determined by reference to the common law of agency. The primary consideration in determining whether a hired party is an employee under the common law of agency is "the hiring party's right to control the manner and means by which the product is accomplished." Reid, 490 U.S. at 751. The contract here provided MCA with such ultimate control, including the ability to accept or reject the

recordings delivered. See 1976 Agreement ¶ 2(c). Moreover, numerous other indicia of an employment relationship exist, including the fact that recording was a regular part of MCA's business, the parties' express acknowledgement of an employment relationship (see 1976 Agreement ¶ 8(c)) and the extended duration of the relationship. See generally Reid, 490 U.S. at 751. Accordingly, the recordings are appropriately categorized as works made for hire, regardless of any artistic control that you may have exercised in the recording process. See Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc., 2010 U.S. Dist. LEXIS 94500, *29-30 (S.D.N.Y. Sept. 10, 2010) ("The fact that [Bob] Marley may have exercised artistic control over the recording process ... is legally irrelevant; what is dispositive is that Island had the contractual right to accept, reject, modify, and otherwise control the creation of the Sound Recordings.").

The recordings created pursuant to the 1976 Agreement also constitute works made for hire under § 101(2) of the Copyright Act, which defines a "work made for hire" as

> a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101(2). The recordings were specially commissioned for use in a compilation, *i.e.*, a long-playing record album. The 1982 Agreement provides in paragraph 1 for the delivery of "LPs," with "LP" or "album" defined in paragraph 21(g) to mean "a sufficient number of master recordings to constitute one (1) 12-inch, 33-1/3 rpm, long-playing phonograph record album of not less than thirty (30) minutes playing time."

Such albums are compilations under the 1976 Act:

> A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

17 U.S.C. § 101. "An album is a collection of preexisting materials—songs—that are selected and arranged by the author in a way that results in an original work of authorship—the album." Bryant v. Media Right Prods., 603 F.3d 135, 140-41 (2d Cir. 2010). Accordingly, "[a]n album falls within the Act's expansive definition of compilation." Id. at 140.

The recordings selected and arranged to comprise the relevant albums were subject to a signed, written agreement deeming MCA to be the owner of copyright from inception as a work made for hire. In addition, the copyright registrations for the recordings specifically identify MCA's ownership status as "employer for hire." Accordingly, no indication of a transfer of copyright from you to MCA appears on the registrations, which have also never been amended since their issuance to reflect any such purported transfers that could potentially be subject to

termination. The registrations were timely made under 17 U.S.C. § 410(c), and are thus <u>prima facie</u> evidence that the master recordings are works made for hire. You would bear the burden of proving otherwise and rebutting the presumption that MCA owned all right, title and interest in the copyright to the recordings in its own name as works made for hire.

In any case, even if the sound recordings were not works made for hire, you would be time-barred from challenging that issue. Under the three-year statute of limitations for copyright claims, 17 U.S.C. § 507(b), claims regarding the initial ownership status of a work must be brought within three years of creation. See, e.g., <u>Robles Vasquez v. Torres-Negron</u>, 2007 U.S. Dist. LEXIS 57872, *21 (S.D.N.Y. July 11, 2007) ("Since plaintiffs' claim … relates to a claim of copyright ownership, the normal three-year limitations period applies."). Accordingly, in <u>Aday v. Sony Music</u>, 44 U.S.P.Q.2d 1688 (S.D.N.Y. 1997), the recording artist Meat Loaf was held to be time-barred when in 1997 he sought to contest the work-for-hire provision in his 1977 recording agreement with Sony after a royalty dispute. The artist sought a declaration that he was not an employee for hire, but the Southern District of New York rejected the claim, stating the singer "had reason to know in 1977 about any of the problems with the work-for-hire provision that [he] now contend[s] violates the Copyright Act."

The 1980 Agreement

With respect to the last three works in Schedule A of your termination notice, MCA obtained ownership of such recordings by virtue of a July 13, 1979 agreement (the "1979 Production Agreement") between two corporate entities, MCA and South Coast Records, Inc. ("South Coast"), which furnished the recording services of various artists, including you, to MCA. Under the 1979 Production Agreement, South Coast represented that it had or would enter into valid written exclusive recording agreements with each artist furnished to MCA, and that such recording agreements would contain all appropriate provisions allowing South Coast to perform its obligations under the 1979 Production Agreement and vesting MCA with ownership of the rights in the works covered by the contract. See 1979 Production Agreement ¶ 1(c)(ii). In paragraph 8, South Coast further acknowledged that MCA was the sole and exclusive owner of all the recordings created under the 1979 Production Agreement from inception. Such ownership was also provided for specifically with respect to your recordings in paragraph 4(e) of a July 1, 1980 amendment to the 1979 Production Agreement, as well as in paragraph 5 of the inducement letter to your July 1, 1980 recording agreement with South Coast (the "1980 Recording Agreement"). Accordingly, there is no operative grant to terminate, but simply a work made for hire relationship that vested ownership in the works in MCA from inception.

Moreover, even if MCA were not itself deemed to be the author of a work made for hire, but rather to have acquired copyright by virtue of a grant of rights under the 1979 Production Agreement, the result would still not be a transfer terminable under the Copyright Act because any such transfer was made by the corporate furnishing company, South Coast, and not by you. A copyrighted work of which a corporate entity is the legal author is <u>ipso facto</u> a work made for hire, and transfers of rights in works made for hire are categorically not terminable under § 203. South Coast expressly warranted in the 1979 Production Agreement that it had or would have a

valid recording agreement in place with all artists furnished to MCA, including you, and that as the "employer of Artist, ... [it] shall pay withholding, payroll and other taxes, and pension and welfare contributions, if any, required to be paid in connection with Artist's ... services to [South Coast]." 1979 Production Agreement ¶ 1(h). Such a recording agreement plainly existed in the form of the 1980 Recording Agreement, which expressly provided in paragraph 12 for South Coast's ownership of your recordings based on your status as South Coast's "employee for hire." You cannot now turn around and claim that the rights all along belonged to you and not the furnishing company that represented to MCA that it owned the rights necessary for purposes of its agreement with MCA. The recordings were created by you within the scope of your employment by South Coast, and accordingly are works made for hire under § 101(1) of the Copyright Act.

These recordings also constitute works made for hire under § 101(2) of the Copyright Act for the same reasons discussed above with respect to the recordings created pursuant to the 1976 Agreement. Once again, the copyright registrations reflect MCA's ownership of the relevant recordings as "employer for hire" and create a presumption that the recordings are works made for hire. And you are also barred by the statute of limitations from challenging MCA's ownership of such recordings in the same manner and for the same reasons addressed above under the 1976 Agreement

For all these reasons, UMG continues to possess the right to exploit the recordings pursuant to its rights as outlined above. You are hereby advised to refrain from attempting to exploit the recordings yourself or taking any other actions interfering with UMG's continuing rights in the recordings that are the subject of your termination notice.

This letter is without prejudice to any of UMG's rights, remedies, or defenses, all of which are expressly reserved.

Sincerely,

Richard S. Mandel

cc: Evan S. Cohen (Via Certified Mail)
1180 South Beverly Drive, Suite 510
Los Angeles, CA 90035-1157