UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                                          :
JOHN WAITE, an individual; JOE ELY, an                    :
individual, and on behalf of all others similarly         :     No. 1:19-cv-01091(LAK)
situated,                                                 :
                                                          :
                              Plaintiffs,                 :
                                                          :
               v.                                         :
                                                          :
UMG RECORDINGS, INC., a Delaware                          :
corporation, and DOES 1 through 10,                       :
                                                          :
                              Defendants.                 :
----------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## UMG RECORDINGS, INC.'S MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................2

   I.     TERMINATION OF COPYRIGHT GRANTS UNDER 17 U.S.C. § 203 ....................2

   II.    PLAINTIFFS' CLAIMS ...........................................................................3

ARGUMENT........................................................................................................................4

   I.     THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE PLAINTIFFS
        CANNOT TERMINATE GRANTS AS TO MOST OF THE WORKS AT ISSUE
        BECAUSE THEY ARE NOT GRANTORS WITHIN THE MEANING OF 17 U.S.C.
        § 203 ...........................................................................................................5

   II.    THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE ELY'S PRE-1978
        COPYRIGHT GRANT IS NOT ELIGIBLE FOR TERMINATION UNDER 17 U.S.C.
        § 203 ...........................................................................................................8

   III.   THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE PLAINTIFFS'
        TERMINATION NOTICES ARE FATALLY DEFICIENT PURSUANT TO 37
        C.F.R. § 201.10(b)(2)...................................................................................12

      A.   Plaintiffs' Notices Did Not Comply with the Applicable Regulation. ....................12

      B.   The Defects in the Notices Are Not Harmless. .......................................14

   IV.   PLAINTIFFS' CLAIMS ARE BARRED BY THE COPYRIGHT ACT'S THREE-
        YEAR STATUTE OF LIMITATIONS ....................................................................17

      A.   Because Waite Was on Notice of His Ownership Claim in the 1980s, His Present
          Claims are Time-Barred. ........................................................................18

      B.   Because Ely Was on Notice of His Ownership Claim in the 1970s, His Present
          Claims are Time-Barred. ........................................................................22

   V.    PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIMS ALSO FAIL...................24

CONCLUSION...................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aday v. Sony Music Entm't,*
1997 WL 598410 (S.D.N.Y. Sept. 25, 1997) ...................................................... 18, 20, 21, 24

*Ashcroft v. Iqbal,*
556 U.S. 662, 129 S. Ct. 1937 (2009) .................................................................................5

*Barnhart v. Sigmon Coal Co., Inc.,*
534 U.S. 438, 122 S. Ct. 941 (2002) ...................................................................................8

*Brumley v. Albert E. Brumley & Sons, Inc.,*
822 F.3d 926 (6th Cir. 2016) ............................................................................................12

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
491 F. Supp. 1320 (S.D.N.Y. 1980) ............................................................................ 14, 16

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
683 F.2d 610 (2d Cir. 1982) ....................................................................................... 12, 17

*Chambers v. Time Warner, Inc.,*
282 F.3d 147 (2d Cir. 2002) ...............................................................................................3

*Consumer Health Info. Corp. v. Amylin Pharm., Inc.,*
819 F.3d 992 (7th Cir. 2016) ......................................................................... 17, 21, 22, 24

*Cooper v. NCS Pearson, Inc.,*
733 F.3d 1013 (10th Cir. 2013) .................................................................... 18, 22, 23, 24

*DiFolco v. MSNBC Cable L.L.C.,*
622 F.3d 104 (2d Cir. 2010) ...........................................................................................3, 5

*Fed. Deposit Ins. Corp. v. Meyer,*
510 U.S. 471, 114 S. Ct. 996 (1994) ...................................................................................8

*Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC,*
139 S. Ct. 881 (2019) ....................................................................................................1, 12

*Kwan v. Schlein,*
634 F.3d 224 (2d Cir. 2011) .............................................................................................17

*Latin Am. Music Co. v. Am. Soc'y of Composers, Authors, and Publishers,*
593 F.3d 95 (1st Cir. 2010) .................................................................................................5

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ...................................................................5

*Milne v. Stephen Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) ..........................................................5, 7, 9

*Music Sales Corp. v. Morris*,
   73 F. Supp. 2d 364 (S.D.N.Y. 1999) ....................................................17

*Penguin Group (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) ..........................................................2, 5, 7, 9

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
   137 S. Ct. 1002 (2017) .........................................................................11

**Statutes**

17 U.S.C. § 101 .......................................................................................19

17 U.S.C. § 106 .........................................................................................6

17 U.S.C. § 111 .........................................................................................8

17 U.S.C. § 201 .......................................................................................19

17 U.S.C. § 203 ..................................................................................*passim*

17 U.S.C. § 204 ....................................................................................7, 8

17 U.S.C. § 304 .................................................................................2, 3, 9

17 U.S.C. § 507 ...................................................................................17, 21

**Other Authorities**

37 C.F.R. § 201.10 ...........................................................................*passim*

ANALYSIS OF GAP GRANTS UNDER THE TERMINATION PROVISIONS OF TITLE 17,
   U.S. COPYRIGHT OFFICE (Dec. 7, 2010), *available at*
   https://www.copyright.gov/reports/gap-grant-analysis.pdf ..........................10, 11

BLACK'S LAW DICTIONARY (Bryan A. Garner ed., 10th ed. 2014) ...............................8

Federal Rule of Civil Procedure 11 ...........................................................16

Federal Rule of Civil Procedure 12 ............................................................1

H.R. REP. NO. 94-1476 (1976), *available at*
   https://www.copyright.gov/history/law/clrev_94-1476.pdf .........................3, 9, 10

Mary LaFrance, *The Separate Tax Status of Loan-Out Corporations*, 48 VAND. L. REV. 879 (1995) ........................................................................................................4

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT .......................................5, 17

HOUSE COMM. ON THE JUDICIARY, 89TH CONG., 1ST SESS., COPYRIGHT LAW REVISION PART 6: SUPPLEMENTARY REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW: 1965 REVISION BILL (1965) ...........................................................................................................................10

GENERAL GUIDE TO THE COPYRIGHT ACT OF 1976, U.S. COPYRIGHT OFFICE (1977), *available at* https://www.copyright.gov/reports/guide-to-copyright.pdf ...................10

Defendant UMG Recordings, Inc. ("UMG") respectfully submits this memorandum in support of its motion to dismiss the Complaint brought by Plaintiffs John Waite ("Waite") and Joe Ely ("Ely") (collectively, "Plaintiffs"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This matter relates to Section 203 of the Copyright Act of 1976, 17 U.S.C. § 203, which permits an author to terminate certain grants of copyright rights executed on or after January 1, 1978, if specific conditions are met.  Plaintiffs are recording artists who sent notices to UMG, purporting to terminate transfers of copyrights pursuant to Section 203.  In this action, Plaintiffs seek a declaration that those termination notices are valid, and assert infringement claims against UMG; Plaintiffs also purport to bring this action on behalf of a putative class of recording artists who have served Section 203 termination notices on UMG.  Plaintiffs' claims, however, are without merit, and the Complaint should be dismissed with prejudice.

Plaintiffs' claims fail as a matter of law for at least four independent reasons.

*First*, under the plain language of the Copyright Act, only an author who executes a grant (or if deceased, his or her statutorily designated heirs) may terminate the grant.  Here, as to all of the agreements involving Waite's sound recordings, and one of the agreements involving Ely's sound recordings, Plaintiffs did not grant any transfer of copyright.  Instead, any grants respecting those works were made by third parties that provided Plaintiffs' services and the fruits of those services to predecessors of UMG or its affiliates.  Because Plaintiffs were not grantors, they are not entitled to terminate the grants.

*Second*, the other agreement involving Ely is not eligible for termination pursuant to Section 203 because the parties executed that agreement prior to January 1, 1978, and Section 203 applies only to grants executed on or after that date.

*Third*, Plaintiffs' termination notices do not comply with statutory and regulatory requirements, making the putative terminations invalid and ineffective.

*Fourth*, the Copyright Act's three-year statute of limitations bars Plaintiffs' claims.  The Complaint fundamentally challenges ownership of the works at issue, and that challenge was ripe

1

decades ago, at the moment the agreements governing the creation and ownership of those works were signed.

Importantly, Plaintiffs' copyright infringement claims are entirely premised on the validity of their purported termination notices and corresponding ownership claims. Because those latter claims fail as a matter of law, Plaintiffs' infringement claims must also fail. For these reasons, UMG respectfully requests that the Court dismiss the Complaint in its entirety.

## **BACKGROUND**

## I.    **TERMINATION OF COPYRIGHT GRANTS UNDER 17 U.S.C. § 203**

Under the Copyright Act of 1909, "authors were entitled to a copyright in their works for an initial twenty-eight year period," and "[a]fter this period expired, the author had the right to renew the copyright for a second twenty-eight year term." *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008). "The 1976 amendments to the Copyright Act, which took effect in 1978, abandoned this framework," and "replaced the two consecutive twenty-eight year terms with a single copyright term of increased duration, and it created for authors . . . [a] right to terminate the grant of a transfer or license." *Id.* 197-98 (citation omitted).

More specifically, Congress established two separate termination regimes, one as to grants executed by authors on or after January 1, 1978, and the other as to certain grants executed before that date. *See* 17 U.S.C. §§ 203(a)(3), 304(c)(3). As to the former (which is the termination provision at issue here), Section 203 provides:

> In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination [under certain specified conditions].

*Id.* at § 203(a).[1]

---

[1] The other termination provision, Section 304(c), provides in relevant part:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before

Congress, however, did not make this right self-effectuating; indeed, "[i]nstead of being automatic, . . . the termination of a transfer or license under section 203 would require the serving of an advance notice within specified time limits and under specified conditions."  H.R. REP. NO. 94-1476, at 124 (1976), *available at* https://www.copyright.gov/history/law/clrev_94-1476.pdf.  Thus, in the Copyright Act, Congress directed the Register of Copyrights to prescribe the "form, content, and manner of service" for termination notices pursuant to Section 203.  17 U.S.C. § 203(a)(4)(B).

The Copyright Office subsequently promulgated a regulation specifying requirements for a termination notice.  *See* 37 C.F.R. § 201.10.  These requirements include, *inter alia*, "[a] brief statement reasonably identifying the grant to which the notice of termination applies" and "a clear identification of . . . [t]he date of execution of the grant being terminated."  *Id.* at § 201.10(b)(2)(iii), (v).  Moreover, the regulation requires that this information be "[c]lear[ly] identifi[ed]" by "a complete and unambiguous statement of facts in the notice itself, without incorporation by reference of information in other documents or records."  *Id.* at § 201.10(b)(3).

## II.   **PLAINTIFFS' CLAIMS**

Plaintiffs are two recording artists who recorded albums that were released by predecessors of UMG or its affiliate in the mid-to-late 1970s and early 1980s.  *See* Compl. ¶¶ 25, 36; Declaration of Rollin A. Ransom ("Ransom Decl.") Exs. A-G.[2]  The contractual relationships pursuant to which UMG or its affiliate obtained copyright ownership of these albums were primarily made not with the artists themselves, but rather with loan-out or other

---

January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination [under certain specified conditions].

17 U.S.C. § 304(c).

[2] On a motion to dismiss, the Court may consider documents attached or explicitly referred to in the Complaint, or on which the Complaint reasonably relies, without converting the motion to one for summary judgment.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); see *also Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002) (noting that recording contracts are integral to a copyright claim and thus were properly incorporated by reference on a motion to dismiss).

companies who agreed to furnish the recording services of Plaintiffs, to record and deliver sound recordings featuring Plaintiffs, and to vest copyright ownership of those sound recordings in predecessors of UMG or its affiliate.[3]  Ransom Decl. Exs. A-G.

By letter to UMG dated April 20, 2015, and sent by Plaintiffs' counsel, Waite purported to terminate copyright grants pursuant to Section 203, with respect to three albums:  *Ignition*, *No Brakes*, and *Mask of Smiles*.  Compl. Ex. A.  On December 15, 2015, Plaintiffs' counsel sent a similar letter to UMG on behalf of Ely, purporting to terminate copyright grants pursuant to Section 203 with respect to four albums:  *Honky Tonk Masquerade*, *Down the Drag*, *Live Shots*, and *Musta Notta Gotta Lotta*.  *Id.* Ex. C.[4]  Notably, the termination notices did not specifically identify the grants that they were purporting to terminate, did not include the date of execution of the grants, and did not identify all of the parties to the agreements governing the grants.  Despite these clear deficiencies, Plaintiffs seek a declaration that their termination notices are valid, and damages for copyright infringement based upon UMG's exploitation of the works following the effective date of the putative terminations.

## ARGUMENT

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007)).  To meet this standard, a plaintiff must plead factual

---

[3] A loan-out company employs the artist and then "loans out" his or her services to another person or entity.  Mary LaFrance, *The Separate Tax Status of Loan-Out Corporations*, 48 Vand. L. Rev. 879, 880–81 (1995).  This structure offers two principal benefits to the artist:  limited personal liability and beneficial tax treatment.  *Id.* at 881.

[4] Ely's termination notice also listed works entitled *Fingernails/Because of the Wind*, *Honky Tonk Masquerade/Johnny Blues*, and *She Never Spoke Spanish to Me/Cornbread Moon*, versions of which were included on the above-referenced albums.  *See* Compl. Exs. C-D.  In addition, the notice listed the album *Hi-Res*.  *Id.* Ex. C.  However, because this work is not referenced in the Complaint, *see* Compl. ¶ 38, UMG understands that Ely is not attempting to validate the termination notice as to it.

content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The Court may properly consider "the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Though all reasonable inferences are drawn in a plaintiff's favor on a motion to dismiss on the pleadings, the Court need not accept as true "conclusions of law or unwarranted deductions of fact." *See, e.g.*, *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174-75 (2d Cir. 2005) (internal quotation omitted).

As demonstrated below, the Complaint fails to state a claim and should be dismissed, for each of four independent reasons.

## I.    THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE PLAINTIFFS CANNOT TERMINATE GRANTS AS TO MOST OF THE WORKS AT ISSUE BECAUSE THEY ARE NOT GRANTORS WITHIN THE MEANING OF 17 U.S.C. § 203

"In a copyright case, as in most cases, the language of the statute provides the starting point for [the Court's] analysis." *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042 (9th Cir. 2005) (citations omitted). Section 203 of the Copyright Act explicitly limits termination of copyright grants to those "executed by the author," in which case only the author (or the statutorily designated heirs of a deceased author/grantor) may terminate the grant. *See* 17 U.S.C. § 203(a); *see also Penguin Group (USA) Inc.*, 537 F.3d at 198-99 ("17 U.S.C. § 203 . . . applies only to grants made by the author rather than to grants made by either the author or other parties."); 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT ("NIMMER") § 11.03[B] ("Grants executed on or after January 1, 1978 are subject to termination only if executed by the author."). Thus, by the express terms of the Copyright Act, only a grant that is executed by and as an author is potentially subject to termination pursuant to Section 203. *See Latin Am. Music Co. v. Am. Soc'y of Composers, Authors, and Publishers*, 593 F.3d 95, 101 (1st Cir. 2010) (rejecting application of Section 203 where terminating party was "neither the author nor a statutory heir of the author," but instead was a successor to the author/composer's music publisher).

5

Here, Waite did not execute any of the grants he now seeks to terminate as a purported author of the corresponding works.  *See* Compl. Ex. B at 2; Ransom Decl. Exs. A-C.  Instead, any grants were made and executed by various loan-out companies that entered into agreements with a predecessor of UMG's affiliate – and Waite admits as much.  Compl. ¶ 25.  Specifically, in 1981, Waite's loan-out company, Heavy Waite, Inc., executed an agreement with Chrysalis Records, Inc. ("Chrysalis").  *Id.*; *see also* Ransom Decl. Ex. A.  In 1983, Waite's loan-out company, Moonwalk Music, Inc. ("Moonwalk"), executed an agreement with Capital Records, Inc. ("Capitol"), a processor of UMG's now-affiliate Capitol Records, LLC.  Compl. ¶ 25; *see also* Ransom Decl. Ex. B.  And in 1985, Waite's loan-out company, Diamond Stripe, Inc., executed an agreement with Capitol.  Compl. ¶ 25; *see also* Ransom Decl. Ex. C.  To the extent these agreements contained a grant of rights, it was the *loan-out* company (not John Waite individually or as author) that granted the transfer of copyrights pertaining to the Waite recordings at issue.  *See* Ransom Decl. Ex. A at ¶ 4 (loan-out company agreeing that "all copyrights therein and thereto . . . shall be entirely [Chysalis's] property, free of any claims whatsoever by [the loan-out company]"); Ex. B at ¶ 5(b) ("*Company* grants and assigns to [Capitol] all exclusive right, title and interest in and to such Work throughout the Territory, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. § 106.") (emphasis added); Ex. C at ¶ 5(b) (same).[5]

Similarly, Ely was not the grantor in the agreement executed in 1979.  Instead, a third-party company called South Coast Records, Inc. granted the rights to works to MCA Records,

---

[5] Moreover, each of these agreements expressly stated that the loan-out company had a separate and enforceable personal services contract with Waite, under which Waite agreed to furnish his recording services exclusively to the loan-out company.  *See* Ransom Decl. Ex. A at ¶ 10(a) ("You hereby warrant and represent that you now have the exclusive right to Artist's recording services under a valid and binding recording contract . . . [and can] require the performance by Artist of said contractual obligations."); Ex. B at ¶ 2 ("Company represents, warrants and agrees that: (a) Company has a contract with Artist.  Company's contract with Artist requires the performance by Artist exclusively for Company."); Ex. C at ¶ 2 ("Company represents, warrants and agrees that: (a) Company has a contract with Artist . . . wherein Artist has agreed to perform exclusively for Company upon such terms and conditions.").

Inc., UMG's predecessor.  *See* Compl. Ex. D at 4; Ransom Decl. Ex. E at ¶ 8A(a) (providing that South Coast "assigns all right, title and interest in the copyright in and to the Masters and all reproductions thereof and the sound performances contained therein"); *see also id.* at ¶ 1(c) ("[South Coast Records] has or shall enter into a valid written Exclusive Artist's Recording Agreement with each artist.").

Under the plain language of the statute, Plaintiffs simply do not have the authority to effectuate termination of these grants; only a grantor can do so, and as to the agreements referenced above, neither Plaintiff is the grantor.[6]  By seeking to terminate grants they did not make, Plaintiffs are essentially asking the Court to disregard the operative agreements and ignore the critical (indeed, determinative) role of the third-party grantors.  Such a request is not within the Court's powers to grant.  *See Milne*, 430 F.3d at 1044-45 (finding that no "authority supplie[d] a basis for [the court] . . . to undo [a copyright] agreement, which was freely and intelligently entered into by the parties"); *see also Penguin Group (USA) Inc.*, 537 F.3d at 200-01 (holding post-1978 agreement terminating and superseding pre-1978 agreement could not be undone).  For this reason, Waite's claims should be dismissed in their entirety, and Ely's claims should be dismissed as to works that are subject to the 1979 agreement, including but not limited to *Live Shots* and *Musta Notta Gotta Lotta*.  Compl. Ex. D at 4.

---

[6] In fact, the grantors are corporate entities who would only own the copyright as works made for hire.  Because works made for hire are expressly exempted from the termination scheme under Section 203(a), these corporate grantors could also not terminate the grants at issue, although no such attempted termination has been made.  Moreover, even if the corporate grantors had somehow acquired their rights by assignment from the artist – and there is no evidence of any such assignment (which would have to have been in writing and signed by the artist under 17 U.S.C. § 204(a)), nor any attempt by the artist to terminate any such grant – the corporate grantors would still have no right of termination here because their grant would not be one made by the author.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE ELY'S PRE-1978 COPYRIGHT GRANT IS NOT ELIGIBLE FOR TERMINATION UNDER 17 U.S.C. § 203

The fifth agreement at issue in this lawsuit is a contract with MCA Records, Inc. that Ely executed on August 26, 1976.  Ransom Decl. Ex. D.  That agreement, however, is likewise not eligible for termination under Section 203.  By its clear terms, Section 203 permits termination only of grants "executed . . . on or after January 1, 1978."  17 U.S.C. § 203(a).  As the Supreme Court has "stated time and again," "courts must presume that the legislature says in a statute what it means and means in a statute what it says."  *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461-62, 122 S. Ct. 941 (2002).  "When the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete."  *Id.* at 462 (internal quotations and citation omitted).

The term "executed" is unambiguous.  Where a term is not expressly defined by a statute, that term must be construed "in accordance with its ordinary or natural meaning."  *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476, 114 S. Ct. 996 (1994).  The traditional definition of "executed" is "([o]f a document) that has been signed."  BLACK'S LAW DICTIONARY (Bryan A. Garner ed., 10th ed. 2014).  Indeed, in multiple sections of the Copyright Act, "executed" is used synonymously with "signed."  *See, e.g.*, 17 U.S.C. §§ 111(e)(1)(D) (requiring that "an owner or officer of [a] cable system execute[] an affidavit"); 204(a) (stating under the heading "*[e]xecution* of transfers of copyright ownership," "[a] transfer of copyright ownership . . . is not valid unless an instrument of conveyance . . . is in writing and *signed* by the owner") (emphasis added); 205(a) (authorizing recordation of a document pertaining to copyright "if the document filed for recordation bears the actual signature of the person who executed it"); 406(a)(2) (referring to recordation of "a document executed by the person named in [a copyright] notice"); 512(h) (authorizing issuance of a subpoena based upon a sworn declaration if "the proposed subpoena is in proper form, and the accompanying declaration is properly executed"); 903(c)(1) (authorizing recordation of a document pertaining to a mask work "if the document filed for recordation bears the actual signature of the person who executed it").  "The normal rule of

statutory construction [is] that identical words used in different parts of the same Act are intended to have the same meaning." *Penguin Group (USA) Inc.*, 537 F.3d at 203 n.6 (quoting *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 562, 115 S. Ct. 1061 (1995)).

Court decisions are in accord. For example, in *Milne*, the Ninth Circuit used the terms "executed" and "signed" interchangeably in a case concerning parallel terminology in Section 304. The court found that because a grantor "*signed* on April 1, 1983 a more lucrative deal," that "grant [wa]s not subject to termination under section 304(d) because it was not '*executed* before January 1, 1978,' as the statute expressly requires." 430 F.3d at 1040, 1043 (emphasis added) (citing 17 U.S.C. § 304(d)). Indeed, no court has held that pursuant to the Copyright Act's termination sections, the term "executed" means anything other than "signed."

Likewise, the legislative history supports the traditional interpretation of "executed," namely, to mean the date on which the parties signed the contract. For example, in discussing Section 203 terminations, the legislative history includes an example of how the time limitations would work:

> The effective date of termination . . . is required to fall within the 5 years following the end of the applicable 35- or 40-year period. . . . As an example of how these time-limit requirements would operate in practice:

> Case 1: Contract for theatrical production *signed* on September 2, 1987. Termination of grant can be made to take effect between September 2, 2022 (35 years from *execution*) and September 1, 2027 (end of 5 year termination period).

H.R. REP. NO. 94-1476 at 126 (emphasis added). By calculating the accrual date from the date the contract was signed, Congress clearly intended for the signature date to be the date of execution. Moreover, in further discussing the application of Section 203, Congress used the terms "execution of the grant" and "signing of the contract" interchangeably:

> As an exception to this basic 35-year rule, the bill also provides that "if the grant covers the right of publication of the work, the period begins at the end of 35 years from the date of publication of the work under the grant or at the end of 40 years from the date of *execution of the grant*, whichever term ends earlier." This alternative method of computation is intended to cover cases where years elapse between the *signing of a publication contract* and the eventual publication of the work.

9

*Id.* at 126 (emphasis added).  Indeed, in this example, Congress actually makes clear that "execution" of the grant means the date of the signing of the contract.

Further, in a report submitted to Congress in the years leading up to the Copyright Act of 1976, the Copyright Office also interpreted "executed" to mean the agreement's signature date. In the report, the Copyright Office provided the following example pertaining to terminations:

> Take, for example, a case in which a book-publication *contract is signed* on July 1, 1970 while the book is in the process of being written, and in which publication does not take place until May 1, 1976.  Since the grant covers the right of first publication, the 5-year period during which the contract could terminate would begin on July 1, 2010 (40 years from *the date of execution*) rather than on July 1, 2005 (35 years from *the date of execution*). . . .

HOUSE COMM. ON THE JUDICIARY, 89TH CONG., 1ST SESS., COPYRIGHT LAW REVISION PART 6: SUPPLEMENTARY REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW:  1965 REVISION BILL, at 73-74 (1965) (emphasis added) (attached as Ransom Decl. Ex. H).  Thus, at least in 1965, the Copyright Office believed that the date of execution was the date the contract was signed, even as to works that were later created. Moreover, in a guide dated just after Congress enacted the Copyright Act of 1976, the Copyright Office explicitly considered an example concerning a grant where a "publishing company, on July 1, 1977, makes a contract with [a] Novelist for a new book," but "[t]he book is not written until July 20, 1979."  GENERAL GUIDE TO THE COPYRIGHT ACT OF 1976, U.S. COPYRIGHT OFFICE, at 6:6 (1977), *available at* https://www.copyright.gov/reports/guide-to-copyright.pdf.  The Copyright Office concluded that such a grant would not be eligible for Section 203 termination, confirming that such grants are not included under the statute.  *Id.*

Although the Copyright Office has more recently suggested that a different interpretation is possible – namely, that the term "executed" in Section 203 might be interpreted to mean not only the signing of a grant, but also the creation of a corresponding work (such that a grant is not "executed" until the work that is the subject of the grant is created), *see* ANALYSIS OF GAP GRANTS UNDER THE TERMINATION PROVISIONS OF TITLE 17 ("ANALYSIS OF GAP GRANTS") at 1-2, U.S. COPYRIGHT OFFICE (Dec. 7, 2010), *available at* https://www.copyright.gov/reports/gap-

10

grant-analysis.pdf – that does not aid Ely here.  First, Ely does not allege when the sound recordings that are the subject of the 1976 Agreement were created, and therefore fails to satisfy even this potential interpretation of the statute.  *Cf.* Compl. ¶ 36 (referring to date on which *Honky Tonk Masquerade* was "released," not date on which it was created).[7]

Second, and in any event, the Copyright Office was clear that its recent consideration of the issue was "not a substitute for statutory clarification" respecting whether works that were created in or after 1978, but which are the subject of a grant dated before 1978, are eligible for termination under Section 203.  ANALYSIS OF GAP GRANTS at iii.  Nor is it the role or responsibility of this Court to rewrite the statute, or to otherwise substitute its judgment in place of the plain language adopted by Congress.  As the Supreme Court has stated, copyright cases do not involve "a free-ranging search for the best copyright policy, but rather 'depend[] solely on statutory interpretation.'"  *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) (quoting *Mazer v. Stein*, 347 U.S. 201, 214, 74 S. Ct. 460 (1954)).  Such an inquiry "must give effect to the clear meaning of statutes as written," *id*. (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 , 112 S. Ct. 2589 (1992)), and "begin[s] and end[s] . . . with the text, giving each word its 'ordinary, contemporary, common meaning.'"  *Id*. (quoting *Walters v. Metropolitan Ed. Enterprises, Inc.*, 519 U.S. 202, 207, 117 S. Ct. 660 (1997)).  Here, both the plain language of the statute and the relevant legislative history confirm that Section 203 clearly excludes such so-called "gap grants", and only Congress – not the courts or the Copyright Office – has the power to amend the statute to include them.

Indeed, just this year, the Supreme Court unanimously reiterated the principle that courts must hew to the Copyright Act as written by Congress, regardless of whether the Act is working precisely as Congress intended or as courts or the Copyright Office believe it should.  *See Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 892 (2019) (noting that

---

[7] Nor could Ely truthfully allege that such works were created prior to January 1, 1978.  On the contrary, UMG's documents reflect that these sound recordings were recorded in 1977.

although "the statutory scheme [requiring issuance of a copyright registration as a condition to filing suit] has not worked as Congress likely envisioned," the Court could not substitute its judgment for that of Congress:  "Unfortunate as the current [issue] may be, that factor does not allow us to revise [the Copyright Act's] congressionally composed text").  Unless and until Congress amends Section 203, courts must follow its plain meaning.  As such, any grant in Ely's pre-1978 cannot be terminated pursuant to Section 203 and his claims pertaining to works subject to that agreement must be dismissed.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE PLAINTIFFS' TERMINATION NOTICES ARE FATALLY DEFICIENT PURSUANT TO 37 C.F.R. § 201.10(B)(2)

The Court should also dismiss the Complaint because Plaintiffs' termination notices did not contain the information required by the applicable regulation, and are therefore invalid.  As noted above, pursuant to 37 C.F.R. § 201.10(b)(2)(iii), (v), a notice of termination under Section 203 must include a "brief statement reasonably identifying the grant to which the notice of termination applies" and a "clear identification" of the "date of execution of the grant being terminated."

Plaintiffs' termination notices are fatally deficient in both respects:  their putative identification of the purported affected grants is woefully inadequate, and they do not include any date of execution whatsoever.  *See Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 931 (6th Cir. 2016) (holding that a purported termination notice did not effectuate termination because "[t]he Act and its implementing regulations describe several requirements of a termination notice" and the notice did not comply with the stated requirements) (citing in part 37 C.F.R. § 201.10).  As a result, Plaintiffs' termination notices failed to effectively terminate any copyright grants.  *See Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982) (leaving intact rights to books not listed in termination notice).

### A.   Plaintiffs' Notices Did Not Comply with the Applicable Regulation.

First, the termination notices are fatally deficient because they do not "reasonably identify[] the grant to which the notice of termination applies."  37 C.F.R. § 201.10(b)(2)(v).

12

Plaintiffs provided the following brief statements:

> Grant Hereby Terminated:  All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the granted dated in or about 1981 between the members of the recording group called The Babys and Chrysalis Records.

Compl. Ex. A (Waite Termination Notice).

> Grant Hereby Terminated:  All grants and transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1978 between the recording artist Joe Ely and MCA Records.

*Id.* Ex. C (Ely Termination Notice).  As explained in UMG's response letters, *see id.* Ex. B, D, these descriptions do not accurately or reasonably identify the grants governing the works listed in the notices.

For example, Waite purports to terminate a "grant dated in or about 1981 between the members of the recording group called The Babys and Chrysalis Records," *id.* Ex. A, but "[t]here is no such agreement covering the sound recordings identified in . . . [Waite's] notice," *id.* Ex. B at 1.  Based on UMG's records, the recordings identified in Waite's notice "appear to be governed by a series of agreements from 1981, 1983 and 1985 entered into by various furnishing companies providing [Waite's services, not The Babys] to either Chrysalis or Capitol."  *Id.* Ex. B at 1; *see also* Ransom Decl. Exs. A-C.  Indeed, the Complaint itself confirms the inaccuracy (and inadequacy) of Waite's putative termination notice – nothing in Plaintiffs' allegations respecting Waite reference the termination of *any* grant respecting a "recording group called The Babys."  *Cf.* Compl. ¶ 25 (referencing Waite-related contracts with no reference to The Babys).

Ely's notice is similarly inadequate in its failure to reasonably identify the grants purportedly at issue.  Ely purports to terminate a "grant dated in or about 1978," Compl. Ex. C, but agreements from 1976, 1979, and 1980 appear to govern the recordings listed in the notice, *id.* Ex. D at 1, 4-5; *see also* Ransom Decl. Exs. D-G.

Second, Plaintiffs also failed to identify the date of execution of the grants at issue. Attached to Plaintiffs' notices are charts that provide various other dates, including publication dates, termination notice dates, and purported effective dates of termination, but noticeably absent from the charts are any dates of execution of the grants. *See* Compl. Exs. A, C. Moreover, as explained above, *supra* Part C.1., while both notices reference a single "grant dated in or about" a certain year, those dates are either incorrect or do not encompass any of the works listed in the notice. *See* Compl. Exs. B, D. Thus, Plaintiffs' notices do not comply with the requirements set by the Copyright Office. *See* 37 C.F.R. § 201.10(b)(2)(iii).

### B.  The Defects in the Notices Are Not Harmless.

Although the regulation provides that "[h]armless errors in a notice…shall not render the notice invalid," 37 C.F.R. § 201.10(e)(1), the defects in the putative termination notices are not harmless. Both Plaintiffs' failure to reasonably identify the grants at issue and their failure to identify the date of execution of the grants at issue "materially affect[ed] the adequacy of the information required to serve the purposes of 17 U.S.C. 203." *Id.*; *see also Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 491 F. Supp. 1320, 1326 (S.D.N.Y. 1980) (failing to provide a "complete and unambiguous" "statement . . . identifying the grant to which the notice of termination applies," "is not 'harmless error'; it undoubtedly 'materially affect[ed]' the adequacy of the Notice") (citing 37 C.F.R. § 201.10(e)(1)), *aff'd* 636 F.2d 1200 (2d Cir. 1980).

While UMG has undertaken a reasonable effort to ascertain which grants Plaintiffs seek to terminate, for the reasons set forth above, *none* of the agreements that UMG has identified is actually terminable under Section 203. Moreover, as to Ely, even though UMG's response to Ely's termination notice identified two agreements covering the works that Ely's notice listed, the Complaint references only the first of those agreements (though it also claims termination as to works covered by the second of those agreements). *See* Compl. ¶¶ 37-38, Exs. C & D. In short, UMG is *still* uncertain of the grants ostensibly covered by Plaintiffs' termination claims (and to the extent Plaintiffs claim some other, as yet unidentified, grants govern the works at issue, that would only underscore the inadequacy of the termination notices and confirm that the

14

error is not harmless).  As a result, UMG was and is left to speculate as to which grants the notices purported to terminate, and to fully and fairly evaluate the timeliness, scope, and validity of the notices.

Likewise, the exclusion of execution dates is a material, non-harmless omission, as the date of execution is essential to establish *whether* a grant is subject to termination under Section 203, *when* the termination may be effected and for what period, and *whether* the notice is timely.  *See* 17 U.S.C. § 203(a).  As to Ely's claim, for example, the notice references a "grant dated in or about 1978," Compl. Ex. C at 1, which may or may not be terminable – if the grant is executed *before* 1978, it is *not* terminable under Section 203.  Indeed, in this critical respect, the notice conflicts with his claims in the Complaint – the Complaint references only a single Ely agreement, and alleges that it was entered into in 1976.  *See* Compl. ¶ 36.[8]  It is therefore apparent that this and Plaintiffs' other errors and omissions "materially affect[ed] the adequacy of the information required to serve the purposes of 17 U.S.C. 203."  37 C.F.R. § 201.10(e)(1).

Nor were the defects in the notice the product of some good faith error.  Plaintiffs' counsel purports to be a "copyright termination expert" with "over thirty years" of experience as "a music lawyer" and "working with terminations since the late 1980s."  *Message From Our Founder*, Copyright Termination Experts, http://copyrightterminationexperts.com/about-us/ (last visited Apr. 18, 2019).  Indeed, his website and domain name is "Copyright Termination Experts."  *See id.*  By including a flatly incorrect description of one agreement; providing an ambiguous and incomplete reference to others; and omitting the required "execution date" column from the charts attached to his termination letters, but including columns for numerous other dates (some of which are *not* required), Plaintiffs' counsel and self-described "Copyright Termination Expert" presumably knew what he was doing – namely, deliberately failing to

---

[8] To the extent Ely intends to claim that the date of *creation* of the works recorded pursuant to the 1976 Agreement is relevant, *see supra* § II, his notice is doubly deficient, as it does not include either a specific date of execution or *any* date of creation.  *See* Compl. Ex. C at 1-2; *see also supra* n.7.

comply with the Copyright Office's regulations.  That is not good faith, and it is not harmless error.

It is also no answer for Plaintiffs to claim that they have lost or otherwise no longer have copies of the contracts that they seek to terminate (notably, Plaintiffs do not allege that they ever asked UMG, much less their own lawyers, for copies of the contracts, or that any such request was refused).  Through their termination notices, Plaintiffs seek to interfere with UMG and its affiliate's ownership rights in the affected sound recordings.  And through their complaint, Plaintiffs endeavor not only to validate that interference, but also to accuse UMG of engaging in copyright infringement.  If Plaintiffs seek to excuse the deficiencies in their notices by claiming ignorance of the terms of the agreements, then they have necessarily conceded that they lacked a good faith basis to bring their Complaint.  *See* Fed. R. Civ. P. 11(b).  Without reviewing and assessing the numerous facts necessary to properly terminate a grant of copyright rights under Section 203 – including the author, the grantor, the grantee, the nature of the grant, and the date of execution of the grant, among numerous other terms – Plaintiffs cannot possibly have conducted "an inquiry reasonable under the circumstances" to support the notice or advance the present claims.  *Id.*[9]

In sum, the Second Circuit has made plain that failing to comply with the regulation's notice requirements, including failing to provide a "complete and unambiguous" "statement . . . identifying the grant to which the notice of termination applies," renders the notice ineffective. *Burroughs*, 491 F. Supp. at 1326; *see also Burroughs*, 683 F.2d at 622 (omitting five works from notice rendered the notice ineffective as to those five works).[10]  Because Plaintiffs failed to

---

[9] The fact that Plaintiffs have recorded the putative termination notices with the Copyright Office (*see* Compl. ¶¶ 26, 37) is also irrelevant.  As the operative regulation states, "[t]he fact that the Office has recorded a notice is not a determination by the Office of the notice's validity or legal effect."  37 C.F.R. § 201.10(f)(4).  *See also id.* (noting that recordation "is without prejudice to any party claiming that the legal or formal requirements for effectuating termination . . . have not been met").

[10] Although the court in *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364 (S.D.N.Y. 1999), adopted a less rigorous standard, that decision has been rebuked for its lax approach to

reasonably identify the grants they sought to terminate, their notices are fatally deficient and their claims should be dismissed.

## IV.   PLAINTIFFS' CLAIMS ARE BARRED BY THE COPYRIGHT ACT'S THREE-YEAR STATUTE OF LIMITATIONS

The Court should also dismiss the Complaint as untimely.  By this action, Plaintiffs claim ownership of the works at issue in the Complaint, and correspondingly dispute UMG's ownership.  This challenge, however, was ripe when the agreements at issue were executed.  At that time, Plaintiffs affirmed that they were *not* legal authors and owners of copyrights in the works at issue; instead, they affirmed that another party was and is the legal author of those works, and was and is the owner from the outset and *in perpetuity* of the corresponding copyrights.  Plaintiffs' claims are therefore time-barred under the Copyright Act's three-year statute of limitations for "civil action[s] . . . maintained under the provision of [the Copyright Act]."  17 U.S.C. § 507(b).[11]

The statute of limitations begins to run "when 'a reasonably diligent plaintiff would have been put on inquiry notice as to the existence of a right.'"  *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (quoting *Stone v. Williams*, 970 F.3d 1043, 1048 (2d Cir. 1992)).  This principle applies to disputes respecting copyright ownership.  *Id.* at 229.  Under the reasonably-diligent plaintiff standard, "any number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership.'"  *Id.* at 228 (quoting *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997)); *see also Consumer Health Info. Corp. v. Amylin Pharm., Inc.*, 819 F.3d 992, 995 (7th Cir. 2016) (affirming district court dismissal of suit as untimely on finding that ownership claim accrued upon Plaintiffs' signing of an agreement transferring "all right, title, and interest in and to" a copyright); *Cooper*

---

termination notices and its apparent misapprehension of the regulatory scheme.  *See* NIMMER at § 11.06[B] (calling the decision in *Music Sales Corp.* "suspect").

[11] As the time bar of these claims by many decades is evident based on the allegations of the Complaint themselves, there is no issue of fact requiring discovery.

*v. NCS Pearson, Inc.*, 733 F.3d 1013, 1016 (10th Cir. 2013) (finding an ownership claim triggered where a contract transferred "all Intellectual Property Rights"); *Aday v. Sony Music Entm't*, No. 96-CV-0991-MGC, 1997 WL 598410 (S.D.N.Y. Sept. 25, 1997) (holding that sole ownership claim accrued when defendants first asserted ownership by entering into contract with plaintiff in which a work-for-hire clause afforded sole ownership of the copyrights to defendants).

Here, Plaintiffs' claims were ripe decades ago when they expressly acknowledged and agreed that they were *not* authors and copyright owners, but instead that their contributions were owned in the first instance and in perpetuity by others.  Plaintiffs' claims are therefore time-barred.

### A.   Because Waite Was on Notice of His Ownership Claim in the 1980s, His Present Claims are Time-Barred.

In the Complaint, Waite alleges that he is "currently the owner of the United States copyright in and to the sound recordings comprising the *Ignition* album."  Compl. ¶ 34.  Waite's claim of ownership is necessarily based on his contention that the agreement governing that album – the 1981 agreement between Waite's loan-out company, Heavy Waite, Inc., and Chrysalis ("1981 Agreement"), *see supra* § I – contained a grant by Waite as an author that is subject to termination under Section 203.  *See* Compl. ¶¶ 25, 27, 32, 34.  That contention, in turn, necessarily assumes that the recordings made pursuant to the 1981 Agreement are not "works made for hire," as Section 203 expressly states that the termination right does *not* apply to works made for hire.  17 U.S.C. § 203(a) (providing for termination right in "the case of any work other than a work made for hire").[12]

---

[12] The Copyright Act defines "work made for hire" as:

> (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in

The parties dispute whether and under what circumstances a sound recording may be a "work made for hire" within the meaning of the Copyright Act.  *See* Compl. ¶¶ 51(A) & (B), 52(A) & (B).  Resolution of that dispute, however, is irrelevant to the present argument.  What *is* relevant is that the repudiation of Waite's claim of copyright ownership, and the status of the sound recordings made under the 1981 Agreement as works made for hire, *are set forth in the 1981 Agreement itself*.  Specifically, Section 4 of the 1981 Agreement states:

> For the purposes hereof, you, Artist, and all other persons rendering services in connection with such master recordings shall be our employees for hire and all such master recordings shall be works made for hire under the United States Copyright Law.  *[Chrysalis] shall, accordingly, have the sole and exclusive right to copyright such master recordings* . . . and to secure any and all renewals and extensions of such copyrights *in our name.*

Ransom Decl. Ex. A at § 4 (emphasis added).  Further, Waite joined in the representations and warranties made by Heavy Waite.  *Id.* at Ex. A, §1(b) ("All of the warranties, representations, covenants and agreements on the part of Producer contained in the Agreement, which concern me, are true and correct.").

The other agreements referenced in the Complaint, which govern the remaining identified works featuring Waite, contain similar provisions.[13]  In the 1983 Agreement between Moonwalk and Capitol ("1983 Agreement"), Waite's loan-out company agreed as follows:

> With respect to any person whose services are furnished by [Moonwalk] in connection with masters recorded hereunder, including, but not limited to, Artist and/or any person engaged to act as a Producer, [Moonwalk] has or shall have a contract in which the person acknowledges that each master embodying the

---

a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101. Under Sections 201(a) and (b) of the Copyright Act, copyright vests initially in the author of a work, and "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author."  17 U.S.C. §§ 201(a) & (b).

[13] Waite claims ownership only of *Ignition*, presumably because the effective date of his putative notice of termination has not yet passed with respect to his other works.  For the reasons set forth herein, however, the statute of limitations necessarily bars his claims as to those other works as well, in light of the plain language of the agreements governing those works.

> results and proceeds of his services is prepared within the scope of [Moonwalk's] engagement of his personal services and is a work made for hire, or as part of an lp-master constitutes a work specifically ordered by [Moonwalk] for use as a contribution to a collection work and shall be considered a work made for hire. [Moonwalk] further agrees that [Moonwalk] shall cause each such person to execute and deliver to EMIA a "Declaration re Collective Work" and "Power of Attorney" in the form attached hereto.

Ransom Decl. Ex. B at § 5(a).  In an Inducement Letter attached as Exhibit B to the 1983 Agreement, Waite agreed to "[a]ll of the warranties, representations and covenants on the part of [Moonwalk] contained in this Agreement concerning [him]" and agreed to be "bound by same as though [he] were a party to the Agreement." *Id.* at Ex. B at ¶ 3.  Accordingly, the 1983 Agreement confirmed that Capitol was and is "the sole, exclusive, and perpetual owner of all masters from inception." Ransom Decl. Ex. B at § 18.  The 1985 Agreement between Diamond Stripe, Inc. and Capitol (the "1985 Agreement") contains similar provisions. *See id.* Ex. C at §§ 5(a), 18, p. 46 of 75.

The 1981, 1983, and 1985 Agreements thus expressly reflect a repudiation of any authorship or ownership claim by Waite.  Under well-established authority, this contractual repudiation triggered the statute of limitations for Waite's current claims, which are necessarily premised on the notion that the sound recordings are *not* works made for hire, and are therefore subject to termination under Section 203.  For example, in *Aday*, a loan-out company for the recording artist professionally known as Meat Loaf entered into a recording agreement with Cleveland Entertainment, Inc. ("Cleveland") in August 1977 ("Cleveland Agreement"), for Meat Loaf's recording services; that agreement provided that Meat Loaf's services were provided as an employee for hire.  1997 WL 598410 at *2.  Cleveland, in turn, had a distribution agreement ("CBS Agreement") with CBS Records ("CBS") with respect to artists under contract with Cleveland, including Meat Loaf; indeed, Meat Loaf signed an inducement letter in which he agreed to be bound by the terms of the CBS Agreement as it applied to Meat Loaf's recordings. *Id.*  The CBS Agreement provided CBS with the "exclusive right to copyright such master recordings in its name as owner and author of them and to all renewals and extensions of such

copyrights." The CBS Agreement also provided that "[s]olely for the purposes of any applicable copyright law, all persons rendering services in connection with the recording of master recordings shall be deemed 'employees for hire' of CBS." *Id.*

Some twenty years later, in 1997, Meat Loaf and his loan-out company sued Cleveland and CBS, among others, seeking a declaration that Meat Loaf "is not, and never was, an 'employee for hire' of either Cleveland and/or CBS pursuant to the copyright laws of the United States . . . and/or that there has been no valid and enforceable assignment to Sony and/or Cleveland of the copyrights in and to [Meat Loaf's] master recordings." *Id.* at *4 (citation omitted). This Court dismissed the claims against Cleveland and CBS as untimely under Section 507 of the Copyright Act. It reasoned that the CBS Agreement and the Cleveland Agreement "clearly set forth that the rights to the sound recordings belong to Cleveland and CBS, not [the loan-out company] or Meat Loaf. Therefore, plaintiffs had reason to know in 1977 about any of the problems with the 'work for hire' provision that they now contend violates the Copyright Act." *Id.* at *5.

The same outcome obtains here. The agreements clearly set forth that the works recorded pursuant to them were "work[s] made for hire," and Waite expressly acknowledged and agreed to these provisions. If he wished to challenge the work for hire status of the works, or assert "any problems with the 'work for hire' provision[s]" of the agreements, his time to do so was within three years of the date of those agreements. His effort to do so in this lawsuit, decades after the agreements were signed and the claim accrued, comes years too late.

*Aday* is not alone in holding that contractual provisions affecting ownership claims start the statute of limitations clock as to such claims. In *Consumer Health Information Corp.*, the Seventh Circuit affirmed the district court's dismissal of a copyright infringement suit as untimely. 819 F.3d at 997. There, the plaintiff contractually assigned "all right, title, and interest in and to said copyrights in the United States and elsewhere, including registration and publication rights, rights to create derivative works and all other rights which are incident to copyright ownership." *Id.* at 994. Although the plaintiff framed its lawsuit as an infringement

21

claim, the court held that "the central dispute [was] copyright *ownership*," and that "copyright claims premised on disputes about ownership accrue 'when plain and express repudiation of co-ownership is communicated to the claimant.'" *Id.* at 996 (emphasis in original) (citation omitted). Because the underlying contract "unambiguously" assigned the copyright to the defendant, the "cause of action accrued in March 2006, when the contract was executed." *Id.* at 993. Accordingly, the lawsuit – brought some seven years later – was untimely. *Id.* at 997.

The Tenth Circuit reached a similar result in *Cooper*, in which it affirmed dismissal of plaintiff's claim of co-ownership of a psychological test. 733 F.3d at 1018. There, plaintiff had entered into an agreement providing that plaintiff's co-authors (but not plaintiff) "exclusively own[ed] all intellectual property rights in the Work and that no other person ha[d] an option, claim, or right to the Work." *Id.* at 1014. The co-authors and the corporation then granted defendant's predecessor corporation "all right, title, and interest" in the psychological test. *Id.* at 1014-15. In affirming the district court's grant of summary judgment in favor of the defendant, the court found that the agreement "placed [Plaintiff] on notice that her ostensible copyright co-ownership claim was in jeopardy and thereby started the statute of limitations running." *Id.* at 1016. Because plaintiff did not sue until seventeen years later, her claim was time barred. *Id.* at 1018.

The rationale of the foregoing cases applies with equal force to Waite. Because he did not bring his claim until *decades* after the agreements put him on notice of his putative challenge to the work for hire status of his recordings and his corresponding ownership claim, that claim is untimely.

**B.      Because Ely Was on Notice of His Ownership Claim in the 1970s, His Present Claims are Time-Barred.**

In the Complaint, Ely alleges that he is "currently the owner of the United States copyright in and to the sound recordings comprising the Ely albums." Compl. ¶ 43. Ely's claim of ownership is based on his contention that the agreements covering the albums – which provide that MCA owns the copyrights in the sound recordings created thereunder as works for hire –

22

were terminable under Section 203 and were terminated.  As with the Waite agreements,

however, because the Ely agreements identified the works created thereunder as works made for

hire and expressly repudiated Ely's claims of ownership, the claims advanced in the Complaint –

which directly challenge the work for hire status of those recordings – are untimely.

As discussed above, the earlier of the agreements was an August 26, 1976, agreement

between Ely and UMG's predecessor, MCA Records, Inc. ("MCA") ("1976 Agreement").

Under Section 8 of the 1976 Agreement, Ely acknowledged MCA as the

> sole, exclusive and perpetual owner of all of the Masters from inception, which
> ownership entitles MCA among other things to . . . (c) All right, title and interest
> in the copyright in and to the Masters and all reproductions thereof and the sound
> performances contained therein, including *the exclusive right to copyright same
> as 'sound recordings' in MCA's name, and to renew and extend such copyrights
> (it being agreed that for this purpose Artist is deemed MCA's employee for hire),
> and to exercise all rights of the copyright proprietor therein.*

Ransom Decl. Ex. D at § 8 (emphasis added).  To the extent Ely intended to challenge the status

of the sound recordings created under the 1976 Agreement as works for hire (as he purports to do

here), the above language clearly put him on notice of such a claim.  Accordingly, the statute of

limitations began to run upon execution in 1976, and has long since passed.

Ely's challenge to the work for hire status of the recordings prepared under the 1979

agreement between South Coast Records, Inc. and MCA (*see supra* I) ("1979 Agreement"), and

his corresponding ownership claim in this action, is also untimely.  Section 1(j) of the 1979

Agreement provides:

> [A]ll such persons, including Artist and the Individual Producers, have
> acknowledged or will *acknowledge that MCA is the sole, exclusive, and perpetual
> owner of all rights of copyright*  . . . including the exclusive right to copyright
> records embodying such results and proceeds as 'sound recordings' in the name of
> MCA, to renew and extend such copyrights (it being agreed that for this purpose
> each such person is deemed MCA's employee for hire and the sound recordings
> 'works-for-hire,' as that term is presently defined in the United States Copyright
> Act).

Ransom Decl. Ex. E at § 1(j) (emphasis added).  And when the 1979 Agreement was amended in

1980, it again affirmed MCA's sole, exclusive, and perpetual ownership of the copyright in

recordings produced thereunder:  "MCA shall own free and clear from any and all claims by any third party for manufacture and sale throughout the world in perpetuity, the masters recorded by you hereunder embodying the performances of Ely."  Ransom Decl. Ex. G at § 4(e); *see also id.* at Inducement Letter, § 5 (stating that "MCA is the exclusive owner of all rights of copyright . . . including the exclusive right to copyright same as 'sound recordings' in the name of MCA . . . it being agreed that for this purpose I am deemed MCA's employee for hire and the sound recordings 'works-for-hire'").

Now, *decades* after entering into agreements expressly acknowledging the work for hire status of the works at issue, and thereby repudiating any claims of authorship or copyright ownership, Ely purports to dispute the work for hire issue and claim that he actually was an author and copyright owner of the works from the outset.  His time to do so has long since passed.  *See, e.g.*, *Aday*, 1997 WL 598410 at *5; *Consumer Health*, 819 F.3d at 997; *Cooper*, 733 F.3d 1016.  The Complaint should therefore be dismissed as barred by the statute of limitations.

## V.     **PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIMS ALSO FAIL**

Plaintiffs' copyright infringement claims are based entirely on the proposition that their termination notices are proper and valid, and that they therefore own the copyrights in the referenced works.  *See, e.g.*, Compl. ¶¶ 35, 45 (alleging that infringement is based on exploitation after "effective date" of termination notices).  Because Plaintiffs' purported terminations pursuant to Section 203 are invalid for the reasons set forth above, and because their ownership claims are time-barred in any event, their infringement claims necessarily fail as a matter of law.

## CONCLUSION

For the forgoing reasons, UMG respectfully requests that the Court grant its Motion to Dismiss in its entirety and grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      May 3, 2019

SIDLEY AUSTIN LLP

By: */s/ Steven M. Bierman*
    Steven M. Bierman
    sbierman@sidley.com
    Melanie Berdecia
    mberdecia@sidley.com
    SIDLEY AUSTIN LLP
    787 Seventh Avenue
    New York, NY 10019
    Telephone: (212) 839-5300
    Facsimile:  (212) 839-5599

    Rollin A. Ransom (admitted *pro hac vice*)
    rransom@sidley.com
    Lisa M. Gilford (admitted *pro hac vice*)
    lgilford@sidley.com
    Adriane Peralta (admitted *pro hac vice*)
    adriane.peralta@sidley.com
    SIDLEY AUSTIN LLP
    555 West 5th Street, Suite 4000
    Los Angeles, CA 90013
    Telephone: (213) 896-6000
    Facsimile:  (213) 896-6600

    Richard S. Mandel
    rsm@cll.com
    Thomas Kjellberg
    txk@cll.com
    COWAN, LIEBOWITZ & LATMAN, P.C.
    114 West 47th Street
    New York, NY 10036-1525
    Telephone: (212) 790-9200
    Facsimile:  (212) 575-0671

    *Attorneys for Defendant UMG Recordings, Inc.*

25