# EXHIBIT A

CHRYSALIS RECORDS, INC.
9255 Sunset Boulevard
Suite 200
Los Angeles, California 90069

Dated:  As of <u>November 1</u>, 1981

Heavy Waite, Inc.
c/o Robert Urband, Esq.
641 Lexington Avenue
New York New York 10002

Gentlemen:

The following shall constitute your and our agreement with respect to your producing, recording and delivering to us during the term of this contract master recordings embodying the performances of John Waite (hereinafter referred to as "Artist") (hereinafter said master recordings are sometimes referred to individually by the term "Master" and collectively by the term "Masters"):

1.   The term of this contract shall consist of an initial term commencing as of the date hereof and continuing until the date one (1) year after the date hereof or, unless we shall otherwise notify you in writing, until the date one hundred twenty (120) days after your delivery to us of the Masters constituting the totality of your recording commitment (as said term "recording commitment" is hereinbelow defined) for such initial term, whichever date shall be later, and of the additional renewal term or terms hereinafter provided.

2.   (a) (i) During the initial term hereof, you shall record and deliver to us, at a minimum, sufficient Masters to constitute one (1) 12-inch, 33-1/3 rpm long-playing record, of no less than thirty-three (33) minutes in duration (hereinafter such a record is sometimes referred to by the term "LP") plus, at our election, sufficient additional Masters to constitute a second LP.  The Masters which you are required to produce, record and deliver hereunder in accordance with the foregoing are hereinafter sometimes referred to collectively as "your recording commitment."  You shall deliver to us in accordance with all of the terms and conditions hereof the Masters constituting the

first LP of your recording commitment for the initial term and each renewal term hereof, if any, not later than ninety (90) days after the commencement of such initial term or renewal term.  You shall deliver to us in accordance with all of the terms and conditions hereof the Masters constituting the second LP of your recording commitment, if any, for the initial term and each renewal term hereof, if any, not later than eight (8) months after the commencement of such initial term or renewal term.

     (ii)  If you shall fail to record and deliver to us the Masters constituting the first LP of your recording commitment for the initial term or for any renewal term hereof within ninety (90) days after the commencement of such term, then, unless we shall notify you to the contrary in writing, such term shall automatically be extended for a period equal to the total number of days which shall elapse from the end of such ninety (90) day period to the date of delivery to us of the Masters constituting such first LP. Nothing contained in this subparagraph 2(a)(ii) shall in any way limit any of our other rights or remedies in connection with your failure to record and deliver Masters hereunder as and when required or to perform any of your other obligations hereunder.

     (b)  Each Master shall embody the performance of Artist as the sole featured artist of a single musical composition previously unrecorded by Artist and shall be recorded in its entirety at a recording studio or studios.  Accordingly, but without limiting the generality of the foregoing, no Masters shall be recorded in whole or in part at live concerts or other live performances.  Each LP recorded hereunder shall embody no less than eight (8) musical compositions. The musical compositions or other selections which shall be embodied in the Masters, the individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters, the studio or studios at which the Masters shall be recorded, and the dates of recording (hereinafter sometimes referred to as the "Recording Elements") shall be designated by you and shall be subject to our reasonable approval.  You shall advise us in writing of the Recording Elements so designated by you prior to or concurrently with your submission to us of the proposed

2

recording budget referred to in paragraph 3(a). If we shall disapprove of any Recording Elements so designated by you, then, subject to your availability, we shall consult with you with respect thereto, but our decision with respect thereto (including, at our election, our designation of one or more Recording Elements in substitution for any Recording Elements designated by you and disapproved by us) shall be final. Each Master shall be subject to our approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon our request, you shall re-record any musical compositions or other selection until a Master technically satisfactory to us shall have been obtained.

(c)  You shall not record hereunder nor shall we be obligated to accept as applying toward the fulfillment of your recording commitment Masters constituting a so-called "multiple album" (i.e., a single package containing two (2) or more LPs [or their tape equivalent] which is sold as a single unit). However, in the event you shall do so, and we shall so accept such Masters hereunder, then, at our election, for the purpose of calculating the number of Masters which shall apply toward the fulfillment of your recording commitment, such Masters shall be deemed to be the equivalent of only one (1) LP.

(d)  Any master recordings which are not recorded or delivered in all respects in accordance with the terms and provisions hereof shall not, unless we otherwise consent in writing or (with respect only to master recordings recorded in their entirety at a recording studio or studios) unless we release such master recordings on records hereunder, apply toward the fulfillment of your recording commitment. Furthermore, in the event we shall make any payments in respect of any such master recordings which shall not have been recorded or delivered in all respects in accordance with the terms and provisions hereof, you shall, upon our demand, promptly reimburse us for any such payments. In the event you shall fail to so reimburse us, we shall, in addition to all of our other rights or remedies which we may have in such event, have the right to deduct an amount equal to such payments from any monies payable by us to you hereunder.

(e)  In the event you or Artist shall for any reason whatsoever (other than our refusal without cause to allow you to do so or an event of force majeure [e.g. your illness, a natural disaster, etc.]) delay

the commencement of, or be unavailable for, any recording sessions hereunder, you shall, upon our demand, promptly reimburse us for any expenses or charges actually incurred or paid by us by reason thereof.  In the event you shall fail to so reimburse us, we shall, in addition to all of our other rights or remedies which we may have in such event, have the right to deduct an amount equal to such expenses or charges from any monies payable by us to you hereunder.

    3.    (a)   Recording sessions for the Masters shall be conducted under our recording license.  No recording sessions shall be commenced hereunder nor shall any commitments be made or costs incurred in connection therewith unless and until a proposed recording budget for the Masters to be recorded at such sessions shall have been submitted by you in writing and approved in writing by one of our officers.  We shall not unreasonably withhold our approval of a recording budget for any LP of your recording commitment which is submitted in accordance with the material terms and provisions hereof; provided, that we shall not be deemed unreasonable if we withhold our approval of such a recording budget on grounds that the amount of such recording budget is too high.  You shall submit to us such proposed recording budget no later than fourteen (14) days prior to the first recording session for which such proposed recording budget is submitted.  We shall not be responsible for any payments to any individuals rendering services in connection with the recording of the Masters which exceed union scale unless such excess and the proposed recipient thereof are specified in said budget and approved by us.  We shall not be responsible for any penalties incurred for late payments caused by your delay in submitting union contract forms, report forms or bills, unless we shall agree to pay said penalties, in which case, they shall be deemed part of recording costs.  We shall pay the recording costs of the Masters recorded at recording sessions conducted hereunder in accordance with the terms and provisions hereof in an amount not in excess of the recording budget therefor approved in writing by one of our officers.  We agree that we shall not withhold our approval of a recording budget for the first LP of your recording commitment which does not exceed one hundred ten thousand dollars ($110,000), exclusive of the advance or fee payable to the producer of such LP; provided such recording budget is otherwise submitted in accordance with the material terms and provisions hereof.  In the event the recording costs of the Masters constituting any LP of your recording

commitment shall exceed one hundred ten percent (110%) of the approved budget therefor, you shall, upon our demand, promptly reimburse us for all such excess costs, and in the event you shall fail to do so, we shall, in addition to all of our other rights and remedies in such event, have the right to deduct an amount equal to all such excess costs from any monies payable by us to you hereunder.

(b)   All union contract forms and report forms for recording sessions hereunder, all bills pertaining to such recording sessions, and all necessary payroll forms (including, without limitation, all necessary W-4 and other withholding tax forms) pertaining to such recording sessions shall be submitted by you to us within forty-eight (48) hours after each recording session and in accordance with all applicable union requirements so that we shall be able to make all payroll payments without penalty for late payment.

(c)   We shall make all minimum union scale payments required to be made to Artist in connection with your recording services hereunder.  All such payments, as well as all payments made by us to any other individuals rendering services in connection with the recording of the Masters, all other payments which are made by us pursuant to any applicable law or regula-tion or the provisions of any collective bargaining agreement between us and any union or guild (including, without limitation, payroll taxes and payments to union pension and welfare funds other than payments based on record sales to the AF of M Music Performance Trust Fund or Special Payments Trust Fund and the corresponding AFTRA Funds), all amounts paid or incurred by us for studio or hall rentals, tape, engineering, editing, instrument rental and cartage, transportation, accommoda-tions, immigration clearances, and so-called "per diems" in respect of any individuals (including you and Artist) rendering services in connection with the recording of the Masters, together with any and all other amounts paid or incurred by us in connection with the recording of the Masters shall be recoupable from royalties earned by you hereunder.

(d)   You shall deliver to us a two-track stereo tape, and, upon our request, a monaural tape for each Master.  All original session tapes and any derivatives or reproductions thereof shall also be delivered to us or maintained at a recording studio or other location designated or reasonably approved by us, in our name and subject to our control.

4.    All master recordings embodying the performances
of Artist recorded during the term hereof, from the inception
of the recording thereof, and all phonograph records and
other reproductions made therefrom, together with the perform-
ances embodied therein and all copyrights therein and thereto,
and any and all renewals and extensions thereof shall be
entirely our property, free of any claims whatsoever by you,
Artist, or any other person, firm or corporation.  For the
purposes hereof, you, Artist, and all other persons rendering
services in connection with such master recordings shall be
our employees for hire and all such master recordings shall
be works made for hire under the United States Copyright
Law.  We shall, accordingly, have the sole and exclusive
right to copyright such master recordings, phonograph records,
or other reproductions, in our name, as the owner and author
thereof, and to secure any and all renewals and extensions
of such copyrights in our name.  Nevertheless, you shall,
upon our request, execute and deliver to us and cause Artist
to execute and deliver to us any assignments of copyright
(including renewals and extensions thereof) in and to such
master recordings as we may reasonably deem necessary, and
you and Artist hereby irrevocably appoint us your and Artist's
attorney-in-fact for the purpose of executing such assignments
in your and Artist's name.  Without limitation of any of the
foregoing, we and/or our designees shall have the exclusive
worldwide right in perpetuity to manufacture, sell, distribute
and advertise phonograph records or other reproductions
(visual and nonvisual) embodying such master recordings, to
lease, license, convey or otherwise use or dispose of such
master recordings by any method now or hereafter known, in
any field of use, to release phonograph records or other
reproductions embodying such master recordings under any
trademarks, trade-names or labels, to perform such phonograph
records or other reproductions publicly, and to permit the
public performance thereof by radio or television broadcast,
or any other method now or hereafter known, all upon such
terms and conditions as we may approve, and to permit any
other person, firm or corporation to do any or all of the
foregoing or we may refrain from doing any or all of the
foregoing.  Notwithstanding the foregoing, we agree that our
initial release in the United States of each LP of your
recording commitment shall be on one of our then-current
top-line labels.

5.    We shall have the worldwide right in perpe-
tuity to use and to permit others to use your and Artist's
name (both legal and professional, and whether presently or
hereafter used by you and Artist), likeness, other identifi-
cation of Artist, and biographical material concerning
Artist, and the name and likeness of any producer rendering

6

services in connection with the master recordings recorded
by Artist during the term hereof, for purposes of trade, and
otherwise without restriction, in connection with such
master recordings, the phonograph records derived therefrom,
and our record business and record-related products.  We
shall have the further right to refer to you during the term
hereof by your legal or professional name as our exclusive
recording artist and you shall cause Artist in his activities
in the entertainment field to use all reasonable efforts to
be billed and advertised during the term hereof as our
exclusive recording artist.  The rights granted to us pursuant
to this paragraph with respect to your and Artist's name,
likeness, other identification and biographical material
concerning Artist shall be exclusive during the term hereof
and non-exclusive thereafter.  Accordingly, but without
limiting the generality of the foregoing, you shall not
during the term hereof authorize or permit any person, firm,
or corporation other than us to use your or Artist's legal
or professional name or your or Artist's likeness in connection
with the advertising or sale of phonograph records.

　　　　6.　　Conditioned upon your and Artist's full and
faithful performance of all of the material terms and provi-
sions hereof, you shall be paid in respect of the sale by us
or our licensees of phonograph records embodying the Masters
recorded hereunder and in respect of any other exploitation
by us or our licensees of such Masters, the following royalties
upon the terms hereinafter set forth:

　　　　　　(a)　(i)  In respect of records sold in the
United States or the United Kingdom in the form of
discs, and in respect of records sold by us in the
United States or by our affiliated company in the
United Kingdom in the form of pre-recorded tapes
(including reel-to-reel tapes, cartridges and cassettes)
or other recorded devices (other than discs), we shall
pay you a royalty at the rate of eleven percent (11%)
of the suggested retail list price from time to time of
such records; and (ii) in respect of records sold by
our licensees in the United States or by the licensees
of our affiliated company in the United Kingdom in the
form of pre-recorded tapes (including reel-to-reel
tapes, cartridges and cassettes) or other recorded
devices (other than discs), we shall pay you a royalty
at the rate of one-half (1/2) of the aforementioned
royalty rate based upon the suggested retail list price
from time to time of such records.

　　　　　　(b)  In respect of records sold outside of
the United States and the United Kingdom we shall pay

you a royalty at the rate of eight percent (8%) of the suggested retail list price from time to time of such records.

    (c)  Notwithstanding any of the foregoing:

      (i)  the royalty rate in respect of records sold through any direct mail or mail order distribution method (including, without limitation, record club distribution), and/or sold through retail stores in conjunction with special radio or television advertisements (including, without limitation, records of the type presently distributed by K-Tel) shall be one-half (1/2) of the net royalty which we shall receive from any licensee distributing such records;

      (ii)  the royalty rate in respect of the sale of records on a mid-priced record line shall be three-fourths (3/4) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions and the royalty rate in respect of the sale of records on a budget record line or low-priced record line shall be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions; provided, that we shall not sell any LP of your recording commitment hereunder on a budget record line in the United States prior to the date eighteen (18) months after our initial release of such LP;

      (iii)  the royalty rate in respect of records sold for use as premiums or in connection with the sale, advertising, or promotion of any other product or service shall, with respect to such records sold by us, be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions, and shall be based upon the price received by us for such records sold by us, and, with respect to such records sold by our licensees, shall be one-half (1/2) of the net royalty which we shall receive from any licensee distributing such records and shall be based upon the price utilized by our licensees in accounting to us for such records sold by our licensees;

      (iv)  the royalty rate in respect of records sold to the United States Government, its

8

subdivisions, departments or agencies (including records sold for resale through military facilities), and in respect of records sold to educational institutions or libraries, shall be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions; and

(v)   the royalty rate in respect of Masters licensed by us for phonograph record use on a flat-fee basis and for all other types of use (other than phonograph record use) on a flat-fee or royalty basis shall be an amount equal to fifty percent (50%) of the net flat fee or net royalty, as the case may be, received by us in respect of each such use.

(d)   Notwithstanding any of the foregoing, no royalties shall be payable on records furnished as free or bonus records to members, applicants, or other participants in any record club or other direct mail distribution method; on records distributed for promotional purposes to radio stations, television stations or networks, record reviewers, or other customary recipients of promotional records; on so-called "promotional sampler" records; on records sold as scrap or as so-called "cut-outs" (it being understood that we shall not sell any LP of your recording commitment as "cut-outs" in the United States unless such LP shall have been previously deleted from our catalogue); and on records distributed on a so-called "no-charge" or "free" basis (such as, but not limited to, records commonly described in the record industry as "free-goods" or "freebies") or sold at less than fifty percent (50%) of their regular wholesale price to distributors, subdistributors, dealers, or others, whether or not the recipients of such records are affiliated with us and whether or not such records are intended for sale by the recipients thereof.   We agree that our policy with respect to the shipment of records hereunder on a no-charge basis for sale by the recipients thereof shall be consistent with our then current generally applicable company policy.   At present our such policy with respect to shipments of records on a no-charge basis for sale by the recipients thereof is as follows:

(i)   With respect to 33-1/3 rpm and 45 rpm single records, thirty (30) such records are distributed on a no-charge basis for sale by the recipients thereof for every one hundred (100) such records sold;

9

(ii)   With respect to long playing records, twenty (20) such records are distributed on a no-charge basis for sale by the recipients thereof for every one hundred (100) such records sold; and

(iii)   With respect to both 33-1/3 rpm and 45 rpm single records and long playing records, additional records are distributed on a no-charge basis for sale by the recipients thereof from time to time in connection with so-called "special sales plans" or similar programs of limited duration.

(e)   Notwithstanding any of the foregoing, royalties in respect of records sold at a discount to distributors, subdistributors, dealers, or others, whether or not affiliated with us (except for records sold at less than fifty percent (50%) of their regular wholesale price, for which no royalties are payable hereunder) shall be reduced in the same proportion as the regular wholesale price of such records is reduced on such sales.

(f)   Notwithstanding any of the foregoing:

(i) for purposes of computing royalties there shall be deducted from the suggested retail list price (or other applicable price, if any, upon which royalties are calculated) of phonograph records hereunder an amount equal to any excise, sales, value added, or comparable or similar taxes;

(ii)   for purposes of computing royalties, there shall be deducted from the suggested retail list price (or other applicable price, if any, upon which royalties are calculated) of phonograph records hereunder, an amount equal to ten percent (10%) thereof for 45 rpm single records packaged in color or other special printed sleeves, and for long playing or extended play records in disc form packaged in our standard "singlefold" album jackets without any special elements (such as, but not limited to, inserts or attachments); fifteen percent (15%) thereof for all other long playing or extended play records in disc form; and twenty percent (20%) thereof for reel-to-reel tapes, cartridges, cassettes or other recorded devices (other than discs);

(iii)   royalties shall be computed and paid upon one hundred percent (100%) of net sales for which we have received payment or credit against an advance previously received by us; provided, however, that if any licensee distributing records hereunder through record clubs or other methods of mail order distribution shall compute and pay royalties to us in respect of such records on less than one hundred percent (100%) of net sales, your royalties hereunder with respect to such records shall be computed and paid on the same percentage of sales as such licensee shall utilize in computing and paying to us royalties in respect of such records; and

(iv)   records distributed in the United States by any of our affiliated branch wholesalers shall be deemed sold for the purposes of this contract only if sold by any such affiliated branch wholesaler to one of its independent third party customers.

(g)   Notwithstanding any of the foregoing:

(i)   the royalties payable to you hereunder with respect to any phonograph record embodying Masters hereunder together with other master recordings shall be computed by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be the number of selections contained on the Masters hereunder which are embodied on such photograph record and the denominator of which shall be the total number of selections embodied on such phonograph record; and

(ii)   the royalty payable to you hereunder and the recording costs hereunder with respect to any Master recorded hereunder by Artist jointly with any other artist or musician to whom we are obligated to pay a royalty in respect of such Master shall be computed by multiplying the otherwise applicable royalty rate and recording costs by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the sum of one (1) and the total number of such other artists or musicians whose performances are embodied thereon.

11

7.    (a)   Statements as to royalties payable hereunder shall be sent by us to you on or before the thirtieth day of September for the semiannual period ending the preceding June 30th and on or before the 31st day of March for the semiannual period ending the preceding December 31st, together with payment of accrued royalties, if any, earned by you hereunder during such semiannual period, less all advances and charges under this contract.  We shall have the right to retain, as a reserve against charges, credits, or returns, such portion of payable royalties as shall be reasonable in our best business judgment.  Each such reserve shall be fully liquidated not later than upon our submission to you of the third semiannual accounting statement following that upon which such reserve was initially established.  We agree that returns of records hereunder in the United States shall be pro-rated among records sold and records distributed on a "no-charge" basis for sale by the recipients thereof in the same proportion as such records were initially invoiced.

(b)   No royalties shall be payable to you in respect of sales of records by any of our licensees until we have received payment therefor or credit therefor against an advance previously received by us. Sales by any such licensees shall be deemed to have occurred in the semiannual accounting period during which such licensees shall have rendered to us accounting statements for such sales.

(c)   Royalties in respect of the sale of records outside of the United States shall be based upon the suggested retail list price from time to time of such records in the country of manufacture, the country of sale, the country of import or the country of export, as we shall be paid (it being understood that if there are no suggested retail list prices of records in any particular country, then for the purposes of computing royalties hereunder, the prices of records in such country generally regarded as the equivalent thereof, provided we are paid thereon, shall be deemed the suggested retail list prices of such records) and shall be computed in the national currency in which we are paid by our licensees, shall be credited to your royalty account hereunder at the same rate of exchange as we are paid, and shall be proportionately subject to any transfer or comparable taxes which may be imposed upon our receipts.  In the event we shall not receive payment in United States dollars in the United States in respect of any such sales, royalties in respect

thereof shall not be credited to your royalty account hereunder. We shall, however, if we are able to do so, accept such payments in foreign currency and deposit in a foreign bank or other depository, at your expense, in such foreign currency, such portion thereof, if any, as shall equal the royalties which would have actually been payable to you hereunder in respect of such sales had such payments been made to us in United States dollars in the United States and we shall notify you thereof promptly. Deposit as aforesaid shall fulfill our royalty obligations hereunder as to such record sales.

(d)  You shall be deemed to have consented to all royalty statements and all other accountings rendered by us hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by you to us within two (2) years after the date rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by us hereunder may be maintained against us unless such action, suit, or proceeding is commenced against us in a court of competent jurisdiction within two (2) years after the date rendered.

(e)  We shall maintain books of account concerning the sale of phonograph records hereunder. You, or a certified public accountant, in your behalf, may, at your sole expense, examine our said books relating to the sale of records hereunder (but excluding any of our books or records relating to the manufacture of records hereunder) solely for the purpose of verifying the accuracy thereof, only during our normal business hours and upon reasonable written notice. Our such books relating to any particular royalty statement may be examined as aforesaid only within two (2) years after the date rendered and we shall have no obligation to permit you to so examine our such books relating to any particular royalty statement more than once. The rights hereinabove granted to you shall constitute your sole and exclusive rights to examine our books and records.

(f)  All monies paid to you or Artist or on your or Artist's behalf or to or on behalf of any person, firm or corporation representing you or Artist, other than royalties payable pursuant to this contract,

shall constitute advances recoupable from any sums payable under this contract, unless we otherwise consent in writing.

(g)  We shall have the right to deduct from any amounts payable to you hereunder such portion thereof as may be required to be deducted under the applicable provisions of the California Revenue and Taxation Code or under any other applicable statute, regulation, treaty or other law, or under any applicable union or guild agreement, and you shall promptly execute and deliver to us such forms and other documents as may be required in connection therewith.

(h)  Each payment required to be made by us to you pursuant to this contract, other than union scale payments pursuant to paragraph 3 hereof, shall, at our election, be made by a single check payable to you.

(i)  Notwithstanding anything to the contrary contained in this contract, other than for the purpose of paragraph 8(a) below, mechanical copyright royalties shall not constitute "royalties" or "monies" hereunder, and accordingly, except as otherwise provided in paragraph 8(a) below, advances and other charges against your royalties or other monies payable to you hereunder shall not be charged against mechanical copyright royalties payable to you hereunder.

8.  (a)  All selections recorded in any Masters hereunder which are written or composed by you or Artist, in whole or in part, alone or in collaboration with others, or which are owned or controlled, in whole or in part, directly or indirectly, by you, Artist, or any person, firm or corporation in which you or Artist have a direct or an indirect interest (herein referred to as "Controlled Compositions") are hereby licensed to us for the United States and Canada at the applicable royalty rates set forth below per selection on the basis of records sold, less returns and credits, except that no copyright royalties shall be payable in respect of any records for which no royalties are payable pursuant to paragraph 6 hereof:

(i)  Two and three-fourths cents ($.0275) for each Controlled Composition with respect to records sold in the United States and two cents ($.02) Canadian for each Controlled Composition with respect to records sold in Canada.

(ii)   Notwithstanding the foregoing, the
maximum aggregate copyright royalty rate payable
by us in respect of any long-playing record album
hereunder containing one (1) or more disc records
or the tape equivalent, regardless of the number
of selections contained thereon, shall be twenty-
seven and one-half cents ($.275) with respect to
records sold in the United States and twenty cents
($.20) Canadian with respect to records sold in
Canada and the maximum aggregate copyright royalty
rate payable by us in respect of any 33-1/3 rpm or
45 rpm single record hereunder, regardless of the
number of selections contained thereon, shall be
five and one-half cents ($.055) with respect to
records sold in the United States and four cents
($.04) Canadian with respect to records sold in
Canada.   Accordingly, in the event the actual
aggregate copyright royalty rate which we shall be
required to pay in respect of any long-playing
record album or any single record hereunder shall
exceed the applicable maximum aggregate copyright
royalty rate hereinabove specified, then the
aggregate copyright royalty rate for the Controlled
Compositions, if any, contained thereon shall be
reduced by an amount equal to such excess.   If the
actual aggregate copyright royalty rate which we
shall be required to pay in respect of any such
long-playing record album or single record, as the
case may be, shall, even as reduced in accordance
with the immediately preceding sentence, still
exceed the applicable maximum aggregate copyright
royalty rate hereinabove specified, then we shall
have the right, at our election, in addition to
all of our other rights or remedies which we may
have in such event, to deduct an amount equal to
the additional payments required to be made by us
as a result thereof from any monies payable to you
hereunder.

(iii)   No copyright royalties shall be
payable in respect of Controlled Compositions
which are arrangements of selections in the public
domain.   In the event, however, that any such
arranged version has a new title and entirely
(substantially) different lyrics or a substantial
addition of melodic material (as determined in
accordance with the standards of the applicable
performing rights society (ASCAP or BMI)), then,
notwithstanding anything to the contrary contained
herein, such arranged version shall be licensed to

15

us at a copyright royalty to be calculated by taking the rate applicable with respect to Controlled Compositions hereunder and multiplying such rate by the percentage utilized by the applicable performing rights society or organization (ASCAP or BMI) in determining the credits to be given to the publisher of such arranged version for public performance of the work; provided, however, that you shall furnish to us a copy of the letter from such performing rights society or organization setting forth the percentage of the otherwise applicable credit which the publisher shall receive for such public performances.  In the event you fail to provide us with such letter from the performing rights society or organization, we shall not be obligated to pay any copyright royalty with respect to any such arranged version.

(iv)  Any assignment made of the owner-ship or copyrights in or the rights to license or administer the use of any Controlled Compositions shall be subject to the terms and provisions hereof.

(v)  (a)  In the event that during the term hereof the minimum compulsory statutory mechanical copyright royalty rate in effect pursuant to the United States Copyright Act shall increase to more than two and three-quarters cents ($.0275), then, with respect to any Controlled Composition embodied in a Master initially released on records hereunder subsequent to the date such increase becomes effective, the rate set forth in subpara-graph 8(a)(i) above for each such Controlled Composition embodied upon records both manufactured and sold in the United States after the date such increase becomes effective shall be the greater of two and three-quarters cents ($.0275) or three-quarters (3/4) of such increased rate, and the maximum aggregate copyright royalty rates set forth in subparagraph 8(a)(ii) for records both manufactured and sold in the United States after the date such increases become effective embodying solely such Masters shall be the product of [A] ten (10) and [B] the greater of two and three-quarters cents ($.0275) or three-quarters (3/4) of such increased rate, and the product of [A] two (2) and [B] the greater of two and three-quarters cents ($.0275) or three-quarters (3/4) of such increased rate, with respect to long-playing

record albums and with respect to 33-1/3 rpm or 45 rpm single records, respectively.

(v)  (b)  In the event that during the term hereof the minimum compulsory mechanical copyright royalty rate in effect pursuant to the Canadian Copyright Act shall increase to more than two cents Canadian ($.02), then, with respect to any Controlled Composition embodied in a Master initially released on records hereunder subsequent to the date such increase becomes effective the rate set forth in subparagraph 8(a)(i) for each such Controlled Composition embodied upon records both manufactured and sold in Canada after the date such increase becomes effective shall be the greater of two cents Canadian ($.02) or three-quarters (3/4) of such increased rate, and the maximum aggregate copyright royalty rates set forth in subparagraph 8(a)(ii) for records both manufactured and sold in Canada after the date such increase becomes effective embodying solely such Masters shall be the product of [A] ten (10) and [B] the greater of two cents Canadian ($.02) or three-quarters (3/4) of such increased rate, and the product of [i] two (2) and [B] the greater of two cents Canadian ($.02) or three-quarters (3/4) of such increased rate with respect to long-playing record albums and with respect to 33-1/3 rpm or 45 rpm single records, respectively.

(b)  You shall, upon our request, cause to be issued to us mechanical licenses for all selections recorded in any Masters hereunder which are not Controlled Compositions.  Such mechanical licenses as you shall cause to be issued to us shall be at rates and upon terms no less favorable to us than those contained in the then current standard mechanical license issued by The Harry Fox Agency, Inc.

9.  You hereby warrant, represent, and agree that:

(a)  Neither you nor Artist are under any disability, restriction, or prohibition, whether contractual or otherwise, with respect to your right to execute this contract, to grant the rights granted by you to us hereunder, to perform each and every term and provision hereof, and to record each and every selection recorded by Artist hereunder.  In this regard, you specifically warrant and represent that no selection

recorded by Artist hereunder is or shall be subject to any re-recording or other restrictions pursuant to any other agreement to which you or Artist are or have been party or by which you or Artist are otherwise bound.

(b) During the term of this contract you and Artist shall become and remain members in good standing of any appropriate labor union or unions with which we may at any time have an agreement lawfully requiring such union membership.

(c) All recording sessions with respect to the Masters shall be conducted in all respects in accordance with the then current AF of M Phonograph Record Labor Agreement, the then current AFTRA Code for the Phonograph Industry, and the then current agreements with all other unions having jurisdiction over the recording of the Masters.

(d) No Controlled Compositions nor any other selections, materials, ideas, or other properties furnished or selected by you or Artist and embodied or contained in or used in connection with the Masters or the packaging or advertising for phonograph records hereunder will violate or infringe upon any common law or statutory right of any person, firm or corporation, including, without limitation, contractual rights, copyrights, and rights of privacy.

(e) There are no recordings embodying your performances which have not heretofore been commercially released in the United States on phonograph records except for recordings owned by us and in our possession.

(f) Neither you nor Artist shall at any time, directly or indirectly, give or offer to give any consideration of any kind to any radio or television station or network, to any employee thereof, or to any person, firm, or corporation controlling or influencing the programming of such station for the purpose of securing the broadcast or promotion of any records hereunder.

(g) Except as otherwise specifically provided herein, we shall have no obligation hereunder or otherwise to pay any person, firm, or corporation any amounts in connection with the recording or exploitation of the Masters.

10.   (a)   You hereby warrant and represent that you now have the exclusive right to Artist's recording services under a valid and binding recording contract (hereinafter referred to as the "Recording Contract"), and that you shall continue to have such exclusive right during the term hereof (including any renewals or extensions).  We shall have and you hereby grant to us all rights acquired and to be acquired under the Recording Contract which are necessary or desirable to enable us to enjoy our rights hereunder.  You shall, for our express benefit, require the performance by Artist of said contractual obligations, so as to enable us to enjoy the rights granted to us by you hereunder.  You hereby further warrant and represent you shall not offer, convey or deliver any Masters or other recordings featuring Artist to any party other than us and that you shall not release Artist from any term or provision of the Recording Contract or modify or amend any term or provision of the Recording Contract, if such release, amendment or modification would adversely affect our rights hereunder, agree to any termination of the Recording Contract, fail to exercise any renewal or extension option with respect thereto, breach or cause a breach of the Recording Contract, permit Artist to perform for the purpose of making phonograph records for any party other than us, all during the term hereof (including any renewals or extensions).  You hereby authorize us to enforce the provisions of the Recording Contract against Artist directly either in our name or in your name.  You agree that in the event you or Artist shall breach the Recording Contract, or the Recording Contract shall expire or terminate, we shall have the right to enter into an agreement directly with Artist upon the same terms and provisions as contained herein.  You shall promptly, upon our request, deliver to us a signed copy or a photocopy of the Recording Contract.

(b) · Concurrently with the execution hereof, you shall cause Artist to execute and deliver to us an inducement letter in the form of Exhibit A attached hereto (hereinafter referred to as the "Inducement Letter").  If by reason of your default hereunder or otherwise, including, without limitation by reason of subparagraph 10(a) above or Paragraph 2 of the Inducement Letter, we shall enter into a recording agreement directly with Artist, our obligations to you hereunder shall be automatically suspended until it is determined by final, non-appealable judgment or written settlement agreement whether you are entitled to Artist's recording

services as required hereunder. If and when you are determined to have been entitled to Artist's services as aforesaid, such suspension shall thereupon be terminated and we shall pay to you any amounts withheld during such suspension, less any amounts paid by us to Artist during such suspension, and any master recordings recorded by Artist during such suspension shall be deemed Masters recorded hereunder. If and when you are determined not to have been entitled to Artist's services as required hereunder, the term hereof shall be deemed to have terminated as of the date the suspension commenced and recordings made directly for us by Artist during such suspension shall be and remain our sole and exclusive property, free from any claims by any person, firm or corporation including you. During any such period of suspension, any extension of the term of the agreement between us and Artist shall likewise extend the current period of the term of this agreement. The exercise of any option under our agreement with Artist or the election by us of any Masters pursuant to our agreement with Artist shall be deemed an exercise of the corresponding Masters or an exercise of the corresponding option hereunder under paragraphs 2 and 20 hereof.

(c)  In the event you shall become bankrupt, or insolvent, or if your solvency shall be threatened, or if you shall attempt to assign this contract or any part thereof, this contract shall terminate and we shall have the right to enter into a recording agreement directly with Artist upon the terms contained herein and in the Inducement Letter, and all of our obligations to you hereunder shall terminated. Your solvency shall be deemed threatened in the event that a proceeding under the bankruptcy or insolvency laws of any state, territory, or country is commenced by, for or against you, or you attempt to assign, mortgage, or pledge all or substantially all of your assets for the benefit of your creditors, or if any of the Masters are levied upon or attached or seized pursuant to any lien, attachment, garnishment, execution, distraint, notice of assignment or other process of law.

(d)  You warrant and represent that you shall pay to Artist any and all royalties or other compensation which may be payable to Artist by reason of the manufacture and sale throughout the world of records embodying master recordings recorded hereunder or by reason of any other exploitation of such master recordings. You hereby further warrant, represent and agree that pursuant to the Recording Contract during each calendar year of

the term hereof (whether or not such term has been suspended or extended) each member of Artist is guaranteed to receive compensation of not less than Six Thousand Dollars ($6,000) per annum in respect solely of the services rendered under the Recording Contract and hereunder by each member of Artist, and that the Recording Contract provides that in the event the California Code of Civil Procedure Section 526 and/or the California Civil Code Section 3423 (Fifth) is amended or supplemented to provide that the minimum compensation per annum under an enforceable personal services contract entered into prior to the effective date of such amendment shall be a sum greater than Six Thousand Dollars ($6,000) per annum, that the applicable provision of the Recording Contract provides for automatic amendment such that each member of Artist shall be guaranteed to receive payment per annum in respect solely of the services rendered under the Recording Contract and hereunder in an amount that the applicable amended law specifies. Hereinafter said Six Thousand Dollars ($6,000.00) or other minimum compensation is referred to as "Minimum Compensation."  In the event, for any reason whatsoever, you shall fail to pay to each member of Artist the applicable Minimum Compensation per annum during the term of this agreement, whether or not said term is extended or suspended, we shall have the right to pay to each member of Artist an amount which when added to the amount (if any) so paid to each member of Artist by you shall equal the applicable Minimum Compensation per annum during the term of this agreement and you shall promptly reimburse us for any such payments.  In the event you shall fail to do so, we shall have the right to deduct an amount equal to such payments from any monies payable by us to you hereunder or under any other agreement between you or Artist and us or our affiliates.  You and we acknowledge and agree that the foregoing provisions of this paragraph and the aforesaid provisions of the Recording Contract are intended to be interpreted and shall be construed so as to comply with the provisions of California Civil Code Section 3423 (Fifth) concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services. You and we further acknowledge that this contract is an agreement to furnish personal services as is described in Section 3423 (Fifth) of the California Civil Code.

11.  (a)  During the term of this contract, neither you nor Artist shall enter into any agreement or make any commitment which would materially interfere with your

or Artist's performance of any of the terms and provisions hereof nor shall you cause, authorize or knowingly permit Artist to perform or render any master recordings for any person, firm, or corporation other than us. After the expiration or termination of the term of this contract, you shall not prior to the later of the following dates produce or cause, authorize or knowingly permit Artist to perform for any person, firm, or corporation other than us, for the purpose of making phonograph records or master recordings, any selection which shall have been recorded hereunder or under any other agreement relating to your recording services to which we were a party:  (i) the date five (5) years subsequent to the date on which such selection shall have been last recorded by you hereunder, or (ii) the date two (2) years subsequent to the expiration or termination of the term of this contract (such later date in respect of any such selection being hereinafter sometimes referred to as the "Restriction Date").

        (b)  Neither you nor Artist shall at any time manufacture, distribute, or sell or authorize the manufacture, distribution, or sale by any person, firm, or corporation other than us of phonograph records embodying (i) any performance rendered by Artist during the term of this contract, or (ii) any performance rendered by Artist after the expiration or termination of the term of this contract of a selection recorded hereunder if such performance shall have been rendered prior to the Restriction Date applicable thereto. Furthermore, neither you nor Artist shall record or authorize or knowingly permit to be recorded for any purpose any such performance without in each case taking reasonable measures to prevent the manufacture, distribution, or sale at any time by any person, firm, or corporation other than us of phonograph records embodying such performance.  Specifically, but without limiting the generality of the foregoing, if during the term of this contract Artist shall perform any selection for the purpose of making transcriptions for radio or television or soundtracks for motion pictures, or if, after the expiration or termination of the term of this contract, Artist performs for any such purpose any selection recorded hereunder prior to the Restriction Date applicable thereto, Artist will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used directly or indirectly for the purpose of making phonograph records.  Upon our request, you shall promptly deliver to us a copy of the pertinent provisions

of each such contract and you shall cause Artist to cooperate fully with us in any controversy which may arise or litigation which may be instituted relating to our rights pursuant to this paragraph.

12. You expressly acknowledge that your and Artist's services hereunder are of a special, unique, and intellectual character which gives them peculiar value, and that in the event of a breach by you or Artist of any term, condition, or covenant hereof, we will be caused irreparable injury. You expressly agree that in the event you shall breach any provision of this contract, we shall be entitled to injunctive relief and/or damages, as we may deem appropriate, in addition to any other rights or remedies available to us, and we shall have the right to recoup any such damages resulting from any such breach from any monies which may be payable to you hereunder.

13. You hereby agree to and do hereby indemnify, save, and hold us harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and attorneys' fees) arising out of or connected with any claim, demand, or action by a third party which is inconsistent with any of the warranties, representations, or covenants made by you in this contract and which results in a final judgment or is settled with your prior written consent. You agree to reimburse us, on demand, for any payment made by us at any time with respect to any such damage, liability, cost, loss or expense to which the foregoing indemnity applies. We shall notify you of any such claim, demand, or action promptly after we have been formally advised thereof. Pending the determination of any such claim, demand, or action, we shall have the right, at our election, to withhold payment of any monies otherwise payable to you hereunder; provided, that we shall liquidate any such withheld amount if litigation with respect to the claim or demand in respect of which we are withholding such amount is not commenced during the period of the statute of limitations applicable to such claim or demand.

14. (a) Notwithstanding anything to the contrary contained herein, you agree that recording sessions for any LP hereunder shall not be commenced by you nor shall the commencement of any such recording sessions be requested by us sooner than three (3) months after the delivery to us, in accordance with all the terms and conditions hereof, of the Masters constituting the immediately preceding LP delivered hereunder.

(b)  We shall have the right, at our election, to suspend the running of the term of this contract and our obligations hereunder upon written notice to you if for any reason whatsoever Artist's voice or Artist's ability to perform as an instrumentalist shall become impaired or if you or Artist shall refuse, neglect, or be unable to comply with any of your material obligations hereunder, or if as a result of an Act of God, accident, fire, labor controversy, riot, civil commotion, act of public enemy, law, enactment, rule, order, or act of any government or governmental instrumentality, failure of technical facilities, failure or delay of transporta- tion facilities, illness or incapacity, or other cause of a similar or dissimilar nature not reasonably within our control or which we could not by reasonable diligence have avoided, we are materially hampered in the recording, manufacture, distribution, or sale of phonograph records or our normal business operations become commercially impractical.  Such suspension shall be for the duration of any such event or contingency, and, unless we notify you to the contrary in writing, the term hereof (whether the initial term or any renewal term hereof) during which such event or contingency shall have commenced shall be automatically extended by such number of days as equal the total number of days of any such suspension. During any such suspension you shall not authorize or permit Artist to render services as a recording artist to any other person, firm, or corporation.  Notwithstand- ing the foregoing, no suspension of the term hereof pursuant to this paragraph 14(b) shall continue for more than six (6) consecutive months unless caused by your breach of this contract or by events affecting a substantial portion of the United States record industry.

(c)  In the event Artist's voice or Artist's ability to perform as an instrumentalist shall become materially impaired or if you or Artist shall refuse, neglect, or be unable to comply with any of your material obligations hereunder, then we shall have the right, at our election, in addition to any other rights or remedies which we may have in such event, to terminate this contract upon written notice to you and shall thereby be relieved of any and all obligations hereunder except our obligations with respect to Masters recorded hereunder prior to such termination.

15.  Artist shall, upon our request, appear on dates and at film studios or other locations designated by us upon reasonable notice to you for the filming, taping, or other permanent fixation of audio-visual reproductions of

Artist's performances of selections recorded hereunder.  In connection therewith, we or our designee will make a payment to you for the services to be performed at the rate of applicable union scale, which such payment shall constitute an advance recoupable from royalties earned by you hereunder. If Artist is required to travel in connection with such audio-visual reproductions of his performances, we shall pay or reimburse you for the reasonable costs of travel, accommodations and transportation incurred by Artist in connection therewith.

16:  We shall have the right, at our election, to assign any of our rights hereunder, in whole or in part, to any subsidiary, affiliated, or related company, or to any person, firm, or corporation owning or acquiring a substantial portion of our stock or assets.  You shall not have the right to assign any of your rights hereunder.

17.  All notices to be given to you hereunder and all statements and payments to be sent to you hereunder shall be addressed to you at the address set forth on page 1 hereof or at such other address as you shall designate in writing from time to time.  All notices to be given to us hereunder shall be addressed to us at the address set forth on page 1 hereof or at such other address as we shall designate in writing from time to time.  All notices shall be in writing and shall either be served by personal delivery (to an officer of our company if to us), registered or certified mail, or telegraph, all charges prepaid.  Except as otherwise provided herein, such notices shall be deemed given when personally delivered, mailed or delivered to a telegraph office, all charges prepaid, except that notices of change of address shall be effective only after the actual receipt thereof.  A copy of each notice to us shall be simultaneously sent to Mitchell, Silberberg & Knupp, 1800 Century Park East, Los Angeles, California 90067, Attn:  Richard I. Leher, Esq.  A courtesy copy of each notice to you shall be simultaneously sent to Robert Urband, Esq., 640 Lexington Avenue, New York, New York, 10022.

18.  (a)  This contract sets forth the entire understanding of the parties hereto relating to the subject matter hereof.  No modification, amendment, waiver, termination or discharge of this contract or of any of the terms or provisions hereof shall be binding upon either of us unless confirmed by a written instrument signed by you and by a duly authorized officer of our company.  No waiver by you or us of any term or provision of this contract or of any default hereunder shall affect your or our respective rights thereafter

25

to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(b)  If any provision of this contract shall be held void, voidable, invalid, or inoperative, no other provision of this contract shall be affected as a result thereof, and, accordingly, the remaining provisions of this contract shall remain in full force and effect as though such void, voidable, invalid, or inoperative provision had not been contained herein.

(c)  Except where otherwise expressly provided in this contract, neither party hereto shall be deemed to be in breach of any of its obligations hereunder unless and until the other party shall have given us specific written notice by certified or registered mail, return receipt requested, of the nature of such breach and the notified party shall have failed to cure such breach within thirty (30) days after receipt of such written notice.  The foregoing shall not apply to those provisions of this contract relating to exclusivity, to your product delivery requirements hereunder, or to your and Artist's re-recording restrictions.

(d)  Wherever your approval or consent is required hereunder, such approval or consent shall not be unreasonably withheld.  We may require you to formally give or withhold such approval or consent by giving you notice requesting same and by furnishing you with the information or material in respect of which such approval or consent is sought.  You shall give us written notice of your approval or disapproval or of your consent or non-consent within five (5) days after such notice is sent and in the event of your disapproval or non-consent, such notice shall contain the specific reasons therefor.  Your failure to give notice as aforesaid shall be deemed to be consent or approval, as the case may be, with respect to the matter submitted. In the event the word "you" includes members of a group, then, at our election, any member of the group shall have the right to give approval or consent on behalf of the entire group.

(e)  Nothing herein contained shall constitute a partnership or a joint venture between you and us.  Neither party hereto shall hold itself out contrary to the terms of this paragraph, and neither you nor we shall become liable for any representation, act, or omission of the other contrary to the provisions hereof.

This contract shall not be deemed to give any right or remedy to any third party whatsoever unless said right or remedy is specifically granted by us in writing to such third party.

(f)  The provisions of any applicable collective bargaining agreement between us and any labor organization which are required by the terms of such agreement to be included in this contract shall be deemed incorporated herein as if such provisions were expressly set forth in this contract.

(g)  In the event of any action, suit, or proceeding arising from or based upon this contract brought by either party hereto against the other, the prevailing party shall be entitled to recover from the other its attorneys' fees in connection therewith in addition to the costs of such action, suit, or proceeding.

(h)  Except as otherwise provided in this contract, all rights and remedies herein or otherwise shall be cumulative and none of them shall be in limitation of any other right or remedy.

(i)  This contract has been entered into in the State of California, and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California.

(j)  This contract shall not become effective until signed by you and countersigned by a duly authorized officer of our company.

19.  As used in this contract the terms "record" or "phonograph record" shall mean any device, whether now known or unknown, on or by which sound may be recorded for later transmission to listeners, whether embodying sound alone, or sound synchronized with or accompanied by visual images, including, without limitation, discs of any speed or size, reel-to-reel tapes, cartridges, cassettes, or other prerecorded tapes; the term "master recording" shall mean any original recording of sound, whether embodying sound alone or sound synchronized with or accompanied by visual images, which may be used in the recording, production, and/or manufacture of phonograph records, together with any derivatives thereof (other than phonograph records); the term "selection" shall mean a single musical composition, medley, poem, story, or similar work; the term "recording

costs" shall mean those costs and expenses referred to in paragraph 3(c) hereof; the term "delivery to us", or words of similar connotation used in connection with master recordings or Masters shall mean delivery for mastering, to a studio or other facility designated or approved by us, of fully mixed, leadered, sequenced and equalized 15 i.p.s. master tapes in proper form for the production of the parts necessary to manufacture phonograph records therefrom and delivery to us at our offices in Los Angeles, California of all consents, approvals, copy information, credits and other material required by us to release phonograph records embodying such master recordings and to manufacture album covers or other packaging therefor; the term "mid-priced record line" shall mean a record line or label the records of which bear a suggested retail list price in the country in question in excess of sixty six and two thirds percent (66-2/3%) and less than eighty percent (80%) of the suggested retail list price in such country of top-line records on which recordings of the majority of our artists are initially released in such country; the term "budget record line" or "low-priced record line" shall mean a record line or label the records of which bear a suggested retail list price in the country in question which is sixty six and two thirds percent (66-2/3%) or less of the suggested retail list price in such country of top-line records on which recordings of the majority of our artists are initially released in such country; the term "net royalty" shall mean the gross royalty received by us from a licensee in respect of record sales, less an amount equal to any monies required to be paid by us in respect of such record sales in the form of contributions to the American Federation of Musicians Special Payments Trust Fund or Music Performance Trust Fund, or any similar fund, or in the form of mechanical royalties to the copyright proprietors (or their designees) of the musical compositions embodied in such records; and the term "net sales" shall mean gross sales less returns and credits of any nature. Notwithstanding anything to the contrary contained herein, the royalty rates provided for in paragraph 6 hereof shall not apply to video-discs, video-cassettes and other audio-visual devices; as to such devices, you and we shall negotiate in good faith as to the rates to be paid therefor and, if we are unable to agree, the matter shall be decided by arbitra-tion in Los Angeles in accordance with the Rules of Commercial Arbitration of the American Arbitration Association.

20.  You hereby grant to us four (4) separate options, each to renew the term of this contract for a term which shall commence upon the expiration of the immediately preceding initial term or renewal term, as applicable, and which shall continue until the date eighteen (18) months

after the commencement date of such renewal term or until one hundred twenty (120) days after your delivery to us in accordance with all the terms and conditions hereof of the Masters constituting your recording commitment for such renewal term, whichever date shall be later.  Such renewal terms shall run consecutively, beginning at the expiration of the initial term, all upon the same terms and conditions applicable to the initial term except as otherwise specified herein.  Each option may be exercised only by giving you written notice of our election to exercise such option at any time prior to the commencement of the renewal term for which such option is exercised.

21.  (a)  You shall be solely responsible for and shall pay any and all royalties or other sums which may be payable to any producer of any of the Masters in respect of the recording and production thereof, the manufacture and sale of phonograph records embodying such Masters, and any other exploitation of such Masters.

(b)  (i)  Notwithstanding anything to the contrary contained herein, we may, with your prior written approval, (but shall not be obligated to) enter into an agreement directly with any producer of any of the Masters which provides for the payment by us, rather than you, of royalties or other compensation payable to such producer in respect of such Masters.  In such event, we shall have the right to deduct any royalties payable by us to any such producer in respect of such Masters from any and all royalties or other monies payable to you hereunder.

(ii)  Notwithstanding the foregoing:

[A]  if the royalty rate in respect of sales of full price LPs on our top line label embodying solely newly recorded Masters in the United States contained in our agreement with the producer of any such LP equals or exceeds four percent (4%) of the suggested retail list price of such LP, then on sales of such LP in the United States on which we are obligated hereunder to pay you a royalty of eleven percent (11%) (or a reduced or pro-rated portion thereof) we shall not deduct from the royalties or other sums payable to you hereunder one-half of one percent (.5%) (or a correspondingly reduced or pro-rated

portion thereof) of the royalty payable to
such producer on such sales; and

[B]  if the royalty rate in respect
of sales of full price LPs on our top line
label embodying solely newly recorded Masters
in the United Kingdom contained in our agree-
ment with the producer of any such LP equals
or exceeds four percent (4%) of the suggested
retail list price of such LP, then on sales
of such LP in the United Kindgom on which we
are obligated hereunder to pay you a royalty
of eleven percent (11%) (or a reduced or pro-
rated portion thereof), we shall not deduct
from the royalties or other sums payable to
you hereunder one-half of one percent (.5%)
(or a correspondingly reduced or pro-rated
portion thereof) of the royalty payable to
such producer on such sales.

(iii)  Furthermore, and subject to the
limitations set forth in the immediately preceding
subparagraph, for the purpose of the recoupment of
any advances or charges against royalties under
this contract, the royalty rates hereunder,
contained in paragraph 6 hereof, with respect to
such Masters shall be deemed reduced in the amount
of the applicable royalty rates with respect to
such Masters which are contained in our agreement
with such producer.  Moreover, in the event that
any advances or fees which are paid by us to any
such producer shall not be recouped in whole by us
from royalties payable to such producer, then we
shall have the right to recoup such advances or
fees from any monies payable to you hereunder.

22.  Notwithstanding anything to the contrary
contained herein:

(a)  (i)  [A]  in the event the aggregate net
sales through normal distribution channels in
the United States of any particular LP
(including disc and tape), computed separately
LP by LP, embodying only newly recorded
Masters hereunder shall exceed five hundred
thousand (500,000) units, then the royalty
rate pursuant to paragraph 6(a)(i) hereof
shall be increased to twelve percent (12%)
only with respect to net sales through
normal distribution channels in the United

States of such LP in excess of five hundred
thousand (500,000) units but not in excess of
one million (1,000,000) units; and

[B]  in the event the aggregate net
sales through normal distribution channels in
the United States of any particular LP
(including disc and tape), computed separately
LP by LP, embodying only newly recorded
Masters hereunder shall exceed one million
(1,000,000) units, then the royalty rate
pursuant to paragraph 6(a)(i) hereof shall be
increased to thirteen percent (13%) only with
respect to net sales through normal distribution
channels in the United States of such LP in
excess of one million (1,000,000) units.

(ii)  [A]  In the event the aggregate net
sales through normal distribution channels in
the United Kingdom (including Eire) of any
particular LP (including disc and tape),
computed separately LP by LP, embodying only
newly recorded Masters hereunder shall exceed
one hundred thousand (100,000) units, then
the royalty rate pursuant to paragraph 6(a)(i)
hereof shall be increased to twelve percent
(12%) only with respect to net sales through
normal distribution channels in the United
Kingdom of such LP in excess of one hundred
thouand (100,000) units, but not in excess of
three hundred thousand (300,000) units; and

[B]  In the event the aggregate net
sales through normal distribution channels in
the United Kingdom (including Eire) of any
particular LP (including disc and tape),
computed separately LP by LP, embodying only
newly recorded Masters hereunder shall exceed
three hundred thousand (300,000) units, then
the royalty rate pursuant to paragraph 6(a)(i)
hereof shall be increased to thirteen percent
(13%) only with respect to net sales through
normal distribution channels in the United
States of such LP in excess of three hundred
thousand (300,000) units.

(iii)  In the event the aggregate net
sales through normal distribution channels outside
the United States and the United Kingdom (including
Eire) of all LPs of your recording (including disc

and tape), computed cumulatively, embodying only
newly recorded Masters hereunder shall exceed one
million (1,000,000) units, then commencing upon
the expiration of the semiannual period during
which the aggregate net sales through normal
distribution channels outside the United States
and the United Kingdom of such LPs exceed such
level the royalty rate pursuant to paragraph 6(b)
hereof shall be increased to nine percent (9%)
only with respect to net sales through normal
distribution channels outside the United States
and the United Kingdom of such LP in excess of one
million (1,000,000) units.

(b)   An increase in the royalty rate pursuant
to paragraph 6(a)(i) hereof or the royalty rate pursuant
to paragraph 6(b) hereof by reason of the foregoing
provisions of this paragraph shall not result in the
increase in any other royalty rates contained in
paragraph 6.   Accordingly, and without limiting the
generality of the foregoing, for the purpose of computing
any royalty rates pursuant to paragraph 6 which are
based on the royalty rate contained in paragraph 6(a)(i)
or the royalty rate contained in paragraph 6(b), the
provisions of this paragraph shall be disregarded.   As
used in this paragraph, the term "net sales through
normal distribution channels shall refer to net sales
of records hereunder through our or our licensees'
customary distributors for resale through record or
other retail stores for which a royalty is payable
hereunder.   Accordingly, and without limiting the
generality of the foregoing, such term shall exclude
records sold or distributed in the manner set forth in
paragraphs 6(a)(ii), 6(c), or 6(d) hereof.

23.   (a)   Promptly after the execution hereof, we
shall pay you the sum of Fifty Thousand Dollars ($50,000)
as the advance for the first LP of your recording
commitment.   Promptly after your commencement of recording
sessions for each LP of your recording commitment,
other than the first LP of your recording commitment,
in accordance with the material terms and provisions
hereof, we shall pay you one-half (1/2) of the Recording
Advance for such LP set forth in the immediately following
schedule.   Promptly after your delivery to us of the
Masters constituting each LP of your recording commitment,
other than the first LP of your recording commitment,
if such Masters are produced, recorded and delivered in
all material respects in accordance with the material
terms and conditions hereof, we shall pay you one-half

32

(1/2) of the Recording Advance for such LP set forth in the immediately following schedule.  All sums paid by us pursuant to this paragraph 22 shall constitute advances recoupable by us from any and all royalties payable to you hereunder.

| LP of your Recording Commitment | Term | Recording Advance |
|---|---|---|
| Second LP (if any) | Initial Term | $ 30,000 |
| Each LP | First Renewal Term | $ 60,000 |
| Each LP | Second Renewal Term | $ 80,000 |
| Each LP | Third Renewal Term | $100,000 |
| Each LP | Fourth Renewal Term | $120,000 |

(b)   In the event the aggregate net sales through normal distribution channels in the United States of the first LP of your recording commitment (including disc and tape), computed separately LP by LP, embodying only newly recorded Masters hereunder shall exceed two hundred fifty thousand (250,000) units, (hereinafter referred to as the "Requisite U.S. NDC net sales") during the first nine (9) months after our release of such LP, then promptly after we determine that the Requisite U.S. NDC net sales have been attained we shall pay you as an advance recoupable from any and all royalties payable to you hereunder the amount by which Twenty-Five Thousand Dollars ($25,000) exceeds the Aggregate Stipend (as defined in paragraph 25(a) below) theretofore paid by us.  As used in this paragraph, the term "net sales through normal distribution channels" shall have the same meaning accorded such term in paragraph 22 hereof and, without limiting the generality of the foregoing, shall not include any record sales in respect of which a reserve is retained.

24.   You warrant, represent and agree that we shall have the right to secure life and/or disability insurance at our expense and for our benefit with respect to Artist. In connection with the foregoing, you agree to cause Artist to submit to up to two (2) reasonable examinations as may be required by any insurance company with whom we shall wish to enter into an agreement with respect to such life and/or disability insurance.

25.  (a)  Conditioned on your full and faithful performance of all the material terms and provisions thereof, we shall pay you a stipend of One Thousand Five Hundred Dollars ($1,500) on or about the first day of each month commencing January 1, 1982 and continuing through September 1, 1982 for Artist's living and other expenses.  The amount of all payments made by us pursuant to the immediately preceding sentence is herein referred to as the "Aggregate Stipend."  Notwithstanding the foregoing, if we pay you the advance referred to in paragraph 25(b) above, then we shall not make any further monthly stipend payments hereunder after the date upon which we pay such advance.  If the advance referred to in paragraph 25(b) above does not become payable by us, then we shall have the right to deduct the amount of the Aggregate Stipend from any and all royalties payable to you hereunder.

(b)  You acknowledge that prior to the date hereof we have paid or incurred approximately Seventeen Thousand Two Hundred and Forty Dollars ($17,240) (herein-after referred to as the "Prior Charges") to or on behalf of Artist for various expenses attributable to Artist (including, without limitation, living and transportation expenses and costs of producing demonstration records).  Conditioned on your full and faithful performance of all the material terms and conditions hereof, we shall pay you a stipend at the rate of approximately One Thousand Two Hundred and Eight Dollars ($1,208) per month during each month remaining in 1981 after the date hereof for Artist's living and other expenses.  The Prior Charges and all sums paid by us pursuant to the immediately preceding sentence shall constitute advances recoupable from any and all royalties payable to you hereunder.

26.  Notwithstanding anything to the contrary contained herein, Artist shall have the right, during the term hereof, to perform as a background musician or background vocalist on phonograph record master recordings for record companies other than us on the following terms and conditions only:

(a)  Such performance shall be rendered only in a background capacity and under no circumstances shall Artist perform as a featured musician or artist;

(b)  Neither Artist's name, likeness, nor biographical material concerning Artist shall be utilized in any manner in connection with the manufacture, sale,

or other exploitation of any such phonograph records
embodying any of Artist's performances or in connection
with the advertising thereof, except, that, subject to
our reasonable prior written approval in each instance,
Artist's name may be printed on the liner notes of any
record album embodying Artist's performances in type no
larger nor more prominent than that used for any other
background musician or background vocalist whose perfor-
mance is embodied therein; and

        (c)  In the event we shall so approve of
Artist's name appearing on such liner notes we shall
receive a credit after Artist's name in substantially
the following form:

        "Courtesy of Chrysalis Records, Inc.".

        (d)  Such performance shall not interfere
with the performance of Artist's obligations hereunder;
and

        (e)  We shall have no financial obligation to
you, the Artist or any person, firm or corporation by
reason of such performance by the Artist as a background
musician or background vocalist.

      27.  If the copyright or other applicable laws of
the United States are hereafter amended to provide for the
payment of public performance royalties in respect of the
public performance in the United States of master recordings
embodied on a record (as opposed to the public performance
of the musical composition embodied thereon) and if we agree
to credit to the royalty accounts of the majority of our
recording artists or the entities furnishing their services
any of the net public performance royalties actually received
by us which are payable solely in respect of the public
performance in the United States, of the Masters hereunder,
then we shall, unless you shall receive payment therefor
directly from a performing rights society or other person,
firm or corporation collecting such payments on your behalf,
credit to your royalty account hereunder an amount equal to
fifty percent (50%) of the net public performance royalties
actually received by us which are payable solely in respect
of the public performance in the United States of the Masters
hereunder, after deduction by us of any and all royalties
payable by us to any person, firm or corporation other than
you with respect to such public performance.

      28.  Upon your reasonable written request, we
shall consult with you concerning the form and content of

the cover artwork and liner notes proposed to be utilized by us in connection with the initial release during the term hereof of any LP of your recording commitment and, upon your reasonable request, we shall, prior to our release of such LP, submit to you or make available to you at our offices in Los Angeles said proposed cover artwork and liner notes for your approval, which such approval you agree not to unreasonably withhold.  Any objections to such material must be specific, in writing, and received by us within ten (10) business days after we have submitted or made available to you such material and such objection shall not be based on the per unit manufacturing cost of such material.  Failure to submit objections in accordance with the foregoing shall constitute your approval of such material.  In the event of a dispute between you and us with respect to any such cover artwork or liner notes, our good faith decision shall be final.

       If the foregoing correctly reflects your understanding and agreement with us, please so indicate by signing below.

                              Very truly yours,

                              CHRYSALIS RECORDS, INC.

                              By: _____

                              Its: _____

AGREED AND ACCEPTED:

HEAVY WAITE, INC.

By: _____

Its: _____

JOHN WAITE


Dated: As of <u>November 1</u>, 1981



Chrysalis Records, Inc.
9255 Sunset Boulevard, Ste. 200
Los Angeles, California  90069

      Re:  Heavy Waite, Inc.

Gentlemen:

      Pursuant to an exclusive recording contract between the undersigned and the above mentioned producer (herein called "Producer"), Producer is entitled to my exclusive services for the recording of phonograph records.  I have been advised that Producer is entering into a written agreement with you (herein called the "Agreement"), pursuant to which Producer is agreeing to furnish to you my recording services, all upon terms and conditions which have been fully explained to me.

      In consideration of your executing the Agreement and as a further inducment for you to do so (it being to my benefit as a recording artist that you execute same), I hereby agree as follows:

      1.  I confirm, warrant, guarantee, covenant and agree that:

      (a)  Producer has the right, insofar as I am concerned, to enter into the Agreement and to assume all of the obligations, warranties and undertakings to you on the part of Producer therein contained, and Producer will continue to have such right during the term of the Agreement and thereafter until all said obligations, warranties and undertakings have been fully performed and discharged.


EXHIBIT A

      (b)  All of the warranties, representations, covenants and agreements on the part of Producer contained in the Agreement, which concern me, are true and correct.

      (c)  I will duly and to the best of my ability perform and discharge all of the obligations and under-takings contained in the Agreement insofar as the same are required of me and to the extent which Producer has undertaken to procure my performance thereof.

      2.  If during the term of the Agreement or any extensions or renewals thereof Producer shall cease to be entitled to my recording services in accordance with the terms of the Agreement, or if Producer shall fail or refuse to furnish my recording services to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Producer had continued to be entitled to my recording services and if Producer had continued to furnish my services to you, and such rights, privileges and benefits shall be enforceable in your behalf against me.

      3.  You have the exclusive right to use and publish and to permit others to use and publish my name (both legal and professional) and likeness for advertising and purposes of trade and otherwise, without restriction, in connection with your record business and record-related products, and you have the right to refer to me as your exclusive artist.

      4.  I shall not, during the term of the Agreement or any extensions or renewals thereof, perform for anyone other than you or Producer for the purpose of making phono-graph records, and I shall not, prior to the later of the following dates, perform for anyone other than you, for the purpose of making phonograph records, any selection embodied in any recording which shall have been conveyed to you or to which you shall have been entitled under the Agreement: (i) the date five years subsequent to the date on which such selection shall have been last recorded under the Agreement, or (ii) the date two (2) years subsequent to the expiration or termination of the term of the Agreement.

      5.  No termination of the Agreement shall operate to diminish my liability or obligation hereunder without your written consent.

      6.  You may in your own name institute any action or proceeding against me to enforce your rights under the Agreement and under this guarantee, or pursuant to my recording contract with Producer.

7.    I expressly acknowledge that my and Pro-
ducer's services hereunder and under the Agreement are of a
special, unique, and intellectual character which give them
peculiar value, and that in the event of a breach by me or
Producer of any term, condition, or covenant hereof or of
the Agreement, you will be caused irreparable injury.   I
expressly agree that in the event Producer or I shall breach
any provision hereof or of the Agreement, you shall be
entitled to injunctive relief and/or damages, as you may
deem appropriate, in addition to any other rights or remedies
available to you, and you shall have the right to recoup any
such damages resulting from any such breach from any monies
which may be payable to me or Producer hereunder or under
the Agreement.

8.    I shall look solely to Producer for any and
all royalties, recording fees and other monies which shall
be payable to me with respect to the making of all recordings
under my recording contract with Producer and in connection
with your manufacture and sale of records embodying said
recordings and your exploitation of said recordings, all
throughout the world.

9.    I warrant and represent that pursuant to my
exclusive recording contract with Producer, I am entitled to
receive, in respect solely of the services rendered by me
thereunder and for your benefit pursuant to the Agreement,
at a minimum the sum of Six Thousand Dollars ($6,000.00)
each per annum during the term of the Agreement, whether or
not said term is extended or suspended.   I further warrant
and represent that in the event the California Code of Civil
Procedure Section 526 and/or the California Civil Code
Section 3423 is amended or supplemented to provide that the
minimum compensation under an enforceable personal services
contract entered into prior to the effective date of such
amendment shall be a sum greater than Six Thousand Dollars
($6,000.00) per annum, that the provisions of my exclusive
recording contract with Producer are automatically deemed
amended pursuant to the provision thereof so as to provide
for me to receive annual compensation pursuant to said
exclusive recording contract in the amount the applicable
amended or supplemented law specifies.   Hereinafter said Six
Thousand Dollars ($6,000.00) or other minimum compensation
is referred to as "Minimum Compensation."   In the event, for
any reason whatsoever, Producer shall fail to pay to me the
applicable Minimum Compensation per annum during the term of
the Agreement, whether or not said term is extended or
suspended, you agree, provided that I am not in breach of
any of the terms and provisions hereof or if the Agreement,
to pay to me an amount which when added to the amount (if

any) so paid to me by Producer shall equal the applicable Minimum Compensation per annum during the term of the Agreement, which payment shall constitute an advance against and be recoupable from any and all monies payable under my contract with Producer or under the Agreement. You acknowledge and agree that your such agreement shall apply regardless of whether the provisions of Paragraph 2 hereof shall become applicable. I acknowledge and confirm that your such agreement is intended to establish and preserve your right to injunctive relief to prevent a breach by Producer and/or me of the agreement and/or of the provisions of this letter agreement. Accordingly, it is your and my mutual intention that your such agreement be interpreted and construed in such a manner as to comply with the provisions of Section 3423 (Fifth) of the California Civil Code concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services.

Very truly yours,

_____
JOHN WAITE

AGREED AND ACCEPTED:

HEAVY WAITE, INC.

By: _____
    An Authorized Signatory

CHRYSALIS RECORDS, INC.

By: _____
    An Authorized Signatory

A-4