# EXHIBIT B

8-29-83/2/ptn:HAB38/A

Contract No. *EMIA-8098*

Los Angeles, California

Date: *9.22.83*

A G R E E M E N T

EMI America Records, a division
of Capitol Records, Inc.
6920 Sunset Boulevard
Los Angeles, California 90028

Gentlemen:

This will confirm the following agreement ("Agreement")
between EMI America Records, a division of Capitol Records,
Inc. ("EMIA") and Moonwalk Music, Inc. ("Company") for the
services of John Waite ("Artist").

1.   Term:

a.   The term of this Agreement shall be for an
Initial Period commencing on the date hereof which Initial
Period shall continue until the later of (i) two (2) years
following the date hereof; or (ii) until one hundred and twenty
(120) days after delivery to EMIA of the Minimum Number of
Masters specified in the Option Periods And Master Schedule.
Company grants EMIA two (2) options, each to renew this
Agreement for that period specified beside each option period
in the "Duration" column of the Option Periods And Master
Schedule below, said option periods to run consecutively
beginning at the expiration of the Initial Period except as
otherwise specified in this Agreement.  Each option may be
exercised by notifying Company in writing at any time prior to
the expiration of the then current period.  In no event shall
the entire term of this Agreement exceed more than seven years
in the aggregate.

829

8-29-83/2/ptn:HAB38/A

OPTION PERIODS & MASTER SCHEDULE

| Periods of This Agreement | Duration | Minimum No. of Masters |
|---|---|---|
| All Periods | The later of two (2) years or until one hundred and twenty (120) days after delivery to EMIA of the Minimum No. of Masters specified for the applicable period. | 2 lp-masters* |

*See Paragraph 1.b. hereinbelow.

b.   In the event that the album embodying the first lp-master delivered hereunder does not achieve Net USA Sales (as defined hereinafter in Paragraph m.i. of Exhibit "A") of One Hundred Thousand (100,000) units within six (6) months after the date of its initial USA commercial release, EMIA shall have the option, exercisable in its sole discretion within ten (10) days following the close of such six (6) month period, to terminate this Agreement upon written notice to Company which termination shall be effective thirty (30) days after EMIA's written notice.

2.   Company and Artist:

Company represents, warrants and agrees that:

a.   Company has a contract (as amended by the Artist Declaration attached hereto) with Artist.  Company's contract with Artist requires the performance by Artist exclusively for Company for a term long enough and otherwise containing appropriate provisions to allow Company to perform its obligations under this Agreement ("Artist Recording Contract").

b.   Artist is the sole owner of the professional name John Waite (sometimes referred to herein as the "Name"); to the best of Company's knowledge, no other person has or will have the right to use the Name and/or any other name that may be used upon the mutual agreement between EMIA and Company or permit such names to be used in connection with records; Company has the authority to grant EMIA the right to use the Name and/or any other Name that may be used upon the mutual agreement between EMIA and Company, and that EMIA's use of the Name and/or any other Name that may be used upon the mutual agreement between EMIA and Company will not infringe upon the rights of any third parties.

829

8-29-83/2/ptn:HAB38/A

c.   Intentionally deleted.

d.   The Artist Recording Contract will authorize Company to record masters for EMIA on all the terms hereof.

e.   In the Artist Recording Contract, Artist acknowledges and agrees that Artist's services in the record field are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot reasonably or adequately be compensated for in damages in an action at law and that a breach of the obligations under the Artist Recording Contract will cause irreparable injury and damage entitling Company to seek injunctive and other equitable relief.

f.   Artist shall execute the Artist's Declaration attached hereto and incorporated herein, and Company shall submit same to EMIA no later than the date of execution hereof.

g.   In the Artist Recording Contract, Artist will grant Company the right to authorize EMIA to enforce the said provisions of the Artist Recording Contract against Artist directly, either in Company's name or in EMIA's own name, and Company does so authorize EMIA.

h.   In the Artist Recording Contract, Company shall be obligated to pay Artist compensation for his services at the rate of not less than Six Thousand Dollars ($6,000) per annum during the term hereof.  During each year of this Agreement, Company shall provide documentation, in a form satisfactory to EMIA, that the aforesaid payments have been paid by Company to Artist. If the California Civil Code §3423 is amended to provide that minimum compensation under an enforceable personal services contract theretofore entered into shall be a sum greater than Six Thousand Dollars ($6,000) per annum, this Paragraph 2.h. shall be deemed automatically amended to provide for annual compensation in the amount that the amended law specifies.  Company agrees that EMIA shall have the right at any time and from time to time during the term hereof to pay Artist the aforesaid minimum compensation specified directly on Company's behalf.  Any such payment made by EMIA shall reduce dollar for dollar any royalties, advances and any other amounts otherwise payable to Company hereunder.

i.   Artist is under no disability, restriction or prohibition respecting musical works that Artist can record for EMIA except to the extent, if any, set forth in the Schedule of Restricted Musical Works attached hereto.

j.   Company will keep and perform all of its obligations under the Artist Recording Contract.

Page 3 of 47

829

     k.   Company has the right to make this entire Agreement and that Company has not done or permitted to be done anything which may curtail or impair any of the rights or grants made herein.

     l.   Company will not authorize Artist and Artist agrees that Artist will not perform any selection embodied in a master recorded hereunder for the purpose of making records for anyone other than EMIA for the later of (i) five (5) consecutive years following the initial USA commercial release of the record embodying the applicable master; or (ii) two (2) consecutive years after the expiration or termination of this Agreement.

     m.   There are no liens, encumbrances and/or obligations upon or with respect to the masters and; in connection with the recording of the masters (1) all costs of recording, applicable union recording scale for all required union fees and charges and all government taxes have been accounted for by Company to EMIA, and (2) all of the performers whose services were rendered in connection with the recording of the masters were contractually free to record for EMIA the selections embodied in the masters.

3.   <u>Recording Obligations:</u>

     In each period of this Agreement Company shall record at least the number of masters shown in the "Minimum Number of Masters" column in the Option Periods And Master Schedule and Company shall be responsible for timely delivery of the required number of masters hereunder pursuant to the terms of this Agreement including without limitation Section 6. hereinbelow; it being understood and agreed that EMIA shall have the right to exercise all of its rights hereunder relating to late delivery of masters regardless of the reason for such late delivery.  Notwithstanding the foregoing in this section, nothing contained in this Agreement shall obligate EMIA to make or sell records manufactured from masters or to have Company, in fact, record or deliver the "Minimum Number of Masters" specified in the Option Periods and Master Schedule for any period hereunder, and EMIA shall fulfill its entire obligation (including advance payments, if any) to Company as to unrecorded and/or undelivered masters by notifying Company prior to Company's recording the applicable lp-master in writing not to record and/or deliver the particular masters ("Notice") and by paying Company fifty percent (50%) of the Approved Recording Fund for the Minimum Number of Masters not recorded or delivered in the particular period.

8-29-83/2/ptn:HAB38/A

4.   <u>Recording Fund</u>:

a.   Prior to the recording of each master to be recorded hereunder, Company or Producer (as that term is defined in Section 9. hereinbelow) shall submit to EMIA for approval a written proposal for the recording of each such master ("Proposed Budget"). The Proposed Budget shall be in substantially the form of Exhibit "C" hereto and shall specify the number of vocalists and/or musicians to be employed, an estimate of the "costs of recording masters," including, without limitation, applicable union scale to the Artist, vocalists, musicians, conductors, arrangers (including "sketchers"), orchestrators and copyists; Producer fees and advances, if any; studio rental (including editing and mixing time) in connection therewith; and the proposed time, date and place of the recording sessions ("Recording Costs"). Provided the particular Proposed Budget does not exceed the applicable amounts in Column "B" below, inclusive of Producer's fees and advances, EMIA's approval of the amount of such Proposed Budget shall not be necessary ("Approved Recording Fund").

| <u>Column "A"</u> | <u>Column "B"</u> |
|---|---|
| First lp-master delivered to EMIA | $300,000 |
| Second, Third and Fourth lp-masters delivered to EMIA | $250,000* |
| Fifth lp-master delivered to EMIA | $300,000* |
| Sixth lp-master delivered to EMIA | $350,000 |

*As same may be increased pursuant to Paragraph 4.b. hereinbelow.

---

b.   EMIA hereby approves the greater of the following amounts as the Approved Recording Fund for the applicable lp-master set forth below:

(i)   In connection with the second lp-master delivered to EMIA:

(a)   Two Hundred Fifty Thousand Dollars ($250,000.00); or

(b)   The amount derived using the Formula (as Formula is hereinafter defined in Paragraph 4.c. below), applicable to said lp-master. The Approved Recording Fund payable pursuant to this Paragraph 4.b.(i)(b) shall not exceed the sum of Five Hundred Thousand Dollars ($500,000.00).

Page 5 of 47

8-29-83/2/ptn:HAB38/A

    (ii)   In connection with the third lp-master delivered to EMIA:

        (a)   Two Hundred Fifty Thousand Dollars ($250,000.00); or

        (b)   The amount derived using the Formula applicable to said lp-master.  The Approved Recording Fund payable pursuant to this Paragraph 4.b.(ii)(b) shall not exceed the sum of Five Hundred Fifty Thousand Dollars ($550,000.00).

    (iii)   In connection with the fourth lp-master delivered to EMIA:

        (a)   Two Hundred Fifty Thousand Dollars ($250,000.00); or

        (b)   The amount derived using the Formula (as Formula is hereinafter defined in Paragraph 4.c. below), applicable to said lp-master.  The Approved Recording Fund payable pursuant to this Paragraph 4.b.(iii)(b) shall not exceed the sum of Six Hundred Thousand Dollars ($600,000.00).

    (iv)   In connection with the fifth lp-master delivered to EMIA:

        (a)   Three Hundred Thousand Dollars ($300,000.00); or

        (b)   The amount derived using the Formula applicable to said lp-master.  The Approved Recording Fund payable pursuant to this Paragraph 4.b.(iv)(b) shall not exceed the sum of Six Hundred Fifty Thousand Dollars ($650,000.00).

c.   (i)   The word "Formula shall refer to the derivation of a recording fund for an applicable lp-master ("Applicable Lp-Master") by computing an amount equal to sixty-six and two-thirds percent (66-2/3%) of net royalties accrued to Company hereunder with respect to sales in the USA and Canada of albums manufactured from the lp-master delivered hereunder immediately preceding the Applicable Lp-Master ("Preceding Album"), less a reasonable reserve for returns, from the date of release of said Preceding Album until the end of the month preceding the commencement of recording the Applicable Lp-Master (the "Calculation Date").

    (ii)   For the purpose of the above computation:

829

(a)   Royalties shall not be counted with respect to sales through a record club distributor, plan, budget-line records, mid-line records or premium records.

(b)   Neither "Best of" nor "Live" lp-masters shall be construed as either Applicable LP-Masters or Preceding Albums.

(c)   The Formula shall be utilized only in the event that at least two (2) accounting statements have been rendered with respect to the Preceding Album.   In the event that less than two (2) accounting statements have been rendered as of the applicable Calculation Date, the applicable Approved Recording Fund shall be the amount set forth in Column "B" with respect to the Applicable LP Master provided that EMIA shall recalculate the Approved Recording Fund when two (2) accounting statements have been rendered in connection with the Preceding Album and shall promptly pay Company any amounts owing Company.

d.   In the event that an lp-master is recorded outside the jurisdiction of the AFM:

(i)   Company or a producer shall conduct the recording sessions in accordance with the Approved Budget for the masters specified therein and shall make all arrangements for such sessions.

(ii)   Company agrees that there will be no liens, encumbrances and/or obligations upon or in connection with the masters recorded and delivered hereunder.

(iii)   If EMIA receives a claim for the payment of any costs relating to the recording of masters hereunder and/or EMIA is requested to pay any costs for the recording of any masters, then, in addition to any of EMIA's other rights hereunder, EMIA, seven (7) days after Company has been notified of such request or claim, shall have the unlimited unilateral right upon notice to Company to elect to pay the Recording Costs incurred for any and/or all masters to be recorded hereunder, and any Recording Costs paid by EMIA shall be deducted from the applicable Approved Recording Fund otherwise payable to Company for recording the particular masters, and such costs shall be recoupable by EMIA from royalties otherwise payable to Company hereunder.

(iv)   Company agrees to furnish EMIA within fourteen (14) days following delivery of masters recorded

829

hereunder a detailed accounting along with all documenta-
tion relating to all costs paid for or incurred by or on
Company's behalf with respect to the recording of such
masters.  If Company fails to comply with the above
provisions in this section and as a result of such failure
EMIA incurs sales and/or use tax liability in excess of
that amount EMIA would have otherwise incurred had Company
complied with such provisions ("Excess Tax"), then EMIA
may deduct from any amount payable to Company hereunder
the amount of such Excess Tax and/or recoup such amount
from royalties otherwise payable to Company hereunder.

        (v)    EMIA shall pay to Company the applicable
Approved Recording Funds which are deemed to be advances
against and fully recoupable from royalties otherwise
payable to Company hereunder in the following manner:

            (a)  With respect to the first lp-master to
be delivered hereunder:

                (1)  One Hundred Thousand Dollars
        ($100,000.00) within fourteen (14) days
        following the execution of this Agreement; and

                (2)  Seventy-Five Thousand Dollars
        ($75,000.00) within fourteen (14) days following
        Company's commencing to record such lp-master;
        and

                (3)  The balance of the Approved
        Recording Fund within fourteen (14) days follow-
        ing delivery to and acceptance by EMIA of the
        first lp-master.

            (b)  With respect to every other lp-master
to be delivered hereunder:

                (1)  One-half (½) of the applicable
        Approved Recording Fund within fourteen (14)
        days following Company's commencing to record
        the applicable lp-master; and

                (2)  The balance within fourteen (14)
        days following delivery to and acceptance by
        EMIA of the applicable lp-master.

    e.    In the event that any lp-master to be delivered
heeunder is recorded within the jurisdiction of the AFM, the
following provisions shall be applicable:

            (i)    Company or Producer shall conduct the
    recording sessions in accordance with an approved budget

Page 8 of 47

8-29-83/2/ptn:HAB38/A

for the masters specified therein and shall make all arrangements for such sessions.

(ii)   Company agrees that there will be no liens, encumbrances and/or obligations upon or in connection with masters recorded and delivered hereunder and in connection with the recording of such masters any applicable government taxes shall be paid in full by Company.

(iii)   All masters recorded and delivered hereunder will be recorded under EMIA's current Phonograph Record Labor Contract with the American Federation of Musicians ("AFM") and all musicians who render services in connection with the recording of such masters (including instrumentalists, if any) will be paid the scale set forth in the said Labor Contract and EMIA shall pay, on Company's behalf, the contributions to the Pension Welfare Fund required by Exhibit "B" thereto.

(iv)   All American Federation of Television and Radio Artists ("AFTRA") members whose performances are embodied in the masters will be paid by EMIA, on Company's behalf, the rates applicable under the current AFTRA Code of Fair Practices for Phonograph Recordings.  Company agrees to be solely responsible for and to pay all royalties and/or other sums payable to Artist, other performers and Producer(s) and any other persons whose performances are embodied on masters recorded hereunder.  EMIA shall, if necessary, also pay to the AFTRA Pension and Welfare Fund, on Company's behalf, any contribution required to be made under the AFTRA Code based on compensation to other performers whose performances are embodied on masters recorded pursuant to this Agreement and the same shall be recovered from royalties to be paid by EMIA to Company hereunder.

(v)   The foregoing representations and warranties are respectively included for the benefit of AFM, AFTRA, the AFM and AFTRA members whose performances are embodied in the masters and EMIA, and may be enforced by AFM and/or AFTRA or their respective designees, as the case may be, and by EMIA.

(vi)   Company shall furnish EMIA with copies of all union contracts and/or union session reports so that all payments may be made by EMIA, on behalf of Company, in a timely fashion to the proper parties thereunder and if Company fails to do so with the result that EMIA is required to pay any penalty sum for making a late payment under the applicable union agreement and no monies are unspent in the Approved Recording Fund, such payments shall be a direct debt from Company to EMIA which, in

829

addition to any other remedy EMIA may have, EMIA may recover from any monies payable to Company. Company hereby agrees to indemnify and hold harmless EMIA from and against any claims arising out of Company's breach of any of the terms and provisions contained in this Paragraph 4.e.(iv).

(vii)   Company shall arrange or shall cause the applicable producer to arrange that all bills incurred with respect to masters recorded hereunder pursuant to an approved budget shall be sent to EMIA and Company shall promptly send such bills to EMIA after having placed on such bills (a) sufficient identification so that EMIA may ascertain the particular approved budget involved and the nature of the bills, and (b) written authorization for EMIA to pay such bills.

(viii)   EMIA shall pay the Recording Costs, advances, fees and applicable government taxes incurred in connection with such sessions up to the applicable Approved Recording Fund and Company shall be responsible for any excess.   If EMIA pays any such excess, EMIA may, in addition to any other remedy EMIA may have, recover such excess from any monies payable to Company hereunder.

(ix)   Company agrees to furnish EMIA within fourteen (14) days following delivery of masters recorded hereunder a detailed accounting along with all documenta-tion relating to all costs paid for or incurred by or on Company's behalf with respect to the recording of such masters.   If Company fails to comply with the above provisions in this section and as a result of such failure EMIA incurs sales and/or use tax liability in excess of that amount EMIA would have otherwise incurred had Company complied with such provisions ("Excess Tax"), then EMIA may deduct from any amount payable to Company hereunder the amount of such Excess Tax and/or recoup such amount from royalties otherwise payable to Company hereunder.

(x)   EMIA shall pay to Company the applicable Approved Recording Fund, which are deemed to be advances against and fully recoupable from royalties otherwise payable hereunder as follows:

(a)   With respect to the first lp-master to be delivered hereunder:

(1)   One Hundred Thousand Dollars ($100,000.00) within fourteen (14) days following the execution of this agreement; and

829

(2)   Fifty Thousand Dollars ($50,000.00) within fourteen (14) days following Company's commencing to record such lp-master; and

(3)   If the total expenses, inclusive of Recording Costs, fees and advances payable to Company and the applicable Producer and applicable government taxes paid by EMIA relating to the recording of the applicable lp-master do not exceed the applicable Approved Recording Fund, the difference ("Recording Fund Difference") within fourteen (14) days following delivery of the applicable lp-master to EMIA unless EMIA has reason to believe that all bills have not yet been received by EMIA with respect to the recording of the applicable lp-master in which case EMIA may hold back from such Recording Fund Difference an amount sufficient to cover such anticipated bills.

(b)   With respect to every other lp-master to be delivered hereunder:

(1)   One-third (1/3) of the applicable Approved Recording Fund within fourteen (14) days following commencement of recording of the applicable lp-master; and

(2)   If the total expenses, inclusive of Recording Costs, fees and advances payable to Company and the applicable Producer and applicable government taxes paid by EMIA relating to the recording of the applicable lp-master do not exceed the applicable Approved Recording Fund, the difference ("Recording Fund Difference") within fourteen (14) days following delivery of the applicable lp-master to EMIA unless EMIA has reason to believe that all bills have not yet been received by EMIA with respect to the recording of the applicable lp-master in which case EMIA may hold back from such Recording Fund Difference an amount sufficient to cover such anticipated bills.

(xi)   Notwithstanding anything to the contrary contained herein, all amounts which become payable as a result of Company's recording any masters within the jurisdiction of the AFM shall be paid by Company and in the event that EMIA must make any such payments, EMIA shall reduce Company's Approved Recording Fund by the amount of such payments, provided, however, that in the

8-29-83/2/ptn:HAB38/A

event that EMIA requests that Artist record any master within AFM jurisdiction, EMIA shall be responsible for all union payments arising from the recording of masters within AFM jurisdiction at EMI's request.

f.   No royalties shall be payable under this Agreement if, at the time such royalties would be payable, there are recoupable payments or advances which have been (i) made hereunder, or (ii) paid to Company, which recoupable payments or advances were paid during or prior to the accounting period in question and have not theretofore been recovered from royalties as set forth herein, and only royalties in excess of such unrecovered sums shall be payable hereunder.

5.   <u>Sound Recording Copyright:</u>

a.   With respect to any person whose services are furnished by Company in connection with masters recorded hereunder, including, but not limited to, Artist and/or any person engaged to act as a Producer, Company has or shall have a contract in which the person acknowledges that each master embodying the results and proceeds of his services is prepared within the scope of Company's engagement of his personal services and is a work made for hire, or as part of an lp-master constitutes a work specifically ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire.  Company further agrees that Company shall cause each such person to execute and deliver to EMIA a "Declaration Re Collective Work and "Power of Attorney" in the form attached hereto.

b.   With respect to each master recorded hereunder and "sound recordings" or "phonorecords" or "copies" manufactured therefrom (individually and collectively called the "Work"), Company grants and assigns to EMIA all exclusive right, title and interest in and to such Work throughout the Territory, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.  Company agrees to execute and deliver to EMIA, and Company grants to EMIA a power of attorney irrevocable and coupled with an interest to execute for Company and in Company's name, all documents and instruments necessary or desirable to effectuate the intents and purposes of this Paragraph 5.b. and to accomplish, evidence and perfect the rights granted to EMIA pursuant to this Paragraph 5.b., including, but not limited to: documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to EMIA.

829

8-29-83/2/ptn:HAB38/A

6.    Company's Master Delivery Obligations:

        a.    Subject to the terms of this Agreement, Company
agrees to have the masters required hereunder delivered as
follows:

                (i)    The first lp-master in the Initial Period
        shall be delivered no later than four (4) months after the
        execution of this Agreement.

                (ii)    The first lp-master in the Second and
        Third Option Periods shall be delivered no later than four
        (4) months following the commencement of the applicable
        period.

                (iii)    The second lp-master in each period
        hereof shall be delivered no earlier than seven (7) months
        nor later than ten (10) months following the delivery of
        the first lp-master in the applicable period.

        b.    Company shall not commence recording with the
intention of completing an lp-master until Company has
delivered the immediately preceding lp-master to EMIA.

        c.    If Company fails to deliver any lp-master
required hereunder within sixty (60) days after such lp-master
was due as aforesaid and such failure does not arise from any
action by EMIA, EMIA in addition to any other rights or
remedies which it may have, may elect to terminate the term
hereof by notice in writing which termination shall be
effective thirty (30) days after such notice# and EMI shall
thereby be relieved of any liability in connection with
undelivered masters.
                # and Company's failure to cure. RBS

        d.    Masters shall not be deemed to be delivered
hereunder until such time as fully equalized, edited two-track
stereophonic tape copies of such masters acceptable to EMIA as
satisfactory for the manufacture and sale of records, ready for
the manufacture of final lacquer masters along with
fully-proofed final reference discs of such masters as well as
all elements necessary for EMIA to have complete "label copy"
information with respect to such masters including, without
limitation, the title of each selection embodied on the
masters, the time of each such selection and the publisher(s)
of each such selection, any other information that is to appear
on labels and/or liners of records hereunder, all "sideman"
clearances, all musical licenses at the rates specified herein
for selections embodied on the masters as well as all other
elements and approvals required for EMIA to manufacture records
from such masters have been accepted by an authorized employee
of EMIA at the address for purposes of serving notices on EMIA
or at such other location as EMIA may advise Company by written
notice from time to time.  Company further agrees to
irrevocably direct in writing the person who has possession of

the multi-track tapes of masters recorded hereunder that such
multi-track tapes are EMIA's property and that such person
shall be obligated to deliver such multi-track tapes to EMIA
upon EMIA's written request.

     e.  With the exception of Section 11. hereof, for
purposes of this Agreement, more than one (1) lp-master
intended to be initially used in the manufacture of an album
shall nevertheless be deemed to be one (1) lp-master.

   7.  <u>Accounting and Audit Rights:</u>

     a.  EMIA will, within sixty (60) days after the
first day of April and the first day of October of each year
(or any other semiannual accounting periods EMIA may adopt for
a majority of its recording artists), compute the total
aggregate royalties earned by Company pursuant to this
Agreement for the preceding six (6) month period, and will
remit to Company an accounting statement and the net amount of
such royalties as may be due, if any, after deducting any and
all unrecouped advances and chargeable costs under this
Agreement.

     b.  At any time within three (3) years after any
royalty statement is rendered to Company hereunder, Company
shall have the right to give EMIA written notice of Company's
intention to examine EMIA's books and records with respect to
such statement.  Such examination shall be commenced at a
mutually convenient time and conducted at Company's sole cost
and expense, by Company, an independent certified public
accountant or attorney designated by Company who is not then
engaged in an outstanding examination of EMIA's books and
records on behalf of a person other than Company and who
certifies that (i) he will conduct such examination in
accordance with the then current rules and regulations of the
applicable society of Certified Public Accountants; and (ii)
such examination shall be made in accordance with generally
accepted accounting principles.  Such examination shall be made
during EMIA's usual business hours at the place where EMIA
maintains the books and records which relate to Company and
which are necessary to verify the accuracy of the statement or
statements specified in Company's notice to EMIA, and Company's
examination shall be limited to the foregoing.  Company's sole
right to inspect EMIA's books and records shall be as set forth
in this paragraph, and EMIA shall have no obligation to produce
such books and records more than once with respect to each
statement rendered to Company.  Without limiting the generality
of the foregoing, EMIA shall have no obligation to furnish
Company with any books and/or records that do not specifically
show sales or gratis distributions of phonograph records as to
which royalties are payable to Company hereunder.  Except with
respect to statements involved in any notice given by Company

8-29-83/2/ptn:HAB38/A

as prescribed in the first sentence of this paragraph, each
royalty statement rendered to Company shall be final,
conclusive and binding on Company and shall constitute an
account stated.   Company shall be foreclosed from maintaining
any action, claim or proceeding against EMIA in any forum or
tribunal with respect to any statement or accounting due
hereunder unless such action, claim or proceeding is commenced
against EMIA in a court of competent jurisdiction within three
(3) years after the date of such statement or accounting is
rendered.

    8.   <u>Royalty Provisions</u>:

      a.   In consideration of (i) the copyright ownership
provided herein, (ii) EMIA's right to use Artist's name and
likeness as provided herein, and (iii) the other agreements,
representations and warranties contained herein, EMIA agrees to
pay Company in connection with records manufactured from
masters recorded hereunder a royalty on net sales of records
manufactured from masters delivered hereunder, computed and
paid pursuant to the provisions of Exhibit "A" attached hereto
and incorporated by reference herein.   Such royalty shall
include royalties due to Artist and all other artists,
musicians, performers, Producer(s) and A & R personnel (other
than those employed by EMIA), and all union payments which
become or may become due by reason of EMIA's exploitation of
the masters delivered hereunder (other than masters recorded
within AFM jurisdiction at EMIA's request).   It is understood
and agreed that EMIA shall have the right, at its sole option,
to calculate royalties payable to Company on a wholesale basis,
in which event the royalty rates at which royalties are payable
hereunder shall be adjusted by EMIA accordingly, it being
further understood that any such recalculation on a wholesale
basis shall not diminish the royalties payable hereunder.

      b.   Notwithstanding anything to the contrary
contained herein; (i) EMIA shall have no obligation to pay
royalties to Company upon records sold by EMIA to a person who
is licensed to manufacture records outside the USA ("Foreign
Associate") utilizing masters owned by EMIA on which sales EMIA
does not collect a royalty, pressing or other license fee ("Ex
Fee Record") until the Foreign Associate sells the Ex Fee
Record to its customer and for royalty computation purposes
hereunder the sale of such Ex Fee Record shall be deemed made
at the time when and in the country where the Foreign Associate
made its sale.   (ii)  The sale to a Foreign Associate of an Ex
Fee Record which embodies any Owned Composition (as "Owned
Composition" is defined in Paragraph 12.c. below) shall not
give rise to an obligation to pay USA mechanical license
royalties, but such Ex Fee Record shall be subject to the
payment of mechanical license royalties by the Foreign
Associate at the rate applicable in the country of sale when

829

8-29-83/2/ptn:HAB38/A

and if the Foreign Associate sells the applicable Ex Fee Record to its customer.

c.    Notwithstanding anything to the contrary contained herein, with respect to sales of records hereunder by EMIA's licensees in East Germany, Hungary, Czechoslovakia, Poland, U.S.S.R., Romania, and Bulgaria, EMIA's obligation to pay rcyalties to Company shall be limited to fifty percent (50%) of the hard currency receipts actually received by or credited to EMIA in the USA from EMIA's applicable licensees, provided that in no event shall such royalty exceed that which would be payable in the event the other applicable royalty provisions contained in this Agreement applied to such sales.

d.    Notwithstanding anything to the contrary contained in this Agreement, EMIA agrees to pay Company in connection with Compact Discs (as that term is defined in Paragraph 14.p. below) released hereunder which are manufactured from masters recorded hereunder a royalty calculated in accordance with and subject to the terms, conditions and provisions contained in this Agreement save that, such royalty will be the same number of pennies as would be payable if the same masters were embodied on the corresponding analogue record (or, if no corresponding analogue exists, the tape record equivalent thereof) or, if no such analogue record (or tape record equivalent thereof) exists, of such album which in the reasonable opinion of EMIA contains similar material to that embodied on such Compact Disc provided that the packaging deduction specified elsewhere in this Agreement shall be applied thereto.  The aforesaid royalty for Compact Discs shall be applicable for a period which shall extend for the earlier of (i) three (3) years following the first accounting period in which Company receives a royalty for the sale of Compact Discs or (ii) June 30, 1987.  After such period Company and EMIA shall negotiate in good faith with respect to a royalty applicable to further exploitation of Compact Discs and, provided further, that EMIA shall have the right to exploit Compact Discs embodying masters delivered hereunder during such negotiations.

9.    Individual Producer of Masters:

Notwithstanding anything to the contrary contained herein, each individual producer of masters hereunder ("Producer") shall be subject to the mutual approval of EMIA and Company unless there is a dispute between Company and Artist with respect to the use of the particular proposed individual producer's services hereunder in which case the Producer to produce the applicable masters shall be mutually approved by EMIA and Artist.  Company shall be solely responsible for the payment of royalties and advances to each Producer of masters hereunder and agrees to indemnify and hold

829

EMIA harmless from any claims and expenses (including reasonable attorney's fees) to the contrary. In the event EMIA agrees to pay any advances and/or royalties to a Producer, EMIA shall reduce Company's applicable Approved Recording Fund and/or royalty rates hereunder by the advances and/or royalty rates payable by EMIA to such Producer. Company shall cause each Producer to sign and return to EMIA a Producer's Declaration in the form attached to this Agreement prior to utilizing such Producer's services hereunder.

10.   Applicable Law:

This Agreement shall become effective only when executed by an authorized agent of Company and an authorized signer on behalf of EMIA. It shall be deemed to have been made in the State of California and its validity, construction, breach, performance and operation shall be governed by the law of the State of California applicable to contracts made and to be performed in the State of California.

11.   Mechanical License Provisions:

a.   Company agrees that in connection with each record manufactured from masters recorded hereunder Company shall grant to EMIA or cause the publisher thereof to grant to EMIA a mechanical license for the USA and Canada for each selection at the statutory rate for a musical composition with a playing time of no longer than five (5) minutes ("Standard Musical Composition") current at the time any record embodying such selection is first manufactured hereunder ("Statutory Rate") for each record sold at EMIA's invoiced price and not returned; provided, in no event shall the combined rates for all selections in an album manufactured from one lp-master be greater than a total of ten (10) times the Statutory Rate for a Standard Musical Composition ("Standard Rate"); and provided further that in no event shall the combined rates for all selections in a single record exceed a total of two (2) times the Statutory Rate for a Standard Musical Composition for each such single sold at EMIA's invoiced price and not returned nor shall the combined rates for all selections in a mini album exceed a total of four (4) times the statutory rate for each such mini album sold at EMIA's invoiced price and not returned. The combined rates for all selections in an album manufactured from more than one (1) lp-master shall be increased from the Standard Rate to an increased combined rate in the same propor- tion as the then current suggested retail list price for a single disc top-line album bears to the suggested retail list price of such multiple disc album. Notwithstanding the fore- going, EMIA shall pay mechanical royalties only for selections embodied on records sold and not returned.

b.   Company agrees to indemnify and hold EMIA harmless from rates in excess of the applicable amounts specified in Paragraph 11.a. above.  If EMIA pays any such excess, such payments shall be a direct debt from Company to EMIA which, in addition to any other remedies available, EMIA may recover from royalties or any other payments to be made by EMIA to Company.

12.  Audiovisual:

From time to time during the term hereof, EMIA may request Company to cause Artist to perform at sessions all of which sessions shall be subject to Company's approval ("Approved Sessions") for the purposes of embodying Artist's performances on videotape and/or film ("Tapes").

a.   Company hereby consents to EMIA's production of the Tapes at the Approved Sessions as herein outlined.

b.   Company agrees that EMIA is the sole, exclusive and perpetual owner of the Tapes from inception including, but not limited to, the sole, exclusive and perpetual owner of all copyrights of any nature whatsoever in and to the Tapes.

c.   Company consents to the exhibition and exploitation of the Tapes by EMIA and its licensees for such purposes, at such times and places and in such media as determined by EMIA, and Company agrees that EMIA and its licensees shall have the right to use all musical compositions appearing on the Tapes that were written by Artist in whole or in part or are owned or controlled by Company and/or Artist directly or indirectly in whole or in part or by a publishing company owned or controlled by Company and/or Artist directly or indirectly in whole or in part ("Owned Compositions") with no further payment for the promotional use of such Owned Compositions, provided that Company shall use its best efforts to cause a free synchronization license to be granted for the commercial exploitation of the Tapes.

d.   (1)  With respect to the exploitation of the Tapes by means of theatrical distribution, non-theatrical distribution (as that term is defined below), on television (including free, pay, subscription, cable and CATV) and any other commercial exploitation of the Tapes with the exception of the types of exploitation of the Tapes specified in Paragraph 12.e. hereof, EMIA agrees to pay Company fifty percent (50%) of EMIA's adjusted gross receipts (as that term is defined below) after EMIA has recouped all Production Costs (as that term is defined hereinbelow) relating to the Tapes from adjusted gross receipts and EMIA has reduced Company's share of such adjusted gross receipts by all amounts payable by EMIA to Producers and Tapes directors.

8-29-83/2/ptn:HAB38/A

(2)   The amounts attributable to the Tape(s) for purposes of Paragraph 12.d.(1) hereof shall be applied against that portion of a given videotape program ("Program") which the playing time of the Tape(s) as utilized in the Program bears to the aggregate playing time of the Program.

e.   (i)     Company hereby agrees that EMIA and/or EMIA's licensees shall have the right to sell and/or rent primarily for home use any form of reproduction of the Tapes reproduced or manufactured hereunder.  EMIA and Company shall negotiate in good faith concerning a royalty with respect to such sale and/or rental.  Notwithstanding the foregoing, EMIA and EMIA's licensees shall have the right to sell and/or rent the devices specified in this paragraph pending agreement between EMIA and Company as to the royalty to be paid in connection with such sale and/or rental.

(ii)    With respect to the exploitation of the Tapes or any portion thereof in generic television commercials (as that term is defined below), EMIA agrees to pay Company twenty-five percent (25%) of EMIA's total revenues from such exploitation of the Tapes prorated on the basis of that portion of each generic television commercial which the playing time of the Tapes, as utilized in each generic television commercial, bears to the playing time of other artists' audiovisual performances contained in each generic television commercial after recoupment of the Production Costs of the Tapes embodied in each such generic television commercial.

f.   In connection with the Tapes, EMIA's sole obligation to Company is to make the payments specified in Paragraph 12.d. and e. hereof.

g.   For purposes of this Section 12., the term "commercial exploitation" shall mean that use of the Tapes for which EMIA receives money with the exception of Paragraphs 12.e.(i) and 12.e.(ii) hereof.

h.   EMIA shall create an account with respect to revenues derived from the exploitation of and Production Costs of the Tapes ("Tape Account").  The Tape Account shall not be cross-collateralized with Company's record royalty account hereunder, provided, however, that fifty percent (50%) of Production Costs incurred with respect to the Tape(s)#may be recouped from the Tape Account and/or Company's record royalty account hereunder.

# Made for promotional use RAS

i.   During the term of this Agreement Company shall not permit Artist to render musical performances on videotape or film for anyone other than EMIA for the purpose of the

Page 19 of 47

manufacture and sale of any form of reproduction of such
performances reproduced or manufactured and sold primarily for
home use.

j.   The words "non-theatrical distribution" shall
mean any use of the Tapes on airlines, ships at sea, or in
institutions, churches, etc., but shall specifically exclude
the types of exploitation of the Tapes specified in Paragraph
12.e. hereof.

k.   The words "adjusted gross receipts" shall mean
EMIA's gross receipts (as that term is defined below) relating
to the exploitation of the Tapes with the exception of Paragraph
12.e. hereof less (i) the greater of (a) a distribution fee
equal to twenty-five percent (25%) of EMIA's gross receipts
from such exploitation of the Tapes; or (b) the distribution
fee charged EMIA by a subdistributor; (ii) Production Costs;
(iii) a reasonable reserve for union payments in connection
with the Tapes; and (iv) all synchronization fees paid to
publishers of selections embodied on the Tapes.

l.   The words "gross receipts" shall mean all sums
received by EMIA in connection with the exploitation of the
Tapes (with the exception of the exploitation of the Tapes as
specified in Paragraphs 12.e.(i) and 12.e.(ii)) after deducting
any taxes paid or payable arising from the aforesaid exploita-
tion of the Tapes.

m.   For the purpose of this Section 12., Production
Costs shall be deemed to include all costs incurred and/or paid
by EMIA in connection with the production of the Tapes including
but not limited to (i) video master tape duplication costs;
(ii) broadcast system transfer charges; (iii) shipping and
freight charges and (iv) all mechanical licensing fees paid to
publishers.

n.   The words "generic television commercials" shall
mean advertisements for radio stations on television using the
visual portion of Tapes.

o.   EMIA shall consult with Company regarding the
budget for Tapes produced hereunder provided that in the event
of any dispute EMIA's decision shall be final.

13.  Force Majeure:

a.   If at any time during the term hereof by reason
of any act of God, fire, earthquake, flood, explosion, strike,
labor disturbance, civil commotion, act of Government, its
agencies or officers, any order, regulation, ruling or action
of any labor union or association of artists, musicians,
composers or employees affecting EMIA, its subsidiaries or

829

8-29-83/2/ptn:HAB38/A

affiliates or the industry in which it is or they are engaged
or any shortage of or failure or delays in the delivery of
materials, supplies, labor or equipment, or any other cause or
causes beyond the control of EMIA, any affiliate or subsidiary,
whether of the same or any other nature; (a) the enjoyment by
EMIA, its subsidiaries or affiliates of any rights, privileges
or benefits hereunder, including, without limitation, the
recording of masters or the manufacture, sale or distribution
of records, is delayed, hampered, interrupted or interfered
with, or otherwise becomes impossible or impracticable; or (b)
the performance of EMIA's obligations hereunder is delayed,
hampered, interrupted or interfered with, or otherwise becomes
impossible or impracticable, then EMIA may upon notice to
Company suspend the term of this Agreement for the duration of
any such contingency.  The duration of the term of the
Agreement shall be extended by a number of days equal to the
total of all such days of suspension.

     b.    Notwithstanding anything to the contrary
contained in Paragraph 16.a. hereinabove, if any suspension
thereunder (i) does not affect most of the major companies in
the phonograph record industry and (ii) continues for more than
six (6) consecutive months, then Company may terminate this
Agreement by notice to EMIA, which termination:  (A) shall be
effective on midnight of the tenth (10th) day after such notice
is given if during such ten (10) day period said suspension is
not discontinued by EMIA; or (b) shall not be effective if
during such ten (10) day period EMIA discontinues such
suspension.

     14.  Definitions:

     a.    The word "person" means a person, firm
association or corporation.

     b.    The word "selection" means a single musical work
(including a medley), story, poem or similar work, irrespective
of length.

     c.    The word "master" means any original recording
of a selection not theretofore recorded by Artist which is
acceptable to EMIA as satisfactory for the manufacture and sale
of records and which embodies a performance by Artist of a
selection approved by EMIA.  Masters shall not contain selec-
tions designed to appeal to a specialized or limited market
including, but not limited to, gospel, Christmas, children's
music or any other such special interest group.  Further,
Artist's performances on masters hereunder shall be of the same
quality and style as those recordings of Artist that originally
induced EMIA to enter into this Agreement with Company for the
services of Artist.  The word "master" includes the original
recording and all derivatives therefrom, including, without

8-29-83/2/ptn:HAB38/A

limitation, mix-down tapes and lacquer masters produced there-from.

d.    The noun "record" means any device by which sound may be recorded for later transmission to listeners, whether now known or unknown and howsoever used, whether embodying sound alone or synchronized with or accompanied by visual images.  The noun "record" does not include a "master" as defined above or a "permitted recording" as defined below.

e.    The phrase "lp-disc" means a 12 inch, 33-1/3 rpm, long playing disc-type record or its tape record equiva-lent, embodying thereon not less than eight (8) nor more than twelve (12) selections.

f.    The word "tape record" mean a record recorded on magnetic tape, whether reel-to-reel, continuous loop or other-wise.

g.    The word "album" means one (1) or more lp-discs embodying more than one selection on each side and released in one (1) package, or the tape record equivalent thereof, provided that in the USA during the term hereof, there shall be no multiple disc albums released absent the mutual consents of EMIA and Company.

h.    The word "lp-master" means a set of masters sufficient to constitute a lp-disc.

i.    The words "special markets plan" mean a marketing plan designed for ultimate distribution of all types of records to consumers through such methods including, but not limited to, methods commonly known in the recording industry as "direct mail to consumers" and "key outlet marketing." Distribution of records on top-line or budget-line through usual channels of distribution, or through a record club distribution plan and/or as premiums are hereby excluded from the foregoing definition.

j.    The words "permitted recording" mean (i) sound tracks for motion pictures, (ii) recordings for broadcasts of radio programs and television programs; and (iii) library service electrical transcriptions other than those which embody a selection recorded for EMIA as to which the restrictive period has not expired.

k.    The letters "USA" mean the United States of America, its territories and possessions.

l.    The words "single record" or "single" mean a disc-type record, regardless of size or playing speed embodying

829

not more than one (1) selection on each side, or the tape record equivalent thereof.

m.   The word "royalties" as used in this Agreement include all royalties (excluding mechanical royalties) payable under this Agreement.

n.   The term "net sales of records" shall refer to (i) in the case of sales by EMIA the aggregate number of records sold, for which EMIA has been paid or credited, in each applicable royalty category after deducting returns, rebates and credits on records returned in each royalty category, provided that EMIA shall liquidate reserves within four (4) accounting periods following the initial withholding thereof; and (ii) in the case of sales by EMIA's licensees of the same quantity of records for which EMIA is paid or credited. Returns shall be pro rated between free goods and sold records in accordance with EMIA's then standard accounting procedures.

o.   (i)   The term "retail list price" shall be deemed to mean the retail list price less all taxes and a container deduction of ten percent (10%) of the retail sales price for seven inch (7") singles in other than a factory crafted sleeve, twelve inch (12") singles and mini albums; twelve and one-half percent (12½%) of the retail sales price for albums in a single fold cover; fifteen percent (15%) of the retail list price for albums in a double-fold cover or including a special insert; and twenty percent (20%) of the retail list price for tape records and Compact Discs.

(ii)   The words "retail list price" shall further mean (a) the retail price suggested by the manufacturer in the USA for records sold in the USA; (b) the retail price suggested by the manufacturer in Canada for the records sold in Canada; and (c) in countries outside the USA and Canada, the suggested retail list price either in the country of manufacture or the country of sale, depending upon which such price EMIA's reporting licensee utilizes in computing fees payable to EMIA.

(iii)   Notwithstanding the foregoing, if, at the end of a period for which royalties are being computed hereunder, no retail list price for the particular record is suggested or recommended by the manufacturer in the relevant country, then for royalty accounting purposes hereunder with respect to that country the basis upon which royalty computations shall be made ("Base"), shall be determined by the method then in general use in the phonograph record industry in that country for arriving at a Base, such as (a) utilizing the retail price agreed upon by the phonograph record industry generally and the local

Page 23 of 47

mechanical rights society for copyright accounting purposes;
(b) determining the prices at which various classes of
phonograph records are customarily available to purchasers
through retail outlets in that country by means of an
averaging or sampling of data gathered through a survey
undertaken by or for the phonograph record industry; or
(c) applying a percentage retail markup to the wholesale
prices for various classes of records established by a
similar process.  If at that time no method is in general
use in the phonograph record industry in that country for
arriving at a Base, then EMIA or its applicable licensee
will establish the Base by use of one of the methods
described in the preceding sentence but applied only to
such licensee's own various classes of EMIA's phonograph
records and not on an industrywide basis.  From the Base
as determined above, there shall be deducted such sales or
other taxes levied on sales as are recovered directly or
indirectly as part of the selling price and the appropriate
container deduction provided for elsewhere in this Agreement
unless in the determination of Base those deductions were
previously made.  In no event shall the Base for sales by
the applicable licensee of EMIA in a given country be
lower than the Base utilized by such licensee in that
country in accounting for fees payable to EMIA.

     p.   The words "compact disc" shall mean a 120 mm
diameter (or such other size) disc-type record primarily
reproducing sound (whether or not synchronized with or accom-
panied by visual images) the signals of which are read and
transmitted from such record by means of a laser.

     q.   The word "Territory" shall mean the universe
including, but not limited to, the Solar System.

     r.   The words "budget line records" mean a record
which bears a retail list price at the date of release of
three-fourths (3/4) or less of the then current retail list
price for the substantial number of top line records in that
particular category.

    15.   <u>Permitted Recordings</u>:

     Company's right to authorize Artist to make any
"permitted recording" does not include the right to authorize
any person other than EMIA to use such permitted recording or
any component thereof for the purpose of manufacturing, distrib-
uting, selling, advertising or exploiting audio and/or audio
visual records for home use either during the term of this
Agreement or thereafter if such permitted recordings were
recorded during the term of this agreement.  Company agrees
that if Artist should make any permitted recording, Artist will

do so only under a written contract expressly prohibiting its
use by any person other than EMIA for any purpose other than
that for which such permitted recording was originally made.
Conditioned upon EMIA's obtaining all necessary rights and
licenses from any other person involved, Company agrees that
any performance by Artist during the term of this Agreement for
a person other than EMIA may be used by EMIA in the manufacture,
distribution, sale, advertising and exploitation of records
upon the same terms and conditions as are applicable under this
Agreement to records manufactured from masters recorded for
EMIA during the then current period except there shall be no
advances payable with respect to such permitted recordings used
by EMIA nor shall such permitted recordings be in satisfaction
of the Minimum Number of Masters to be recorded in such period
unless EMIA agrees to the contrary in writing.  If any contro-
versy should arise or litigation be brought in respect of
EMIA's rights under this Section 15., Company and Artist agree
to cooperate fully with EMIA in connection therewith.

   16.   Indemnification by Company:

        Company agrees to indemnify and hold EMIA harmless
from any third party claims, damages, expenses (including
reasonable attorney's fees) and litigation which may come about
because of any breach or claimed breach of any representation,
warranty or agreement by Company contained in this agreement,
it being understood that EMIA may withhold sums otherwise due
Company hereunder in amounts reasonably related to such
claim(s) until such time as such claim(s) are reduced to a
final judgment by a court of competent jurisdiction or are
settled pursuant to an agreement which has been approved by
Company in writing.  If EMIA settles a claim relating to
Company without Company's prior written consent, Company shall
not be liable for indemnifying EMIA for the amount of the
settlement, but will be liable for expenses (including
reasonable attorney's fees) which EMIA incurred up to and
including the date as of which the claim is settled.  Company
will receive prompt notice by EMIA of any litigation commenced
and, at Company's expense, Company shall have the right to join
in the defense of any claim, demand or litigation which relates
to Company in connection with this agreement.  If litigation is
not commenced within one (1) year after an aforesaid claim or
demand is made, EMIA shall release royalties withheld in
connection with said claim or demand.

   17.   Notices:

        a.   All notices, statements and payments which EMIA
may be required or desire to serve upon Company may be served
by depositing same, postage prepaid, in any mail box, chute or
other receptacle authorized by the United States Postal Service
for mail addressed to Company at the address below its
signature, or at such other address as Company may from time to

8-29-83/2/ptn:HAB38/A

time designate by written notice to EMIA to the attention of the Secretary. The date of service of any notice, statement or payment so deposited shall be the date of deposit. A courtesy copy of each notice shall be sent to Steven Machat, Esq., Machat & Machat, 1501 Broadway, 30th Floor, New York, New York 10036, provided that EMIA's inadvertent failure to send any courtesy copy shall not be deemed a breach of this Agreement, nor shall it affect the validity of any notice sent to Company.

b.   All notices which Company may be required or desire to serve upon EMIA may be served upon EMIA by depositing the same, postage prepaid, in any mail box, chute or other receptacle authorized by the United States Postal Service for mail addressed to EMIA at the address in the heading of this Agreement, attention Secretary, or at such other address as EMIA may from time to time designate by written notice to Company. The date of service of any notice so deposited shall be the date of deposit.

18.   EMIA's Ownership of Masters and Related Rights:

Company acknowledges that EMIA is the sole, exclusive, and perpetual owner of all masters from inception, which ownership entitles EMIA among other things to:

a.   The exclusive and perpetual ownership of all duplicates of the masters and records manufactured therefrom and the right to use and control the same and the performances embodied therein.

b.   The exclusive and perpetual right throughout the Territory to manufacture, advertise, sell, lease, license or otherwise use or dispose of records manufactured from or embodying all or any part of the contents of the masters, or to refrain therefrom, in any and all fields of use upon such terms and conditions as EMIA may approve.

c.   The perpetual right to use and publish and to permit others to use and publish the names (including any professional names heretofore or hereafter adopted), likenesses of, and biographical material concerning all the performers who recorded the masters and of Company, for advertising and trade purposes in connection with the sale and exploitation of records produced from the masters, or to refrain therefrom. Notwithstanding anything to the contrary contained herein, in the USA during the term of this Agreement, Company shall have the right to approve Artist's likeness and EMIA's use of Artist's name, which approval shall be deemed granted five (5) days after Company is informed the applicable material is available for inspection at EMIA's offices and EMIA shall use its best efforts to cause its licensees to utilize such approved material.

829

d.   The right to release records manufactured from the masters under the name of "EMI America" or such other trade name or mark as EMIA may elect, provided that the initial USA commercial release of each album recorded hereunder shall be on a top-line label.

e.   The right to sell and exploit records manufactured from the masters on which performances by other artists are coupled and to sell records manufactured from the masters in albums, which albums may contain pictures, prose and verse, and records embodying performances of other artists.

f.   EMIA's ownership and rights with respect to the masters shall extend to all tapes and other physical devices embodying performances made at recording sessions held pursuant to the terms of this Agreement.

g.   During the term of this Agreement, including all renewals, extensions, days of suspension, and all periods added by amendments or by other agreements: Company will not authorize or permit Artist to perform and Artist will not perform for the purpose of or himself engage in the making of records for anyone other than EMIA; neither Company nor Artist will authorize or permit the use of Artist's name, likeness, or other identification for the purpose of distributing, selling, advertising, or exploiting records for anyone other than EMIA.

19.  <u>Other Termination Rights:</u>

a.   If Artist's voice should be materially and permanently impaired, or if Company or Artist should fail, refuse or neglect to comply with any of the material obligations of Company hereunder, then, and in addition to any other rights or remedies which it may have, EMIA may elect to terminate this Agreement by notice in writing and shall thereby be relieved of any liability in connection with undelivered masters.

b.   No termination of this Agreement (whether by Company or by EMIA) shall in any way limit or curtail any of EMIA's rights, title, interest or privileges to or in connection with any of the results and proceeds of Company's endeavors under this Agreement or any rights or privileges of EMIA which continue after the term of this Agreement ends.

20.  <u>Cure and Assignment Provisions:</u>

The terms set forth in this Agreement and all attachments hereto, constitute the entire agreement between EMIA and Company, all prior negotiations and understandings being merged herein.  Company represents that no person acting or purporting to act on behalf of EMIA has made any promises or representations upon which Company has relied except those

829

expressly found herein.  This Agreement may only be altered by
an instrument executed by the party sought to be bound by such
instrument.  No failure by EMIA to perform any of its material
obligations under this Agreement shall be deemed a material
breach of this Agreement until Company has given EMIA written
notice of such breach and such breach has not been corrected
within forty five days after the giving of such notice.  With
the exception of Company's requirement to timely deliver
masters hereunder, a breach by Company which is not capable of
cure and/or any breach hereof by Company or Artist for which
EMIA might obtain injunctive relief, no failure by Company to
perform any of its material obligations hereunder shall be
deemed a breach of this agreement until EMIA has given written
notice of such breach and such breach has not been corrected
within forty-five (45) days after the giving of such notice.
EMIA may assign this Agreement or any part hereof or any rights
hereunder to any person.

21.  <u>Waiver:</u>

No waiver by EMIA of any breach by Company of any
term or condition of this Agreement shall operate as a waiver
by EMIA of any subsequent breach by Company of any term or
condition of this Agreement.

22.  <u>Time of Essence:</u>

Time is of the essence of this Agreement and all of
the terms and provisions hereof.

23.  <u>Severability:</u>

If the payments provided by this Agreement shall
exceed the amount permitted by any present or future law or
governmental order or regulation, such stated payments shall be
reduced while such limitation is in effect to the amount which
is so permitted; and the payment of such amount shall be deemed
to constitute full performance by Company of its obligations to
EMIA hereunder with respect to compensation during the time
when such limitation is in effect.  If any part of this
Agreement is determined to be void, invalid, inoperative or
unenforceable by a court of competent jurisdiction or by any
other legally constituted body having jurisdiction to make such
determination, such decision shall not affect any other
provisions hereof, and the remainder of this Agreement shall be
effective as though such void, invalid, inoperative or
unenforceable provision had not been contained herein.

24.  <u>Attorneys' Fees:</u>

If either party shall institute any action or
proceeding to enforce any of the terms and conditions of this
Agreement, the prevailing party in such action shall be

829

entitled to receive reasonable attorneys' fees and costs in addition to any other relief which may be granted by the court having jurisdiction over the action.

25.  Clause Headings:

The clause headings in this Agreement are for information purposes only and do not form a part of this Agreement.

26.  Promotional Records:

EMIA shall provide Company with fifty (50) unmarked copies of each album embodying an lp-master recorded hereunder. No royalties shall be payable to Company with respect to such albums supplied pursuant to this Paragraph 26. and Company warrants and represents that such albums shall be used by Company solely for promotional purposes.

27.  Coupling Restriction:

Subject to Paragraph 28. hereinbelow, in the USA during the term of this Agreement, EMIA shall not use masters recorded hereunder on records on which performances of other artists are embodied (except in the case of "Sampler" records, "Best of" records and records licensed or distributed for background, airline or other transportation use), provided that during the term of this Agreement outside the USA, EMIA shall obtain Company's consent in the event that any licensee of EMIA requests permission to couple masters produced hereunder.

28.  Greatest Hits:

a.   In the USA during the term of this Agreement, Company shall have the right to approve the selection of masters to be embodied in "Greatest Hits" records, which approval shall not be unreasonably withheld.

b.   After the term of this Agreement, EMIA shall consult with Company regarding the selection of masters to be embodied on Greatest Hits records provided that EMIA's decision shall be final in the event of any dispute.

29.  Company Logo Credit:

EMIA shall afford Company a logo credit in a form to be supplied by Company on each record solely embodying an lp-master delivered hereunder and in all advertising placed by EMIA in connection therewith, provided that EMIA's inadvertent failure to include such credit shall not be deemed a breach of this Agreement.

829

30.   Selection of Singles:

a.   In the USA during the term of this Agreement, EMIA and Company shall mutually select the "A" side of each single commercially released hereunder, provided that neither EMIA nor Company shall unreasonably withhold consent with respect therewith.

b.   In the USA during the term of this Agreement, Company shall select the master to be embodied on the "B" side of each single record commercially released hereunder.

31.   Release Commitment:

a.   Solely as a condition precedent to EMIA's right to exercise its remaining options hereunder, EMIA agrees to commercially release in the then current period of this Agreement, an album in the USA embodying each lp-master delivered by Company pursuant to this Agreement.  The aforesaid remedy in this Paragraph 31. shall be Company's sole remedy for EMIA's failure to release albums in the USA.

b.   EMIA shall use reasonable efforts to ensure that its licensees outside the USA and Canada release records embodying each lp-master delivered to EMIA pursuant to this agreement.

32.   Artwork:

a.   During the term of this Agreement EMIA and Company shall mutually approve all artwork in connection with albums commercially released embodying masters recorded hereunder.  Company's approval shall be given or withheld in good faith and shall be deemed granted if Company does not object within five (5) business days after being informed that the applicable artwork is available for inspection in EMIA's offices.

b.   During the term of this Agreement, Company and Capitol may mutually agree that Company shall prepare artwork in connection with any album embodying an lp-master delivered hereunder in which event Company shall prepare such artwork pursuant to a budget approved by EMIA ("Company Artwork"). Company agrees that manufacturing costs in connection with Company Artwork shall not exceed EMIA's then standard packaging costs.  In the event that Company prepares Company Artwork with respect to an album, the Company Artwork shall be submitted to EMIA in time for EMIA to meet its fabrication and release deadlines ("Deadlines").  The Company Artwork shall include cover art, photographs, credits and liner notes.  EMIA agrees to utilize the Company Artwork in the form submitted by Company, provided that the Company Artwork, in EMIA's judgment, is not offensive, indecent, scurrilous or obscene, and Company represents and warrants that the use by EMIA of the Company

829

8-29-83/2/ptn:HAB38/A

Artwork will not infringe upon the rights of any third parties. If Company does not submit Company Artwork to EMIA in time for EMIA to meet its Deadline, EMIA shall prepare artwork for the album which artwork shall be deemed approved by Company. Notwithstanding anything to the contrary contained herein, the copyright in and to all artwork, including without limitation, Company Artwork, shall be and remain the property of EMIA.

c.   In the event that Company pays all costs of producing camera-ready artwork, Company shall own the copyright in and to such artwork and shall grant EMIA a perpetual license to use such artwork in connection with masters recorded hereunder.

33.   Remix Rights:

In the USA during the term of this Agreement, Company shall have the first right to remix, re-edit, re-sequence or otherwise alter an lp-master (the "Services") previously delivered to and accepted by EMIA provided, however, that Company's right to perform the Services shall be subject to the following terms and conditions:

a.   EMIA shall notify Company that EMIA desires Company to perform the applicable Services ("Notice").

b.   Company shall perform the particular Services within five (5) business days following the Notice from EMIA ("Date").

c.   If Company fails to complete the applicable Services specified in the Notice to EMIA's satisfaction by the Date, EMIA and/or EMIA's designee, shall thereafter have the right to perform the applicable Services with no further obligation or Notice to Company.

d.   Company shall have no right to perform the Services with respect to the resequencing of cassettes embodying masters delivered hereunder.

34.   Sideman Provision:

Nothing contained in this Agreement shall prevent or prohibit Artist from performing as a "side person," background vocalist or producer for the making of records for any person; provided that Artist does not receive cover credit or credit as a featured artist, Artist's likeness is not used, Artist's name is not printed on the liner of such records in a size, style or color of print any larger or more prominent than that size,

829

8-29-83/2/ptn:HAB38/A

style or color of print used to credit any other side person on such records, and a readable credit line is printed on the liner of such record in substantially the following form:

"John Waite appears by courtesy of EMI-America Records, a division of Capitol Records, Inc."

Very truly yours,

MOONWALK MUSIC, INC.

By: _Richard B. Smith_

Title: _V.P._

An Authorized Signer

c/o Steven Machat, Esq.
1501 Broadway
30th Floor
New York, New York  10036

ACCEPTED AND AGREED TO:

EMI AMERICA RECORDS, a division
of Capitol Records, Inc.

By: _MARK BERGER_

Title: _Vice President_

An Authorized Officer

829

EXHIBIT "A"

With respect to the sales of records hereunder which embody only the performances in the masters, royalties shall be computed by reference to the applicable basic royalty rate ("Royalty Rate") detailed hereinbelow in the Royalty Schedule.

ROYALTY SCHEDULE

| | USA & Canada | | United Kingdom | | Italy, Japan, Australia, France, Germany Scandinavia & Beneluex | | Rest of Universe |
| | Singles & Mini-Lp's | Other Records | Singles & Mini Lp's | Other Records | Singles & Mini Lp's | Other Records | All Records |
|---|---|---|---|---|---|---|---|
| st & 2nd Masters | 10% | 13%* | 8% | 11% | 8% | 10% | 8% |
| ll Other Masters | 10% | 13%* | 8% | 12% | 8% | 10% | 8% |

s same may be escalated pursuant to Paragraph (m).

(a)  With respect to records hereunder sold in the USA and Canada which embody only masters produced hereunder, royalties shall be computed on the retail list price (less all excise; sales and use taxes and other taxes, however designated, if any) on one hundred percent (100%) of the net retail sales of such records sold in the United States and Canada, except as hereinafter provided.

(b)  With respect to records hereunder sold outside the USA and Canada which embody only the masters produced hereunder, royalties shall be computed on the retail list price (less (1) any and all applicable taxes on the sale and/or transfer of such records and (2) the container deduction charged EMIA by the applicable licensee) in the country of manufacture, the country of sale or the USA, as EMIA is paid, on one hundred percent (100%) of the net retail sales of such records, except as hereinafter provided.  Foreign royalties shall be computed in the currency of the country involved, and shall be paid, only after receipt by or credit to EMIA, at the same rate of exchange as EMIA was paid, less any and all foreign taxes allocable to records produced hereunder on payments made to EMIA and not otherwise deducted hereunder.  If EMIA cannot receive payment in the USA and in USA currency, and

elects to accept payment in a foreign currency, EMIA may deposit (at Company's expense) in such currency in a depository selected by Company, all payments so received as royalties applicable to this Agreement and shall notify Company thereof promptly.  Such deposit as above stated shall fulfill EMIA's obligations hereunder as to record sales hereunder to which such royalty payments are applicable.  Royalties for records sold outside the USA and Canada at Armed Forces Post Exchanges, irrespective of where the initial transaction occurs, shall be accounted as though such records had been sold in the rest of the universe.

(c)  With respect to records sold through any and all so-called "Record Clubs", "Mail Order Operations" and/or similar sales plan or devices or any other use of masters not otherwise specified herein, the royalty shall be one-half (1/2) of EMIA's net royalty receipts therefor less any amounts that EMIA may be obligated to pay a Producer of masters hereunder ("Producer's Share") and the Producer's Share shall be deducted solely from Company's share of net royalties.

(d)  With respect to records sold as so-called "economy" or "budget" priced records, the royalty shall be one-half (1/2) of the respective basic royalty rates set forth in Paragraphs (a) and (b) hereinabove, but not to exceed one-half (1/2) of EMIA's net royalty receipts therefor (less all third party payments), calculated in the manner set forth in this Agreement.

(e)  With respect to records sold as premiums or in connection with the sale of any other product, commodity, or service, the basic royalty rate shall be one-half (½) of the respective basic royalty rates set forth in Paragraphs (a) and (b) hereinabove, computed, however, on the basis of the amount per record actually received by EMIA, less album cover packaging allowance, applicable taxes and costs of delivery and shipping expenses rather than on the retail list price.  No masters recorded hereunder shall be embodied on records sold as premium records absent Company's prior written consent.

(f)  With respect to the licensing by EMIA of masters recorded hereunder to third parties (other than record clubs or mail order organizations and licensees outside the USA who distribute EMIA's top line records) Company's royalty shall be one-half (½) of the net royalty receipts received by EMIA from such licensing (less all third party payments exclusive of any amounts that EMIA may be obligated to pay a Producer) but not more than one-half (½) of the otherwise applicable royalty rate specified above in the Royalty Schedule computed on the same basis, quantity, and in the same manner as EMIA is paid.  Any portion of the net royalties EMIA may be obligated to pay a Producer shall be deducted solely from Company's share of net

royalties.  The sums provided for in this paragraph shall be
the only sums payable to Company for such licensing by EMIA,
and Company shall not be entitled to receive any other payments
with respect thereto.  The sums provided for in this paragraph
shall be payable only after the receipt by or credit to EMIA of
monies from its licensees and shall be reported on the
accounting date next succeeding the accounting period during
which royalties have actually been received by EMIA from its
licensees.

    (g)  With respect to the sale by EMIA of records hereunder
at less than EMIA's normal distributor price as a result of a
promotional program or discount plan ("Discount Records"), the
retail list price of such records shall bear the same
proportion to the actual distributor selling price as the
normal retail list price bears to EMIA's normal distributor
price.

    (h)  No royalties shall be computed or shall be due or
payable hereunder with respect to records given away (including
such records generally described as "free goods", "bonus
records" or "freebies") or furnished on a nonprofit basis to
disc jockeys, radio and televisions stations, motion picture
companies, "one-stops", rack jobbers, distributors, dealers,
consumers, employees, publishers or EMIA's subsidiaries,
divisions or branches or others; or with respect to records
sold for less than fifty percent (50%) of EMIA's normal whole-
sale price; or with respect to records sold at salvage or
close-out prices; or on promotional records which include the
masters together with master recordings recorded by others,
which promotional masters (sometimes referred to as "sampler"
records) are designed for sale at a substantially lower price
than the regular retail list price of such records.
Notwithstanding anything to the contrary contained herein,
during the term of this Agreement no records embodying masters
produced hereunder shall be furnished as a sales inducement and
invoiced on a no-charge basis ("Sales Inducement Records")
and/or as Discount Records except pursuant to a special sales
program of limited duration of which Company has been notified.

    (i)  Intentionally deleted.

    (j)  As to records not consisting entirely of the masters
the royalty otherwise payable hereunder shall be prorated in
the proportion that the number of masters which are on such
records bears to the total number of selections on such
records.  As to masters embodying performances of Artist
together with performances of other artists, ("Joint Masters")
the royalty otherwise payable to Company hereunder and the
recording costs otherwise chargeable to Company hereunder shall
be prorated in the proportion that Artist bears to the total
number of featured artists whose performances are on such Joint

Page 35 of 47

Masters, provided that no Joint Masters shall be recorded
hereunder absent the consents of EMIA and Company.

(k)   Notwithstanding anything to the contrary contained in
this Exhibit "A", or the Agreement to which it is attached, it
is specifically understood and agreed that royalties payable to
Company pursuant to the Agreement and/or Exhibit are deemed to
include all royalties, sums and other compensation due to the
actual producers of masters under the Agreement.

(l).  Company acknowledges that, with respect to records
sold in the USA, EMIA may convert its method of calculating
royalties to a system based upon the wholesale price of such
records.  Company acknowledges, however, that for the
foreseeable future, EMIA will continue to calculate royalties
with respect to records sold in the USA using a system based on
the retail list price of such records.

(m)        (i)   Notwithstanding anything to the contrary
contained in the Royalty Schedule, with respect to sales
of each album hereunder manufactured solely from an
lp-master delivered to EMIA hereunder during the term of
this Agreement and sold by EMIA in the USA (other than
sales (1) through a record club or special markets plan;
(2) to wholesalers in the USA solely for export to
customers outside the USA; (3) of budget-line records and
premium records and/or (4) to military post exchanges)
("Net USA Sales"), the royalty, to be computed and paid
pursuant to the terms hereof shall be as specified in
Column "B" below.

| Column "A" | Column "B" |
|---|---|
| For such Net USA Sales of the applicable album to 500,000 copies. . . . . . . . . . . | 13% |
| For such Net USA Sales of the applicable album from 500,001 to 1,000,000 copies . . . . . . . . . . . . . . . | 14% |
| For such Net USA Sales of the applicable album in excess of 1,000,000 copies . . . . . . . . . . . . . . . | 15% |

(ii)   Notwithstanding anything to the contrary
contained in the Royalty Schedule, with respect to sales
of each album hereunder manufactured solely from an
lp-master delivered to EMIA hereunder during the term of
this Agreement and sold by EMIA in Canada (other than
sales (1) through a record club or special markets plan;
(2) to wholesalers in Canada solely for export to
customers outside Canada; (3) of budget-line records and

829

premium records and/or (4) to military post exchanges)
("Net Canadian Sales"), the royalty, to be computed and
paid pursuant to the terms hereof shall be as specified in
Column "D" below.

| Column "C" | Column "D" |
|---|---|
| For such Net Canadian Sales of the applicable album to 50,000 copies . . . . . . . . . . . . | 13% |
| For such Net Canadian Sales of the applicable album from 50,001 to 100,000 copies . . . . . . . . . . . . . . . . . . . . | 14% |
| For such Net Canadian Sales of the applicable album in excess of 100,000 copies . . . . . . . . . . . . . . . . . . . . | 15% |

Page 37 of 47

8-29-83/2/ptn:HAB38/A

EXHIBIT "B"

Date:

EMI AMERICA RECORDS, a division
of Capitol Records, Inc.
6920 Sunset Boulevard
Los Angeles, California   90028

Gentlemen:

You have advised me that you are about to enter into an
agreement with Moonwalk Music, Inc. ("Company") under the terms
of which you will undertake to distribute recordings embodying
my performances ("Agreement").   I have been advised of the
terms of the Agreement and acknowledge it is beneficial to me
and I am desirous that it be executed.

In order to induce you to enter said Agreement, I agree as
follows:

1.    I warrant and represent that I am now under exclusive
      contract with Company as to the services to be rendered
      pursuant to the Agreement and said contract will continue
      in full force and effect during the term of the Agreement
      including all extensions, renewals and modifications
      thereof.

2.    Company has the right insofar as I am concerned to enter
      into the Agreement with you and to assume all of the
      obligations, warranties and undertakings therein
      contained.

3.    All of the warranties, representations and covenants on
      the part of Company contained in thus Agreement concerning
      me are true and correct and I hereby agree to be bound by
      same as though I were a party to the Agreement.

4.    I will duly and to the best of my ability perform and
      discharge all of the obligations and undertakings
      contained in the Agreement insofar as the same are
      required of me and which Company has undertaken to procure
      me to do and perform in the Agreement.

5.    I also acknowledge that no direct payment will be made by
      you to me and that any royalties for performances that may
      be due on the sale of records pursuant to the Agreement
      shall be paid directly by you to Company and provided that
      you have rendered accounting statements to Company and
      made the payments specified therein, I shall look solely
      to Company with respect to all artist royalties and

Page 38 of 47

829

Company will be solely liable for artist royalties which may be due me.

6.  If during the term of the Agreement or any extensions, renewals or modifications thereof, Company shall cease to be entitled to make my services available to you in accordance with the terms of the Agreement, or if Company shall fail or refuse to make my services available to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Company had continued to be entitled to my services, and I shall make the same available to you, and such rights, privileges and benefits shall be enforceable on your behalf against me.

7.  I do hereby acknowledge that my services are special, unique and extraordinary, the loss of which cannot be reasonably or adequately compensated for in an action at law, and that in addition to any rights you may have at law, you shall be entitled to seek injunctive relief to enforce your rights hereunder.

8.  If this Agreement is executed by more than one person as Artist, the first person singular shall include the plural wherever the context so requires.

9.  I represent that I shall become a member of all unions requisite for me to fulfill my obligations pursuant to this Agreement.

Very truly yours,

JOHN WAITE

8-29-83/2/ptn:HAB38/A


Contract No.

Los Angeles, California

Date:


DECLARATION RE COLLECTIVE WORK
AND POWER OF ATTORNEY


EMI AMERICA RECORDS, a division of Capitol Records, Inc.
("EMIA") and Moonwalk Music, Inc. ("Company") are parties to an
agreement ("EMIA-Company Agreement"), with respect to "masters"
and "sound recordings", "phonorecords" and "copies"
manufactured from such masters (individually and collectively
called the "Works"). For valuable consideration, receipt of
which is hereby acknowledged:

A.   The undersigned (jointly and severally if more than
one) acknowledge and agree that each master recorded under the
EMIA-Company Agreement embodying the results and proceeds of my
services (i) is prepared within the scope of Company's
engagement of my personal services and is a work made for hire,
or (ii) as part of an album constitutes a work specially
ordered by Company for use as a contribution to a collective
work and shall be considered a work made for hire. I further
acknowledge that Company is the exclusive owner of all right,
title and interest in and to each Work throughout the universe,
including, but not limited to, all rights of the owner of
copyright specified in 17 U.S.C. §106.

B.   Notwithstanding the provisions of Paragraph A. above,
I agree to the extent, if any, that I may be deemed an "author"
of any Work, I grant and assign to EMIA all exclusive right,
title and interest in and to such Work throughout the universe,
including, but not limited to, all rights of the owner of
copyright specified in 17 U.S.C. §106. For purposes of this
Paragraph B.:

1.   I hereby make, constitute and appoint EMIA,
irrevocably and coupled with an interest, my true and lawful
Attorney for me and in my name, place and stead to sign,
execute, acknowledge, deliver and record all documents and
instruments necessary or desirable to grant and assign to EMIA
all exclusive right, title and interest in and to the Works
throughout the universe, including, but not limited to, all
rights of the owner of copyright specified in 17 U.S.C. §106.

2.   The documents and instruments referred to in
Paragraph B.1. above shall include, but shall not be limited
to:  documents to apply for and obtain all registration of

829

8-29-83/2/ptn:HAB38/A

copyrights in and to any Work, and documents to assign such
copyrights to EMIA.

       3.   The undersigned grants to said Attorney full
power and authority to do and perform all and every act and
thing whatsoever requisite, necessary or appropriate to be done
with respect to the Works as fully to all intents and purposes
as I might or could do if personally present, hereby ratifying
all that my said Attorney shall lawfully do or cause to be done
by virtue of this Power of Attorney.

       4.   My said Attorney is empowered to determine in
his sole discretion the time when, purpose for and manner in
which any power conferred upon him shall be exercised, and the
conditions, provisions and covenants of any document or
instrument which may be executed by him pursuant to this Power
of Attorney.


    IN WITNESS WHEREOF, the undersigned has executed this
"Declaration Re Collective Work and Power of Attorney" on the
date first above written.

               MOONWALK MUSIC, INC.


               By: _Richard B. Smith_____

               Title: _V.P._____
                    An Authorized Signer

Page 41 of 47

8-29-83/2/ptn:HAB38/A

SCHEDULE OF RESTRICTED MUSICAL WORKS


IMPORTANT INSTRUCTION


1.   If there are any musical works you <u>cannot</u> record for EMIA
     because of a restriction in a previous record contract,
     please delete the word "NONE" and insert all of the
     information called for in the Schedule of Restricted
     Musical Works for each restricted selection.

2.   If you are under no restrictions as regards musical works
     you can record for EMIA, place your initials in the
     Schedule of Restricted Musical Works.


| Selection | Company | Date Recorded | Type of Restriction | Expiration of Restriction |
|-----------|---------|---------------|---------------------|---------------------------|

N O N E

829

8-29-83/2/ptn:HAB38/A

PRODUCER'S DECLARATION

I, the undersigned, declare that I have read and understand the agreement between EMI America Records, a division of Capitol Records, Inc., ("EMIA") and Moonwalk Music, Inc. ("Company") being signed concurrently herewith ("EMIA-Company Agreement").

For the express and direct benefit of EMIA, I hereby:

a.   Join in the representations and warranties made in the EMIA-Company Agreement as respects my employment contract with Company.  I agree to perform all the terms and provisions of my said employment contract and of the EMIA-Company Agreement which relate to my phonograph record endeavors, the use to be made of such results and proceeds and grant to EMIA the perpetual right to use and publish and to permit others to use and publish my name, signature, likeness, and biographical material concerning me for advertising and trade purposes in connection with the sale and exploitation of records manufactured from master recordings made pursuant to the EMIA-Company Agreement, and I agree that if the EMIA-Company Agreement is inconsistent with my employment contract, the obligations of the former shall supersede those of the latter.

b.   Acknowledge that the rights, privileges, benefits and remedies granted to Company in my employment contract with Company shall, at EMIA's election, be deemed to be granted to EMIA in the EMIA-Company Agreement, and I agree that if EMIA does so elect, they may be enforced against me directly by EMIA in EMIA's own name and in its own behalf in any court of competent jurisdiction whether or not Company is a party to the litigation.

c.   Agree to look solely to Company for the payment of my fees and/or royalties, as the case may be, and will not assert any claim in this regard against EMIA or attempt to prevent the manufacture, sale or distribution of phonograph records manufactured from Company masters produced under the terms and conditions of the EMIA-Company Agreement.

d.   Acknowledge and agree that each master recorded under the EMIA-Company Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) as part of an lp-master constitutes a work specially ordered by Company or EMIA for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that

Page 43 of 47

8-29-83/2/ptn:HAB38/A

Company has the right to exercise all rights of the copyright
proprietor with respect thereto, including, but not limited to:
all exclusive rights specified in 17 U.S.C. §106 and the
exclusive right to register copyright in the name of EMIA.

     e.    Notwithstanding the provisions of Paragraph d. above,
I agree that to the extent, if any, that I may be deemed an
"author" of any Work, I grant and assign to EMIA all exclusive
rights of copyright in and to such Work throughout the
universe, including, but not limited to, all exclusive rights
specified in 17 U.S.C. §106.  I agree to execute and deliver to
EMIA and I grant to EMIA a power of attorney irrevocable and
coupled with an interest to execute for me and in my name, all
documents and instruments necessary or appropriate to
effectuate the intents and purposes of this Paragraph e. and to
accomplish, evidence and perfect the rights granted to EMIA
pursuant to this Paragraph e., including but not limited to:
documents to apply for and obtain all registration of
copyrights in and to any such Work, and documents to assign
such copyrights to EMIA.


                                                    _____
                                                  APPLICABLE PRODUCER

829

## DECLARATION RE COLLECTIVE WORK
## AND POWER OF ATTORNEY

Concurrently herewith Moonwalk Music, Inc. ("Company") and EMI America Records, a division of Capitol Records, Inc. ("EMIA") are entering into an agreement ("EMIA-Company Agreement"), with respect to "masters" embodying the performances of John Waite and "sound recordings", "phonorecords" and "copies" manufactured from such masters (individually and collectively called the "Works").  For valuable consideration, receipt of which is hereby acknowledged:

A.    The undersigned (jointly and severally if more than one) acknowledge and agree that each master recorded under the EMIA-Company Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) as part of an lp-master constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered  a work made for hire.  I further acknowledge that Company is the exclusive owner of all right, title and interest in and to each Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

B.    Notwithstanding the provisions of Paragraph A. above, I agree to the extent, if any, that I may be deemed an "author" of any Work, I grant and assign to EMIA all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.  For purposes of this Paragraph B.:

1.    I hereby make, constitute and appoint EMIA, irrevocably and coupled with an interest, my true and lawful Attorney for me and in my name, place and stead to sign, execute, acknowledge, deliver and record all documents and instruments necessary or desirable to grant and assign to EMIA all exclusive right, title and interest in and to the Works throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

2.    The documents and instruments referred to in Paragraph B.1. above shall include, but shall not be limited to:  documents to apply for and obtain all registration of copyrights in and to any Work, and documents to assign such copyrights to EMIA.

3.    The undersigned grants to said Attorney full power and authority to do and perform all and every act and thing whatsoever requisite, necessary or appropriate to be done

8-29-83/2/ptn:HAB38/A

with respect to the Works as fully to all intents and purposes
as I might or could do if personally present, hereby ratifying
all that my said Attorney shall lawfully do or cause to be done
by virtue of this Power of Attorney.

    4.   My said Attorney is empowered to determine in
his sole discretion the time when, purpose for and manner in
which any power conferred upon him shall be exercised, and the
conditions, provisions and covenants of any document or
instrument which may be executed by him pursuant to this Power
of Attorney.


    IN WITNESS WHEREOF, the undersigned has executed this
"Declaration Re Collective Work and Power of Attorney" on the
date first above written.


                               _____
                               JOHN WAITE

829

8-29-83/2/ptn:HAB38/A

Budget

829