# EXHIBIT C

6-2/-85/jt:KB39/A

Contract No. *EMIA-8/6E*

Los Angeles, California

Date: *7/4/85*

A G R E E M E N T

EMI America Records, a division
of Capitol Records, Inc.
6920 Sunset Boulevard
Los Angeles, California 90028

Gentlemen:

This will confirm the following agreement ("Agreement")
between EMI America Records, a division of Capitol Records, Inc.
("EMIA") and Diamond Stripe, Inc. ("Company") and Anonymous
Music, Inc. ("Anonymous") as successor-in-interest to Moonwalk
Music, Inc. for the services of John Waite ("Artist"), which is
being entered into hereby with reference to the following facts:

A.    Prior to the date hereof, EMIA and Moonwalk Music, Inc.
(Moonwalk") were parties to an agreement dated September 22,
1983, bearing EMIA's Contract No. EMIA-8098, whereby Moonwalk
agreed to furnish to EMIA the exclusive personal recording
services of Artist (the "Prior Agreement").

B.    Pursuant to the Prior Agreement, Moonwalk was obligated
to record and deliver various master recordings embodying the
performances of Artist.

C.    As of the date hereof, Moonwalk had delivered to EMIA
one (1) lp-master pursuant to the Prior Agreement and Moonwalk
had further caused Artist to commence recording of the second
lp-master (the "Second LP") required to be recorded and delivered
to EMIA thereunder.

D.    Moonwalk and Artist have requested that EMIA enter into
a new agreement with Company upon terms and conditions which, by
Artist's judgment, shall be more favorable to Artist than those
contained in the Prior Agreement.

*Original Vaulte
7/24/8
81*

*MR*

Page 1 of 75

0328A

E.    Conditioned upon the acknowledgements, agreements, warranties and representations of Artist, Company and Anonymous set forth hereinbelow, EMIA has agreed to terminate the Prior Agreement and to enter into this Agreement containing terms and conditions, which in the judgment of Artist, Company and Anonymous are more favorable to Artist, Company and Anonymous than those contained in the Prior Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1.    <u>Term:</u>

a.    EMIA hereby engages, and Company hereby agrees to provide to EMIA, Artist's exclusive personal services in connection with the production of records.

b.    The term of this Agreement shall be for an initial period (the "Initial Period") commencing on the date of delivery of the Second LP being recorded by Artist pursuant to the Prior Agreement and such Initial Period shall continue until one hundred twenty (120) days thereafter.  Company also hereby grants EMIA three (3) options ("Options"), each to renew this Agreement for that period specified beside each Option in the "Duration" column of the OPTION PERIODS AND MASTER SCHEDULE below, said Option Periods to run consecutively beginning at the expiration of the Initial Period except as otherwise specified in this Agreement.  Each Option may be exercised by notifying Company in writing at any time prior to the expiration of the then current Period.  In no event shall the entire term of this Agreement exceed more than seven years in the aggregate.

OPTION PERIODS & MASTER SCHEDULE

| Period of This Agreement | Duration | Minimum Number of Masters |
|---|---|---|
| All Option Periods | The later of two (2) years or until one hundred and twenty (120) days after delivery to EMIA of the Minimum Number of Masters specified for the applicable Period. | 2 lp-masters |



2.   <u>Company and Artist:</u>

Company represents, warrants and agrees that:

a.   Company has a written contract with Artist (the "Artist Recording Contract") as amended by the Artist Declaration in the form of that marked as Exhibit "A" and attached hereto, wherein Artist has agreed to perform exclusively for Company upon such terms and conditions, including a term of sufficient duration and otherwise containing appropriate provisions to allow Company to perform all of its obligations under this Agreement.

b.   Artist is the sole owner of the professional name John Waite (sometimes referred to herein as the "Name"); to the best of Company's knowledge, no other person has or will have the right to use the Name and/or any other name that may be used upon the mutual agreement between EMIA and Company or permit such names to be used in connection with records; Company has the authority to grant EMIA the right to use the Name and/or any other Name that may be used upon the mutual agreement between EMIA and Company, and that EMIA's use of the Name and/or any other Name that may be used upon the mutual agreement between EMIA and Company will not infringe upon the rights of any third parties.

c.   Intentionally deleted.

d.   The Artist Recording Contract authorizes Company to record masters for EMIA on all the terms and conditions of this Agreement.

e.   In the Artist Recording Contract, Artist acknowledged and agreed that Artist's services in the record field are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot reasonably or adequately be compensated for in damages in an action at law and that a breach of the obligations under the Artist Recording Contract will cause irreparable injury and damage entitling Company to seek injunctive and other equitable relief.

f.   Artist shall execute the Artist's Declaration in the form of that marked as Exhibit "A" and attached hereto, and Company shall submit same to EMIA no later than the date of execution hereof.

g.   In the Artist Recording Contract, Artist granted to Company the right to authorize EMIA to enforce the provisions of the Artist Recording Contract against Artist directly, either in Company's name or in EMIA's own name, and Company does so authorize EMIA.



0328A

6-27-85/jt:KB39/A

h.   In the Artist Recording Contract, Company is obligated to pay Artist compensation for his services at the rate of not less than Six Thousand Dollars ($6,000) per annum during the term hereof.  During each year of this Agreement, Company shall provide documentation, in a form satisfactory to EMIA, that the aforesaid payments have been paid by Company to Artist. If the California Civil Code §3423 is amended to provide that minimum compensation under an enforceable personal services contract theretofore entered into shall be a sum greater than Six Thousand Dollars ($6,000) per annum, this Subparagraph 2.h. shall be deemed automatically amended to provide for annual compensation in the amount that the amended law specifies. Company agrees that EMIA shall have the right at any time and from time to time during the term hereof to pay Artist the aforesaid minimum compensation specified directly on Company's behalf.  Any such payment made by EMIA shall reduce dollar for dollar any royalties, advances and any other amounts otherwise payable to Company hereunder.

i.   Artist is under no disability, restriction or prohibition respecting musical works that Artist can record for EMIA except to the extent, if any, set forth in the Schedule of Restricted Musical Works in the form of that marked as Exhibit "B" and attached hereto.

j.   Company will keep and perform all of its obligations under the Artist Recording Contract.

k.   Company has the right to make this entire Agreement and Company has not done or permitted to be done anything which may curtail or impair any of the rights or grants made herein.

l.   Company will not authorize Artist and Artist agrees that Artist will not perform any selection embodied in a master recorded hereunder for the purpose of making records for anyone other than EMIA for the later of five (5) consecutive years following the initial USA commercial release of the record embodying the applicable master; or two (2) consecutive years after the expiration or termination of this Agreement.

m.   There are no liens, encumbrances and/or obligations upon or with respect to the masters and; in connection with the recording of the masters all costs of recording, applicable union recording scale for all required union fees and charges and all government taxes have been accounted for by Company to EMIA, and all of the performers whose services were rendered in connection with the recording of the masters were contractually free to record for EMIA the selections embodied in the masters.



0328A

o.   The benefits to be derived by Company and Artist pursuant to this Agreement are at least as favorable as could be obtained by Company and Artist from other record companies.

p.   The benefits obtained by Company and Artist pursuant to this Agreement are commensurate with the present and future value of the present and future rights conferred upon EMIA.

q.   The terms of this Agreement are more favorable to Company and Artist than those of the Prior Agreement, which Prior Agreement has, pursuant to Company's, Artist's and Anonymous' request, been terminated in writing by EMIA, Moonwalk and Anonymous prior to the execution of this Agreement.

r.   When this Agreement is taken and viewed in its entirety, there is no detriment suffered by Company, Artist, Moonwalk and/or Anonymous by reason of entering into this Agreement or terminating the Prior Agreement.

s.   This Agreement was not only negotiated at "arms length" but also as though Company, Artist, Anonymous and Moonwalk were free of any further obligation under the Prior Agreement.

t.   The benefits accruing to Company, Artist and Anonymous pursuant to this Agreement are conferred upon Company, Artist and Anonymous effective as of the date of execution of this Agreement and neither Company, Artist, or Anonymous will be required to wait until the date which, except for this Agreement, would have been the scheduled termination date of the Prior Agreement, to enjoy such benefits for any reason.

u.   This Agreement does not constitute either an amendment to or an extension of the Prior Agreement, but is an entirely new and separate agreement.

v.   It would constitute an unjust enrichment to Company, Artist and Anonymous if EMIA does not, by virtue of any attempt by Company, Artist and/or Anonymous to invoke the provisions of Section 2855 of the Labor Code of the State of California and to claim that this Agreement is an amendment of, an extension of, or otherwise the same as or part of, the Prior Agreement for the purpose interpreting such Labor Code provision, enjoy its rights under this Agreement for the full term hereof and to the full extent of the requirements hereof relating to the recording and delivery of master recordings featuring Artist's performances.



0328A

3.   Recording Obligations:

In each Option Period of this Agreement, Company shall record at least the number of masters shown in the "Minimum Number of Masters" column in the OPTION PERIODS AND MASTER SCHEDULE hereinabove and Company shall be responsible for timely delivery of the required number of masters hereunder pursuant to the terms of this Agreement including, without limitation, Paragraph 6. hereinbelow; it being understood and agreed that EMIA shall have the right to exercise all of its rights hereunder relating to late delivery of masters regardless of the reason for such late delivery.   Notwithstanding anything to the contrary contained in this Paragraph 3., nothing contained in this Agreement shall obligate EMIA to make or sell records manufactured from masters or to have Company, in fact, record or deliver the "Minimum Number of Masters" specified in the OPTION PERIODS AND MASTER SCHEDULE for any Option Period hereunder, and EMIA shall fulfill its entire obligation (including advance payments, if any) to Company as to unrecorded and/or undelivered masters by notifying Company prior to Company's recording the applicable 1p-master in writing not to record and/or deliver the particular masters ("Notice") and by paying Company fifty percent (50%) of the Approved Recording Fund for the Minimum Number of Masters not recorded or delivered in the then applicable Option Period.

4.   Recording Fund:

a.   Prior to the recording of each master to be recorded hereunder, Company or "Producer" (as that term is defined in Paragraph 9. hereinbelow) shall submit to EMIA for approval a written proposal for the recording of each such master which shall include a proposed budget ("Proposed Budget").   The Proposed Budget shall be in substantially in the form marked as Exhibit "C" and attached hereto and shall specify the number of vocalists and/or musicians to be employed, an estimate of the "costs of recording masters," including, without limitation, applicable union scale to the Artist, vocalists, musicians, conductors, arrangers (including "sketchers"), orchestrators and copyists; Producer fees and advances, if any; studio rental (including editing and mixing time) in connection therewith; and the proposed time, date and place of the recording sessions ("Recording Costs").   Provided the particular Proposed Budget does not exceed the applicable amounts in Column "B" below, inclusive of Producer's fees and advances for the applicable 1p-master set forth in Column "A" below ("Approved Recording Fund"), EMIA's approval of the amount of such Proposed Budget shall not be necessary.

Case 1:19-cv-01091-LAK   Document 51-3   Filed 06/26/19   Page 8 of 77

| Column "A" | Column "B" |
|---|---|
| First lp-master recorded and delivered in the First Option Period (if applicable) . . . | $250,000.00* |
| Second lp-master recorded and delivered in the First Option Period (if applicable) . . . | $250,000.00* |
| First lp-master recorded and delivered in the Second Option Period (if applicable) . . | $300,000.00* |
| Second lp-master recorded and delivered in the Second Option Period (if applicable) . . | $350,000.00* |
| First lp-master recorded and delivered in the Third Option Period (if applicable) . . . | $400,000.00* |
| Second lp-master recorded and delivered in the Third Option Period (if applicable) . . . | $400,000.00* |

*(Subject to increase or decrease pursuant to Subparagraph 4.b. hereinbelow)

---

b.    EMIA hereby approves the greater of the following amounts as the Approved Recording Fund for the applicable lp-master set forth below:

(i)  In connection with the first lp-master recorded and delivered to EMIA in the First Option Period (if applicable):

(A)  Two Hundred Fifty Thousand Dollars ($250,000.00); or

(B)  The amount derived using the "Formula" (as that term is defined in Subparagraph 4.c.(i) hereinbelow) applicable to said lp-master; provided, however, that the Approved Recording Fund payable pursuant to this Subparagraph 4.b.(i)(B) shall not exceed the sum of Five Hundred Fifty Thousand Dollars ($550,000.00).

(ii) In connection with the second lp-master recorded and delivered to EMIA in the First Option Period (if applicable):

(A)  Two Hundred Fifty Thousand Dollars ($250,000.00); or



6-27-85/jt:KB39/A

(B)   The amount derived using the Formula applicable to said lp-master; provided, however that the Approved Recording Fund payable pursuant to this Subparagraph 4.b.(ii)(B) shall not exceed the sum of Six Hundred Thousand Dollars ($600,000.00).

(iii) In connection with the first lp-master recorded and delivered to EMIA in the Second Option Period (if applicable):

(A)   Three Hundred Thousand Dollars ($300,000.00); or

(B)   The amount derived using the Formula applicable to said lp-master; provided, however, that the Approved Recording Fund payable pursuant to this Subparagraph 4.b.(iii)(B) shall not exceed the sum of Six Hundred Fifty Thousand Dollars ($650,000.00).

(iv) In connection with the second lp-master recorded and delivered to EMIA in the Second Option Period (if applicable):

(A)   Three Hundred Fifty Thousand Dollars ($350,000.00); or

(B)   The amount derived using the Formula applicable to said lp-master; provided, however that the Approved Recording Fund payable pursuant to this Subparagraph 4.b.(iv)(B) shall not exceed the sum of Seven Hundred Thousand Dollars ($700,000.00).

(v)   In connection with the first and second lp-master recorded and delivered to EMIA in the Third Option Period (if applicable):

(A)   Four Hundred Thousand Dollars ($400,000.00); or

(B)   The amount derived using the Formula applicable to said lp-master; provided, however that the Approved Recording Fund payable pursuant to this Subparagraph 4.b.(v)(B) shall not exceed the sum of One Million Dollars ($1,000,000.00).

(vi) Notwithstanding anything to the contrary contained in this Subparagraph 4.b., the amounts specified in Subparagraphs 4.b.(i), 4.b.(ii), 4.b.(iii) and 4.b.(iv) may be reduced pursuant to Subparagraph 35.d. hereinbelow.



0328A

6-27-85/jt:KB39/A

    c.   (i)    The word "Formula shall refer to the derivation of a recording fund for an applicable lp-master ("Applicable Lp-Master") by computing an amount equal to sixty-six and two-thirds percent (66-2/3%) of net royalties accrued to Company hereunder with respect to sales in the USA and Canada of albums manufactured from the lp-master delivered hereunder immediately preceding the Applicable Lp-Master ("Preceding Album"), less a reasonable reserve for returns, from the date of release of said Preceding Album until the end of the month preceding the commencement of recording the Applicable Lp-Master (the "Calculation Date").

       (ii)    For the purpose of the above computation:

         (a)   Royalties shall not be counted with respect to sales through a record club distributor, plan, budget-line records, mid-line records or premium records.

         (b)   Neither "Best of" nor "Live" lp-masters shall be construed as either Applicable LP-Masters or Preceding Albums.

         (c)   The Formula shall be utilized only in the event that at least two (2) accounting statements have been rendered with respect to the Preceding Album. In the event that less than two (2) accounting statements have been rendered as of the applicable Calculation Date, the applicable Approved Recording Fund shall be the amount set forth in Column "B" with respect to the Applicable LP Master provided that EMIA shall recalculate the Approved Recording Fund when two (2) accounting statements have been rendered in connection with the Preceding Album and shall promptly pay Company any amounts owing Company.

    d.  In the event that an lp-master is recorded outside the jurisdiction of the AFM:

       (i)    Company or a Producer shall conduct the recording sessions in accordance with the Approved Budget for the masters specified therein and shall make all arrangements for such sessions.

       (ii)    Company agrees that there will be no liens, encumbrances and/or obligations upon or in connection with the masters recorded and delivered hereunder.

       (iii)  If EMIA receives a claim for the payment of any costs relating to the recording of masters hereunder



0328A

and/or EMIA is requested to pay any costs for the recording of any masters, then, in addition to any of EMIA's other rights hereunder, seven (7) days after Company has been notified of such request or claim, EMIA shall have the unlimited unilateral right upon notice to Company to elect to pay the Recording Costs incurred for any and/or all masters to be recorded hereunder, and any Recording Costs paid by EMIA shall be deducted from the applicable Approved Recording Fund otherwise payable to Company for recording the particular masters, and such costs shall be recoupable by EMIA from royalties otherwise payable to Company hereunder.

(iv)   Company agrees to furnish EMIA within fourteen (14) days following delivery of masters recorded hereunder a detailed accounting along with all documentation relating to all costs paid for or incurred by or on Company's behalf with respect to the recording of such masters.  If Company fails to comply with the above provisions in this section and as a result of such failure EMIA incurs sales and/or use tax liability in excess of that amount EMIA would have otherwise incurred had Company complied with such provisions ("Excess Tax"), then EMIA may deduct from any amount payable to Company hereunder the amount of such Excess Tax and/or recoup such amount from royalties otherwise payable to Company hereunder.

(v)   Subject to the terms of Subparagraph 35.d. hereinbelow, EMIA shall pay to Company the applicable Approved Recording Funds which are deemed to be advances against and fully recoupable from royalties otherwise payable hereunder in the following manner:

(A)   With respect to every applicable lp-master to be delivered hereunder:

(1)   One-half (½) of the applicable Approved Recording Fund within fourteen (14) days following Company's notice to EMIA that Artist has commenced recording of the applicable lp-master; and

(2)   The balance within fourteen (14) days following delivery to and acceptance by EMIA of the applicable lp-master.

e.   In the event that any lp-master to be delivered heeunder is recorded within the jurisdiction of the AFM, the following provisions shall be applicable:



0328A

6-27-85/jt:KB39/A

(i)    Company or Producer shall conduct the recording sessions in accordance with an approved budget for the masters specified therein and shall make all arrangements for such sessions.

(ii)    Company agrees that there will be no liens, encumbrances and/or obligations upon or in connection with masters recorded and delivered hereunder and in connection with the recording of such masters any applicable government taxes shall be paid in full by Company.

(iii)    All masters recorded and delivered hereunder will be recorded under EMIA's current Phonograph Record Labor Contract with the American Federation of Musicians ("AFM") and all musicians who render services in connection with the recording of such masters (including instrumentalists, if any) will be paid the scale set forth in the said Labor Contract and EMIA shall pay, on Company's behalf, the contributions to the Pension Welfare Fund required by Exhibit "B" thereto.

(iv)    All American Federation of Television and Radio Artists ("AFTRA") members whose performances are embodied in the masters will be paid by EMIA, on Company's behalf, the rates applicable under the current AFTRA Code of Fair Practices for Phonograph Recordings.  Company agrees to be solely responsible for and to pay all royalties and/or other sums payable to Artist, other performers and Producer(s) and any other persons whose performances are embodied on masters recorded hereunder.  EMIA shall, if necessary, also pay to the AFTRA Pension and Welfare Fund, on Company's behalf, any contribution required to be made under the AFTRA Code based on compensation to other performers whose performances are embodied on masters recorded pursuant to this Agreement and the same shall be recovered from royalties to be paid by EMIA to Company hereunder.

(v)    The foregoing representations and warranties are respectively included for the benefit of AFM, AFTRA, the AFM and AFTRA members whose performances are embodied in the masters and EMIA, and may be enforced by AFM and/or AFTRA or their respective designees, as the case may be, and by EMIA.

(vi)    Company shall furnish EMIA with copies of all union contracts and/or union session reports so that all payments may be made by EMIA, on behalf of Company, in a timely fashion to the proper parties thereunder and if Company fails to do so with the result that EMIA is required



0328A

to pay any penalty sum for making a late payment under the applicable union agreement and no monies are unspent in the Approved Recording Fund, such payments shall be a direct debt from Company to EMIA which, in addition to any other remedy EMIA may have, EMIA may recover from any monies payable to Company.  Company hereby agrees to indemnify and hold harmless EMIA from and against any claims arising out of Company's breach of any of the terms and provisions contained in this Paragraph 4.e.

    (vii)  Company shall arrange or shall cause the applicable producer to arrange that all bills incurred with respect to masters recorded hereunder pursuant to an approved budget shall be sent to EMIA and Company shall promptly send such bills to EMIA after having placed on such bills sufficient identification so that EMIA may ascertain the particular approved budget involved and the nature of the bills, and written authorization for EMIA to pay such bills.

    (viii)  EMIA shall pay the Recording Costs, advances, fees and applicable government taxes incurred in connection with such sessions up to the applicable Approved Recording Fund and Company shall be responsible for any excess.  If EMIA pays any such excess, EMIA may, in addition to any other remedy EMIA may have, recover such excess from any monies payable to Company hereunder.

    (ix)  Company agrees to furnish EMIA within fourteen (14) days following delivery of masters recorded hereunder a detailed accounting along with all documentation relating to all costs paid for or incurred by or on Company's behalf with respect to the recording of such masters.  If Company fails to comply with the above provisions in this section and as a result of such failure EMIA incurs sales and/or use tax liability in excess of that amount EMIA would have otherwise incurred had Company complied with such provisions ("Excess Tax"), then EMIA may deduct from any amount payable to Company hereunder the amount of such Excess Tax and/or recoup such amount from royalties otherwise payable to Company hereunder.

    (x)  Subject to the terms of Subparagraph 35.d. hereinbelow and the terms of Subparagraph n.(iii) of Exhibit "G" attached hereto and incorporated herein, EMIA shall pay to Company the applicable Approved Recording Fund, which are deemed to be advances against and fully recoupable from royalties otherwise payable hereunder as follows:



6-27-85/jt:KB39/A

    (A) With respect to every applicable lp-master to be delivered hereunder:

      (1) One-third (1/3) of the applicable Approved Recording Fund within fourteen (14) days following Company's notice to EMIA that Artist has commenced recording of the applicable lp-master; and

      (2) If the total expenses, inclusive of Recording Costs, fees and advances payable to Company and the applicable Producer and applicable government taxes paid by EMIA relating to the recording of the applicable lp-master do not exceed the applicable Approved Recording Fund, the difference ("Recording Fund Difference") within fourteen (14) days following delivery of the applicable lp-master to EMIA unless EMIA has reason to believe that all bills have not yet been received by EMIA with respect to the recording of the applicable lp-master in which case EMIA may hold back from such Recording Fund Difference an amount sufficient to cover such anticipated bills.

    (xi) EMIA shall pay all applicable AFM Music Performance Trust Fund and Special Payments arising from EMIA's manufacture and sale of records embodying masters delivered hereunder, and such payments shall be deemed to be non-recoupable by EMIA.

    f. No royalties shall be payable under this Agreement if, at the time such royalties would be payable, there are recoupable payments or advances which have been either made hereunder, or paid to Company, which recoupable payments or advances were paid during or prior to the accounting period in question and have not theretofore been recovered from royalties as set forth herein, and only royalties in excess of such unrecovered sums shall be payable hereunder.

    5. <u>Sound Recording Copyright</u>:

    a. With respect to any person whose services are furnished by Company in connection with masters recorded hereunder, including, but not limited to, Artist and/or any person engaged to act as a Producer, Company has or shall have a contract in which the person acknowledges that each master embodying the results and proceeds of his services is prepared within the scope of Company's engagement of his personal services and is a work made for hire, or as part of an lp-master constitutes a work specifically ordered by Company for use as a

0323A

contribution to a collective work and shall be considered a work made for hire.  Company further agrees that Company shall cause each such person other than Artist to execute and deliver to EMIA a "Declaration Re Collective Work and Power of Attorney" in the form of that marked as Exhibit "D" and attached hereto and Company shall cause Artist to execute the "Declaration Re Collective Work and Power of Attorney" in the form of that marked as Exhibit "E" and attached hereto.

b.   With respect to each master recorded hereunder and "sound recordings" or "phonorecords" or "copies" manufactured therefrom (individually and collectively called the "Work"), Company grants and assigns to EMIA all exclusive right, title and interest in and to such Work throughout the Territory, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.  Company agrees to execute and deliver to EMIA, and Company grants to EMIA the Power of Attorney in the form of that marked as Exhibit "F" and attached hereto irrevocable and coupled with an interest to execute for Company and in Company's name, all documents and instruments necessary or desirable to effectuate the intents and purposes of this Paragraph 5.b. and to accomplish, evidence and perfect the rights granted to EMIA pursuant to this Paragraph 5.b., including, but not limited to: documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to EMIA.

6.   Company's Master Delivery Obligations:

a.   Subject to the terms of this Agreement, Company agrees to have the masters required hereunder delivered as follows:

(i)   The first lp-master in each applicable Option Period shall be delivered no later than four (4) months following the commencement of the applicable Option Period.

(ii) The second lp-master in each applicable Option Period hereof shall be delivered no earlier than seven (7) months nor later than ten (10) months following the delivery of the first lp-master in the applicable Option Period.

b.   Company shall not commence recording with the intention of completing an lp-master until Company has delivered the immediately preceding lp-master to EMIA.

c.   If Company fails to deliver any lp-master required hereunder within sixty (60) days after such lp-master was due as

0328A



aforesaid and such failure does not arise from any action by EMIA, EMIA in addition to any other rights or remedies which it may have, may elect to terminate the term hereof by notice in writing which termination shall be effective thirty (30) days after such notice if Company fails to deliver such lp-master during such thirty (30) day period, and EMIA shall thereby be relieved of any liability in connection with undelivered masters.

     d.   Masters shall not be deemed to be delivered hereunder until such time as fully equalized, edited two-track stereophonic tape copies of such masters acceptable to EMIA as satisfactory for the manufacture and sale of records, ready for the manufacture of final lacquer masters along with fully-proofed final reference discs of such masters as well as all elements necessary for EMIA to have complete "label copy" information with respect to such masters including, without limitation, the title of each selection embodied on the masters, the time of each such selection and the publisher(s) of each such selection, any other information that is to appear on labels and/or liners of records hereunder, all "sideman" clearances, all musical licenses at the rates specified herein for selections embodied on the masters as well as all other elements and approvals required for EMIA to manufacture records from such masters have been accepted by an authorized employee of EMIA at the address for purposes of serving notices on EMIA or at such other location as EMIA may advise Company by written notice from time to time.  Company further agrees to irrevocably direct in writing the person who has possession of the multi-track tapes of masters recorded hereunder that such multi-track tapes are EMIA's property and that such person shall be obligated to deliver such multi-track tapes to EMIA upon EMIA's written request.

     e.   With the exception of Paragraph 11. hereof, for purposes of this Agreement, more than one (1) lp-master intended to be initially used in the manufacture of an album shall nevertheless be deemed to be one (1) lp-master.

    7.   <u>Accounting and Audit Rights</u>:

     a.   EMIA will, within sixty (60) days after the first day of April and the first day of October of each year (or any other semiannual accounting periods EMIA may adopt for a majority of its recording artists), compute the total aggregate royalties earned by Company and Anonymous pursuant to this Agreement for the preceding six (6) month period, and will, subject to the terms of Subparagraph n. of Exhibit "G" attached hereto and incorporated herein, remit to Company and Anonymous an accounting statement and the net amount of such royalties as may be due, if any, after deducting any and all unrecouped advances and

o-28-85/jt:KB39/A

chargeable costs under this Agreement or the Prior Agreement which were made during or prior to the close of the applicable accounting period.

b.    At any time within three (3) years after any royalty statement is rendered to Company and Anonymous hereunder, Company and Anonymous shall have the right to give EMIA written notice of either party's intention to examine EMIA's books and records with respect to such statement ("Audit Notice").  Such examination shall be commenced at a mutually convenient time and conducted at Company's and/or Anonymous' sole cost and expense, by an independent certified public accountant or attorney designated by Company and/or Anonymous who is not then engaged in an outstanding examination of EMIA's books and records on behalf of a person other than Company and/or Anonymous and who certifies that (i) he will conduct such examination in accordance with the then current rules and regulations of the applicable society of Certified Public Accountants; and (ii) such examination shall be made in accordance with generally accepted accounting principles. Such examination shall be made during EMIA's usual business hours at the place where EMIA maintains the books and records which relate to Company and/or Anonymous and which are necessary to verify the accuracy of the statement or statements specified in Company's and/or Anonymous' Audit Notice to EMIA, and Company's and Anonymous' examination shall be limited to the foregoing. Company's and Anonymous' sole right to inspect EMIA's books and records shall be as set forth in this paragraph, and EMIA shall have no obligation to produce such books and records more than once with respect to each statement rendered to Company and/or Anonymous.  Without limiting the generality of the foregoing, EMIA shall have no obligation to furnish Company and/or Anonymous with any books and/or records that do not specifically show sales or gratis distributions of phonograph records as to which royalties are payable to Company and/or Anonymous hereunder. Except with respect to statements involved in any Audit Notice given by Company and/or Anonymous as prescribed in the first sentence of this paragraph, each royalty statement rendered to Company and/or Anonymous shall be final, conclusive and binding on Company and/or Anonymous and shall constitute an account stated.  Company and/or Anonymous shall be foreclosed from maintaining any action, claim or proceeding against EMIA in any forum or tribunal with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against EMIA in a court of competent jurisdiction within three (3) years after the date of such statement or accounting is rendered.

c.    Notwithstanding anything contained in Subparagraph 7.b. hereinabove to the contrary, it is understood and agreed that with respect to each accounting period hereunder, Company and Anonymous shall in the aggregate, be entitled to no more than



0328A

6-28-85/jt:KB39/A

one (1) examination of EMIA's books and records for each such
period (regardless of whether such examination was initiated by
Company or Anonymous) and that:

       (i)    the benefits of any settlement, compromise
or final judgment obtained by either party shall
proportionally accrue to the other (if applicable
hereunder); and

       (ii)    any such settlement, compromise or final
judgment obtained by either party shall be final and binding
on both Company and Anonymous whether or not such party
elected to join in such examination or action;

       (iii)    copies of any Audit Notices shall be sent
to all parties hereto so that the party who does not send
such Audit Notice may elect to join in such examination.
The party receiving a copy of such Audit Notice shall be
permitted to elect to join in such examination only if
notice of such election is received by EMIA within twenty
(20) days of the date of the Audit Notice.

8.   <u>Royalty Provisions</u>:

   a.   In consideration of (i) the copyright ownership
provided herein, (ii) EMIA's right to use Artist's name and
likeness as provided herein, and (iii) the other agreements,
representations and warranties contained herein, EMIA agrees to
pay Company in connection with records manufactured from masters
recorded hereunder a royalty on net sales of records manufactured
from masters delivered hereunder, computed and paid pursuant to
the provisions of Exhibit "G" attached hereto and incorporated by
reference herein.  Such royalty shall include royalties due to
Artist and all other artists, musicians, performers, Producer(s)
and A & R personnel (other than those employed by EMIA), and all
union payments which become or may become due by reason of EMIA's
exploitation of the masters delivered hereunder (other than
masters recorded within AFM jurisdiction at EMIA's request).  It
is understood and agreed that EMIA shall have the right, at its
sole option, to calculate royalties payable to Company and
Anonymous on a wholesale basis, in which event the royalty rates
at which royalties are payable hereunder shall be adjusted by
EMIA accordingly, it being further understood that any such
recalculation on a wholesale basis shall not diminish the
royalties payable hereunder.

   b.   Notwithstanding anything to the contrary contained
herein; (i) EMIA shall have no obligation to pay royalties upon
records sold by EMIA to a person who is licensed to manufacture
records outside the USA ("Foreign Associate") utilizing masters
owned by EMIA on which sales EMIA does not collect a royalty,



0328A

pressing or other license fee ("Ex Fee Record") until the Foreign
Associate sells the Ex Fee Record to its customer and for royalty
computation purposes hereunder the sale of such Ex Fee Record
shall be deemed made at the time when and in the country where
the Foreign Associate made its sale.  (ii) The sale to a Foreign
Associate of an Ex Fee Record which embodies any Owned
Composition (as "Owned Composition" is defined in Subparagraph
12.c. below) shall not give rise to an obligation to pay USA
mechanical license royalties, but such Ex Fee Record shall be
subject to the payment of mechanical license royalties by the
Foreign Associate at the rate applicable in the country of sale
when and if the Foreign Associate sells the applicable Ex Fee
Record to its customer.

       c.   Notwithstanding anything to the contrary contained
herein, with respect to sales of records hereunder by EMIA's
licensees in East Germany, Hungary, Czechoslovakia, Poland,
U.S.S.R., Romania, and Bulgaria, EMIA's obligation to pay
royalties hereunder shall be limited to fifty percent (50%) of
the hard currency receipts actually received by or credited to
EMIA in the USA from EMIA's applicable licensees, provided that
in no event shall such royalty exceed that which would be payable
in the event the other applicable royalty provisions contained in
this Agreement applied to such sales.

       d.   Notwithstanding anything to the contrary contained
in this Agreement, EMIA agrees to pay royalties in connection
with Compact Discs (as that term is defined in Paragraph 14.p.
below) released hereunder which are manufactured from masters
recorded hereunder a royalty calculated in accordance with and
subject to the terms, conditions and provisions contained in this
Agreement save that, such royalty will be the same number of
pennies as would be payable if the same masters were embodied on
the corresponding analogue record (or, if no corresponding
analogue record exists, the tape record equivalent thereof) or,
if no such analogue record (or tape record equivalent thereof)
exists, of such album which in the reasonable opinion of EMIA
contains similar material to that embodied on such Compact Disc
provided that the packaging deduction specified elsewhere in this
Agreement shall be applied thereto.  The aforesaid royalty for
Compact Discs shall be applicable for a period which shall extend
for the earlier of (i) three (3) years following the first
accounting period in which royalties are payable for the sale of
Compact Discs or (ii) June 30, 1987.  After such period Company
and EMIA shall negotiate in good faith with respect to a royalty
applicable to further exploitation of Compact Discs and, provided
further, that EMIA shall have the right to exploit Compact Discs
embodying masters delivered hereunder during such negotiations.

0328A

6-28-85/jt:KB39/A

9.  Individual Producer of Masters:

Notwithstanding anything to the contrary contained herein, each individual producer of masters hereunder ("Producer") shall be subject to the mutual approval of EMIA and Company unless there is a dispute between Company and Artist with respect to the use of the particular proposed individual producer's services hereunder in which case the Producer to produce the applicable masters shall be mutually approved by EMIA and Artist.  Subject to the provisions of Paragraph n. of Exhibit "G" attached hereto and incorporated herein, Company and Anonymous shall be solely responsible for the payment of royalties and advances to each Producer of masters hereunder and agrees to indemnify and hold EMIA harmless from any claims and expenses (including reasonable attorney's fees) to the contrary. In the event EMIA agrees to pay any advances and/or royalties to a Producer, EMIA shall reduce the applicable Approved Recording Fund and/or royalty rates hereunder by the advances and/or royalty rates payable by EMIA to such Producer.  Company shall cause each Producer to sign and return to EMIA a Producer's Declaration in the form marked as Exhibit "H" attached to this Agreement prior to utilizing such Producer's services hereunder. Notwithstanding anything contained herein to the contrary, EMIA shall have the right to approve all Producer advances and all Producer royalty rates in excess of three percent (3%) of the retail list price.

10.  Applicable Law:

This Agreement shall become effective only when executed by an authorized agent of Company, Anonymous and an authorized signer on behalf of EMIA.  It shall be deemed to have been made in the State of New York and its validity, construction, breach, performance and operation shall be governed by the law of the State of New York applicable to contracts made and to be performed in the State of New York and all parties hereto agree that any action brought be either party hereto shall only be adjudicated by the courts of the State of New York.

11.  Mechanical License Provisions:

a.  Company and Anonymous agree that in connection with each record manufactured from masters recorded hereunder Company and/or Anonymous shall grant to EMIA or cause the publisher thereof to grant to EMIA a mechanical license for the USA and Canada for each selection at the statutory rate for a musical composition with a playing time of no longer than five (5) minutes ("Standard Musical Composition") current at the time any record embodying such selection is first manufactured hereunder ("Statutory Rate") for each record sold at EMIA's invoiced price and not returned; provided, in no event shall the combined rates for all selections in an album manufactured from

0328A



6-27-85/jt:KB39/A

total of ten (10) times the Statutory Rate for a Standard Musical Composition ("Standard Rate"); and provided further that in no event shall the combined rates for all selections in a single record exceed a total of two (2) times the Statutory Rate for a Standard Musical Composition for each such single sold at EMIA's invoiced price and not returned nor shall the combined rates for all selections in a mini album exceed a total of four (4) times the statutory rate for each such mini album sold at EMIA's invoiced price and not returned.  The combined rates for all selections in an album manufactured from more than one (1) lp-master shall be increased from the Standard Rate to an increased combined rate in the same proportion as the then current suggested retail list price for a single disc top-line album bears to the suggested retail list price of such multiple disc album.  Notwithstanding the foregoing, EMIA shall pay mechanical royalties only for selections embodied on records sold and not returned.

b.   Company agrees to indemnify and hold EMIA harmless from rates in excess of the applicable amounts specified in Subparagraph 11.a. above.  If EMIA pays any such excess, such payments shall be a direct debt from Company to EMIA which, in addition to any other remedies available, EMIA may recover from royalties or any other payments to be made by EMIA to Company.

12.   Audiovisual:

From time to time during the term hereof, EMIA may request Company to cause Artist to perform at sessions all of which sessions shall be subject to Company's approval ("Approved Sessions") for the purposes of embodying Artist's performances on videotape and/or film ("Tapes").

a.   Company and Anonymous hereby consent to EMIA's production of the Tapes at the Approved Sessions as herein outlined.

b.   Company and Anonymous agree that EMIA is the sole, exclusive and perpetual owner of the Tapes from inception including, but not limited to, the sole, exclusive and perpetual owner of all copyrights of any nature whatsoever in and to the Tapes.

c.   Company and Anonymous consent to the exhibition and exploitation of the Tapes by EMIA and its licensees for such purposes, at such times and places and in such media as determined by EMIA, and Company and Anonymous agree that EMIA and its licensees shall have the right to use all musical compositions appearing on the Tapes that were written by Artist in whole or in part or are owned or controlled by Company,



Anonymous and/or Artist directly or indirectly in whole or in part or by a publishing company owned or controlled by Company, Anonymous and/or Artist directly or indirectly in whole or in part ("Owned Compositions") with no further payment for the promotional use of such Owned Compositions, provided that Company shall use its best efforts to cause a free synchronization license to be granted for the commercial exploitation of the Tapes.

d.    (1)  With respect to the exploitation of the Tapes by means of theatrical distribution, non-theatrical distribution (as that term is defined below), on television (including free, pay, subscription, cable and CATV) and any other commercial exploitation of the Tapes with the exception of the types of exploitation of the Tapes specified in Paragraph 12.e. hereof, EMIA agrees to pay as a royalty for such exploitation hereunder fifty percent (50%) of EMIA's adjusted gross receipts (as that term is defined below) after EMIA has recouped all Production Costs (as that term is defined hereinbelow) relating to the Tapes from adjusted gross receipts and EMIA has reduced Company's and Anonymous' share of such adjusted gross receipts by all amounts payable by EMIA to Producers and Tapes directors.

(2)  The amounts attributable to the Tape(s) for purposes of Paragraph 12.d.(1) hereof shall be applied against that portion of a given videotape program ("Program") which the playing time of the Tape(s) as utilized in the Program bears to the aggregate playing time of the Program.

e.    (i)    Company and Anonymous hereby agree that EMIA and/or EMIA's licensees shall have the right to sell and/or rent primarily for home use any form of reproduction of the Tapes reproduced or manufactured hereunder.  EMIA and Company shall negotiate in good faith concerning a royalty with respect to such sale and/or rental.  Notwithstanding the foregoing, EMIA and EMIA's licensees shall have the right to sell and/or rent the devices specified in this paragraph pending agreement between EMIA and Company as to the royalty to be paid in connection with such sale and/or rental.

(ii)   With respect to the exploitation of the Tapes or any portion thereof in generic television commercials (as that term is defined below), EMIA agrees to pay hereunder, twenty-five percent (25%) of EMIA's total revenues from such exploitation of the Tapes prorated on the basis of that portion of each generic television commercial which the playing time of the Tapes, as utilized in each generic television commercial, bears to the playing time of other artists' audiovisual performances contained in each

0328A

6-27-85/jt:KB39/A

generic television commercial after recoupment of the Production Costs of the Tapes embodied in each such generic television commercial.

f.   In connection with the Tapes, EMIA's sole obligation to Company and Anonymous is to make the payments specified in Paragraph 12.d. and e. hereof.

g.   For purposes of this Section 12., the term "commercial exploitation" shall mean that use of the Tapes for which EMIA receives money with the exception of Paragraphs 12.e.(i) and 12.e.(ii) hereof.

h.   EMIA shall create an account with respect to revenues derived from the exploitation of and Production Costs of the Tapes ("Tape Account").  The Tape Account shall not be cross-collateralized with Company's record royalty account hereunder, provided, however, that fifty percent (50%) of Production Costs incurred with respect to the Tape(s) made for promotional use may be recouped from the Tape Account and/or all record royalties hereunder.

i.   During the term of this Agreement Company shall not permit Artist to render musical performances on videotape or film for anyone other than EMIA for the purpose of the manufacture and sale of any form of reproduction of such performances reproduced or manufactured and sold primarily for home use.

j.   The words "non-theatrical distribution" shall mean any use of the Tapes on airlines, ships at sea, or in institutions, churches, etc., but shall specifically exclude the types of exploitation of the Tapes specified in Paragraph 12.e. hereof.

k.   The words "adjusted gross receipts" shall mean EMIA's gross receipts (as that term is defined below) relating to the exploitation of the Tapes with the exception of Paragraph 12.e. hereof less (i) the greater of (a) a distribution fee equal to twenty-five percent (25%) of EMIA's gross receipts from such exploitation of the Tapes; or (b) the distribution fee charged EMIA by a subdistributor; (ii) Production Costs; (iii) a reasonable reserve for union payments in connection with the Tapes; and (iv) all synchronization fees paid to publishers of selections embodied on the Tapes.

l.   The words "gross receipts" shall mean all sums received by EMIA in connection with the exploitation of the Tapes (with the exception of the exploitation of the Tapes as specified in Paragraphs 12.e.(i) and 12.e.(ii)) after deducting any taxes



0328A

6-27-85/jt:KB39/A

paid or payable arising from the aforesaid exploitation of the Tapes.

m.   For the purpose of this Section 12., Production Costs shall be deemed to include all costs incurred and/or paid by EMIA in connection with the production of the Tapes including but not limited to (i) video master tape duplication costs; (ii) broadcast system transfer charges; (iii) shipping and freight charges and (iv) all mechanical licensing fees paid to publishers.

n.   The words "generic television commercials" shall mean advertisements for radio stations on television using the visual portion of Tapes.

o.   EMIA shall consult with Company regarding the budget for Tapes produced hereunder provided that in the event of any dispute EMIA's decision shall be final.

13.   Force Majeure:

a.   If at any time during the term hereof by reason of any act of God, fire, earthquake, flood, explosion, strike, labor disturbance, civil commotion, act of Government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting EMIA, its subsidiaries or affiliates or the industry in which it is or they are engaged or any shortage of or failure or delays in the delivery of materials, supplies, labor or equipment, or any other cause or causes beyond the control of EMIA, any affiliate or subsidiary, whether of the same or any other nature; (a) the enjoyment by EMIA, its subsidiaries or affiliates of any rights, privileges or benefits hereunder, including, without limitation, the recording of masters or the manufacture, sale or distribution of records, is delayed, hampered, interrupted or interfered with, or otherwise becomes impossible or impracticable; or (b) the performance of EMIA's obligations hereunder is delayed, hampered, interrupted or interfered with, or otherwise becomes impossible or impracticable, then EMIA may upon notice to Company suspend the term of this Agreement for the duration of any such contingency. The duration of the term of the Agreement shall be extended by a number of days equal to the total of all such days of suspension.

b.   Notwithstanding anything to the contrary contained in Subparagraph 16.a. hereinabove, if any suspension thereunder (i) does not affect most of the major companies in the phonograph record industry and (ii) continues for more than six (6) consecutive months, then Company may terminate this Agreement by notice to EMIA, which termination shall be effective on midnight



of the tenth (10th) day after such notice is given if during such ten (10) day period said suspension is not discontinued by EMIA.

14. Definitions:

a.   The word "person" means a person, firm association or corporation.

b.   The word "selection" means a single musical work (including a medley), story, poem or similar work, irrespective of length.

c.   The word "master" means any original recording of a selection not theretofore recorded by Artist which is acceptable to EMIA as satisfactory for the manufacture and sale of records and which embodies a performance by Artist of a selection approved by EMIA.  Masters shall not contain selections designed to appeal to a specialized or limited market including, but not limited to, gospel, Christmas, children's music or any other such special interest group.  Further, Artist's performances on masters hereunder shall be of the same quality and style as those recordings of Artist that originally induced EMIA to enter into this Agreement with Company for the services of Artist.  The word "master" includes the original recording and all derivatives therefrom, including, without limitation, mix-down tapes and lacquer masters produced therefrom.

d.   The noun "record" means any device by which sound may be recorded for later transmission to listeners, whether now known or unknown and howsoever used, whether embodying sound alone or synchronized with or accompanied by visual images.  The noun "record" does not include a "master" as defined above or a "permitted recording" as defined below.

e.   The phrase "lp-disc" means a 12 inch, 33-1/3 rpm, long playing disc-type record or its tape record equivalent, embodying thereon not less than eight (8) nor more than twelve (12) selections.

f.   The word "tape record" mean a record recorded on magnetic tape, whether reel-to-reel, continuous loop or other-wise.

g.   The word "album" means one (1) or more lp-discs embodying more than one selection on each side and released in one (1) package, or the tape record equivalent thereof, provided that in the USA during the term hereof, there shall be no multiple disc albums released absent the mutual consents of EMIA and Company.



h.   The word "lp-master" means a set of masters sufficient to constitute a lp-disc.

i.   The words "special markets plan" mean a marketing plan designed for ultimate distribution of all types of records to consumers through such methods including, but not limited to, methods commonly known in the recording industry as "direct mail to consumers" and "key outlet marketing."  Distribution of records on top-line or budget-line through usual channels of distribution, or through a record club distribution plan and/or as premiums are hereby excluded from the foregoing definition.

j.   The words "permitted recording" mean (i) sound tracks for motion pictures, (ii) recordings for broadcasts of radio programs and television programs; and (iii) library service electrical transcriptions other than those which embody a selection recorded for EMIA as to which the restrictive period has not expired.

k.   The letters "USA" mean the United States of America, its territories and possessions.

l.   The words "single record" or "single" mean a disc-type record, regardless of size or playing speed embodying not more than one (1) selection on each side, or the tape record equivalent thereof.

m.   The word "royalties" as used in this Agreement include all royalties (excluding mechanical royalties) payable under this Agreement.

n.   The term "net sales of records" shall refer to (i) in the case of sales by EMIA the aggregate number of records sold, for which EMIA has been paid or credited, in each applicable royalty category after deducting returns, rebates and credits on records returned in each royalty category, provided that EMIA shall liquidate reserves within four (4) accounting periods following the initial withholding thereof; and (ii) in the case of sales by EMIA's licensees of the same quantity of records for which EMIA is paid or credited.  Returns shall be pro rated between free goods and sold records in accordance with EMIA's then standard accounting procedures.

o.   (i)   The term "retail list price" shall be deemed to mean the retail list price less all taxes and a container deduction of ten percent (10%) of the retail sales price for seven inch (7") singles in other than a factory crafted sleeve, twelve inch (12") singles and mini albums; twelve and one-half percent (12½%) of the retail sales price for albums in a single fold cover; fifteen percent (15%) of



0323A

0-27-85/jt:KB39/A

the retail list price for albums in a double-fold cover or including a special insert; and twenty percent (20%) of the retail list price for tape records and Compact Discs.

(ii)   The words "retail list price" shall further mean (a) the retail price suggested by the manufacturer in the USA for records sold in the USA; (b) the retail price suggested by the manufacturer in Canada for the records sold in Canada; and (c) in countries outside the USA and Canada, the suggested retail list price either in the country of manufacture or the country of sale, depending upon which such price EMIA's reporting licensee utilizes in computing fees payable to EMIA.

(iii)   Notwithstanding the foregoing, if, at the end of a period for which royalties are being computed hereunder, no retail list price for the particular record is suggested or recommended by the manufacturer in the relevant country, then for royalty accounting purposes hereunder with respect to that country the basis upon which royalty computations shall be made ("Base"), shall be determined by the method then in general use in the phonograph record industry in that country for arriving at a Base, such as (a) utilizing the retail price agreed upon by the phonograph record industry generally and the local mechanical rights society for copyright accounting purposes; (b) determining the prices at which various classes of phonograph records are customarily available to purchasers through retail outlets in that country by means of an averaging or sampling of data gathered through a survey undertaken by or for the phonograph record industry; or (c) applying a percentage retail markup to the wholesale prices for various classes of records established by a similar process.  If at that time no method is in general use in the phonograph record industry in that country for arriving at a Base, then EMIA or its applicable licensee will establish the Base by use of one of the methods described in the preceding sentence but applied only to such licensee's own various classes of EMIA's phonograph records and not on an industrywide basis. From the Base as determined above, there shall be deducted such sales or other taxes levied on sales as are recovered directly or indirectly as part of the selling price and the appropriate container deduction provided for elsewhere in this Agreement unless in the determination of Base those deductions were previously made.  In no event shall the Base for sales by the applicable licensee of EMIA in a given country be lower than the Base utilized by such licensee in that country in accounting for fees payable to EMIA.



0328A

p.    The words "compact disc" shall mean a 120 mm diameter (or such other size) disc-type record primarily reproducing sound (whether or not synchronized with or accompanied by visual images) the signals of which are read and transmitted from such record by means of a laser.

q.    The word "Territory" shall mean the universe including, but not limited to, the Solar System.

r.    The words "budget line records" mean a record which bears a retail list price at the date of release of three-fourths (3/4) or less of the then current retail list price for the substantial number of top line records in that particular category.

15.    <u>Permitted Recordings:</u>

Company's right to authorize Artist to make any "permitted recording" does not include the right to authorize any person other than EMIA to use such permitted recording or any component thereof for the purpose of manufacturing, distributing, selling, advertising or exploiting audio and/or audio visual records for home use either during the term of this Agreement or thereafter if such permitted recordings were recorded during the term of this agreement.  Company agrees that if Artist should make any permitted recording, Artist will do so only under a written contract expressly prohibiting its use by any person other than EMIA for any purpose other than that for which such permitted recording was originally made.  Conditioned upon EMIA's obtaining all necessary rights and licenses from any other person involved, Company agrees that any performance by Artist during the term of this Agreement for a person other than EMIA may be used by EMIA in the manufacture, distribution, sale, advertising and exploitation of records upon the same terms and conditions as are applicable under this Agreement to records manufactured from masters recorded for EMIA during the then current period except there shall be no advances payable with respect to such permitted recordings used by EMIA nor shall such permitted recordings be in satisfaction of the Minimum Number of Masters to be recorded in such period unless EMIA agrees to the contrary in writing.  If any controversy should arise or litigation be brought in respect of EMIA's rights under this Paragraph 15., Company and Artist agree to cooperate fully with EMIA in connection therewith.

16.    <u>Indemnification by Company:</u>

Company and Anonymous agree (as applicable) to indemnify and hold EMIA harmless from any third party claims, damages, expenses (including reasonable attorney's fees) and litigation which may come about because of any breach or claimed breach of any representation, warranty or

0323A



agreement by Company and/or Anonymous contained in this
agreement, it being understood that EMIA may withhold sums
otherwise due Company and/or Anonymous hereunder in amounts
reasonably related to such claim(s) until such time as such
claim(s) are reduced to a final judgment by a court of competent
jurisdiction or are settled pursuant to an agreement which has
been approved in writing.  If EMIA settles a claim relating to
Company and/or Anonymous (as applicable) without Company's and/or
Anonymous's (as applicable) prior written consent, Company or
Anonymous shall not be liable for indemnifying EMIA for the
amount of the settlement, but will be liable for expenses
(including reasonable attorney's fees) which EMIA incurred up to
and including the date as of which the claim is settled.  Company
and Anonymous (as applicable) will receive prompt notice by EMIA
of any litigation commenced and, at their own expense, Company
and Anonymous shall have the right to join in the defense of any
claim, demand or litigation which relates to Company and/or
Anonymous in connection with this agreement.  If litigation is
not commenced within one (1) year after an aforesaid claim or
demand is made, EMIA shall release royalties withheld in
connection with said claim or demand.

17.  Notices:

a.    All notices, statements and payments which EMIA
may be required or desire to serve upon Company may be served by
depositing same, postage prepaid, in any mail box, chute or other
receptacle authorized by the United States Postal Service for
mail addressed to Company at the address below its signature, or
at such other address as Company may from time to time designate
by written notice to EMIA to the attention of the Secretary.  The
date of service of any notice, statement or payment so deposited
shall be the date of deposit.  A courtesy copy of each notice
shall be sent to Peter Shukat, Esq., Shukat & Singer, 111 West
57th Street, New York, New York 10019, provided that EMIA's
inadvertent failure to send any courtesy copy shall not be deemed
a breach of this Agreement, nor shall it affect the validity of
any notice sent to Company.

b.    All notices, statements and payments which EMIA may
be required or desire to serve upon Anonymous may be served by
depositing same, postage prepaid, in any mail box, chute or other
receptacle authorized by the United States Postal Service for
mail addressed to Anonymous at the address below its signature,
or at such other address as Anonymous may from time to time
designate by written notice to EMIA to the attention of the
Secretary.  The date of service of any notice, statement or
payment so deposited shall be the date of deposit.  A courtesy
copy of each notice shall be sent to Steve Machat, Esq., 1 West
67th Street, New York, New York 10023, provided that EMIA's
inadvertent failure to send any courtesy copy shall not be deemed
a breach of this Agreement, nor shall it affect the validity of
any notice sent to Anonymous.

0328A



6-27-85/jt:KB39/A

c.   All notices which Company and/or Anonymous may be required or desire to serve upon EMIA may be served upon EMIA by depositing the same, postage prepaid, in any mail box, chute or other receptacle authorized by the United States Postal Service for mail addressed to EMIA at the address in the heading of this Agreement, attention Secretary, or at such other address as EMIA may from time to time designate by written notice to Company and Anonymous.   The date of service of any notice so deposited shall be the date of deposit.

18.   <u>EMIA's Ownership of Masters and Related Rights:</u>

Company and Anonymous acknowledge that EMIA is the sole, exclusive, and perpetual owner of all masters from inception, which ownership entitles EMIA among other things to:

a.   The exclusive and perpetual ownership of all duplicates of the masters and records manufactured therefrom and the right to use and control the same and the performances embodied therein.

b.   The exclusive and perpetual right throughout the Territory to manufacture, advertise, sell, lease, license or otherwise use or dispose of records manufactured from or embodying all or any part of the contents of the masters, or to refrain therefrom, in any and all fields of use upon such terms and conditions as EMIA may approve.

c.   The perpetual right to use and publish and to permit others to use and publish the names (including any professional names heretofore or hereafter adopted), likenesses of, and biographical material concerning all the performers who recorded the masters and of Company, for advertising and trade purposes in connection with the sale and exploitation of records produced from the masters, or to refrain therefrom. Notwithstanding anything to the contrary contained herein, in the USA during the term of this Agreement, Company shall have the right to approve Artist's likeness and EMIA's use of Artist's name, which approval shall be deemed granted five (5) days after Company is informed the applicable material is available for inspection at EMIA's offices and EMIA shall use its best efforts to cause its licensees to utilize such approved material.

d.   The right to release records manufactured from the masters under the name of "EMI America" or such other trade name or mark as EMIA may elect, provided that the initial USA commercial release of each album recorded hereunder shall be on a top-line label.

0328A



6-27-85/jt:KB39/A

e.    The right to sell and exploit records manufactured from the masters on which performances by other artists are coupled and to sell records manufactured from the masters in albums, which albums may contain pictures, prose and verse, and records embodying performances of other artists.

f.    EMIA's ownership and rights with respect to the masters shall extend to all tapes and other physical devices embodying performances made at recording sessions held pursuant to the terms of this Agreement.

g.    During the term of this Agreement, including all renewals, extensions, days of suspension, and all periods added by amendments or by other agreements: neither Company nor Anonymous will authorize or permit Artist to perform and Artist will not perform for the purpose of or himself engage in the making of records for anyone other than EMIA; neither Company, Anonymous nor Artist will authorize or permit the use of Artist's name, likeness, or other identification for the purpose of distributing, selling, advertising, or exploiting records for anyone other than EMIA.

19.    Other Termination Rights:

a.    If Artist's voice should be materially and permanently impaired, or if Company or Artist should fail, refuse or neglect to comply with any of the material obligations of Company hereunder, then, and in addition to any other rights or remedies which it may have, EMIA may elect to terminate this Agreement by notice in writing and shall thereby be relieved of any liability in connection with undelivered masters.

b.    No termination of this Agreement (whether by Company or by EMIA) shall in any way limit or curtail any of EMIA's rights, title, interest or privileges to or in connection with any of the results and proceeds of Company's endeavors under this Agreement or any rights or privileges of EMIA which continue after the term of this Agreement ends.

20.    Cure and Assignment Provisions:

The terms set forth in this Agreement and all attachments hereto, constitute the entire agreement between EMIA Company and Anonymous, all prior negotiations and understandings being merged herein.  Company and Anonymous represent that no person acting or purporting to act on behalf of EMIA has made any promises or representations upon which they have relied except those expressly found herein.  This Agreement may only be altered by an instrument executed by the party sought to be bound by such instrument.  No failure by EMIA to perform any of its material



obligations under this Agreement shall be deemed a material breach of this Agreement until Company and/or Anonymous has given EMIA written notice of such breach and such breach has not been corrected within forty five days after the giving of such notice. With the exception of Company's requirement to timely deliver masters hereunder, a breach by Company which is not capable of cure and/or any breach hereof by Company, Anonymous or Artist for which EMIA might obtain injunctive relief, no failure by Company or Anonymous to perform any of its material obligations hereunder shall be deemed a breach of this agreement until EMIA has given written notice of such breach and such breach has not been corrected within forty-five (45) days after the giving of such notice. EMIA may assign this Agreement or any part hereof or any rights hereunder to any person.

21. **Waiver:**

No waiver by EMIA of any breach by Company and/or Anonymous of any term or condition of this Agreement shall operate as a waiver by EMIA of any subsequent breach by Company and/or Anonymous of any term or condition of this Agreement.

22. **Time of Essence:**

Time is of the essence of this Agreement and all of the terms and provisions hereof.

23. **Severability:**

If the payments provided by this Agreement shall exceed the amount permitted by any present or future law or governmental order or regulation, such stated payments shall be reduced while such limitation is in effect to the amount which is so permitted; and the payment of such amount shall be deemed to constitute full performance by EMIA of its obligations to Company and/or Anonymous hereunder with respect to compensation during the time when such limitation is in effect. If any part of this Agreement is determined to be void, invalid, inoperative or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, such decision shall not affect any other provisions hereof, and



0328A

28-85/jt:KB39/A

the remainder of this Agreement shall be effective as though such void, invalid, inoperative or unenforceable provision had not been contained herein.

24. Attorneys' Fees:

If any action or proceeding is instituted to enforce any of the terms and conditions of this Agreement, and if any party makes a written settlement offer (the "Settlement Offer") in such action or proceeding, a party shall be entitled to recover reasonable attorneys fees and costs incurred after the date of the Settlement Offer in the event a final judgment is later entered the monetary terms of which are more favorable to such party than the monetary terms of the Settlement Offer.  In the event no such Settlement Offer is made, the prevailing party in any such action or proceeding shall be entitled to recover reasonable attorney's fees and costs.

25. Clause Headings:

The clause headings in this Agreement are for information purposes only and do not form a part of this Agreement.

26. Promotional Records:

EMIA shall provide Company with fifty (50) unmarked copies of each album embodying an lp-master recorded hereunder. No royalties shall be payable to Company with respect to such albums supplied pursuant to this Paragraph 26. and Company warrants and represents that such albums shall be used by Company solely for promotional purposes.

27. Coupling Restriction:

Subject to Paragraph 28. hereinbelow, in the USA during the term of this Agreement, EMIA shall not use masters recorded hereunder on records on which performances of other artists are embodied (except in the case of "Sampler" records, "Best of" records and records licensed or distributed for background, airline or other transportation use), provided that during the term of this Agreement outside the USA, EMIA shall obtain Company's consent in the event that any licensee of EMIA requests permission to couple masters produced hereunder.

0328A

28.  **Greatest Hits:**

a.   In the USA during the term of this Agreement, Company shall have the right to approve the selection of masters to be embodied in "Greatest Hits" records, which approval shall not be unreasonably withheld.

b.   After the term of this Agreement, EMIA shall consult with Company regarding the selection of masters to be embodied on Greatest Hits records provided that EMIA's decision shall be final in the event of any dispute.

29.  **Company Logo Credit:**

EMIA shall afford Company a logo credit in a form to be supplied by Company on each record solely embodying an lp-master delivered hereunder and in all advertising placed by EMIA in connection therewith, provided that EMIA's inadvertent failure to include such credit shall not be deemed a breach of this Agreement.

30.  **Selection of Singles:**

a.   In the USA during the term of this Agreement, EMIA and Company shall mutually select the "A" side of each single commercially released hereunder, provided that neither EMIA nor Company shall unreasonably withhold consent with respect therewith.

b.   In the USA during the term of this Agreement, Company shall select the master to be embodied on the "B" side of each single record commercially released hereunder.

31.  **Release Commitment:**

a.   Solely as a condition precedent to EMIA's right to exercise its remaining options hereunder, EMIA agrees to commercially release in the then current period of this Agreement, an album in the USA embodying each lp-master delivered by Company pursuant to this Agreement.  The aforesaid remedy in this Subparagraph 31.a. shall be Company's sole remedy for EMIA's failure to release albums in the USA.

b.   EMIA shall use reasonable efforts to ensure that its licensees outside the USA and Canada release records



6-28-85/jt:KB39/A

embodying each lp-master delivered to EMIA pursuant to this agreement.

32. <u>Artwork</u>:

a.   During the term of this Agreement EMIA and Company shall mutually approve all artwork in connection with albums commercially released embodying masters recorded hereunder. Company's approval shall be given or withheld in good faith and shall be deemed granted if Company does not object within five (5) business days after being informed that the applicable artwork is available for inspection in EMIA's offices.

b.   During the term of this Agreement, Company and Capitol may mutually agree that Company shall prepare artwork in connection with any album embodying an lp-master delivered hereunder in which event Company shall prepare such artwork pursuant to a budget approved by EMIA ("Company Artwork"). Company agrees that manufacturing costs in connection with Company Artwork shall not exceed EMIA's then standard packaging costs.  In the event that Company prepares Company Artwork with respect to an album, the Company Artwork shall be submitted to EMIA in time for EMIA to meet its fabrication and release deadlines ("Deadlines").  The Company Artwork shall include cover art, photographs, credits and liner notes.  EMIA agrees to utilize the Company Artwork in the form submitted by Company, provided that the Company Artwork, in EMIA's judgment, is not offensive, indecent, scurrilous or obscene, and Company represents and warrants that the use by EMIA of the Company Artwork will not infringe upon the rights of any third parties. If Company does not submit Company Artwork to EMIA in time for EMIA to meet its Deadline, EMIA shall prepare artwork for the album which artwork shall be deemed approved by Company. Notwithstanding anything to the contrary contained herein, the copyright in and to all artwork, including without limitation, Company Artwork, shall be and remain the property of EMIA.

c.   In the event that Company pays all costs of producing camera-ready artwork, Company shall own the copyright in and to such artwork and shall grant EMIA a perpetual license to use such artwork in connection with masters recorded hereunder.

33. <u>Remix Rights</u>:

In the USA during the term of this Agreement, Company shall have the first right to remix, re-edit, re-sequence or

0328A



otherwise alter an lp-master (the "Services") previously
delivered to and accepted by EMIA provided, however, that
Company's right to perform the Services shall be subject to the
following terms and conditions:

a.   EMIA shall notify Company that EMIA desires
Company to perform the applicable Services ("Notice").

b.   Company shall perform the particular Services
within five (5) business days following the Notice from EMIA
("Date").

c.   If Company fails to complete the applicable
Services specified in the Notice to EMIA's satisfaction by the
Date, EMIA and/or EMIA's designee, shall thereafter have the
right to perform the applicable Services with no further
obligation or Notice to Company.

d.   Company shall have no right to perform the
Services with respect to the resequencing of cassettes embodying
masters delivered hereunder.

34.  <u>Sideman Provision</u>:

Nothing contained in this Agreement shall prevent or
prohibit Artist from performing as a "side person," background
vocalist or producer for the making of records for any person;
provided that Artist does not receive cover credit or credit as a
featured artist, Artist's likeness is not used, Artist's name is
not printed on the liner of such records in a size, style or
color of print any larger or more prominent than that size, style
or color of print used to credit any other side person on such
records, and a readable credit line is printed on the liner of
such record in substantially the following form:

"John Waite appears by courtesy of EMI America Records,
          a division of Capitol Records, Inc."

35.  <u>Additional Payment</u>:

a.   Company and Artist have heretofore advised EMIA of
their intention to purchase that certain parcel of real property
located at _____
and all structures, fixtures and improvements thereon (the
"Parcel"), therefore, notwithstanding anything to the contrary
contained herein and in consideration of Company's agreement

0328A



6-28-85/jt:KB39/A

herein to record and deliver all applicable required lp-masters hereunder, EMIA hereby agrees to pay to Company the sum of Two Hundred Thousand Dollars ($200,000.00) with fourteen (14) days following the execution hereof ("Sum") which Sum shall be in addition to any other payments to be made by EMIA to Company hereunder, including, without limitation, the Approved Recording Funds specified in Paragraph 4. hereinabove.  It is hereby agreed said Sum shall be held in Steven Machat's Client Escrow account until such time as the final funding and closing of the pending escrow for the purchase of the Parcel occurs, at which time, and only at such time, may the Sum be disbursed.  In the event of any failure of the purchase of the Parcel occur or should Artist, prior to such closing, suffer death, the Sum shall immediately be returned to EMIA and not be subject to or a part of Artist's estate.  The Sum shall be deemed to be a demand loan solely to Company and to Artist (but not to Anonymous) and a direct debt to EMIA subject to the provisions of this Paragraph 35. and Paragraph 36. hereinbelow.

b.   Company agrees that EMIA may recover the Sum (including any interest) or any part thereof, from: (i) any monies otherwise payable by EMIA to Company or any other entity owned and/or controlled by Company (excluding Anonymous) pursuant to this agreement; and (ii) eighty percent (80%) of all monies payable to Moonwalk pursuant to the Prior Agreement.

c.   Concurrently with the execution of this Agreement, Company shall execute and deliver to EMIA with respect to the Sum the following:

(i) a Promissory Note in the form of Exhibit "I" attached hereto;

(ii) a Security Agreement in the form of Exhibit "J" attached hereto;

(iii) an executed filed and recorded second mortgage relating to the Parcel in the form of Exhibit "K" attached hereto (to be supplied by Company within five (5) days of the closing of escrow on the Parcel);

(iv) such further documents as may be necessary to evidence and perfect EMIA's security interest.

d.   Notwithstanding anything to the contrary contained herein, said Sum or the applicable portion of such Sum shall be deemed debited to the royalty account hereunder as an unsecured



0328A

nonreturnable advance (and not a demand loan as aforesaid) against and fully recoupable from any royalties payable by EMIA to Company and Anonymous pursuant to this Agreement ("Advance") upon the occurrence of the following events and in the following manner:

(1) One quarter (1/4) of the then outstanding balance of the Sum including interest shall be deemed an Advance if at the time Company commences recording of the first lp-master in the First Option Period, the full amount of the Sum and all interest has not theretofore been recovered pursuant to Subparagraph 35.b. above; and the Approved Recording Fund shall be charged with such Advance so that the amount payable by EMIA in connection with such lp-master shall be correspondingly reduced; and

(2) With respect to the next three (3) lp-masters to be recorded by Company (if applicable), a portion ("Portion") of the remaining unrecovered balance of the Sum (including interest) which has not theretofore been recovered pursuant to Subparagraph 35.b. hereinabove or deemed to be an Advance (the "Balance"), which Portion shall be determined by multiplying the Balance by a fraction, the numerator of which is one (1) and the denominator of which is the number of lp-masters remaining to be delivered in the First and Second Option Periods hereof, shall be deemed to be an Advance which shall be charged to such applicable Approved Recording Fund so that the amount payable by EMIA in connection with such lp-master shall be correspondingly reduced.

36.  Direct Debts:

a.  With respect to any provision of this Agreement which provides that monies due to EMIA from Company shall be a direct debt ("Debt"), Company, Artist, Anonymous and Moonwalk agree that with respect to EMIA's recoupment of any such Debt from all monies payable to Company hereunder and from eighty percent (80%) of all monies payable to Moonwalk pursuant to the Prior Agreement as the case may be, exclusive only of payments to third party audio Producers of masters embodying Artist's performances recorded and delivered to EMIA ("Record Revenues"), EMIA shall recoup such Debt from the following sources of Record Revenues in the following priority, with the first source listed hereinbelow to be used by EMIA to the fullest extent necessary for such recoupment before proceeding against the second source listed, and so on until such Debt has been fully recouped by EMIA:

(i)  the specified shares of audio record royalties under this Agreement or under the Prior Agreement;



0328A

(ii) the specified shares of audiovisual revenues under this Agreement or under the Prior Agreement;

(iii) any other source of Record Revenues under this Agreement or the Prior Agreement.

b.   All sums due hereunder from Company, Moonwalk and/or Artist to EMIA including any Direct Debts hereunder shall be recovered pursuant to the following priorities:

(i)   All Approved Recording Funds paid in connection with any lp-master recorded by Artist including, but not limited to, the Second LP (or debited pursuant to Subparagraphs 35.d.(i) and (ii) hereinabove; and

(ii)   All other advances paid to Company, Moonwalk and/or Artist; and

(iii)   All then current interest on the Sum; and

(iv)   All then unrecovered principal due on the Sum.

37.   Miscellaneous Provisions:

Company, Artist, Anonymous and EMIA hereby further acknowledge and agree that:

a.   The provisions of Subparagraph n. of Exhibit "G" attached hereto and incorporated herein shall be deemed to be of the essence of this Agreement; and

b.   At the time this Agreement is being executed, Anonymous is employed by Company as Artist's manager.  It is therefore agreed that all amendments hereto shall require execution by an authorized officer of Anonymous, Company and EMIA for such time as Anonymous continues to be employed in such capacity.  In the event Company and/or Artist gives EMIA written notice of the termination of Anonymous' engagement as Artist's manager, no amendment hereto shall thereafter require execution by Anonymous unless the effect of any such amendment(s) is to reduce the royalties to be earned hereunder or to reduce the maximum lp-master delivery requirements which may be exercised by EMIA at its sole election.  In the event EMIA should terminate the term hereof prior to receiving all such lp-masters as may be required hereunder ("Maximum Number of LP's") and thereafter enter into a new agreement with Company, Artist or any other



6-28-85/jt:KB39/A

entity for Artist's recording service ("New Agreement"), Anonymous shall receive the specified percentage share of all such sums payable to Anonymous under this Agreement for such lp-masters embodying Artist's performances delivered pursuant to the New Agreement which, when combined with all lp-masters delivered hereunder, equals the Maximum Number of LP's.

     c.   Notwithstanding anything contained herein to the contrary including without limitation the terms of Subparagraph 37.b. hereinabove, the execution by Anonymous shall not be required with respect to any amendment which authorizes the recoupability of expenses directly relating to the exploitation of Artist's live performances and of masters recorded hereunder (excluding direct advances to Company and/or Artist) which are incurred by EMIA in the ordinary course of EMIA's record manufacturing and distribution endeavors, for which Company specifically authorizes the recoupment thereof from royalties payable hereunder including, but not limited to, such expenses as tour support, promotional video Production Costs and excess "packaging" costs; whether or not Anonymous is then managing Artist, and all such expenses shall be recouped (if agreed to by Company) before any monies are paid to Anonymous or Company

/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/



hereunder and no monies shall be paid to any party until such time as all applicable Approved Recording Funds have been theretofore recouped from all royalties payable hereunder.


ACCEPTED AND AGREED TO:

EMI AMERICA RECORDS, a division of Capitol Records, Inc.

By: _____

Title: _____
      An Authorized Officer

Very truly yours,

DIAMOND STRIPE, INC.

By: _____

Title: _____
       An Authorized Signer

Address:
c/o Steven Machat, Esq.
1 West 67th Street
New York, New York  10023

ANONYMOUS MUSIC, INC.

By: _____

Title: _____

Address:
c/o Steven Machat, Esq.
1 West 67th Street
New York, New York  10023


ACKNOWLEDGED AND AGREED AS TO FORM AND CONTENTS INCLUDING WITHOUT LIMITATION, ALL EXHIBITS ATTACHED HERETO:

MOONWALK MUSIC, INC.

By: _____

Title: _____

Address:
c/o Steven Machat, Esq.
1 West 67th Street
New York, New York  10023

Title: _____

0328A

6-27-85/jt:KB39/A

EXHIBIT "A"

ARTIST DECLARATION

Date: *July 4, 1985*

EMI AMERICA RECORDS, a division
of Capitol Records, Inc.
6920 Sunset Boulevard
Los Angeles, California  90028

Gentlemen:

You have advised me that you are about to enter into an
agreement with Diamond Stripe, Inc. ("Company") under the terms
of which you will undertake to distribute recordings embodying my
performances ("Agreement").  I have been advised of the terms of
the Agreement and acknowledge it is beneficial to me and I am
desirous that it be executed.

In order to induce you to enter said Agreement, I agree as
follows:

1.   I warrant and represent that I am now under exclusive
contract with Company as to the services to be rendered pursuant
to the Agreement and said contract will continue in full force
and effect during the term of the Agreement including all
extensions, renewals and modifications thereof.

2.   Company has the right insofar as I am concerned to
enter into the Agreement with you and to assume all of the
obligations, warranties and undertakings therein contained.

3.   All of the warranties, representations and covenants on
the part of Company contained in thus Agreement concerning me are
true and correct and I hereby agree to be bound by same as though
I were a party to the Agreement.

4.   I will duly and to the best of my ability perform and
discharge all of the obligations and undertakings contained in
the Agreement insofar as the same are required of me and which
Company has undertaken to procure me to do and perform in the
Agreement.

5.   I also acknowledge that:

a.   no direct payment will be made by you to me and
that any royalties for performances that may be due on the sale

0328A



of records pursuant to the Agreement shall be paid directly by you to Company and Anonymous Music, Inc. ("Anonymous") and provided that you have rendered accounting statements to Company and made the payments specified therein, I shall look solely to Company with respect to all artist royalties and Company will be solely liable for artist royalties which may be due me.

b.   I have read and understand all of the terms of the Agreement including but not limited to those provisions requiring the payment of specified shares of royalties and other sums thereunder to Anonymous as set forth in Subparagraph n. of Exhibit "G" attached to and incorporated into such Agreement.

c.   I also acknowledge that I have received independent counsel unrelated to Anonymous and that I have entered this Agreement without being subject to any coercion or undue influence from any party.

6.   If during the term of the Agreement or any extensions, renewals or modifications thereof, Company shall cease to be entitled to make my services available to you in accordance with the terms of the Agreement, or if Company shall fail or refuse to make my services available to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Company had continued to be entitled to my services, and I shall make the same available to you, and such rights, privileges and benefits shall be enforceable on your behalf against me.

7.   I do hereby acknowledge that my services are special, unique and extraordinary, the loss of which cannot be reasonably or adequately compensated for in an action at law, and that in addition to any rights you may have at law, you shall be entitled to seek injunctive relief to enforce your rights hereunder.

8.   If this Agreement is executed by more than one person as Artist, the first person singular shall include the plural wherever the context so requires.

9.   I represent that I shall become a member of all unions requisite for me to fulfill my obligations pursuant to this Agreement.

10.  For the express and direct benefit of EMIA, I further acknowledge and agree that:

a.   the benefits to be derived by me from the Agreement are at least as favorable as could be obtained by me from other phonograph record companies;



J-27-85/jt:KB39/A

b.   the benefits afforded me under the Agreement are commensurate with the present value of the rights conferred upon Capitol and their value in the future;

c.   the terms of the Agreement are more favorable to me than those of the "Prior Agreement" (as that term is defined in the Agreement) which pursuant to my demand has been terminated in writing by EMIA and Moonwalk Productions, Inc. as of a date prior to the date of the Agreement;

d.   viewing the Agreement as a whole, there is no detriment suffered by me by reason of Company's entering into the Agreement or by Moonwalk Productions, Inc. terminating the Prior Agreement;

e.   the Agreement was negotiated not only at arms' length but as though I was free of any obligation under the Prior Agreement;

f.   the benefits accruing to me hereunder are conferred effective as of the date of execution of the Agreement and I will not be required to wait until the date which, except for the Agreement, would have been the scheduled termination date of the Prior Agreement, to enjoy such benefits for any reason;

g.   the Agreement does not constitute an amendment to or an extension of the Prior Agreement, but is an entirely new and separate agreement;

h.   it would constitute an unjust enrichment to me if EMIA does not, by virtue of any attempt by me to invoke the provisions of Section 2855 of the Labor Code of the State of California and to claim that the Agreement  is an amendment of, an extension of, or otherwise the same as or part of the Prior Agreement, for purposes of interpreting said Labor Code provision, enjoy its rights under the Agreement for full term hereof and to the full extent of the requirements hereof relating to the delivery of master recordings featuring my performances.

Very truly yours,

JOHN WAITE

0328A



Exhibit "B"

SCHEDULE OF RESTRICTED MUSICAL WORKS

IMPORTANT INSTRUCTION

1.  If there are any musical works you <u>cannot</u> record for EMIA
    because of a restriction in a previous record contract,
    please delete the word "NONE" and insert all of the
    information called for in the Schedule of Restricted Musical
    Works for each restricted selection.

2.  If you are under no restrictions as regards musical works
    you can record for EMIA, place your initials in the Schedule
    of Restricted Musical Works.

| Selection | Company | Date Recorded | Type of Restriction | Expiration of Restriction |
|-----------|---------|---------------|---------------------|---------------------------|

N O N E



0328A

Exhibit "C"

### PRODUCT BUDGET AND COST ACCUMULATION



Artist _____     Project No. _____
Artist Contract No. _____     Singles Included in Album:
Recording Period _____     _____
Producer _____     _____
Producer Contract No. _____     Album Number _____ Release Date _____
Album ☐                    Single ☐          Album Title _____

| Musicians Payroll | BUDGET | COST CODE | ACTUAL | | Other Costs | BUDGET | COST CODE | ACTUAL |
|---|---|---|---|---|---|---|---|---|
| Roy. Artist (575) | | | | | Producer Fee (589) | | | |
| Scale & H&W (550-555) | | | | | Producer Expenses | | | |
| Overscale (551) | | | | | Artist Per Diem (516) | | | |
| Taxes (552) | | | | | Artist Expenses (518, 519) | | | |
| P&W (10%) (553) | | | | | | | | |
| Total: | | | | | Master Purchase (579) | | | |
| | | | | | | | | |
| | | | | | | | | |
| Cartage (554) | | | | | Pre-Production (517.) | | | |
| Instrument Rental (587) | | | | | Shipping (525.) | | | |
| | | | | | Misc. (584) | | | |
| | | | | | Reimb. Expenses (583) | | | |
| | | | | | Engineer Fee (585) | | | |
| | | | | | | | | |
| Vocalists Payroll | | | | | Studio Costs | | | |
| Roy. Artist (576) | | | | | Tracking | | | |
| Scale (557) | | | | | Overdubbing | | | |
| Taxes (558) | | | | | Mixing | | | |
| P&W (559) | | | | | | | | |
| Total: | | | | | Studio Total (588) | | | |
| | | | | | Mastering | | | |
| Arranging & Copying | | | | | Outside Studio (590) | | | |
| Arranging (562-563) | | | | | Capitol Studio | | | |
| P & W (10%) (564) | | | | | | | | |
| Copying (565/567) | | | | | Internal Studio (591) | | | |
| P & W (10%) (571) | | | | | | | | |
| Taxes (572) | | | | | Recoverable | | | |
| Reprod. Expenses (573) | | | | | Non-Recoverable | | | |
| | | | | | TOTAL BUDGET | | | |

Sides Recorded _____     Sides Released _____

                                            Date Reconciled _____

**SUBMITTED BY:**


Producer _____ Date _____

**APPROVED BY:**


Capitol Contact _____ Date _____


V.P., Business Affairs _____ Date _____


V.P., A&R _____ Date _____

This production budget is final and binding unless a revised budget bearing producer's signature is submitted and approved in writing by Capitol's V.P., A&R.

**REMARKS:**

*R = Recoverable N = Non-recoverable                              FORM 5123 REV. 6 12/81

## SELECTIONS

SONG TITLE                                MASTER NO.        RELEASE INFO

(1) _____    _____   _____

(2) _____    _____   _____

(3) _____    _____   _____

(4) _____    _____   _____

(5) _____    _____   _____

(6) _____    _____   _____

(7) _____    _____   _____

(8) _____    _____   _____

(9) _____    _____   _____

(10) _____    _____   _____

(11) _____    _____   _____

(12) _____    _____   _____

6-27-85/jt:KB39/A

Exhibit "D"

Contract No. *EMIA-8168*

Los Angeles, California

Date: *July 4, 1985*

DECLARATION RE COLLECTIVE WORK
AND POWER OF ATTORNEY

EMI AMERICA RECORDS, a division of Capitol Records, Inc.
("EMIA") and Diamond Stripe, Inc. ("Company") are parties to an
agreement ("EMIA-Company Agreement"), with respect to "masters"
and "sound recordings", "phonorecords" and "copies" manufactured
from such masters (individually and collectively called the
"Works").  For valuable consideration, receipt of which is hereby
acknowledged:

A.  The undersigned (jointly and severally if more than
one) acknowledge and agree that each master recorded under the
EMIA-Company Agreement embodying the results and proceeds of my
services (i) is prepared within the scope of Company's engagement
of my personal services and is a work made for hire, or (ii) as
part of an album constitutes a work specially ordered by Company
for use as a contribution to a collective work and shall be
considered  a work made for hire.  I further acknowledge that
Company is the exclusive owner of all right, title and interest
in and to each Work throughout the universe, including, but not
limited to, all rights of the owner of copyright specified in 17
U.S.C. §106.

B.  Notwithstanding the provisions of Paragraph A. above, I
agree to the extent, if any, that I may be deemed an "author" of
any Work, I grant and assign to EMIA all exclusive right, title
and interest in and to such Work throughout the universe,
including, but not limited to, all rights of the owner of
copyright specified in 17 U.S.C. §106.  For purposes of this
Paragraph B.:

1.  I hereby make, constitute and appoint EMIA,
irrevocably and coupled with an interest, my true and lawful
Attorney for me and in my name, place and stead to sign, execute,
acknowledge, deliver and record all documents and instruments
necessary or desirable to grant and assign to EMIA all exclusive
right, title and interest in and to the Works throughout the

Page 46 of 75

0328A



6-27-85/jt:KB39/A

universe, including, but not limited to, all rights of the owner
of copyright specified in 17 U.S.C. §106.

        2.    The documents and instruments referred to in
Paragraph B.1. above shall include, but shall not be limited to:
documents to apply for and obtain all registration of copyrights
in and to any Work, and documents to assign such copyrights to
EMIA.

        3.    The undersigned grants to said Attorney full power
and authority to do and perform all and every act and thing
whatsoever requisite, necessary or appropriate to be done with
respect to the Works as fully to all intents and purposes as I
might or could do if personally present, hereby ratifying all
that my said Attorney shall lawfully do or cause to be done by
virtue of this Power of Attorney.

        4.    My said Attorney is empowered to determine in his
sole discretion the time when, purpose for and manner in which
any power conferred upon him shall be exercised, and the
conditions, provisions and covenants of any document or
instrument which may be executed by him pursuant to this Power of
Attorney.

    IN WITNESS WHEREOF, the undersigned has executed this
"Declaration Re Collective Work and Power of Attorney" on the
date first above written.

By: _____

Title: _____
          An Authorized Signer

0328A

o-27-85/jt:KB39/A

Exhibit "E"

DECLARATION RE COLLECTIVE WORK
AND POWER OF ATTORNEY

Concurrently herewith Diamond Stripe, Inc. ("Company") and EMI America Records, a division of Capitol Records, Inc. ("EMIA") are entering into an agreement ("EMIA-Company Agreement"), with respect to "masters" embodying my performances and "sound recordings", "phonorecords" and "copies" manufactured from such masters (individually and collectively called the "Works").  For valuable consideration, receipt of which is hereby acknowledged:

A.    The undersigned (jointly and severally if more than one) acknowledge and agree that each master recorded under the EMIA-Company Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) as part of an lp-master constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered  a work made for hire.  I further acknowledge that Company is the exclusive owner of all right, title and interest in and to each Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

B.    Notwithstanding the provisions of Paragraph A. above, I agree to the extent, if any, that I may be deemed an "author" of any Work, I grant and assign to EMIA all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.  For purposes of this Paragraph B.:

1.    I hereby make, constitute and appoint EMIA, irrevocably and coupled with an interest, my true and lawful Attorney for me and in my name, place and stead to sign, execute, acknowledge, deliver and record all documents and instruments necessary or desirable to grant and assign to EMIA all exclusive right, title and interest in and to the Works throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

2.    The documents and instruments referred to in Paragraph B.1. above shall include, but shall not be limited to: documents to apply for and obtain all registration of copyrights in and to any Work, and documents to assign such copyrights to EMIA.



0328A

3.    The undersigned grants to said Attorney full power and authority to do and perform all and every act and thing whatsoever requisite, necessary or appropriate to be done with respect to the Works as fully to all intents and purposes as I might or could do if personally present, hereby ratifying all that my said Attorney shall lawfully do or cause to be done by virtue of this Power of Attorney.

4.    My said Attorney is empowered to determine in his sole discretion the time when, purpose for and manner in which any power conferred upon him shall be exercised, and the conditions, provisions and covenants of any document or instrument which may be executed by him pursuant to this Power of Attorney.

IN WITNESS WHEREOF, the undersigned has executed this "Declaration Re Collective Work and Power of Attorney" on the date first above written.

JOHN WAITE

0328A

6-27-85/jt:KB39/A

EXHIBIT "F"

POWER OF ATTORNEY

Concurrently herewith Diamond Stripe, Inc. ("Company") and
EMI America Records, a division of Capitol Records, Inc. ("EMIA")
are entering into an agreement with respect to "masters"
embodying the performances of EMIA's exclusive recording artist
professionally known as "John Waite" and all "sound recordings",
"phonorecords" and "copies" manufactured from such masters are
hereinafter individually and collectively called the "Works".

A.    The undersigned hereby makes, constitutes and appoints
EMIA, irrevocably and coupled with an interest, its true and
lawful Attorney for Company and in Company's name, place and
stead to sign, execute, acknowledge, deliver and record all
documents and instruments necessary or appropriate to grant and
assign to EMIA all exclusive rights of copyright in and to the
Works, including, but not limited to, all exclusive rights
specified in 17 U.S.C. §106.

B.    The documents and instruments referred to in Paragraph
A. of this Power of Attorney shall include, but shall not be
limited to: documents to apply for and obtain all registration of
copyrights in and to any Work, and documents to assign such
copyrights to EMIA.

C.    The undersigned grants to said Attorney full power and
authority to do and perform all and every act and thing
whatsoever requisite, necessary or appropriate to be done with
respect to the Works as provided above as fully to all intents
and purposes as Company might or could do if an authorized
Company representative were personally present, hereby ratifying
all that Company's said Attorney shall lawfully do or cause to be
done by virtue of this Power of Attorney.

D.    Company's said Attorney is empowered to determine in
his sole discretion the time when, purpose for, and manner in
which any power conferred upon it hereunder shall be exercised,
and the conditions, provisions and covenants of any document or
instrument which may be executed by it pursuant to this Power of
Attorney.

E.    When the context so requires the masculine gender
includes the feminine and or neuter, and the singular number
includes the plural.

0328A

6-27-85/jt:KB39/A

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney on the date first above written.

DIAMOND STRIPE, INC.

By: _____

Title: _____
(An Authorized Officer)

0328A

6-27-85/jt:KB39/A

EXHIBIT "G"

ROYALTY SCHEDULE

With respect to the sales of records hereunder which embody only the performances in the masters, royalties shall be computed by reference to the applicable basic royalty rate ("Royalty Rate") detailed hereinbelow in the Royalty Schedule.

ROYALTY SCHEDULE

| | USA & Canada | | United Kingdom | | Italy, Japan Australia, France, Germany Scandinavia & Benelux | | Rest Unive |
|---|---|---|---|---|---|---|---|
| | Singles & Mini-Lp's | Other Records | Singles & Mini Lp's | Other Records | Singles & Mini Lp's | Other Records | Al Rec |
| 1st, 2nd & 3rd 1p masters | 10% | 13%* | 8% | 12% | 8% | 10% | 8 |
| 4th lp master | 10% | 14%* | 8% | 12% | 8% | 10% | 8 |
| 5th & 6th 1p masters | 10% | 14%* | 8% | 12% | 8% | 10% | 8 |

*Subject to escalation pursuant to Paragraph m. hereinbelow.

a.   With respect to records hereunder sold in the USA and Canada which embody only masters produced hereunder, royalties shall be computed on the retail list price (less all excise; sales and use taxes and other taxes, however designated, if any) on one hundred percent (100%) of the net retail sales of such records sold in the United States and Canada, except as hereinafter provided.

b.   With respect to records hereunder sold outside the USA and Canada which embody only the masters produced hereunder, royalties shall be computed on the retail list price (less (1) any and all applicable taxes on the sale and/or transfer of such records and (2) the container deduction charged EMIA by the applicable licensee) in the country of manufacture, the country



0328A

of sale or the USA, as EMIA is paid, on one hundred percent
(100%) of the net retail sales of such records, except as
hereinafter provided.  Foreign royalties shall be computed in the
currency of the country involved, and shall be paid, only after
receipt by or credit to EMIA, at the same rate of exchange as
EMIA was paid, less any and all foreign taxes allocable to
records produced hereunder on payments made to EMIA and not
otherwise deducted hereunder.  If EMIA cannot receive payment in
the USA and in USA currency, and elects to accept payment in a
foreign currency, EMIA may deposit (at Company's and Anonymous's
expense) in such currency in a depository selected by Company
and/or Anonymous (as applicable), all payments so received as
royalties applicable to this Agreement and shall notify Company
thereof promptly.  Such deposit as above stated shall fulfill
EMIA's obligations hereunder as to record sales hereunder to
which such royalty payments are applicable.  Royalties for
records sold outside the USA and Canada at Armed Forces Post
Exchanges, irrespective of where the initial transaction occurs,
shall be accounted as though such records had been sold in the
rest of the universe.

　　　c.  With respect to records sold through any and all
so-called "Record Clubs", "Mail Order Operations" and/or similar
sales plan or devices or any other use of masters not otherwise
specified herein, the royalty shall be one-half (1/2) of EMIA's
net royalty receipts therefor less any amounts that EMIA may be
obligated to pay a Producer of masters hereunder ("Producer's
Share") and the Producer's Share shall be deducted solely from
Company's and Anonymous's share of net royalties.

　　　d.  With respect to records sold as so-called "economy" or
"budget" priced records, the royalty shall be one-half (1/2) of
the respective basic royalty rates set forth in Paragraphs (a)
and (b) hereinabove, but not to exceed one-half (1/2) of EMIA's
net royalty receipts therefor (less all third party payments),
calculated in the manner set forth in this Agreement.

　　　e.  With respect to records sold as premiums or in
connection with the sale of any other product, commodity, or
service, the basic royalty rate shall be one-half (½) of the
respective basic royalty rates set forth in Paragraphs a. and b.
hereinabove, computed, however, on the basis of the amount per
record actually received by EMIA, less album cover packaging
allowance, applicable taxes and costs of delivery and shipping
expenses rather than on the retail list price.  No masters
recorded hereunder shall be embodied on records sold as premium
records absent Company's prior written consent.

　　　f.  With respect to the licensing by EMIA of masters
recorded hereunder to third parties (other than record clubs or

0328A



mail order organizations and licensees outside the USA who distribute EMIA's top line records) the royalty payable hereunder shall be one-half (½) of the net royalty receipts received by EMIA from such licensing (less all third party payments exclusive of any amounts that EMIA may be obligated to pay a Producer) but not more than one-half (½) of the otherwise applicable royalty rate specified above in the ROYALTY SCHEDULE computed on the same basis, quantity, and in the same manner as EMIA is paid.  Any portion of the net royalties EMIA may be obligated to pay a Producer shall be deducted solely from Company's share of net royalties.   The sums provided for in this paragraph shall be the only sums payable to Company for such licensing by EMIA, and Company shall not be entitled to receive any other payments with respect thereto.   The sums provided for in this paragraph shall be payable only after the receipt by or credit to EMIA of monies from its licensees and shall be reported on the accounting date next succeeding the accounting period during which royalties have actually been received by EMIA from its licensees.

g.   With respect to the sale by EMIA of records hereunder at less than EMIA's normal distributor price as a result of a promotional program or discount plan ("Discount Records"), the retail list price of such records shall bear the same proportion to the actual distributor selling price as the normal retail list price bears to EMIA's normal distributor price.

h.   No royalties shall be computed or shall be due or payable hereunder with respect to records given away (including such records generally described as "free goods", "bonus records" or "freebies") or furnished on a nonprofit basis to disc jockeys, radio and televisions stations, motion picture companies, "one-stops", rack jobbers, distributors, dealers, consumers, employees, publishers or EMIA's subsidiaries, divisions. or branches or others; or with respect to records sold for less than fifty percent (50%) of EMIA's normal wholesale price; or with respect to records sold at salvage or close-out prices; or on promotional records which include the masters together with master recordings recorded by others, which promotional masters (sometimes referred to as "sampler" records) are designed for sale at a substantially lower price than the regular retail list price of such records.   Notwithstanding anything to the contrary contained herein, during the term of this Agreement no records embodying masters produced hereunder shall be furnished as a sales inducement and invoiced on a no-charge basis ("Sales Inducement Records") and/or as Discount Records except pursuant to a special sales program of limited duration of which Company has been notified.

i.   Intentionally deleted.



j.   As to records not consisting entirely of the masters the royalty otherwise payable hereunder shall be prorated in the proportion that the number of masters which are on such records bears to the total number of selections on such records.   As to masters embodying performances of Artist together with performances of other artists, ("Joint Masters") the royalty otherwise payable to Company hereunder and the recording costs otherwise chargeable to Company hereunder shall be prorated in the proportion that Artist bears to the total number of featured artists whose performances are on such Joint Masters, provided that no Joint Masters shall be recorded hereunder absent the consents of EMIA and Company.

k.   Notwithstanding anything to the contrary contained in this Exhibit "G", or the Agreement to which it is attached, it is specifically understood and agreed that royalties payable to Company pursuant to the Agreement and/or Exhibit are deemed to include all royalties, sums and other compensation due to the actual producers of masters under the Agreement.

l.   Company acknowledges that, with respect to records sold in the USA, EMIA may convert its method of calculating royalties to a system based upon the wholesale price of such records. Company acknowledges, however, that for the foreseeable future, EMIA will continue to calculate royalties with respect to records sold in the USA using a system based on the retail list price of such records.

m.   (i)   Notwithstanding anything to the contrary contained in the ROYALTY SCHEDULE, with respect to sales of each applicable album hereunder manufactured solely from each applicable lp-master specified in Column "A" below delivered to EMIA hereunder during the term of this Agreement and sold by EMIA in the USA (other than sales (1) through a record club or special markets plan; (2) to wholesalers in the USA solely for export to customers outside the USA; (3) of budget-line records and premium records and/or (4) to military post exchanges) ("Net USA Sales"), the royalty, to be computed and paid pursuant to the terms hereof shall be as specified in Column "B" below.



6-27-85/jt:KB39/A

| Column "A" | | Column "B" |
|---|---|---|
| 1st, 2nd, & 3rd lp-masters | (For such Net USA Sales of the applicable (album to 500,000 copies . . . . . . . . ( | 13% |
| | (For such Net USA Sales of the applicable (album from 500,001 to 1,000,000copies . ( | 14% |
| | (For such Net USA Sales of the applicable (album in excess of 1,000,000 copies . . | 15% |
| 4th lp-master | (For such Net USA Sales of the applicable (album to 500,000 copies . . . . . . . ( | 14% |
| | (For such Net USA Sales of the applicable (album in excess of 500,000 copies  . . | 15% |
| 5th & 6th lp-masters | (For such Net USA Sales of the applicable (album to 500,000 copies . . . . . . . ( | 14% |
| | (For such Net USA Sales of the applicable (album from 500,001 to 1,000,000copies . ( | 15% |
| | (For such Net USA Sales of the applicable (album in excess of 1,000,000 copies . . | 16% |

(ii)    Notwithstanding anything to the contrary contained in the ROYALTY SCHEDULE, with respect to sales of each applicable album hereunder manufactured solely from each applicable lp-master specified in Column "C" below delivered to EMIA hereunder during the term of this Agreement and sold by EMIA in Canada (other than sales (1) through a record club or special markets plan; (2) to wholesalers in Canada solely for export to customers outside Canada; (3) of budget-line records and premium records and/or (4) to military post exchanges) ("Net Canadian Sales"), the royalty, to be computed and paid pursuant to the terms hereof shall be as specified in Column "D" below.



0328A

| Column "C" | | Column "D" |
|---|---|---|
| 1st, 2nd, & 3rd lp-masters | (For such Net Canadian Sales of the (applicable album to 50,000 copies . . . . | 13% |
| | (For such Net Canadian Sales of the (applicable album from 50,001 to (100,000 copies . . . . . . . . . . | 14% |
| | (For such Net Canadian Sales of the (applicable album in excess of (100,000 copies . . . . . . . . . . . | 15% |
| 4th lp-master | (For such Net Canadian Sales of the (applicable album to 50,000 copies . . . . | 14% |
| | (For such Net Canadian Sales of the (applicable album in excess of (50,000 copies . . . . . . . . . . . . | 15% |
| 5th & 6th lp-masters | (For such Net Canadian Sales of the (applicable album to 50,000 copies . . . . | 14% |
| | (For such Net Canadian Sales of the (applicable album from 50,001 (to 100,000 copies . . . . . . . . . | 15% |
| | (For such Net Canadian Sales of the (applicable album in excess of (100,000 copies . . . . . . . . . . . | 16% |

n. (i) With respect to all monies payable pursuant to the Agreement to which this Exhibit "G" is attached, including, but not limited to, all record royalties, licensing fees and video royalties, excluding only payments to third party audio Producers of masters recorded and delivered thereunder which do not exceed four percent (4%) of the retail list price for such records ("Net Monies"), Company hereby irrevocably authorizes and directs EMIA to pay to Anonymous twenty percent (20%) of all such Net Monies (the "Anonymous Share").

(ii) In the event that the remaining eighty percent (80%) of all Net Monies otherwise payable to Company hereunder ("Company's Share") is insufficient to pay any other third party royalties, if any, when such royalties would be payable by Company ("Third Party Deficit"), the

0328A



6-27-85/jt:KB39/A

Anonymous Share may be reduced by the Third Party Deficit and all subsequent Net Monies payable to Company will first be used to credit Anonymous with any Third Party Deficits previously deducted from the Anonymous Share; provided, however, Artist and Company shall not encumber Company Share without EMIA's and Anonymous's prior written consent in each instance.

(iii)  With respect to all "Recording Fund Differences", as that term is defined in Subparagraph 4.e.(x)(2) of the Agreement, Company hereby irrevocably authorizes and directs EMIA to pay to Anonymous any Recording Fund Difference up to a sum equal to twenty percent (20%) of the total applicable Approved Recording Fund.



Exhibit "H"

PRODUCER'S DECLARATION

I, the undersigned, declare that I have read and understand the agreement between EMI America Records, a division of Capitol Records, Inc. ("EMIA") and Diamond Stripe, Inc. ("Company") being signed concurrently herewith ("EMIA-Company Agreement").

For the express and direct benefit of EMIA, I hereby:

    a.    Join in the representations and warranties made in the EMIA-Company Agreement as respects my employment contract with Company.  I agree to perform all the terms and provisions of my said employment contract and of the EMIA-Company Agreement which relate to my phonograph record endeavors, the use to be made of such results and proceeds and grant to EMIA the perpetual right to use and publish and to permit others to use and publish my name, signature, likeness, and biographical material concerning me for advertising and trade purposes in connection with the sale and exploitation of records manufactured from master recordings made pursuant to the EMIA-Company Agreement, and I agree that if the EMIA-Company Agreement is inconsistent with my employment contract, the obligations of the former shall supersede those of the latter.

    b.    Acknowledge that the rights, privileges, benefits and remedies granted to Company in my employment contract with Company shall, at EMIA's election, be deemed to be granted to EMIA in the EMIA-Company Agreement, and I agree that if EMIA does so elect, they may be enforced against me directly by EMIA in EMIA's own name and in its own behalf in any court of competent jurisdiction whether or not Company is a party to the litigation.

    c.    Agree to look solely to Company for the payment of my fees and/or royalties, as the case may be, and will not assert any claim in this regard against EMIA or attempt to prevent the manufacture, sale or distribution of phonograph records manufactured from Company masters produced under the terms and conditions of the EMIA-Company Agreement.

    d.    Acknowledge and agree that each master recorded under the EMIA-Company Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) as part of an lp-master constitutes a work specially ordered by Company or EMIA for use as a contribution to a collective work and shall be considered a work made for hire.  I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound

0328A



6-27-85/jt:KB39/A

recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to: all exclusive rights specified in 17 U.S.C. §106 and the exclusive right to register copyright in the name of EMIA.

e.   Notwithstanding the provisions of Paragraph d. above, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I grant and assign to EMIA all exclusive rights of copyright in and to such Work throughout the universe, including, but not limited to, all exclusive rights specified in 17 U.S.C. §106.  I agree to execute and deliver to EMIA and I grant to EMIA a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph e. and to accomplish, evidence and perfect the rights granted to EMIA pursuant to this Paragraph e., including but not limited to: documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to EMIA.

APPLICABLE PRODUCER

0328A



○-27-85/jt:KB39/A

Re:  Contract No. *EMIA-8168*

Los Angeles, California

Date: *July 4, 1985*

EMI America Records, a division
of Capitol Records, Inc.
6920 Sunset Boulevard
Los Angeles, California  90028


EXHIBIT "I"


PROMISSORY NOTE

($200,000.00)


For value received John Waite and Diamond Stripe, Inc., a corporation organized and in good standing in the State of New York ("Company") (hereinafter individually and collectively referred to as the "Makers"), promise jointly and severally to pay to EMI America Records, a division of Capitol Records, Inc., a Delaware Corporation (hereinafter referred to as "EMIA"), or order, on December 31, 1989 ("Due Date") the principal amount of Two Hundred Thousand Dollars ($200,000.00) paid by EMIA on behalf of Makers pursuant to the Agreement of even date herewith to which this Promissory Note is attached as Exhibit "G", with interest on the then-current unpaid or unrecouped principal amount hereof from the date hereof until paid or recouped as provided below and in the "Agreement" (as that term is defined hereinbelow), at the rate of twelve and one-half percent (12½%) per annum; provided, however, that in no event shall the interest rate hereunder exceed the highest lawful rate of interest prescribed by law.  This promissory note ("Note") arises out of a separate agreement between the Makers and EMIA, dated of even date herewith _____, being EMIA's Contract Number _____ ("Agreement").  From the date hereof, EMIA may recoup the combined principal and interest then outstanding on the Note from any amounts now or hereafter payable to the Makers by EMIA under the Agreement (exclusive of amounts payable to Anonymous Music, Inc.) and/or from eighty percent (80%) of the amounts payable to Moonwalk Music, Inc. ("Moonwalk") pursuant to the agreement dated September 22, 1983 between EMIA and Moonwalk bearing EMIA's Contract Number EMIA-8098 (as amended) (the "Prior Agreement"),

0328A

6-28-85/jt:KB39/A

it being understood EMIA shall first recoup all other outstanding recoupable amounts under the Agreement and Prior Agreement before recouping the then-current amount of interest accrued on the then-outstanding principal amount of the Note.  Notwithstanding the foregoing, if the Note has not been repaid by the Due Date, EMIA may recoup the combined or unrepaid or unrecouped principal and interest then outstanding on the Note from the Collateral set forth in the Security Agreement of even date herewith.

1.   The Due Date, At EMIA's option shall be accelerated upon the occurrence of the earliest of the following conditions:

(a)   The termination of the Agreement, which shall immediately cause the then outstanding principal amount of the Note and all interest accrued to become due and payable; or

(b)   Upon the occurence of any other event as specified in the Security Agreement causing an acceleration of the Due Date.

2.   Principal and interest shall be payable in lawful money of the United States of America at 1750 North Vine Street, Hollywood, California 90028, Attention; C.P.Fitzgerald; or to such other person or at such other place as EMIA may from time to time designate in writing.

3.   The Makers reserve the right at any time to pay the principal remaining due on this Note with interest to the time of payment, and with no penalty.

4.   The obligation of the Makers under this Note are secured by a Security Agreement of even date herewith.

5.   Each and every party to this Note, either as Maker, endorser, surety or otherwise, hereby waives presentment, demand, protest and notice of any kind with respect to this Note, and assents to any extension or postponement of the time of payment or other indulgence and to any substitution, exchange or release of the collateral granted or permitted by EMIA or its successors or assigns.

6.   With respect to the repayment of this Note, the Makers hereby waive: any right of offset they now have or may hereafter have against EMIA, or its successor and assigns; all rights and benefits conferred by any and all statues of limitation in any action on this Note to the extent permitted by Section 360.5 of the California Code of Civil Procedure; the right to require EMIA to proceed against them, and except as otherwise required by law, waive the right to require EMIA to proceed against any security



0328A

6-27-85/jt:KB39/A

before proceeding against the Makers; and agree that no delay or omission on the part of EMIA in exercising any right or power under this Note shall affect Makers' liability.

7.   The Note may only be altered by an instrument in writing executed by both EMIA and all of the Makers.

8.   If this Note is not paid in full upon demand, the Makers agree to pay all reasonable costs and expenses of collection, including but not limited to, reasonable attorney's fees.

9.   The Makers agree and acknowledge that neither the making of this Note nor EMIA's assumption or exercise of rights and powers under this Note shall constitute an election of remedies, accord and satisfaction, or any other limitation of remedy, with respect to EMIA's rights under the Agreement; the Makers further acknowledge that this Note shall not be construed to reduce, limit, alter or in any way affect EMIA's rights, powers and remedies arising out of EMIA's contractual relations with the Makers.

10.   Time is of the essence of this Note.

11.   If for any reason, performance of any provision of this Note shall have the effect of requiring the payment of interest at a rate exceeding the highest rate of interest allowed by law, the rate of interest chargeable hereunder shall be reduced to the highest lawful rate.  If, for any reason, EMIA shall receive as interest any amounts which exceed the highest rate of interest allowed by law, such amounts as would otherwise be excessive interest shall be immediately and automatically applied to the reduction of the unpaid balance of the principal amount and not to payment of interest, and any such remaining amounts after the principal balance and interest due have been paid shall be remitted to Maker.

12.   This Note shall be construed and interpreted in accordance with, and all disputes hereunder shall be governed by, the laws of the State of New York.  It is hereby agreed that any actions commenced by either party with respect to the Note and any obligations thereunder may only be pursued in either the courts of the State of New York and County of New York or the Federal District Court for the Southern District of New York.

13. (a)   All notices, statements and payments which EMIA may be required or desire to serve upon Makers may be personally served upon Makers or by depositing same, postage prepaid, in any mailbox, chute or other receptacle authorized by the United States Postal Service for (certified or registered mail, return



0328A

6-28-85/jt:KB39/A

receipt requested) mail addressed to Makers at the address below its signature, or at such other address as Makers may from time to time designate by written notice to EMIA.  The date of service of any notice, statement or payment so deposited shall be the date of deposit.

b.   All notices which any of the Makers may be required or desire to serve upon EMIA may be served upon EMIA by depositing the same, certified or registered mail return receipt requested, postage prepaid, in any mail box, chute or other receptacle authorized by the United States Postal Service for mail addressed to EMIA at the address in the heading of this agreement, attention Secretary, or at such other address as EMIA may from time to time designate by written notice to Makers.  The date of service of any notice so deposited shall be the date of deposit.

14.   When the context so requires the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

<u>MAKERS</u>

By: _____

Title: _____
      An Authorized Officer

Federal I.D.#_____

c/o Steven Machat, Esq.
1 West 67th Street
New York, New York  10023

_____
JOHN WAITE

Social Security #_____

Address:

0328A



6-27-85/jt:KB39/A

Re:  Contract No. *EMIA-8168*

Los Angeles, California

Date:  *7/4/85*

EXHIBIT "J"

SECURITY AGREEMENT

John Waite and Diamond Stripe, Inc. (individually and collectively referred to as "Debtor") and EMI America Records, a division of Capitol Records, Inc. ("Secured Party") whose addresses are as they appear with their signatures below, agree as follows:

I    Creation of Security Interest

Debtor hereby grants to Secured Party a security interest in the Collateral described in Paragraph II and in its expectancy to acquire such Collateral described in Paragraph II in the ordinary course of business to secure the performance and payment of all obligations of Debtor under a certain Promissory Note of even date herewith for a principal amount of Two Hundred Thousand Dollars ($200,000.00), with interest accruing thereon (the "Note") in favor of Secured Party. The security interest in the Collateral shall remain in full force and effect until the Note, plus any interest accruing thereon, has been satisfied in full.

II    Collateral

The Collateral of this Security Agreement is:

A.    That certain parcel of real property located at _____ and all structures, fixtures and improvements thereon (the "Parcel") and Debtor shall prepare, file and record such interest in the name of EMIA subject, only to a purchase money first mortgage; and

B.    Debtor's accounts receivable, royalties, and other amounts otherwise payable to Debtor under the agreement between Secured Party and Diamond Stripe, Inc. dated _____ and any other contract between Secured Party and Debtor or any

0328A



other entity owned or controlled directly or indirectly in whole or in part by Debtor.

C.   Debtor's accounts receivable, royalties, and other amounts payable to Debtor or any other entity owned or controlled commonly by or for Debtor under any agreements with any third parties including, but not limited to, all mechanical copyright, royalty agreements, all music publishing agreements of any kind, all merchandising agreements, all name and/or likeness licensing agreements, all television or motion picture agreements of any kind and all concert performance agreements.

D.   All results and proceeds of the foregoing including, without limitation, any and all monies (whether advances, royalties or otherwise) payable pursuant to the foregoing.

III   <u>Obligations of Debtor</u>

A.   <u>Obligation to Pay</u>

(1)   Debtor shall pay to Secured Party the sums evidenced by the Note in accordance with the terms of the Note.

(2)   If the Note has not been repaid to Secured Party in full by January 1, 1988 Debtor shall pay to, turn over to and deposit with Secured Party or its designee for application to Debtor's indebtedness all Collateral or proceeds of Collateral in the form of cash and negotiable and other instruments for the payment of money within ten (10) days of receipt by Debtor from any person or entity in payment of or on an account or contract right ("Account Debtor") and Secured Party shall have the exclusive right in accordance with Paragraph VI hereinbelow to collect, apply, and use the proceeds paid, turned over, or deposited by Debtor, and

(3)   Debtor shall pay all reasonable expenses and reimburse Secured Party for any reasonable expenditures, including reasonable attorney's fees and legal expenses charged to EMIA by outside legal counsel in connection with Secured Party's exercise of rights and remedies under the Note and this Security Agreement.

0328A



6-27-85/jt:KB39/A

B.   Additional Obligations of Debtor.

(1)   Protection of Collateral.

a.   Debtor represents and warrants that to the best of Debtor's knowledge:  Debtor has and shall continue to have full title to the Collateral free from any liens, leases, encumbrances, defenses or other claims, and the security interest in the Collateral constitutes and shall continue to constitute a first, prior, and indefeasible security interest subject only to the purchase money first mortage on the Parcel, and no financing statement covering the Collateral, or any part thereof, is on  file in any public office whatsoever, except in favor of Secured Party.

b.   Debtor shall not sell or assign any of the Collateral.

c.   Subject to the purchase money first mortgage on the Parcel, Debtor shall keep the Collateral free from voluntary liens, encumbrances or security interests, except the security interests created hereunder.  In the event the Collateral should become subject to any involuntary liens, Debtor shall have ninety (90) days to satisfy such involuntary liens provided Debtor sends EMIA prompt written notice of any such involuntary liens within five (5) days of Debtor's receipt of any notice regarding any such involuntary liens.

d.   Debtor shall promptly notify Secured Party of any bankruptcy or insolvency proceedings instituted by or against Debtor as specified in Paragraph V.

e.   Debtor shall defend the Collateral against any claims or demands of third parties except those claims and demands, if any, solely arising out of the conduct of the Secured Party.

(2)   Protection of Security Interest.

a.   Debtor shall sign and execute along or with Secured Party, Form UCC-1 Financing Statements or other documents necessary to protect the security interest under this Security Agreement against the rights or interests of third persons.

b.   With respect to the Parcel, Debtor shall cause to be prepared, executed, filed and recorded a second mortgage in the name of Secured Party in the principal amount of Two Hundred Thousand Dollars



Page 67 of 75

6-27-85/jt:KB39/A

($200,000.00) and Debtor shall send copies of such recorded documents to Secured Party within five (5) days of the closing of Debtor's escrow for the purchase of the Parcel.

IV.     Purpose of Security Interest

This Security Agreement secures payment and performance with respect to the Note between Secured Party and Debtor in the amount of Two Hundred Thousand Dollars ($200,000.00), with simple interest added thereto at a rate of twelve and one-half percent (12½%) per annum.

V.     Default.  Misrepresentation or misstatement in connection with, noncompliance with or nonperformance of any of Debtor's obligations or agreements under the Note and this Security Agreement shall constitute default.  In addition, Debtor shall be in default if bankruptcy or insolvency proceedings are instituted by or against Debtor or if Debtor makes any assignment for the benefit of creditors (subject to the provisions of Paragraph III B.(1)c. hereof).

VI.     Secured Party's Rights and Remedies.

A.     Rights Exclusive of Debtor's Default.
(1)  Secured Party may renew or extend the term of the Note, and;

(2)  Secured Party may add any person or entity as guarantor, endorser, surety or other party to the Note.
B.     Upon Debtor's Default.

(1)     Secured Party shall have all of the rights and remedies provided in this Security Agreement and in the Uniform Commercial Code as enacted in the State of New York and in effect at the date of execution of this Security Agreement.

(2)     All obligations secured hereunder shall, at Secured Party's option, immediately become due and payable without notice or demand.

(3)     Secured Party shall have the right to foreclose the liens and security interests created under this Security Agreement or under any other agreement relating to any and all Collateral by any available judicial procedure, or where appropriate, without judicial process.

(4)     Secured Party shall have the right to notify any and all Account Debtors or any obligors on accounts



0328A

that the same have been assigned to Secured Party
and/or that all payments thereon are to be made to
Secured Party.

(5)    Secured Party may by any employee or employ-
ees designate, execute, sign, endorse, transfer or
deliver in the name of the Debtor, notes, checks,
drafts or other instruments for the payment of money
and receipts, certificates of origin, applications for
certificates of title or any other documents, necessary
to evidence, perfect and realize upon the security
interest and obligations of this Security Agreement;

(6)    Secured Party may settle, compromise, or
release, on terms acceptable to Secured Party, in whole
or in part, any amounts owing on accounts.

(7)    Secured Party shall have the right to sell,
assign, lease, or otherwise dispose of the Collateral
or any part thereof, either at public or private sale,
in credit or otherwise, and upon such terms as shall be
acceptable to Secured Party, all at Secured Party's
option and as Secured Party deems advisable, and
Secured Party may bid or become purchaser at any such
sale, if public, free from any right of redemption,
which right of redemption is hereby waived by Debtor.
Secured Party will give Debtor reasonable notice of the
time and place of any public sale of the Collateral or
of the time after which any private sale of the
Collateral or any other intended disposition thereof is
made.  Unless otherwise provided by law, the
requirement of reasonable notice shall be met if such
notice is mailed, postage prepaid, to Debtor at least
twenty (20) days before the time of sale or
disposition.  Debtor shall indemnify Secured Party with
respect to the expenses of retaking, holding, preparing
for sale, selling, and the like shall include
reasonable attorney's fees and other legal expenses.

(8)    In addition to, and in conjunction with or in
substitution for those rights and remedies, Secured
Party may remedy any default and/or may waive any
default without waiving the default remedied or without
waiving any other prior or subsequent default.

VII.    <u>Debtor's Rights and Remedies</u>

A.    Debtor shall have all of the rights and remedies
provided in this Security Agreement and by the Uniform Commercial

0328A



Code as enacted in the State of New York and in effect at the same time of execution of this Security Agreement.

    B.    Debtor shall have the right to collect and enforce at its own expense as agent for Secured Party all accounts until Debtor is in default under Paragraph V hereinabove or until Secured Party notifies Debtor that it will collect any or all accounts pursuant to Paragraph III A.(2) hereof.

## VIII.    Additional Agreements and Affirmations.

    A.    Debtor's Agreements and Affirmations.  Debtor agrees and affirms:

    (1)    That his only place of business is that which is indicated beneath his signature below and that he will promptly notify Secured Party of any change of location of any place of business or of the addition of any new place of business.

    (2)    That, if Debtor is a corporation, it is duly incorporated under the laws of the State of New York, that it is duly qualified and in good standing in every other state in which it is doing business, and that the execution and performance of this Security Agreement are within the corporate powers, have been duly authorized and are not in contravention of law or the terms of Debtor's charter, by-laws or other incorporation papers, or of any agreement to which Debtor is a party or by which it is bound.

    (3)    That at the time Secured Party's security interest attaches to any of the Collateral or its proceeds Debtor is the lawful owner with the right to transfer any interest therein, that to the best of

Debtor's knowledge the Collateral and its proceeds is not and shall not be the subject of any adverse voluntary lien, encumbrance, security interest or financing statement on file in any public office or subject to the interest of any persons.

    (4)    That to the best of Debtor's knowledge all financial or credit statements, statements, and schedules of accounts, invoices, documents of title, negotiable, and other instruments for the payment of money and any other writing submitted to Secured Party or upon which Secured Party relied prior or subsequent to execution of this Security Agreement are or shall be true, correct, complete, valid, and genuine.



0328A

(5)    That notice of default and presentment, demand, protest, and notice of dishonor as to any instrument are hereby waived.

(6)    Notwithstanding this Security Agreement, that the Secured Party's remedies to obtain payment under the Note shall not be limited to the Collateral and Secured Party may proceed directly against the Debtor or against any assets owned by the Debtor without first proceeding against the Collateral and may proceed against the Debtor directly or against assets owned by the Debtor in the event that the Collateral is not sufficient to satisfy Debtor's obligations hereunder.

B.    Mutual Agreement

(1)    "Secured Party" and "Debtor" as used in this Security Agreement shall include the heirs, assigns, executors, administrators, successors, representatives, trustees, and receivers of those parties.

(2)    If more than one Debtor signs this Security Agreement, their liability shall be joint and several and the Collateral of each Debtor shall secure all liabilities of that Debtor but shall not secure the separate liabilities of another Debtor.

(3)    This Security Agreement shall include all attachments, amendments, and supplements thereto and all assignments, instruments, documents, accounts and other writings submitted by Debtor to Secured Party pursuant to this Security Agreement, but neither Debtor nor Secured Party shall be bound by an undertaking not expressed in writing.

(4)    This Security Agreement shall be construed and interpreted in accordance with, and all disputes hereunder shall be governed by, the laws of the State of New York.  It is hereby agreed that any actions commenced by either party with respect to the Note and any obligations thereunder may only be pursued in either the courts of the State of New York and County of New York or the Federal District Court for the Southern District of New York.  If any of the provisions of this Security Agreement shall contravene or be held invalid under the laws of the State of New York, the Security Agreement shall be construed as if not containing such provisions and the rights and obligations of the parties hereto shall be construed and enforced accordingly.



0328A

6-27-85/jt:KB39/A

5. (a)     All notices, statements and payments which Secured Party may be required or desire to serve upon Debtor may be personally served upon Debtor or by depositing same, postage prepaid, in any mailbox, chute or other receptacle authorized by the United States Postal Service for mail addressed to Debtor at the address below its signature, or at such other address as Debtor may from time to time designate by written notice to Secured Party.  The date of service of any notice, statement or payment so deposited shall be the date of deposit.

(b)     All notices which Debtor may be required or desire to serve upon Secured Party may be served upon Secured Party by depositing the same, certified or registered mail, return receipt requested, postage prepaid, in any mail box, chute or other receptacle authorized by the United States Postal Service for mail addressed to Secured Party at the address below its signature, attention Secretary, or at such other address as Secured Party may from time to time designate by written notice to Debtor.  The date of service of any notice so deposited shall be the date of deposit.

6.     Time is of the essence of this Security Agreement.

/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/



0328A

6-27-85/jt:KB39/A

   7.   When the context of this Security Agreement
so requires, the masculine gender includes the feminine
and/or neuter, and the singular number includes the
plural.


EXECUTED IN QUADRUPLICATE THIS _____ DAY OF _____, 1985


SECURED PARTY:                     DEBTOR:

EMI AMERICA RECORDS, INC., a       DIAMOND STRIPE, INC.
division of Capitol Records, Inc.


By: _____        By: _____

Title: _____        Title: _____
     An Authorized Officer              An Authorized Officer

                                   Federal I.D.#_____

                                   Address:_____
6920 Sunset Boulevard              _____
Hollywood, California 90028        _____


                                   X_____
                                   JOHN WAITE

                                   Social Security #_____

                                   Address:_____
                                   _____
                                   _____

0328A

6-27-85/jt:KB39/A

Exhibit "K"

Deeds Page 1



6-27-85/jt:KB39/A

Deeds Page 2



0328A