## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN WAITE, an individual; JOE ELY, an individual; KASIM SULTON, an individual; SUSAN STRAW HARRIS p/k/a SYD STRAW, an individual; LEONARD GRAVES PHILLIPS, an individual, STAN SOBOL a/k/a STAN LEE, an individual, and ISRAEL CABALLERO, an individual; and on behalf of all others similarly situated, | Civil Action No. 1:19-cv-01091-LAK |
| Plaintiffs, | |
| v. | |
| UMG RECORDINGS, INC., a Delaware corporation, and DOES 1 through 10, Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Date: August 7, 2019

**BLANK ROME LLP**

Ryan E. Cronin
Gregory M. Bordo (*admitted pro hac vice*)
David M. Perry (*admitted pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone (212) 885-5000

**COHEN MUSIC LAW**
Evan S. Cohen (*admitted pro hac vice*)
Maryann R. Marzano (*admitted pro hac vice*)
1180 South Beverly Drive, Suite 510
Los Angeles, CA 90035-1157
Telephone: (310) 556-9800
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF FACTS ........................................................................3

PLAINTIFFS TERMINATE ALL GRANTS TO THEIR SOUND

RECORDINGS.........................................................................................3

    A.    The Waite Albums.................................................................3

    B.    The Ely Albums....................................................................4

    C.    The Sulton Albums...............................................................5

    D.    The Syd Straw Albums.........................................................5

    E.    The Dickies' Album .............................................................6

    F.    UMG's Refusal to Acknowledge the Termination of the Grants and its Continued Exploitation of Plaintiffs' Sound Recordings ...........................7

    G.    Plaintiffs' First Amended Class Action Complaint ....................................8

APPLICABLE LEGAL STANDARD ........................................................8

ARGUMENT.............................................................................................8

    A.    OVERVIEW OF SECTION 203 AND ITS UNDERLYING POLICIES...9

    B.    OVERVIEW OF SECTION 101 – "WORKS MADE FOR HIRE" AND ITS TWO PRONGS.........................................................................10

    C.    PLAINTIFFS' TERMINATION NOTICES ARE NOT BARRED BY THE STATUTE OF LIMITATIONS ...............................................11

        1.    The Premise of UMG's Statute of Limitation Argument Is Wrong ...........12

        2.    UMG's Reliance on the Unsupportable Work for Hire Language Violates §203(a)(5) of the Copyright Act.....................................13

        3.    In the Absence of Indisputable Proof That Plaintiffs Were Actually Employees of the Record Labels at the Time, the Work for Hire Clause Does Not Eliminate Their Termination Rights..........15

        4.    The Language of the Agreements Themselves is Equivocal, Contradictory and Cannot Support UMG's Statute of Limitations Defense ........17

        5.    UMG Fails to Cite Even One Case Involving the Termination Statute ........20

        6.    The Accrual of a Claim Regarding Rejection of Termination Cannot Possibly Occur Until At Least the Effective Date of Termination.........23

D.   WHETHER WAITE AND ELY WERE EMPLOYEES OF THIRD-PARTY COMPANIES IS, AT BEST, A QUESTION OF FACT NOT RIPE FOR DETERMINATION ON A MOTION TO DISMISS ...............................25

E.   ELY'S PRE-1978 COPYRIGHT GRANT MAY QUALIFY AS A GAP GRANT..................................................................................................28

F.   UMG RECEIVED SUFFICIENT NOTICE OF THE GRANTS BEING TERMINATED ........................................................................................30

    1.   Plaintiffs Reasonably Identified the Grants Being Terminated.....30

    2.   The Wealth of Information Contained in Plaintiffs' Notices Ensures that any Errors Noted by UMG Constitute Mere Harmless Error...........................................................................................32

G.   PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIMS ARE SUFFICIENTLY PLEAD ........................................................................33

CONCLUSION..................................................................................................34

154498.00601/121581116v.13

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aday v. Sony Music Entertainment*,
    No. 96-CV-0991MGC, 1997 WL 598410 (S.D.N.Y. Sept. 25, 1997) ....................................22, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009)......................................................................................8

*Aymes v. Bonelli*
    980 F.2d 857 (2d Cir. 1992) ...................................................................................................27

*Ballas v. Tedesco*,
    41 F. Supp. 2d 531 (D.N.J. 1999)...........................................................................................11

*Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*,
    522 U.S. 192, 118 S. Ct. 542 (1997).......................................................................................23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007).......................................................................................8

*Biro v. Conde Nast*,
    807 F.3d 541 (2d. Cir. 2015) ...................................................................................................8

*Burroughs v. Metro-Goldwyn-Meyer*,
    683 F.2d 610 (2nd Cir. 1982) .................................................................................................31

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730, 109 S. Ct. 2166 (1989)...................................................................12, 16, 27, 28

*Consumer Health Info. Corp. v. Amylin Pharms., Inc.*,
    819 F.3d 992 (7th Cir. 2016) ..................................................................................................22

*Cooper v. NCS Pearson, Inc.*,
    733 F.3d 1013 (10th Cir. 2013) ..............................................................................................22

*Donaldson Pub. Co. v. Bregman, Vocco Conn, Inc.*,
    375 F.2d 639 (2d Cir. 1967) ...................................................................................................15

*Fisher Co. v. M. Witmark Sons*,
    318 U.S. 643, 63 S. Ct. 773 (1943)..........................................................................................13

*Horror Inc. v. Miller*,
    335 F. Supp. 3d 273 (D. Conn. 2018)...........................................................................16, 31, 32

iv

*Kwan v. Schlein*,
    634 F.3d 224 (2d Cir. 2011) ................................................. 21

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002) ......................................... *passim*

*Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*,
    290 F.3d 98 (2d Cir. 2002) ................................................. 16

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) ................................................. 8

*Mills Music, Inc. v. Snyder*,
    469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985) ................................................. 15

*Milne v. Stephen Slesinger, Inc.*,
    430 F.3d 1036 (9th Cir. 2005) ................................................. 15, 28

*Music Sales Corp. v. Morris*,
    73 F. Supp. 2d 364 (S.D.N.Y. 1999) ................................................. 10

*Netzer v. Continuity Graphic Assoc.*,
    963 F. Supp. 1308 (S.D.N.Y. 1997) ................................................. 21

*Penguin Group v. Steinbeck*,
    537 F.3d 193 (2d Cir. 2008) ................................................. 15, 28

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663, 134 S. Ct. 1962 (2014) ................................................. 17, 23

*Siegel v. Warner Bros. Entertainment Inc.*,
    542 F. Supp. 2d 1098 (C.D. Cal. 2008) ................................................. 21, 24

*Siegel v. Warner Bros Entertainment Inc.*,
    658 F. Supp. 2d 1036 (C.D. Cal. 2011) ................................................. 9, 10, 16, 33

*Siegel v. Warner Bros. Entertainment Inc.*,
    690 F. Supp. 2d 1048 (C.D. Cal. 2009) ................................................. 31, 32

*Stewart v. Abend*,
    495 U.S. 207, 110 S. Ct. 1750 (1990) ................................................. 17

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000) ................................................. 27

*WPIX, Inc. v. IVI, Inc.*,
    691 F.3d 275 (2d Cir. 2012). ................................................. 29

v

*Zuill v. Shanahan*,
   80 F.3d 1366 (9th Cir. 1996) ........................................................................... 20

**Statutes**

17 U.S.C. § 101 ...................................................................................... 10, 11, 12

17 U.S.C. § 203 ................................................................................................. *passim*

17 U.S.C. § 203(a) ........................................................................................... 12

17 U.S.C. § 203(a)(5) ....................................................................................... *passim*

17 U.S.C. § 304(c)(4) ................................................................................. 14, 16

17 U.S.C. §304(c)(5) .................................................................................. 14, 15

**Other Authorities**

37 C.F.R. §201.10(e)(1) .................................................................................. 32

37 C.F.R § 201.10(e)(2) .................................................................................. 32

37 C.F.R. § 201.10(f)(1)(ii)(C) ....................................................................... 29

37 CFR § 201.10(d)(1) .................................................................................... 26

37 CFR §§ 201.10 et seq. .......................................................................... 10, 30

Federal Rule of Civil Procedure 12(b)(6) ................................................. *passim*

*Gap in Termination Provisions*, 75 Fed. Reg. 15390 (March 29, 2010) ............ 29

Menell and Nimmer, *Pooh-Poohing Copyright Law's 'Inalienable' Termination
   Rights*, 57 J. Copyright Soc'y U.S.A. 799 (2010) ........................................ 14

Nimmer on Copyright, §11.02[A][2](2018) ...................................................... 13

Nimmer on Copyright, § 11.07[A](2018) .......................................................... 14

U.S. Constitution Supremacy Clause, Article VI, Section 2 ............................... 7

U.S. Copyright Office, *Analysis of Gap Grants Under the Termination Provisions of
   Title 17* (December 7, 2010) ........................................................................ 29

United States Copyright Office, *Notices of Termination*
   https://www.copyright.gov/recordation/termination.html (last accessed July 30,
   2019) ............................................................................................................. 9

Plaintiffs John Waite, Joe Ely, Kasim Sulton, Susan Straw Harris, Leonard Graves Phillips, Stan Sobol, and Israel Caballero, on behalf of themselves and all others similarly situated ("Plaintiffs"), hereby oppose the Motion to Dismiss ("Motion") filed by UMG Recordings, Inc. ("UMG").

## PRELIMINARY STATEMENT

UMG's Motion to Dismiss is a master class in sleight-of-hand with an exaggerated focus on minutiae and technicality to the complete exclusion of basic policy and fairness under U.S. copyright law.  Decades ago, Plaintiffs granted UMG the exclusive right to release and distribute Plaintiffs' sound recordings throughout the United States for the enjoyment of all.  Pursuant to U.S. copyright law, Plaintiffs have notified UMG that they are exercising their statutory right to reclaim their sound recordings now that the 35-year mark has arrived.  To date, UMG refuses to acknowledge that Plaintiffs terminated their grants and continues to exploit Plaintiffs' sound recordings for its own financial gain, in violation of Section 203 of the Copyright Act.  Plaintiffs filed this lawsuit seeking declaratory relief and damages for copyright infringement resulting from UMG's flagrant disregard of Plaintiffs' legal rights.

Plaintiffs' First Amended Class Action Complaint (Doc. 45, cited herein as "FAC") sets forth UMG's ongoing violation of Section 203.  Since at least 2015, UMG was on notice that Plaintiffs were terminating the grants to Plaintiffs' sound recordings.  For months, UMG ignored Plaintiffs' termination notices. And then, before the grants were set to terminate, UMG advised that it refused to honor Plaintiffs' termination notices.  To date, UMG continues to exploit Plaintiffs' sound recordings as if the termination notices had never been sent.  Through these actions, UMG has and continues to willfully infringe Plaintiffs' U.S.  copyrights, and in the process is filling its coffers by illegally exploiting Plaintiffs' artistic labors.

UMG filed its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Memorandum of Law in Support (Doc. 50, referenced herein as "Memorandum").  UMG argues that

Plaintiffs' FAC should be dismissed asserting that Plaintiffs' claims are untimely and that the termination notices are substantively defective.[1]   UMG contends that: 1) the three year statute of limitations bars Plaintiffs from challenging ownership of the sound recordings at issue; 2) Plaintiffs' notices are invalid because the grants described therein either pre-date 1978 or lack certain information, such as the date of execution, for the grants Plaintiffs sought to terminate; and 3) because Plaintiffs' purported "loan-out companies" or "third-party companies" signed agreements with UMG's predecessor labels, Plaintiffs themselves cannot terminate the grants because Plaintiffs are not "grantors" within the meaning of Section 203.   Each of these contentions are fatally flawed, as is demonstrated below.

In addition to being hyper-technical, UMG's arguments are replete with misdirection and mischaracterization.   First and foremost, UMG relies on a theory that the statute of limitations forecloses *any* inquiry into whether the sound recordings are truly "work[s] made for hire" as set forth in Plaintiffs' recording agreements and claims that Plaintiffs filed this lawsuit decades too late.   However, courts and commentators alike have uniformly rejected UMG's statute of limitations theory and, in fact, *none* of the cases cited by UMG involves or even discusses copyright termination law.

Next, UMG contends that Plaintiffs' notices are fatally deficient because they do not reasonably identify the grants to which the notices of termination apply.   Contrary to UMG's insinuations, Plaintiffs supplied UMG with more than sufficient information to identify *exactly* what grants Plaintiffs terminated.   Indeed, ***UMG itself confirmed this fact by attaching to its Motion the very agreements covering the grants at issue.***   Section 203 of the Copyright Act requires only that Plaintiffs' termination

---

[1]     UMG's remaining argument, to the extent it can be called an argument, serves merely to cast aspersions on Plaintiffs' counsel. The instant response addresses only UMG's substantive legal arguments, not UMG's unwarranted *ad hominem* attacks.

notices contain sufficient detail to alert UMG of the grants that Plaintiffs sought to terminate – and Plaintiffs' notices contained the requisite detail.

Finally, UMG argues that Plaintiffs Waite and Ely do not have the authority to terminate their grants either because: 1) the grants were made by third-party companies as "works made for hire"; and/or 2) Waite and Ely are not the authors of the works they seek to terminate. However, UMG's argument is based on a skewed reading of the agreements and not the facts as they existed. Moreover, no determination has been made, nor can be made, at this stage of the proceedings as to whether Waite and Ely were in fact employees of the third-party companies.

In essence, UMG's Motion is an attempt to ignore Plaintiffs' termination notices and confiscate Plaintiffs' rights; however, Plaintiffs' Amended Complaint and the record before the Court confirm that the termination notices are appropriate and UMG's Motion is unfounded. As it stands, Plaintiffs have sufficiently pled facts demonstrating that: 1) UMG was timely and properly notified of the grants Plaintiffs' sought to terminate; and 2) Plaintiffs validly terminated their copyright grants and have complied with the statutory formality of recordation of the notices. For all of these reasons, the Court should reject UMG's Motion and allow Plaintiffs to proceed with this suit and focus on the heart of this matter – enforcing the termination notices and allowing Plaintiffs to reclaim their copyrighted sound recordings. Accordingly, Plaintiffs respectfully request that the Court deny UMG's Motion.

## <u>STATEMENT OF FACTS</u>

### <u>PLAINTIFFS TERMINATE ALL GRANTS TO THEIR SOUND RECORDINGS</u>

**A.**   **<u>The Waite Albums</u>**

Plaintiff John Waite ("Waite") is a British singer and songwriter who started his career in the early 1970s with the musical group "The Babys" and later launched a successful solo career in 1983. FAC ¶ 6. Between 1981 and 1985, Waite, through three separate "loan-out" companies, signed recording agreements with UMG's predecessor labels. FAC ¶ 30. On April 20, 2015, approximately

3

35 years after Waite Granted UMG the rights to his sound recordings, Waite notified UMG that he was terminating the grants to all three Waite Albums.  FAC ¶ 31.

Through his notice of termination, Waite terminated "[a]ll grants or transfers of copyright and all rights of copyright proprietor …in and to the [] sound recordings including, without limitation to the grant dated in or about 1981[.]"  FAC Ex. A. As part of his notice of termination and for ease of reference, Waite provided UMG with a termination notice "schedule" that detailed: 1) the work; 2) the author; 3) the publication date; 4) the copyright registration number; 5) the termination notice date; and 6) the effective date of termination for each of the grants to musical works that Waite was terminating. *Id*.  Waite's termination notice included all of the information he had available to apprise UMG of the grants Waite sought to terminate. Waite's notice of termination was duly recorded by the Copyright Office on August 30, 2016.  FAC Ex. A.

**B.**     **The Ely Albums**

Plaintiff Joe Ely ("Ely") has had a storied musical career as a singer, songwriter and guitarist, having released his first solo album in 1977.  FAC ¶ 7. Ely signed a recording agreement with UMG and released four albums after February 8, 1978 – *Honky Tonk Masquerade*, *Down The Drag*, *Live Shots*, and *Musta Notta Gotta Lotta* (hereinafter collectively referred to as the "Ely Albums").  FAC ¶¶ 42; 44.  On December 15, 2015, Ely notified UMG that he was terminating the grants for the sound recordings on the Ely Albums, 35 years after those grants were made. FAC ¶ 43. Like Waite, Ely's notice terminated "[a]ll grants or transfers of copyright and all rights of copyright proprietor …in and to the [] sound recordings including, without limitation to the grant dated in or about 1978[.]" FAC Ex. C.  The termination notice identified: 1) the work; 2) the author; 3) the publication date; 4) the copyright registration number; 5) the termination notice date; and 6) the effective date of termination for each of the grants to musical works that Ely was terminating. *Id*.  Ely supplied UMG with all the information

4

he had in his possession to identify the grants being terminated. The Copyright Office duly recorded Ely's notice of termination on June 17, 2016. FAC Ex. C.

    **C.**    <u>**The Sulton Albums**</u>

American bass guitarist, keyboardist and vocalist Kasim Sulton ("Sulton") signed his recording deal on September 29, 1980.   FAC ¶¶ 8; 52.  Per the terms of that agreement, Sulton released one album – *Kasim* (referred to as the "Sulton Album").  *Id.*  Nearly 35 years after having granted UMG the rights to his music, Sulton served UMG with a notice of termination dated July 20, 2016.  FAC Ex. E.

Sulton's notice terminated "[a]ll grants or transfers of copyright and all rights of copyright proprietor …in and to the [] sound recordings including, without limitation to the grant dated in or about 1981[.]" FAC Ex. E.  Like Waite and Ely, the Sulton termination notice identified: 1) the work; 2) the author; 3) the publication date; 4) the copyright registration number; 5) the termination notice date; and 6) the effective date of termination for each of the grants to musical works that Sulton was terminating. *Id.*  As with his fellow representative class members, Sulton's termination notice contained all of the information he had related to the UMG grants that were being terminated. Sulton's notice of termination was recorded by the Copyright Office and was given a recordation date of July 25, 2016. FAC Ex. E.

    **D.**    <u>**The Syd Straw Albums**</u>

Plaintiff Susan Straw Harris, professionally known as Syd Straw ("Straw") is an American singer and songwriter who was a member of the Golden Palominos. FAC ¶ 9. Straw signed her recording deal on July 20, 1987. FAC ¶ 68.  In keeping with the terms of her agreement, Straw released the album *Surprise* (referred to as the "Straw Album") on July 21, 1989. Straw served UMG with a notice of termination on June 21, 2016, nearly 35 years after granting UMG the rights to her music. FAC Ex. G.

5

Like her fellow named Plaintiffs and other class members, Straw's notice terminated "[a]ll grants or transfers of copyright and all rights of copyright proprietor …in and to the [] sound recordings including, without limitation to the grant dated in or about 1989[.]" FAC Ex. G.  As is typical of the class, Straw's termination notice identified: 1) the work; 2) the author; 3) the publication date; 4) the copyright registration number; 5) the termination notice date; and 6) the effective date of termination for each of the grants to musical works that Sulton was terminating. *Id*. Straw's termination notice contained all the information she had related to the UMG grants that were being terminated. And, Straw also submitted her notice of termination to the United States Copyright Office for recordation.  FAC ¶ 69.

### E.    The Dickies' Album

The California punk rock band The Dickies – comprised of lead vocalist Leonard Graves Phillips, guitarist and vocalist Stan Sobol and drummer Carlos Caballero (hereinafter collectively "The Dickies") – signed a record deal with UMG on April 3, 1979. FAC ¶¶ 10 – 12. Under the terms of their agreement, The Dickies released the album *Dawn of the Dickies* on November 9, 1979 (referred to as the "Dickies Album"). FAC ¶ 75. *Dawn of the Dickies* was authored by Phillips, Lee and Cabellero, as well as Bill Remar and Bob Davis. *Id*. Approximately 35 years after granting UMG the rights to the band's music, a majority of the authors of the Dickies Album served UMG with a notice of termination dated September 12, 2017.  FAC ¶ 76.

The Dickies' notice terminated "[t]he grant or transfer of copyright interests in and to the sound recordings in [] Schedule A, including without limitation the right of publication, as set forth in the recording agreement dated on or about January 7, 1979[.]" FAC Ex. I. As with the individual artists noted above, The Dickies' termination notice identified: 1) the work; 2) the author; 3) the publication date; 4) the copyright registration number; 5) the termination notice date; and 6) the effective date of termination for each of the grants to musical works that The Dickies were terminating. *Id*.  The Dickies'

6

termination notice also contained all of the information they had related to the UMG grants that were being terminated.  The Dickies also submitted their notice of termination to the Copyright Office for recordation.  FAC ¶ 76.

**F.     UMG's Refusal to Acknowledge the Termination of the Grants and its Continued Exploitation of Plaintiffs' Sound Recordings**

It was not until months after being served that UMG's legal department finally deigned to notify Plaintiffs that UMG would not honor the termination notices. UMG's stated grounds for refusing to recognize grant termination was virtually identical as to all Plaintiffs. Specifically, UMG maintains that: 1) the works at issue are "works made for hire" and thus not subject to termination under any circumstance; 2) a three-year statute of limitation bars Plaintiffs from challenging ownership status of their original works; 3) Plaintiffs' grants to sound recordings are not terminable because the grants were made by "loan-out" companies (in the case of Waite) and by a "third-party" company (in the case of Ely); and 4) Plaintiffs cannot make any use of their sound recordings because state contract law governs the agreements and prohibits anyone other than UMG from using the sound recordings. *See* FAC Ex. B; FAC Ex. D; FAC Ex. F; FAC Ex. H; FAC Ex. J.[2]

As of the effective dates of termination, Plaintiffs once again became (or will become) the owners of their sound recordings and reclaimed the exclusive right to reproduce and distribute those sound recordings as Plaintiffs see fit, in the United States. FAC ¶¶ 40; 50; 60; 73; 80. Despite this fact, UMG continues to disregard the explicit terms of the Copyright Act and the long-standing "second chance" policy enshrined in the Copyright Act.  UMG continues to illegally exploit the sound recordings of Plaintiffs Waite, Ely and Sulton throughout the United States, and it is anticipated that

---

[2]     This frivolous argument is absurd and contrary to established law. UMG wisely abandoned this argument in its Brief as contrary to the Supremacy Clause of the U.S. Constitution, Article VI, Section 2.

UMG will do the same with Straw and The Dickies, as if UMG never received notice that Plaintiffs' grants had terminated.   ¶¶ 41; 51; 61; 74; 81.

G.      **Plaintiffs' First Amended Class Action Complaint**

Plaintiffs filed their FAC in this Court on behalf of themselves and those similarly situated, seeking declaratory relief and monetary damages resulting from UMG's ongoing and anticipated copyright infringement.   FAC ¶¶ 28 – 86.

## APPLICABLE LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'"   *Biro v. Conde Nast*, 807 F.3d 541 (2d. Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1960 (2007).   "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citations omitted).   Under the standard applicable to rule 12(b)(6), this Court must "accept [] all factual allegations [in the complaint] as true and draw [] all reasonable inferences in favor of the plaintiff."   *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (citation omitted) (alterations in original). At the motion to dismiss stage, "dismissal is appropriate only where [plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief."   *Id*. (citation omitted).   Here, Plaintiffs will be entitled to judgment on their claims against UMG once Plaintiffs prove their factual allegations.

## ARGUMENT

## THE COURT SHOULD DENY UMG'S MOTION TO DISMISS BECAUSE PLAINTIFFS' TERMINATION NOTICES ARE SUFFICIENT AND TIMELY AS A MATTER OF LAW

UMG's memorandum advances three interrelated, albeit incorrect, arguments for dismissal of Plaintiffs' FAC.   First, UMG argues that Plaintiffs' claims are time-barred by the Copyright Act's

three-year statute of limitations as it pertains to the issue of whether the sound recordings at issue are "works made for hire." Docket No. 50 at pp. 6 – 16. Second, UMG contends that the termination notices are invalid because Plaintiffs did not identify the grants' dates of execution nor did Plaintiffs sufficiently identify the grants being terminated. Id. 16 – 22. Third, UMG maintains that Plaintiffs Waite and Ely are ineligible to terminate their grants as to most of their works either because the recording agreements were signed by a "loan-out" or "third-party" company or because the grant pre-dates 1978. Id. at pp. 22 – 28. UMG's arguments not only mischaracterize applicable law, but they misrepresent the nature of Plaintiffs' termination notices.

A.   <u>**Overview of Section 203 and its Underlying Policies.**</u>

Section 203 of the Copyright Act gives authors an opportunity to terminate grants of copyrights they made years in the past. The stated purpose of these termination provisions is "to protect authors and their heirs against unremunerative agreements by giving them an opportunity to share in the later economic success of their works by allowing authors or their heirs, during particular periods of time long after the original grant, to regain previously granted copyright or copyright rights." United States Copyright Office, *Notices of Termination* https://www.copyright.gov/recordation/termination.html (last accessed July 30, 2019). Indeed, courts considering this part of the Copyright Act (discussed below) routinely recognize that one of its main purposes is to ensure that artists have an opportunity to reclaim their works.

As an initial matter, "there is no approved form for termination notices [including schedules], [however] the Copyright Office has promulgated regulations specifying the required contents of a termination notice[.]" *Siegel v. Warner Bros Entertainment Inc.*, 658 F.Supp.2d 1036, 1092 (C.D. Cal.

2011) (citing 37 C.F.R. §201.10(b)(2).[3] A termination notice is to include: 1) the name of each grantee (or successor), and each address where service is made; 2) the title and name of at least one author, and the date the copyright was secured for each work to which the notice applies (including the registration number if available); 3) a brief statement reasonably identifying the grant being terminated; 4) the effective date of termination; and 5) the name, signature and address of the person executing the termination. *Id*. (citing 37 C.F.R. §201.10(b)(1)-(2), (c)(1), and (c)(4)).

Recognizing the potential for human error and the fact that authors may not possess every piece of information set forth in the Copyright Act, the regulations include a safety net to ensure that "[h]armless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of [the statute] shall not render the notice invalid." *Id*. (citing 37 C.F.R. §201.10(e)(1)). Indeed, even boilerplate termination notices that seek to terminate a "[g]rant or transfer of copyright and the rights of copyright proprietor, including publication and recording right[]" have been held adequate to effect termination even though such a generic statement does not "reasonably identify[] the grant" being terminated. *See Music Sales Corp. v. Morris*, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999) (stating that although generic, "the custom of the industry and of the Register of Copyrights dictates that this language is adequate. In fact, it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights.").

**B.**    **Overview of Section 101 – "Works Made for Hire" and Its Two Prongs**

UMG's statute of limitations argument presupposes that Plaintiffs' sound recordings are irrefutably "works made for hire" under Section 101 of the Copyright Act. UMG's argument rests on a faulty premise.

---

[3]    That the termination notice schedules are part of the termination notices is plain to see. The schedules are expressly "annexed" to the preceding summary page in each case, thereby becoming part of the termination notice document.

10

Section 101 of the Copyright Act defines a "work made for hire" as follows:

(1)     A work prepared by an employee within the scope of his or her employment; or

(2)     A work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

Subsection (2) enumerates nine separate artistic creations that may be deemed a "work made for hire," but only if the parties agree to that effect, in writing. "Sound recordings," which are at issue in this case, are noticeably absent from that list. "Furthermore, the sound recordings are not a work for hire under the second part of the statute because they do not fit within any of the nine enumerated categories…" *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 (D.N.J. 1999). For this reason, UMG desperately latches onto subsection (1) in an attempt to confiscate the rights to Plaintiffs' artistic creations. However, UMG's reliance on a few words of Plaintiffs' agreements, including the "loan-out" rubrics and accompanying documents, is undermined by the inclusion elsewhere of equivocal language. Through this contractual language, Plaintiffs agreed, with UMG's predecessor labels, that in the event their works are determined to not be "works made for hire," Plaintiffs merely *assigned* UMG the rights to their sound recordings.

**C.     Plaintiffs' Termination Notices Are Not Barred by the Statute of Limitations**

The primary focus of UMG's motion is its lengthy statute of limitations argument. That argument is premised on the erroneous  theory that by reference to a scant few sentences characterizing the sound recordings as "works for hire," a record label may effectively vaporize a recording artist's right of termination, a right that did not, could not, and would not even be exercisable earlier than *25 years* after the parties executed the agreement, because a notice of termination may be not be sent

11

earlier than ten years before the date that is 35 years from the publication of sound recordings subject to that agreement. § 203(a)(4)(A). In UMG's view, because the recording artists did not march into federal court within three years of signing with the label (which was at the nascent stage of a presumably productive business relationship) to pursue a declaratory relief action – concerning termination rights that would not arise for another 35 years – the words it inserted in the agreement become a settled and unassailable legal truth. This is an absurd, extremist position that is contrary to law and copyright policy.

Even more astounding is the fact that UMG has undertaken this full frontal attack on virtually *every* recording artist's right to termination (because the use of similar work for hire language was nearly ubiquitous in record industry agreements of that era), while, at the same time, totally failing to discuss or even mention any of the relevant caselaw or commentary involving § 203 or its counterpart for pre-1978 works, § 304(c). *None* of the cases cited by UMG on this statute of limitations issue involves the termination law.

### 1.   **The Premise of UMG's Statute of Limitation Argument Is Wrong.**

UMG has a dilemma. The *only* avenue that it can pursue to try to broadly eliminate recording artists' termination rights would be in those instances in which the sound recordings were created as a work for hire because there is no right of termination that applies to them.  17 U.S.C. § 203(a).

According to § 101 of the Copyright Act, in which the term is defined, there are only two ways to arrive at such a conclusion. The first prong of the definition states that a work can be a work made for hire, *if* it was created by "an employee within the scope of his or her employment." The second prong is not available to UMG, because the subsection lists only nine categories of works that can be works for hire, and sound recordings decidedly are not one of those categories. *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 741, 109 S. Ct. 2166, 2173 (1989) ("*CCNV*") (explaining that "[s]ection 101 plainly creates two distinct ways in which a work can be deemed for hire: one for works

12

prepared by employees, the other for those specially ordered or commissioned works which fall within one of the nine enumerated categories and are the subject of a written agreement."). Consequently, all that remains for UMG to try to argue is that the sound recordings at issue were employment-type works for hire – which necessarily would have meant that plaintiffs were employees of UMG's predecessor labels – *solely* because the recording agreements contain the scant work for hire language. UMG conveniently ignores, however, any examination of the *actual facts* as to whether the recording artists were *actually* employees. Just because it is labeled as work for hire, does not make it so.

UMG's position is just plain wrong. As discussed below, courts have repeatedly held that in the examination of whether a creator was an employee for hire, *the actual facts of the relationship between the parties, and not the words of the agreement, are determinative of the issue*. "Insofar as a work is made 'for hire' because it has been prepared by an employee within the scope of his employment, it is the relationship that actually exists between the parties, not their description of that relationship, that is determinative."   Nimmer on Copyright, §11.02[A][2](2018), citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290-91 (2d Cir. 2002)(treatise cited).

### 2.   UMG's Reliance on the Unsupportable Work for Hire Language Violates §203(a)(5) of the Copyright Act.

In order to fix the termination provisions of the 1909 Act, which had been watered down by Supreme Court decisions *(e.g., Fisher Co. v. M. Witmark Sons*, 318 U.S. 643, 63 S. Ct. 773 (1943)) that had eroded the termination rights of creative individuals, Congress enacted 203(a)(5): "(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." This subsection prohibits *any* clause, contractual language, or agreement that would deprive an author of his or her termination right.   "After judicial interpretation of the 1909 Act frustrated this intent by upholding advance assignments of renewal terms,

Congress spoke unambiguously in 1976." Nimmer § 11.07[A](2018). Congress did not intend that "any" mean anything less than "any."

Nimmer has identified four categories of agreements that violate § 203(a)(5), or its virtually identical counterpart that applies to pre-1978 grants, § 304(c)(4). These are: (1) an express agreement not to terminate a grant; (2) a penalty clause that acts in contravention of termination; (3) an agreement mischaracterizing the copyrighted work so as to avoid a termination right; and (4) a rescission and re-grant of a testamentary transfer. *See* Menell and Nimmer, *Pooh-Poohing Copyright Law's 'Inalienable' Termination Rights*, 57 J. Copyright Soc'y U.S.A. 799, 824–25 (2010). Upon factual examination of the actual relationship between plaintiffs and UMG's predecessor labels, through discovery or trial, UMG's unfounded assertions will no doubt fit into the third category. But for now, UMG's game of thirty-five-year-after-the fact "gotcha," with regard to the scant work for hire boilerplate language cannot hold up to scrutiny for the purposes of this motion; it is, at the very least, a question of fact as to whether plaintiffs were employees of the label at that time, and that is a matter that cannot be resolved in a Rule 12(b)(6) motion.

As noted in Nimmer, and as cited by *Marvel*: "The parties to a grant may not agree that a work shall be deemed one made "for hire" in order to avoid the termination provisions if a "for hire" relationship . . . does not in fact exist between them." Nimmer 11.07[A][2]. The risk of coercion is high, especially with new artists. And while *Marvel* specifically involved a post-hoc settlement agreement that purported to confirm (that is, retroactively confirm) the work for hire relationship that purportedly existed in the past, there is no reason why a clause inserted into a contemporaneous agreement would not be just as coercive. "If an agreement between an author and publisher that a work was created for hire were outside the purview of § 304(c)(5), the termination provision would be rendered a nullity; litigation-savvy publishers would be able to utilize their superior bargaining position

14

to compel authors to agree that a work was created for hire in order to get their works published." *Marvel,* at 290-291.

3. **In the Absence of Indisputable Proof That Plaintiffs Were *Actually* Employees of the Record Labels at the Time, the Work for Hire Clause Does Not Eliminate Their Termination Rights.**

When courts have addressed the issue of whether a work has been prepared by an individual as a work for hire or "employee for hire," the actual facts override any wording to the contrary in an agreement.  "Courts engaging in such an analysis have focused on the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work, *see, e.g.*, *Donaldson Pub. Co. v. Bregman, Vocco Conn, Inc.*,375 F.2d 639, 640-42 (2d Cir. 1967) (holding that a composer's work was not created as a work for hire for defendant even though his contract with defendant provided him with a drawing account during his "employment")," *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 291 (2d Cir. 2002)("*Marvel*"). "If an agreement between an author and publisher that a work was created for hire were outside the purview of § 304(c)(5)[4], the termination provision would be rendered a nullity; litigation-savvy publishers would be able to utilize their superior bargaining position to compel authors to agree that a work was created for hire in order to get their works published." *Marvel,* at 290-291.

---

[4]    17 U.S.C. §304(c)(5) is the nearly identical provision prohibiting alienation of renewal rights of pre-1978 works. The strong policy against alienation or destruction of the termination right is the essence of both statutes. "We note that the passages quoted above concern the termination provision that applies to post-1978 grants, rather than the termination provisions here at issue. The Supreme Court has described the two provisions, however, as 'comparable,' *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 n. 39, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985), and indeed they both contain the 'agreement to the contrary' clause;… *see also Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1046 n. 9 (9th Cir. 2005) ('To the extent that the legislative record references section 304(c)(5)'s counterpart provision under section 203(a)(5), we find that history instructive given Congress's use of identical language in both provisions.')." *Penguin Group v. Steinbeck*, 537 F.3d 193, 204 n.6 (2d Cir. 2008).

15

The court's analysis of whether Plaintiffs, as recording artists, were actually employees of the label must be determined not by convenient or short-cut labels, but by the "general agency" factors, as set forth in *CCVN*, *supra*.  But a discussion of the various *CCNV* factors is not necessary here, as UMG does not even attempt to argue that Plaintiffs were actually employees of the labels to which they were signed; UMG repeatedly asserts that mere words are enough, contrary to the case law.  And, at the very least, such an issue would be a question of fact, inappropriate for this motion. "It will be up to a jury to determine whether Simon was the author of the Works and, therefore, whether he can exercise §304(c)'s termination right," *Simon*, 310 F.3d 280, at 292, citing *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 110 (2d Cir. 2002) (authorship is a jury question).

UMG repeatedly complains about how much time has passed since the agreements were signed, and that this somehow forecloses the necessary judicial factual analysis of the facts (or lack of facts) regarding the employment issue. The cases say otherwise. In *Horror Inc. v. Miller*, 335 F. Supp. 3d 273 (D. Conn. 2018), the court engaged in an extensive examination in the relationship (as it existed in 1979) between a screenwriter and a production company, to determine whether the screenplay was a work for hire, including a lengthy analysis of the facts and the *CCNV* factors. In *Siegel v. Warner Bros. Entertainment Inc.*, 658 F. Supp. 2d 1036 (C.D. Cal. 2009)("*Siegel II*"), the court engaged in an extensive review of the circumstances surrounding the creators of Superman in the mid-1930s. And, of course, in *Marvel*, the court held that because the document upon which Marvel relied was violative of 304(c)(4), the work for hire issue – involving the creation of the Captain America comic book in 1940 – would be a jury question. Indeed, the *Marvel* court went on to conclude that the termination section of the Copyright Act "necessarily contemplates the likelihood that long-dormant copyright ownership issues will be awakened and litigated once the original fifty-six-year copyright term expires. In fact,

16

Congress's goal in providing authors with this termination right was to enable them to reclaim long lost copyright grants." 310 F.3d at 292.

Similarly, in the seminal case of *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 683, 134 S. Ct. 1962, 1976 (2014), an argument was made by the defendant therein (in the laches context), that it was prejudicial and unfair for courts to examine old copyright matters, sometimes from decades ago. The Supreme Court rejected that view:

> "[Defendant] points to the danger that evidence needed or useful to defend against liability will be lost during a copyright owner's inaction. Recall, however, that Congress provided for reversionary renewal rights exercisable by an author's heirs, rights that can be exercised, at the earliest for pre-1978 copyrights, 28 years after a work was written and copyrighted. At that time, the author, and perhaps other witnesses to the creation of the work, will be dead. Congress must have been aware that the passage of time and the author's death could cause a loss or dilution of evidence. Congress chose, nonetheless, to give the author's family "a second chance to obtain fair remuneration," citing *Stewart v. Abend*, 495 U.S. 207, 208, 110 S. Ct. 1750, 1753 (1990) (internal citations omitted).

Factual examination is necessary because the mere words of the agreements do not control; the facts do. UMG's self-serving attempt to short circuit the required analysis is unsupportable. An employment relationship between recording artist and label must have actually existed. If it did not, Plaintiffs were not employees, the works were not made for hire, Plaintiffs are in fact authors, and they have timely and validly exercised their termination rights. Plaintiffs are confident that discovery will show that no such employment relationship existed and UMG's argument is pure pretext.

4.     **The Language of the Agreements Themselves is Equivocal, Contradictory and Cannot Support UMG's Statute of Limitations Defense.**

Contrary to governing case law, UMG appears to argue that it does not matter whether Plaintiffs were employees at the time the agreements were signed, because UMG maintains that all of the Plaintiffs waited too long to sue to challenge the language of the agreements. UMG asserts that from the very moment that they signed agreements with the work for hire words, they were immediately put

on notice of a claim ("this challenge was necessarily ripe at the moment of execution"), UMG Motion at 6, and the statute of limitations started running, right then and there.

As noted above, UMG has not and cannot cite to a single case involving the termination law in support of this proposition. Instead, UMG relies on several cases involving claims of copyright co-ownership in which the factual circumstances, and federal policies, are necessarily different. Many federal claims have been brought by a putative author against another author for co-ownership of a copyright. In those cases, courts have developed the basic principle that the statute of limitations begins to run when the putative author is put on notice that the opposing owner has denied the putative author's ownership. This might be by express repudiation, or it might be some other way, such as the failure to accord credit, publication with inconsistent credits, or the long-standing failure to receive royalties from an important work.

But this action is not a co-ownership case, nor is it even an "ownership" case.[5] This is a case involving a totally separate and distinct statutory right that arises at a certain time far into the future, applicable to any and all grants of copyright rights or interests.

The cherry-picked examples of contractual language that UMG inserts into its brief to try to prove its argument are not in fact as direct and clear as UMG attempts to argue. Moreover, UMG glaringly ignores other critical language that negates its argument. The paragraphs that contain the work for hire language also contain other, equivocal language that diminishes and casts doubt on the intent and efficacy of the work for hire language and, taken as a whole, certainly do not constitute an "express assertion of sole authorship or ownership," as UMG maintains they do. The subject paragraph (or contractual section) of each and every agreement at issue also contains another clause, with

---

[5]     As noted above, Plaintiffs would have had no reason to question the ownership of the sound recordings by the label during the pre-termination period.

language of assignment, in which the label used what is commonly referred to as the "belt and suspenders" approach, plainly anticipating that the designation of the sound recordings as works for hire might very well be rejected in court at a later date.

Every paragraph of the agreements (or section of the agreement, in some cases) that has work for hire language *also* has ***assignment verbiage*** that says basically, and in effect: "If, for some reason, these works are deemed to not be works for hire, the recording artist nevertheless assigns the works to the label."[6] Of course, if the grant or transfer is deemed to be an assignment, that necessarily means that the sound recordings are *not* works for hire and the recording artist is the author; for if he or she were not the author, there would be nothing to assign. A recording artist agreeing to such a paragraph as a whole, in no way "expressly asserts" that he or she is an employee of the label, and that works created under the recording agreement are thereby works for hire. Rather, the paragraphs (in each agreement) appear to be what they actually are: an age-old, oft-repeated and well-trodden concoction

---

[6] Waite 1981 Agreement ("Nevertheless…you shall, upon our request, execute and deliver to us…any assignments of copyright…in and to such master recordings as we may reasonably deem necessary…")(Docket 51-1, at p. 7); Waite 1983 Agreement ("Notwithstanding the provisions of [the work for hire clause], I agree to the extent, if any, that I may be deemed an 'author' of any Work, I grant and assign to [UMG's predecessor label] all exclusive right, title and interest in and to such Work…")(Docket No. 51-2, at p. 46);Waite 1985 Agreement ("…I agree to the extent, if any, that I may be deemed an 'author' of any Work, I grant and assign to [label]…") (Docket 51-3, p. 50); Ely 1976 Agreement ("To the extent, if any, that Artist may be deemed an 'author' of such 'sound recordings,' Artist grants [label] a power of attorney…to assign to [label], all such copyrights and renewal copyrights.") (Docket 51-4, p.18); Ely 1980 Agreement ("Nevertheless, Artist shall, upon Company's request, execute and deliver to Company any assignment of copyright in and to the 'sound recordings' fixed in such Masters as Company may deem necessary…") (Docket 51-6, p. 21); Sulton ("…ARTIST agrees that to the extent, if any, that ARTIST be deemed an 'author' of any Work, ARTIST grants and assigns to COMPANY all exclusive rights of the copyright in and to such Work…") (Docket 51-8, p. 6); Straw Agreement ("If we shall be deemed not to be the author of those Master Recordings, this Contract shall constitute an irrevocable transfer to us of ownership of copyright…") (Docket 51-10, p. 8); The Dickies ("Nevertheless, you shall, upon our request, execute and deliver to us any assignments of copyright…in and to such master recordings as we may deem necessary…") (Docket 51-11, p. 5).

of the record label's business affairs department, changed not one iota for different artists.[7] These are simply not agreements that set forth an employment relationship in any meaningful way.

And not only are the words of the agreement equivocal, there was no "express repudiation" of anything. The word "repudiation" means that one side has a position, and the other side rejects it. Given the paragraphs at issue, it cannot be said that plaintiffs, "at the moment they signed the agreements," had any position at all on whether their termination right, to be exercised decades later, would be foreclosed by a few words of the contract, that, in fact, had no basis in reality at the time. For UMG to have a viable argument about "express repudiation," as the phrase is used in other (usually co-ownership) cases, it refers to the repudiation of a specific, immediate right, not a right that will arise decades later.  Here, the right involved is the right to send a notice of termination in the future. Also, "repudiation" requires an act on the part of the party rejecting the position of an opposite party, and repudiation must be communicated to the party asserting a right. *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996). Simply nothing like that occurred here or is alleged to have occurred.

### 5.   UMG Fails to Cite Even One Case Involving the Termination Statute.

The case authority UMG relies upon is inapposite to the discussion at hand. While UMG aggressively argues that Plaintiffs' claims are time-barred because they did not rush to file federal declaratory relief actions decades ago, not one of the cases UMG cites to support that view involves termination law.  Copyright co-ownership cases, or simply disputed ownership cases, are predicated on a distinctly different set of factual considerations and circumstances than those presented here.  In that variety of case, the putative owner is claiming co-ownership, which is an immediate and existing

---

[7]     The fact that all of the agreements have virtually identical conceptual content on this issue – boilerplate work for hire clauses coupled with equivocal assignment language, and highly similar verbiage – amply supports Plaintiffs' allegations that common questions of fact and law predominate in this action and make this controversy particularly appropriate for class action treatment. *See* FAC ¶ 25.

right to control part or all of a copyrighted work. This is markedly different from termination rights, which do not even arise until decades into the future. Moreover, even in co-ownership cases, the statute does not start running (against the putative co-owner) from the moment of creation; it is required that there be some sort of repudiation on the part of the co-owner, directed to the putative owner. That factor distinguishes those actions from termination cases, because mere copyright co-ownership cases do not have separate or distinct statutory rights involved (with strong Congressional policies attached), and certainly not a right that will not even arise for years.[8]

The cases cited by UMG are typical illustrations of that theme. In *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011), an editor of a book claimed to co-own the copyright in a book she had written; this claim was quickly rejected by the publisher via written communication. Kwan, the editor, did not bring suit until seven years later. "Here, [the publisher] rejected Kwan's express assertion of authorship in December 1998, and then published the first edition of [the book], which did not list Kwan as an author, in January 1999." *Kwan*, at 229. There was an express assertion of rights, and an express repudiation. Nothing like that happened with any of the Plaintiffs.

Likewise, *Netzer v. Continuity Graphic Assoc.*, 963 F. Supp. 1308, 1315-16 (S.D.N.Y. 1997) is also a typical co-ownership case, with the plaintiff therein, a putative co-owner of copyright in a comic book, was put on notice via the credits used on the publication that he was not considered a co-owner. He received the conflicting information in 1984 but did not sue until 1993. In that case, termination

---

[8] An "express repudiation" is important in a co-ownership case, because a co-ownership claimant has an *immediate* right to sue for that to which he or she is entitled at that time, that is, usually some *present* co-ownership right, or, in the case of an ownership claim, the right to own and control the entire copyright. "Stated another way, a party's status as a creator is a factual question subject to being challenged by the other putative co-owner at any time, and hence, the accrual date for the same would begin at that instant." *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1134 n.7 (C.D. Cal. 2008) ("*Siegel I*"). In sharp contrast, termination cases do not involve the immediate assertion of rights, and those rights can only be exercised decades later.

rights were not involved or mentioned. *Consumer Health Info. Corp. v. Amylin Pharms., Inc.*, 819 F.3d 992, 997 (7th Cir. 2016) involves a claim of copyright ownership, with the court finding that plaintiff knew about the claim upon signing the assignment of the copyright, and the claim arose at that time. However, this factual scenario is also not applicable to the instant case. Here, at the time that they entered into the recording agreements, Plaintiffs would have had no reason to question the *ownership* of the sound recordings by UMG's predecessor labels; the recording agreements plainly and repeatedly state that the label owns the sound recordings, as is a common music industry practice. But that is <u>for the first 35 years</u> – then the grant of rights to the label is subject to termination pursuant to § 203. A recording artist signing an assignment of copyright interests to the label is simply the first act of the process, without which there would be no need for § 203. Finally, *Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013, 1016 (10th Cir. 2013) is another co-ownership case. The plaintiff therein sued to be adjudged the co-owner of a psychological text but was found to have signed an assignment of all rights. The case did not touch upon any termination issues.

After repeatedly citing these co-ownership cases, UMG places great emphasis on an unpublished 1997 case, *Aday v. Sony Music Entertainment*, No. 96-CV-0991MGC, 1997 WL 598410 (S.D.N.Y. Sept. 25, 1997), involving the efforts of rock musician Meat Loaf to break free of a 1977 agreement in which he agreed that he was an "employee for hire" of a loan-out corporation. The court ruled that Meat Loaf had three years from 1977 to bring an action, if he had reason to believe that his employee-for-hire status was incorrect. Of course, the case did not involve any termination rights, and moreover, and what is particularly problematic for UMG, *Aday* has been functionally overruled by the Second Circuit in *Marvel*.

*Marvel* held, as discussed above, that it is improper for parties to insert words into an agreement solely for the purpose of destroying an author's termination right. *Marvel* also held that it is the actual

22

relationship between the parties that is determinative of the truth or falsity of the work for hire or "employee for hire" language, and not what the document says. But since *Aday* does not involve *any* of the important issues surrounding the termination law and its strong oft-stated federal policy that authors need protection from unremunerative transfers they made early in their careers, its importance to the issues before the court are severely limited.

*Aday* is simply like the co-ownership cases cited repeatedly by UMG, in which other, unrelated factual scenarios are involved. In contrast, termination cases have distinct factual settings and vastly different policies to consider. "It is plain that § 304(c) necessarily contemplates the likelihood that long-dormant copyright ownership issues will be awakened and litigated once the original fifty-six-year copyright term expires. In fact, Congress's goal in providing authors with this termination right was to enable them to reclaim long lost copyright grants." *Marvel*, at 292. Indeed, the plain language of § 203 provides the right of termination to authors, provided they do so in a timely fashion. That right cannot be diminished or eliminated by grantees offering up sham "employee for hire" agreements that had no basis in fact, or any other agreement that would be violative of § 203(a)(5).

6. **The Accrual of a Claim Regarding Rejection of Termination Cannot Possibly Occur Until At Least the Effective Date of Termination.**

As noted above, UMG's reliance on boilerplate language – that had no basis in reality – cannot withstand scrutiny under § 203(a)(5).  More importantly, authors cannot be subject to an invented rule that they must rush into federal court and sue to protect their termination right – which is expressly inalienable under the Copyright Act – decades before that right even comes into play. "A claim ordinarily accrues "when [a] plaintiff has a complete and present cause of action." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670, 134 S. Ct. 1962, 1969 (2014), citing *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201, 118 S. Ct. 542, 549 (1997).  It is an impossible burden to expect a recording artist, who just signed a record deal in 1980,

to suddenly realize – on some date before 1983 – that a few words of his recording agreement might be construed at some future time by the record label (in 2005, at the earliest, and 2018, at the latest) as destroying his termination right, thereby justifying the cost and hostility of a federal court action for declaratory relief for, in most instances, works that have not yet even proven to be commercially successful.  The law does not impose such an impractical and artificial burden on artists.

The utter infirmity of UMG's argument raises the issue of *when* a claim accrues in relation to the rejection of a notice of termination by a grantee. The only case to discuss the issue in a substantive way is *Siegel I*, and the court held that the claim accrues on the effective date of termination. ("Accordingly, the Court finds that the present action seeking declaratory relief regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the effective date of that termination.") *Siegel I*, at 1136. On the statute of limitations issue raised by defendant, the court addressed a factual issue of whether a 1997 letter to Siegel was an express repudiation of his notice of termination, and whether Siegel's failure to sue within three years thereby foreclosed his claim. The court found that the letter was *not* a repudiation, but nevertheless criticized the view that the date of accrual could, because of rejection letter, trigger a duty on the part of an author to either sue, or lose his or her termination rights. "One could quibble with whether any date other than the termination effective date itself can serve as the accrual date in a case involving the right to termination of a grant. … [A] claim of ownership by way of termination of a grant cannot be realized unless and until after the termination's effective date." *Siegel I*, at 1134 n.7. [9]

---

[9]     In other words, a rule that could potentially deprive an author of his or her termination rights, because of a rejection letter sent years ahead of time -- which would *then* trigger a deadline that would still be *years* prior to the effective date -- would not be in conformity with Congressional policies on termination. For instance, assuming the "express repudiation" theory of claim accrual is utilized, if an author sent a notice with the maximum ten years' notice, an immediate rejection letter from a grantee would set up a situation in which an author "must" sue no later than *seven years* prior to the effective date of termination, under pain that if he or she does not do so, the terminate right is lost. Such a rule

Solid case authority, as well as commentary, congressional intent, and logic, overwhelmingly support the view that the date of accrual of a claim that a grantee party has failed to honor a notice of termination is the effective date of termination, as set forth in the notice, and not some earlier date.

### D.   Whether Waite and Ely Were Employees of Third-Party Companies Is, at Best, a Question of Fact Not Ripe for Determination on a Motion to Dismiss

UMG also desperately contends that Plaintiffs Waite and Ely "do not have the authority to effectuate termination of any grants reflected in these agreements," because UMG asserts that those grants were made by "third-party companies," and not Waite or Ely.[10] UMG further claims that the third-party companies, and not Waite or Ely, are the "authors." For the same reasons addressed in the preceding section, UMG's position is wrong on the law, or, at the very least, there are questions of fact that cannot be resolved by way of a 12(b)(6) motion.

Consistent with its erroneous statute of limitations argument, UMG presupposes that Waite and Ely were employees for hire based on wording in the agreements, and not the actual facts as they existed. No such determination has been made as to whether Waite and Ely were employees of the third-party companies (and, in the case of Ely, of UMG's predecessor, MCA Records, Inc. ["MCA"],

---

would be violative of the Congressional policy that so vociferously gave authors a new and stronger termination right under the Copyright Act of 1976; and, as well, given the relative ease with which a large corporate music conglomerate can generate rejection letters (or hire law firms to churn out such letters), such a rule would put an improper burden on authors to either file a federal suit to counter the rejection letter and obtain declaratory relief, or lose their termination right. Of course, if the recipient grantee feels strongly about it, it can file a declaratory relief action against the author sending the notice of termination, at that time.

[10] In the case of Waite, UMG refers to the third-party companies as "loan-out" companies, owned by Waite himself, but with Ely, the company is a third-party record company called South Coast Records, Inc., referred to in those agreements as a "producer" or a "production company," a common practice at the time. But the arrangement carried so little importance at the time that MCA required Ely to sign a Inducement Letter stating that "…it being agreed for this purpose I am deemed MCA's employee for hire and the sound recordings 'works-for-hire'…" rather than South Coast. Docket No. 51-7, at p. 15.

25

itself) and, indeed, such a determination cannot be made at this stage of the proceedings. *See Simon*, supra ("Authorship is a question of fact for the jury.").

If Waite and Ely were *not* employees for hire of the third-party companies, then Waite and Ely as authors had every right to send notices of termination to the *current* grantee of the sound recordings at issue, which is UMG. It is neither necessary, as UMG seemingly argues, for the third-party companies to have sent termination notices, nor is it even proper. Terminations are sent by *authors*, or their successors. And, according to the regulations of the Copyright Office, notices do not need to be served on every entity in the chain of title from author to current grantee, but, rather, just to the *current* grantee ("The notice of termination shall be served upon each grantee whose rights are being terminated, *or the grantee's successor in title*, by personal service, or by first class mail sent to an address which, after a reasonable investigation, is found to be the last known address of the grantee or successor in title.") 37 CFR § 201.10(d)(1)(emphasis added). The third-party companies are simply grantees of the sound recording copyrights of Waite and Ely; UMG's predecessor labels (such as MCA, in the case of Ely) are grantees of the rights of the third-party companies, and UMG is the ultimate grantee of the predecessor labels.

The required factual inquiry for discovery and, potentially trial, will be to determine whether Waite and Ely were *actually* "employees" or "independent contractors" of the third-party companies and, whether in the case of Waite, the loan-out strategy was merely a tax-planning device, without any intention to implicate termination rights.[11]  This requires an analysis of common law agency principles,

---

[11]    Yet again, just as with the "belt and suspenders" language in the recording agreements discussed in the previous section, so too are the documents which directly belie UMG's claim of "reliance" on the third-party documents. For *every* recording agreement with a third-party company, the labels required an "Inducement Letter" to be executed by Waite and Ely personally. *See* Docket Nos.: 51-1, at pp. 38-41; 51-2, at pp. 39-40; 51-3, at pp. 42-44; 51-5, at p. 55-60; and 51-7, at pp. 14-16. If UMG's predecessors felt that a third-party document gave them a complete (and legally

26

necessitating a factual inquiry into the nature and substance of the purported employer/employee relationship. *CCNV, supra,* 490 U.S. at 731, 109 S. Ct. at 2167-68. Plaintiffs expect that discovery will show that UMG did not treat them as employees except for this feeble artifice and that UMG's argument will collapse on itself on a fulsome record.

While no single stated *CCNV* factor is determinative of an employer/employee relationship, the Second Circuit ascribes particular weight to the following five factors: (1) the hiring party's right to control manner and means of creation; (2) the skill required; (3) provision of employee benefits; (4) tax treatment of the hired party; and (5) the hiring party's right to assign additional projects to hired party. *Id.*; *see also Aymes v. Bonelli* 980 F.2d 857, 861 (2d Cir. 1992). Thus, determining whether Waite and Ely were employees of the third-party companies (or MCA, as well, in the case of Ely) requires a factual inquiry into Plaintiffs' employment relationships with those companies. At this stage of the proceedings, Waite's agreements with the third-party companies are not before the Court, and the parties have not yet conducted discovery concerning Waite and Ely's performance under any of the third-party agreements. Plaintiffs will prove facts demonstrating that Waite and Ely were not employees and that their sound recordings were not "works made for hire", thus entitling Plaintiffs to the relief they seek.[12] *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000) (explaining that dismissal is only proper where it clear that a plaintiff "can prove no set of facts which would entitle him or her to relief.").

Finally, while Waite and Ely may have been characterized as "employees" for the purposes of the tax code in the early 1980s, that issue is not before the Court. This is a copyright termination law

---

supportable) chain of title (and valid, enforceable rights), there would have been no need for *any* Inducement Letter.

[12]    And, to the extent that UMG contends that recording artists were employees of UMG's predecessor labels, plaintiff suspects that UMG will be unable to present any evidence that any recording artist was actually an employee of any label, and the matter will be laid to rest.

case. The issue here is whether Waite and Ely can be considered "employees" within the "common agency" rule set forth in *CCNV*, and not by reference to unrelated statutory schemes, such as the tax code. The very notion that recording artists could have unwittingly or inadvertently waived or relinquished their termination right, based upon a tax-planning device (quite likely most often on the advice of accountants or business managers) would be contrary to Congressional policy of protecting authors from unremunerative transfers on the basis of unequal bargaining power. Furthermore, to the extent that the third-party agreements are being construed by UMG as obliterating the termination right of Waite and Ely, each of the agreements violate § 203(a)(5), which prohibits any alienation of the termination right, that is, "any agreement to the contrary."[13]

Dismissal is unwarranted on the current record before the Court, and as will be further amplified through the discovery process.

### E.   Ely's Pre-1978 Copyright Grant May Qualify as a Gap Grant

UMG's entire four-page section on whether one or more of Ely's works qualify as "gap grant" is solely an argument to support UMG's position that there is no such thing as a "gap grant," *at all*, despite the current position of the Copyright Office that it shall accept recordation of notices of termination for "gap grants." UMG asserts that grants made prior to January 1, 1978 should not even be subject to a § 203 termination, because the statute only allows for termination of grants "executed…on or after January 1, 1978."

---

[13]   While UMG cites *Milne ex Rel. Coyne v. Stephen Slesinger*, 430 F.3d 1036 (9th Cir. 2005) and *Penguin Group v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008) for their holdings about "freedom of contract," the facts of those two cases are vastly different from the instant case. In *Milne* and *Penguin Group*, heirs of authors, years after the creation of the works, decided to extinguish an old grant (and with it, the termination right) and effectuate a new grant. But here, there are no such facts or anything close to them; UMG is just playing another cynical "gotcha" game with rights that cannot be transferred, sold, or extinguished.

As set forth in 37 C.F.R. § 201.10(f)(1)(ii)(C), the Copyright Office takes a different view: "In any case where an author agreed, prior to January 1, 1978, to a grant of a transfer or license of rights in a work that was not created until on or after January 1, 1978, a notice of termination of a grant under section 203 of title 17 may be recorded if it recites, as the date of execution, the date on which the work was created." The Copyright Office recognizes that while a writing establishing a grant may predate 1978, works subject to that agreement were *not yet in existence*, and cannot be assigned; instead, the grant could only attach post January 1, 1978 – after the works came into existence – and therefore would be available for assignment at that time.

In March 2010, the U.S. Copyright Office published a Notice of Inquiry seeking comments on the issue of gap grants. *See Gap in Termination Provisions*, 75 Fed. Reg. 15390 (March 29, 2010). Based on the comments received and its own analysis, the Copyright Office concluded that gap grants *can* be terminated under § 203, because "as a matter of copyright law, a transfer that predates the existence of the copyrighted work cannot be effective (and therefore cannot be "executed") until the work of authorship (and the copyright) come into existence." *See* U.S. Copyright Office, *Analysis of Gap Grants Under the Termination Provisions of Title 17* (December 7, 2010), https://www.copyright.gov/reports/gapgrant-analysis.pdf. In arriving at its conclusion, the Copyright Office looked at the plain language of Title 17, including § 203, as well as the legislative history of the termination provisions, and the transfer of copyrights and renewal rights under common law, prior to the enactment of the termination provisions.

This court should defer to the sound position taken by the Copyright Office, and the experience and expertise of that agency. *See*, *e.g.*, *WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275 (2d Cir. 2012)(court defers to opinion of the Copyright Office, based upon care and expertise on a particular issue. "To determine the appropriate amount of deference to an agency administering a statute, 'courts have looked to the

29

degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.' The weight accorded to the Copyright Office's interpretations 'depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'")(internal citations omitted). 691 F.3d 275, at 279.

Moreover, UMG fails to mention that its own documents, submitted with its Motion, show that Ely signed the first agreement in 1976, but also two other agreements in 1979 and 1980, respectively. *See* Docket No. 45 at Exh. D – F. These two later agreements are outside of the "gap grant" issue (both grant and creations post-date January 1, 1978).  Ultimately, it is a question of fact as to the exact date Ely "created" the first works after January 1, 1978, and thereby making them subject to the "gap grant" rule under 37 CFR §201.10.  These questions can only be answered during the course of discovery – UMG's self-serving allegation of "they were created in 1977" notwithstanding.

**F.**      **UMG Received Sufficient Notice of the Grants Being Terminated**

1.      **Plaintiffs Reasonably Identified the Grants Being Terminated.**

UMG also self-servingly contends that Plaintiffs' termination notices are "invalid" because: 1) the termination notices do not identify the grants to which the notices apply; 2) the termination notices fail to state the date of execution of the grants being terminated; and 3) such failures do not constitute harmless error. Memorandum pp. 16-22.  In fact, Plaintiffs' termination notices contain sufficient information to apprise UMG of the grants being terminated – which is all the law requires.

All the Copyright Act requires is that the grantor's notice provide "sufficient information to assist a grantee in having a 'reasonable' opportunity to identify the [affected] work."  *Id.* at 1062; *see also* 37 C.F.R. § 201.10 at (b)(1)(iii) (stating that a notice "must include" a "brief statement **reasonably** identifying the grant to which the notice of termination applies." (emphasis added)).  And, despite

30

UMG's characterization to the contrary, the harmless error doctrine is a broad concept.  As aptly summarized by the *Siegel* court:

> Lest there be any doubt on the point, the Register placed a proviso at the beginning of subsection (e)(2) that specifically reminds the reader that the litany of examples that followed were to be read '*without prejudice* to the general rule provided by paragraph (e)(1) of this section' … this proviso recognizes that the reach of the harmless error safety valve is broader than the specified class of examples listed in (e)(2).

*Siegel v. Warner Bros. Entertainment Inc.*, 690 F. Supp. 2d 1048, 1054 (C.D. Cal. 2009) (emphasis in original).

While UMG cites *Burroughs v. Metro-Goldwyn-Meyer*, 683 F.2d 610 (2nd Cir. 1982), for its dicta referencing the proper identification of grants, the main holding of that case was that termination cannot be affected with regard to works that the terminating party fails to list. 683 F.2d 610, at 622. No such thing happened here; all of the works are precisely and completely identified by title, author, date of publication, and registration number.  Indeed, all of the notices of termination at issue were accepted by the Copyright Office and duly recorded without comment.

In *Horror Inc. v. Miller*, 335 F. Supp. 3d 273 (D. Conn. 2018), the court therein also firmly rejected the objecting parties' hyper-technical view of § 203.  In that case, production companies sued for declaratory relief against screenwriter Miller, regarding grants of rights he had made in 1979 regarding the film *Friday the 13th*.  The production entities argued that Miller's notices of termination were not specific enough, and "only [served to] terminate the copyright in the screenplay proper, and not in the earlier treatment." *Id*. at 320.  The court rejected that argument, and held that:

> *No party* in receipt of Miller's termination notices, which referred to all prior drafts and iterations of the work, *could reasonably have believed* that Miller sought to terminate only the copyrights in the completed screenplays, and not in the preliminary treatments. (emphasis added).

*Id*.  Likewise, in the instant case, no one could reasonably believe that given the detailed information set forth in Plaintiffs' notices, UMG would not know *exactly* what albums and works Plaintiffs intended to cover, with each notice. Indeed, UMG has had the written agreements effectuating the grant of rights for each album for decades and attached those very agreements to its Motion. UMG has paid royalties and conducted significant music business surrounding the works, obviously referring to the agreements themselves for that purpose. For UMG to even insinuate that it "did not know" which agreement pertained to which album is wildly implausible and should be summarily rejected. Plaintiffs' notices are sufficient under applicable law.

### 2. The Wealth of Information Contained in Plaintiffs' Notices Ensures that any Errors Noted by UMG Constitute Mere Harmless Error.

Next, UMG argues that Plaintiffs' notices are "invalid" because they do not list the "date of execution of the grant being terminated." Memorandum at pp. 16.  In doing so, UMG deliberately mischaracterizes the harmless error provisions applicable to Section 203 notices. 37 C.F.R. §201.10(e)(1) provides that "[h]armless errors in a notice [of termination] that do not materially affect the adequacy of the information required to serve the purposes of 17 U.S.C. 203 … shall not render the notice invalid."  This regulation specifically recognizes that any errors related to the date of a grant of execution "shall not affect the validity of the notice if the errors were made in good faith and without any intention to deceive, mislead, or conceal relevant information."  37 C.F.R § 201.10(e)(2).

Here, Plaintiffs sought to provide as much detailed information within their possession that they could.  *See* FAC Ex. A; Ex. C; Ex. E; Ex. G; Ex. I; Ex. K.  This is enough to meet the requirements of the Copyright Act.  *See Siegel v. Warner Bros. Entm't Inc.*, 690 F. Supp. 2d 1048, 1062 (C.D. Cal. 2009) (recognizing that a grantor's notice need only supply "sufficient information to assist a grantee in having a 'reasonable' opportunity to identify the [affected] work."). Plaintiffs' notices contain more than sufficient information to apprise UMG of the sound recording grants that were being terminated.

Neither are the notices invalid because Plaintiffs lacked the information UMG claims should have been contained therein. Courts make allowances for an artist's lack of knowledge or certainty when attempting to identify their works in notices of termination, having noted that "entirely legitimate reasons may exist for gaps in [an artist's] knowledge and certainty" as it relates to their works. *Siegel*, 658 F.Supp.2d at 1061 (citation omitted). The very reason Plaintiffs' notices reference generalized timeframes is simple – Plaintiffs no longer possessed the contracts that granted UMG the rights Plaintiffs now seek to terminate. This is not atypical; rather, it is the record companies who maintain copies of the grants of sound recording rights – not the musicians. For UMG to feign ignorance of what is being terminated is disingenuous at best. Any errors or inaccuracies contained therein were plainly unintentional and harmless. However, Plaintiffs' notices of termination are not deficient as a matter of law.

### G.       **Plaintiffs' Copyright Infringement Claims are Sufficiently Plead**

Plaintiffs' copyright infringement claims are based upon Plaintiffs' proper and valid termination notices which ensure that Plaintiffs own the copyrights to the works at issue. *See*, *e.g.* FAC ¶¶ 41; 62 (alleging that UMG's has infringed Plaintiffs' copyrights by "willfully continuing to exploit the sound recordings … after the effective date[.]" Because Plaintiffs' termination notices are valid for the reasons set forth above, Plaintiffs' infringement claims are valid as a matter of law.

154498.00601/121581116v.13

## <u>CONCLUSION</u>

For all of these reasons, UMG's Motion to Dismiss the First Amended Complaint pursuant to

Fed. R. Civ. P. 12(b)(6) should be denied.

Date: August 7, 2019                                **BLANK ROME LLP**


                                                     By:   */s/Ryan E. Cronin*_____

                                                     Ryan E. Cronin
                                                     Gregory M. Bordo
                                                     David M. Perry
                                                     1271 Avenue of the Americas
                                                     New York, NY 10020
                                                     Telephone (212) 885-5000

                                                     **COHEN MUSIC LAW**
                                                     Evan S. Cohen
                                                     Maryann R. Marzano
                                                     1180 South Beverly Drive, Suite 510
                                                     Los Angeles, CA  90035-1157
                                                     Telephone: (310) 556-9800

                                                     *Attorneys for Plaintiffs*

154498.00601/121581116v.13