K236WAIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JOHN WAITE, et al.,

                    Plaintiffs,

          v.                              19 CV 1091(LAK)

UMG RECORDINGS, INC., d/b/a
Universal Music Group,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          February 3, 2020
                                          10:25 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                          District Judge

                         APPEARANCES

BLANK ROME, LLP
     Attorneys for Plaintiffs
BY:  ROY W. ARNOLD
     DAVID M. PERRY
     RYAN E. CRONIN
     EVAN S. COHEN

SIDLEY AUSTIN, LLP
     Attorneys for Defendant
BY:  STEVEN M. BIERMAN
     ROLLIN A. RANSOM

COWAN, LIEBOWITZ & LATMAN, P.C.
     Attorneys for Defendant
BY:  RICHARD S. MANDEL
     THOMAS KJELLBERG

K236WAIA

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for plaintiff, are you

3    ready?

4          MR. ARNOLD:  Yes, your Honor.

5          THE DEPUTY CLERK:  Counsel for defendant, are you

6    ready?

7          MR. RANSOM:  We are, your Honor.

8          THE COURT:  Mr. Bierman.

9          MR. BIERMAN:  My name is Steven Bierman.  My partner

10   Rollin Ransom will argue the motion.

11         THE COURT:  Okay.  Mr. Ransom.

12         MR. RANSOM:  Good morning, your Honor.

13         THE COURT:  Please use the lecturn.

14         MR. RANSOM:  Your Honor, we have raised four arguments

15   in our motion, and I would like to start with the first, which

16   is the statute of limitations because it would resolve and

17   require dismissal of the complaint in its entirety.  I think it

18   is important and useful to review some fundamental principles

19   because I believe they are dispositive of plaintiffs' claims

20   here.

21         The statute of limitations begins to run when a

22   reasonably diligent plaintiff would have been put on inquiry as

23   to the existence of a right.  That is the Second Circuit in

24   *Kwan*.  In *Kwan* the Second Circuit further noted that when a

25   dispute over authorship or ownership forms what it

K236WAIA

1    characterized as the backbone of an infringement claim, then

2    the statute of limitations starts to run when the plaintiff is

3    first put on notice there's a dispute as to his or her claim of

4    authorship or ownership.  That is clearly the situation here.

5    That is, that the dispute over authorship is the backbone of

6    the plaintiffs' claims in this action.

7        Plaintiffs concede, as they must, that only authors or

8    the heirs of authors can terminate under Section 203 of the

9    Copyright Act.  Plaintiffs also concede, as they must, that if

10   these sound recordings are works made for hirer, then

11   plaintiffs are not the authors and that plaintiffs do not have

12   a termination right.

13       THE COURT:  Where did they concede that they were not

14   works made for hire?  I don't find any concessions anywhere on

15   that issue.

16       MR. RANSOM:  I think, your Honor, what they

17   acknowledge is that if in fact these are works made for hire,

18   if they are works for hire, then plaintiffs do not have a

19   termination right.  They don't dispute that.  What they dispute

20   is whether or not these are in fact works made for hire.  That

21   in fact almost the entirety of their opposition brief is taking

22   on the merits of the issue of whether or not these sound

23   recordings were prepared as works for hire.  The reason that

24   they take on that issue is because they recognize that if these

25   sound records are works made for hire, then under the plain

K236WAIA

1    language of 203 they have no termination right.

2            So, your Honor, what the opposition makes clear and

3    what the complaint makes clear is that what this case is all

4    about -- the backbone of their claim -- is whether or not these

5    sound recordings are works made for hire and therefore whether

6    or not plaintiffs are authors of the work or whether or not the

7    record labels that commissioned them are authors of the work.

8    Because if they are in fact works made for hire, then the

9    record label, the commissioning party, is by statute the author

10   of the work and plaintiffs are not and in that event plaintiffs

11   have no termination right.

12           So the dispute over work for hire is the core or the

13   backbone of the plaintiffs' claim here.  Without resolution of

14   that, they have no claim.  What that means under *Kwan*, your

15   Honor, is that the statute of limitations starts to run as soon

16   as their is an inquiry notice of a dispute as to their claim

17   respecting work for hire and authorship.  So when was that

18   claim triggered?  That I think is the question that is

19   presented by the motion and that the Court needs to resolve --

20   when were plaintiffs on notice of a dispute as to any claim

21   that these are not works for hire and that they, plaintiffs,

22   are not as a result authors of the work?

23           Now, the Second Circuit has recognized that any number

24   of events can trigger the accrual of an authorship claim

25   including "an express assertion of sole authorship or ownership

K236WAIA

by another."  One example, which the Second Circuit has also

repeatedly recognized, is when alleged co-authors are presented

with a contract identifying the defendant as the sole owner and

copyright holder.  That is from the *Gary Friedrich Enterprises*

case that we cited in our papers.  There are several other

cases that repeat that well established principle, that when a

plaintiff who is claiming authorship is presented with a

contract that identifies the defendant as the author and sole

copyright owner, that triggers the statute of limitations for

that plaintiff to bring an action challenging the authorship

claim.

     So what do we have here?  Well, we cited the language

from each of the contracts involving each of the plaintiffs in

our papers.  I will read from the contract with respect to the

first named plaintiff, Mr. Waite.  Here is what his contract

said, which he signed or acknowledged these terms in his own

inducement letter.  It says, "For purposes hereof you, artist,

and all other persons rendering services in connection with

such master recordings shall be our employees for hire and all

such master recording shall be works made nor hire under the

United States Copyright Law.  Chrysalis, the record label,

shall accordingly have the sole and exclusive right to

copyright such master recordings in our name as the owner and

author thereof."  In the words of the Second Circuit in *Kwan*

and *Gary Friedrich* and throughout the jurist prudence on this

K236WAIA

issue, this is an expressed assertion of sole authorship and a
repudiation of any claim of authorship by Mr. Waite.  Under the
well established, and we think overwhelming Second Circuit
authority that we cite in our papers, that repudiation that is
reflected on the face of the contract that Mr. Waite
acknowledged at the time it was entered into triggered the
statute of limitations if he was then going to claim that these
are not works made for hire and that he is in fact an author of
the sound recording.

Your Honor, we believe this case is on all fours with
Judge Cedarbaum's decision in *Aday v. Sony Music Entertainment*.
That was the case, as the Court may know, that involved the
artist Meatloaf.  As in *Aday*, plaintiff, that is Meatloaf
signed contracts stating that the sound recordings he was
creating were works made for hire.  And was the case in *Aday*,
there was no dispute as to what plaintiff's role was in the
creation of the reportings.  There was no dispute that the
contract characterized those recordings as works made for hire.
The contracts, as in our present case, were clear in that
regard.  As in *Aday*, plaintiff, to the extent he had any
dispute respecting the recitation in the contract that the
sound recording were works made for hire, knew of that claim or
was on notice of that claim at the time he signed the contract.
And as in this case, Mr. Aday, Meatloaf, waited decades to
bring his claims premised on what he contended was the

K236WAIA

1  inaccuracy in the contract characterized in the works as works

2  for hire.

3          THE COURT:  Contracts, substantially like at least in

4  the respect that you cite and substantially like the language

5  you read were to say the least extraordinarily common in the

6  music industry; right?

7          MR. RANSOM:  They may well have been, your Honor.  We

8  certainly see --

9          THE COURT:  So your position is that the effect of

10  that language for all practical purposes is to aggregate

11  Section 203 of the Copyright Act?

12          MR. RANSOM:  I don't think that is correct, your

13  Honor.  I do agree that when presented with that language, the

14  artist is put to a choice.  The artist can either sign the

15  contract recognizing that triggers the statute of limitations

16  and then bring a claim disputing the legal effect of that

17  language or it can refuse to the sign the contract.

18          THE COURT:  Do you think this is what Congress had in

19  mind in Section 203?

20          MR. RANSOM:  I think, your Honor, what Congress had in

21  mind in Section 507, which is the statute of limitations as

22  interpreted by the Second Circuit, is that plaintiffs need when

23  a crime of authorship is repudiated --

24          THE COURT:  Mr. Ransom, that is not my question.

25          MR. RANSON:  I am sorry, your Honor.

K236WAIA

1      I candidly don't know whether that was what Congress

2  had in mind or not.

3      THE COURT:  I think I have a pretty good idea.

4      MR. RANSOM:  Okay.  Your Honor, my expectation is that

5  Congress expected that if something was framed as a work for

6  hire, then that would put a party on notice.  Because Congress

7  did expressly exclude works for hire from the scope of Section

8  203.

9      THE COURT:  You think that they really thought that

10  what they were doing is triggering an avalanche of lawsuits by

11  and enacting 203?  Do you really think that?

12      MR. RANSON:  I don't think so, your Honor.  But I

13  don't think that an avalanche of lawsuits is what would or

14  should have occurred.  Certainly in this case we have, and some

15  of the contracts reflect, that an album is a compilation and

16  that these works were specifically commissioned for

17  contribution to this compilation that is an album.  So the

18  proposition that this is somehow de facto not a work for hire I

19  think is not accurate.

20      THE COURT:  Well, help me out on the law of

21  compilations.  A copyright and a compilation considered apart

22  from the copyright in the various constituent components of the

23  compilation protects the arrangement of the constituent

24  elements and nothing more; right?

25      MR. RANSOM:  It depends, your Honor, on whether the

K236WAIA

1   owner of the compilation is also the owner of the individual

2   components.

3        THE COURT:  That is why I say as distinct from the

4   individual components.

5        MR. RANSOM:  The compilation copyright generally

6   protects the work in its entirety.  That's correct, your Honor.

7        THE COURT:  It protects it in its entirety?

8        MR. RANSOM:  Correct.

9        THE COURT:  So if Jones, Smith and Schwartz write

10  original articles, have copyrights in their own right as to the

11  individual articles and agree that there will be an anthology

12  or some other work that is a compilation of those three

13  articles, that means that the publisher of the compilation who

14  has a copyright in the compilation has the sole and exclusive

15  right to infringe if somebody begins to knock of Schwartz's

16  article; that is your position?

17       MR. RANSOM:  Your Honor, our position is that the

18  copyright in the compilation and the album as a whole is a

19  compilation.

20       THE COURT:  Yes.  I understand that.  This is not my

21  first time at this copyright radio.

22       MR. RANSOM:  I understand that, your Honor.  In this

23  instance it happens that the record company is the owner both

24  of the copyright in the individual tracks, which may be

25  separately copyrightable, your article in this instance, as

K236WAIA

1    well as in the collection of tracks as reflected in the album.

2              THE COURT:  On the facts that I put to you, the

3    hypothetical that I put to you, Schwartz has the right to sue

4    for infringement of Schwartz's article when somebody copies

5    80 percent of it and sticks it in some other publication;

6    right?

7              MR. RANSOM:  Correct.

8              THE COURT:  And the owner of the compilation copyright

9    has exclusive rights only in the manner in which the order, and

10   so forth, the three individual articles are presented and

11   doesn't have any right to sue for infringement of Schwartz's

12   article unless he can show that the infringement of Schwartz's

13   article also infringes that which is independently

14   copyrightable in the compilation, to wit, the arrangement of

15   the constituents; correct?

16             MR. RANSON:  In your fact pattern, I think that is a

17   fair statement, your Honor.

18             THE COURT:  Let's move on then.

19             MR. RANSON:  Just to close out then on the compilation

20   issue and without getting too far into the merits of the work

21   for hire claim, of course in the *Bryant* case, the Second

22   Circuit recognized that an album is a compilation.  It fits

23   squarely within the broad definition of compilation.  And then

24   when you look at the work for hire definition, it specifically

25   contemplates a compilation as within the scope of a work that

K236WAIA

1    can be a work for hire.

2            THE COURT:  But I don't think anybody is purporting to

3    terminate any copyright you have in the album as a compilation.

4    That was the point of my last question.

5            MR. RANSOM:  Your Honor, I think it is, with all due

6    respect, beside the point because the question is whether or

7    not the album what owned by the record company is a work for

8    hire or can be a work for hire.

9            THE COURT:  We're not connecting here.

10           MR. RANSOM:  I apologize, your Honor.

11           THE COURT:  Let us assume that Waite or one of the

12    other plaintiffs clearly, unequivocally concededly retained

13    copyright in each track on the album your client put out or its

14    predecessor.  Yes, we okay on the assumption?

15           MR. RANSOM:  Okay.

16           THE COURT:  I know you dispute it, but that's the

17    hypothetical.

18           MR. RANSOM:  Okay.

19           THE COURT:  That is the way it is.

20           The album may well be a compilation and you may well

21    have copyright in the compilation.  That is to say the sequence

22    of the tracks, for example, and maybe a couple other things.

23    Now, what are the rights of Waite and the rights of the album

24    producer, vis-á-vis someone else who infringes upon Track 6

25    standing alone?  They are not putting out another album.  They

K236WAIA

```
1    put out a single and it is supposedly substantially similar to

2    Track 6.

3             MR. RANSON:  In your scenario where Waite retained

4    ownership interest in Track 6 standing alone, Waite would have

5    a claim and the record label would have a claim to the extent

6    it could establish that that infringement of Track 6

7    compromised or infringed its right in the compilation.

8             THE COURT:  So isn't the compilation issue a red

9    herring in this case?

10            MR. RANSOM:  I don't think so, your Honor, because

11   that is exactly what Waite has purported to terminate.  Waite

12   has asserted --

13            THE COURT:  Really?

14            MR. RANSOM:  -- that Universal's continued

15   exploitation of the compilation of the album violates his

16   rights.

17            THE COURT:  But on my hypothetical UMG's copyright in

18   the compilation gives it the exclusive right to the arrangement

19   and if somebody else owns copyright in Track 6, you may be

20   infringing every time you put Track 6 on the album.

21            MR. RANSOM:  But then in that scenario -- and this is

22   why I respectfully disagree -- then Universal's right in the

23   compilation in the work for hire has been terminated by Waite

24   and that is exactly --

25            THE COURT:  No, no, no.  I think not.  It may put you
```

K236WAIA

1    in a position in which the value of your copyright which nobody

2    has terminated in the compilation is useless to you, certainly

3    of no economic value, without the copyrights in these

4    individual tracks.  That may be, but you still are the

5    copyright holder in the compilation.

6    MR. RANSOM:  In that event, your Honor, I submit that

7    it would render a nullity the portion of the work for hire

8    definition that allows compilations to be works for hire if in

9    fact the termination right in any individual piece deprived the

10    owner of the compilation their rights in the compilation.  I

11    don't see any indication that that is what Congress intended.

12    THE COURT:  You would not on that hypothetical be

13    deprived of your rights in the compilation.  You still have it.

14    To the extent there is anything about the compilation that is

15    original and subject to subsisting copyright that is separate

16    and part from the tracks, it is all of your.  Knock yourself

17    out with it.

18    MR. RANSON:  As I understand the Court's hypothetical,

19    you would by dent of the termination of transfer of one

20    elements of the compilation be precluded from exploiting the

21    compilation in its entirety.  I think the effect of that --

22    THE COURT:  That may be, but life sometimes is hard.

23    MR. RANSOM:  Yes.  To your point, your Honor, I see

24    nothing in either the language of the statute or the

25    legislative history that that is what Congress was

K236WAIA

1    contemplating.

2              THE COURT:  Let's go back.  The analogy I am sure is

3    imperfect, but I spent quite a few years of my life presiding

4    over the digital rights in the complete National Geographic.

5    Photographers and authors who had written the articles and had

6    given Geographic one-time publication rights all of a sudden

7    sued for infringement -- sued National Geographic for

8    infringement when National Geographic brought out in digital

9    format the possible existence of which nobody imagined when the

10   articles and photographs were created and took the position

11   that National Geographic owed them a lot of money for the

12   digital exploitation of their copyrights in the articles, in

13   the photographs and everything else.

14             No doubt National Geographic had a copyright in the

15   arrangement.  No doubt at all.  Call it a compilation.  Call it

16   derivative work.  They had those rights.  Now, that case turned

17   on a different statute.  It was the question of whether the

18   digital collection was a revision under Section 201(f) of the

19   Act, and that came out Geographic's way; but it was certainly

20   not inconceivable that National Geographic had the

21   interpretation of 201(f) gone against them would have held the

22   copyright in every single issue of the National Geographic

23   magazine -- the arrangement, the placement of the pictures, the

24   sequence, and so forth -- and the photographers and the authors

25   who wrote the articles and took the pictures would have owned

K236WAIA

1    the copyrights in the individual constituent elements and

2    National Geographic as a practical matter either couldn't have

3    put out the digital edition or would have had to renegotiate

4    and presumably provide new compensation to every one of those

5    people.  It's notice inconceivable and it is not inconceivable

6    here.  It goes to the nature of a compilation copyright or

7    something like it.

8        MR. RANSOM:  Your Honor, I think in that case the

9    contract that the parties signed at the outset included

10   National Geographic having heretofore unseen but anticipated

11   digital rights and the photographers intended to claim that

12   notwithstanding the recitation in that contract it did not

13   actually afford National Geographic digital rights the statute

14   of limitations triggered at the moment the contract was signed.

15       THE COURT:  Well, I understand that is your position.

16       MR. RANSOM:  It is.  I do want to bring to the Court's

17   attention one other case that I think bears on this issue and

18   may speak to the concern the Court is articulating because just

19   in 2018 in *Wilson v. Dyatone Publishing*, which, your Honor, is

20   a 892 F.3d 112, the Court was faced with the question of when

21   the statute of limitations was triggered with respect to an

22   artist's claim that it was the owner of the renewal term.  I

23   believe the Court knows prior to the current Copyright Act, the

24   Copyright Act had a two-term system -- an initial term of 28

25   years and a renewal term of 28 years.  In that case, the

K236WAIA

plaintiff brought an action in I believe 2015 or so claiming
that as to a sound recording made back in 1972 or 1973, the
plaintiff owned the copyright in the renewal term, which would
have commenced around 2001.  The Court said, Look, if there was
a repudiation of your copyright ownership if the record label
told you in 1972 or '73, we are your employer for hire, that
statement, that repudiation to the recording artist would have
triggered the statute of limitations not just as to the initial
term but also as to the renewal term even though that wouldn't
be triggered until 2001.

        Now, in that case the problem was, although the record
company filed a certificate of registration listing itself as
the copyright owner and author as an employer for hire, it had
not or at least there was no allegation in the case that it had
provided a copy of that copyright registration from 1973 to the
plaintiff.  But what the Court said is if discovery shows that
the plaintiff knew or as a result of other facts should have
checked that copyright registration, that would trigger the
statute of limitations as of 1973 with respect to the claim of
ownership of the renewal term even though that renewal term
would not have commenced until 2001.  It reflected Footnote 2
of the Court's opinion that is it in that situation a
repudiation in 1973 of a claim of ownership by way of a record
company's assertion that it is the employer for hire triggers
the statute of limitations as to the renewal term that is still

K236WAIA

1    at that point 28 years hence.

2              So the Second Circuit has made clear I think in that

3    case, as in others it, that it means what it says.  With due

4    respect, I believe that plaintiffs therefore are put to a

5    decision and admittedly they are put to a decision early on.

6    Contracts mean something and they have to mean something.  When

7    a plaintiff is presented with a contract that says this is a

8    work for hire and they dispute that it is a work for hire, it

9    triggers the statute of limitations if they are going to take

10   that on.  They can elect not to sign the contract or they can

11   sign the contract.  But the statute of limitations as to this

12   critical work for hire issue that we're debating this morning

13   is triggered under the well established Second Circuit

14   authority that we've discussed.

15             THE COURT:  I think it is time to begin to wrap it up.

16             MR. RANSOM:  Your Honor, in addition to the statute of

17   limitations argument we've raised a few other arguments.  One

18   is the question of whether or not the Waite agreements can be

19   terminated where Mr. Waite was not himself the grantor.  He

20   operated through another company.  That is also true of one of

21   Mr. Ely's agreements.  The statute is clear that only grants,

22   if that is what these are, that are executed by an author are

23   subject to termination, they don't dispute again because they

24   can't that Mr. Waite is not the grantor and Mr. Ely as to the

25   South Coast Record agreement is not the grantor.  They say,

K236WAIA

Well, gee, this was just a common practice of furnishing

companies to sign agreements.  And that may or may not be, but

the reality is it doesn't change the fact that these

individuals are not grantors.

What is interesting I think about the argument, and

dovetails into our next argument respecting the deficiencies in

the notice, is one of the ways they try to get around the fact

that Mr. Waite and Mr. Ely are not grantors is to say, Well, it

is because there is a separate grant between those artists and

their furnishing company.  So really you are just a successor

grantee because there is some intermediate grant between the

artist and these loan-out or furnishing companies.  The

problem, your Honor, is there is no allegation about that in

the complaint.  No allegation of the existence of this other

grant.

The other problem is that if there were such a grant,

it would have to be in writing.  And I can without getting too

much into the status of discovery assure the Court that no such

written assignment or other grant between Waite or Ely and

these intermediate companies has been produced or we think even

exists.

The third problem is that the notices that the

plaintiffs provided make no reference of it.  This is apropos

of our argument that these notices are fatally deficient.  How

can they terminate a grant where there is not even the

K236WAIA

slightest hint of its existence in the notices that they

provided?  We believe there are multiple other problems with

the notices and we refer the Court to our papers in that

respect.

            The final argument we've raised, your Honor, relates

to the gap-grant issue.  We set forth in our opening papers the

history.  Both of the language of the statute, which we believe

is clear with respect to the meaning of executed.  As reflected

in the statute throughout the statute "executed" means

"signed."  We have presented the legislative history that

repeatedly and unequivocally showed that Congress understood

that when it was using the word executed in Section 203 to

trigger the timing of the termination right, it meant signed.

We have shown the history from the Copyright Office until

recently that reflected that the Copyright Office understood

that executed meant signed.

            In plaintiffs' opposition, they don't take on any of

it.  They don't respond to any of it.  They don't candidly

follow the *Chevron* requirements with respect to how statutes

are to be interpreted in light of disputes.  As we note in our

reply that really is the end of the matter.  The uniform

authority shall, the plain language, the legislative history,

the historical application, the other language of the statute

all of it establishes that executed used in Section 203 means

signed.  They do not dispute that as to Mr. Ely's 1976

K236WAIA

1    agreement, agreement by definition was not executed.  Meaning,

2    it was not signed prior to 1978.  As a result Section 203

3    doesn't apply.  Their fallback is, Well, the Copyright Office

4    more recently suggested a different interpretation.

5              THE COURT:  It is time to wrap it up.

6              MR. RANSON:  Fair enough.

7         The one thing I would say is they haven't met even the

8    Copyright Office's interpretation because there is no

9    allegation as to when Mr. Ely even created the work.  So in all

10   events that claim should be dismissed.

11             THE COURT:  Thank you.

12             MR. RANSOM:  Thank you, your Honor.

13             THE COURT:  Who will argue for plaintiff?

14             MR. ARNOLD:  I will, your Honor.  Roy Arnold from

15   Blank Rome.  I was going to hand up a case that was decided

16   after the briefing and a chart.

17             THE COURT:  Okay.  Hand it to one of my law clerks.

18             MR. ARNOLD:  May it please the Court, your Honor, Roy

19   Arnold on behalf of the plaintiffs.

20        We have seven plaintiffs here, your Honor, today.  The

21   musical artist, John Waite; Joe Ely, Kasim Sulton, Susan Straw

22   Harris, who is professionally known as Sid Straw; Leonard

23   Graves Phillips; Stan Sobol, who is also known as Stan Lee

24   professionally; and Israel Caballero.  The latter three

25   performed together as the group The Dickies.  We're here on

K236WAIA

1    behalf of the plaintiffs and the plaintiff class, your Honor.

2              Your Honor, this is a straightforward action.  It is a

3    straightforward claim.  It is brought by plaintiffs in the

4    class, who are recordings artists for copyright infringement

5    and declaratory injunctive relief.  As set forth in the

6    plaintiffs' first amended complaint, the plaintiffs in the

7    class have exercised their inalienable statutory termination

8    rights under Section 203 of the Copyright Act.  They are

9    seeking to terminate the grants to the rights that really it

10   was undisputed when the grants were made.  The plaintiffs

11   understood that they were granting to UMG for a period of time

12   the ability to own and exploit the copyright for that period of

13   time.  They granted that right and there is no dispute about

14   that; but there is also no dispute that UMG knew that the

15   creator of the works, in fact the people who put pen to paper;

16   so to speak in your article example, were the plaintiffs.  They

17   were the artists.  At page 8 of their reply, yes, page 8, and

18   Mr. Ransom referred to it today alluding to the fact that the

19   works they were creating.  The "they" was my client, the

20   artists.  The artists were creating the work.

21             So we have sued defendant UMG as sort of the successor

22   to various subsidiary on behalf of subsidiaries affiliates.  In

23   doing so plaintiffs have effectuated with those notice of

24   determination of the prior grants of the rights and recaptured

25   their copyrights -- their rights under the copyright.

K236WAIA

1    Defendant UMG's response was to wrongfully refuse to recognize

2    plaintiffs' various termination notices and instead of

3    acknowledging the plaintiffs' recapture of their rights as

4    unequivocally intended by Congress, the defendant has continued

5    to commercially exploit the sound recordings created by the

6    plaintiffs and to reap the financial windfall.  The stated

7    purpose, your Honor, of the termination provisions of the

8    Copyright Act, Section 203 in particular, and there are others,

9    is to protect authors and their heirs against unremunerative

10   agreements by giving them a opportunity to share in their

11   economic success of their works by allowing authors or their

12   heirs during particular periods of time long after their

13   original grant to regain previously granted copyright or

14   copyright rights.

15           Your Honor, defendant's motion to dismiss should be

16   denied for four principle reasons that I will discuss.  And

17   we're pleased to be here to address any questions the Court may

18   have.  The plaintiffs' claims are not barred by the expiration

19   of the three-year statute of limitations, which would have

20   arisen shortly after the original grant was made with respect

21   to statutory rights that don't accrue or vest until decades

22   later.  Your Honor, Mr. Ransom when he is talking about new or

23   should have known of a right, it is really a cause of action.

24   When we break that down, when is it under this statutory right

25   of termination, this inalienable statutory right of

K236WAIA

1    termination, when is it that the artists can possibly know that

2    there is infringement being done falling the determination?

3    What has to happen?  That statutory period, that decades' long

4    time period has to proceed and then the artist has to express

5    the notice of intent to terminate.  They have to notify the

6    recording company that they are going to terminate.  Then what

7    do we have?  What should happen is the recording company,

8    somebody like the defendant, should acknowledge the termination

9    and things should go smoothly.

10           Instead, they wrongfully refuse and they throw up a

11   number of different reasons why the determination is not going

12   to be recognized so they can continue to exploit and test

13   whether or not the artist has the fortitude to pursue the claim

14   or not.  So they wrongfully deny, but even then -- even then --

15   when they wrongfully refuse to recognize that termination,

16   until there is an effective termination date -- and that is the

17   reason why I gave you the chart, your Honor.  The chart sort of

18   illustrates it.  It lays out how the information is presented.

19   That is drawn from our clients' notices of determination and

20   then the defendant's response with respect to the grant dates.

21   So those are the exhibits that are in the record.

22           More fundamentally so what is it?  What is the knew or

23   should have known?  Well, the artist doesn't know until that

24   determination is going to be refused and that the defendant is

25   going to continue to exploit the work post-effective

K236WAIA

1    termination date.  That is at the point there is an injury.

2    That is the point where they can assert a copyright

3    infringement claim.  In fact, we did it differently with

4    respect to different plaintiffs in this case, your Honor.  We

5    did it carefully.  My colleague Mr. Cohen sitting at counsel

6    table was very careful about this.

7         With respect to those artists who have an instance

8    where the effective date has past, there is a copyright

9    infringement claim.  With respect to, for example, Sid Straw,

10   the artist who is performing as Sid Straw, that is a

11   declaratory relief claim.  So we have a concrete dispute for

12   declaratory relief purposes at that point, but it is only at

13   that point so that we can then -- and when we get past that

14   effective termination date, we can proceed with a copyright

15   claim.

16        THE COURT:  Your position basically boils down as I

17   understand on the statute of limitations point to this:  There

18   is no infringement until the effective termination date because

19   there is no violation of your client's rights.  So the

20   infringement claim isn't barred.  It has just begun to run.  So

21   far as declaratory relief is concerned, there was no live

22   controversy as of the time the contract was signed.

23        MR. ARNOLD:  Exactly correct, your Honor.

24        Just briefly.  The *Siegel* case that we cite talks

25   about how the statute really should be the effective date.  The

K236WAIA

1    termination is the date of accrual.  As explained defendants

2    rests heavily on cases that don't involve termination rights.

3    Their citation don't involve termination rights, period.  So

4    they are mixing apples and oranges.

5            The *Aday* case that counsel has cited, the Meatloaf

6    case, that was not a termination case.  More fundamentally it

7    wasn't a situation where as I said the injury was flowing from

8    the wrongful refusal to recognize the termination rights.

9    Moreover, it wasn't an instance where Section 203(a)(5)

10   notwithstanding the agreements to the contrary language that

11   Congress specifically enacted with the termination right in

12   order to -- because Congress knew.  Your Honor picked up on

13   this and commented on it.  Congress knew and it was widespread

14   practice in the industry to have these kind of artifice

15   contracts.

16           So our position is we understand that the defendant

17   may assert a work -- a work made for hire defense in trying to

18   argue that our client doesn't have a termination right, but we

19   welcome that battle in discovery.  We welcome their showing us

20   the documents where UMG treated our client as an employee.

21   Because what we are saying, your Honor, is that argument needs

22   to be dealt with in discovery, that they knew our artist was

23   the creator.  That is exactly why they demanded the assignment

24   language in the inducement letters, number one.

25           Number two, with respect to the work made for hire

K236WAIA

1    argument, we welcome to see whether they were paying FICA and

2    unemployment compensation and a salary and whether they were

3    providing a place to work.  In any of those indicia of an

4    actual employee/employer relationship as opposed to the clever

5    language that they limit that frankly Mr. Ransom cited is for

6    purposes hereof.  It is an employee for hire relationship under

7    the Copyright Law.  It is an artifice, your Honor.  The reason

8    why they had the assignment was to ensure that there was

9    actually that transfer.  And that is why our clients are not

10   disputing that period of time when they had that ownership and

11   those rights.  However, that was a terminable relationship

12   under Section 203.  So from our position the statute of

13   limitations issue really falls away.

14        THE COURT:  Let me ask you another question if I may.

15   Do you dispute the proposition that the albums on which these

16   various tracks appeared were compilations?

17        MR. ARNOLD:  Your Honor, I think at this juncture I

18   would say it is not clear factually that they are compilations.

19   I understand they raise that in their reply brief.  They

20   alluded to in their moving papers.  The reason I say that is in

21   the notice of termination we have the SR number.  That means

22   these works were registered as sound recordings.  They were not

23   registered as compilations by the defendant as far as we can

24   tell.  So that, your Honor, is something yet to be determined,

25   but we certainly believe they are sounds recordings and that

K236WAIA

1    our client is able to terminate and get their rights to the

2    songs at a minimum.

3            The *Bryant* case that UMG has cited, the *Bryant* case

4    says essentially that an album is a compilation for purposes of

5    statutory damages so you can only get one statutory damage

6    reward.  What is unclear in the record, your Honor, is whether

7    or not the works, the songs on the album were fixed in a

8    tangible medium prior to or at the time that the album was

9    published.  So what I am saying, your Honor, is it is not yet

10   clear in the record factually what they are asserting in terms

11   of compilation.  So I would say it is a factual issue to be

12   borne out in discovery.  But, your Honor, I understand where

13   you were analyzing it and as a general matter we agree with

14   your analysis.

15           THE COURT:  Okay.  Let's go ahead.

16           MR. ARNOLD:  So the statute of limitations issue we

17   believe really doesn't make sense when you really understand

18   the termination right.  It is sort of a gotcha argument way

19   later because of the nature of the right.

20           Secondly, the plaintiffs' termination notices were

21   valid, timely and sufficient under Section 203 and the

22   applicable regulations.  Section 203 of the Copyright Act and

23   the applicable regulations.  Our clients were the creators of

24   the sound recordings at issue.

25           THE COURT:  Let's get to the loan-out companies.

K236WAIA

1          MR. ARNOLD:  Excuse me?

2          THE COURT:  The loan-out companies.

3          MR. ARNOLD:  The our position on the loan-out

4    companies is there could be intermediate grants, but the notice

5    on the termination goes to effectively the final grantee, which

6    is why we gave notice to UMG.  The loan-out companies were for

7    certain artists in existence at a certain point in time.  They

8    may have been used for tax structuring purposes.  That is

9    another factual issue to get into, but our clients were still

10   the creators of the work.  So those individuals were still

11   giving assignments along the way and transferring the rights.

12         THE COURT:  They were giving assignments along the

13   way?  What are you talking about?

14         MR. ARNOLD:  Well, I am sorry, your Honor.  That was

15   an inartful phrase.  The artist is being asked to give the

16   grant via assignment to UMG along the way.  That essentially is

17   the way I am describing it.  I don't know if I am being clear

18   on that or not.

19         THE COURT:  Your position basically is that the

20   corporate forum ought to be disregarded here because you only

21   want it for tax purposes.

22         MR. ARNOLD:  Exactly.

23         THE COURT:  Why should any judge do that?

24         MR. ARNOLD:  Well, your Honor, I understand the

25   reluctance there, but --

K236WAIA

```
 1          THE COURT:  It just can't be that now I am a
 2   corporation and now I am not.
 3          MR. ARNOLD:  But the artist is still creating a work.
 4   I understand the reluctance of the Court to disregard that
 5   forum, but in our instance the artist is a single person.  It's
 6   like a very closely held company or essentially John Waite
 7   is --
 8          THE COURT:  That doesn't help your argument.
 9          MR. ARNOLD:  I understand your Honor's position, but I
10   think that is a technique that frankly discovery will show was
11   passé years ago.
12          THE COURT:  Whether it was passé years ago or not, you
13   have a couple of situations here where it happened and you my
14   have a problem with those.
15          MR. ARNOLD:  And which we believe in discovery that
16   can be borne out and we can deal with it factually based upon
17   what the facts show in discovery given that the artists created
18   the work and were the copyright holders ab initio.
19          THE COURT:  I am sorry.  And they were the copyright
20   holders ab initio?
21          MR. ARNOLD:  They were.  They created the works.  So
22   what I am saying is that the artists, using John Waite or Joe
23   Ely as an example, creates the work and there may be some --
24   the loan-out company documentation is a question to be looked
25   into in discovery.  I don't think that a complete record is
```

K236WAIA

1   here to decide on a motion to dismiss.  What we're saying is we

2   certainly have to establish that John Waite and Joe Ely were

3   the creators of the work.

4           THE COURT:  What I know for sure for purposes of the

5   motion to dismiss is that the loan-out companies signed the

6   contracts with the record companies; right?

7           MR. ARNOLD:  Yes.  As did and John Waite personally as

8   well.

9           THE COURT:  And the loan-out companies gave no notice;

10  right?

11          MR. ARNOLD:  No.  Because John Waite was the creator,

12  author.

13          THE COURT:  No, I am not right; or, no, they gave no

14  notice?

15          MR. ARNOLD:  You are right in that my understanding is

16  loan-out companies did not give notice, but John Waite was the

17  original creator and therefore he is the one giving the notice.

18          THE COURT:  Under the statute the loan-out companies

19  have no termination right; correct?

20          MR. ARNOLD:  I don't think the loan-out companies do,

21  but the artist does.

22          THE COURT:  I know that is your position but --

23          MR. ARNOLD:  I understand, your Honor.

24          THE COURT:  -- there may be a statutory problem maybe.

25          MR. ARNOLD:  What I am getting at is given the review

K236WAIA

1    and motion to dismiss that should be dealt with on a more

2    developed record perhaps at summary judgement if they are still

3    pursuing it at that point.

4              THE COURT:  I hear you.

5              MR. ARNOLD:  On the sufficiency of notices issue, your

6    Honor, I handed up the *Mtume* case.  It was decided in September

7    of 2019 by Judge Ramos.  That case also involves some

8    disagreement or dispute about whether or not the date of the

9    grant was accurate in the notice of termination.  Judge Ramos

10   denied the motion to dismiss saying that -- I will

11   paraphrase -- that there is a plausible claim that the

12   defendant was on notice sufficient to identify the grants.

13             Here, similarly, the notices were sufficient.  Each of

14   the plaintiffs' termination notices provided the identity of

15   the work, the author, the publication date, the copyright

16   registration number, the termination date, termination notice

17   date, and the effective date of each of the terminations.  It

18   also needed to have language about terminating all grants or

19   transfers of copyright and all rights of the copyright

20   proprietor being terminated and to the sound recordings

21   including and then various dates.  So we would submit, your

22   Honor, as did the plaintiff in the *Mtume* case that I handed

23   up -- the *Mtume* case is for the record I will cite --

24             THE COURT:  I have it right here.

25             MR. ARNOLD:  Yes.  408 F.Supp. 3d, 471 (S.D.N.Y.

K236WAIA

1    2019).  There were issues again regarding the dates, but the

2    harmless error doctrine was looked to saying, Well, they are

3    not material in this situation.  On that point I would

4    highlight, your Honor, the particular statutory provision that

5    is really at issue with regard to most of the plaintiffs -- put

6    Joe Ely aside because of the gap-grant issue -- is in Section

7    203(a)(3), there is the termination provision.  There is a

8    first clause that says, *Termination of the grant may be*

9    *effected at any time during the period of five years beginning*

10   *at the end of 35 years from the date of execution of the grant.*

11   Everyone accept Joe Ely the next sentence is what is important,

12   and that is why I put the publication dates in that chart, your

13   Honor, and those were in the notices of termination.  This next

14   clause says, *Or if the grant covers the right of publication of*

15   *the work, the period begins at the end of 35 years from the*

16   *date of publication of the work under the grant or at the end*

17   *of 40 years from the date of execution of the grant, whichever*

18   *term ends earlier*.  So unless you have sort of an extended

19   number of years after the contract is entered into, or signed

20   to use Mr. Ransom's order, in this instance where the

21   publication dates are relatively prompt after whenever that

22   contract was signed, this statutory provision makes clear that

23   we're essentially teeing off of the publication date.  So that

24   is really where the analysis flows for the vast majority of the

25   plaintiffs at least on the named plaintiff.

K236WAIA

1          THE COURT:  How, if at all, does that relate to the

2    statute of limitations argument?

3          MR. ARNOLD:  It doesn't.  I was talking about the

4    sufficiency of the termination issue.

5          THE COURT:  I know you were, but I asked you a

6    different question.

7          MR. ARNOLD:  Well, I would go back to my point that I

8    made at the beginning when I was addressing the statute of

9    limitations argument, which is you really couldn't have a

10   limitations period that begins to run before essentially the --

11   it could be that the publication date is more than three years

12   after but less than five years.

13         THE COURT:  Right.  So in applying the statute of

14   limitations here and determining when the right accrues, isn't

15   it appropriate to give some role to Section 203(a)(3) because

16   it would seem more than passingly weird for Congress to think

17   that an artist who signed a contract like the ones at issue

18   here has the statute of limitations running against him from

19   the day he signs the contract, hum?

20         MR. ARNOLD:  Yes.  Exactly.

21         THE COURT:  And the period within which the right that

22   turns on the claim that theoretically your colleague says

23   should have been brought within three years of the day he

24   signed the contract is not even exercisable for 35 years?

25         MR. ARNOLD:  Exactly.

K236WAIA

1          THE COURT:  Okay.

2          MR. ARNOLD:  That's exactly our argument.

3          But for the sufficiency of the notices, I was just

4    making the point under this language that the publication date

5    really becomes more consequential and that fits into the

6    harmless error standard about its lack of materiality.

7          Your Honor, I will wrap up very quickly because I know

8    you've been more than patient with us.

9          As to the works made for hire argument, our

10   fundamental position is your Honor that the case law *Marvel*

11   *Characters v. Kirby* in 310 F.Supp 280 (2d Cir. 2002); *Nimrod*

12   *Copyright*, fundamentally to the extent that we're going to

13   delve into this employment relationship and whether or not

14   these are works made for hire or not, that is an issue for

15   discovery.  We welcome that discovery and look forward to

16   seeing it.

17         Lastly on the gap-grant issue, our argument there is

18   very simple.  It is consistent with the Copyright Office as of

19   2010.  By way of introduction this issue only affects -- it's a

20   peculiar issue that affects only a single work by a single

21   plaintiff and that is Joe Ely.  UMG's position here is to

22   counterman the Copyright Office's position.  The so-called gap

23   grants -- essentially the copyright can only be borne once it

24   is fixed in a tangible medium of expression.  Until the

25   copyright is borne, which each instance the works were created

K236WAIA

1    or published after January 1, 1978, they are born after that

2    date and therefore they carry a termination right under this

3    statutory scheme and the Copyright Office's analysis dating

4    back to 20 10.  This Court should defer to that position under

5    *WPIX*, which we cite.

6            Your Honor, for all of those reasons, we would ask

7    that the Court deny defendant's motion to dismiss.  We

8    otherwise rely on our briefing that we submitted.

9            Thank you, your Honor.

10            THE COURT:  Thank you.

11            MR. RANSOM:  Your Honor.

12            THE COURT:  Two minutes.

13            MR. RANSOM:  Thank you.

14            Your Honor, the accrual of an infringement claim here

15    is a red herring.  I don't think plaintiffs can dispute that

16    the infringement claim is premised on their contention of

17    authorship and ownership.  So that is where we need to look.

18    In that respect the Court asked whether there was any live

19    controversy before the effective date of the determination, and

20    I submit there certainly was.  Plaintiffs' counsel relied on

21    the *Siegel* case out of California.  In *Siegel* there was no

22    dispute as to authorship or ownership.  That claim wasn't

23    triggered until the termination date because the challenge was

24    to the termination notice itself, not to whether or not the

25    plaintiffs actually had some authorship claim to the work

K236WAIA

1    dating back to its creation.

2          In fact, plaintiffs' argument respecting *Siegel*, and

3    to some extent this Court's suggestion or seeming reservation

4    about application of the statute of limitations from the moment

5    of contracting was rejected by the Court in the *Scorpio* case we

6    cited in our papers also out of California.  Here is what the

7    Court said in *Scorpio* with respect to application of the

8    statute of limitations 203 termination claim, and this 2013 WL

9    790940 at *3-5, "The fact that Willis' future rights to the

10   disputed works vested upon service of the notice of termination

11   does not mean that Willis could not have brought his co-owner

12   ship claim earlier.  At the time Willis granted his copyright

13   interest in the disputed works to *Can't Stop*, the Copyright Act

14   of 1976 was already enacted.  Therefore, Willis knew from the

15   very beginning that he would have" --

16          THE COURT:  Counsel, I am capable of reading.

17          MR. RANSOM:  I am sorry.

18          THE COURT:  That is a District Court case from San

19   Diego.

20          MR. RANSOM:  It does, however, rely on the Ninth

21   Circuit's opinion in *Zuill*, which the Second Circuit has

22   repeated cited in support of its application of statute of

23   limitations and then quoted particularly from *Zuill* at 80 F.3d

24   1370-71 about plaintiff's not being able to sit in the weeds as

25   soon as they are aware they have a claim, wait for someone else

K236WAIA

 1  to exploit it and then leap up and say, Notwithstanding what I

 2  agreed and notwithstanding what a contract said, I now claim

 3  decades later I have this right that I never advised you of.

 4  That claim was joined.  In the words of the Court, There was a

 5  live controversy at the moment these contracts were signed and

 6  under the Second Circuit authority this certainly triggered the

 7  statute.

 8          With respect to the grantor issue, your Honor, nothing

 9  in discovery is going to change the fact that the loan-out

10  companies were the parties to the contract with Universal Music

11  and nothing is going to change the fact that plaintiffs have

12  not established any grant from plaintiffs to those loan-outs.

13  Certainly as to the loan-out situation under the plain language

14  of the statute, they have got to live with the structure they

15  elected for themselves and live with the operation of the

16  statute.

17          We refer to our papers for the balance.  Thank you,

18  your Honor.

19          THE COURT:  Where are you on discovery?

20          MR. BIERMAN:  I will address that, your Honor, if I

21  may.

22          May it please the Court, when we were before your

23  Honor on April 1, 2019, for the previous pretrial conference,

24  your Honor set a number of dates including the service of

25  initial document requests.  We did that.

K236WAIA

```
1          THE COURT:  There is a scheduling order in place.

2          MR. BIERMAN:  There is not.

3          THE COURT:  There was a motion for stay of discovery

4     pending motions and it was withdrawn.

5          MR. BIERMAN:  It was not withdrawn, your Honor.

6          Among the dates that your Honor set at that conference

7     were dates to make initial requests, dates for depositions to

8     start, and also the December 1, 2019, as the date by which fact

9     discovery would conclude -- must conclude.  You set that date,

10    your Honor, and this is at page 9 and 10 of the transcript,

11    after asking plaintiffs' counsel, *From today how much time do*

12    *you need to complete fact discovery?  Six months,* you asked?

13    Counsel for plaintiff said at that time, *More like six to eight*

14    *months, your Honor.*  And your Honor said, *Okay.  Fact discovery*

15    *completed by December 1.*  The fact discovery period is done.

16    So when counsel for plaintiffs talks about --

17         THE COURT:  Excuse me.  What fact discovery has

18    actually happened?

19         MR. BIERMAN:  What has happened is the exchange of

20    document requests, responses thereto, and production of

21    documents.  Plaintiffs have produced in response to defendant's

22    documents requests 92 pages.  UMG has produced nearly 15,000

23    pages.  That is the discovery that has been done.  UMG also

24    served nonparty document subpoenas within that December 1 time

25    period and the response that we got is that the recipients did
```

K236WAIA

1    not have documents or did not any longer exist.

2              That is the discovery that has been completed and we

3    take the position, your Honor, we took what you said in Court

4    that day at its word.  And seriously the parties were to

5    complete fact discovery by December 1.  Indeed, during the time

6    between that conference and that cutoff we asked plaintiffs

7    several times, *Would you consent to a stay of discovery?*  And

8    they said, *No.  We will abide by the*--

9              THE COURT:  The State of the Union is tomorrow night.

10   I got the picture.

11             MR. BIERMAN:  Understood, your Honor.

12             THE COURT:  You exchanged documents.  You want to cut

13   it off now.  They probably don't: right?

14             MR. BIERMAN:  I appreciate that, your Honor.

15             THE COURT:  I would have appreciated that summary,

16   too.

17             Let me hear from the other side.

18             MR. BIERMAN:  Thank you.

19             MR. ARNOLD:  Your Honor, what Mr. Bierman overlooked

20   or passed by was there was briefing on the motion to dismiss.

21   They asked us to extend the time extensively for them to

22   respond to the written requests for production.  Then after

23   they got that extension, they waited months to even give us the

24   first dribbling out of documents.  The 15,000 that he is

25   bragging about, they dumbed 10,000 of those plus on Friday at

K236WAIA

1    8:00 in the evening so that he could stand up and say that.

2              THE COURT:  Friday when?

3              MR. ARNOLD:  This past Friday.

4              THE COURT:  I see.  Not December 1st?

5              MR. ARNOLD:  No.  No.

6              THE COURT:  So what happened is everybody ignored the

7    scheduling order?

8              MR. ARNOLD:  Well, your Honor, we understood that your

9    Honor had entered the order, but we also knew that defendants'

10   motion to dismiss was pending and we would need to see an

11   answer before we could proceed with depositions of the

12   defendant so that we could examine them about their defenses.

13   That is in terms of deposition discovery.  We absolutely wanted

14   discovery to proceed on documents and we were asking them for

15   documents.  We had meet and confers about specific issues about

16   them.  I haven't received a full response from them on that

17   meet and confer.  We may or may not need to come back to your

18   Honor on those issues.  I am hopeful that we can move past any

19   disagreements.  We do no have a certification from the

20   defendant that they have provided all the responsive documents

21   requested or discussed in our meet and confer.

22             so I do expect, your Honor, and I would propose that

23   we sit down with the defendant upon -- if the motion to dismiss

24   is denied that we try to work on an amended schedule to try to

25   actually address where we are and where we can move forward.

K236WAIA

|  | THE COURT:  How long a trial will this be if I deny |
| 1 | |
| 2 | the motion? |
| 3 | MR. ARNOLD:  I think probably plaintiffs' case is a |
| 4 | week or less.  It is a pretty straightforward case. |
| 5 | THE COURT:  Mr. Ransom, how long? |
| 6 | MR. RANSOM:  I think total two weeks probably, your |
| 7 | Honor. |

1    THE COURT:  How long a trial will this be if I deny
2    the motion?
3    MR. ARNOLD:  I think probably plaintiffs' case is a
4    week or less.  It is a pretty straightforward case.
5    THE COURT:  Mr. Ransom, how long?
6    MR. RANSOM:  I think total two weeks probably, your
7    Honor.
8    THE COURT:  You now have a new schedule as of now.
9    Expert disclosures by May 1st.  All discovery, expert and fact,
10   completed by July 1st.  Joint pretrial order and any summary
11   judgment motions by August 1st.  Trial November 9th.
12   There are elements of this motion as to which I
13   haven't made up my mind, particularly the loan-out company
14   issue.  There may be others, but I think you can probably count
15   on going to trial in this case.
16   Anything else today?
17   MR. ARNOLD:  No, your Honor.  Thank you.
18   MR. BIERMAN:  No, your Honor.  Thank you.
19   MR. RANSOM:  Thank you, your Honor.
20                        -0-
21
22
23
24
25