UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN WAITE, an individual; JOE ELY, an individual;
KASIM SULTON, an individual; SUSAN STRAW
HARRIS  p/k/a SYD STRAW, an individual;
LEONARD GRAVES PHILLIPS, an individual; STAN
SOBOL a/k/a  STAN LEE, an individual; and ISRAEL
CABALLERO, an individual; and on behalf of all others
similarly situated,

                                        19-cv-1091 (LAK)

                        Plaintiffs,


                -against-


UMG RECORDINGS, INC., a Delaware
corporation doing business as Universal Music
Group, and DOES 1 through 10,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

      Appearances:

        Ryan E. Cronin
        Gregory M. Bordo
        David M. Perry
        BLANK ROME LLP

        Evan S. Cohen
        Maryann R. Marzano
        COHEN MUSIC LAW

        *Attorneys for Plaintiffs*

        Steven M. Bierman
        Melanie Berdecia
        Rollin A. Ransom
        Lisa M. Gilford
        Adriane Peralta
        SIDLEY AUSTIN LLP

Richard S. Mandel
Thomas Kjellberg
COWAN, LIEBOWITZ & LATMAN, P.C.

*Attorneys for Defendant UMG Recordings, Inc.*

LEWIS A. KAPLAN, *District Judge.*

Aspiring singers, musicians, authors and other artists – sometimes young and inexperienced and often not well known – tend to have little bargaining power in negotiating financial arrangements with recording companies, publishers, and others who promote and commercialize the artists' work. They often grant copyright in that work as part of the bargain they strike for promotion and commercialization. Accordingly, when an artistic work turns out to be a "hit," the lion's share of the economic returns often goes to those who commercialized the works rather than to the artist who created them. Section 203 of the Copyright Act of 1976 established a limited opportunity for artists to terminate the copyright ownership that they had granted to commercializers decades earlier in order to address this issue. The idea was that termination of these rights would more fairly balance the allocation of the benefits derived from the artists' creativity.

Termination is effectuated by serving the grantee with written notice.[1] This notice lists, among other information, the effective date of termination.[2] Once the effective date of termination has passed, the grantee becomes the owner of the copyright and therefore holds

---

[1] 17 U.S.C. § 203(a)(4).

[2] *Id* § 203(a)(4)(A).

exclusive right to reproduce and distribute the sound recordings.[3]

This is a purported class action by recording artists[4] whose albums were released by predecessors in interest of defendant UMG Recordings, Inc. ("UMG") pursuant to agreements the artists signed in the 1970s and 1980s that granted copyright in their works to UMG's predecessor recording companies. These grants allowed those companies (and now UMG) to market, distribute, and sell the artists' sound recordings.

Each member of the class allegedly has terminated that grant as to the sound recordings comprising certain albums.[5] UMG disputes the validity of those terminations.[6]

Plaintiffs argue that UMG is infringing the artists' copyrights by continuing to market and sell the recordings for which the effective date of termination has passed. With regard to recordings for which termination notices have been served but the effective dates of termination have not yet been reached, plaintiffs seek a declaratory judgment of certain legal rights and duties of the parties. Plaintiffs seek also an injunction restraining defendant from continuing to deny and

---

[3]

*Id.* § 106.

[4]

In one instance, the plaintiff is an alleged successor in interest to the artist. FAC [DI 45] ¶ 12.

[5]

*Id.* ¶¶ 31-32, 37, 43-44, 53-54, 69-70, 76-77.

Plaintiffs seek to validate the termination notices for the following albums: *Ignition*, *No Brakes*, and *Mask of Smiles* (Waite); *Honky Tonk Masquerade, Down the Drag, Live Shots,* and *Musta Notta Gotta Lotta* (Ely); *Surprise* (Harris); *Kasim* (Sulton); *Dawn of the Dickies* (Phillips/Sobol/Caballero, "The Dickies"). *Id.* ¶¶ 32, 37, 44, 54, 77.

Ely's termination notice lists an additional album, *Hi-Res*, *see* FAC Ex. C at 3, which is not referenced in the FAC. The Court therefore assumes that Ely does not seek to enforce the termination notice as to that album.

[6]

*Id.* ¶ 4.

disregard the termination notices. The matter is before the Court on UMG's motion to dismiss the first amended complaint ("FAC").

*Discussion*

I.      *Legal Standards*

    A.      *Motion to Dismiss*

To survive a motion to dismiss for failure to state a claim, a complaint must allege facts sufficient "to state a claim to relief that is plausible on its face."[7] This standard is met where the "pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8] The Court accepts as true all well-pleaded factual allegations and "draw[s] all reasonable inferences in the plaintiffs' favor."[9] In resolving a motion to dismiss, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[10]

---

[7]        *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

[8]        *Id.*

[9]        *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

[10]       *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

        On its motion to dismiss, defendant's attached the parties' recording contracts. These documents are integral to a copyright claim and appropriately incorporated by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The Court does not convert this motion to dismiss into one for summary judgment. *See* FED. R. CIV. P. 12(d).

B.      *Section 203 of the Copyright Act of 1976*

Recording artists often transfer copyright ownership in their works to record labels and music publishers. Recognizing that publishers often hold more bargaining power than authors and the "impossibility of determining a work's value until it has been exploited," Congress created a termination right to provide authors with an opportunity to enjoy a greater share of their work's economic success.[11]  Authors of works created on or after January 1, 1978 may terminate transfers of a license or copyright in those works thirty-five years from the date of the grant's execution or, if the grant covers publication rights, the earlier of thirty-five years after the work's publication or forty years after the execution of the grant.[12]  The termination right for the first eligible works therefore did not vest until January 1, 2013.

Termination under Section 203 is available for all works "executed by the author," other than those "made for hire."[13] Termination is not automatic.  The earlier grant will remain in effect absent a termination notice.[14]  These notices must include the effective date of termination, which may fall on any date in the five-year period after the work becomes terminable, and other requirements set forth by regulation.[15] The notice must be recorded with the Copyright Office and

---

The Court has considered these documents only for the facts stated therein and not for the truth of the matters asserted.

[11]     H.R. Rep. No. 94-1476, 124 (Sept. 3, 1976).

[12]     17 U.S.C. § 203(a)(3).

[13]     *Id*. § 203(a).

[14]     *Id*.  § 203(a)(3).

[15]     *Id*. § 203(a)(4).

served upon the grantee prior to the effective date of termination.[16] Upon the effective date of termination, the grant is terminated and the copyright reverts to the author.[17]

For instance, if an author executed a grant transferring the copyright in Work A in January 1980, the grant for Work A may be terminated on a date between January 2015 (thirty-five years from the date of execution) and January 2020. If the author selected January 1, 2018 as the effective date of termination, assuming the termination notice comports with all applicable requirements, the grantee can continue to distribute Work A until December 31, 2017. On January 1, 2018, copyright ownership reverts to the author. At that point, any continued exploitation of that work by the grantee is an infringement on the author's copyright.

II.     *Plaintiffs' Claims Cannot be Dismissed Based on Section 203's "Works Made for Hire" Exception*

Under Section 101 of the Copyright Act, a work made for hire is either a work "prepared by an employee within the scope of his or her employment" or certain types of "specially ordered or commissioned" work, so long as the parties agree in writing that the work will be considered a work made for hire.[18] The statute enumerates nine categories of works that can qualify as commissioned works: a contribution to a collective work, a part of a motion picture or other audio visual work, a translation, a supplementary work, a compilation, an instructional text, a test,

---

[16]     *Id.* § 203(a)(4)(A)-(B). The grantee must be served with the termination notice within two and ten years before the effective date of termination

[17]     *Id*. § 203(b).

[18]     *Id.* § 101.

answer material for a test, and an atlas. [19]

The legal author (creator of the work) and owner of a "work made for hire" is the employer or person who specially ordered it, rather than the artist.[20] Section 203 excludes these works from the termination right precisely for this reason: "The hired [or commissioned] party, although the 'author' in the colloquial sense . . . never owned the copyrights to assign. It stands to reason, then, that there are no rights the assignment of which [the artist or] his or her heirs may now terminate."[21]

Though plaintiffs' agreements with UMG's predecessors contained "works made for hire" language – which stated that the recording company, rather than the artist, was the legal author and owner of the works[22] – neither party argues, at this stage, that plaintiffs' works were specially commissioned. Nor do the parties contend that there was an employee-employer relationship between the artists and recording companies. As will be explained in more detail in the following section, defendant, for purposes of the motion to dismiss, argues only that the "works made for hire" language is relevant to the question of when the statute of limitations began to run on plaintiffs' claims.[23] The Court therefore need not resolve, for purposes of this motion, whether the agreements

---

[19]

    *Id*.

[20]

    *Id*. § 201(b); *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 737 (1988) (distinguishing between copyright authors and owners).

[21]

    *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 137 (2d Cir. 2013).

[22]

    *See* Declaration of Rollin A. Ransom [hereinafter "Ransom Decl."] [DI 51] Exs. A, B, C, D, E, G, H, I, J, K.

[23]

    Defendant suggests only in a footnote that sound recordings comprising an album constitute either a "compilation" or "contributions to a collective work," two of the nine enumerated

conferred "for hire" status on the works.

## III.   *Plaintiffs' Claims: Copyright Infringement and Declaratory Relief*

Plaintiffs' copyright infringement claim is brought on behalf of the artists with albums for which the respective effective dates of termination have passed. Plaintiffs with albums for which the effective dates of termination had not passed when the FAC was filed request a declaratory judgment concerning the rights and duties of the parties.

### A.   *Plaintiffs' Infringement Claims Are Not Barred by the Statute of Limitations*

#### 1.   *When Did Plaintiffs' Copyright Infringement Claims Accrue?*

A copyright infringement claim must be brought within three years from the time the cause of action accrues.[24] Accrual occurs when a plaintiff "knows or has reason to know of the

---

categories of works that can be made "for hire." Defendant's Reply in Support of its Motion to Dismiss [DI 59] at 2 n.1. However, UMG makes no other arguments on this point and instead focuses on the consequences of a "works made for hire" agreement in light of the statute of limitations for Copyright Act claims. *See id.* 1-2 (stating that the "merits of a work for hire claim" is "beyond the scope of UMG's motion"); Defendant's Memorandum in Support of its Motion to Dismiss [hereinafter "Def's. Mem."] [DI 50] at 8 ("Resolution of the dispute [as to whether sound recordings on an album may be a 'work made for hire'] is irrelevant to the [statute of limitations] argument.").

The Court notes also that, in any event, defendant's limited cited authority is unpersuasive. In support of the position that sound recordings on an album could be "contributions to a collective work," defendant includes two sentences uttered during a congressional hearing. Defendant then cites to *Bryant v. Media Right Productions*, 603 F.3d 135, 140 (2d. Cir. 2010), for the proposition that albums are "compilations." While *Bryant* concluded that "a[n] album falls within the Act's expansive definition of compilation," this classification was considered for purposes of statutory damages under a provision that, by its very terms, is limited to "the purposes of [that] subsection." *Id.* 140-141; 17 U.S.C. § 504(c)(1). The Circuit's conclusion in *Bryant* is thus not dispositive in the "works for hire" context.

[24]   17 U.S.C. § 507(b).

injury upon which the claim is premised."[25]  This is known as the discovery rule.[26]

a.      Case Law

The Second Circuit follows the discovery rule for all copyright claims.[27]  However, the application of the rule may vary.  "An ownership [or authorship] claim accrues only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'"[28]  "By contrast, an infringement action may be commenced within three years of any infringing act, regardless of any prior acts of infringement[.]"[29]

This distinction is less clear when an infringement claim implicates questions of ownership or authorship.[30]  To succeed on an infringement claim, a plaintiff must establish "ownership of a valid copyright" and "copying of constituent elements of the work that are

---

[25]

*Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996) (quoting *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)); *see also Psihoyos v. John Wiley & Sons*, *Inc.*, 748 F.3d 120, 125 (2d Cir. 2014).

[26]

*John Wiley & Sons*, 748 F.3d at 124.

[27]

*Id*.

[28]

*Kwan v. Schlein,* 634 F.3d 224, 228 (2d Cir. 2011) (quoting *Stone*, 970 F.2d at 1048).

[29]

*Id*.

[30]

Because copyright ownership vests initially in the author, and the artist is not the legal author of a work created under a "work made for hire" agreement, questions of ownership and authorship are intrinsically linked in this context. 17 U.S.C. § 201(a), (b).

Indeed, plaintiffs do not challenge historical ownership of the sound recordings.  There is no dispute that UMG's predecessors owned the copyrights to these works when the agreements were executed.  This is precisely why the plaintiffs served termination notices.

original."[31]  As the Second Circuit explained in *Kwan v. Schlein*, "[i]n many infringement cases, the first element (ownership) is not in dispute" and the copyright claim turns on the "copying" element.[32]  However, when a dispute over a work does not involve the "the nature, extent or scope, of copying, [then] ownership forms the backbone of the 'infringement claim.'"[33] When ownership, rather than copying, is the crux of an infringement claim, the Second Circuit has held, "any attendant infringement claims must fail" if the underlying ownership-claim is time-barred.[34]

Defendant argues that a dispute over authorship and ownership is at the core of plaintiffs' claims.[35]  This argument is premised on plaintiffs' allegations that they are the owners – or will be the owners following the effective dates of termination – of the copyrights to sound recordings that make up certain albums.  However, as explained above, plaintiffs could not become the owners of the works if the works were "made for hire."  Defendant contends that plaintiffs were put on notice of an authorship and ownership dispute – thereby triggering the three-year statute of limitations period – in the 1970s and 1980s when they signed agreements containing "works made for hire" provisions, as this language was an "express assertion of sole authorship or ownership" and

---

[31]
 *Kwan*, 634 F.3d at 229 (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)).

[32]
 *Id*.

[33]
 *Id.*

[34]
 *Id*. at 230.

[35]
 Defendant argues that this is true for all claims, regardless of whether the effective date of termination has or has not passed.  *See* Def's. Mem. at 6-15.

reflected a "repudiation" of any authorship or ownership claim by plaintiffs.[36]  On this ground, defendant argues that plaintiffs' claims are now time barred, and that this is true whether or not the works qualify as "made for hire" within the meaning of the Act.  The salient fact, UMG contends, is that plaintiffs knew when they executed their contracts that another party was declaring itself to be the legal author and owner.

In support of its argument, defendant analogizes plaintiffs' claims to those brought in *Aday v. Sony Music Entertainment*.[37]  There, recording artist Meat Loaf entered into an agreement with a production company.  The 1977 agreement included a work made for hire clause, stating "[s]olely for the purposes of any applicable copyright law, all persons rendering services in connection with the recording of master recordings shall be deemed 'employees for hire' of [the record company.]"[38]  Almost thirty years later, Meat Loaf sought a declaration stating that he was "not, and never was, an 'employee for hire.'"[39]  In other words, Meat Loaf argued that he always had been the sole owner of his copyright. The Court held that the three-year statute of limitations began to run in 1977 when Meat Loaf was put on notice "about any of the problems with the 'work for hire provision'" and his ownership claim was now barred.[40]

---

[36]

*Id*. at 8-15 (citing *Consumer Health Info. Corp. v. Amylin Pharm, Inc.*, 819 F.3d 992, 997 (7th Cir. 2016); *Cooper v. NCS Pearson, Inc*., 733 F.3d 1013, 1016 (10th Cir. 2014), *Kwan*, 634 F.3d at 228, *Aday v. Sony Music Entertainment*, No. 96-cv-0991 (MGC), 1997 WL 598410, at *5 (S.D.N.Y. Sept. 25, 1997)).

[37]

1997 WL 598410.

[38]

*Id*. at *2.

[39]

*Id*. at *4.

[40]

*Id*. at *4-*5.

The issue here is a close one. Defendant correctly points out that authorship is relevant to plaintiffs' claims. The FAC acknowledges this. For example, the FAC alleges that, for claims based on effective dates of termination which have passed, the artists are "currently the owner of the United States copyright" in the sound recordings[41] and that the artists with future effective termination dates "authored" the recordings.[42] Further, plaintiffs seek a declaratory judgment that "[s]ound recordings cannot be considered 'a work made for hire'" within the meaning of Section 101.[43]

Yet relevance is not enough. An ownership claim is masked as an infringement claim, for purposes of statute of limitations accrual, when plaintiffs' cause of action is "rooted in [a] contested assertion of ownership in the copyright[.]"[44] In the archetypal case, "the lawsuit is between two parties who claim ownership of the copyrights . . . and one party's claim of infringement is entirely a function of whether the other party is the sole owner of the disputed copyrights."[45] Here, while authorship is certainly pertinent, plaintiffs' infringement claim is a function of defendant's failure to comply with plaintiffs' termination notices. This distinction reveals why defendant's reliance on *Aday* is misplaced. Though plaintiffs indirectly challenge the validity of their "works made of hire" provisions by virtue of their infringement claim, unlike Meat

---

[41] *See, e.g.*, FAC ¶ 40.

[42] *See e.g.*, *id.* ¶¶ 68, 75.

[43] *Id.* ¶ 82(A).

[44] *See Simmons v. Stanberry,* 810 F.3d 114, 116 (2d Cir. 2016).

[45] *Flo & Eddie, Inc. v. Sirius XM Radio Inc*., 80 F. Supp. 3d 535, 542-43 (S.D.N.Y. 2015).

Loaf in *Aday*, the gravamen of plaintiffs' claim is defendant's refusal to recognize their termination rights. Termination rights are, by their very nature, about the "nature, extent, or scope of copying" a particular work. Indeed, it is impossible for there to be a legally cognizable infringement claim until a termination right vests, a valid and timely termination notice is sent, is ignored, and the copyright's grantee continues to distribute the work.

>          *b.*          *Section 203*

Congress's explicit rationale for enacting Section 203 and the text of Section 203(a)(3) suggests that a "repudiation" of authorship or ownership did not trigger the running of the statute of limitations on plaintiffs' claims.

Section 203(a)(3) prescribes the time period in which an author may terminate his or her grant. At the earliest, the termination right may be exercised thirty-five years after copyright ownership was transferred.[46] That the statute of limitations would begin to run against an artist the day the contract is signed would be incongruent with a termination right that does not vest for at least thirty-five years from that date.

The explicit purpose of Section 203 reinforces the conclusion that plaintiffs' copyright claims could not have accrued upon the signing of their contracts. Congress enacted the termination provision to safeguard "authors against unremunerative transfers."[47] These authors needed statutory protection "because of the unequal bargaining position of authors, resulting in part

---

[46]     17 U.S.C. § 203(a)(3).

[47]     H.R. Rep. No. 94-1476, 124 (Sept. 3, 1976).

from the impossibility of determining a work's value until it has been exploited."[48]  To restrict the termination right based on the artist's failure to bring a claim within three years of signing a recording agreement – a time during which the artist and recording company may still have disparate levels of bargaining power – would thwart Congress's intent and eviscerate the right itself.[49]

Defendant's argument is weakened  further by the music industry's practice of frequently inserting "work made for hire" language into recording contracts.[50]  Its  position requires that many artists, often early in their careers, would confront a choice when presented with a "works made for hire" provision.  They could refuse to sign the contract and jeopardize their chance for the record company to record or distribute the artist's music.  Or the artist could sign the contract and then bring a claim within three years to dispute the effect of the "work made for hire" provision in order to protect the copyright.  Either outcome would be inconsistent with Section 203.  The first would exemplify the unequal bargaining power Section 203 sought to correct. The second would render Section 203 meaningless, as its very purpose is to provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable.  Defendant's argument simply does withstand scrutiny in light of the unequivocal purpose of the termination provision.

---

[48]

     *Id*.

[49]

     *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002) (noting that the Copyright Act termination provisions "necessarily contemplate[] the likelihood that long-dormant copyright ownership issues will be awakened and litigated once the original . . . copyright term expires.").  *Marvel* involved Section 304(c) of the Copyright Act, "a close but not exact counterpart of Section 203."  H.R. Rep. No. 94-1476, 140 (Sept. 3, 1976).

[50]

     1 *Nimmer on Copyright* § 5.03 (2019) (noting that since sound recordings earned copyright protection in 1972, "virtually all contracts" between artists and recording companies include "work made for hire" provisions).

### 2. Whether Plaintiffs' Copyright Infringement Claims are Time Barred

For the foregoing reasons, the Court concludes that the statute of limitations for plaintiffs' infringement claim accrued after the effective date of termination passed. Plaintiffs brought these claims within the three-year statutory period and are not time-barred.[51]

### B. The Court Will Exercise its to Discretion to Deny Plaintiffs' Request for Declaratory Relief

Plaintiffs seek declaratory relief concerning the interpretation of the Copyright Act provisions relied upon by UMG to reject the artists' termination notices.[52] For example, plaintiffs seek a declaratory judgment resolving the issues of whether "[t]he sound recordings at issue are a 'work made for hire'"[53] and the "exercise by recording artists of their rights under §203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, constitutes a breach of contract of the recording agreements."[54] Plaintiffs therefore, in effect, seek a declaration that their termination notices are valid and their grants terminable.

---

[51]

The earliest effective date of termination alleged is May 22, 2017. FAC ¶ 32. The FAC was filed two years later, on June 5, 2019.

[52]

See id. ¶¶ 16, 82, 85, Prayer for Relief (C).

[53]

Id. ¶¶ 82(A)-(B), 83(A)-(B), Prayer for Relief (C).

[54]

Id. ¶¶ 82(I), 83(H), Prayer for Relief (C).

To the extent that plaintiffs seek a declaratory judgment on certain legal issues resolved by this opinion, declaratory relief is unnecessary. See, e.g., id. ¶¶ 82(H), 83(G), Prayer for Relief (C) (seeking a determination that plaintiffs' assertion of their termination rights are not time barred).

The Declaratory Judgment Act bestowed a "broad grant of discretion" on district courts to determine whether to exercise jurisdiction over an action for declaratory judgment.[55] The Second Circuit has instructed district courts to consider several factors in determining whether to exercise this discretion, including " whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved" and "whether a judgment would finalize the controversy and offer relief from uncertainty."[56]

It is not clear how either objective would be achieved by the declaratory relief sought. The uncertainty here is whether UMG will continue to distribute plaintiffs' sound recordings after the effective date of termination claimed by a plaintiff has passed. This uncertainty is eliminated if prior to the effective date of termination, the termination notices were declared valid and there were no grounds on which defendant could argue that the grants are not otherwise terminable. Plaintiffs suggest that the declaratory relief they seek, if granted, would achieve this outcome because it would address the various grounds defendant has cited when rejecting the termination notices. This would be so, however, only insofar as defendant never proffers new arguments as to why the termination notices are invalid or why the grants could not be terminated. The declaratory judgment plaintiffs seek now therefore could not guarantee that UMG would accept the termination notices and cease exploitation of the sound recordings after the effective date of termination. In other words, the cloud of uncertainty would not necessarily be lifted fully.

Moreover, plaintiffs have not alleged why, other than it would presently halt defendant's denials of the termination notice, the declaratory relief sought is necessary. While the

---

[55]

*Dow Jones & Co v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

[56]

*Id.* (citation omitted).

Court could speculate as to why it would be useful to resolve certain legal issues prior to the effective date of termination, no such reason has been alleged.[57]

Plaintiffs' claim for declaratory relief is dismissed.[58]

## IV. UMG Received Sufficient Notice of the Grants to be Terminated

### A. Termination Notice Requirements

A termination notice must contain a "clear identification" of certain information, including the "the date of execution of the grant being terminated and, if the grant covered the right of publication of a work, the date of publication of the work under the grant," "the title of the work and the name of the author," "a brief statement reasonably identifying the grant to which the notice of termination applies," and the effective date of termination.[59] A termination notice with incorrect information is valid if the errors were made in good faith and "without any intention to deceive,

---

[57]

Compare *Ray Charles Found v. Robinson*, 795 F.3d 1109, 1117 (9th Cir. 2015) (alleging "that the notices of termination immediately clouded [the Foundation's] ability to assess its future income stream and to rely on the royalties") *with* FAC ¶ 86 (alleging that a declaratory judgment is necessary because defendant "repeatedly denied Plaintiffs' rights, and the rights of hundreds of class members, and has denied all of them the right to own the U.S. copyright in and to the sound recordings for the post-termination period.").

[58]

When the complaint was filed on June 5, 2019, the effective date of termination had passed for the following albums: *Ignition* (Waite); *Honky Ton Masquerade, Down the Dog, Live Shots*, and *Musta Notta Gotta Lotta* (Ely); and *Kasim* (Sulton). *Id*. ¶¶ 32, 44, 54. While the case was pending, the effective dates of termination passed for *No Breaks* (Waite, June 16, 2019) and *Dawn of the Dickies* (the Dickies, September 12, 2019). *Id*. ¶¶ 37, 77. Assuming plaintiffs' termination notices were valid and that UMG has continued to distribute the recordings, plaintiffs now have an infringement claim. However, plaintiffs have not yet filed any such claims.

The effective dates of termination have not still not passed for *Mask of Smiles* (Waite, July 27, 2020) and *Surprise* (Straw, June 22, 2024). *Id*. ¶ 37, 70.

[59]

37 C.F.R. § 201.10(b)(1).

mislead or conceal relevant information" and if the errors are harmless and "do not materially affect the adequacy of the information required to serve the purposes of [Section 203]."[60] This purpose is to award artists an opportunity to obtain a more equitable share of the copyright's profits. But to do so, the grantee must be given "reasonable opportunity to identify the affected grant and work from the information given in the notice."[61]

### B. *Plaintiffs' Termination Notices*

Defendant argues that each of plaintiffs' terminations notices contain material omissions and errors rendering them invalid. The termination notices omit the dates of the relevant grants' execution and list incorrect dates for the agreements governing the grants. As to the latter issue, Ely's notice purports to terminate a grant "dated in or about 1978," though defendant claims that the relevant albums were recorded under contracts from 1976, 1979, and 1980.[62] Similarly, the other termination notices list dates that differ by one or two years from the actual agreements.[63]

These defects are harmless. Despite the incorrect dates and omissions, defendant has sufficient notice as to which grants and works plaintiffs seek to terminate. While perhaps in other circumstances an omitted execution date could be fatal to the validity of a termination notice,

---

[60] *Id.* § 201.10(e).

[61] Termination of Transfers and Licenses Covering Extended Renewal Term, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977).

[62] *See* FAC Ex. C; Def's. Mem. at 18-19.

[63] *See* FAC Exs. E, G, I; Def's. Mem. at 18-19.

defendant possesses the relevant agreements and can discern the relevant dates.[64] Defendant cannot use the parties' agreements to claim that the statue of limitation bars plaintiffs claims and then feign ignorance of which grants plaintiffs purport to terminate. Here, viewing the facts in the light most favorable to plaintiffs, it is plausible that defendant can reasonably identify the grants and works plaintiffs seek to terminate.[65]

Nor is there any sufficient basis for claiming that the errors were not made in good faith. Defendant argues that because plaintiffs' counsel is a purported "copyright termination expert" he presumably "knew what he was doing – namely, deliberately failing to comply with the Copyright Office's regulations."[66] This is a baseless attack. Plaintiffs assert that they no longer possessed the relevant agreements, an assertion that the Court must credit on this motion. Indeed, as the Copyright Office noted when promulgating 37 C.F.R. § 201.10, "we . . . must recognize that entirely legitimate reasons may exist for gaps in [grantor's] knowledge and certainty" of required termination notice contents.[67] Because the notices' defects were harmless and not made with an

---

[64]

See Ransom Decl. Exs. A-K.

The Court recognizes that the harmless error provision necessarily assumes that there has been an error, that is, that a piece of incorrect information was included "in [the] notice." 37 C.F.R. § 201.10(e)(1). However, the Court does not read the provision so narrowly as to preclude a finding that an omission of a discrete piece of information can be harmless under the circumstances.

[65]

Any grants not listed in both the FAC and termination notices governing the rights to the works are not alleged nor are "reasonably identified" in the grant. Plaintiffs cannot bring infringement claims based on these purported grants.

[66]

Def's. Mem. at 20.

[67]

Termination of Transfers and Licenses Covering Extended Renewal Term, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977).

intent to deceive, mislead, or conceal information, defendant's motion is denied as to its claim that plaintiffs' termination notices are facially invalid.

## V. *Grants May be Terminated Only by the Grantor*

Only grants "executed by the author" (or the statutorily designated successor) may be terminated.[68]  Therefore, third parties to a contract and loan-out companies, which "loan" out an artist's services to employers and enter into contracts on behalf of the artist, do not have a termination right under the statute.[69]

It is undisputed that loan-out companies executed the Waite grants and that a third party company, South Coast, executed the grant for Ely's recordings made under his 1979 agreement.[70]  In these instancesg, neither Waite nor Ely was the grantor.  The plain language of the statue precludes either of these plaintiffs from effectuating termination.

Plaintiffs assert that Waite and Ely can terminate their grants despite their use of third parties.  They contend that Waite and Ely issued a grant to the third parties, which then transferred the rights to UMG's predecessors.  The third parties are thus, like UMG's predecessors, grantees rather than grantors. The FAC does not support this allegation.

Plaintiffs argue also that the loan-out company is only a tax-planning device.  Even

---

[68]     17 U.S.C. § 203(a).

[69]     *Great Entm't Merch., Inc. v. VN Merch., Inc.*, No. 95-cv-9333 (LBS), 1996 WL 355377, at *1 n.1 (S.D.N.Y. June 27, 1996).  Loan-out companies are common in the entertainment industry.  *Id.*  The purpose of this corporate structure is to limit personal liability and secure tax treatment.  *Id.*

[70]     FAC ¶ 30; Ransom Decl. Ex. E.

so, people cannot use a corporate structure for some purposes – *e.g.* taking advantage of tax benefits

– and then disavow it for others. While Waite and his loan-out companies, like Heavy Waite, Inc.,

perhaps are distinct entities only in a formal legal sense,[71] the statutory text is clear: termination

rights exist only if the *author* executed the grant. The Supreme Court recently reaffirmed that courts

must adhere to the text the Copyright Act, even if the Act "has not worked as Congress likely

envisioned."[72] The unambiguous text precludes Waite and Ely from terminating the copyrights

granted by third parties. Defendant's motion to dismiss claims related to grants executed by Waite's

loan-out companies or Ely's third party company is granted.

VI.    *Ely Has Not Sufficiently Alleged that any Grants Executed Pursuant to his 1976*
       *Agreement are Terminable under Section 203*

Section 203's termination right extends only to grants executed on or after January

1, 1978, regardless of when the work was created.[73] The Copyright Act's other termination

provision, Section 304(c), pertains to terminating grants of renewal rights executed prior to January

1, 1978.[74] To terminate under Section 304(c), the work must have been created and copyrighted

---

[71]

The other loan-out companies are Moonwalk Music, Inc. and Diamond Stripe, Inc. FAC Ex. B at 2.

[72]

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 892 (2019).

[73]

17 U.S.C. § 203(a).

[74]

*Id.* § 304(c).

before January 1, 1978.[75]  The dynamic between Section 203 and 304(c) created a category of grants for which there was no termination right.  These "gap grants" refer to those grants executed prior to January 1, 1978, but the work was created on or after January 1, 1978.  Based on the grant execution date, Section 304(c), but not Section 203, is applicable.  However based on the work's creation date, the grant could be terminated only under Section 203.  Accordingly, gap grants cannot be terminated under either provision.

The Copyright Office promulgated a rule in 2011 clarifying the issue: "In any case where an author agreed, prior to January 1, 1978, to a grant of a transfer or license of rights in a work that was not created until on or after January 1, 1978, a notice of termination of a grant under section 203 of title 17 may be recorded if it recites, as the date of execution, the date on which the work was created."[76]  In other words, the Copyright Office's position is that "Gap Grants are terminable under section 203."[77]  However, the Copyright Office noted that its decision to accept recordation of termination notices for gap grants was "without prejudice to how a court might ultimately rule on whether the document is a notice of termination within the scope of Section 203."[78]  Courts have not yet addressed whether Section 203 applies to gap grants.  For reasons that will become clear, the Court need not address it here.

Defendant argues that Ely's grants transferred pursuant to his 1976 agreement are not

---

[75]

   *Id*.

[76]

   37 C.F.R. § 201.10(f)(1)(ii)(c).

[77]

   Gap in Termination Provisions, 76 Fed. Reg. 32316 (June 6, 2011).

[78]

   *Id*. at 32317.

terminable under Section 203.[79]  Assuming *arguendo* that the Court adopted the Copyright Office's view, the termination notice must still contain the requisite information.  Instead of the grant date's execution, under the 2011 Copyright Office regulation, Section 203 termination notices for gap grants must contain "the date on which the work was created."[80]  "Sound recordings are created for purposes of the Copyright Act on the date they are 'fixed,' or recorded."[81]  Ely's termination notice includes only the publication date[82] and the FAC alleges the release" date.[83]  "Publication" refers to the distribution or transfer of ownership, not to the creation of a work.[84]  Nor does "release" indicate when the work was "created."  Ely's termination notice is thus insufficient.

A footnote in defendant's brief reveals that "UMG's documents reflect [that Ely's] sound recordings [made pursuant to the 1976 agreement] were recorded in 1977."[85]  For the reasons stated above, that defendant has the missing information renders the omission harmless.  However, if this date is correct, then this pre-1978 creation is not covered by Section 203, even as a gap

---

[79]

    Under this agreement, Ely granted a transfer of the copyright in the sound recordings comprising the album *Honky Tonk Masquerade*.  FAC ¶ 42.

[80]

    37 C.F.R. § 201.10(f)(1)(ii)(c).

[81]

    *Mtume v. Sony Music Entertainment*, No. 18-cv-6037 (ER), 2019 WL 4805925, at *3 (S.D.N.Y. Sept. 30, 2019) (citation omitted); *see also* 17 U.S.C. § 101 ("A work is 'created' when it is fixed in a copy or phonorecord for the first time.').

[82]

    FAC Ex. C at 3.

[83]

    FAC ¶ 42.

[84]

    *See* 17 U.S.C. § 101.

[85]

    Def's. Mem. at 27 n.13.

grant.[86]  Therefore, either the 1977 date is correct and the notice's deficiency is a harmless error, but outside the scope of Section 203, or the date is incorrect, but the termination notice is invalid because the "creation date" is not alleged, inhibiting UMG's ability to determine which grant and work Ely seeks to terminate.  Accordingly, defendant's motion is granted as to sound recordings made pursuant to Ely's 1976 agreement that were created prior to January 1, 1978.


*Conclusion*

For the reasons stated above, defendant's motion to dismiss [DI 49] is granted as to (1) plaintiffs' request for declaratory relief; (2) Waite and Ely's claims based on grants transferred by third parties; and (3) Ely's claim related to his 1976 agreement for sound recordings that were created prior to January 1, 1978.  Defendant's motion is denied in all other respects.


SO ORDERED.

Dated:          March 31, 2020

/s/    Lewis A. Kaplan

_____

Lewis A. Kaplan
United States District Judge

---

[86] *See* Gap in Termination Provisions, 76 Fed. Reg. 32316 (June 6, 2011) (explaining that gap grants refer to when an "author agreed to make a grant prior to January 1, 1978, but the work in question was *created* on or after January 1, 1978.") (emphasis added).