## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOHN WAITE, an individual; EARLE R. ELY, JR. p/k/a JOE ELY, an individual; KASIM SULTON, an individual; SUSAN STRAW HARRIS p/k/a SYD STRAW, an individual; LEONARD GRAVES PHILLIPS, an individual; STAN SOBOL a/k/a STAN LEE, an individual, and ISRAEL CABALLERO, an individual; and STEVE WYNN, an individual; DENNIS MEHAFFEY p/k/a DENNIS DUCK, an individual; and DAVID PELLISH p/k/a DAVE PROVOST, an individual, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group; CAPITOL RECORDS, LLC, a Delaware limited liability company; and DOES 1 through 10,

Defendants.

Case No. 1:19-cv-01091-LAK

**CLASS ACTION FIRST SECOND AMENDED COMPLAINT FOR:**

**(1) COPYRIGHT INFRINGEMENT; AND**

**(2) DECLARATORY RELIEF**

**DEMAND FOR TRIAL BY JURY**

Plaintiffs JOHN WAITE, an individual ("Waite"), and EARLE R. ELY, JR. p/k/a JOE ELY ("Ely"), an individual, KASIM SULTON ("Sulton"), an individual, and SUSAN STRAW HARRIS p/k/a SYD STRAW ("Straw"), an individual, LEONARD GRAVES PHILLIPS ("Phillips"), an individual, STAN SOBOL a/k/a STAN LEE ("Lee"), an individual and, ISRAEL CABALLERO ("Caballero"), an individual, STEVE WYNN ("Wynn"), an individual, DENNIS MEHAFFEY p/k/a DENNIS DUCK ("Mehaffey"), an individual, and DAVID PELLISH p/k/a DAVE PROVOST ("Pellish"), an individual, (collectively, "Plaintiffs") on behalf of themselves and all other similarly situated authors of sound recordings ("sound recordings") who have served Notices of Termination pursuant to §302 203 of the Copyright Act of 1976 upon DefendantDefendants UMG RECORDINGS, INCRecordings, Inc. (also known as and doing business as "Universal Music Group" and "UMG") (hereinafter "UMG" or "and Defendant Capitol Records, LLC ( "Capitol") and DOES 1-10 (collectively "Defendants"), allege as follows. for their Second Amended Complaint.[1]

**NATURE OF THE ACTION**

1.    This class action lawsuit filed on behalf of Plaintiffs and two classes of similarly situated recording artists and other authors – a class of artist victims of Defendants' ongoing, willful copyright infringement and a class of artists who seek immediate declaratory relief – seeks to protect and vindicate the § 203 termination rights granted by Congress under the Copyright Act of 1976 that Defendants routinely seek to thwart through an integrated and systematic corporate

---

[1]    Plaintiffs hereby amend their First Amended Complaint reserving their appellate rights with respect to the dismissal of certain claims alleged on behalf of John Waite and Joe Ely and to clarify that Plaintiffs continue to assert claims on behalf of John Waite and Joe Ely to the extent that the grants were made by them personally and not by third parties. Plaintiffs also reserve the appellate rights of Susan Straw Harris with regard to the claim for declaratory relief.

154498.00601/120317498v.1155811.00601/123147253v.4

scheme to reject valid termination notices in the hopes that the artists will surrender to, or otherwise acquiesce in, Defendants' continued and unlawful commercial exploitation of their valuable works.

2.     1. Since the first Copyright Act was enacted in 1790, that Act, and the several successive copyright statutes have always had a feature which allows a second chance for authors (or their heirs) to reclaim copyrights from unwise grants made by authors early on in their careers, close to the creation of the works. While the particular features of those laws, and the length of the terms and statutory scheme of the terminations involved, have changed and evolved, the strong "second chance" concept has remained. In fact, the very first act, the Copyright Act of 1790, borrowed that concept from the English Statute of Anne, enacted in 1709, the first copyright law. The theme continued in the Copyright Acts of 1831, 1870, and 1909.

3.     2. Likewise, § 203 of the Copyright Act of 1976 modified the Act of 1909 substantially, but yet continued the "second chance" policy with full force. According to the Congressional Record, the purpose of the statute was to protect authors and their heirs from "the unequal bargaining position of authors" in dealing with unpublished works, because of "the impossibility of [an author] determining [his or her] work's prior value until it has been exploited." H.R.Rep. No. 94-1476, at 124 (1976). Section 203 provides that authors (a term that includes both songwriters and recording artists) may terminate grants of copyright ownership thirty-five (35) years after the initial grant, generally computed from the date of the publication of those works subject to the grant.

4.     3. But while While the Copyright Act confers upon authors the this valuable "second chance," that they so often need, the authors of sound recordings, in particular, who have attempted to avail themselves of this important protection have encountered not only resistance from many record labels, they have been subjected to the have faced stubborn and unfounded disregard of their federal legal

3

rights ~~under the law~~by Defendants and, in many instances, willful copyright infringement. In fact, Defendants have repeatedly and systematically sought to eviscerate the important protections granted by this federal termination right.

5. ~~4.~~ Plaintiffs Waite, Ely, Sulton, Straw, Phillips, Lee, ~~and~~ Caballero, Wynn, Mehaffey, and Pellish, and hundreds of other recording artists (or their successors), have served Notices of Termination upon ~~UMG~~Defendants pursuant to the provisions set forth in 17 U.S.C. § 203, but ~~UMG has~~Defendants have routinely, uniformly and systematically refused to honor them.

6. These refusals are made, in every instance, on similar ~~legal~~ grounds, the first and foremost of which is ~~UMG's~~Defendants' position that the sound recordings created by recording artists under contract with ~~UMG~~Defendants (or ~~its~~their affiliated or predecessor companies) are "works made for hire," and, therefore, not part of the subject matter of § 203. ~~UMG claims~~Defendants claim that the recordings are "works made for hire" solely because of certain contractual language that is found in every ~~UMG~~one of Defendants' recording ~~agreement~~agreements.

7. Through this artifice, Defendants seek to intimidate and bully the recording artists – most of whom now are well over 60 years of age – from enforcing their federal legal rights that supersede Defendants' sharp commercial practices.

8. As a result of ~~UMG's policy, UMG has~~Defendants' policy and practices, Defendants have refused to acknowledge that *any* recording artist (or ~~his or her successor~~their successors) has the right to terminate and take over control of the sound recordings or enter into an agreement with a different label for the exploitation of recordings, after the effective date of termination. ~~In many instances~~

9. ~~, UMG has~~Overwhelmingly, Defendants have continued to exploit the recordings after the effective date set forth on each Notice of Termination, thereby

engaging in willful copyright infringement of the United States copyright in those recordings.

10.    As a result of ~~UMG's~~Defendants' actions, ~~UMG has~~Defendants have effectively stymied any chance that the ~~class plaintiffs~~Plaintiffs or the members of the Classes have of entering into a new agreement with a third party, or even exploiting the recordings themselves, as is their right. ~~As a result, these~~ under the law. In doing so, Defendants' actions ~~by UMG have~~have negatively impacted and/or effectively destroyed the very salability and commercial value (to Plaintiffs) of the post-termination rights in the recordings that the Copyright Act expressly guarantees.

11.    ~~5.~~  On account of ~~UMG's~~Defendants' repeated, methodical, and willful copyright infringement, Plaintiffs (except Straw) seek recovery of actual and/or statutory damages ~~are the remedy. For those recordings for which the associated Notice of Termination has not reached its~~on behalf of themselves and the members of Class A (as hereinafter defined below). Plaintiff Straw seeks immediate declaratory relief on behalf of Class B (as hereinafter defined below) to vindicate the rights of the recording artists for whom the effective date of the termination, in the ~~proper remedy is declaratory relief. With regard to both copyright infringement and all recordings for which a Notice~~Notices of Termination ~~has been sent to UMG,~~will not occur prior to class certification.

12.    Plaintiffs further seek permanent injunctive relief, ~~addressing and preventing UMG's lawless behavior, is warranted~~ restraining Defendants, their affiliates and all those acting in concert with them, from engaging in this systematic scheme to eviscerate and thwart all class members' valid termination rights. Therefore, Plaintiffs bring this class action for copyright infringement, declaratory relief, and injunctive relief, on behalf of themselves and all similarly situated recording artists (or their successors) who have sent Notices of Termination to ~~UMG~~Defendants with an effective date of termination on or after

5

January 1, 2013, as more precisely described in ¶~~15~~47, below.

## THE PARTIES

13.   ~~6.~~ Plaintiff ~~JOHN WAITE (~~"Waite~~")~~ is an adult individual who is a resident of Santa Monica, California. Waite is a British singer and songwriter, who began his career in the early 1970s as a member of the musical group The Babys. In 1983, he began a solo career and released several successful albums.

14.   ~~7.~~ Plaintiff ~~JOE ELY (~~"Ely~~")~~ is an adult individual who is a resident of Austin, Texas. Ely, an American artist, has had a long career in music as a singer, songwriter, and guitarist. Since releasing his first solo album in 1977, he has recorded a total of eighteen studio albums on several labels, including MCA, which is a predecessor to UMG/Capitol. Ely has also been a performer on numerous albums by other recording artists, including The Clash and Rosie Flores.

15.   ~~8.~~ Plaintiff ~~KASIM SULTON (~~"Sulton~~")~~ is an adult individual who is an American bass guitarist, keyboardist and vocalist, and is best known for his work with Todd Rundgren's band, Utopia. Sulton has been a frequent collaborator, bassist and singer on many of Todd Rundgren's projects and solo tours, as well as a bassist and touring musician with the performer known as Meatloaf.

16.   ~~9.~~ Plaintiff ~~SUSAN STRAW HARRIS p/k/a Syd Straw ("Straw") is an~~ Straw is an adult individual who is an American singer and songwriter. She was a member of the band called Golden Palominos, and has contributed vocals to recordings by Rickie Lee Jones, Leo Kottke, and Dave Alvin.

17.   ~~10.~~ Plaintiff ~~LEONARD GRAVES PHILLIPS (~~"Phillips~~")~~ is an adult individual who is the lead vocalist for the California punk rock band called The Dickies.

18.   ~~11.~~ Plaintiff ~~STAN SOBOL a/k/a STAN LEE (~~"Lee~~")~~ is an adult

~~154498.00601/120317498v.1~~155811.00601/123147253v.4

individual who is the guitarist and vocalist for ~~the~~ The Dickies.

19. ~~12.~~ Plaintiff ~~ISRAEL CABALLERO ("Caballero")~~ is an adult individual who is the brother, and the statutory successor-in-interest to Carlos Caballero p/k/a Karlos Kaballero~~, who~~.  Kaballero was the original drummer of The Dickies, and ~~who~~ died in 2009.

20.    Plaintiff Wynn is an adult individual who is the lead vocalist and a guitarist for the rock band called The Dream Syndicate.

21.    Plaintiff Mehaffey is an adult individual who is the drummer for The Dream Syndicate.

22.    Plaintiff Pellish is an adult individual who was bass player for The Dream Syndicate in 1984.

23.    Wynn, Mehaffey, and Pellish constitute a majority of the authors of The Dream Syndicate works at issue, and have standing to assert their claims, pursuant to 17 U.S.C. § 203(b)(3).

24. ~~13.~~ Defendant UMG RECORDINGS, INC. ~~("UMG") is a Delaware corporation doing business as~~ is an American global music corporation organized under Delaware law.  It is also known as and does business interchangeably as "UMG" and "Universal Music Group~~, and which has~~" (referred to herein as "UMG," "Universal Music Group" and/or "UMG/Universal Group").  It is a subsidiary of Vivendi Universal S.A. ("Vivendi"), with its principal place of business and global corporate headquarters located ~~in~~ at 2220 Colorado Avenue, Santa Monica, California. UMG also maintains U.S. headquarters at 1755 Broadway, New York City, New York offices, where Island Records, Def Jam Recordings, Republic Records, Decca Label Group, Spinefarm Records, Geffen Records, and other of UMG's labels are headquartered. ~~UMG utilizes the tradename Universal Music Group for its various corporate operations, and is an~~

7

American global music corporation that is a subsidiary of the French media conglomerate Vivendi Universal S.A.

25.     In corporate filings with the State of California, where it is registered as a foreign corporation, UMG describes its business as "manag[ing] recorded music assets."

26.     UMG utilizes the trade names "UMG" and "Universal Music Group" for its various corporate music-based operations.  It is also the successor-in-interest to several other companies and/or brands within the Universal Music Group, including, but not limited to, Chrysalis, PolyGram Records, Inc., A & M, Capitol, EMI, Motown, Def Jam, Geffen, and all of the companies to which UMG/Universal Music Group succeeded by merger, acquisition, business combination, restructuring or operation of law.

27.     Vivendi is a French mass media conglomerate headquartered in Paris, France. According to its website, music is its most important asset through UMG/Universal Music Group, with 2019 year-end revenues of €7.19 billion. (*See* www.vivendi.com.) Vivendi recently valued Universal Music Group at approximately $30 billion when it sold a 10% stake in Universal Music to Tencent Holdings Limited for $3 billion in January 2020. Such an astronomical valuation is built upon the actual and projected revenue streams generated by the sound recordings of musical artists like the Plaintiffs and the Plaintiff class members. Such massive revenues have incentivized corporate management to vigorously reject the Plaintiffs and the Plaintiff class members' lawful attempts to reclaim their rights.

28.     UMG is considered one of the "Big Three" record labels, along with Sony Music and Warner Music Group. UMG is one of the world's largest recorded music and music publishing companies, and includes record labels such

as Capitol, Motown, Def Jam and Geffen. UMG is successor to, and was formerly named, PolyGram Records, Inc.

29.     UMG is a record label, as well as a global music conglomerate, and has released music under the Universal and Mercury imprints and is the successor-in-interest to many record labels, including EMI, Capitol, Geffen, A&M, and Chrysalis imprints, among many others. In fact, UMG holds itself out to the public and musical artists as owning and controlling these record labels, including on its public website www.universalmusic.com.

30.     Moreover, according to the Universal Music Group website terms and conditions, "all notices not related to these Site Terms and Conditions should be sent to: UMG Recordings, Inc. c/o Legal Dept. 2220 Colorado Ave, Santa Monica, CA 90404."  Defendants provide this instruction and directive with respect to all the labels and brands identified on the Universal Music Group website, including with respect to UMG, Capitol and the other labels and brands under the Universal Music Group "umbrella" and within the UMG/Universal Music conglomerate.

31.     In fact, when UMG responded after receipt of the Notices of Termination, UMG representatives responded on behalf of UMG and its label via correspondence on UMG letterhead regardless of the identity of the underlying record label.

32.     Defendant Capitol Records, LLC ("Capitol") is a Delaware limited liability company, and which has its principal place of business and global corporate headquarters located in Santa Monica, California, at the same address as the UMG entities. Capitol also maintains offices at 1755 Broadway, New York City, within this judicial district. Capitol originally incorporated in Delaware under the name Capitol Records, Inc., and later converted to a limited liability company. In corporate filings with the State of California, it states that its type of business is

"Recorded music."

33.     Capitol utilizes the trade name "Capitol Records" for its operations, and also is the successor-in-interest to several other companies within the Universal Music Group, including, but not limited to, Chrysalis Records, Inc., EMI America Records, Inc., Virgin Records America, Inc., and Capitol Records, Inc. As used herein, the term "Capitol" includes both Capitol Records, LLC and all of the companies to which Capitol succeeded by operation of law, acquisition, business combination, restructuring or merger.

34.     In the corporate structure of the conglomerate known as the Universal Music Group, UMG functions as the corporate agent of the other business entities that are part of the Universal Music Group. UMG, through its business and legal personnel, oversees and conducts the integrated business operations servicing the relationships with the Plaintiffs and the class members, including accounting for revenues generated through digital and physical sales of sound recordings, negotiating transactions and commercially exploiting the sound recordings created by Plaintiffs and the class members.

35.     UMG and Capitol have the same business address in Santa Monica, California, so any correspondence sent to the Universal Music Group is directed, without exception, to personnel who perform legal and business affairs functions for both UMG and Capitol. UMG and Capitol share the same office space, the have substantially the same personnel, and, notably, the same in-house attorneys and business affairs staff. Put simply, notwithstanding the myriad and complex interrelationships of brands, labels, divisions and affiliates, the core servicing and music exploitation business is conducted under the trade name of Universal Music Group and/or UMG for them all through a centralized, administrative servicing and recordkeeping function.

154498.00601/120317498v.1155811.00601/123147253v.4

36.     Further, consistent with the instructions on the Universal Music website, the Plaintiff recording artists and the class members sent their Notices of Termination to Defendants' business address located at 2220 Colorado Avenue in Santa Monica, California, addressed to "Universal Music Group." Universal Music Group and/or UMG function as corporate agent for, specifically, Capitol, and the Notices were received, read, and analyzed by the same business affairs staff for any matter involving either UMG or Capitol.

37.     The legal and business affairs staff of UMG has full and complete access to all relevant and pertinent documents and information relating to both UMG and Capitol, including decades-old recording agreements, correspondence, royalty statements, financial analysis, sales information, catalogue database information, so-called "metadata" for all releases (including various identification codes utilized in the music industry for tracking digital performances and sales), release dates and dates of publication, and revenue information of all kinds and nature.

38.     This access to documents and information extends not only to UMG and Capitol, but the corporations and entities that have been subsumed or merged into Capitol, including, but not limited to, Chrysalis Records, Inc., EMI America Records, Inc., Virgin Records America, Inc., and Capitol Records, Inc.

39.     On account of this unquestionably close relationship between UMG and Capitol, Notices of Termination sent to the Universal Music Group were valid for both corporations as both companies unquestionably were put on notice of the recording artists' intent to terminate by their use of common staff and personnel.

40.     Furthermore, upon information and belief, "UMG" and "Universal Music Group" are trade names utilized by UMG Recordings, Inc., which holds itself out publicly as the owner and controller of Capitol. Both UMG and Capitol

have identical or nearly identical officers and directors.

41.    ~~14.~~ The true names and capacities (whether individual, corporate, associate or otherwise) of the ~~defendants~~Defendants named herein as Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue said ~~defendants~~Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when such have been ascertained. Upon information and belief, each of the Doe ~~defendants~~Defendants herein is responsible in some manner for the occurrences herein alleged, and Plaintiffs' and class members' injuries as herein alleged were proximately caused by such ~~defendants~~Defendants' acts or omissions.

42.    ~~15.~~ Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned in this Complaint, UMG, Capitol, and each of the Doe ~~defendants~~Defendants were the agent of each other and, in doing the things alleged in this Complaint, were acting within the course and scope of such agency.

## JURISDICTION AND VENUE

43.    ~~16.~~ This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and also seeks declaratory relief with regard to several legal issues that arise from the language and interpretation of the Copyright Act.

44.    ~~17.~~ This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1331 and 1338(a).

45.    ~~18.~~ This Court is empowered to issue a declaratory judgment and further necessary or proper relief pursuant to 28 U.S.C. §§2201 and 2202.

46.    ~~19.~~ Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because both UMG ~~is~~and Capitol are subject to personal jurisdiction in this District and because a substantial part of the events or omissions

by UMG and Capitol giving rise to the claims occurred in this District.

## CLASS ALLEGATIONS

47. 20. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. Proc. 23 on behalf of themselves and on behalf of a class two classes of similarly situated recording artists, defined as follows:

> **Class A:** All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination on UMG pursuant to § 203 of the Copyright Act (or who may serve such Notice in the pendency of this action), with describing an effective date of termination of for a particular work (i) occurring on or after January 1, 2013 and (ii) occurring no later than the date the Court grants class certification of Class A.

> **Class B:** All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination pursuant to § 203 of the Copyright Act, describing an effective date of termination for a particular work (i) occurring on or after the date the Court grants class certification of Class A and (ii) occurring no later than December 31, 2030.

48. Classes A and B shall include all persons serving any Notice of Termination on Defendants up to and including the date on which the Court rules on Plaintiffs' motion for class certification and shall not be limited to persons who served Notices of Termination as of the date of the filing of the original or any amended complaint in this action. Membership in Class A or B shall be determined based upon whether the effective date of termination occurs on or before the date the Court grants certification of Class A.

13

49.     ~~, 2013 or later, and who have not~~Excluded from Classes A and B is any officer, director or person employed by Defendants and any recording artist who has entered into a ~~further~~valid written agreement with ~~UMG (~~Defendants pursuant to § 203(b)(4)~~)~~ wherein UMG ~~has~~and/or Capitol have been granted ~~"a~~ further ~~rights~~grant" therein.

50.     ~~21.~~This action has been brought and may be properly maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed ~~class~~classes are readily and easily ascertainable and identifiable.

51.     ~~22.~~The members of the ~~class~~classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe, and on that basis allege, that there are hundreds of members in the ~~class~~classes who can be readily located, identified from various records and databases (including those maintained by ~~UMG~~Defendants and the United States Copyright Office), and notified of this action.

52.     ~~23.~~Plaintiffs' claims for copyright infringement, injunctive and declaratory relief are typical of the claims of the members of the ~~class~~classes, and Plaintiffs' interests are consistent with and not antagonistic to those of the other members of the class they seek to represent.

53.     Plaintiffs and all members of ~~the class~~Class A have sustained damages and face irreparable harm arising out of Defendants' continued infringement and disregard of the Notices of Termination as alleged herein and, thus, are entitled to recover actual damages and/or statutory damages and obtain injunctive relief to prevent further wrongful conduct by Defendants. ~~In other instances, class members have had the salability of their sound recordings damaged and/or destroyed by UMG's behavior, and seek declaratory relief for the legal issues discussed below.~~

54.   24. Plaintiffs have no interests that are adverse to, or which conflict conflicting with, the interests of the absent members of the class classes and they are able to fairly and adequately represent and protect the interests of such a class. Plaintiffs believe strongly in the protection of the rights of recording artists and are committed to protecting such rights.

55.   Plaintiffs (except Straw) have raised a viable claim and compelling claims for copyright infringement of the type reasonably expected to be raised by members of the class classes and will diligently and vigorously pursue that claim. the infringement claims.

56.   Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action.

57.   24. If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to include additional class representatives to represent the any class or to assert additional claims as may be appropriate. Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action.

58.   Questions Class certification under Fed. R. Civ. Proc. 23(b)(3) is warranted because questions of fact and law (to the extent that any may exist) are common to all members of the class and would plainly predominate over any questions affecting only individual members of the class under Fed. R. Civ. Proc. 23(b)(3). These common legal and factual questions, to the extent that any may exist, do not vary from class member to class member, and can be determined through common proof without reference to the individual circumstances of any class member, including. Said questions include (without limitation) the following:

(A)   Whether sound recordings can ever be considered "a work made for hire," as that term is defined in the Copyright Act, because where

(1) the definition of "a work made for hire" set forth in § 101 of the Copyright Act does not include sound recordings as being one of the enumerated types of "specially ordered" or "commissioned" works that can be a work made for hire; , and (2) none of the recording artists in the class was ever in an employer-employee relationship with the Defendants, their affiliated or related companies, or their predecessors-in-interest.

(B)   Whether the release of sound recordings that were created by a particular recording artist in "album" form, as is typical in the music industry, constitutes a "contribution to a collective work," or creates a "compilation," as those terms are used in §101 of the Copyright Act, thereby transforming the sound recordings into the definition of "a work made for hire" in § 101 of the Copyright Act;

(C)   Whether a foreign choice of law provision in a recording agreement has any effect upon the application of United States copyright law to issues relating to the application of the Copyright Act (and § 203 specifically) to the United States copyrights at issue, orand whether such a clause raises viable claims of "breach of contract" against the recording artists for the act of exercising their rights under United States copyright law;

(D)   Whether UMG'sthe recording agreements upon which Defendants base their position regarding "a work made for hire" clauses violatesviolate § 203(a)(5) of the Copyright Act;

(E)   Whether sound recordings created and delivered pursuant to a recording agreement are "commissioned works," as that term is used in §101 of the Copyright Act, thereby transforming the sound recordings into "a work made for hire";

(FE) Whether and to what extent recording artists are barred from

16

exercising their rights under § 203 of the Copyright Act if a "loan-out company," or third-party record label, or, in the appellation utilized by UMGDefendants, a "Furnishing Company", was involved in the contractual transaction relating to the original grant; and whether UMG'sthe agreements upon which Defendants' position regarding third-party record labels or so called "Furnishing Companies" violatesis premised violate § 203(a)(5) of the Copyright Act;

(F)    Whether, in the aforementioned instance of the involvement of a "Furnishing Company" or a third-party record label, the use of the document commonly known as an "Inducement Letter" creates a direct grant of rights from the recording artist to Defendants, or their related or affiliated companies, so that, if and when the third-party record label or "Furnishing Company" ceases to exist, the service of a Notice of Termination from the recording artist to Defendants is a valid termination of the original grant of rights.

(G)    Whether the exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, is a breach of contract by the recording artists of a clause in the recording agreement that, according to UMGDefendants, provides that recording artists may never exploit the sound recordings themselves, and whether such a clause violates § 203(a)(5) of the Copyright Act;

(H)    Whether the assertion of rights by the recording artists under § 203 of the Copyright Act is "time-barred" because, according to UMGas alleged by Defendants, "claims regarding the initial ownership status of a work must be brought within three years of creation," and the act of serving a Notice of Termination is a claim "challenging that issue"; and

17

(I)     The basis and method for determining and computing damages, including statutory damages.

59.   26.  Class certification of Class B also is appropriate pursuant to Fed. R. Civ. Proc. 23(b)(2) because UMG has Defendants have acted and/or refused to act on grounds that are generally applicable to the Class, which makes declaratory and injunctive relief with respect to Plaintiffs and the Class, as a whole, appropriate.

60.   27.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all class members is impracticable. The claims of the individual members of the class may range from smaller sums to larger sums. Thus, for those class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually. And even if every member of the class could afford to pursue individual litigation, the court system could not be so encumbered. It would be unduly burdensome to those courts in which individual litigation of numerous cases would otherwise proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action presents few, if any, management difficulties, conserves the resources of the parties and court system, and protects the rights of each member of the class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

154498.00601/120317498v.1 155811.00601/123147253v.4

**FIRST CLAIM FOR RELIEF**
**(Copyright Infringement – Against All Defendants)**

61. 28. Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 2760 above, as though fully set forth herein.

62. 29. Pursuant to § 203 of the Copyright Act, recording artists (or their successors) have the right to serve a Notice of Termination to terminate the grant of rights made to a record label, generally thirty-five (35) years after the publication of those recordings.

63.    The Notice isNotices of Termination have been duly and correctly served upon the current granteegrantees, and, with regard to Plaintiffs Waite, Ely, Sulton, Straw, Phillips, Lee, and Caballero, Wynn, Mehaffey, and Pellish, and the members of the classClass A, that current grantee is either UMG and/or Capitol.

The Waite Albums

64. 30. On or about November 1, 1981, Plaintiff Waite, through a loan-out company called Heavy Waite, Inc., entered into a recording agreement dated as of November 1, 1981 with Chrysalis Records, Inc. ("Chrysalis"), a predecessor to UMG, in or about November 1981, and thereafterCapitol (the "Heavy Waite Chrysalis released the album *Ignition*. InAgreement").[2]

65.    Heavy Waite, Inc. was a Delaware corporation incorporated on October 26, 1981. Waite was the president/sole owner of Heavy Waite, Inc. and he was not an employee of Heavy Waite, Inc.

---

[2]    Plaintiffs reserve all appellate rights with respect to the Court's March 31, 2020 dismissal of Waite's "claims based on grants transferred by third parties." Dkt. No. 68 at 24. Plaintiff Waite hereby amends his claim to clarify that the inducement letters he signed at Defendants' urging constituted direct grants of rights to Defendants that fall within the scope of his Notice of Termination. Waite continues to assert his copyright infringement claim in good faith arising from these direct grants that are *not* based on grants transferred by third parties.

19

66.    The Heavy Waite Chrysalis Agreement was designed, drafted and intended by Chrysalis, among other things, to secure the exclusive recording services of Waite.

67.    In the Heavy Waite Chrysalis Agreement, Waite was expressly identified as the "Artist."

68.    At the time of execution of the Heavy Waite Chrysalis Agreement, Waite was not an employee of Chrysalis.

69.    In fact, Waite was not an employee of Chrysalis at any time during the term of the Heavy Waite Chrysalis Agreement.

70.    Nonetheless, without any bona fide employment relationship between Chrysalis and Waite, and in an attempt to circumvent the § 203 statutory termination right, Chrysalis sought in the Heavy Waite Chrysalis Agreement to create an artifice by which Waite would be deemed an employee of Chrysalis and the works Waite would author as Artist would be characterized as employee "works made for hire."

71.     Indeed, paragraph 4 of the Heavy Waite Chrysalis Agreement memorialized Chrysalis's attempted artifice by using the following language directed at both Plaintiff Waite and Heavy Waite, Inc.: "For the purposes hereof, you, Artist, and all other persons rendering services in connection with such master recordings shall be our employees for hire and all such master recordings shall be works made for hire under the United States Copyright Law."

72.    Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Chrysalis also demanded and obtained several provisions in the Heavy Waite Chrysalis Agreement that effectuated a direct, personal grant by Waite to

20

Chrysalis of the copyright in and to the sound recordings that Waite agreed to record pursuant to the Heavy Waite Chrysalis Agreement.

73.     Paragraph 4 of the Agreement further memorialized the parties' expectation and intent that Heavy Waite, Inc. would "cause Artist [John Waite] to execute and deliver to us any assignments of copyright (including renewals or extensions thereof) in and to such master recordings as we may reasonably deem necessary, and you and Artist hereby irrevocably appoint us your and Artist's attorney-in-fact for the purposes of executing such assignments in your and Artist's name."

74.     Indeed, contemporaneously with the Heavy Waite Chrysalis Agreement and as a material requirement of the Heavy Waite Chrysalis Agreement itself, and at the request and insistence of Chrysalis, Waite also signed what is commonly referred to in the music industry as an "inducement letter," as an alternative and reliable means to effect a transfer to Chrysalis of the copyright in and to the subject sound recording. A true and correct copy of the Waite Chrysalis Inducement Letter dated as of November 1, 1981 is attached as **Exhibit 1** and incorporated by reference.

75.     The Waite Chrysalis Inducement Letter contained a rights provision that would be triggered in the event Heavy Waite, Inc. ceased to provide or be entitled to Waite's recording services, thereby emphasizing that *Waite* (and *not* Heavy Waite, Inc.) was the creative and artistic driving force behind the creation of the works and that his unique and special talents were the essential consideration for the Agreement. In pertinent part, the Waite Chrysalis Inducement Letter provided:

"2. If during the term of the Agreement or any extensions or renewals thereof Producer [Heavy Waite, Inc.] shall cease to be entitled to my recording services in accordance with the terms of the Agreement, or if

21

Producer [Heavy Waite, Inc.] shall fail or refuse to furnish my recording services to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Producer [Heavy Waite, Inc.] had continued to be entitled to my recording services and if Producer [Heavy Waite, Inc.] had continued to furnish my services to you, and such rights, privileges and benefits shall be enforceable in your behalf against me."

(**Exhibit 1**, Waite Chrysalis Inducement Letter, ¶ 2.)

76.     Paragraph 2 of the Inducement Letter served as a further acknowledgment by Chrysalis that the copyrights may be deemed to belong to Waite as the author, thereby necessitating his personal and direct grant of rights to Chrysalis as a material and essential component of the overall recording agreement.

77.     The Waite Chrysalis Inducement Letter, along with paragraph 4 of the Heavy Waite Chrysalis Agreement, was a direct, personal grant of copyright rights by Plaintiff Waite to Defendants' predecessor-in-interest Chrysalis.

78.     Chrysalis insisted on paragraph 4 of the Agreement and the Inducement Letter from Waite, including the direct grant of rights, because Chrysalis needed to ensure that Waite would render the musical performance services under the Agreement, but knew that Waite would be the author of the sound recording and the direct grant of rights by Waite was the only way to ensure that Chrysalis received the contemplated grant of exclusive rights to the sound recordings created by Waite.

79.     Chrysalis knew that, notwithstanding the language in the Heavy Waite Chrysalis Agreement purporting to characterize Waite as Chrysalis's employee, Waite was not at the time of execution and was not at any time thereafter, a bona fide employee of Chrysalis.

80.     Chrysalis further knew that sound recordings could not otherwise qualify as "works made for hire" under the governing Copyright Act definition.

81.     Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

82.     Chrysalis also knew that any grant of the copyright was not effective until the work was created by Waite by fixing the work in a tangible medium of expression.

83.     Despite Chrysalis's efforts, because Waite was not an employee of Chrysalis and the works were not "works made for hire," Chrysalis's artificial construct contained in the Heavy Waite Chrysalis Agreement was ineffective and, thus, the only effective transfer of the author's copyright would be made by Waite's direct, personal transfer.

84.     Accordingly, Chrysalis demanded and obtained the direct, personal grant of Waite's copyright, which he acquired by law as the author of the work, to ensure that it could publish, market and commercially exploit the work, specifically because the facts showed that the sound recording could not qualify as a "works made for hire."

85.     Having enjoyed the benefit of the Waite Chrysalis Inducement Letter for decades, including certainty as to the effectiveness of Waite's grant of rights, Defendants cannot now disavow the effectiveness of Waite's prior direct grant of rights to their predecessors-in-interest.

86.     After the Waite Chrysalis Inducement Letter was executed as demanded by Chrysalis, Waite created the sound recording released as the *Ignition* Album.

154498.00601/120317498v.1155811.00601/123147253v.4

87.    The *Ignition* Album, which was Waite's debut solo album, was released by Chrysalis on or about June 29, 1982, well after Waite made the direct, personal grant demanded by Chrysalis.

88.    In or about March 1986, Heavy Waite, Inc. ceased to be in good standing in the State of Delaware, and has not been in good standing for well over thirty years.

89.    Moreover, upon information and belief, Chrysalis, and its successor-in-interest Capitol, has not accounted to Heavy Waite, Inc. as a corporation, for decades.

90.    Accordingly, Chrysalis and its successors dealt and communicated directly with Waite or his representatives thereafter.

91.    Therefore, pursuant to the Waite Chrysalis Inducement Letter, the relationship between Chrysalis and Capitol, on the one hand, and Heavy Waite, Inc., on the other, has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Waite served his Notice of Termination upon Capitol, was and is a *direct* contractual relationship between Waite and Capitol.

92.    In September 1983, Waite, through ~~another~~a different loan-out company called Moonwalk Music, Inc., entered into ~~another~~an agreement with Capitol~~, and, thereafter,~~ Records, Inc. ("Capitol ~~released the album *No Brakes*~~.") (the "First Capitol Agreement").

93.    Moonwalk Music, Inc. was a New York corporation incorporated on March 31, 1982. Waite was the president/sole owner of Moonwalk Music, Inc. He was not an employee of Moonwalk Music, Inc.

94.    The First Capitol Agreement was designed, drafted and intended by Capitol, among other things, to secure the exclusive recording services of Waite.

95.    At the time of execution of the First Capitol Agreement, Waite was

not an employee of Capitol.

96.    In fact, Waite was not an employee of Capitol at any time during the term of the First Capitol Agreement.

97.    The First Capitol Agreement was prepared by Capitol and sought to create an artifice that Waite was an employee of Capitol and that the works Waite authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

98.    Nonetheless, without any bona fide employment relationship between Capitol and Waite, and in an attempt to circumvent the § 203 statutory termination right, Capitol sought in the First Capitol Agreement to create an artifice by which Waite would be deemed an employee of Capitol and the works Waite would author as Artist would be characterized as employee "works made for hire."

99.    Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Capitol also demanded and obtained several provisions in the First Capitol Agreement that effectuated a direct, personal grant by Waite to Capitol of the copyright in and to the sound recordings that Waite agreed to record pursuant to the First Capitol Agreement.

100.    Like the Heavy Waite Chrysalis Agreement, Capitol memorialized Capitol's attempted artifice by using "work made or hire" language in paragraph 5(a) of the First Capitol Agreement, even though Capitol knew that Waite did not have, and never had, a bona fide employment relationship with Capitol.

101.    Indeed, paragraph 5(a) of the First Capitol Agreement further memorialized the parties' expectation and intent that Moonwalk Music, Inc.

25

would "cause" Waite to execute a declaration and power of attorney as a material and essential term of the Agreement.

102.    The declaration demanded by Capitol provided in paragraph B that, notwithstanding the "work made for hire" language added to the Agreement to create the artifice described above, Waite agreed "to the extent, if any, that I may deemed an 'author' of any Work, I grant and assign to EMIA [Capitol] all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106." A true and correct copy of the First Capitol Declaration is attached as **Exhibit 2** and incorporated by reference.

103.    Contemporaneously with the First Capitol Agreement and as a material requirement of the First Capitol Agreement itself, and at the request and insistence of Capitol, Waite also signed what is commonly referred to in the music industry as an "inducement letter," as an alternative and reliable means to effect a transfer to Capitol of the copyright in and to the subject sound recording. A true and correct copy of the First Capitol Inducement Letter dated as of August 29, 1983 is attached as **Exhibit 3** and incorporated by reference.

104.    The First Capitol Inducement Letter similarly contained a provision that would be triggered in the event Moonwalk Music, Inc. ceased to provide or be entitled to Waite's recording services thereby again emphasizing that Waite was the creative and artistic driving force behind the creation of the works and that his unique and special talents were the essential consideration for the Agreement.  In pertinent part, the First Capitol Inducement Letter provided:

"If during the term of this Agreement or any extensions, or renewals or modifications thereof [Moonwalk Music, Inc.] shall cease to be entitled to make my recording services available to you in accordance with the terms of the Agreement, or if [Moonwalk Music, Inc.] shall fail or refuse to

make my recording services to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if [Moonwalk Music, Inc.] had continued to be entitled to my recording services, and I shall make the same available to you, and such rights, privileges and benefits shall be enforceable on your behalf against me."

(**Exhibit 3**, First Capitol Inducement Letter, para. 6).

105.    Paragraph 6 of the First Capitol Inducement Letter served as a further confirmation by Capitol that the copyrights may be deemed to belong to Waite as the author, thereby necessitating his personal and direct grant of rights to Capitol as a material and essential component of the overall recording agreement.

106.    The First Capitol Declaration, along with First Capitol Inducement Letter and paragraph 5(a) of the First Capitol Agreement, was a direct, personal grant of rights by Plaintiff Waite to Capitol.

107.    Capitol insisted on the First Capitol Inducement Letter, including its direct grant of rights, from Waite because Capitol needed to ensure that Waite would render the musical performance services under the First Capitol Agreement, but knew that Waite would be the author of the sound recording and the direct grant of rights by Waite was the only way to ensure that Capitol received the contemplated grant of rights to the sound recording created by Waite.

108.    Capitol knew that, notwithstanding the language in the First Capitol Agreement purporting to characterize Waite as an employee, Waite was not at the time of execution and was not at any time thereafter a bona fide employee of Capitol.

109.    Capitol further knew that the sound recording could not otherwise

27

qualify as "work made for hire" under the governing Copyright Act definition.

110.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

111.   Capitol also knew that any grant of the copyright was not effective until the work was created by Waite by fixing the work in a tangible medium of expression.

112.   Despite Capitol's efforts, because Waite was not an employee of Capitol and the works were not "works made for hire," Capitol's artificial construct contained in the First Capitol Agreement was ineffective and, thus, the only effective transfer of the author's copyright would be made by Waite's direct, personal grant.

113.   Accordingly, Capitol demanded and obtained the direct, personal grant of Waite's copyright, which he acquired by law as the author of the works, to ensure that it could publish, market and commercially exploit the works, specifically because the facts showed that the sound recording could not qualify as "work made for hire."

114.   Having enjoyed the benefit of the First Capitol Inducement Letter for decades, including certainty as to the effectiveness of Waite's grant of rights, Defendants cannot now disavow the effectiveness of Waite's prior direct grant of rights to them.

115.   After the Declaration and First Capitol Inducement Letter were executed as demanded by Capitol, Waite created the sound recordings released as the *No Brakes* Album.

116.   The *No Brakes* Album was Waite's second solo album and was

154498.00601/120317498v.1 155811.00601/123147253v.4

released by Capitol in June 1984, well after Waite made the direct, personal grant demanded by Capitol.

117.  On March 25, 1992, Moonwalk Music, Inc. ceased to be in good standing in the State of New York, and not has not been in good standing for nearly thirty years.

118.  Accordingly, Capitol and its successors dealt and communicated directly with Waite or his representatives thereafter

119.  Moreover, upon information and belief, Capitol, and its successor-in-interest Capitol, has not accounted to Moonwalk Music, Inc. as a corporation, for decades.

120.  Therefore, pursuant to the First Capitol Inducement Letter of the First Capitol Agreement and the Waite First Capitol Declaration, the relationship between Capitol and its successor Capitol, on the one hand, and Moonwalk Music, Inc., on the other, has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Waite served his Notice of Termination upon Capitol, was and is a *direct* contractual relationship between Waite and Capitol.

121.  In July 1985, Waite, through another loan-out company called Diamond Strife, Inc.[3], entered into another agreement with Capitol, and, thereafter, Capitol released the album *Mask of Smiles* (collectively, the "Waite Albums (the "Second Capitol Agreement").

122.  Diamond Strife, Inc. was a New York corporation incorporated on June 27, 1985. Waite was the president/sole owner of Diamond Strife, Inc. He was not an employee of Diamond Strife, Inc.

---

[3] The correct name of the corporation is "Diamond Strife, Inc."  However, the documents drafted by Capitol incorrectly referred to the corporation as "Diamond *Stripe*, Inc." The allegations herein shall utilize the correct corporate name, "Diamond Strife, Inc."

123.    The Second Capitol Agreement was designed, drafted and intended by Chrysalis, among other things, to secure the exclusive recording services of Waite.

124.    At the time of the execution of the Second Capitol Agreement, Waite was not an employee of Capitol.

125.    In fact, Waite was not an employee of Capitol at any time during the term of the Second Capitol Agreement.

126.    Nonetheless, without any bona fide employment relationship between Capitol and Waite, and in an attempt to circumvent the § 203 statutory termination right, Capitol sought in the Second Capitol Agreement to create an artifice by which Waite would be deemed an employee of Capitol and the works Waite would author as Artist would be characterized as employee "works made for hire."

127.    Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Capitol also demanded and obtained several provisions in the Second Capitol Agreement that effectuated a direct, personal grant by Waite to Capitol of the copyright in and to the sound recordings that Waite agreed to record pursuant to the Second Capitol Agreement.

128.    Like the Heavy Waite Chrysalis Agreement and the First Capitol Agreement, Capitol memorialized its attempted artifice by using "work made for hire" language in paragraph 5(a) of the Second Capitol Agreement, even though Capitol knew that Waite did not have, and never had, a bona fide employment relationship with Capitol.

129.    Paragraph 5(a) of the Second Capitol Agreement further

30

memorialized the parties' expectation and intent that Diamond Strife, Inc. would "cause" Waite to execute a declaration and power of attorney as a material and essential term of the Agreement.

130.    The declaration demanded by Capitol provided in paragraph B that, notwithstanding the "work made for hire" language added to the Agreement to create the artifice described above, Waite agreed "to the extent, if any, that I may be deemed an 'author' of any Work, I grant and assign to [Capitol] all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106." A true and correct copy of the Second Capitol Declaration (captioned "Exhibit 'E'") is attached as **Exhibit 4** and incorporated by reference.

131.    Contemporaneously with the Second Capitol Agreement and as a material requirement of the Second Capitol Agreement itself, and at the request and insistence of Capitol, Waite also signed another so-called "inducement letter." A true and correct copy of the Second Capitol Inducement Letter, captioned "EXHIBIT 'A' ARTIST DECLARATION" and dated July 4, 1985, is attached as **Exhibit 5** and incorporated by reference.

132.    The Second Capitol Inducement Letter similarly contained a provision that would be triggered in the event that Diamond Strife, Inc. ceased to provide or be entitled to Waite's recording services, thereby again emphasizing that Waite was the creative and artistic driving force behind the creation of the works and that his unique and special talents were the essential consideration for the Agreement.    In pertinent part, the Second Capitol Inducement Letter provided: "If during the term of this Agreement or any extensions, or renewals or modifications thereof, [Diamond Strife, Inc.] shall cease to be entitled to make my services available to you in accordance with the terms of the Agreement, or if [Diamond Strife, Inc.] shall fail or refuse to make my services to you, I shall,

31

at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if [Diamond Strife, Inc.] had continued to be entitled to my services, and I shall make the same available to you, and such rights, privileges and benefits shall be enforceable on your behalf against me."

(**Exhibit 5**, Second Capitol Inducement Letter, para. 6).

133.   Paragraph 6 of the Second Capitol Inducement Letter served as a further confirmation by Capitol that the copyrights may be deemed to belong to Waite as the author, thereby necessitating his personal and direct grant of rights to Capitol as a material and essential component of the recording agreement.

134.   The Second Capitol Declaration, along with the Second Capitol Inducement Letter and paragraph 5(a) of the Second Capitol Agreement was a direct, personal grant of rights by Plaintiff Waite to Capitol.

135.   Capitol insisted on the Second Capitol Inducement Letter, including its direct grant of rights, from Waite because Capitol needed to ensure that Waite would render the musical performance services under the Second Capitol Agreement, but knew that Waite was the author of the sound recording and the direct grant of rights by Waite would be the only way to ensure that Capitol received the contemplated grant of rights to the sound recording created by Waite.

136.   Capitol knew that, notwithstanding the language in the Waite Second Capitol Agreement purporting to characterize Waite as an employee, Waite was not at the time of execution and was not at any time thereafter a bona fide employee of Capitol.

137.   Capitol further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

138.   Because the sound recording, once created, would constitute neither

(a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

139.   Capitol also knew that any grant of the copyright was not effective until the work was created by Waite by fixing the work in a tangible medium of expression.

140.   Despite Capitol's efforts, because Waite was not an employee of Capitol and the works were not "works made for hire," Capitol's artificial construct contained in the Second Capitol Agreement was ineffective and the only effective transfer of the author's copyright would be made by Waite's direct, personal transfer.

141.   Accordingly, Capitol demanded and obtained the direct, personal grant of Waite's copyright, which he acquired by law as the author of the works, to ensure it could publish, market and commercially exploit the works, specifically because the sound recording could not qualify as "work made for hire."

142.   Having enjoyed the benefit of the Second Capitol Inducement Letter for decades, including certainty as to the effectiveness of Waite's grant of rights, Defendants cannot now disavow the effectiveness of Waite's prior direct grant of rights to them.

143.   After the Second Declaration and Second Capitol Inducement Letter were executed as demanded by Capitol, Waite created the sound recording released as the *Mask of Smiles* Album.

144.   The *Mask of Smiles* Album, which was Waite's third solo album, was released by Capitol on July 26, 1985, well after Waite made the direct, personal grant demanded by Capitol.

154498.00601/120317498v.1 155811.00601/123147253v.4

145.   On or about June 24, 1992, Diamond Strife, Inc. ceased to be in good standing in the State of New York and has not been in good standing for nearly thirty years.

146.   Accordingly, Capitol and its successors dealt and communicated directly with Waite or his representatives.

147.   Moreover, upon information and belief, Capitol, and its successor-in-interest Capitol, has not accounted to Diamond Strife, Inc. as a corporation, for decades.

148.   Therefore, pursuant to the Second Capitol Inducement Letter, the relationship between Capitol and its successor Capitol, on the one hand, and Diamond Strife, Inc., on the other, has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Waite served his Notice of Termination upon UMG/Capitol, was and is a *direct* contractual relationship between Waite and Capitol.

149.   At no time did any facts, which would ~~indicate or~~ establish an employer-employee relationship between Waite and any of the loan-out companies named above, exist, and at no time did any facts exist which would have established an employer-employee relationship between Waite and any of the Defendants or their predecessors.

150.   ~~31.~~ On or about April 20, 2015, Waite served a Notice of Termination (the "Waite Termination Notice") upon ~~UMG, and~~Capitol's agent Universal Music Group, notifying Defendants of Waite's termination of any prior grants of rights with respect to the sound recordings on the *Ignition* Album, the *No Brakes* Album and the *Mask of Smiles* Album.

151.   Thereafter, Waite promptly caused the Waite Termination Notice to be recorded in the United States Copyright Office, on August 30, 2016, as document V9924 D957 P1 through P3. A true and correct copy of the Waite

34

Termination Notice is attached hereto as **Exhibit** A**6** and incorporated by reference.

152. 32. The effective date of termination for the *Ignition* Album was May 22, 2017.

153. Initially, UMG made an effort to cease the United States exploitation of the *Ignition* Album, and although UMG repeatedly informed Waite that UMG did not agree that Waite had presented a validdisputed the validity of the Notice of Termination, UMG and/or Capitol sought to negotiate a further grant from Waite, pursuant to § 203(a)(5).

154. 33. On or about August 1, 2017, after Waite rejected UMG'sUMG/Capitol's inadequate proposal, and thereafterWaite began to exploit the *Ignition* Album himself, via digital outlets, through a record label that he owns.

155. 34. In May 2018, UMG, despite its previous decision to cease the United States exploitation of the *Ignition* Album, suddenly assertedreversed its position, asserting that Waite's exploitation of the *Ignition* Album was improper.

156. On May 31, 2018, counsel for UMG/Capitol sent Waite a letter setting forth UMG'sUMG/Capitol's legal positions for its claims that the Waite Notice was invalid, and, in addition, demanded that Waite "cease and desist from any and all unauthorized exploitation of the sound recordings, including the 'Ignition' Album." A true and correct copy of thatthe May 31, 2018 letter is attached hereto as **Exhibit** B**7**.

157. 35. In or about early July 2018, UMG/Capitol issued a take-down notice against Waite's digital release of that album.

158. 36. After UMG had successfully/Capitol caused Waite's release to be taken down from digital sites, UMG/Capitol resumed the digital exploitation of the *Ignition* Album through UMG'sUMG/Capitol's normal digital outlets.

159.   The effective date of termination for the *No Brakes* Album was June 16, 2019.

160.   The effective date of termination has passed for both the *Ignition* Album and the *No Brakes* Album.

161.   Notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the *No Brakes* Album and instead continue to infringe on Waite's rights with respect to the sound recording on the *No Brakes* Album, just like their infringement of the *Ignition* Album.

162.   ~~37. The effective date of termination has passed for the *Ignition* Album.~~ Despite ~~this fact, and UMG's~~these facts, and UMG/Capitol's knowledge of the effective termination dates, UMG/Capitol willfully infringed upon the United States copyright belonging to Waite by continuing to exploit the sound recordings, as if the Waite Notice of Termination had not been sent at all, in complete disregard of the law.

163.   In addition, ~~the effective date of termination for the second album set forth on the Waite Notice, *No Brakes*, is June 16, 2019, and~~ the effective date of termination for the third album set forth on the Waite Notice, *Mask of Smiles*, is July 27, 2020 ~~As set forth below, declaratory relief for these two albums is necessary, in that UMG has indicated that it will disregard the Waite Notice as to those albums, and infringe on those copyrights, as well.~~, approximately three months from the date of this amendment.

164.   Defendants have not changed their position or indicated any change will be forthcoming with respect to the *Mask of Smiles* Album in approximately three years – well prior to the scheduled trial date in this action.

165.   Upon information and belief, Plaintiff Waite expects and believes in good faith that Defendants will infringe on Waite's rights with respect to the

*Mask of Smiles* Album, just as they have done with respect to the *Ignition* and *No Brakes* Albums.

166. 38. UMG/Capitol routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

167. 39. Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

168. 40. Pursuant to the Waite Notice of Termination, Waite is currently the owner of the United States copyright in and to the sound recordings comprising the *Ignition* Album and the *No Brakes* Album.  Waite will become the owner of the United States copyright in and to the sound recording comprising the *Mask of Smiles* Album on July 27, 2020.

169. 41. By willfully continuing to exploit the sound recordings comprising the *Ignition* Album and the *No Brakes* Album in the United States after the effective datedates of termination, all of which occurred within the past three years, UMG hasand/or Capitol have infringed upon those recordings, and, furthermore, the unlawful reproduction and distribution of the sound recordings owned by PlaintiffWaite as alleged hereinabove constitutes copyright infringement under the Copyright Act.

170. Additionally, by willfully continuing to exploit the sound recording comprising the *Mask of Smiles* Album in the United States after the effective date of termination on July 27, 2020, Defendants will infringe upon that sound

recording and any unlawful reproduction and distribution of the sound recording will constitute copyright infringement under the Copyright Act.

171.   Upon information and belief, Defendants engaged in substantially similar practices with respect to the small minority of class members who used "loan-out" companies at the time they entered into recording agreements with Defendants and their predecessors-in-interest.

172.   Upon information and belief, of those particular class members, all of them, without exception, executed "inducement letters" which provided that if the "loan-out" company or the third-party record labels ceased to exist, a direct transfer of rights or relationship between the recording artists and Defendants or their predecessors would exist.

173.   These inducement letters constituted a direct, personal grant of rights by these class members to Defendants or their predecessors-in-interest.

174.   In addition to grant language in the recording agreements directed at the class members, Defendants or their predecessors insisted on the inducement letters, including their direct grant of rights, from the class members because Defendants needed to ensure that the class members would render the musical performance services under the recording agreements, but knew that the class members were the authors of the sound recordings and the direct grant of rights by the class members was the only way to ensure that Defendants received the contemplated grant of rights to the sound recordings created by the artists.

175.   Having enjoyed the benefit of the inducement letters for decades, including certainty as to the effectiveness of the class members' grants of rights, Defendants cannot now disavow the effectiveness of the class members' prior direct grants of rights to Defendants.

176.   Accordingly, Waite further seeks to represent a subclass of similarly situated recording artists within the scope of Class A who executed direct grants

of rights to Defendants pursuant to the inducement letters demanded by Defendants or their predecessors-in-interest.

The Ely Albums

177.   42. Ely entered into a recording agreement with MCA Records, Inc. ("MCA"), a predecessor of UMG, in 1976. (the "MCA Agreement").

178.   In February 19781979, Ely's secondthird album, *Honky Tonk Masquerade* *Down on the Drag,* was released on the MCA label. [4]

179.   Ely created *Down on the Drag,* and the subsequent albums, after December 31, 1977.

180.   In February 1980, Ely recorded live recordings in London, United Kingdom, which were released on March 27, 1981, as the album entitled *Live Shots.*

181.   Both *Down on the Drag* and *Live Shots* were recorded by Ely pursuant to the MCA Agreement.

182.   On or about July 1, 1980, Ely entered into an agreement with South Coast Records, Inc. ("South Coast") for Ely's recording services (the "Ely South Coast Agreement").

183.   South Coast, in turn, entered into an agreement with MCA on July 1, 1980 (the "South Coast MCA Agreement") in which South Coast agreed to furnish Ely's services to MCA.

184.   South Coast was a Texas corporation incorporated on July 31, 1979.

---

[4]   Plaintiffs reserve all appellate rights with respect to the Court's March 31, 2020 dismissal of Ely's "claims based on grants transferred by third parties" or his "claim related to his 1976 agreement for sound recordings that were created prior to January 1, 1978." Dkt. No. 68 at 24. Plaintiff Ely hereby amends his claim to clarify that the inducement letters he signed at Defendants' urging constituted direct grants of rights to Defendants that fall within the scope of his Notice of Termination.  Ely continues to assert his copyright infringement claim in good faith arising from these direct grants that are ***not*** based on grants transferred by third parties. Additionally, he continues to assert copyright infringement claims with respect to sound recordings that were created on or after January 1, 1978.

Michael Brovsky ("Brovsky") was the principal of South Coast.

185.   At the time of execution of the Ely South Coast Agreement, Ely was not an employee of South Coast or of MCA.

186.   In fact, Ely was not an employee of South Coast, or of MCA, at any time during the term of the Ely South Coast Agreement.

187.   The Ely South Coast Agreement was prepared by MCA and sought to create an artifice that Ely was an employee of MCA and that the works Ely authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

188.   Nonetheless, without any bona fide employment relationship between Ely and South Coast, or Ely and MCA, and in an attempt to circumvent the § 203 statutory termination right, MCA sought in the Ely South Coast Agreement to create an artifice by which Ely would be deemed an employee of MCA and the works Ely would author as Artist would be characterized as employee "works made for hire."

189.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, MCA also demanded and obtained several provisions in the Ely South Coast Agreement that effectuated a direct, personal grant by Ely to MCA of the copyright in and to the sound recordings that Ely agreed to record pursuant to the Ely South Coast Agreement.

190.   MCA memorialized MCA's attempted artifice by using "employee for hire" language in paragraph 12(a) of the Ely South Coast Agreement, even though MCA knew that Ely did not have, and never had, a bona fide employment relationship with either South Coast or MCA.

191.   In connection with the Ely South Coast Agreement, MCA required Ely to sign an "inducement letter" (the "Ely MCA Inducement Letter") which similarly provided in its paragraph 7 that "If, during the term of the Production Agreement or any extensions or renewals thereof, [South Coast] shall cease to be entitled to my recording services in accordance with the terms of said Agreement, or, if [South Coast] shall fail or refuse to convey any of my recordings to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Production Agreement if [South Coast] had continued to be entitled to my recording services and if [South Coast] had continued to deliver to you my recordings, and such rights, privileges and benefits shall be enforceable in your behalf against me; . . . ." A true and correct copy of the inducement letter attached to the Second South Coast Agreement as "EXHIBIT 'B'" is attached as **Exhibit 8** and incorporated by reference.

192.   The Ely MCA Inducement Letter was a direct, personal grant of rights by Ely to Defendants' predecessor-in-interest MCA.

193.   MCA insisted on the Ely MCA Inducement Letter, including its direct grant of rights, from Ely because MCA needed to ensure that Ely would render the musical performance services under the South Coast Agreement, but knew that Ely was the author of the sound recording and the direct grant of rights by Ely would be the only way to ensure that MCA received the contemplated grant of rights to the sound recording created by Ely.

194.   MCA knew that, notwithstanding the language in the South Coast Agreement purporting to characterize Ely as an employee, Ely was not at the time of execution and was not at any time thereafter a bona fide employee of MCA.

195.   MCA further knew that the sound recording could not otherwise

41

qualify as "work made for hire" under the governing Copyright Act definition.

196.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

197.   MCA also knew that any grant of the copyright was not effective until the work was created by Ely by fixing the work in a tangible medium of expression.

198.   Despite MCA's efforts, because Ely was not an employee of MCA and the works were not "works made for hire," MCA's artificial construct contained in the Ely South Coast Agreement was ineffective and the only effective transfer of the author's copyright would be made by Ely's direct, personal transfer.

199.   Accordingly, MCA demanded and obtained the direct, personal grant of Ely's copyright, which he acquired by law as the author of the works, to ensure it could publish, market and commercially exploit the works, specifically because the sound recording could not qualify as "work made for hire."

200.   After the Ely MCA Inducement Letter was executed as demanded by MCA, Ely created the sound recording released as the *Musta Notta Gotta Lotta* Album.

201.   The *Musta Notta Gotta Lotta* Album was released by MCA (on the South Coast sublabel) on or about April 11, 1981, well after Ely made the direct, personal grant demanded by MCA.

202.   MCA knew that, notwithstanding the language in the South Coast Agreement purporting to characterize Ely as an employee, Ely was not at the time of execution and was not at any time thereafter a bona fide employee of

154498.00601/120317498v.1 155811.00601/123147253v.4

MCA.

203.   MCA further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

204.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

205.   MCA also knew that any grant of the copyright was not effective until the work was created by Ely by fixing the work in a tangible medium of expression.

206.   Despite MCA's efforts, because Ely was not an employee of MCA and the works were not "works made for hire," MCA's artificial construct contained in the South Coast Agreement was ineffective and the only effective transfer of the author's copyright would be made by Ely's direct, personal transfer.

207.   Accordingly, MCA demanded and obtained the direct, personal grant of Ely's copyright, which he acquired by law as the author of the works, to ensure it could publish, market and commercially exploit the works, specifically because the sound recording could not qualify as "work made for hire."

208.   Having enjoyed the benefit of the Ely MCA Inducement Letter for decades, including certainty as to the effectiveness of Ely's grant of rights, Defendants cannot now disavow the effectiveness of Ely's prior direct grant of rights to them.

209.   On February 20, 1984, South Coast ceased to be in good standing in the State of Texas, and not has not been in good standing for over 25 years. Therefore, pursuant to the Ely MCA Inducement Letter, the relationship between

43

South Coast and MCA (and its successor UMG) has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Ely served his Notice of Termination upon UMG, was and is a *direct* contractual relationship between Ely and UMG.

210.   Moreover, upon information and belief, MCA, and its successor-in-interest UMG, has not accounted to South Coast as a corporation, for decades.

211.   Accordingly, MCA and its successor UMG dealt and communicated directly with Ely or his representatives thereafter.

212.   Therefore, pursuant to the Ely MCA Inducement Letter, the relationship between MCA, on the one hand, and South Coast, on the other, has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Ely served his Notice of Termination upon UMG, was and is a *direct* contractual relationship between Ely and UMG.

213.   At no time did any facts, which would establish an employer-employee relationship between Ely and South Coast, or Ely and MCA, exist, and at no time did any facts exist which would have established an employer-employee relationship between Ely and South Coast or between Ely and MCA.

214.   In 1997, Jerry Jeff Walker ("Walker"), a recording artist associated with South Coast, sued the principal of South Coast,  Brovsky , in Texas state court for Travis County (Case No. 455,736), as well as South Coast itself, and other related entities. In settlement of Walker's claims therein, Brovsky assigned all right, title, and interest of South Coast to any sound recording recorded by both Walker and Ely, to Walker, on August 8, 1997.

215.   On August 14, 1997, counsel for Ely wrote to Brenda Prackup of MCA, and informed her of this assignment to Walker, so that, as of that date, MCA had full knowledge that South Coast no longer had any rights in the Ely recordings.

216.   On or about January 1, 1998, Walker assigned all of his right, title, and interest in and to those sound recordings to Ely (further memorialized on June 24, 2019 in a memorandum of the transfer entitled, "Acknowledgement of Assignment", a true and correct copy of which is attached as **Exhibit 9**). At that point, Ely became the owner of the rights in the sound recordings (recorded by Ely) that had been owned by South Coast or Walker, and succeeded to whatever termination rights South Coast and/or Walker had had before that date, if any.

217.   43. On December 15, 2015, Ely served a Notice of Termination (the "Ely Notice") upon UMG, and. In doing so, he was acting on behalf of his own termination rights afforded to him pursuant to § 203 of the Copyright Act, and pursuant to the rights that had formerly been with either South Coast, or Walker, or both, if any, and that were assigned to Ely in 1998. A true and correct copy of the Ely Notice is attached as **Exhibit 10** and incorporated by reference.

218.   Thereafter, Ely caused the Notice of Termination to be recorded in the United States Copyright Office, on August 30, 2016, as document V9921 D732 P1 through P3. A true and correct copy of the Ely Notice is attached hereto as Exhibit C.

219.   44. The effective date of termination for four three albums on the Ely Notice, namely, *Honky Tonk Masquerade,* *Down the Drag, Live Shots*, and *Musta Notta Gotta Lotta* was December 16, 2017, and the effective date of termination for the final album on the Ely Notice, *Hi-Res*, was April 3, 2019 (the "Ely Albums") was December 16, 2017.

220.   45. On May 6, 2016, counsel for UMG sent Ely a letter setting forth UMG's legal positions for its claims that the Ely Notice was invalid, and, in addition, demanded that Ely "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with UMG's continuing rights in the recordings that are the subject of your termination notice." A true and correct

45

copy of that letter is attached hereto as **Exhibit** ~~D~~**11**.

221. ~~46.~~ UMG failed and refused to cease the sale, distribution, and exploitation of the Ely Albums on the effective ~~date~~dates of termination, that is, December 16, 2017, and April 3, 2019, and has continued such exploitation after that date.

222. Indeed, notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the *Hi-Res* Album and instead continue to infringe on Ely's rights with respect to the sound recording on the *Hi-Res* Album, just like their willful infringement of the *Down the Drag, Live Shots*, and *Musta Notta Gotta Lotta* Albums for more than two years.

223. ~~47.~~ Despite UMG's knowledge of the effective ~~date~~dates of termination, UMG has willfully infringed upon the United States ~~copyright~~copyrights belonging to Ely by continuing to exploit the sound recordings, as if the Ely Notice had not been sent at all, in complete disregard of the law.

~~48.~~ UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

224. ~~49.~~ Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

225. ~~50.~~ Pursuant to the Ely Notice, Ely is currently the owner of the

United States copyright in and to the sound recordings comprising the Ely Albums.

226.  51.  By willfully continuing to exploit the sound recordings comprising the Ely Albums in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon Ely's rights in those recordings, and, furthermore, unlawful reproduction and distribution of the sound recordings owned by Ely as alleged hereinabove constitutes copyright infringement under the Copyright Act.

<u>The Sulton Album</u>

227.  52.  Sulton entered into a recording agreement with EMI America Records, Inc. ("EMI"), a predecessor to Capitol Records, Inc., which is currently known as Capitol Records, LLC, a division of UMG, on September 29, 1980. (the "Sulton Agreement").

228.  The Sulton Agreement was designed, drafted and intended by EMI, among other things, to secure the exclusive recording services of Sulton.

229.  At the time of execution of the Sulton Agreement, Sulton was not an employee of EMI.

230.  In fact, Sulton was not an employee of EMI at any time during the term of the Sulton Agreement.

231.  The Sulton Agreement was prepared by EMI and sought to create an artifice that Sulton was an employee of EMI and that the work Sulton authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

232.  Nonetheless, without any bona fide employment relationship between Ely and EMI, and in an attempt to circumvent the § 203 statutory termination right, EMI sought in the Sulton Agreement to create an artifice by

which Sulton would be deemed an employee of EMI and the works Sulton would author as Artist would be characterized as employee "works made for hire."

233.   EMI memorialized EMI's attempted artifice by using "work made or hire" language in paragraph 6 of the Sulton Agreement, even though EMI knew that Sulton did not have, and never had, a bona fide employment relationship with EMI.

234.   EMI knew that, notwithstanding the language in the Sulton Agreement purporting to characterize Sulton as an employee, Sulton was not at the time of execution and was not at any time thereafter a bona fide employee of EMI.

235.   EMI further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

236.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, EMI also demanded and obtained several provisions in the Sulton Agreement that effectuated a direct, personal grant by Sulton to EMI of the copyright in and to the sound recordings that Sulton agreed to record pursuant to the Sulton Agreement.

237.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

238.   EMI also knew that any grant of the copyright was not effective

until the work was created by Sulton by fixing the work in a tangible medium of expression.

239.    Despite EMI's efforts, because Sulton was not an employee of EMI and the works were not "works made for hire," EMI's artificial construct contained in the Sulton Agreement was ineffective and the only effective transfer of the author's copyright would be made by Sulton's direct, personal transfer.

240.    On January 11, 1982, EMI released *Kasim*, an album ~~of recordings~~sound recording authored by Sulton.

241.    ~~53.~~ On July 20, 2016, Sulton served a Notice of Termination (the "Sulton Notice") upon UMG, ~~and Sulton~~as agent for Capitol. A true and correct copy of the Sulton Notice is attached hereto as **Exhibit 12** and incorporated by reference.

242.    Thereafter, Sulton promptly caused the Notice to be recorded in the United States Copyright Office, on July 25, 2016, as document V9924 D803 P1 through P3. ~~A true and correct copy of the Sulton Notice is attached hereto as Exhibit E.~~

243.    ~~54.~~ The effective date of termination for *Kasim* (the "Sulton Album") was July 21, 2018.

244.    ~~55.~~ On September 20, 2016, counsel for UMG/Capitol sent Sulton a letter setting forth ~~UMG's~~the legal positions of UMG and/or Capitol for ~~its~~their claims that the Sulton Notice was invalid, and, in addition, demanded that Sulton "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with Capitol's continuing rights in such sound recordings." A true and correct copy of that letter is attached ~~hereto~~as **Exhibit ~~F~~13**.

245.    ~~56.~~ UMG and/or Capitol failed and refused to cease the sale, distribution, and exploitation of the Sulton Album on the effective date of termination, that is, July 21, ~~2016~~2018, and continued such exploitation in the

United States after that date.

246. 57. Despite UMG's~~the~~ knowledge of UMG and/or Capitol of the effective date, UMG ~~has~~and/or Capitol have willfully infringed upon the United States ~~copyright~~copyrights belonging to Sulton by continuing to exploit the sound ~~recordings~~recording, as if the Sulton Notice had not been sent at all, in complete disregard of the law.

247. 58. UMG/Capitol routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

248. 59. Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

249. 60. Pursuant to the Sulton Notice, Sulton is currently the owner of the United States copyright in and to the sound ~~recordings~~recording comprising the Sulton Album.

250. 61. By willfully continuing to exploit the sound ~~recordings~~recording comprising the Sulton Album in the United States after the effective date, all of which occurred within the past three years, UMG/Capitol has infringed upon ~~those~~Sulton's rights in the recordings, and, furthermore, unlawful reproduction and distribution of the sound ~~recordings~~recording owned by Sulton as alleged hereinabove constitutes copyright infringement under the Copyright Act.

### The Dickies Album

251. The members of The Dickies entered into a recording agreement

154498.00601/120317498v.1155811.00601/123147253v.4

with A&M Records, Inc. ("A&M"), a predecessor of UMG, on April 3, 1978 (the "Dickies Agreement").

252.    The Dickies Agreement was designed, drafted and intended by A&M, among other things, to secure the exclusive recording services of The Dickies.

253.    At the time of execution of the Dickies Agreement, none of the band members of The Dickies were employees of A&M.

254.    In fact, none of the band members of The Dickies was an employee of A&M at any time during the term of the Dickies Agreement.

255.    The Dickies Agreement was prepared by A&M and sought to create an artifice that the members of The Dickies were employees of A&M and that the works The Dickies authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

256.    Nonetheless, without any bona fide employment relationship between the members of The Dickies and A&M, and in an attempt to circumvent the § 203 statutory termination right, A&M sought in the Dickies Agreement to create an artifice by which the members of The Dickies would be deemed employees of A&M and the works that the members of The Dickies would author as Artist would be characterized as employee "works made for hire."

257.    A&M memorialized A&M's attempted artifice by using "employees for hire" language in paragraph 4 of the Dickies Agreement, even though A&M knew that the band members of The Dickies did not have, and never had, a bona fide employment relationship with MCA.

258.    A&M knew that, notwithstanding the language in the Dickies Agreement purporting to characterize band members of The Dickies as employees, The Dickies band members were not at the time of execution and were not at any time thereafter bona fide employees of A&M.

259.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, A&M also demanded and obtained several provisions in the Dickies Agreement that effectuated a direct, personal grant by the members of The Dickies to A&M of the copyright in and to the sound recording that the members of The Dickies agreed to record pursuant to the Dickies Agreement.

260.   A&M further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

261.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

262.   A&M also knew that any grant of the copyright was not effective until the work was created by the members of The Dickies by fixing the work in a tangible medium of expression.

263.   Despite A&M's efforts, because no member of The Dickies was an employee of A&M and the works were not "works made for hire," A&M's artificial construct contained in the Dickies Agreement was ineffective and the only effective transfer of the author's copyright would be made by band members' direct, personal transfers.

264.   On November 9, 1979, A&M released *Dawn of The Dickies*, an album sound recording authored by Phillips, Lee, Bill Remar p/k/a Billy Club, Bob Davis a/k/a Chuck Wagon, and Caballero's brother, Carlos a/k/a Karlos Kaballero (the "Dickies Album").

265.   On September 12, 2017, a majority of the authors (or their successors, in the case of Caballero), set forth above, served a Notice of Termination (the "Dickies Notice") upon UMG.

266.   Thereafter, the majority of The Dickies caused the Dickies Notice to be recorded in the United States Copyright Office, on June 19, 2019, as document V9964 D904 P1 through P3. A true and correct copy of the recorded Dickies Notice is attached as **Exhibit 14** and incorporated by reference.

267.   The effective date of termination for the Dickies Album was September 13, 2019.

268.   On January 23, 2018, counsel for UMG sent Phillips, Lee, and Caballero a letter setting forth UMG's legal positions for its claims that the Dickies Notice was invalid, and, in addition, demanded that Phillips, Lee, and Caballero "refrain from attempting to exploit the recordings themselves or taking any other actions interfering with our clients' continuing rights in the sound recordings that are the subject of the termination notice." A true and correct copy of the letter dated January 23, 2018 is attached as **Exhibit 15** and incorporated by reference.

269.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recording, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recording through subscription or non-subscription online digital music services.

270.   Pursuant to the Dickies Notice, the authors of the Dickies Album are the owners of the United States copyright in and to the sound recording comprising the Dickies Album, as of September 13, 2019, the effective date of termination set forth in the Dickies Notice.

271.   Indeed, notwithstanding the filing and pendency of this action and

the passage of the effective date, Defendants have not changed their position with respect to the *Dawn of the Dickies* Album and instead continue to infringe on Phillips, Lee, and Caballero's rights with respect to the sound recording on the *Dawn of the Dickies* Album.

272.    Despite the knowledge of UMG of the effective date, UMG has willfully infringed upon the United States copyright belonging to the authors of the Dickies Album by continuing to exploit the sound recording, as if the Dickies Notice had not been sent at all, in complete disregard of the law.

273.    UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

274.    Pursuant to the Dickies Notice, the authors of the Dickies Album are currently the owners of the United States copyright in and to the sound recording comprising the Dickies Album.

275.    By willfully continuing to exploit the sound recording comprising the Dickies Album in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon the recording, and, furthermore, unlawful reproduction and distribution of the sound recording owned by the authors of the Dickies Album as alleged hereinabove constitutes copyright infringement under the Copyright Act.

### The Dream Syndicate Album

276.    The members of The Dream Syndicate entered into a recording agreement with A&M Records, Inc. ("A&M"), a predecessor of UMG, in 1984 (the "Dream Syndicate Agreement").

277.    The Dream Syndicate Agreement was designed, drafted and intended by A&M, among other things, to secure the exclusive recording

54

services of the members of The Dream Syndicate.

278.  At the time of execution of the Dream Syndicate Agreement, none of the band members of The Dream Syndicate were employees of A&M.

279.  In fact, none of the band members of The Dream Syndicate was an employee of A&M at any time during the term of the Dream Syndicate Agreement.

280.  The Dream Syndicate Agreement was prepared by A&M and sought to create an artifice that members of The Dream Syndicate were employees of A&M and that the works The Dream Syndicate authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

281.  Nonetheless, without any bona fide employment relationship between the members of The Dream Syndicate and A&M, and in an attempt to circumvent the § 203 statutory termination right, A&M sought in the Dream Syndicate Agreement to create an artifice by which the members of The Dream Syndicate would be deemed employees of A&M and the works that the members of The Dream Syndicate would author as Artists would be characterized as employee "works made for hire."

282.  A&M memorialized A&M's attempted artifice by using "work made or hire" language in the Dream Syndicate Agreement, even though A&M knew that the band members of The Dream Syndicate did not have, and never had, a bona fide employment relationship with MCA.

283.  A&M knew that, notwithstanding the language in the Dream Syndicate Agreement purporting to characterize band members of The Dream Syndicate as employees, The Dream Syndicate band members were not at the time of execution and were not at any time thereafter bona fide employees of A&M.

154498.00601/120317498v.1 155811.00601/123147253v.4

284.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, A&M also demanded and obtained several provisions in the Dream Syndicate Agreement that effectuated a direct, personal grant by the members of The Dream Syndicate to A&M of the copyright in and to the sound recording that the members of The Dream Syndicate agreed to record pursuant to the Dream Syndicate Agreement.

285.   A&M further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

286.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

287.   A&M also knew that any grant of the copyright was not effective until the work was created by the members of The Dream Syndicate by fixing the work in a tangible medium of expression.

288.   Despite A&M's efforts, because no member of The Dream Syndicate was an employee of A&M and the works were not "works made for hire," A&M's artificial construct contained in the Dream Syndicate Agreement was ineffective and the only effective transfer of the author's copyright would be made by band members' direct, personal transfers.

289.   On May 7, 1984, A&M released *Medicine Show*, an album of recording authored by Wynn, Mehaffey, Pellish, and Karl Precoda (the "Dream Syndicate Album").

290.   On March 1, 2016, all of the authors, set forth above, served a Notice of Termination (the "Dream Syndicate Notice") upon UMG.

291.   Thereafter, the four authors promptly caused the Dream Syndicate Notice to be recorded in the United States Copyright Office, on July 11, 2016, as document V9924 D131 P1 through P6. A true and correct copy of recorded the Dream Syndicate's Notice is attached as **Exhibit 16** and incorporated by reference.

292.   The effective date of termination for the Dream Syndicate Album was May 8, 2019.

293.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recording, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

294.   Pursuant to the Dream Syndicate Notice, the authors of the Dream Syndicate Album are the owners of the United States copyright in and to the sound recording comprising the Dream Syndicate Album, as of May 8, 2019, the effective date of termination set forth in the Dream Syndicate Notice.

295.   Indeed, notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the Dream Syndicate Album and instead continue to infringe on rights the authors with respect to the sound recording on the *Medicine Show* Album.

296.   Despite the knowledge of UMG of the effective date, UMG has willfully infringed upon the United States copyright belonging to the authors of the Dream Syndicate Album by continuing to exploit the sound recording, as if the Dream Syndicate Notice had not been sent at all, in complete disregard of the

154498.00601/120317498v.1155811.00601/123147253v.4

law.

297.   UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

298.   Pursuant to the Dream Syndicate Notice, the four authors of the Dream Syndicate Album are currently the owner of the United States copyright in and to the sound recording comprising the Dream Syndicate Album.

299.   By willfully continuing to exploit the sound recording comprising the Dream Syndicate Album in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon the authors' rights in and to the recordings, and, furthermore, the unlawful reproduction and distribution of the sound recording owned by The Dream Syndicate as alleged hereinabove constitutes copyright infringement under the Copyright Act.

300.   62. Plaintiffs are further informed and believe, and on that basis allege, that the continued willful exploitation by UMG and/or Capitol of sound recordings of members of the class Class A in the United States after the effective date of dates set forth in the Notices of Termination that were served on UMG and/or Capitol pursuant to § 203 by or on behalf of such class members, all of which occurred within the past three years, constitutes willful infringement by UMG.

63. /Capitol. UMG/Capitol's UMG's acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs and the members of the class.

301.   64. As a direct and proximate result of Defendants' infringements of Plaintiffs' copyrights and the copyrights of the members of the class Class A,

pursuant to 17 U.S.C. § 504(c), Plaintiffs and the class members are entitled to recover up to $150,000 in statutory damages for each sound recording infringed. Alternatively, at their election, pursuant to 17 U.S.C. § 504(b), Plaintiffs and the class members are entitled to their actual damages, as well as all profits attributable to the infringement, including but not limited to ~~UMG's~~UMG/Capitol's profits from infringement, as will be proven at trial.

302. Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiffs, and will continue to so harm Plaintiffs unless Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, are permanently enjoined and restrained under 17 U.S.C. § 502 from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member.

303. Furthermore, there is no available remedy at law sufficient to make Plaintiffs and the members of Class B whole.

304. ~~65.~~ Plaintiffs and the class members ~~are~~ also are entitled to recover attorney's fees and costs pursuant to 17 U.S.C. § 505, and prejudgment interest according to law.

~~66. UMG is causing, and unless enjoined by the Court will continue to~~

59

cause, Plaintiffs and the class members irreparable harm for which they have no adequate remedy at law. Plaintiffs and the class members are entitled to an injunction under 17 U.S.C. §502 prohibiting the continued infringement of their sound recordings.

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other members of Class A, respectfully request that the Court enter judgment against Defendants, and each of them, as follows:

A.      Determining that this is a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B.      Awarding Plaintiffs actual damages according to proof, or, at Plaintiffs' election, statutory damages in an amount of $150,000 per infringed work, or according to proof;

D.      A permanent injunction enjoining and restraining Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member;;

E.      For pre- and post-judgment interest;

F.      For such fees and costs (including reasonable attorney's fees) incurred

herein as permitted by law; and

G.     For such other and further relief as this Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Relief – Against All Defendants)**

305. 67. Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 66304 above, as though fully set forth herein.

The Syd Straw Album

306. 68. Straw entered into a recording agreement with Virgin Records America, Inc. ("Virgin"), a predecessor of Capitol  Records, LLC, which is currently a division of UMG, on July 20, 1987. (the "Straw Agreement").

307. On June 21, 1989, Virgin released *Surprise*, an album of recordingsrecording authored by Straw.

69. On June 21, 2016, Straw served a Notice of Termination (the "Straw Notice") upon UMG. Straw has submitted the Straw Notice to the United States Copyright Office for recordation. A true and correct copy of the Straw Notice is attached hereto as Exhibit G.

70. The effective date of termination for the album on the Straw Notice, namely, *Surprise* (the "Straw Album") is June 22, 2024.

71. On December 16, 2016, counsel for UMG sent Straw a letter setting forth UMG's legal positions for its claims that the Straw Notice was invalid, and, in addition, demanded that Straw "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with Capitol's continuing rights in such sound recordings." A true and correct copy of that letter is attached hereto as Exhibit H.

72. Under §106 of the Copyright Act, the copyright owner of a sound

recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

73. Pursuant to the Straw Notice, Straw will be the owner of the United States copyright in and to the sound recordings comprising the Straw Album, as of the effective date of termination set forth in the Straw Notice.

74. Based upon the foregoing facts, pursuant to 28 U.S.C. §§2201 & 2202, a case of actual and present controversy within the jurisdiction of this court has arisen and now exists between Straw and UMG, concerning their respective rights and duties concerning the Straw Notice.

The Dickies' Album

75. The Dickies entered into a recording agreement with A & M Records, Inc. ("A&M"), a predecessor of UMG, on April 3, 1979. On November 9, 1979, A&M released *Dawn of The Dickies*, an album of recordings authored by Phillips, Lee, Bill Remar p/k/a Billy Club, Bob Davis a/k/a Chuck Wagon, and Caballero's brother, Carlos a/k/a Karlos Kaballero.

308.   Straw was never an employee of Virgin, Capitol or any of the Defendants and there are no facts to establish any such employer-employee relationship.

309.   The Straw Agreement was designed, drafted and intended by Virgin, among other things, to secure the exclusive recording services of Straw.

310.   The Straw Agreement was prepared by Virgin and sought to create an artifice that Straw was an employee of Virgin and that the works Straw authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

311.   Nonetheless, without any bona fide employment relationship between Straw and Virgin, and in an attempt to circumvent the § 203 statutory termination right, Virgin sought in the Straw Agreement to create an artifice by which Straw would be deemed an employee of Virgin and the works Straw would author as Artist would be characterized as employee "works made for hire."

312.   EMI memorialized EMI's attempted artifice by using "work made or hire" language in paragraph 6(a) of the Straw Agreement, even though Virgin knew that Straw did not have, and never had, a bona fide employment relationship with Virgin.

313.   Virgin knew that, notwithstanding the language in the Straw Agreement purporting to characterize Straw as an employee, Straw was not at the time of execution and was not at any time thereafter a bona fide employee of Virgin.

314.   EMI further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

315.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Virgin also demanded and obtained several provisions in the Straw Agreement that effectuated a direct, personal grant by Straw to Virgin of the copyright in and to the sound recording that Straw agreed to record pursuant to the Straw Agreement.

316.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it

would be neither a collective work nor a compilation as defined under the Copyright Act.

317.   Virgin also knew that any grant of the copyright was not effective until the work was created by Straw by fixing the work in a tangible medium of expression.

318.   Despite Virgin's efforts, because Straw was not an employee of Virgin and the works were not "works made for hire," Virgin's artificial construct contained in the Straw Agreement was ineffective and the only effective transfer of the author's copyright would be made by Straw's direct, personal transfer.

319.   76. On September 12, 2017, a majority of the authors (or their successors, in the case of Caballero), set forth above, On June 21, 2016, Straw served a Notice of Termination (the "The Dickies Straw Notice") upon UMG, and The Dickies have submitted The Dickies as agent for Capitol.

320.   Thereafter, Straw promptly caused the Notice to be recorded in the United States Copyright Office for recordation, on May 31, 2019 as document V9964 D257 P1 through P3. A true and correct copy of The Dickies Straw's recorded Notice is attached hereto as **Exhibit I17 and incorporated by reference.**

321.   77. The effective date of termination for the album on the The Dickies Straw Notice, namely, *Dawn of The Dickies Surprise* (the "The Dickies Straw Album") is September 13 June 22, 2019 2024.

322.   78. On January 23, 2018 On December 16, 2016, counsel for UMG sent Phillips, Lee, and Caballero Straw a letter setting forth UMG's legal positions for its claims that The Dickies the Straw Notice was invalid, and, in addition, demanded that Phillips, Lee, and Caballero Straw "refrain from attempting to exploit the recordings themselves yourself or taking any other actions interfering with our clients' Capitol's continuing rights in the such sound

recordings ~~that are the subject of the termination notice~~.” A true and correct copy of that December 16, 2016 letter is attached ~~hereto~~ as **Exhibit ~~J~~18 and incorporated by reference**.

323. ~~79.~~ Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

324. ~~80.~~ Pursuant to the ~~The Dickies~~Straw Notice, ~~the authors of The Dickies Album~~Straw will be the ~~owners~~owner of the United States copyright in and to the sound ~~recordings~~recording comprising the ~~The Dickies~~Straw Album, as of the effective date of termination set forth in ~~The Dickies~~the Straw Notice.

325. ~~81.~~ Based upon the foregoing facts, pursuant to 28 U.S.C. §§ 2201 & 2202, a case of actual and present controversy within the jurisdiction of this court has arisen and now exists between ~~Phillips, Lee, and Caballero, on the one hand,~~Straw and UMG, ~~on the other,~~concerning their respective rights and duties concerning the ~~The Dickies~~Straw Notice, as herein set forth below.

Declaratory Relief Applicable to Plaintiffs and All Class B Members

326. ~~82.~~ In addition, pursuant to 28 U.S.C. §§ 2201 & 2202, a case of actual and present controversy within the jurisdiction of this court has arisen and now exists between Plaintiffs and the ~~class~~ members of Class B on the one hand, and Defendants on the other hand, concerning their respective rights and duties, in that Plaintiffs and the ~~class~~members of Class B contend that:

    (A)   Sound recordings cannot be considered “a work made for hire,” as that term is defined in the Copyright Act, because the definition set forth in § 101 of the Copyright Act does not include sound recordings as being

one of the types of works that can be "a work made for hire";

(B)     There are no facts as to Plaintiff Straw and, upon information and belief, no such facts as to the members of Class B that would establish that Straw or any class member was ever in an employer-employee relationship with Defendants, or any of their affiliated or related companies, at the time the recording artists entered into the recording agreements, or during the time that the recordings pertaining thereto were created;

(B̶C) The release of sound recordings that were created by a particular recording artist in "album" form, as is typical in the music industry, do not constitute a "contribution to a collective work," or a "compilation," as those terms are used in § 101 of the Copyright Act, and do not t̶r̶a̶n̶s̶f̶o̶r̶m̶qualify the sound recordings i̶n̶t̶o̶as "works made for hire";

(C)     U̶M̶G̶ ̶r̶o̶u̶t̶i̶n̶e̶l̶y̶ ̶m̶a̶r̶k̶e̶t̶s̶,̶ ̶d̶i̶s̶t̶r̶i̶b̶u̶t̶e̶s̶,̶ ̶a̶n̶d̶ ̶s̶e̶l̶l̶s̶ ̶s̶o̶u̶n̶d̶ ̶r̶e̶c̶o̶r̶d̶i̶n̶g̶s̶ ̶i̶n̶ ̶d̶i̶g̶i̶t̶a̶l̶ ̶m̶e̶d̶i̶a̶ ̶f̶o̶r̶m̶a̶t̶ ̶(̶e̶.̶g̶.̶,̶ ̶p̶e̶r̶m̶a̶n̶e̶n̶t̶ ̶d̶i̶g̶i̶t̶a̶l̶ ̶s̶o̶n̶g̶ ̶d̶o̶w̶n̶l̶o̶a̶d̶s̶,̶ ̶a̶n̶d̶ ̶i̶n̶t̶e̶r̶a̶c̶t̶i̶v̶e̶ ̶a̶n̶d̶ ̶n̶o̶n̶-̶i̶n̶t̶e̶r̶a̶c̶t̶i̶v̶e̶ ̶s̶o̶n̶g̶ ̶s̶t̶r̶e̶a̶m̶s̶)̶ ̶o̶f̶ ̶i̶n̶d̶i̶v̶i̶d̶u̶a̶l̶ ̶t̶r̶a̶c̶k̶s̶ ̶(̶i̶.̶e̶.̶,̶ ̶s̶o̶n̶g̶s̶)̶ ̶t̶a̶k̶e̶n̶ ̶f̶r̶o̶m̶ ̶t̶h̶e̶ ̶s̶u̶b̶j̶e̶c̶t̶ ̶a̶l̶b̶u̶m̶s̶.̶

(D)     A foreign choice of law provision in a recording agreement has no effect upon the application of United States copyright law, exclusively, to issues relating to the application of the Copyright Act (and § 203 specifically) to the United States copyright, and cannot support a claim of "breach of contract" by the recording artists for exercising their rights under United States law;

(E)     U̶M̶G̶'̶s̶Defendants' position regarding "a work made for hire" clauses violates § 203(a)(5) of the Copyright Act;

(F)     Sound recordings created and delivered pursuant to a recording agreement are not "specially ordered" or "commissioned works," as t̶h̶a̶t̶ ̶t̶e̶r̶m̶ ̶i̶s̶such terms are used in § 101 of the Copyright Act, thereby

66

~~transforming the sound recordings into~~disqualifying any sound recording as "a work made for hire";

(G)   Recording artists are not barred from exercising their rights under § 203 of the Copyright Act, even if a "loan-out company," or, in the appellation utilized by UMG, a "Furnishing Company" was involved in the contractual transaction relating to the original grant; and UMG's position regarding "Furnishing Company" clauses violates § 203(a)(5) of the Copyright Act;

(H)   The exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, does not constitute a breach of contract of the recording agreements; and

(I)   The assertion of rights by the recording artists under § 203 of the Copyright Act are not "time-barred" because "claims regarding the initial ownership status of a work must be brought within three years of creation."

327. ~~83.~~ Defendants, on the other hand, contend that:

(A)   Each of the sound recordings at issue are "a work made for hire," because the recording agreements at issue contain clauses that purport to be an agreement between the parties to those agreements that the sound recordings should be so characterized;

(B)   The sound recordings at issue are contributions to a "collective work" or "compilation," *i.e.*, record albums, and so are "a work made for hire";

(C)   If a recording agreement so provides, foreign law may be applied to the rights of recording artists in United States copyrights, and may be used to deny terminations that would be otherwise valid under the United

67

States Copyright Act;

(D)   ~~UMG's~~Defendants' position regarding "work made for hire" clauses does not violate § 203(a)(5) of the Copyright Act;

(E)   Sound recordings created and delivered pursuant to a recording agreement are "commissioned works," as that term is used in § 101 of the Copyright Act, thereby transforming each of the sound recordings into "a work made for hire";

(F)   Recording artists are barred from exercising their rights under § 203 of the Copyright Act if a "loan-out company," or, in the appellation utilized by UMG, a "Furnishing Company" was involved in the contractual transaction relating to the original grant;

(G)   The exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, constitutes a breach of contract of the recording agreements; and

(H)   The assertion of rights by the recording artists under § 203 of the Copyright Act are "time-barred" because "claims regarding the initial ownership status of a work must be brought within three years of creation."

~~84.   Defendant's actions have caused, and will continue to cause, irreparable harm to Plaintiffs, and will continue to so harm Plaintiffs unless preliminarily and permanently enjoined.   Furthermore, there is no available remedy at law sufficient to make Plaintiffs whole.~~

328.   ~~85. Plaintiffs~~Plaintiff Straw and the ~~class~~ members of Class B desire a judicial determination of their rights and duties, and a present declaration that ~~UMG's repeated~~their Notices of Termination are valid, the dates of termination in the Notices are effective, their termination rights vested and Defendants' disregard of the rights of ~~Plaintiffs~~Plaintiff Straw and the ~~class~~ members of Class

68

B violates the Copyright Act.

329. 86. Such a prompt and immediate, judicial determination of the rights and duties of the parties is presently ripe, useful and necessary at this time, in that Defendants have repeatedly denied refused to honor Plaintiffs' rights, and including the rights of hundreds of Straw, and those of the Plaintiff class members, and has denied all of them the right to own the United States copyright in and to the sound recordings for the post-termination period. By doing these acts in the past, and unless enjoined from engaging in like behavior in the future, UMG will be because:

(i) Defendants have engaged in the virtually identical conduct with respect to both Classes A and B, and Defendants have shown no willingness or intent to alter their willful behavior during this litigation absent a judicial order, judgment or declaration;

(ii) Defendants have not advanced any defenses or arguments beyond or outside of the detailed arguments asserted in their lengthy letters refusing to honor Plaintiffs and the class members' Notices of Termination and Defendants' central defense – that the sound recordings qualify as "works made for hire" – can be readily disposed of on a class-wide basis because Defendants are unable to prove the existence of bona fide employment relationships with Plaintiff Straw and the class members;

(iii) Defendants have created an actual and immediate disagreement with Plaintiff Straw and, upon information and belief, members of Class B by accusing these recording artists of anticipatory breach of contract and/or asserting repudiation claims arising from Defendants' inclusion of "work made for hire" language and related representations in the underlying recording agreements;

(iv) Defendants have stated their clear intent *not* to honor the Notices of

69

Termination served by Plaintiffs and class members pursuant to § 203, and therefore, Plaintiffs and class members, as the rightful owners of the sound recordings that they themselves created, should not be forced to wait until a date far in the future after their effective termination dates *and* the resolution of (possibly piecemeal) litigation over the validity of their ownership rights, and in the interim lose the ability to license, exploit or otherwise monetize those valuable copyrights;

(v) Plaintiffs and class members – most of whom are well over 60 years of age – will be substantially aided in developing and implementing their estate plans with respect to their rights to the sound recordings in that there is a very real and genuine need to value the rights for purposes of their calculation of the gift and/or estate tax exemptions, depending on whether they make an *inter vivos* gift or a testamentary bequest to a beneficiary under his or her will;

(vi) the requested declaratory relief would determine in all material respects and/or completely the validity of the termination notices, the effective dates of termination and the vesting of the termination rights; and

(vii) in that Defendants' legal position is centrally dependent upon their factual contention that the recordings at issue are "works made for hire," if Defendants are able to prove that issue, then there is no termination right available and the Notices of Termination served by the members of Class B are invalid.  On the other hand, if Defendants are unable to prove that the recordings are "works made for hire," then the members of Class B seek to be protected from future infringement and potential piecemeal litigation from Defendants on the identical or substantially similar defensive positions

---

[5] In making these new allegations and arguments, Plaintiffs do not dispute or quarrel with the Court's own discretion in deciding *sua sponte* to consider the ripeness of Plaintiffs'

330.   In the absence of prompt and immediate declaratory relief, Plaintiff Straw and the members of Class B will continue to experience significant uncertainty with respect to their termination rights and they will be unable to accurately calculate the value of their rights given the future, indeterminate litigation cloud hanging over their rights.  They will be left to await the virtually certain future event of Defendants' infringement of their copyrights and then incur years of additional delay before gaining clarity and vindication of their rights – all while they wonder whether they will live to see their rights vindicated, or whether Defendants will profit from the unlawful exploitation of the sound recordings.

331.   In the absence of prompt and immediate declaratory relief, Defendants will be allowed to destroy the value and ultimate salability of the subject sound recordings, in direct contradiction of the second chance guaranteed by the Copyright Act. Furthermore, with regard to Plaintiff Straw and the members of Class B for which the effective dates of termination have not yet arrived, the policies, practices and actions of Defendants are injuring the interests of those class members; for instance, many, if not most, of the class members are over the age of 60 (and in many cases, many years older than 60), and are actively engaged in estate planning activities, including devising or bequeathing valuable rights in the copyrights in and to sound recordings that are the subject matter of the Notices of Termination sent to UMG and Capitol.

332.   Due to the conduct of UMG and Capitol, as described above, class

the Court's power or discretion in deciding *sua sponte* to consider the ripeness of Plaintiffs' claim for declaratory relief. Because Defendant UMG did not raise the ripeness issue on its motion to dismiss and the issue did not arise during oral argument on UMG's motion, Plaintiffs were unable to address the Court's concerns with respect to Plaintiffs' allegations in paragraph 86 of the First Amended Complaint. Plaintiffs respectfully submit that these more detailed allegations provide an effective and useful justification for permitting the declaratory relief claim to proceed at this time.

members, most of whom are over 60 years of age, cannot be sure that any estate planning activities in which they engage (including, but not limited to, the drafting of wills and trusts, and tax planning and analysis; pursuant to § 203(b)(2), the post-termination rights in sound recordings become vested upon *service* of the Notices of Termination, and the right to devise or bequeath those rights are, at that point in time, within the sole power of the authors (and *not* pursuant to the succession scheme set forth in § 203(a)(2)), in many cases years before the effective dates of termination) will have the effect envisioned by § 203 of the Copyright Act, that is, full ownership of the United States copyright in and to the sound recordings set forth in the Notices of Termination and the right to collect all revenues from the United States exploitation of sound recordings, on a date certain in the future. Without this certainty, any such estate or tax planning cannot be fully realized or relied upon, causing present injury to those class members, and not just at a future time.

333.   Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiffs, and will continue to so harm Plaintiffs unless Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, are permanently enjoined and restrained under 17 U.S.C. § 502 from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to

the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member.

334.   Furthermore, there is no available remedy at law sufficient to make Plaintiffs and the members of Class B whole.

## PRAYER FOR RELIEF

WHEREFORE, ~~Plaintiffs~~Plaintiff Straw, on behalf of ~~themselves~~herself and on behalf of all other members of ~~the class, pray for Judgment~~Class B, respectfully requests that the Court enter judgment against ~~UMG and the Doe~~ Defendants~~,~~ and each of them, as follows:

A.   Determining that this is a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying ~~Plaintiffs~~Plaintiff as class representatives and Plaintiffs' counsel as class counsel;

~~B.   For actual damages according to proof, or, at Plaintiffs' election, for statutory damages in an amount of $150,000 per infringed work, or according to proof;~~

~~C~~ B.   For declaratory relief, regarding the legal issues described in ~~¶¶ 82~~paragraphs 314 through ~~86~~322, above;

~~D~~C.   A ~~temporary, preliminary, and~~ permanent injunction enjoining and restraining Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, from ~~continued denial and disregard of the Notices of Termination served by Plaintiffs and the members of the class, and each of them, upon UMG, to the extent that UMG bases said grounds on the legal and factual issues that are adjudicated in this suit;~~directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff

classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download) any of the sound recordings, or to distribute (i.e., upload) any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member;;

E.    For pre- and post-judgment interest;

F.    For such fees and costs (including reasonable attorney's fees) incurred herein as permitted by law; and

G.      For such other and further relief as this Court deems just and proper.

**BLANK ROME LLP**

Dated: ~~June 5~~April 30, ~~2019~~2020                  _/s/Ryan E. Cronin_

Ryan E. Cronin~~, Esquire~~
Roy W. Arnold (admitted pro hac vice)
David M. Perry (admitted pro hac vice)
Gregory M. Bordo (admitted pro hac vice)
BLANK ROME LLP
1271 Avenue of the America
New York, NY  10020
(212) 885-5000
RCronin@BlankRome.com
~~GREGORY M. BORDO~~
~~BLANK ROME LLP~~
~~2029 Century Park East, 6ᵗʰ Floor~~
~~Los Angeles, CA  90067~~
~~(424) 239-3404~~
~~RArnold@BlankRome.com~~GBordo@Blank
Rome.com
~~DAVID M. PERRY~~
~~BLANK ROME LLP~~
~~One Logan Square~~
~~130 North 18ᵗʰ Street~~
~~Philadelphia, PA  19103-6998~~
~~(215) 569-5767~~
Perry@BlankRome.com

and


~~EVAN~~Evan S. ~~COHEN~~Cohen (admitted pro
hac vice)
Maryann R. Marzano (admitted pro hac
vice)
COHEN MUSIC LAW
1180 South Beverly Drive, Suite 510
Los Angeles, CA  90035-1157
(310) 556-9800
esc@cohenmusiclaw.com
~~MARYANN R. MARZANO~~
~~COHEN MUSIC LAW~~
~~1180 South Beverly Drive, Suite 510~~

Los Angeles, CA  90035-1157
(310) 556-9800
mmarzano@cohenmusiclaw.com

*Attorneys for Plaintiffs*

154498.00601/120317498v.1155811.00601/123147253v.4

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of the claims alleged in this Second Amended Complaint.

**BLANK ROME LLP**

Dated: ~~June 5~~April 30, ~~2019~~2020                */s/Ryan E. Cronin*

Ryan E. Cronin
Roy W. Arnold (admitted pro hac vice)
David M. Perry (admitted pro hac vice)
Gregory M. Bordo (admitted pro hac vice)
BLANK ROME LLP
1271 Avenue of the America
New York, NY  10020
(212) 885-5000
RCronin@BlankRome.com
RArnold@BlankRome.com
~~GREGORY M. BORDO~~
~~BLANK ROME LLP~~
~~2029 Century Park East, 6ᵗʰ Floor~~
~~Los Angeles, CA  90067~~
~~(424) 239-3404~~
GBordo@BlankRome.com
Perry@BlankRome.com

~~DAVID M. PERRY~~
~~BLANK ROME LLP~~
~~One Logan Square~~
~~130 North 18ᵗʰ Street~~
~~Philadelphia, PA  19103-6998~~
~~(215) 569-5767~~
~~Perry@BlankRome.com~~
and

Evan S. Cohen (admitted pro hac vice)
~~MARYANN~~Maryann R.
~~MARZANO~~Marzano (admitted pro hac vice)
COHEN MUSIC LAW

1180 South Beverly Drive, Suite 510
Los Angeles, CA  90035-1157
(310) 556-9800
esc@cohenmusiclaw.com
mmarzano@cohenmusiclaw.com

*Attorneys for Plaintiffs*

154498.00601/120317498v.1155811.00601/123147253v.4

EVAN S. COHEN
COHEN MUSIC LAW
1180 South Beverly Drive, Suite 510
Los Angeles, CA  90035-1157
(310) 556-9800
esc@cohenmusiclaw.com

*Attorneys for Plaintiffs*

| Summary report: Litera® Change-Pro for Word 10.2.0.10 Document comparison done on 5/8/2020 4:50:51 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://imanage.blankrome.com/BRMATTERS/120317498/1 | |
| **Modified DMS:** iw://imanage.blankrome.com/BRMATTERS/123147253/4 | |
| **Changes:** | |
| Add | 963 |
| Delete | 396 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1359 |