**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN WAITE, an individual; EARLE R. ELY, JR. p/k/a JOE ELY, an individual; KASIM SULTON, an individual; SUSAN STRAW HARRIS p/k/a SYD STRAW, an individual; LEONARD GRAVES PHILLIPS, an individual; STAN SOBOL a/k/a STAN LEE, an individual, ISRAEL CABALLERO, an individual; STEVE WYNN, an individual; DENNIS MEHAFFEY p/k/a DENNIS DUCK, an individual; and DAVID PELLISH p/k/a DAVE PROVOST, an individual, on behalf of themselves and all others similarly situated, | Case No. 1:19-cv-01091-LAK<br><br>**CLASS ACTION SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) COPYRIGHT INFRINGEMENT; AND**<br><br>**(2) DECLARATORY RELIEF**<br><br><br>**<u>DEMAND FOR TRIAL BY JURY</u>** |
| Plaintiffs, | |
| v. | |
| UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group; CAPITOL RECORDS, LLC, a Delaware limited liability company; and DOES 1 through 10, | |
| Defendants. | |

Plaintiffs JOHN WAITE, an individual ("Waite"), and EARLE R. ELY, JR. p/k/a JOE ELY ("Ely"), an individual, KASIM SULTON ("Sulton"), an individual, and SUSAN STRAW HARRIS p/k/a SYD STRAW ("Straw"), an individual, LEONARD GRAVES PHILLIPS ("Phillips"), an individual, STAN SOBOL a/k/a STAN LEE ("Lee"), an individual, ISRAEL CABALLERO ("Caballero"), an individual, STEVE WYNN ("Wynn"), an individual, DENNIS MEHAFFEY p/k/a DENNIS DUCK ("Mehaffey"), an individual, and DAVID PELLISH p/k/a DAVE PROVOST ("Pellish"), an individual, (collectively, "Plaintiffs") on behalf of themselves and all other similarly situated authors of sound recordings ("sound recordings") who have served Notices of Termination pursuant to § 203 of the Copyright Act of 1976 upon Defendants UMG Recordings, Inc. (also known as and doing business as "Universal Music Group" and "UMG") and Defendant Capitol Records, LLC ( "Capitol") and DOES 1-10 (collectively "Defendants"), allege as follows for their Second Amended Complaint.[1]

## NATURE OF THE ACTION

1.     This class action lawsuit filed on behalf of Plaintiffs and two classes of similarly situated recording artists and other authors – a class of artist victims of Defendants' ongoing, willful copyright infringement and a class of artists who seek immediate declaratory relief – seeks to protect and vindicate the § 203 termination rights granted by Congress under the Copyright Act of 1976 that Defendants routinely seek to thwart through an integrated and systematic corporate scheme to reject valid termination notices in the hopes that the artists will surrender to, or otherwise acquiesce in, Defendants' continued and unlawful commercial

---

[1]     Plaintiffs hereby amend their First Amended Complaint reserving their appellate rights with respect to the dismissal of certain claims alleged on behalf of John Waite and Joe Ely and to clarify that Plaintiffs continue to assert claims on behalf of John Waite and Joe Ely to the extent that the grants were made by them personally and not by third parties. Plaintiffs also reserve the appellate rights of Susan Straw Harris with regard to the claim for declaratory relief.

exploitation of their valuable works.

2.      Since the first Copyright Act was enacted in 1790, that Act, and the several successive copyright statutes have always had a feature which allows a second chance for authors (or their heirs) to reclaim copyrights from unwise grants made by authors early on in their careers, close to the creation of the works. While the particular features of those laws, and the length of the terms and statutory scheme of the terminations involved, have changed and evolved, the strong "second chance" concept has remained. In fact, the very first act, the Copyright Act of 1790, borrowed that concept from the English Statute of Anne, enacted in 1709, the first copyright law. The theme continued in the Copyright Acts of 1831, 1870, and 1909.

3.      Likewise, § 203 of the Copyright Act of 1976 modified the Act of 1909 substantially yet continued the "second chance" policy with full force. According to the Congressional Record, the purpose of the statute was to protect authors and their heirs from "the unequal bargaining position of authors" in dealing with unpublished works, because of "the impossibility of [an author] determining [his or her] work's prior value until it has been exploited." H.R.Rep. No. 94-1476, at 124 (1976). Section 203 provides that authors (a term that includes both songwriters and recording artists) may terminate grants of copyright ownership thirty-five (35) years after the initial grant, generally computed from the date of the publication of those works subject to the grant.

4.      While the Copyright Act confers upon authors this valuable "second chance," the authors of sound recordings have faced stubborn and unfounded disregard of their federal legal rights by Defendants and, in many instances, willful copyright infringement. In fact, Defendants have repeatedly and systematically sought to eviscerate the important protections granted by this federal termination right.

5.      Plaintiffs Waite, Ely, Sulton, Straw, Phillips, Lee, Caballero, Wynn, Mehaffey, and Pellish, and hundreds of other recording artists (or their successors),

have served Notices of Termination upon Defendants pursuant to the provisions set forth in 17 U.S.C. § 203, but Defendants have routinely, uniformly and systematically refused to honor them.

6.      These refusals are made, in every instance, on similar grounds, the first and foremost of which is Defendants' position that the sound recordings created by recording artists under contract with Defendants (or their affiliated or predecessor companies) are "works made for hire," and, therefore, not part of the subject matter of § 203. Defendants claim that the recordings are "works made for hire" solely because of certain contractual language that is found in every one of Defendants' recording agreements.

7.      Through this artifice, Defendants seek to intimidate and bully the recording artists – most of whom now are well over 60 years of age – from enforcing their federal legal rights that supersede Defendants' sharp commercial practices.

8.      As a result of Defendants' policy and practices, Defendants have refused to acknowledge that *any* recording artist (or their successors) has the right to terminate and take over control of the sound recordings or enter into an agreement with a different label for the exploitation of recordings after the effective date of termination.

9.      Overwhelmingly, Defendants have continued to exploit the recordings after the effective date set forth on each Notice of Termination, thereby engaging in willful copyright infringement of the United States copyright in those recordings.

10.     As a result of Defendants' actions, Defendants have effectively stymied any chance that the Plaintiffs or the members of the Classes have of entering into a new agreement with a third party, or even exploiting the recordings themselves, as is their right under the law. In doing so, Defendants' actions have negatively impacted and/or effectively destroyed the very salability and commercial value (to Plaintiffs) of the post-termination rights in the recordings that the Copyright Act expressly guarantees.

11.    On account of Defendants' repeated, methodical, and willful copyright infringement, Plaintiffs (except Straw) seek recovery of actual and/or statutory damages on behalf of themselves and the members of Class A (as hereinafter defined below). Plaintiff Straw seeks immediate declaratory relief on behalf of Class B (as hereinafter defined below) to vindicate the rights of the recording artists for whom the effective date of the termination in the Notices of Termination will not occur prior to class certification.

12.    Plaintiffs further seek permanent injunctive relief restraining Defendants, their affiliates and all those acting in concert with them, from engaging in this systematic scheme to eviscerate and thwart all class members' valid termination rights. Therefore, Plaintiffs bring this class action for copyright infringement, declaratory relief, and injunctive relief, on behalf of themselves and all similarly situated recording artists (or their successors) who have sent Notices of Termination to Defendants with an effective date of termination on or after January 1, 2013, as more precisely described in ¶47, below.

## THE PARTIES

13.    Plaintiff Waite is an adult individual who is a resident of Santa Monica, California. Waite is a British singer and songwriter, who began his career in the early 1970s as a member of the musical group The Babys. In 1983, he began a solo career and released several successful albums.

14.    Plaintiff Ely is an adult individual who is a resident of Austin, Texas. Ely, an American artist, has had a long career in music as a singer, songwriter, and guitarist. Since releasing his first solo album in 1977, he has recorded a total of eighteen studio albums on several labels, including MCA, which is a predecessor to UMG/Capitol. Ely has also been a performer on numerous albums by other recording artists, including The Clash and Rosie Flores.

15.　Plaintiff Sulton is an adult individual who is an American bass guitarist, keyboardist and vocalist, and is best known for his work with Todd Rundgren's band, Utopia. Sulton has been a frequent collaborator, bassist and singer on many of Todd Rundgren's projects and solo tours, as well as a bassist and touring musician with the performer known as Meatloaf.

16.　Plaintiff Straw is an adult individual who is an American singer and songwriter. She was a member of the band called Golden Palominos, and has contributed vocals to recordings by Rickie Lee Jones, Leo Kottke, and Dave Alvin.

17.　Plaintiff Phillips is an adult individual who is the lead vocalist for the California punk rock band called The Dickies.

18.　Plaintiff Lee is an adult individual who is the guitarist and vocalist for The Dickies.

19.　Plaintiff Caballero is an adult individual who is the brother, and the statutory successor-in-interest to Carlos Caballero p/k/a Karlos Kaballero. Kaballero was the original drummer of The Dickies, and died in 2009.

20.　Plaintiff Wynn is an adult individual who is the lead vocalist and a guitarist for the rock band called The Dream Syndicate.

21.　Plaintiff Mehaffey is an adult individual who is the drummer for The Dream Syndicate.

22.　Plaintiff Pellish is an adult individual who was bass player for The Dream Syndicate in 1984.

23.　Wynn, Mehaffey, and Pellish constitute a majority of the authors of The Dream Syndicate works at issue, and have standing to assert their claims, pursuant to 17 U.S.C. § 203(b)(3).

24.　Defendant UMG RECORDINGS, INC. is an American global music corporation organized under Delaware law.  It is also known as and does business interchangeably as "UMG" and "Universal Music Group" (referred to herein as

"UMG," "Universal Music Group" and/or "UMG/Universal Group").   It is a subsidiary of Vivendi Universal S.A. ("Vivendi"), with its principal place of business and global corporate headquarters located at 2220 Colorado Avenue, Santa Monica, California. UMG also maintains U.S. headquarters at 1755 Broadway, New York City, New York offices, where Island Records, Def Jam Recordings, Republic Records, Decca Label Group, Spinefarm Records, Geffen Records, and other of UMG's labels are headquartered.

25.    In corporate filings with the State of California, where it is registered as a foreign corporation, UMG describes its business as "manag[ing] recorded music assets."

26.    UMG utilizes the trade names "UMG" and "Universal Music Group" for its various corporate music-based operations.  It is also the successor-in-interest to several other companies and/or brands within the Universal Music Group, including, but not limited to, Chrysalis, PolyGram Records, Inc., A & M, Capitol, EMI, Motown, Def Jam, Geffen, and all of the companies to which UMG/Universal Music Group succeeded by merger, acquisition, business combination, restructuring or operation of law.

27.    Vivendi is a French mass media conglomerate headquartered in Paris, France. According to its website, music is its most important asset through UMG/Universal Music Group, with 2019 year-end revenues of €7.19 billion. (*See* www.vivendi.com.)  Vivendi recently valued Universal Music Group at approximately $30 billion when it sold a 10% stake in Universal Music to Tencent Holdings Limited for $3 billion in January 2020. Such an astronomical valuation is built upon the actual and projected revenue streams generated by the sound recordings of musical artists like the Plaintiffs and the Plaintiff class members. Such massive revenues have incentivized corporate management to vigorously reject the Plaintiffs and the Plaintiff class members' lawful attempts to reclaim their rights.

28.     UMG is considered one of the "Big Three" record labels, along with Sony Music and Warner Music Group. UMG is one of the world's largest recorded music and music publishing companies, and includes record labels such as Capitol, Motown, Def Jam and Geffen. UMG is successor to, and was formerly named, PolyGram Records, Inc.

29.     UMG is a record label, as well as a global music conglomerate, and has released music under the Universal and Mercury imprints and is the successor-in-interest to many record labels, including EMI, Capitol, Geffen, A&M, and Chrysalis imprints, among many others. In fact, UMG holds itself out to the public and musical artists as owning and controlling these record labels, including on its public website www.universalmusic.com.

30.     Moreover, according to the Universal Music Group website terms and conditions, "all notices not related to these Site Terms and Conditions should be sent to: UMG Recordings, Inc. c/o Legal Dept. 2220 Colorado Ave, Santa Monica, CA 90404." Defendants provide this instruction and directive with respect to all the labels and brands identified on the Universal Music Group website, including with respect to UMG, Capitol and the other labels and brands under the Universal Music Group "umbrella" and within the UMG/Universal Music conglomerate.

31.     In fact, when UMG responded after receipt of the Notices of Termination, UMG representatives responded on behalf of UMG and its label via correspondence on UMG letterhead regardless of the identity of the underlying record label.

32.     Defendant Capitol Records, LLC ("Capitol") is a Delaware limited liability company, and which has its principal place of business and global corporate headquarters located in Santa Monica, California, at the same address as the UMG entities. Capitol also maintains offices at 1755 Broadway, New York City, within this judicial district. Capitol originally incorporated in Delaware under the name

Capitol Records, Inc., and later converted to a limited liability company. In corporate filings with the State of California, it states that its type of business is "Recorded music."

33.     Capitol utilizes the trade name "Capitol Records" for its operations, and also is the successor-in-interest to several other companies within the Universal Music Group, including, but not limited to, Chrysalis Records, Inc., EMI America Records, Inc., Virgin Records America, Inc., and Capitol Records, Inc. As used herein, the term "Capitol" includes both Capitol Records, LLC and all of the companies to which Capitol succeeded by operation of law, acquisition, business combination, restructuring or merger.

34.     In the corporate structure of the conglomerate known as the Universal Music Group, UMG functions as the corporate agent of the other business entities that are part of the Universal Music Group. UMG, through its business and legal personnel, oversees and conducts the integrated business operations servicing the relationships with the Plaintiffs and the class members, including accounting for revenues generated through digital and physical sales of sound recordings, negotiating transactions and commercially exploiting the sound recordings created by Plaintiffs and the class members.

35.     UMG and Capitol have the same business address in Santa Monica, California, so any correspondence sent to the Universal Music Group is directed, without exception, to personnel who perform legal and business affairs functions for both UMG and Capitol. UMG and Capitol share the same office space, the have substantially the same personnel, and, notably, the same in-house attorneys and business affairs staff. Put simply, notwithstanding the myriad and complex interrelationships of brands, labels, divisions and affiliates, the core servicing and music exploitation business is conducted under the trade name of Universal Music Group and/or UMG for them all through a centralized, administrative servicing and

recordkeeping function.

36.     Further, consistent with the instructions on the Universal Music website, the Plaintiff recording artists and the class members sent their Notices of Termination to Defendants' business address located at 2220 Colorado Avenue in Santa Monica, California, addressed to "Universal Music Group." Universal Music Group and/or UMG function as corporate agent for, specifically, Capitol, and the Notices were received, read, and analyzed by the same business affairs staff for any matter involving either UMG or Capitol.

37.     The legal and business affairs staff of UMG has full and complete access to all relevant and pertinent documents and information relating to both UMG and Capitol, including decades-old recording agreements, correspondence, royalty statements, financial analysis, sales information, catalogue database information, so-called "metadata" for all releases (including various identification codes utilized in the music industry for tracking digital performances and sales), release dates and dates of publication, and revenue information of all kinds and nature.

38.     This access to documents and information extends not only to UMG and Capitol, but the corporations and entities that have been subsumed or merged into Capitol, including, but not limited to, Chrysalis Records, Inc., EMI America Records, Inc., Virgin Records America, Inc., and Capitol Records, Inc.

39.     On account of this unquestionably close relationship between UMG and Capitol, Notices of Termination sent to the Universal Music Group were valid for both corporations as both companies unquestionably were put on notice of the recording artists' intent to terminate by their use of common staff and personnel.

40.     Furthermore, upon information and belief, "UMG" and "Universal Music Group" are trade names utilized by UMG Recordings, Inc., which holds itself out publicly as the owner and controller of Capitol. Both UMG and Capitol have identical or nearly identical officers and directors.

41.     The true names and capacities (whether individual, corporate, associate or otherwise) of the Defendants named herein as Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when such have been ascertained. Upon information and belief, each of the Doe Defendants herein is responsible in some manner for the occurrences herein alleged, and Plaintiffs' and class members' injuries as herein alleged were proximately caused by such Defendants' acts or omissions.

42.     Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned in this Complaint, UMG, Capitol, and each of the Doe Defendants were the agent of each other and, in doing the things alleged in this Complaint, were acting within the course and scope of such agency.

## JURISDICTION AND VENUE

43.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and also seeks declaratory relief with regard to several legal issues that arise from the language and interpretation of the Copyright Act.

44.     This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1331 and 1338(a).

45.     This Court is empowered to issue a declaratory judgment and further necessary or proper relief pursuant to 28 U.S.C. §§2201 and 2202.

46.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because both UMG and Capitol are subject to personal jurisdiction in this District and because a substantial part of the events or omissions by UMG and Capitol giving rise to the claims occurred in this District.

## CLASS ALLEGATIONS

47.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. Proc. 23 on behalf of themselves and on behalf of two classes of similarly situated recording artists, defined as follows:

> **Class A:** All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination pursuant to § 203 of the Copyright Act describing an effective date of termination for a particular work (i) occurring on or after January 1, 2013 and (ii) occurring no later than the date the Court grants class certification of Class A.

> **Class B:** All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination pursuant to § 203 of the Copyright Act, describing an effective date of termination for a particular work (i) occurring on or after the date the Court grants class certification of Class A and (ii) occurring no later than December 31, 2030.

48.     Classes A and B shall include all persons serving any Notice of Termination on Defendants up to and including the date on which the Court rules on Plaintiffs' motion for class certification and shall not be limited to persons who served Notices of Termination as of the date of the filing of the original or any amended complaint in this action. Membership in Class A or B shall be determined based upon whether the effective date of termination occurs on or before the date the Court grants certification of Class A.

49.     Excluded from Classes A and B is any officer, director or person employed by Defendants and any recording artist who has entered into a valid

written agreement with Defendants pursuant to § 203(b)(4) wherein UMG and/or Capitol have been granted "a further grant" therein.

50.     This action has been brought and may be properly maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed classes are readily and easily ascertainable and identifiable.

51.     The members of the classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe, and on that basis allege, that there are hundreds of members in the classes who can be readily located, identified from various records and databases (including those maintained by Defendants and the United States Copyright Office), and notified of this action.

52.     Plaintiffs' claims for copyright infringement, injunctive and declaratory relief are typical of the claims of the members of the classes, and Plaintiffs' interests are consistent with and not antagonistic to those of the other members of the class they seek to represent.

53.     Plaintiffs and all members of Class A have sustained damages and face irreparable harm arising out of Defendants' continued infringement and disregard of the Notices of Termination as alleged herein and, thus, are entitled to recover actual damages and/or statutory damages and obtain injunctive relief to prevent further wrongful conduct by Defendants.

54.     Plaintiffs have no interests adverse to, or conflicting with, the interests of the absent members of the classes and they are able to fairly and adequately represent and protect the interests of such a class. Plaintiffs believe strongly in the protection of the rights of recording artists and are committed to protecting such rights.

55.     Plaintiffs (except Straw) have raised viable and compelling claims for copyright infringement of the type reasonably expected to be raised by

members of the classes and will diligently and vigorously pursue the infringement claims.

56.    Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action.

57.    If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to include additional class representatives to represent any class or to assert additional claims as may be appropriate.

58.    Class certification under Fed. R. Civ. Proc. 23(b)(3) is warranted because questions of fact and law (to the extent that any may exist) are common to all members of the class and would plainly predominate over any questions affecting only individual members of the class. These common legal and factual questions, to the extent that any may exist, do not vary from class member to class member, and can be determined through common proof without reference to the individual circumstances of any class member.  Said questions include (without limitation) the following:

(A)    Whether sound recordings can ever be considered "a work made for hire," as that term is defined in the Copyright Act, where (1) the definition of "a work made for hire" set forth in § 101 of the Copyright Act does not include sound recordings as being one of the enumerated types of "specially ordered" or "commissioned" works that can be a work made for hire, and (2) none of the recording artists in the class was ever in an employer-employee relationship with the Defendants, their affiliated or related companies, or their predecessors-in-interest.

(B)    Whether the release of sound recordings that were created by a particular recording artist in "album" form, as is typical in the music industry, constitutes a "contribution to a collective work," or creates a "compilation," as those terms are used in the definition of "a work made for hire" in § 101 of

14

the Copyright Act;

(C)     Whether a foreign choice of law provision in a recording agreement has any effect upon the application of United States copyright law to issues relating to the application of the Copyright Act (and § 203 specifically) to the United States copyrights at issue, and whether such a clause raises viable claims of "breach of contract" against the recording artists for the act of exercising their rights under United States copyright law;

(D)     Whether the recording agreements upon which Defendants base their position regarding "work made for hire" clauses violate § 203(a)(5) of the Copyright Act;

(E)     Whether and to what extent recording artists are barred from exercising their rights under § 203 of the Copyright Act if a "loan-out company" or third-party record label, or, in the appellation utilized by Defendants, a "Furnishing Company", was involved in the contractual transaction relating to the original grant; and whether the agreements upon which Defendants' position regarding third-party record labels or so called "Furnishing Companies" is premised violate § 203(a)(5) of the Copyright Act;

(F)     Whether, in the aforementioned instance of the involvement of a "Furnishing Company" or a third-party record label, the use of the document commonly known as an "Inducement Letter" creates a direct grant of rights from the recording artist to Defendants, or their related or affiliated companies, so that, if and when the third-party record label or "Furnishing Company" ceases to exist, the service of a Notice of Termination from the recording artist to Defendants is a valid termination of the original grant of rights.

(G)     Whether the exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter

exploit the sound recordings after the effective date of termination, is a breach of contract by the recording artists of a clause in the recording agreement that, according to Defendants, provides that recording artists may never exploit the sound recordings themselves, and whether such a clause violates § 203(a)(5) of the Copyright Act;

(H)    Whether the assertion of rights by the recording artists under § 203 of the Copyright Act is "time-barred" because, as alleged by Defendants, "claims regarding the initial ownership status of a work must be brought within three years of creation," and the act of serving a Notice of Termination is a claim "challenging that issue"; and

(I)    The basis and method for determining and computing damages, including statutory damages.

59.    Class certification of Class B also is appropriate pursuant to Fed. R. Civ. Proc. 23(b)(2) because Defendants have acted and/or refused to act on grounds that are generally applicable to the Class, which makes declaratory and injunctive relief with respect to Plaintiffs and the Class, as a whole, appropriate.

60.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all class members is impracticable. The claims of the individual members of the class may range from smaller sums to larger sums. Thus, for those class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually. And even if every member of the class could afford to pursue individual litigation, the court system could not be so encumbered. It would be unduly burdensome to those courts in which individual litigation of numerous cases would otherwise proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court

system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action presents few, if any, management difficulties, conserves the resources of the parties and court system, and protects the rights of each member of the class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF
### (Copyright Infringement – Against All Defendants)

61.     Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 60 above, as though fully set forth herein.

62.     Pursuant to § 203 of the Copyright Act, recording artists (or their successors) have the right to serve a Notice of Termination to terminate the grant of rights made to a record label, generally thirty-five (35) years after the publication of those recordings.

63.      The Notices of Termination have been duly and correctly served upon the current grantees, and, with regard to Plaintiffs Waite, Ely, Sulton, Straw, Phillips, Lee, Caballero, Wynn, Mehaffey, and Pellish, and the members of Class A, that current grantee is either UMG and/or Capitol.

The Waite Albums

64.     On or about November 1, 1981, Plaintiff Waite, through a loan-out company called Heavy Waite, Inc., entered into a recording agreement dated as of November 1, 1981 with Chrysalis Records, Inc. ("Chrysalis"), a predecessor to Capitol (the "Heavy Waite Chrysalis Agreement").[2]

65.     Heavy Waite, Inc. was a Delaware corporation incorporated on

---

[2]     Plaintiffs reserve all appellate rights with respect to the Court's March 31, 2020 dismissal of Waite's "claims based on grants transferred by third parties." Dkt. No. 68 at 24. Plaintiff Waite hereby amends his claim to clarify that the inducement letters he signed at Defendants' urging

October 26, 1981. Waite was the president/sole owner of Heavy Waite, Inc. and he was not an employee of Heavy Waite, Inc.

66.    The Heavy Waite Chrysalis Agreement was designed, drafted and intended by Chrysalis, among other things, to secure the exclusive recording services of Waite.

67.    In the Heavy Waite Chrysalis Agreement, Waite was expressly identified as the "Artist."

68.    At the time of execution of the Heavy Waite Chrysalis Agreement, Waite was not an employee of Chrysalis.

69.    In fact, Waite was not an employee of Chrysalis at any time during the term of the Heavy Waite Chrysalis Agreement.

70.    Nonetheless, without any bona fide employment relationship between Chrysalis and Waite, and in an attempt to circumvent the § 203 statutory termination right, Chrysalis sought in the Heavy Waite Chrysalis Agreement to create an artifice by which Waite would be deemed an employee of Chrysalis and the works Waite would author as Artist would be characterized as employee "works made for hire."

71.    Indeed, paragraph 4 of the Heavy Waite Chrysalis Agreement memorialized Chrysalis's attempted artifice by using the following language directed at both Plaintiff Waite and Heavy Waite, Inc.: "For the purposes hereof, you, Artist, and all other persons rendering services in connection with such master recordings shall be our employees for hire and all such master recordings shall be works made for hire under the United States Copyright Law."

72.    Contemporaneously, because the "work made for hire" language

_____

constituted direct grants of rights to Defendants that fall within the scope of his Notice of Termination. Waite continues to assert his copyright infringement claim in good faith arising from these direct grants that are **not** based on grants transferred by third parties.

alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Chrysalis also demanded and obtained several provisions in the Heavy Waite Chrysalis Agreement that effectuated a direct, personal grant by Waite to Chrysalis of the copyright in and to the sound recordings that Waite agreed to record pursuant to the Heavy Waite Chrysalis Agreement.

73.     Paragraph 4 of the Agreement further memorialized the parties' expectation and intent that Heavy Waite, Inc. would "cause Artist [John Waite] to execute and deliver to us any assignments of copyright (including renewals or extensions thereof) in and to such master recordings as we may reasonably deem necessary, and you and Artist hereby irrevocably appoint us your and Artist's attorney-in-fact for the purposes of executing such assignments in your and Artist's name."

74.     Indeed, contemporaneously with the Heavy Waite Chrysalis Agreement and as a material requirement of the Heavy Waite Chrysalis Agreement itself, and at the request and insistence of Chrysalis, Waite also signed what is commonly referred to in the music industry as an "inducement letter," as an alternative and reliable means to effect a transfer to Chrysalis of the copyright in and to the subject sound recording. A true and correct copy of the Waite Chrysalis Inducement Letter dated as of November 1, 1981 is attached as **Exhibit 1** and incorporated by reference.

75.     The Waite Chrysalis Inducement Letter contained a rights provision that would be triggered in the event Heavy Waite, Inc. ceased to provide or be entitled to Waite's recording services, thereby emphasizing that *Waite* (and *not* Heavy Waite, Inc.) was the creative and artistic driving force behind the creation of the works and that his unique and special talents were the essential

consideration for the Agreement. In pertinent part, the Waite Chrysalis Inducement Letter provided:

> "2. If during the term of the Agreement or any extensions or renewals thereof Producer [Heavy Waite, Inc.] shall cease to be entitled to my recording services in accordance with the terms of the Agreement, or if Producer [Heavy Waite, Inc.] shall fail or refuse to furnish my recording services to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Producer [Heavy Waite, Inc.] had continued to be entitled to my recording services and if Producer [Heavy Waite, Inc.] had continued to furnish my services to you, and such rights, privileges and benefits shall be enforceable in your behalf against me."

> (**Exhibit 1**, Waite Chrysalis Inducement Letter, ¶ 2.)

76.    Paragraph 2 of the Inducement Letter served as a further acknowledgment by Chrysalis that the copyrights may be deemed to belong to Waite as the author, thereby necessitating his personal and direct grant of rights to Chrysalis as a material and essential component of the overall recording agreement.

77.    The Waite Chrysalis Inducement Letter, along with paragraph 4 of the Heavy Waite Chrysalis Agreement, was a direct, personal grant of copyright rights by Plaintiff Waite to Defendants' predecessor-in-interest Chrysalis.

78.    Chrysalis insisted on paragraph 4 of the Agreement and the Inducement Letter from Waite, including the direct grant of rights, because Chrysalis needed to ensure that Waite would render the musical performance services under the Agreement, but knew that Waite would be the author of the sound recording and the direct grant of rights by Waite was the only way to ensure that Chrysalis received the contemplated grant of exclusive rights to the sound

recordings created by Waite.

79.    Chrysalis knew that, notwithstanding the language in the Heavy Waite Chrysalis Agreement purporting to characterize Waite as Chrysalis's employee, Waite was not at the time of execution and was not at any time thereafter, a bona fide employee of Chrysalis.

80.    Chrysalis further knew that sound recordings could not otherwise qualify as "works made for hire" under the governing Copyright Act definition.

81.    Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

82.    Chrysalis also knew that any grant of the copyright was not effective until the work was created by Waite by fixing the work in a tangible medium of expression.

83.    Despite Chrysalis's efforts, because Waite was not an employee of Chrysalis and the works were not "works made for hire," Chrysalis's artificial construct contained in the Heavy Waite Chrysalis Agreement was ineffective and, thus, the only effective transfer of the author's copyright would be made by Waite's direct, personal transfer.

84.    Accordingly, Chrysalis demanded and obtained the direct, personal grant of Waite's copyright, which he acquired by law as the author of the work, to ensure that it could publish, market and commercially exploit the work, specifically because the facts showed that the sound recording could not qualify as a "works made for hire."

85.    Having enjoyed the benefit of the Waite Chrysalis Inducement Letter for decades, including certainty as to the effectiveness of Waite's grant of rights, Defendants cannot now disavow the effectiveness of Waite's prior direct grant of

rights to their predecessors-in-interest.

86.     After the Waite Chrysalis Inducement Letter was executed as demanded by Chrysalis, Waite created the sound recording released as the *Ignition* Album.

87.     The *Ignition* Album, which was Waite's debut solo album, was released by Chrysalis on or about June 29, 1982, well after Waite made the direct, personal grant demanded by Chrysalis.

88.     In or about March 1986, Heavy Waite, Inc. ceased to be in good standing in the State of Delaware, and has not been in good standing for well over thirty years.

89.     Moreover, upon information and belief, Chrysalis, and its successor-in-interest Capitol, has not accounted to Heavy Waite, Inc. as a corporation, for decades.

90.     Accordingly, Chrysalis and its successors dealt and communicated directly with Waite or his representatives thereafter.

91.     Therefore, pursuant to the Waite Chrysalis Inducement Letter, the relationship between Chrysalis and Capitol, on the one hand, and Heavy Waite, Inc., on the other, has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Waite served his Notice of Termination upon Capitol, was and is a *direct* contractual relationship between Waite and Capitol.

92.     In September 1983, Waite, through a different loan-out company called Moonwalk Music, Inc., entered into an agreement with Capitol Records, Inc. ("Capitol") (the "First Capitol Agreement").

93.     Moonwalk Music, Inc. was a New York corporation incorporated on March 31, 1982. Waite was the president/sole owner of Moonwalk Music, Inc.  He was not an employee of Moonwalk Music, Inc.

94.     The First Capitol Agreement was designed, drafted and intended by Capitol, among other things, to secure the exclusive recording services of Waite.

95.     At the time of execution of the First Capitol Agreement, Waite was not an employee of Capitol.

96.     In fact, Waite was not an employee of Capitol at any time during the term of the First Capitol Agreement.

97.     The First Capitol Agreement was prepared by Capitol and sought to create an artifice that Waite was an employee of Capitol and that the works Waite authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

98.     Nonetheless, without any bona fide employment relationship between Capitol and Waite, and in an attempt to circumvent the § 203 statutory termination right, Capitol sought in the First Capitol Agreement to create an artifice by which Waite would be deemed an employee of Capitol and the works Waite would author as Artist would be characterized as employee "works made for hire."

99.     Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Capitol also demanded and obtained several provisions in the First Capitol Agreement that effectuated a direct, personal grant by Waite to Capitol of the copyright in and to the sound recordings that Waite agreed to record pursuant to the First Capitol Agreement.

100.    Like the Heavy Waite Chrysalis Agreement, Capitol memorialized Capitol's attempted artifice by using "work made or hire" language in paragraph 5(a) of the First Capitol Agreement, even though Capitol knew that Waite did not

have, and never had, a bona fide employment relationship with Capitol.

101.   Indeed, paragraph 5(a) of the First Capitol Agreement further memorialized the parties' expectation and intent that Moonwalk Music, Inc. would "cause" Waite to execute a declaration and power of attorney as a material and essential term of the Agreement.

102.   The declaration demanded by Capitol provided in paragraph B that, notwithstanding the "work made for hire" language added to the Agreement to create the artifice described above, Waite agreed "to the extent, if any, that I may deemed an 'author' of any Work, I grant and assign to EMIA [Capitol] all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106." A true and correct copy of the First Capitol Declaration is attached as **Exhibit 2** and incorporated by reference.

103.   Contemporaneously with the First Capitol Agreement and as a material requirement of the First Capitol Agreement itself, and at the request and insistence of Capitol, Waite also signed what is commonly referred to in the music industry as an "inducement letter," as an alternative and reliable means to effect a transfer to Capitol of the copyright in and to the subject sound recording. A true and correct copy of the First Capitol Inducement Letter dated as of August 29, 1983 is attached as **Exhibit 3** and incorporated by reference.

104.   The First Capitol Inducement Letter similarly contained a provision that would be triggered in the event Moonwalk Music, Inc. ceased to provide or be entitled to Waite's recording services thereby again emphasizing that Waite was the creative and artistic driving force behind the creation of the works and that his unique and special talents were the essential consideration for the Agreement. In pertinent part, the First Capitol Inducement Letter provided:

"If during the term of this Agreement or any extensions, or renewals or

24

modifications thereof [Moonwalk Music, Inc.] shall cease to be entitled to make my recording services available to you in accordance with the terms of the Agreement, or if [Moonwalk Music, Inc.] shall fail or refuse to make my recording services to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if [Moonwalk Music, Inc.] had continued to be entitled to my recording services, and I shall make the same available to you, and such rights, privileges and benefits shall be enforceable on your behalf against me."

(**Exhibit 3**, First Capitol Inducement Letter, para. 6).

105.   Paragraph 6 of the First Capitol Inducement Letter served as a further confirmation by Capitol that the copyrights may be deemed to belong to Waite as the author, thereby necessitating his personal and direct grant of rights to Capitol as a material and essential component of the overall recording agreement.

106.   The First Capitol Declaration, along with First Capitol Inducement Letter and paragraph 5(a) of the First Capitol Agreement, was a direct, personal grant of rights by Plaintiff Waite to Capitol.

107.   Capitol insisted on the First Capitol Inducement Letter, including its direct grant of rights, from Waite because Capitol needed to ensure that Waite would render the musical performance services under the First Capitol Agreement, but knew that Waite would be the author of the sound recording and the direct grant of rights by Waite was the only way to ensure that Capitol received the contemplated grant of rights to the sound recording created by Waite.

108.   Capitol knew that, notwithstanding the language in the First Capitol Agreement purporting to characterize Waite as an employee, Waite was not at the time of execution and was not at any time thereafter a bona fide employee of Capitol.

109.   Capitol further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

110.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

111.   Capitol also knew that any grant of the copyright was not effective until the work was created by Waite by fixing the work in a tangible medium of expression.

112.   Despite Capitol's efforts, because Waite was not an employee of Capitol and the works were not "works made for hire," Capitol's artificial construct contained in the First Capitol Agreement was ineffective and, thus, the only effective transfer of the author's copyright would be made by Waite's direct, personal grant.

113.   Accordingly, Capitol demanded and obtained the direct, personal grant of Waite's copyright, which he acquired by law as the author of the works, to ensure that it could publish, market and commercially exploit the works, specifically because the facts showed that the sound recording could not qualify as "work made for hire."

114.   Having enjoyed the benefit of the First Capitol Inducement Letter for decades, including certainty as to the effectiveness of Waite's grant of rights, Defendants cannot now disavow the effectiveness of Waite's prior direct grant of rights to them.

115.   After the Declaration and First Capitol Inducement Letter were executed as demanded by Capitol, Waite created the sound recordings released as the *No Brakes* Album.

116.   The *No Brakes* Album was Waite's second solo album and was

released by Capitol in June 1984, well after Waite made the direct, personal grant demanded by Capitol.

117.   On March 25, 1992, Moonwalk Music, Inc. ceased to be in good standing in the State of New York, and not has not been in good standing for nearly thirty years.

118.   Accordingly, Capitol and its successors dealt and communicated directly with Waite or his representatives thereafter

119.   Moreover, upon information and belief, Capitol, and its successor-in-interest Capitol, has not accounted to Moonwalk Music, Inc. as a corporation, for decades.

120.   Therefore, pursuant to the First Capitol Inducement Letter of the First Capitol Agreement and the Waite First Capitol Declaration, the relationship between Capitol and its successor Capitol, on the one hand, and Moonwalk Music, Inc., on the other, has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Waite served his Notice of Termination upon Capitol, was and is a *direct* contractual relationship between Waite and Capitol.

121.   In July 1985, Waite, through another loan-out company called Diamond Strife, Inc.[3], entered into another agreement with Capitol (the "Second Capitol Agreement").

122.   Diamond Strife, Inc. was a New York corporation incorporated on June 27, 1985. Waite was the president/sole owner of Diamond Strife, Inc. He was not an employee of Diamond Strife, Inc.

123.   The Second Capitol Agreement was designed, drafted and intended

---

[3] The correct name of the corporation is "Diamond Strife, Inc."  However, the documents drafted by Capitol incorrectly referred to the corporation as "Diamond *Stripe*, Inc." The allegations herein shall utilize the correct corporate name, "Diamond Strife, Inc."

by Chrysalis, among other things, to secure the exclusive recording services of Waite.

124.   At the time of the execution of the Second Capitol Agreement, Waite was not an employee of Capitol.

125.   In fact, Waite was not an employee of Capitol at any time during the term of the Second Capitol Agreement.

126.   Nonetheless, without any bona fide employment relationship between Capitol and Waite, and in an attempt to circumvent the § 203 statutory termination right, Capitol sought in the Second Capitol Agreement to create an artifice by which Waite would be deemed an employee of Capitol and the works Waite would author as Artist would be characterized as employee "works made for hire."

127.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Capitol also demanded and obtained several provisions in the Second Capitol Agreement that effectuated a direct, personal grant by Waite to Capitol of the copyright in and to the sound recordings that Waite agreed to record pursuant to the Second Capitol Agreement.

128.   Like the Heavy Waite Chrysalis Agreement and the First Capitol Agreement, Capitol memorialized its attempted artifice by using "work made for hire" language in paragraph 5(a) of the Second Capitol Agreement, even though Capitol knew that Waite did not have, and never had, a bona fide employment relationship with Capitol.

129.   Paragraph 5(a) of the Second Capitol Agreement further memorialized the parties' expectation and intent that Diamond Strife, Inc. would

"cause" Waite to execute a declaration and power of attorney as a material and essential term of the Agreement.

130.   The declaration demanded by Capitol provided in paragraph B that, notwithstanding the "work made for hire" language added to the Agreement to create the artifice described above, Waite agreed "to the extent, if any, that I may be deemed an 'author' of any Work, I grant and assign to [Capitol] all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106." A true and correct copy of the Second Capitol Declaration (captioned "Exhibit 'E'") is attached as **Exhibit 4** and incorporated by reference.

131.   Contemporaneously with the Second Capitol Agreement and as a material requirement of the Second Capitol Agreement itself, and at the request and insistence of Capitol, Waite also signed another so-called "inducement letter." A true and correct copy of the Second Capitol Inducement Letter, captioned "EXHIBIT 'A' ARTIST DECLARATION" and dated July 4, 1985, is attached as **Exhibit 5** and incorporated by reference.

132. The Second Capitol Inducement Letter similarly contained a provision that would be triggered in the event that Diamond Strife, Inc. ceased to provide or be entitled to Waite's recording services, thereby again emphasizing that Waite was the creative and artistic driving force behind the creation of the works and that his unique and special talents were the essential consideration for the Agreement.  In pertinent part, the Second Capitol Inducement Letter provided: "If during the term of this Agreement or any extensions, or renewals or modifications thereof, [Diamond Strife, Inc.] shall cease to be entitled to make my services available to you in accordance with the terms of the Agreement, or if [Diamond Strife, Inc.] shall fail or refuse to make my services to you, I shall, at your request, do all such acts and things as shall give to you the same rights,

privileges and benefits as you would have had under the Agreement if [Diamond Strife, Inc.] had continued to be entitled to my services, and I shall make the same available to you, and such rights, privileges and benefits shall be enforceable on your behalf against me."

(**Exhibit 5**, Second Capitol Inducement Letter, para. 6).

133.   Paragraph 6 of the Second Capitol Inducement Letter served as a further confirmation by Capitol that the copyrights may be deemed to belong to Waite as the author, thereby necessitating his personal and direct grant of rights to Capitol as a material and essential component of the recording agreement.

134.   The Second Capitol Declaration, along with the Second Capitol Inducement Letter and paragraph 5(a) of the Second Capitol Agreement was a direct, personal grant of rights by Plaintiff Waite to Capitol.

135.   Capitol insisted on the Second Capitol Inducement Letter, including its direct grant of rights, from Waite because Capitol needed to ensure that Waite would render the musical performance services under the Second Capitol Agreement, but knew that Waite was the author of the sound recording and the direct grant of rights by Waite would be the only way to ensure that Capitol received the contemplated grant of rights to the sound recording created by Waite.

136.   Capitol knew that, notwithstanding the language in the Waite Second Capitol Agreement purporting to characterize Waite as an employee, Waite was not at the time of execution and was not at any time thereafter a bona fide employee of Capitol.

137.   Capitol further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

138.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would

be neither a collective work nor a compilation as defined under the Copyright Act.

139.   Capitol also knew that any grant of the copyright was not effective until the work was created by Waite by fixing the work in a tangible medium of expression.

140.   Despite Capitol's efforts, because Waite was not an employee of Capitol and the works were not "works made for hire," Capitol's artificial construct contained in the Second Capitol Agreement was ineffective and the only effective transfer of the author's copyright would be made by Waite's direct, personal transfer.

141.   Accordingly, Capitol demanded and obtained the direct, personal grant of Waite's copyright, which he acquired by law as the author of the works, to ensure it could publish, market and commercially exploit the works, specifically because the sound recording could not qualify as "work made for hire."

142.   Having enjoyed the benefit of the Second Capitol Inducement Letter for decades, including certainty as to the effectiveness of Waite's grant of rights, Defendants cannot now disavow the effectiveness of Waite's prior direct grant of rights to them.

143.   After the Second Declaration and Second Capitol Inducement Letter were executed as demanded by Capitol, Waite created the sound recording released as the *Mask of Smiles* Album.

144.   The *Mask of Smiles* Album, which was Waite's third solo album, was released by Capitol on July 26, 1985, well after Waite made the direct, personal grant demanded by Capitol.

145.   On or about June 24, 1992, Diamond Strife, Inc. ceased to be in good standing in the State of New York and has not been in good standing for nearly thirty years.

146.   Accordingly, Capitol and its successors dealt and communicated

directly with Waite or his representatives.

147.   Moreover, upon information and belief, Capitol, and its successor-in-interest Capitol, has not accounted to Diamond Strife, Inc. as a corporation, for decades.

148.   Therefore, pursuant to the Second Capitol Inducement Letter, the relationship between Capitol and its successor Capitol, on the one hand, and Diamond Strife, Inc., on the other, has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Waite served his Notice of Termination upon UMG/Capitol, was and is a *direct* contractual relationship between Waite and Capitol.

149.   At no time did any facts, which would establish an employer-employee relationship between Waite and any of the loan-out companies named above, exist, and at no time did any facts exist which would have established an employer-employee relationship between Waite and any of the Defendants or their predecessors.

150.   On or about April 20, 2015, Waite served a Notice of Termination (the "Waite Termination Notice") upon Capitol's agent Universal Music Group, notifying Defendants of Waite's termination of any prior grants of rights with respect to the sound recordings on the *Ignition* Album, the *No Brakes* Album and the *Mask of Smiles* Album.

151.   Thereafter, Waite promptly caused the Waite Termination Notice to be recorded in the United States Copyright Office, on August 30, 2016, as document V9924 D957 P1 through P3. A true and correct copy of the Waite Termination Notice is attached hereto as **Exhibit 6** and incorporated by reference.

152.   The effective date of termination for the *Ignition* Album was May 22, 2017.

153.   Initially, UMG made an effort to cease the United States exploitation

of the *Ignition* Album, and although UMG disputed the validity of the Notice of Termination, UMG and/or Capitol sought to negotiate a further grant from Waite, pursuant to § 203(a)(5).

154.   On or about August 1, 2017, after Waite rejected UMG/Capitol's inadequate proposal, Waite began to exploit the *Ignition* Album himself, via digital outlets, through a record label that he owns.

155.   In May 2018, UMG, despite its previous decision to cease the United States exploitation of the *Ignition* Album, suddenly reversed its position, asserting that Waite's exploitation of the *Ignition* Album was improper.

156.   On May 31, 2018, counsel for UMG/Capitol sent Waite a letter setting forth UMG/Capitol's legal positions for its claims that the Waite Notice was invalid, and, in addition, demanded that Waite "cease and desist from any and all unauthorized exploitation of the sound recordings, including the 'Ignition' Album." A true and correct copy of the May 31, 2018 letter is attached as **Exhibit 7**.

157.   In or about early July 2018, UMG/Capitol issued a take-down notice against Waite's digital release of that album.

158.   After UMG/Capitol caused Waite's release to be taken down from digital sites, UMG/Capitol resumed the digital exploitation of the *Ignition* Album through UMG/Capitol's normal digital outlets.

159.   The effective date of termination for the *No Brakes* Album was June 16, 2019.

160.   The effective date of termination has passed for both the *Ignition* Album and the *No Brakes* Album.

161.   Notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the *No Brakes* Album and instead continue to infringe on Waite's rights

with respect to the sound recording on the *No Brakes* Album, just like their infringement of the *Ignition* Album.

162.   Despite these facts, and UMG/Capitol's knowledge of the effective termination dates, UMG/Capitol willfully infringed upon the United States copyright belonging to Waite by continuing to exploit the sound recordings, as if the Waite Notice of Termination had not been sent at all, in complete disregard of the law.

163.   In addition, the effective date of termination for the third album set forth on the Waite Notice, *Mask of Smiles*, is July 27, 2020, approximately three months from the date of this amendment.

164.   Defendants have not changed their position or indicated any change will be forthcoming with respect to the *Mask of Smiles* Album in approximately three years – well prior to the scheduled trial date in this action.

165.   Upon information and belief, Plaintiff Waite expects and believes in good faith that Defendants will infringe on Waite's rights with respect to the *Mask of Smiles* Album, just as they have done with respect to the *Ignition* and *No Brakes* Albums.

166.   UMG/Capitol routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

167.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

168.   Pursuant to the Waite Notice of Termination, Waite is currently the

owner of the United States copyright in and to the sound recordings comprising the *Ignition* Album and the *No Brakes* Album.  Waite will become the owner of the United States copyright in and to the sound recording comprising the *Mask of Smiles* Album on July 27, 2020.

169.   By willfully continuing to exploit the sound recordings comprising the *Ignition* Album and the *No Brakes* Album in the United States after the effective dates of termination, all of which occurred within the past three years, UMG and/or Capitol have infringed upon those recordings, and, furthermore, the unlawful reproduction and distribution of the sound recordings owned by Waite as alleged hereinabove constitutes copyright infringement under the Copyright Act.

170.   Additionally, by willfully continuing to exploit the sound recording comprising the *Mask of Smiles* Album in the United States after the effective date of termination on July 27, 2020, Defendants will infringe upon that sound recording and any unlawful reproduction and distribution of the sound recording will constitute copyright infringement under the Copyright Act.

171.   Upon information and belief, Defendants engaged in substantially similar practices with respect to the small minority of class members who used "loan-out" companies at the time they entered into recording agreements with Defendants and their predecessors-in-interest.

172.   Upon information and belief, of those particular class members, all of them, without exception, executed "inducement letters" which provided that if the "loan-out" company or the third-party record labels ceased to exist, a direct transfer of rights or relationship between the recording artists and Defendants or their predecessors would exist.

173.   These inducement letters constituted a direct, personal grant of rights by these class members to Defendants or their predecessors-in-interest.

174.    In addition to grant language in the recording agreements directed at the class members, Defendants or their predecessors insisted on the inducement letters, including their direct grant of rights, from the class members because Defendants needed to ensure that the class members would render the musical performance services under the recording agreements, but knew that the class members were the authors of the sound recordings and the direct grant of rights by the class members was the only way to ensure that Defendants received the contemplated grant of rights to the sound recordings created by the artists.

175.    Having enjoyed the benefit of the inducement letters for decades, including certainty as to the effectiveness of the class members' grants of rights, Defendants cannot now disavow the effectiveness of the class members' prior direct grants of rights to Defendants.

176.    Accordingly, Waite further seeks to represent a subclass of similarly situated recording artists within the scope of Class A who executed direct grants of rights to Defendants pursuant to the inducement letters demanded by Defendants or their predecessors-in-interest.

<u>The Ely Albums</u>

177.    Ely entered into a recording agreement with MCA Records, Inc. ("MCA"), a predecessor of UMG, in 1976 (the "MCA Agreement").

178.    In February 1979, Ely's third album, *Down on the Drag,* was released on the MCA label. [4]

---

[4]    Plaintiffs reserve all appellate rights with respect to the Court's March 31, 2020 dismissal of Ely's "claims based on grants transferred by third parties" or his "claim related to his 1976 agreement for sound recordings that were created prior to January 1, 1978."  Dkt. No. 68 at 24. Plaintiff Ely hereby amends his claim to clarify that the inducement letters he signed at Defendants' urging constituted direct grants of rights to Defendants that fall within the scope of his Notice of Termination.  Ely continues to assert his copyright infringement claim in good faith arising from these direct grants that are ***not*** based on grants transferred by third parties. Additionally, he continues to assert copyright infringement claims with respect to sound recordings that were created on or after January 1, 1978.

179.   Ely created *Down on the Drag,* and the subsequent albums, after December 31, 1977.

180.   In February 1980, Ely recorded live recordings in London, United Kingdom, which were released on March 27, 1981, as the album entitled *Live Shots.*

181.   Both *Down on the Drag* and *Live Shots* were recorded by Ely pursuant to the MCA Agreement.

182.   On or about July 1, 1980, Ely entered into an agreement with South Coast Records, Inc. ("South Coast") for Ely's recording services (the "Ely South Coast Agreement").

183.   South Coast, in turn, entered into an agreement with MCA on July 1, 1980 (the "South Coast MCA Agreement") in which South Coast agreed to furnish Ely's services to MCA.

184.   South Coast was a Texas corporation incorporated on July 31, 1979. Michael Brovsky ("Brovsky") was the principal of South Coast.

185.   At the time of execution of the Ely South Coast Agreement, Ely was not an employee of South Coast or of MCA.

186.   In fact, Ely was not an employee of South Coast, or of MCA, at any time during the term of the Ely South Coast Agreement.

187.   The Ely South Coast Agreement was prepared by MCA and sought to create an artifice that Ely was an employee of MCA and that the works Ely authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

188.   Nonetheless, without any bona fide employment relationship between Ely and South Coast, or Ely and MCA, and in an attempt to circumvent the § 203 statutory termination right, MCA sought in the Ely South Coast Agreement to create an artifice by which Ely would be deemed an employee of

MCA and the works Ely would author as Artist would be characterized as employee "works made for hire."

189.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, MCA also demanded and obtained several provisions in the Ely South Coast Agreement that effectuated a direct, personal grant by Ely to MCA of the copyright in and to the sound recordings that Ely agreed to record pursuant to the Ely South Coast Agreement.

190.   MCA memorialized MCA's attempted artifice by using "employee for hire" language in paragraph 12(a) of the Ely South Coast Agreement, even though MCA knew that Ely did not have, and never had, a bona fide employment relationship with either South Coast or MCA.

191.   In connection with the Ely South Coast Agreement, MCA required Ely to sign an "inducement letter" (the "Ely MCA Inducement Letter") which similarly provided in its paragraph 7 that "If, during the term of the Production Agreement or any extensions or renewals thereof, [South Coast] shall cease to be entitled to my recording services in accordance with the terms of said Agreement, or, if [South Coast] shall fail or refuse to convey any of my recordings to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Production Agreement if [South Coast] had continued to be entitled to my recording services and if [South Coast] had continued to deliver to you my recordings, and such rights, privileges and benefits shall be enforceable in your behalf against me; . . . ." A true and correct copy of the inducement letter attached to the Second South Coast Agreement as "EXHIBIT 'B'" is attached as **Exhibit 8** and incorporated by

reference.

192.   The Ely MCA Inducement Letter was a direct, personal grant of rights by Ely to Defendants' predecessor-in-interest MCA.

193.   MCA insisted on the Ely MCA Inducement Letter, including its direct grant of rights, from Ely because MCA needed to ensure that Ely would render the musical performance services under the South Coast Agreement, but knew that Ely was the author of the sound recording and the direct grant of rights by Ely would be the only way to ensure that MCA received the contemplated grant of rights to the sound recording created by Ely.

194.   MCA knew that, notwithstanding the language in the South Coast Agreement purporting to characterize Ely as an employee, Ely was not at the time of execution and was not at any time thereafter a bona fide employee of MCA.

195.   MCA further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

196.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

197.   MCA also knew that any grant of the copyright was not effective until the work was created by Ely by fixing the work in a tangible medium of expression.

198.   Despite MCA's efforts, because Ely was not an employee of MCA and the works were not "works made for hire," MCA's artificial construct contained in the Ely South Coast Agreement was ineffective and the only effective transfer of the author's copyright would be made by Ely's direct, personal transfer.

199.   Accordingly, MCA demanded and obtained the direct, personal grant of Ely's copyright, which he acquired by law as the author of the works, to ensure

it could publish, market and commercially exploit the works, specifically because the sound recording could not qualify as "work made for hire."

200.   After the Ely MCA Inducement Letter was executed as demanded by MCA, Ely created the sound recording released as the *Musta Notta Gotta Lotta* Album.

201.   The *Musta Notta Gotta Lotta* Album was released by MCA (on the South Coast sublabel) on or about April 11, 1981, well after Ely made the direct, personal grant demanded by MCA.

202.   MCA knew that, notwithstanding the language in the South Coast Agreement purporting to characterize Ely as an employee, Ely was not at the time of execution and was not at any time thereafter a bona fide employee of MCA.

203.   MCA further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

204.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

205.   MCA also knew that any grant of the copyright was not effective until the work was created by Ely by fixing the work in a tangible medium of expression.

206.   Despite MCA's efforts, because Ely was not an employee of MCA and the works were not "works made for hire," MCA's artificial construct contained in the South Coast Agreement was ineffective and the only effective transfer of the author's copyright would be made by Ely's direct, personal transfer.

207.   Accordingly, MCA demanded and obtained the direct, personal grant of Ely's copyright, which he acquired by law as the author of the works, to ensure it could publish, market and commercially exploit the works, specifically because

the sound recording could not qualify as "work made for hire."

208.   Having enjoyed the benefit of the Ely MCA Inducement Letter for decades, including certainty as to the effectiveness of Ely's grant of rights, Defendants cannot now disavow the effectiveness of Ely's prior direct grant of rights to them.

209.   On February 20, 1984, South Coast ceased to be in good standing in the State of Texas, and not has not been in good standing for over 25 years. Therefore, pursuant to the Ely MCA Inducement Letter, the relationship between South Coast and MCA (and its successor UMG) has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Ely served his Notice of Termination upon UMG, was and is a *direct* contractual relationship between Ely and UMG.

210.   Moreover, upon information and belief, MCA, and its successor-in-interest UMG, has not accounted to South Coast as a corporation, for decades.

211.   Accordingly, MCA and its successor UMG dealt and communicated directly with Ely or his representatives thereafter.

212.   Therefore, pursuant to the Ely MCA Inducement Letter, the relationship between MCA, on the one hand, and South Coast, on the other, has ceased to exist, and the only contractual relationship that exists at the present time, and at the time that Ely served his Notice of Termination upon UMG, was and is a *direct* contractual relationship between Ely and UMG.

213.   At no time did any facts, which would establish an employer-employee relationship between Ely and South Coast, or Ely and MCA, exist, and at no time did any facts exist which would have established an employer-employee relationship between Ely and South Coast or between Ely and MCA.

214.   In 1997, Jerry Jeff Walker ("Walker"), a recording artist associated with South Coast, sued the principal of South Coast,  Brovsky , in Texas state court

for Travis County (Case No. 455,736), as well as South Coast itself, and other related entities. In settlement of Walker's claims therein, Brovsky assigned all right, title, and interest of South Coast to any sound recording recorded by both Walker and Ely, to Walker, on August 8, 1997.

215.   On August 14, 1997, counsel for Ely wrote to Brenda Prackup of MCA, and informed her of this assignment to Walker, so that, as of that date, MCA had full knowledge that South Coast no longer had any rights in the Ely recordings.

216.   On or about January 1, 1998, Walker assigned all of his right, title, and interest in and to those sound recordings to Ely (further memorialized on June 24, 2019 in a memorandum of the transfer entitled, "Acknowledgement of Assignment", a true and correct copy of which is attached as **Exhibit 9**). At that point, Ely became the owner of the rights in the sound recordings (recorded by Ely) that had been owned by South Coast or Walker, and succeeded to whatever termination rights South Coast and/or Walker had had before that date, if any.

217.   On December 15, 2015, Ely served a Notice of Termination (the "Ely Notice") upon UMG. In doing so, he was acting on behalf of his own termination rights afforded to him pursuant to § 203 of the Copyright Act, and pursuant to the rights that had formerly been with either South Coast, or Walker, or both, if any, and that were assigned to Ely in 1998. A true and correct copy of the Ely Notice is attached as **Exhibit 10** and incorporated by reference.

218.   Thereafter, Ely caused the Notice of Termination to be recorded in the United States Copyright Office, on August 30, 2016, as document V9921 D732 P1 through P3.

219.   The effective date of termination for three albums on the Ely Notice, namely*, Down the Drag, Live Shots*, and *Musta Notta Gotta Lotta* was December 16, 2017, and the effective date of termination for the final album on the Ely Notice, *Hi-Res*, was April 3, 2019 (the "Ely Albums").

42

220.   On May 6, 2016, counsel for UMG sent Ely a letter setting forth UMG's legal positions for its claims that the Ely Notice was invalid, and, in addition, demanded that Ely "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with UMG's continuing rights in the recordings that are the subject of your termination notice." A true and correct copy of that letter is attached hereto as **Exhibit 11**.

221.   UMG failed and refused to cease the sale, distribution, and exploitation of the Ely Albums on the effective dates of termination, that is, December 16, 2017, and April 3, 2019, and has continued such exploitation after that date.

222.   Indeed, notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the *Hi-Res* Album and instead continue to infringe on Ely's rights with respect to the sound recording on the *Hi-Res* Album, just like their willful infringement of the *Down the Drag, Live Shots*, and *Musta Notta Gotta Lotta* Albums for more than two years.

223.   Despite UMG's knowledge of the effective dates of termination, UMG has willfully infringed upon the United States copyrights belonging to Ely by continuing to exploit the sound recordings, as if the Ely Notice had not been sent at all, in complete disregard of the law. UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

224.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings

through subscription or non-subscription online digital music services.

225.   Pursuant to the Ely Notice, Ely is currently the owner of the United States copyright in and to the sound recordings comprising the Ely Albums.

226.   By willfully continuing to exploit the sound recordings comprising the Ely Albums in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon Ely's rights in those recordings, and, furthermore, unlawful reproduction and distribution of the sound recordings owned by Ely as alleged hereinabove constitutes copyright infringement under the Copyright Act.

## The Sulton Album

227.   Sulton entered into a recording agreement with EMI America Records, Inc. ("EMI"), a predecessor to Capitol, on September 29, 1980 (the "Sulton Agreement").

228.   The Sulton Agreement was designed, drafted and intended by EMI, among other things, to secure the exclusive recording services of Sulton.

229.   At the time of execution of the Sulton Agreement, Sulton was not an employee of EMI.

230.   In fact, Sulton was not an employee of EMI at any time during the term of the Sulton Agreement.

231.   The Sulton Agreement was prepared by EMI and sought to create an artifice that Sulton was an employee of EMI and that the work Sulton authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

232.   Nonetheless, without any bona fide employment relationship between Ely and EMI, and in an attempt to circumvent the § 203 statutory termination right, EMI sought in the Sulton Agreement to create an artifice by

which Sulton would be deemed an employee of EMI and the works Sulton would author as Artist would be characterized as employee "works made for hire."

233.   EMI memorialized EMI's attempted artifice by using "work made or hire" language in paragraph 6 of the Sulton Agreement, even though EMI knew that Sulton did not have, and never had, a bona fide employment relationship with EMI.

234.   EMI knew that, notwithstanding the language in the Sulton Agreement purporting to characterize Sulton as an employee, Sulton was not at the time of execution and was not at any time thereafter a bona fide employee of EMI.

235.   EMI further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

236.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, EMI also demanded and obtained several provisions in the Sulton Agreement that effectuated a direct, personal grant by Sulton to EMI of the copyright in and to the sound recordings that Sulton agreed to record pursuant to the Sulton Agreement.

237.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

238.   EMI also knew that any grant of the copyright was not effective until the work was created by Sulton by fixing the work in a tangible medium of expression.

239.   Despite EMI's efforts, because Sulton was not an employee of EMI

and the works were not "works made for hire," EMI's artificial construct contained in the Sulton Agreement was ineffective and the only effective transfer of the author's copyright would be made by Sulton's direct, personal transfer.

240.   On January 11, 1982, EMI released *Kasim*, an album sound recording authored by Sulton.

241.   On July 20, 2016, Sulton served a Notice of Termination (the "Sulton Notice") upon UMG, as agent for Capitol. A true and correct copy of the Sulton Notice is attached hereto as **Exhibit 12** and incorporated by reference.

242.   Thereafter, Sulton promptly caused the Notice to be recorded in the United States Copyright Office, on July 25, 2016, as document V9924 D803 P1 through P3.

243.   The effective date of termination for *Kasim* (the "Sulton Album") was July 21, 2018.

244.   On September 20, 2016, counsel for UMG/Capitol sent Sulton a letter setting forth the legal positions of UMG and/or Capitol for their claims that the Sulton Notice was invalid, and, in addition, demanded that Sulton "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with Capitol's continuing rights in such sound recordings." A true and correct copy of that letter is attached as **Exhibit 13**.

245.   UMG and/or Capitol failed and refused to cease the sale, distribution, and exploitation of the Sulton Album on the effective date of termination, that is, July 21, 2018, and continued such exploitation in the United States after that date.

246.   Despite the knowledge of UMG and/or Capitol of the effective date, UMG and/or Capitol have willfully infringed upon the United States copyrights belonging to Sulton by continuing to exploit the sound recording, as if the Sulton Notice had not been sent at all, in complete disregard of the law.

247.   UMG/Capitol routinely markets, distributes, and sells sound

recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

248.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

249.   Pursuant to the Sulton Notice, Sulton is currently the owner of the United States copyright in and to the sound recording comprising the Sulton Album.

250.   By willfully continuing to exploit the sound recording comprising the Sulton Album in the United States after the effective date, all of which occurred within the past three years, UMG/Capitol has infringed upon Sulton's rights in the recordings, and, furthermore, unlawful reproduction and distribution of the sound recording owned by Sulton as alleged hereinabove constitutes copyright infringement under the Copyright Act.

<u>The Dickies Album</u>

251.   The members of The Dickies entered into a recording agreement with A&M Records, Inc. ("A&M"), a predecessor of UMG, on April 3, 1978 (the "Dickies Agreement").

252.   The Dickies Agreement was designed, drafted and intended by A&M, among other things, to secure the exclusive recording services of The Dickies.

253.   At the time of execution of the Dickies Agreement, none of the band members of The Dickies were employees of A&M.

254.   In fact, none of the band members of The Dickies was an employee

of A&M at any time during the term of the Dickies Agreement.

255.   The Dickies Agreement was prepared by A&M and sought to create an artifice that the members of The Dickies were employees of A&M and that the works The Dickies authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

256.   Nonetheless, without any bona fide employment relationship between the members of The Dickies and A&M, and in an attempt to circumvent the § 203 statutory termination right, A&M sought in the Dickies Agreement to create an artifice by which the members of The Dickies would be deemed employees of A&M and the works that the members of The Dickies would author as Artist would be characterized as employee "works made for hire."

257.   A&M memorialized A&M's attempted artifice by using "employees for hire" language in paragraph 4 of the Dickies Agreement, even though A&M knew that the band members of The Dickies did not have, and never had, a bona fide employment relationship with MCA.

258.   A&M knew that, notwithstanding the language in the Dickies Agreement purporting to characterize band members of The Dickies as employees, The Dickies band members were not at the time of execution and were not at any time thereafter bona fide employees of A&M.

259.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, A&M also demanded and obtained several provisions in the Dickies Agreement that effectuated a direct, personal grant by the members of The Dickies to A&M of the copyright in and to the sound recording that the members of The Dickies agreed to record pursuant to the Dickies Agreement.

260.   A&M further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

261.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

262.   A&M also knew that any grant of the copyright was not effective until the work was created by the members of The Dickies by fixing the work in a tangible medium of expression.

263.   Despite A&M's efforts, because no member of The Dickies was an employee of A&M and the works were not "works made for hire," A&M's artificial construct contained in the Dickies Agreement was ineffective and the only effective transfer of the author's copyright would be made by band members' direct, personal transfers.

264.   On November 9, 1979, A&M released *Dawn of The Dickies*, an album sound recording authored by Phillips, Lee, Bill Remar p/k/a Billy Club, Bob Davis a/k/a Chuck Wagon, and Caballero's brother, Carlos a/k/a Karlos Kaballero (the "Dickies Album").

265.   On September 12, 2017, a majority of the authors (or their successors, in the case of Caballero), set forth above, served a Notice of Termination (the "Dickies Notice") upon UMG.

266.   Thereafter, the majority of The Dickies caused the Dickies Notice to be recorded in the United States Copyright Office, on June 19, 2019, as document V9964 D904 P1 through P3. A true and correct copy of the recorded Dickies Notice is attached as **Exhibit 14** and incorporated by reference.

267.   The effective date of termination for the Dickies Album was September 13, 2019.

268.   On January 23, 2018, counsel for UMG sent Phillips, Lee, and Caballero a letter setting forth UMG's legal positions for its claims that the Dickies Notice was invalid, and, in addition, demanded that Phillips, Lee, and Caballero "refrain from attempting to exploit the recordings themselves or taking any other actions interfering with our clients' continuing rights in the sound recordings that are the subject of the termination notice." A true and correct copy of the letter dated January 23, 2018 is attached as **Exhibit 15** and incorporated by reference.

269.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recording, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recording through subscription or non-subscription online digital music services.

270.   Pursuant to the Dickies Notice, the authors of the Dickies Album are the owners of the United States copyright in and to the sound recording comprising the Dickies Album, as of September 13, 2019, the effective date of termination set forth in the Dickies Notice.

271.   Indeed, notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the *Dawn of the Dickies* Album and instead continue to infringe on Phillips, Lee, and Caballero's rights with respect to the sound recording on the *Dawn of the Dickies* Album.

272.   Despite the knowledge of UMG of the effective date, UMG has willfully infringed upon the United States copyright belonging to the authors of the Dickies Album by continuing to exploit the sound recording, as if the Dickies Notice had not been sent at all, in complete disregard of the law.

273.   UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and

non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

274.   Pursuant to the Dickies Notice, the authors of the Dickies Album are currently the owners of the United States copyright in and to the sound recording comprising the Dickies Album.

275.   By willfully continuing to exploit the sound recording comprising the Dickies Album in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon the recording, and, furthermore, unlawful reproduction and distribution of the sound recording owned by the authors of the Dickies Album as alleged hereinabove constitutes copyright infringement under the Copyright Act.

<u>The Dream Syndicate Album</u>

276.   The members of The Dream Syndicate entered into a recording agreement with A&M Records, Inc. ("A&M"), a predecessor of UMG, in 1984 (the "Dream Syndicate Agreement").

277.   The Dream Syndicate Agreement was designed, drafted and intended by A&M, among other things, to secure the exclusive recording services of the members of The Dream Syndicate.

278.   At the time of execution of the Dream Syndicate Agreement, none of the band members of The Dream Syndicate were employees of A&M.

279.   In fact, none of the band members of The Dream Syndicate was an employee of A&M at any time during the term of the Dream Syndicate Agreement.

280.   The Dream Syndicate Agreement was prepared by A&M and sought to create an artifice that members of The Dream Syndicate were employees of A&M and that the works The Dream Syndicate authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

281.   Nonetheless, without any bona fide employment relationship

between the members of The Dream Syndicate and A&M, and in an attempt to circumvent the § 203 statutory termination right, A&M sought in the Dream Syndicate Agreement to create an artifice by which the members of The Dream Syndicate would be deemed employees of A&M and the works that the members of The Dream Syndicate would author as Artists would be characterized as employee "works made for hire."

282. A&M memorialized A&M's attempted artifice by using "work made or hire" language in the Dream Syndicate Agreement, even though A&M knew that the band members of The Dream Syndicate did not have, and never had, a bona fide employment relationship with MCA.

283. A&M knew that, notwithstanding the language in the Dream Syndicate Agreement purporting to characterize band members of The Dream Syndicate as employees, The Dream Syndicate band members were not at the time of execution and were not at any time thereafter bona fide employees of A&M.

284. Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, A&M also demanded and obtained several provisions in the Dream Syndicate Agreement that effectuated a direct, personal grant by the members of The Dream Syndicate to A&M of the copyright in and to the sound recording that the members of The Dream Syndicate agreed to record pursuant to the Dream Syndicate Agreement.

285. A&M further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

286. Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would

be neither a collective work nor a compilation as defined under the Copyright Act.

287.   A&M also knew that any grant of the copyright was not effective until the work was created by the members of The Dream Syndicate by fixing the work in a tangible medium of expression.

288.   Despite A&M's efforts, because no member of The Dream Syndicate was an employee of A&M and the works were not "works made for hire," A&M's artificial construct contained in the Dream Syndicate Agreement was ineffective and the only effective transfer of the author's copyright would be made by band members' direct, personal transfers.

289.   On May 7, 1984, A&M released *Medicine Show*, an album of recording authored by Wynn, Mehaffey, Pellish, and Karl Precoda (the "Dream Syndicate Album").

290.   On March 1, 2016, all of the authors, set forth above, served a Notice of Termination (the "Dream Syndicate Notice") upon UMG.

291.   Thereafter, the four authors promptly caused the Dream Syndicate Notice to be recorded in the United States Copyright Office, on July 11, 2016, as document V9924 D131 P1 through P6. A true and correct copy of recorded the Dream Syndicate's Notice is attached as **Exhibit 16** and incorporated by reference.

292.   The effective date of termination for the Dream Syndicate Album was May 8, 2019.

293.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recording, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

294.   Pursuant to the Dream Syndicate Notice, the authors of the Dream Syndicate Album are the owners of the United States copyright in and to the sound

recording comprising the Dream Syndicate Album, as of May 8, 2019, the effective date of termination set forth in the Dream Syndicate Notice.

295.   Indeed, notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the Dream Syndicate Album and instead continue to infringe on rights the authors with respect to the sound recording on the *Medicine Show* Album.

296.   Despite the knowledge of UMG of the effective date, UMG has willfully infringed upon the United States copyright belonging to the authors of the Dream Syndicate Album by continuing to exploit the sound recording, as if the Dream Syndicate Notice had not been sent at all, in complete disregard of the law.

297.   UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

298.   Pursuant to the Dream Syndicate Notice, the four authors of the Dream Syndicate Album are currently the owner of the United States copyright in and to the sound recording comprising the Dream Syndicate Album.

299.   By willfully continuing to exploit the sound recording comprising the Dream Syndicate Album in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon the authors' rights in and to the recordings, and, furthermore, the unlawful reproduction and distribution of the sound recording owned by The Dream Syndicate as alleged hereinabove constitutes copyright infringement under the Copyright Act.

300.   Plaintiffs are further informed and believe, and on that basis allege, that the continued willful exploitation by UMG and/or Capitol of sound recordings of members of Class A in the United States after the effective dates set forth in the Notices of Termination that were served on UMG and/or Capitol pursuant to § 203

by or on behalf of such class members, all of which occurred within the past three years, constitutes willful infringement by UMG/Capitol. UMG/Capitol's acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs and the members of the class.

301.  As a direct and proximate result of Defendants' infringements of Plaintiffs' copyrights and the copyrights of the members of Class A, pursuant to 17 U.S.C. § 504(c), Plaintiffs and the class members are entitled to recover up to $150,000 in statutory damages for each sound recording infringed.  Alternatively, at their election, pursuant to 17 U.S.C. § 504(b), Plaintiffs and the class members are entitled to their actual damages, as well as all profits attributable to the infringement, including but not limited to UMG/Capitol's profits from infringement, as will be proven at trial.

302. Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiffs, and will continue to so harm Plaintiffs unless Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, are permanently enjoined and restrained under 17 U.S.C. § 502 from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member.

303.  Furthermore, there is no available remedy at law sufficient to make

Plaintiffs and the members of Class B whole.

304.   Plaintiffs and the class members also are entitled to recover attorney's fees and costs pursuant to 17 U.S.C. § 505, and prejudgment interest according to law.

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other members of Class A, respectfully request that the Court enter judgment against Defendants, and each of them, as follows:

A.   Determining that this is a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B.   Awarding Plaintiffs actual damages according to proof, or, at Plaintiffs' election, statutory damages in an amount of $150,000 per infringed work, or according to proof;

D.   A permanent injunction enjoining and restraining Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member;;

E.   For pre- and post-judgment interest;

F.   For such fees and costs (including reasonable attorney's fees) incurred

herein as permitted by law; and

G.      For such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Declaratory Relief – Against All Defendants)

305.    Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 304 above, as though fully set forth herein.

### The Syd Straw Album

306.    Straw entered into a recording agreement with Virgin Records America, Inc. ("Virgin"), a predecessor of Capitol on July 20, 1987 (the "Straw Agreement").

307.    On June 21, 1989, Virgin released *Surprise*, an album of recording authored by Straw.

308.    Straw was never an employee of Virgin, Capitol or any of the Defendants and there are no facts to establish any such employer-employee relationship.

309.    The Straw Agreement was designed, drafted and intended by Virgin, among other things, to secure the exclusive recording services of Straw.

310.    The Straw Agreement was prepared by Virgin and sought to create an artifice that Straw was an employee of Virgin and that the works Straw authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

311.    Nonetheless, without any bona fide employment relationship between Straw and Virgin, and in an attempt to circumvent the § 203 statutory termination right, Virgin sought in the Straw Agreement to create an artifice by which Straw would be deemed an employee of Virgin and the works Straw would author as Artist would be characterized as employee "works made for hire."

312.   EMI memorialized EMI's attempted artifice by using "work made or hire" language in paragraph 6(a) of the Straw Agreement, even though Virgin knew that Straw did not have, and never had, a bona fide employment relationship with Virgin.

313.   Virgin knew that, notwithstanding the language in the Straw Agreement purporting to characterize Straw as an employee, Straw was not at the time of execution and was not at any time thereafter a bona fide employee of Virgin.

314.   EMI further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

315.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Virgin also demanded and obtained several provisions in the Straw Agreement that effectuated a direct, personal grant by Straw to Virgin of the copyright in and to the sound recording that Straw agreed to record pursuant to the Straw Agreement.

316.   Because the sound recording, once created, would constitute neither (a) collections of preexisting materials or data, nor (b) comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a collective work nor a compilation as defined under the Copyright Act.

317.   Virgin also knew that any grant of the copyright was not effective until the work was created by Straw by fixing the work in a tangible medium of expression.

318.   Despite Virgin's efforts, because Straw was not an employee of Virgin and the works were not "works made for hire," Virgin's artificial construct contained in the Straw Agreement was ineffective and the only effective transfer

of the author's copyright would be made by Straw's direct, personal transfer.

319.   On June 21, 2016, Straw served a Notice of Termination (the "Straw Notice") upon UMG, as agent for Capitol.

320.   Thereafter, Straw promptly caused the Notice to be recorded in the United States Copyright Office, on May 31, 2019 as document V9964 D257 P1 through P3. A true and correct copy of Straw's recorded Notice is attached as **Exhibit 17** and incorporated by reference.

321.   The effective date of termination for the album on the Straw Notice, namely, *Surprise* (the "Straw Album") is June 22, 2024.

322.   On December 16, 2016, counsel for UMG sent Straw a letter setting forth UMG's legal positions for its claims that the Straw Notice was invalid, and, in addition, demanded that Straw "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with Capitol's continuing rights in such sound recordings." A true and correct copy of that December 16, 2016 letter is attached as **Exhibit 18** and incorporated by reference.

323.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

324.   Pursuant to the Straw Notice, Straw will be the owner of the United States copyright in and to the sound recording comprising the Straw Album, as of the effective date of termination set forth in the Straw Notice.

325.   Based upon the foregoing facts, pursuant to 28 U.S.C. §§ 2201 & 2202, a case of actual and present controversy within the jurisdiction of this court has arisen and now exists between Straw and UMG, concerning their respective rights and duties concerning the Straw Notice, as herein set forth below.

Declaratory Relief Applicable to Plaintiffs and All Class B Members

326.   In addition, pursuant to 28 U.S.C. §§ 2201 & 2202, a case of actual and present controversy within the jurisdiction of this court has arisen and now exists between Plaintiffs and the members of Class B on the one hand, and Defendants on the other hand, concerning their respective rights and duties, in that Plaintiffs and the members of Class B contend that:

(A)    Sound recordings cannot be considered "a work made for hire," as that term is defined in the Copyright Act, because the definition set forth in § 101 of the Copyright Act does not include sound recordings as being one of the types of works that can be "a work made for hire";

(B)    There are no facts as to Plaintiff Straw and, upon information and belief, no such facts as to the members of Class B that would establish that Straw or any class member was ever in an employer-employee relationship with Defendants, or any of their affiliated or related companies, at the time the recording artists entered into the recording agreements, or during the time that the recordings pertaining thereto were created;

(C)    The release of sound recordings that were created by a particular recording artist in "album" form, as is typical in the music industry, do not constitute a "contribution to a collective work," or a "compilation," as those terms are used in § 101 of the Copyright Act, and do not qualify the sound recordings as "works made for hire";

(D)    A foreign choice of law provision in a recording agreement has no effect upon the application of United States copyright law, exclusively, to issues relating to the application of the Copyright Act (and § 203 specifically) to the United States copyright, and cannot support a claim of "breach of contract" by the recording artists for exercising their rights under United States law;

(E)     Defendants' position regarding "a work made for hire" clauses violates § 203(a)(5) of the Copyright Act;

(F)     Sound recordings created and delivered pursuant to a recording agreement are not "specially ordered" or "commissioned works," as such terms are used in § 101 of the Copyright Act, thereby disqualifying any sound recording as "a work made for hire";

(G)     Recording artists are not barred from exercising their rights under § 203 of the Copyright Act, even if a "loan-out company," or, in the appellation utilized by UMG, a "Furnishing Company" was involved in the contractual transaction relating to the original grant; and UMG's position regarding "Furnishing Company" clauses violates § 203(a)(5) of the Copyright Act;

(H)     The exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, does not constitute a breach of contract of the recording agreements; and

(I)     The assertion of rights by the recording artists under § 203 of the Copyright Act are not "time-barred" because "claims regarding the initial ownership status of a work must be brought within three years of creation."

327.     Defendants, on the other hand, contend that:

(A)     Each of the sound recordings at issue are "a work made for hire," because the recording agreements at issue contain clauses that purport to be an agreement between the parties to those agreements that the sound recordings should be so characterized;

(B)     The sound recordings at issue are contributions to a "collective work" or "compilation," *i.e.,* record albums, and so are "a work made for hire";

(C)     If a recording agreement so provides, foreign law may be applied to the rights of recording artists in United States copyrights, and may be used to deny terminations that would be otherwise valid under the United States Copyright Act;

(D)     Defendants' position regarding "work made for hire" clauses does not violate § 203(a)(5) of the Copyright Act;

(E)     Sound recordings created and delivered pursuant to a recording agreement are "commissioned works," as that term is used in § 101 of the Copyright Act, thereby transforming each of the sound recordings into "a work made for hire";

(F)     Recording artists are barred from exercising their rights under § 203 of the Copyright Act if a "loan-out company," or, in the appellation utilized by UMG, a "Furnishing Company" was involved in the contractual transaction relating to the original grant;

(G)     The exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, constitutes a breach of contract of the recording agreements; and

(H)     The assertion of rights by the recording artists under § 203 of the Copyright Act are "time-barred" because "claims regarding the initial ownership status of a work must be brought within three years of creation."

328.   Plaintiff Straw and the members of Class B desire a judicial determination of their rights and duties, and a present declaration that their Notices of Termination are valid, the dates of termination in the Notices are effective, their termination rights vested and Defendants' disregard of the rights of Plaintiff Straw and the members of Class B violates the Copyright Act.

329.   Such a prompt and immediate, judicial determination of the rights

and duties of the parties is presently ripe, useful and necessary at this time, in that Defendants have repeatedly refused to honor Plaintiffs' rights, including the rights of Straw, and those of the Plaintiff class members because:

(i) Defendants have engaged in the virtually identical conduct with respect to both Classes A and B, and Defendants have shown no willingness or intent to alter their willful behavior during this litigation absent a judicial order, judgment or declaration;

(ii) Defendants have not advanced any defenses or arguments beyond or outside of the detailed arguments asserted in their lengthy letters refusing to honor Plaintiffs and the class members' Notices of Termination and Defendants' central defense – that the sound recordings qualify as "works made for hire" – can be readily disposed of on a class-wide basis because Defendants are unable to prove the existence of bona fide employment relationships with Plaintiff Straw and the class members;

(iii) Defendants have created an actual and immediate disagreement with Plaintiff Straw and, upon information and belief, members of Class B by accusing these recording artists of anticipatory breach of contract and/or asserting repudiation claims arising from Defendants' inclusion of "work made for hire" language and related representations in the underlying recording agreements;

(iv) Defendants have stated their clear intent *not* to honor the Notices of Termination served by Plaintiffs and class members pursuant to § 203, and therefore, Plaintiffs and class members, as the rightful owners of the sound recordings that they themselves created, should not be forced to wait until a date far in the future after their effective termination dates *and* the resolution of (possibly piecemeal) litigation over the validity of their ownership rights, and in the interim lose the ability to license, exploit or otherwise monetize

those valuable copyrights;

(v) Plaintiffs and class members – most of whom are well over 60 years of age – will be substantially aided in developing and implementing their estate plans with respect to their rights to the sound recordings in that there is a very real and genuine need to value the rights for purposes of their calculation of the gift and/or estate tax exemptions, depending on whether they make an *inter vivos* gift or a testamentary bequest to a beneficiary under his or her will;

(vi) the requested declaratory relief would determine in all material respects and/or completely the validity of the termination notices, the effective dates of termination and the vesting of the termination rights; and

(vii) in that Defendants' legal position is centrally dependent upon their factual contention that the recordings at issue are "works made for hire," if Defendants are able to prove that issue, then there is no termination right available and the Notices of Termination served by the members of Class B are invalid.  On the other hand, if Defendants are unable to prove that the recordings are "works made for hire," then the members of Class B seek to be protected from future infringement and potential piecemeal litigation from Defendants on the identical or substantially similar defensive positions.[5]

330.   In the absence of prompt and immediate declaratory relief, Plaintiff Straw and the members of Class B will continue to experience significant

---

[5]   In making these new allegations and arguments, Plaintiffs do not dispute or quarrel with the Court's power or discretion in deciding *sua sponte* to consider the ripeness of Plaintiffs' claim for declaratory relief. Because Defendant UMG did not raise the ripeness issue on its motion to dismiss and the issue did not arise during oral argument on UMG's motion, Plaintiffs were unable to address the Court's concerns with respect to Plaintiffs' allegations in paragraph 86 of the First Amended Complaint. Plaintiffs respectfully submit that these more detailed allegations provide an effective and useful justification for permitting the declaratory relief claim to proceed at this time.

uncertainty with respect to their termination rights and they will be unable to accurately calculate the value of their rights given the future, indeterminate litigation cloud hanging over their rights. They will be left to await the virtually certain future event of Defendants' infringement of their copyrights and then incur years of additional delay before gaining clarity and vindication of their rights – all while they wonder whether they will live to see their rights vindicated, or whether Defendants will profit from the unlawful exploitation of the sound recordings.

331. In the absence of prompt and immediate declaratory relief, Defendants will be allowed to destroy the value and ultimate salability of the subject sound recordings, in direct contradiction of the second chance guaranteed by the Copyright Act. Furthermore, with regard to Plaintiff Straw and the members of Class B for which the effective dates of termination have not yet arrived, the policies, practices and actions of Defendants are injuring the interests of those class members; for instance, many, if not most, of the class members are over the age of 60 (and in many cases, many years older than 60), and are actively engaged in estate planning activities, including devising or bequeathing valuable rights in the copyrights in and to sound recordings that are the subject matter of the Notices of Termination sent to UMG and Capitol.

332. Due to the conduct of UMG and Capitol, as described above, class members, most of whom are over 60 years of age, cannot be sure that any estate planning activities in which they engage (including, but not limited to, the drafting of wills and trusts, and tax planning and analysis; pursuant to § 203(b)(2), the post-termination rights in sound recordings become vested upon *service* of the Notices of Termination, and the right to devise or bequeath those rights are, at that point in time, within the sole power of the authors (and *not* pursuant to the succession scheme set forth in § 203(a)(2)), in many cases years before the effective dates of termination) will have the effect envisioned by § 203 of the Copyright Act, that is,

full ownership of the United States copyright in and to the sound recordings set forth in the Notices of Termination and the right to collect all revenues from the United States exploitation of sound recordings, on a date certain in the future. Without this certainty, any such estate or tax planning cannot be fully realized or relied upon, causing present injury to those class members, and not just at a future time.

333. Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiffs, and will continue to so harm Plaintiffs unless Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, are permanently enjoined and restrained under 17 U.S.C. § 502 from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member.

334. Furthermore, there is no available remedy at law sufficient to make Plaintiffs and the members of Class B whole.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Straw, on behalf of herself and on behalf of all other members of Class B, respectfully requests that the Court enter judgment against Defendants and each of them, as follows:

A.     Determining that this is a proper class action maintainable pursuant to

Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as class representatives and Plaintiffs' counsel as class counsel;

B.    For declaratory relief, regarding the legal issues described in paragraphs 314 through 322, above;

C.    A permanent injunction enjoining and restraining Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download) any of the sound recordings, or to distribute (i.e., upload) any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member;;

E.    For pre- and post-judgment interest;

F.    For such fees and costs (including reasonable attorney's fees) incurred herein as permitted by law; and

G.    For such other and further relief as this Court deems just and proper.

**BLANK ROME LLP**

Dated: April 30, 2020              _____*/s/Ryan E. Cronin*_____
                                   Ryan E. Cronin
                                   Roy W. Arnold (admitted pro hac vice)
                                   David M. Perry (admitted pro hac vice)
                                   Gregory M. Bordo (admitted pro hac vice)
                                   BLANK ROME LLP
                                   1271 Avenue of the America

New York, NY  10020
(212) 885-5000
RCronin@BlankRome.com
RArnold@BlankRome.comGBordo@BlankRome.com
Perry@BlankRome.com

and


Evan S. Cohen (admitted pro hac vice)
Maryann R. Marzano (admitted pro hac vice)
COHEN MUSIC LAW
1180 South Beverly Drive, Suite 510
Los Angeles, CA  90035-1157
(310) 556-9800
esc@cohenmusiclaw.com
mmarzano@cohenmusiclaw.com

*Attorneys for Plaintiffs*

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of the claims alleged in this Second Amended Complaint.

**BLANK ROME LLP**

Dated:  April 30, 2020                       */s/Ryan E. Cronin*
                                      Ryan E. Cronin
                                      Roy W. Arnold (admitted pro hac vice)
                                      David M. Perry (admitted pro hac vice)
                                      Gregory M. Bordo (admitted pro hac vice)
                                      BLANK ROME LLP
                                      1271 Avenue of the America
                                      New York, NY  10020
                                      (212) 885-5000
                                      RCronin@BlankRome.com
                                      RArnold@BlankRome.com
                                      GBordo@BlankRome.com
                                      Perry@BlankRome.com

                                      and

                                      Evan S. Cohen (admitted pro hac vice)
                                      Maryann R. Marzano (admitted pro hac vice)
                                      COHEN MUSIC LAW
                                      1180 South Beverly Drive, Suite 510
                                      Los Angeles, CA  90035-1157
                                      (310) 556-9800
                                      esc@cohenmusiclaw.com
                                      mmarzano@cohenmusiclaw.com

                                      *Attorneys for Plaintiffs*

EVAN S. COHEN
COHEN MUSIC LAW
1180 South Beverly Drive, Suite 510
Los Angeles, CA  90035-1157
(310) 556-9800
esc@cohenmusiclaw.com

*Attorneys for Plaintiffs*

EXHIBIT 1

JOHN WAITE

Dated: As of <u>November 1</u>, 1981

Chrysalis Records, Inc.
9255 Sunset Boulevard, Ste. 200
Los Angeles, California  90069

　　　　Re:  Heavy Waite, Inc.

Gentlemen:

　　　　Pursuant to an exclusive recording contract between the undersigned and the above mentioned producer (herein called "Producer"), Producer is entitled to my exclusive services for the recording of phonograph records.  I have been advised that Producer is entering into a written agreement with you (herein called the "Agreement"), pursuant to which Producer is agreeing to furnish to you my recording services, all upon terms and conditions which have been fully explained to me.

　　　　In consideration of your executing the Agreement and as a further inducment for you to do so (it being to my benefit as a recording artist that you execute same), I hereby agree as follows:

　　　　1.　I confirm, warrant, guarantee, covenant and agree that:

　　　　　　(a)  Producer has the right, insofar as I am concerned, to enter into the Agreement and to assume all of the obligations, warranties and undertakings to you on the part of Producer therein contained, and Producer will continue to have such right during the term of the Agreement and thereafter until all said obligations, warranties and undertakings have been fully performed and discharged.

EXHIBIT A

(b)   All of the warranties, representations, covenants and agreements on the part of Producer contained in the Agreement, which concern me, are true and correct.

(c)   I will duly and to the best of my ability perform and discharge all of the obligations and undertakings contained in the Agreement insofar as the same are required of me and to the extent which Producer has undertaken to procure my performance thereof.

2.   If during the term of the Agreement or any extensions or renewals thereof Producer shall cease to be entitled to my recording services in accordance with the terms of the Agreement, or if Producer shall fail or refuse to furnish my recording services to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Producer had continued to be entitled to my recording services and if Producer had continued to furnish my services to you, and such rights, privileges and benefits shall be enforceable in your behalf against me.

3.   You have the exclusive right to use and publish and to permit others to use and publish my name (both legal and professional) and likeness for advertising and purposes of trade and otherwise, without restriction, in connection with your record business and record-related products, and you have the right to refer to me as your exclusive artist.

4.   I shall not, during the term of the Agreement or any extensions or renewals thereof, perform for anyone other than you or Producer for the purpose of making phonograph records, and I shall not, prior to the later of the following dates, perform for anyone other than you, for the purpose of making phonograph records, any selection embodied in any recording which shall have been conveyed to you or to which you shall have been entitled under the Agreement: (i) the date five years subsequent to the date on which such selection shall have been last recorded under the Agreement, or (ii) the date two (2) years subsequent to the expiration or termination of the term of the Agreement.

5.   No termination of the Agreement shall operate to diminish my liability or obligation hereunder without your written consent.

6.   You may in your own name institute any action or proceeding against me to enforce your rights under the Agreement and under this guarantee, or pursuant to my recording contract with Producer.

A-2

7.    I expressly acknowledge that my and Producer's services hereunder and under the Agreement are of a special, unique, and intellectual character which give them peculiar value, and that in the event of a breach by me or Producer of any term, condition, or covenant hereof or of the Agreement, you will be caused irreparable injury. I expressly agree that in the event Producer or I shall breach any provision hereof or of the Agreement, you shall be entitled to injunctive relief and/or damages, as you may deem appropriate, in addition to any other rights or remedies available to you, and you shall have the right to recoup any such damages resulting from any such breach from any monies which may be payable to me or Producer hereunder or under the Agreement.

8.    I shall look solely to Producer for any and all royalties, recording fees and other monies which shall be payable to me with respect to the making of all recordings under my recording contract with Producer and in connection with your manufacture and sale of records embodying said recordings and your exploitation of said recordings, all throughout the world.

9.    I warrant and represent that pursuant to my exclusive recording contract with Producer, I am entitled to receive, in respect solely of the services rendered by me thereunder and for your benefit pursuant to the Agreement, at a minimum the sum of Six Thousand Dollars ($6,000.00) each per annum during the term of the Agreement, whether or not said term is extended or suspended. I further warrant and represent that in the event the California Code of Civil Procedure Section 526 and/or the California Civil Code Section 3423 is amended or supplemented to provide that the minimum compensation under an enforceable personal services contract entered into prior to the effective date of such amendment shall be a sum greater than Six Thousand Dollars ($6,000.00) per annum, that the provisions of my exclusive recording contract with Producer are automatically deemed amended pursuant to the provision thereof so as to provide for me to receive annual compensation pursuant to said exclusive recording contract in the amount the applicable amended or supplemented law specifies. Hereinafter said Six Thousand Dollars ($6,000.00) or other minimum compensation is referred to as "Minimum Compensation." In the event, for any reason whatsoever, Producer shall fail to pay to me the applicable Minimum Compensation per annum during the term of the Agreement, whether or not said term is extended or suspended, you agree, provided that I am not in breach of any of the terms and provisions hereof or if the Agreement, to pay to me an amount which when added to the amount (if

any) so paid to me by Producer shall equal the applicable Minimum Compensation per annum during the term of the Agreement, which payment shall constitute an advance against and be recoupable from any and all monies payable under my contract with Producer or under the Agreement. You acknowledge and agree that your such agreement shall apply regardless of whether the provisions of Paragraph 2 hereof shall become applicable. I acknowledge and confirm that your such agreement is intended to establish and preserve your right to injunctive relief to prevent a breach by Producer and/or me of the agreement and/or of the provisions of this letter agreement. Accordingly, it is your and my mutual intention that your such agreement be interpreted and construed in such a manner as to comply with the provisions of Section 3423 (Fifth) of the California Civil Code concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services.

Very truly yours,

John Waite
JOHN WAITE

AGREED AND ACCEPTED:

HEAVY WAITE, INC.

By: John Waite, Pres
An Authorized Signatory

CHRYSALIS RECORDS, INC.

By: _____
An Authorized Signatory

A-4

# EXHIBIT 2

8-29-83/2/ptn:HAB38/A

Contract No.

Los Angeles, California

Date:

DECLARATION RE COLLECTIVE WORK
AND POWER OF ATTORNEY

EMI AMERICA RECORDS, a division of Capitol Records, Inc. ("EMIA") and Moonwalk Music, Inc. ("Company") are parties to an agreement ("EMIA-Company Agreement"), with respect to "masters" and "sound recordings", "phonorecords" and "copies" manufactured from such masters (individually and collectively called the "Works"). For valuable consideration, receipt of which is hereby acknowledged:

A. The undersigned (jointly and severally if more than one) acknowledge and agree that each master recorded under the EMIA-Company Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) as part of an album constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Company is the exclusive owner of all right, title and interest in and to each Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

B. Notwithstanding the provisions of Paragraph A. above, I agree to the extent, if any, that I may be deemed an "author" of any Work, I grant and assign to EMIA all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106. For purposes of this Paragraph B.:

1. I hereby make, constitute and appoint EMIA, irrevocably and coupled with an interest, my true and lawful Attorney for me and in my name, place and stead to sign, execute, acknowledge, deliver and record all documents and instruments necessary or desirable to grant and assign to EMIA all exclusive right, title and interest in and to the Works throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

2. The documents and instruments referred to in Paragraph B.1. above shall include, but shall not be limited to: documents to apply for and obtain all registration of

Page 40 of 47

8-29-83/2/ptn:HAB38/A

copyrights in and to any Work, and documents to assign such
copyrights to EMIA.

     3.   The undersigned grants to said Attorney full
power and authority to do and perform all and every act and
thing whatsoever requisite, necessary or appropriate to be done
with respect to the Works as fully to all intents and purposes
as I might or could do if personally present, hereby ratifying
all that my said Attorney shall lawfully do or cause to be done
by virtue of this Power of Attorney.

     4.   My said Attorney is empowered to determine in
his sole discretion the time when, purpose for and manner in
which any power conferred upon him shall be exercised, and the
conditions, provisions and covenants of any document or
instrument which may be executed by him pursuant to this Power
of Attorney.

     IN WITNESS WHEREOF, the undersigned has executed this
"Declaration Re Collective Work and Power of Attorney" on the
date first above written.

MOONWALK MUSIC, INC.

By: _Richard B. Smith_____

Title: _V.P._____
     An Authorized Signer

Page 41 of 47

# EXHIBIT 3

8-29-83/2/ptn:HAB38/A

EXHIBIT "B"

Date:

EMI AMERICA RECORDS, a division
of Capitol Records, Inc.
6920 Sunset Boulevard
Los Angeles, California  90028

Gentlemen:

You have advised me that you are about to enter into an
agreement with Moonwalk Music, Inc. ("Company") under the terms
of which you will undertake to distribute recordings embodying
my performances ("Agreement").  I have been advised of the
terms of the Agreement and acknowledge it is beneficial to me
and I am desirous that it be executed.

In order to induce you to enter said Agreement, I agree as
follows:

1.    I warrant and represent that I am now under exclusive
      contract with Company as to the services to be rendered
      pursuant to the Agreement and said contract will continue
      in full force and effect during the term of the Agreement
      including all extensions, renewals and modifications
      thereof.

2.    Company has the right insofar as I am concerned to enter
      into the Agreement with you and to assume all of the
      obligations, warranties and undertakings therein
      contained.

3.    All of the warranties, representations and covenants on
      the part of Company contained in thus Agreement concerning
      me are true and correct and I hereby agree to be bound by
      same as though I were a party to the Agreement.

4.    I will duly and to the best of my ability perform and
      discharge all of the obligations and undertakings
      contained in the Agreement insofar as the same are
      required of me and which Company has undertaken to procure
      me to do and perform in the Agreement.

5.    I also acknowledge that no direct payment will be made by
      you to me and that any royalties for performances that may
      be due on the sale of records pursuant to the Agreement
      shall be paid directly by you to Company and provided that
      you have rendered accounting statements to Company and
      made the payments specified therein, I shall look solely
      to Company with respect to all artist royalties and

Company will be solely liable for artist royalties which may be due me.

6. If during the term of the Agreement or any extensions, renewals or modifications thereof, Company shall cease to be entitled to make my services available to you in accordance with the terms of the Agreement, or if Company shall fail or refuse to make my services available to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Company had continued to be entitled to my services, and I shall make the same available to you, and such rights, privileges and benefits shall be enforceable on your behalf against me.

7. I do hereby acknowledge that my services are special, unique and extraordinary, the loss of which cannot be reasonably or adequately compensated for in an action at law, and that in addition to any rights you may have at law, you shall be entitled to seek injunctive relief to enforce your rights hereunder.

8. If this Agreement is executed by more than one person as Artist, the first person singular shall include the plural wherever the context so requires.

9. I represent that I shall become a member of all unions requisite for me to fulfill my obligations pursuant to this Agreement.

Very truly yours,

JOHN WAITE

Page 39 of 47

829

# EXHIBIT 4

Exhibit "E"

### DECLARATION RE COLLECTIVE WORK
### AND POWER OF ATTORNEY

Concurrently herewith Diamond Stripe, Inc. ("Company") and EMI America Records, a division of Capitol Records, Inc. ("EMIA") are entering into an agreement ("EMIA-Company Agreement"), with respect to "masters" embodying my performances and "sound recordings", "phonorecords" and "copies" manufactured from such masters (individually and collectively called the "Works").  For valuable consideration, receipt of which is hereby acknowledged:

A.    The undersigned (jointly and severally if more than one) acknowledge and agree that each master recorded under the EMIA-Company Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) as part of an lp-master constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered  a work made for hire.  I further acknowledge that Company is the exclusive owner of all right, title and interest in and to each Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

B.    Notwithstanding the provisions of Paragraph A. above, I agree to the extent, if any, that I may be deemed an "author" of any Work, I grant and assign to EMIA all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.  For purposes of this Paragraph B.:

1.    I hereby make, constitute and appoint EMIA, irrevocably and coupled with an interest, my true and lawful Attorney for me and in my name, place and stead to sign, execute, acknowledge, deliver and record all documents and instruments necessary or desirable to grant and assign to EMIA all exclusive right, title and interest in and to the Works throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

2.    The documents and instruments referred to in Paragraph B.1. above shall include, but shall not be limited to: documents to apply for and obtain all registration of copyrights in and to any Work, and documents to assign such copyrights to EMIA.



0328A

3.     The undersigned grants to said Attorney full power and authority to do and perform all and every act and thing whatsoever requisite, necessary or appropriate to be done with respect to the Works as fully to all intents and purposes as I might or could do if personally present, hereby ratifying all that my said Attorney shall lawfully do or cause to be done by virtue of this Power of Attorney.

4.     My said Attorney is empowered to determine in his sole discretion the time when, purpose for and manner in which any power conferred upon him shall be exercised, and the conditions, provisions and covenants of any document or instrument which may be executed by him pursuant to this Power of Attorney.

IN WITNESS WHEREOF, the undersigned has executed this "Declaration Re Collective Work and Power of Attorney" on the date first above written.

JOHN WAITE

0328A

# EXHIBIT 5

6-27-85/jt:KB39/A

EXHIBIT "A"

ARTIST DECLARATION

Date: July 4, 1985

EMI AMERICA RECORDS, a division
of Capitol Records, Inc.
6920 Sunset Boulevard
Los Angeles, California   90028

Gentlemen:

You have advised me that you are about to enter into an
agreement with Diamond Stripe, Inc. ("Company") under the terms
of which you will undertake to distribute recordings embodying my
performances ("Agreement").  I have been advised of the terms of
the Agreement and acknowledge it is beneficial to me and I am
desirous that it be executed.

In order to induce you to enter said Agreement, I agree as
follows:

1.   I warrant and represent that I am now under exclusive
contract with Company as to the services to be rendered pursuant
to the Agreement and said contract will continue in full force
and effect during the term of the Agreement including all
extensions, renewals and modifications thereof.

2.   Company has the right insofar as I am concerned to
enter into the Agreement with you and to assume all of the
obligations, warranties and undertakings therein contained.

3.   All of the warranties, representations and covenants on
the part of Company contained in thus Agreement concerning me are
true and correct and I hereby agree to be bound by same as though
I were a party to the Agreement.

4.   I will duly and to the best of my ability perform and
discharge all of the obligations and undertakings contained in
the Agreement insofar as the same are required of me and which
Company has undertaken to procure me to do and perform in the
Agreement.

5.   I also acknowledge that:

a.   no direct payment will be made by you to me and
that any royalties for performances that may be due on the sale

0328A



of records pursuant to the Agreement shall be paid directly by you to Company and Anonymous Music, Inc. ("Anonymous") and provided that you have rendered accounting statements to Company and made the payments specified therein, I shall look solely to Company with respect to all artist royalties and Company will be solely liable for artist royalties which may be due me.

     b.   I have read and understand all of the terms of the Agreement including but not limited to those provisions requiring the payment of specified shares of royalties and other sums thereunder to Anonymous as set forth in Subparagraph n. of Exhibit "G" attached to and incorporated into such Agreement.

     c.   I also acknowledge that I have received independent counsel unrelated to Anonymous and that I have entered this Agreement without being subject to any coercion or undue influence from any party.

     6.   If during the term of the Agreement or any extensions, renewals or modifications thereof, Company shall cease to be entitled to make my services available to you in accordance with the terms of the Agreement, or if Company shall fail or refuse to make my services available to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Company had continued to be entitled to my services, and I shall make the same available to you, and such rights, privileges and benefits shall be enforceable on your behalf against me.

     7.   I do hereby acknowledge that my services are special, unique and extraordinary, the loss of which cannot be reasonably or adequately compensated for in an action at law, and that in addition to any rights you may have at law, you shall be entitled to seek injunctive relief to enforce your rights hereunder.

     8.   If this Agreement is executed by more than one person as Artist, the first person singular shall include the plural wherever the context so requires.

     9.   I represent that I shall become a member of all unions requisite for me to fulfill my obligations pursuant to this Agreement.

     10.  For the express and direct benefit of EMIA, I further acknowledge and agree that:

     a.   the benefits to be derived by me from the Agreement are at least as favorable as could be obtained by me from other phonograph record companies;

0328A



-27-85/jt:KB39/A

b.   the benefits afforded me under the Agreement are commensurate with the present value of the rights conferred upon Capitol and their value in the future;

c.   the terms of the Agreement are more favorable to me than those of the "Prior Agreement" (as that term is defined in the Agreement) which pursuant to my demand has been terminated in writing by EMIA and Moonwalk Productions, Inc. as of a date prior to the date of the Agreement;

d.   viewing the Agreement as a whole, there is no detriment suffered by me by reason of Company's entering into the Agreement or by Moonwalk Productions, Inc. terminating the Prior Agreement;

e.   the Agreement was negotiated not only at arms' length but as though I was free of any obligation under the Prior Agreement;

f.   the benefits accruing to me hereunder are conferred effective as of the date of execution of the Agreement and I will not be required to wait until the date which, except for the Agreement, would have been the scheduled termination date of the Prior Agreement, to enjoy such benefits for any reason;

g.   the Agreement does not constitute an amendment to or an extension of the Prior Agreement, but is an entirely new and separate agreement;

h.   it would constitute an unjust enrichment to me if EMIA does not, by virtue of any attempt by me to invoke the provisions of Section 2855 of the Labor Code of the State of California and to claim that the Agreement  is an amendment of, an extension of, or otherwise the same as or part of the Prior Agreement, for purposes of interpreting said Labor Code provision, enjoy its rights under the Agreement for full term hereof and to the full extent of the requirements hereof relating to the delivery of master recordings featuring my performances.

Very truly yours,

JOHN WAITE

0328A



# EXHIBIT 6

# Certificate of Recordation



This is to certify that the attached document was recorded on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

*Maria A. Pallante*

United States Register of Copyrights and Director

August 30, 2016

―――――――――――――――――――――――――――――

Date Of Recordation

9924                          957

―――――――――――――――――――――――――――――

Volume                       Doc. No.

Case 1:19-cv-01091-LAK Document 74-2 Filed 05/08/19 Page 91 of 155
Case 1:19-cv-01091-LAK   Document 1-1   Filed 02/05/19   Page 3 of 5
V9924 D957 P 1

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

April 20, 2015

Universal Music Group
2220 Colorado Avenue
Santa Monica, CA 90404

As successor-in-interest to Chrysalis Records, Inc., EMI America Records, and Capitol Records, Inc.

**RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10**

Dear Sir or Madam:

The undersigned is the author of the works listed on Schedule A annexed hereto. Pursuant to 17 U.S.C. § 203 and 37 C.F.R. § 201.10 I am hereby serving notice of my intention to terminate the grant or transfer of copyright and the rights of copyright proprietor in the works listed below. To my best knowledge and belief, this notice has been signed by the only person(s) whose signature(s) is necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works: | See Schedule A |
| Name of Author(s): | John Waite |
| Copyright Date: | See Schedule A |
| Copyright Registration No: | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated: | All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1981 between the members of the recording group called The Babys and Chrysalis Records. |

Name(s)/Address(es) of
Person(s) Executing Termination:

John Waite
c/o Bill Vulsteke
Provident Financial Management
2850 Ocean Park Blvd. Suite 300
Santa Monica, CA 90405

JOHN WAITE

V9924 D957 P 2

## Schedule A

| Work | Author | Publication Date | Copyright Registration No | Termination Notice Date | Effective Date of Termination |
|---|---|---|---|---|---|
| Ignition | John Waite | 5/21/1982 | SR000036195 | 4/20/2015 | 5/22/17 |
| No Brakes | John Waite | 6/15/1984 | SR000055904 | 4/20/2015 | 6/16/2019 |
| Mask of Smiles | John Waite | 7/26/1985 | SR000093264 | 4/20/2015 | 7/27/2020 |

# PROOF OF SERVICE

State of California                    )
                                       )
County of Los Angeles                  )

     I, EVAN S. COHEN, am employed in the aforesaid county, State of California; I am over the age of 18 years; my business address is: 1180 South Beverly Drive, Suite 510, Los Angeles, California 90035-1157.

     On April 20, 2015, I served the foregoing **NOTICE OF TERMINATION UNDER 17 U.S.C. §203 and 37 C.F.R. §201.10** on all interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

**Business Affairs**
**Universal Music Group**
**c/o UMG Recordings, Inc.**
**2220 Colorado Avenue, First Floor**
**Santa Monica, CA 90404**

     I am readily familiar with the business's practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business. On this date, the above referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing following ordinary business practices.

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 20, 2015.

_____
EVAN S. COHEN

# EXHIBIT 7



**COWAN LIEBOWITZ LATMAN**

Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

(212) 790-9200 Tel
(212) 575-0671 Fax
www.cll.com

**Thomas Kjellberg**
(212) 790-9202
txk@cll.com

May 31, 2018

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

Mr. John Waite
c/o Bill Vulsteke
Provident Financial Management
2850 Ocean Park Blvd., Suite 300
Santa Monica, CA 90405

Mr. John Waite
Chief Executive Officer
No Brakes Tour Inc.
3130 Wilshire Blvd., Suite 600
Santa Monica, CA 90403

Re:   John Waite Copyright Termination Notice
"Ignition," "No Brakes" and "Mask of Smiles" Albums

Dear Mr. Waite:

We represent Capitol Records, LLC f/k/a Capitol Records, Inc. ("Capitol"), the successor to Chrysalis Records, Inc. ("Chrysalis"), and write with reference to your notice dated April 20, 2015 (which notice Capitol has no record of having received, and of which it had no knowledge until late 2017) purporting to terminate Capitol's rights in John Waite sound recordings contained on the albums "Ignition," "No Brakes" and "Mask of Smiles" (the "Albums"). As set forth in detail below, your attempt to terminate Capitol's rights in and to these sound recordings under 17 U.S.C. § 203 is without legal or factual merit.

As a threshold matter, your notice fails to comply with the requirement of "[a] brief statement reasonably identifying the grant to which the notice of termination applies." Your notice purports to identify a grant "dated in or about 1981 between the members of the recording group called The Babys and Chrysalis Records." There is no such agreement covering the sound recordings identified in Schedule A to your notice. Rather, as addressed below, those recordings appear to be governed by a series of agreements from 1981, 1983 and 1985 entered into by various furnishing companies providing your services to either Chrysalis or Capitol. Accordingly, while your notice purports to terminate rights in the sound recordings on the

Cowan, Liebowitz & Latman, P.C.
Mr. John Waite
May 31, 2018
Page 2

Albums, you have failed to properly identify any grant covering such works. Certainly, a notice that references incorrect parties and dates cannot be considered a reasonable identification of the grants you purport to be terminating.

While your failure to provide a reasonable identification of the alleged grant is itself sufficient to render the purported notice ineffective, your termination attempt would fail even had you properly identified the controlling agreement. Accordingly, for purposes of efficiency, we proceed to address the absence of any right to terminate under the applicable agreements.

The relevant agreements that form the basis for the parties' relationship with respect to the Albums are: (1) with respect to "Ignition," a November 1, 1981 agreement (the "1981 Agreement") between Chrysalis and Heavy Waite, Inc. ("Heavy Waite"); (2) with respect to "No Brakes," a September 22, 1983 agreement (the "1983 Agreement") between Capitol and Moonwalk Music, Inc. ("Moonwalk"); and (3) with respect to "Mask of Smiles," a July 4, 1985 agreement (the "1985 Agreement") between Capitol and Diamond Stripe, Inc. ("Diamond"). Heavy Waite, Moonwalk and Diamond (referred to collectively herein as the "Furnishing Companies") were each engaged to furnish your recording services. Each of the agreements contains unambiguous language specifying that any recordings created during its term are works made for hire owned by the record company. The 1981 Agreement provides:

> All master recordings embodying the performances of Artist recorded during the term hereof, from the inception of the recording thereof, and all phonograph records and other reproductions made therefrom, together with the performances embodied therein and all copyrights therein and thereto, and any and all renewals and extensions thereof shall be entirely [Chrysalis's] property, free of any claims whatsoever by [Heavy Waite], Artist, or any other person, firm or corporation. For the purposes hereof, [Heavy Waite], Artist, and all other persons rendering services in connection with such master recordings shall be our employees for hire and all such master recordings shall be works made for hire under the United States Copyright Law.

1981 Agreement ¶ 4. The 1983 and 1985 Agreements contain a provision establishing the recordings covered by such agreements as works made for hire:

> With respect to any person whose services are furnished by [Moonwalk or Diamond] in connection with masters recorded hereunder, including, but not limited to, Artist and/or any person engaged to act as a Producer, [Moonwalk or Diamond] has or shall have a contract in which the person acknowledges that each master embodying the results and proceeds of his services is prepared within the scope of [Moonwalk's or Diamond's] engagement of his personal services and is a work made for hire, or as part of an lp-master constitutes a work specifically ordered by [Moonwalk or Diamond] for use as a contribution to a collective work and shall be considered a work made for hire.

**Cowan, Liebowitz & Latman, P.C.**
Mr. John Waite
May 31, 2018
Page 3

1983 and 1985 Agreements ¶ 5(a); *see also* ¶ 18 (acknowledging Capitol as the "sole, exclusive, and perpetual owner of all masters from inception"). Accordingly, there is no operative grant to terminate, but simply a work made for hire relationship, which is not subject to termination under the statute.

Moreover, even if Chrysalis and/or Capitol were deemed to have acquired copyright rights to the sound recordings by virtue of a grant made by the Furnishing Companies, the result would still not be a transfer terminable under the Copyright Act because any such grant was made by the company that was signatory to such agreements, not by you. A copyrighted work of which a corporate entity is the legal author is *ipso facto* a work made for hire, and transfers of rights in works made for hire are categorically not terminable under § 203. The Furnishing Companies all represented, warranted and agreed that they had the proper authority to enter into the relevant agreement and to perform all of its terms, including granting the rights covered by the agreement. 1981 Agreement ¶ 9(a); 1983 and 1985 Agreements ¶¶ 2(i), (j), (k). Moreover, you personally signed inducement letters and/or declarations in which you joined in the representations and warranties made by the Furnishing Companies, confirmed the Furnishing Companies' right to perform their contracts with the record companies and/or acknowledged the work made for hire status of the recordings created under the relevant agreements. 1981 Agreement Exhibit A ¶¶ 1(a)-(c); 1983 Agreement Exhibit B ¶¶ 1-3, Declaration ¶ A; 1985 Agreement Exhibit A ¶¶ 1-3; Exhibit E ¶ A. Having permitted the Furnishing Companies to enter into these agreements and signed documentation confirming their authority to make such agreements, including most fundamentally the right to transfer the necessary rights, you cannot now turn around and claim that the rights all along belonged to you and not the entity that made the relevant agreements with Chrysalis and Capitol. The sound recordings were created by you within the scope of your employment by the Furnishing Companies, which presumably were formed for the purpose of permitting you to be treated as an employee of such companies. *See generally Caso v. Nimrod Productions, Inc.*, 77 Cal. Rptr. 3rd 313, 316-17 (2d Dist. 2008) (describing typical entertainment industry loan-out arrangement in which loan-out company furnishes services of its employee); *see also* 17 U.S.C. § 101(1) (defining a work made for hire as "a work prepared by an employee within the scope of his or her employment."); 17 U.S.C. § 201(b) (under which "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright").

The sound recordings also constitute works made for hire under section 101(2) of the Copyright Act, which defines a "work made for hire" as

a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

**Cowan, Liebowitz & Latman, P.C.**
Mr. John Waite
May 31, 2018
Page 4

17 U.S.C. § 101(2). The sound recordings were specially commissioned for use in compilations, *i.e.*, long-playing record albums. The 1981 Agreement provided in paragraph 2 for delivery of "sufficient Masters to constitute one (1) 12-inch, 33-1/3 rpm long-playing record, of no less than thirty-three (33) minutes in duration (hereinafter such a record is sometimes referred to by the term 'LP') plus, at our election, sufficient additional Masters to constitute a second LP." The 1983 and 1985 Agreements likewise provided for delivery of "lp-masters." 1983 and 1985 Agreement ¶ 1. An "lp-master" is defined as "a set of masters sufficient to constitute a lp-disc," and "lp-disc" is defined as "a 12 inch, 33-1/3 rpm, long playing disc-type record or its tape record equivalent, embodying thereon not less than eight (8) nor more than twelve (12) selections." *Id.* ¶¶ 14(e), (h).

> The Albums are compilations under the Copyright Act:

> A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

17 U.S.C. § 101. "An album is a collection of preexisting materials—songs—that are selected and arranged by the author in a way that results in an original work of authorship—the album." *Bryant v. Media Right Prods.*, 603 F.3d 135, 140-41 (2d Cir. 2010). Accordingly, "[a]n album falls within the Act's expansive definition of compilation." *Id.* at 140. The sound recordings selected and arranged to comprise the Albums were subject to signed, written agreements deeming such sound recordings to be works made for hire. 1981 Agreement ¶ 4; 1983 and 1985 Agreements ¶ 5(a). In addition, the copyright registration for the Albums specifically identify Chrysalis (in the case of "Ignition") and Capitol (in the case of the other two Albums) as owning the copyright as "employer for hire." Accordingly, no indication of a transfer of copyright from you to Chrysalis or Capitol appears on the registrations, which have also never been amended since their issuance to reflect any such purported transfer that could potentially be subject to termination. The registrations were timely made under 17 U.S.C. § 410(c), and are thus *prima facie* evidence that the sound recordings are works made for hire. You would bear the burden of proving otherwise and rebutting the presumption that Chrysalis and/or Capitol owned all right, title and interest in the copyright to the sound recordings in their own names as works made for hire under § 101(2) of the Copyright Act from inception.

In any case, even if the sound recordings were not works made for hire, you would be time-barred from challenging that issue. Under the three-year statute of limitations for copyright claims, 17 U.S.C. § 507(b), claims regarding the initial ownership status of a work must be brought within three years of creation. *See, e.g., Robles Vasquez v. Torres-Negron*, 2007 U.S. Dist. LEXIS 57872, *21 (S.D.N.Y. July 11, 2007) ("Since plaintiffs' claim … relates to a claim of copyright ownership, the normal three-year limitations period applies."). Accordingly, in *Aday v. Sony Music*, 44 U.S.P.Q.2d 1688 (S.D.N.Y. 1997), the recording artist Meat Loaf was held to be time-barred when in 1997 he sought to contest the work-for-hire provision in his 1977

**Cowan, Liebowitz & Latman, P.C.**
Mr. John Waite
May 31, 2018
Page 5

recording agreement with Sony after a royalty dispute. The artist sought a declaration that he was not an employee for hire, but the Southern District of New York rejected the claim, stating the singer "had reason to know in 1977 about any of the problems with the work-for-hire provision that [he] now contend[s] violates the Copyright Act."

Finally, with respect to the "Ignition" Album, paragraph 11(b) of the 1981 Agreement prohibits you from making any use of the sound recordings, regardless of whether or not your purported termination notice is effective:

> Neither [Heavy Waite] nor Artist shall at any time manufacture, distribute, or sell or authorize the manufacture, distribution or sale by any person, firm, or corporation other than [Chrysalis] of phonograph records embodying ... any performance rendered by Artist during the term of this contract....

This provision is not a "grant or transfer or license of copyright or any right under a copyright" as section 203(a) requires, and thus it is not terminable. Clearly, the statute does not contemplate that a terminated assignment or license agreement is rescinded *in toto*, only that the grant of U.S. rights is terminated. The remainder of the provisions of the agreement arise under state contract law and are not affected by termination; the Copyright Act explicitly states in section 203(b)(5) that termination shall not affect "rights arising under any other Federal, State or foreign laws," such as state contract law. Courts have consistently recognized that parties are free to contract away rights they would otherwise enjoy under the Copyright Act. *See Bowers v. Baystate Technologies*, 320 F.3d 1317 (Fed. Cir. 2003) (contract waiving fair use rights); *Davidson Assocs. v. Jung*, 422 F.3d 630 (8th Cir. 2005) (same). Accordingly, you would continue to be bound by your contractual obligation to refrain from exploiting the "Ignition" recordings, or permitting others to exploit the works, even if your termination of any "grant" to Chrysalis were given effect. This is not an "agreement to contrary" under section 203(a)(5), because it does not prevent you from exercising whatever termination rights you may have.

For all these reasons, Capitol continues to possess the exclusive right to exploit the sound recordings comprising the Albums pursuant to its rights as outlined above. Any exploitation of those sound recordings by you or on your behalf would be in violation of Capitol's exclusive rights, and would render you, and any other individuals or entities involved in such exploitation, liable for a number of claims including copyright infringement, and subject to all of the remedies provided by the Copyright Act.

In fact, we are aware that at least one of the Albums ("Ignition") has been added to Spotify, Apple and other digital services by an entity named "No Brake Records," which we believe is controlled by or associated with you. Accordingly, we hereby demand that you cease and desist from any and all unauthorized exploitation of the sound recordings, including the "Ignition" Album, and take immediate steps to remove any such sound recordings from any digital services to which you, an entity with which you are associated, or an entity purporting to be acting upon authorization from you have added them without Capitol's authorization.

Cowan, Liebowitz & Latman, P.C.
Mr. John Waite
May 31, 2018
Page 6


　　　　This letter is not intended to be a complete statement of the facts or the law, and is without prejudice to any of Capitol's rights, remedies, or defenses, all of which are expressly reserved.

　　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　　Thomas Kjellberg

cc:  Evan S. Cohen, Esq. (via email)

# EXHIBIT 8

9/04BATCH55242

July 1, 1980

MCA Records, Inc.
100 Universal City Plaza
Universal City, California  91608

Gentlemen:

      I have been advised by SOUTH COAST RECORDS, INC.
(hereinafter referred to as "Producer") that you have entered
into a production agreement pursuant to which you shall distri-
bute master recordings delivered to you by Producer (herein
called the "Production Agreement").  The terms of this Produc-
tion Agreement, insofar as they concern my services, have been
explained to me.

      In consideration of and as an inducement to you to
include me within the terms of the Production Agreement, I
hereby represent, warrant and agree as follows:

      1.   Producer is and will be at all times during
the term of the Production Agreement, as it may be extended
in accordance with the terms thereof as of the date hereof,
authorized to furnish my services to you as therein provided;
and if for any reason my contract of employment with Producer
should expire or be terminated prior to the completion of the
Production Agreement, I agree to keep, perform, observe and be
bound by each and all of the terms, conditions and covenants
thereof as though I were a party thereto and had executed the
same in place of Producer, except that the royalty payable to
me in such event shall be that royalty to which I was en-
titled pursuant to my recording agreement with Producer.

      2.   I will look solely to Producer for any and all
royalties, advances and/or other payments for services to be
performed by me pursuant to my agreement with Producer and the
Production Agreement, and I will not look to you for compen-
sation for services rendered or rights granted to you pursuant
to the Production Agreement, except as expressly provided for
in the preceding paragraph.

      3.   All of the terms and conditions and restrictions
relating to me in the Production Agreement shall be binding
upon me as a performer on phonograph records, whether perform-
ing alone or as part of a group, regardless of the name or
names by which I may be identified.  The rights of Producer
and the obligations, liabilities, prohibitions and restrictions

EXHIBIT "B"

9/04BATCH55243

imposed in the Production Agreement shall be deemed applicable to me.

4. I hereby confirm and join in the granting to you of the rights specified in the Production Agreement, including, but not limited to, all rights in and to the results and proceeds of my services and the right to use and publish my name and likeness and to write and publish and permit others to write and publish articles concerning me for advertising and trade purposes. I agree that I will not during the term of the Production Agreement, or any extension or renewal thereof (but only so long as you are entitled to my services thereunder), perform for anyone else for the purpose of making phonograph records, and I will not record any compositions which are recorded or acquired under the Production Agreement for anyone else in accordance with the provisions of Paragraph 10 of the Production Agreement.

5. I acknowledge that MCA is the exclusive owner of all rights of copyright in records embodying the results and proceeds of my services, including the exclusive right to copyright same as "sound recordings" in the name of MCA, to renew and extend such copyrights, and to exercise all rights of the copyright proprietor thereunder. I agree that to the extent, if any, that I may be deemed an "author" of "sound recordings" manufactured from masters recorded under the Production Agreement, I grant to MCA a power of attorney, irrevocable and coupled with an interest, for me and in my name to apply for and obtain, and on obtaining same to assign to MCA, all copyrights and renewal copyrights in and to such "sound recordings".

6. (a) I am the sole owner of the professional name: Joe Ely.

(b) To the best of my knowledge, no other person has the right to use the same professional name or to permit it to be used in connection with phonograph records.

(c) I have the sole authority to grant you the right to use said professional name, and I agree to indemnify and hold you harmless from any claims, damages, expenses and litigation which may come about because of your use of said professional name in accordance with the provisions of this agreement and the Production Agreement.

7. If, during the term of the Production Agreement or any extensions or renewals thereof, Producer shall cease to be entitled to my recording services in accordance with the

-2-

2/9/04 BATCH 55244

terms of said agreement, or if Producer shall fail or refuse to convey any of our recordings to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Production Agreement if Producer had continued to be entitled to my recording services and if Producer had continued to deliver to you my recordings, and such rights, privileges and benefits shall be enforceable in your behalf against me; provided however, that this paragraph 7 shall not be construed to grant you rights to my services for a period in excess of the term of my recording agreement with Producer, as same may be extended in accordance with the terms thereof.

Very truly yours,

JOE ELY

DEA:  :mo:B2-5                    -3-
7/21/80

# EXHIBIT 9

## ACKNOWLEDGMENT OF ASSIGNMENT

This acknowledgment of assignment is made by Jerry Jeff Walker and Groper Music (collectively herein "Walker" or "Assignor") to acknowledge, confirm, and further memorialize that Assignor made the following assignment ("Assignment") to Earle R. "Joe" Ely (herein "Ely" or "Assignee") in or about January 1, 1998 ("Effective Date"): (a) all of Assignor's right, title, and interest in and to each and every master recording ("Master") primarily featuring the recorded musical performances of Ely, including the Masters listed in Schedule A, attached hereto, including the copyrights in and to such Masters and including the contracts regarding such Masters; and (b) all of Assignor's right, title, and interest in and to each and every musical composition ("Composition") written in whole or part by Ely, including the Compositions listed in Schedule A, attached hereto, including the copyrights in and to such Compositions and including the contracts regarding such Compositions.

Assignor acknowledges that Assignor obtained all such rights, title and interest in and to the Masters and Compositions through the lawsuit styled *Jerry Jeff Walker and Grouper Music v. Michael Brovsky, Free Flow Productions, Inc., Southcoast Records, Inc., Brovsky-Stewart Group, Inc., and Concorde Capital, Inc.,* Cause No. 455.736 in the 261st District Court of Travis County, Texas (those named defendants collectively herein "Brovsky"); through the settlement of such lawsuit pursuant to the settlement agreement executed in or about August of 1997 between Walker and Brovsky (on behalf of those named defendants, and all other entities which Brovsky then owned or controlled, including April Songs); and through the assignments by Brovsky, incident to that settlement agreement, which included assignments dated on or about August 8, 1997, assigning of all of Brovsky's rights and interests in and to the contracts involving the Masters and Compositions to Walker (Assignor herein). Ely acknowledges that he signed consents to the assignments of Brovsky to Walker on or about August 5, 1997.

It is Assignor's understanding, and it has always been Assignor's intention, that Assignor (Walker) made the Assignment to Assignee (Ely) and did so in writing(s) around or as of the Effective Date; however, the parties have been unable to locate such writing(s) due to the passage of time; therefore, Assignor and Assignee wish to further memorialize the Assignment with this writing. In the event the Assignment is ever deemed to not have occurred as of the Effective Date, it shall be deemed effective as of the date set forth below in the execution section.

Assignee acknowledges that Assignor has had the right to receive royalty statements and payments in connection with the Masters and Compositions from the time of the aforementioned settlement agreement between Assignor and Brovsky until the date set forth below in the execution portion of this writing, and Assignee waives any claim to any monies that Assignor or Assignor's other assignees may have received in connection with the Masters and Compositions. Assignor and Assignee hereby agree that from the date of this writing forward, Assignee shall have the sole right to receive royalty statements and compensation in connection with the Masters and Compositions. Assignor will reasonably cooperate with Assignee in connection with directing third parties to account to and pay to Assignee directly in connection with the Masters and Compositions, rather than accounting and paying through Assignor. In connection therewith, Assignor agrees to sign letters of direction to such third parties, such letters prepared by Assignee, subject to the approval of Assignor, such approval not to be unreasonably withheld.

*ACKNOWLEDGED AND AGREED:*

ASSIGNOR:                                          ASSIGNEE:

_____  6-24-2019        _____  6-24.19
Jerry Jeff Walker          Date              Earle R. "Joe" Ely          Date
Individually and o/b/o Groper                Individually and o/b/o his
Music                                        affiliates

# EXHIBIT 10

# Certificate of Recordation



This is to certify that the attached document was recorded
on the date and in the place shown below.

This certificate is issued under the seal of the
United States Copyright Office.

*Maria A. Pallante*

United States Register of Copyrights and Director

June 17, 2016
_____

Date Of Recordation

9921                        732
_____

Volume                     Doc. No.

Case 1:19-cv-01091-LAK Document 1-3 Filed 02/05/19 Page 3 of 5
Case 1:19-cv-01091-LAK Document 1-3 Filed 02/05/19 Page 3 of 5
V9921 D732 P 1

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

December 15, 2015

Universal Music Group
2220 Colorado Avenue
Santa Monica, CA 90404

As successor-in-interest to MCA Records, Inc.

**RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10**

Dear Sir or Madam:

The undersigned persons are the authors of the works listed on Schedule A annexed hereto. Pursuant to 17 U.S.C. § 203 and 37 C.F.R. § 201.10, we are hereby serving notice of our intention to terminate the grant or transfer of copyrights and the rights of the copyright proprietor in the works listed below. To the best of our knowledge and belief, this notice has been signed by the only persons whose signatures are necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works: | See Schedule A |
| Name of Author(s): | Joe Ely |
| Copyright Date: | See Schedule A |
| Copyright Registration No: | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated: | All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1978 between the recording artist Joe Ely and MCA Records, Inc. |

Name(s)/Address(es) of
Person(s) Executing Termination:        Joe Ely
                                         P.O. Box 91479
                                         Austin, TX 78709

## Schedule A

| Work | Author | Publication Date | Copyright Registration No | Termination Notice Date | Effective Date of Termination |
|---|---|---|---|---|---|
| Honky Tonk Masquerade | Joe Ely | February 9, 1978 | SR0000001085 | December 15, 2015 | December 16, 2017 |
| Honky Tonk Masquerade | Joe Ely | February 9, 1978 | SR0000080445 | December 15, 2015 | December 16, 2017 |
| Fingernails/Because Of The Wind | Joe Ely | February 8, 1978 | SR0000000183 | December 15, 2015 | December 16, 2017 |
| Honky Tonk Masquerade/Johnny Blues | Joe Ely | April 26, 1978 | SR0000000983 | December 15, 2015 | December 16, 2017 |
| She Never Spoke Spanish To Me/ Cornbread Moon | Joe Ely | September 27, 1978 | SR0000003875 | December 15, 2015 | December 16, 2017 |
| Down The Drag | Joe Ely | February 14, 1979 | SR0000008563 | December 15, 2015 | December 16, 2017 |
| Live Shots | Joe Ely | April 11, 1981 | SR0000033289 | December 15, 2015 | December 16, 2017 |
| Musta Notta Gotta Lotta | Joe Ely | March 27, 1981 | SR0000025796 | December 15, 2015 | December 16, 2017 |
| Hi-Res | Joe Ely | April 2, 1984 | SR0000053613 | December 15, 2015 | April 3, 2019 |

## PROOF OF SERVICE

State of California )
)
County of Los Angeles )

    I, EVAN S. COHEN, am employed in the aforesaid county, State of California; I am over the age of 18 years; my business address is: 1180 South Beverly Drive, Suite 510, Los Angeles, California 90035-1157.

    On December 15, 2015, I served the foregoing **NOTICE OF TERMINATION UNDER 17 U.S.C. §203 and 37 C.F.R. §201.10** on all interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

**Business Affairs
Universal Music Group
c/o UMG Recordings, Inc.
2220 Colorado Avenue, First Floor
Santa Monica, CA 90404**

    I am readily familiar with the business's practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business. On this date, the above referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing following ordinary business practices, **via certified mail, return receipt requested.**

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 15, 2015.

                                      _____
                                      EVAN S. COHEN

EXHIBIT 11


**COWAN LIEBOWITZ LATMAN**

Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

(212) 790-9200 Tel
(212) 575-0671 Fax
www.cll.com

Richard S. Mandel
(212) 790-9291
rsm@cll.com

May 6, 2016

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

Mr. Joe Ely
P.O. Box 91479
Austin, Texas 78709

      Re:   Joe Ely Copyright Termination Notice

Dear Mr. Ely:

      We represent UMG Recordings, Inc. ("UMG"), the successor to MCA Records, Inc. ("MCA"), and write with reference to your notice dated December 15, 2015 purporting to terminate UMG's rights in certain specified recordings containing your performances. As set forth in detail below, your attempt to terminate UMG's rights in and to these recordings under 17 U.S.C. § 203 is without legal or factual merit.

The 1976 Agreement

      The first six works referenced in Schedule A of your termination notice were created pursuant to an August 26, 1976 agreement between you and MCA (the "1976 Agreement"). As a threshold matter, § 203 has no application to the 1976 Agreement because it was executed prior to January 1, 1978. By its clear terms, § 203 only permits termination of grants executed "on or after January 1, 1978." To the extent you are attempting to treat either the date of publication of the works or the date of creation of such works as being the date of execution, rather than the date the relevant agreement was signed, there is no basis for such a strained statutory interpretation. Based on the unambiguous meaning of the term, "executed" plainly refers to when the agreement was signed and not when the recordings were created or published. Neither the courts nor Congress has ever endorsed a contrary interpretation of the term "executed" that would fix such date based on the creation or publication of the work rather than the signing of the relevant agreement. Even the Copyright Office has recognized in its final rulemaking on the issue, 76 Fed. Reg. 32316 (June 6, 2011), that the definition of "executed" in § 203 "should be settled in the courts (or in Congress, if Congress accepts the Office's suggestion to enact legislation that will clarify the status of [such grants].)."

2059855v.1 30057/001

**Cowan, Liebowitz & Latman, P.C.**
Mr. Joe Ely
May 6, 2016
Page 2

Even assuming for the sake of argument only that § 203 could apply to pre-1978 agreements, termination would nevertheless be inapplicable. As the statute itself recognizes, termination is not available with respect to works made for hire. Because the relevant contractual relationship pre-dates the effective date of the 1976 Copyright Act, the work-made-for-hire-status of the recordings is determined under the 1909 Copyright Act. See Roth v. Pritikin, 710 F.2d 934 (2d Cir.), cert. den, 464 U.S. 961 (1983) (1909 Act governed post-1978 work created under pre-1978 contract); Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 98 (2d Cir. 2002) (work for hire determination "turns on whether the relevant contract was entered into prior to January 1, 1978").

Under the 1909 Act, "in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done." Twentieth Century Fox Film Corp. v. Entm't Distrib., 429 F.3d 869, 877 (9th Cir. 2005) (quoting Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965)). Indeed, under the 1909 Act, there arose "an almost irrebuttable presumption that any person who paid another to create a copyrightable work was the statutory 'author' under the 'work for hire' doctrine." Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 158 (2d Cir. 2003) (citation omitted); Easter Seal Society for Crippled Children & Adults v. Playboy Enters., 815 F.2d 323, 327 (5th Cir. 1987) (same).

As the Second Circuit has noted, under the 1909 Act "[a] work is made at the hiring party's 'instance and expense' when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out. The right to direct and supervise the manner in which work is created need never be exercised." Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 635 (2d Cir. 2004). The recordings here were unmistakably made at the "instance and expense" of MCA, which contracted for the delivery of the recordings, approved and paid the budget for such recordings and had the right to approve such recordings as satisfactory.

In any event, even if the 1976 Act were controlling for purposes of determining the work made for hire status of the recordings made pursuant to pre-1978 agreements, the recordings would still constitute works made for hire. The Copyright Act defines a work made for hire as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1); see also 17 U.S.C. § 201(b) (under which "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright"). The Supreme Court held in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989), that whether a person created a work as an "employee within the scope of his or her employment" under the 1976 Act is to be determined by reference to the common law of agency. The primary consideration in determining whether a hired party is an employee under the common law of agency is "the hiring party's right to control the manner and means by which the product is accomplished." Reid, 490 U.S. at 751. The contract here provided MCA with such ultimate control, including the ability to accept or reject the

**Cowan, Liebowitz & Latman, P.C.**
Mr. Joe Ely
May 6, 2016
Page 3

recordings delivered. See 1976 Agreement ¶ 2(c). Moreover, numerous other indicia of an employment relationship exist, including the fact that recording was a regular part of MCA's business, the parties' express acknowledgement of an employment relationship (see 1976 Agreement ¶ 8(c)) and the extended duration of the relationship. See generally Reid, 490 U.S. at 751. Accordingly, the recordings are appropriately categorized as works made for hire, regardless of any artistic control that you may have exercised in the recording process. See Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc., 2010 U.S. Dist. LEXIS 94500, *29-30 (S.D.N.Y. Sept. 10, 2010) ("The fact that [Bob] Marley may have exercised artistic control over the recording process ... is legally irrelevant; what is dispositive is that Island had the contractual right to accept, reject, modify, and otherwise control the creation of the Sound Recordings.").

The recordings created pursuant to the 1976 Agreement also constitute works made for hire under § 101(2) of the Copyright Act, which defines a "work made for hire" as

> a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101(2). The recordings were specially commissioned for use in a compilation, i.e., a long-playing record album. The 1982 Agreement provides in paragraph 1 for the delivery of "LPs," with "LP" or "album" defined in paragraph 21(g) to mean "a sufficient number of master recordings to constitute one (1) 12-inch, 33-1/3 rpm, long-playing phonograph record album of not less than thirty (30) minutes playing time."

Such albums are compilations under the 1976 Act:

> A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

17 U.S.C. § 101. "An album is a collection of preexisting materials—songs—that are selected and arranged by the author in a way that results in an original work of authorship—the album." Bryant v. Media Right Prods., 603 F.3d 135, 140-41 (2d Cir. 2010). Accordingly, "[a]n album falls within the Act's expansive definition of compilation." Id. at 140.

The recordings selected and arranged to comprise the relevant albums were subject to a signed, written agreement deeming MCA to be the owner of copyright from inception as a work made for hire. In addition, the copyright registrations for the recordings specifically identify MCA's ownership status as "employer for hire." Accordingly, no indication of a transfer of copyright from you to MCA appears on the registrations, which have also never been amended since their issuance to reflect any such purported transfers that could potentially be subject to

Case 1:19-cv-01091 Document 1-4 Filed 02/05/19 Page 5 of 6

**Cowan, Liebowitz & Latman, P.C.**
Mr. Joe Ely
May 6, 2016
Page 4

termination. The registrations were timely made under 17 U.S.C. § 410(c), and are thus prima facie evidence that the master recordings are works made for hire. You would bear the burden of proving otherwise and rebutting the presumption that MCA owned all right, title and interest in the copyright to the recordings in its own name as works made for hire.

In any case, even if the sound recordings were not works made for hire, you would be time-barred from challenging that issue. Under the three-year statute of limitations for copyright claims, 17 U.S.C. § 507(b), claims regarding the initial ownership status of a work must be brought within three years of creation. See, e.g., Robles Vasquez v. Torres-Negron, 2007 U.S. Dist. LEXIS 57872, *21 (S.D.N.Y. July 11, 2007) ("Since plaintiffs' claim … relates to a claim of copyright ownership, the normal three-year limitations period applies."). Accordingly, in Aday v. Sony Music, 44 U.S.P.Q.2d 1688 (S.D.N.Y. 1997), the recording artist Meat Loaf was held to be time-barred when in 1997 he sought to contest the work-for-hire provision in his 1977 recording agreement with Sony after a royalty dispute. The artist sought a declaration that he was not an employee for hire, but the Southern District of New York rejected the claim, stating the singer "had reason to know in 1977 about any of the problems with the work-for-hire provision that [he] now contend[s] violates the Copyright Act."

The 1980 Agreement

With respect to the last three works in Schedule A of your termination notice, MCA obtained ownership of such recordings by virtue of a July 13, 1979 agreement (the "1979 Production Agreement") between two corporate entities, MCA and South Coast Records, Inc. ("South Coast"), which furnished the recording services of various artists, including you, to MCA. Under the 1979 Production Agreement, South Coast represented that it had or would enter into valid written exclusive recording agreements with each artist furnished to MCA, and that such recording agreements would contain all appropriate provisions allowing South Coast to perform its obligations under the 1979 Production Agreement and vesting MCA with ownership of the rights in the works covered by the contract. See 1979 Production Agreement ¶ 1(c)(ii). In paragraph 8, South Coast further acknowledged that MCA was the sole and exclusive owner of all the recordings created under the 1979 Production Agreement from inception. Such ownership was also provided for specifically with respect to your recordings in paragraph 4(e) of a July 1, 1980 amendment to the 1979 Production Agreement, as well as in paragraph 5 of the inducement letter to your July 1, 1980 recording agreement with South Coast (the "1980 Recording Agreement"). Accordingly, there is no operative grant to terminate, but simply a work made for hire relationship that vested ownership in the works in MCA from inception.

Moreover, even if MCA were not itself deemed to be the author of a work made for hire, but rather to have acquired copyright by virtue of a grant of rights under the 1979 Production Agreement, the result would still not be a transfer terminable under the Copyright Act because any such transfer was made by the corporate furnishing company, South Coast, and not by you. A copyrighted work of which a corporate entity is the legal author is ipso facto a work made for hire, and transfers of rights in works made for hire are categorically not terminable under § 203. South Coast expressly warranted in the 1979 Production Agreement that it had or would have a

**Cowan, Liebowitz & Latman, P.C.**

Mr. Joe Ely
May 6, 2016
Page 5

valid recording agreement in place with all artists furnished to MCA, including you, and that as
the "employer of Artist, ... [it] shall pay withholding, payroll and other taxes, and pension and
welfare contributions, if any, required to be paid in connection with Artist's ... services to [South
Coast]." 1979 Production Agreement ¶ 1(h). Such a recording agreement plainly existed in the
form of the 1980 Recording Agreement, which expressly provided in paragraph 12 for South
Coast's ownership of your recordings based on your status as South Coast's "employee for hire."
You cannot now turn around and claim that the rights all along belonged to you and not the
furnishing company that represented to MCA that it owned the rights necessary for purposes of
its agreement with MCA. The recordings were created by you within the scope of your
employment by South Coast, and accordingly are works made for hire under § 101(1) of the
Copyright Act.

These recordings also constitute works made for hire under § 101(2) of the Copyright Act
for the same reasons discussed above with respect to the recordings created pursuant to the 1976
Agreement. Once again, the copyright registrations reflect MCA's ownership of the relevant
recordings as "employer for hire" and create a presumption that the recordings are works made
for hire. And you are also barred by the statute of limitations from challenging MCA's
ownership of such recordings in the same manner and for the same reasons addressed above
under the 1976 Agreement

For all these reasons, UMG continues to possess the right to exploit the recordings
pursuant to its rights as outlined above. You are hereby advised to refrain from attempting to
exploit the recordings yourself or taking any other actions interfering with UMG's continuing
rights in the recordings that are the subject of your termination notice.

This letter is without prejudice to any of UMG's rights, remedies, or defenses, all of
which are expressly reserved.

Sincerely,

Richard S. Mandel

cc:    Evan S. Cohen (Via Certified Mail)
       1180 South Beverly Drive, Suite 510
       Los Angeles, CA 90035-1157

EXHIBIT 12

# Certificate of Recordation



This is to certify that the attached document was recorded on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

*[signature]*

Acting United States Register of Copyrights and Director

July 25, 2016
_____
Date Of Recordation

9924                         803
_____
Volume                      Doc. No.

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

July 20, 2016

Universal Music Group
2220 Colorado Avenue
Santa Monica, CA 90404

As successor-in-interest to EMI America Records, a division of Capitol Records, Inc.

## RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10

Dear Sir or Madam:

The undersigned persons are the authors of the works listed on Schedule A annexed hereto. Pursuant to 17 U.S.C. § 203 and 37 C.F.R. § 201.10, we are hereby serving notice of our intention to terminate the grant or transfer of copyrights and the rights of the copyright proprietor in the works listed below. To the best of our knowledge and belief, this notice has been signed by the only persons whose signatures are necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works: | See Schedule A |
| Name of Author(s): | Kasim Sulton |
| Copyright Date: | See Schedule A |
| Copyright Registration No: | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated: | All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1981 between the recording artist Kasim and EMI America Records, a division of Capitol Records, Inc. |

Name(s)/Address(es) of
Person(s) Executing Termination:

Kasim Sulton
78 Greeley Avenue
Staten Island, NY 10906

**Schedule A**

| Work | Author | Publication Date | Copyright Registration No | Termination Notice Date | Effective Date of Termination |
|------|--------|------------------|---------------------------|-------------------------|-------------------------------|
| Kasim | Kasim Sulton | January 11, 1982 | SR0000032117 | July 20, 2016 | July 21, 2018 |

**PROOF OF SERVICE**

State of California )
                   }
County of Los Angeles )

    I, EVAN S. COHEN, am employed in the aforesaid county, State of California; I am over the age of 18 years; my business address is: 1180 South Beverly Drive, Suite 510, Los Angeles, California 90035-1157.

    On July 20, 2016, I served the foregoing **NOTICE OF TERMINATION UNDER 17 U.S.C. §203 and 37 C.F.R. §201.10** on all interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

**Business Affairs**
**Universal Music Group**
**2220 Colorado Avenue**
**Santa Monica, CA 90404**

    I am readily familiar with the business's practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business. On this date, the above referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing (**via Certified Mail, Return Receipt Requested**) following ordinary business practices.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 20, 2016.

_____
EVAN S. COHEN

# EXHIBIT 13



Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

(212) 790-9200 Tel
(212) 575-0671 Fax
www.cll.com

Richard S. Mandel
(212) 790-9291
rsm@cll.com

September 20, 2016

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

Mr. Kasim Sulton
78 Greeley Avenue
Staten Island, NY 10306

> Re: Kasim Sulton Copyright Termination Notice
> "Kasim"

Dear Mr. Sulton:

We represent Capitol Records LLC, formerly known as Capitol Records, Inc., ("Capitol"), the successor to EMI America Records Inc. ("EMI"), and write with reference to your notice dated July 20, 2016, purporting to terminate Capitol's rights in sound recordings from the album "Kasim" (the "Album"). As set forth in detail below, your attempt to terminate Capitol's rights in and to these sound recordings under 17 U.S.C. § 203 is without legal or factual merit. Among other things, the sound recordings at issue are works made for hire under the U.S. Copyright Act. As such, they are not terminable under § 203(a), which allows for termination of certain transfers and licenses of rights in "any work other than a work made for hire" (emphasis added).

The relevant agreement governing the rights of the parties is a September 29, 1980 agreement between you and EMI (the "1980 Agreement"). Paragraph 6(a) of the 1980 Agreement acknowledges that all of the sound recordings created pursuant to the contract are works made for hire owned by EMI. Accordingly, there is no "grant" that could be terminable under § 203, but rather simply a work-for-hire relationship that was confirmed by explicit agreement.

The Copyright Act defines a work made for hire as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1); *see also* 17 U.S.C. § 201(b) (under which "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright"). The Supreme Court held in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730 (1989), that whether a person created a work as an "employee within the scope of his or her employment"

2120951v.1 30057/001

Cowan, Liebowitz & Latman, P.C.
Mr. Kasim Sulton
September 20, 2016
Page 2

under the 1976 Act is to be determined by reference to the common law of agency. The primary consideration in determining whether a hired party is an employee under the common law of agency is "the hiring party's right to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751. The contract here provided EMI with such ultimate control, including the ability to accept or reject the masters delivered as satisfactory and the ability to control the time and location of all recording sessions. See 1980 Agreement ¶ 3. Moreover, numerous other indicia of an employment relationship exist, including the fact that recording was a regular part of EMI's business, the parties' express acknowledgement of a work for hire relationship (as referenced above) and the extended duration of the relationship. *See generally Reid*, 490 U.S. at 751. Accordingly, the recordings are appropriately categorized as works made for hire, regardless of any artistic control you may have exercised in the recording process. *See Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*, 2010 U.S. Dist. LEXIS 94500, *29-30 (S.D.N.Y. Sept. 10, 2010) ("The fact that [Bob] Marley may have exercised artistic control over the recording process ... is legally irrelevant; what is dispositive is that Island had the contractual right to accept, reject, modify, and otherwise control the creation of the Sound Recordings.").

The sound recordings created pursuant to the 1980 Agreement also constitute works made for hire under § 101(2) of the Copyright Act, which defines a "work made for hire" as

> a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101(2). The sound recordings were specially commissioned for use in a compilation, *i.e.*, a long-playing record album. The 1980 Agreement provides in paragraph 3 for the delivery of masters "as shall constitute . . . long-playing phonograph records(s) ('Albums' or 'LPs')." "Albums" and "LPs" are, in turn, defined interchangeably in paragraph 16(b) as "a package containing one or more 33-1/3 r.p.m. long-playing disc records (or their tape equivalent)."

Such albums are compilations under the 1976 Act:

> A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

17 U.S.C. § 101. "An album is a collection of preexisting materials—songs—that are selected and arranged by the author in a way that results in an original work of authorship—the album." *Bryant v. Media Right Prods.*, 603 F.3d 135, 140-41 (2d Cir. 2010). Accordingly, "[a]n album falls within the Act's expansive definition of compilation." *Id.* at 140.

2120951v.1 30057/001

Cowan, Liebowitz & Latman, P.C.
Mr. Kasim Sulton
September 20, 2016
Page 3

The sound recordings selected and arranged to comprise the relevant Album were subject to a signed, written agreement deeming EMI to be the owner of copyright as a work made for hire. In addition, the copyright registration for the Album states that the work is owned by Capitol as "employer for hire." Accordingly, no indication of a transfer of copyright from you to Capitol (or EMI) appears on the registration, which has also never been amended since its issuance to reflect any such purported transfer that could potentially be subject to termination. The registration was timely made under 17 U.S.C. § 410(c), and is thus *prima facie* evidence that the sound recordings are works made for hire. You would bear the burden of proving otherwise and rebutting the presumption that Capitol owned all right, title and interest in the copyright to the sound recordings in its own name as works made for hire.

In any case, even if the sound recordings were not works made for hire, you would be time-barred from challenging that issue. Under the three-year statute of limitations for copyright claims, 17 U.S.C. § 507(b), claims regarding the initial ownership status of a work must be brought within three years of creation. *See, e.g., Robles Vasquez v. Torres-Negron*, 2007 U.S. Dist. LEXIS 57872, *21 (S.D.N.Y. July 11, 2007) ("Since plaintiffs' claim ... relates to a claim of copyright ownership, the normal three-year limitations period applies."). Accordingly, in *Aday v. Sony Music*, 44 U.S.P.Q.2d 1688 (S.D.N.Y. 1997), the recording artist Meat Loaf was held to be time-barred when in 1997 he sought to contest the work-for-hire provision in his 1977 recording agreement with Sony after a royalty dispute. The artist sought a declaration that he was not an employee for hire, but the Southern District of New York rejected the claim, stating the singer "had reason to know in 1977 about any of the problems with the work-for-hire provision that [he] now contend[s] violates the Copyright Act."

For all these reasons, Capitol continues to possess the right to exploit the sound recordings that are the subject of your termination notice pursuant to its rights as outlined above. You are hereby advised to refrain from attempting to exploit the sound recordings yourself or taking any other actions interfering with Capitol's continuing rights in such sound recordings.

This letter is without prejudice to any of Capitol's rights, remedies, or defenses, all of which are expressly reserved.

Sincerely,

Richard S. Mandel

cc: Evan S. Cohen
1180 South Beverly Drive, Suite 510
Los Angeles, CA 90035-1157

2120951v.1 30057/001

# EXHIBIT 14

# Certificate of Recordation



This is to certify that the attached document was recorded on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

*Kary A. Tingle*

United States Register of Copyrights and Director

June 21, 2019
_____
Date Of Recordation

9964                              904
_____
Volume                           Doc. No.

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

September 12, 2017

Universal Music Group
2220 Colorado Avenue, 1st Floor
Santa Monica, CA 90404

As successor-in-interest to A&M Records, Inc.

**RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10**

Dear Sir or Madam:

The undersigned persons are the authors of the works listed on Schedule A annexed hereto. Pursuant to 17 U.S.C. § 203 and 37 C.F.R. § 201.10, we are hereby serving notice of our intention to terminate the grant or transfer of copyrights and the rights of the copyright proprietor in the works listed below. To the best of our knowledge and belief, this notice has been signed by the only persons whose signatures are necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works: | See Schedule A |
| Name of Author(s): | Leonard Graves Phillips, Stan Lee, Billy Club, Chuck Wagon, Karlos Kaballero |
| Date of Publication: | See Schedule A |
| Copyright Registration No: | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated: | The grant or transfer of copyright interests in and to the **sound recordings** identified in the attached Schedule A, including without limitation the right of publication, as set forth in the recording agreement dated on or about January 7, 1979, between the members of the recording group called The Dickies and A&M Records, Inc. |

Name(s)/Address(es) of
Person(s) Executing Termination:

Leonard Graves Phillips
611 Geneva St., Apt. 221
Glendale, CA 91206

Stan Sobol
P/K/A Stan Lee
6108 Buffalo Ave.
Van Nuys, CA 91401

Israel Caballero (Brother)
As successor to Carlos Caballero
P/K/A Karlos Kaballero
42320 Aaron Ct.
Lancaster, CA 93536

## Schedule A

| Work | Author | Publication Date | Copyright Registration No | Termination Notice Date | Effective Date of Termination |
|---|---|---|---|---|---|
| Dawn Of The Dickies | Leonard Graves Phillips, Stan Lee, Billy Club, Chuck Wagon, Karlos Kaballero | November 9, 1979 | SR0000015629 | September 12, 2017 | September 13, 2019 |

V9964 D904 P2

## PROOF OF SERVICE

State of California                 )
                                    )
County of Los Angeles              )

    I, EVAN S. COHEN, am employed in the aforesaid county, State of California; I am over the age of 18 years; my business address is: 1180 South Beverly Drive, Suite 510, Los Angeles, California 90035-1157.

    On September 12, 2017, I served the foregoing **NOTICE OF TERMINATION UNDER 17 U.S.C. §203 and 37 C.F.R. §201.10** on all interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

**Business Affairs**
**Universal Music Group**
**c/o UMG Recordings, Inc.**
**2220 Colorado Avenue, 1ˢᵗ Floor**
**Santa Monica, CA 90404**

    I am readily familiar with the business's practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business. On this date, the above referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing (**via Certified Mail, Return Receipt Requested**) following ordinary business practices.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 12, 2017.

EVAN S. COHEN

# EXHIBIT 15



COWAN
LIEBOWITZ
LATMAN

Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

(212) 790-9200 Tel
(212) 575-0671 Fax
www.cll.com

**Richard S. Mandel**
(212) 790-9291
rsm@cll.com

January 23, 2018

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

Mr. Leonard Graves Phillips
611 Geneva St., Apt. 221
Glendale, CA 91206

Mr. Stan Sobol
6108 Buffalo Ave.
Van Nuys, CA 91401

Mr. Israel Caballero
42320 Aaron Ct.
Lancaster, CA 93536

   Re:  The Dickies Copyright Termination Notice
      "Dawn Of The Dickies" Album

Dear Messrs. Phillips, Sobol and Caballero:

  We represent A&M Records Limited and UMG Recordings, Inc. ("UMG"), the successor to A&M Records, Inc. (referred to collectively herein with A&M Records Limited as "A&M"), and write with reference to your Notice of Termination dated September 12, 2017, purporting to terminate our clients' rights in the sound recordings contained on the album "Dawn Of The Dickies" (the "Album") performed by the group The Dickies. As set forth below, your attempt to terminate our clients' rights in and to these sound recordings under 17 U.S.C. § 203 is without legal or factual merit. The recordings at issue are works made for hire under the Copyright Act. As such, they are not terminable under § 203(a), which allows for termination of certain transfers and licenses of rights in "any work <u>other than</u> a work made for hire" (emphasis added).

  Although your notice refers to a January 7, 1979 agreement between the members of the recording group The Dickies and A&M, the relevant agreement that forms the basis for the parties' relationship with respect to the recordings identified in your notice is actually an April 3, 1978 agreement (the "1978 Agreement") between A&M and the band members Leonard Phillips, Stan Sobol, William Remar, Robert Davis and Carlos Caballero. Paragraph 4 of the

Cowan, Liebowitz & Latman, P.C.
Messrs. Leonard Phillips, Stan Sobol and Israel Caballero
January 23, 2018
Page 2

1978 Agreement provides in unequivocal terms that the sound recordings created pursuant to the contract were owned from inception by A&M as works made for hire:

> All master recordings recorded by your during the term hereof, from the inception of the recording thereof, and all phonograph records and other reproductions made therefrom, together with the performances embodied therein and all copyrights therein and thereto, and all renewals and extensions thereof, shall be entirely our property free of any claims whatsoever by you or any other person, firm, or corporation. We shall, accordingly, have the sole and exclusive right to copyright such master recordings, phonograph records, or other reproductions, in our name, as the owner and author thereof, and to secure any and all renewals and extensions of such copyrights (it being understood that for such purposes you and all other persons rendering services in connection with such master recordings shall be our employees for hire).

1978 Agreement ¶ 4. Accordingly, there is no operative grant to terminate, but simply a work made for hire relationship that was confirmed by explicit agreement.

The Copyright Act defines a work made for hire as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1); see also 17 U.S.C. § 201(b) (under which "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright"). The Supreme Court held in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989), that whether a person created a work as an "employee within the scope of his or her employment" under the Copyright Act is to be determined by reference to the common law of agency. The primary consideration in determining whether a hired party is an employee under the common law of agency is "the hiring party's right to control the manner and means by which the product is accomplished." Reid, 490 U.S. at 751. The contract here provided A&M with such ultimate control, including the ability to accept or reject the masters delivered. See 1978 Agreement ¶ 2(b) ("Each Master shall be subject to our approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon our request, you shall re-record, re-mix, or otherwise alter any Master recording until a Master technically satisfactory to us shall have been obtained."). Moreover, numerous other indicia of an employment relationship exist, including the fact that recording was a regular part of A&M's business, the parties' express acknowledgement of an employment relationship and the extended duration of the relationship. See generally Reid, 490 U.S. at 751. Accordingly, the recordings are appropriately categorized as works made for hire, regardless of any artistic control that may have been exercised by the band members in the recording process. See Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc., 2010 U.S. Dist. LEXIS 94500, *29-30 (S.D.N.Y. Sept. 10, 2010) ("The fact that [Bob] Marley may have exercised artistic control over the recording process … is legally irrelevant; what is dispositive is that Island had the contractual right to accept, reject, modify, and otherwise control the creation of the Sound Recordings.").

Cowan, Liebowitz & Latman, P.C.
Messrs. Leonard Phillips, Stan Sobol and Israel Caballero
January 23, 2018
Page 3

       The sound recordings also constitute works made for hire under § 101(2) of the Copyright Act, which defines a "work made for hire" as

> a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101(2). The sound recordings were specially commissioned for use in compilations, i.e., long-playing record albums. The 1978 Agreement provides in paragraph 2 for the recording and delivery of "at a minimum sufficient Masters to constitute one (1) 12-inch, 33-1/3 rpm long-playing record of not less than thirty (30) and of not more than forty-five (45) minutes in duration (hereinafter referred to by the term 'LP'), plus at our election Masters sufficient to constitute a second LP."

       The sound recordings created pursuant to the 1978 Agreement are compilations under the Copyright Act:

> A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

17 U.S.C. § 101. "An album is a collection of preexisting materials—songs—that are selected and arranged by the author in a way that results in an original work of authorship—the album." Bryant v. Media Right Prods., 603 F.3d 135, 140-41 (2d Cir. 2010). Accordingly, "[a]n album falls within the Act's expansive definition of compilation." Id. at 140. The sound recordings selected and arranged to comprise the Album were subject to a signed, written agreement deeming that the copyright in such sound recordings to be owned by A&M as works made for hire. 1978 Agreement ¶ 4. In addition, the copyright registration for the sound recordings specifically identify A&M as owning the copyright as "employer for hire." Accordingly, no indication of a transfer of copyright from the band members to A&M appears on the registration, which has also never been amended since its issuance to reflect any such purported transfer that could potentially be subject to termination. The registration was timely made under 17 U.S.C. § 410(c), and is thus prima facie evidence that the sound recordings are works made for hire. The band members would bear the burden of proving otherwise and rebutting the presumption that A&M owned all right, title and interest in the copyright to the sound recordings in its own name as works made for hire under § 101(2) of the Copyright Act from inception.

       In any case, even if the sound recordings were not works made for hire, the band members would be time-barred from challenging that issue. Under the three-year statute of

Cowan, Liebowitz & Latman, P.C.
Messrs. Leonard Phillips, Stan Sobol and Israel Caballero
January 23, 2018
Page 4

limitations for copyright claims, 17 U.S.C. § 507(b), claims regarding the initial ownership status of a work must be brought within three years of creation. See, e.g., Robles Vasquez v. Torres-Negron, 2007 U.S. Dist. LEXIS 57872, *21 (S.D.N.Y. July 11, 2007) ("Since plaintiffs' claim … relates to a claim of copyright ownership, the normal three-year limitations period applies."). Accordingly, in Aday v. Sony Music, 44 U.S.P.Q.2d 1688 (S.D.N.Y. 1997), the recording artist Meat Loaf was held to be time-barred when in 1997 he sought to contest the work-for-hire provision in his 1977 recording agreement with Sony after a royalty dispute. The artist sought a declaration that he was not an employee for hire, but the Southern District of New York rejected the claim, stating the singer "had reason to know in 1977 about any of the problems with the work-for-hire provision that [he] now contend[s] violates the Copyright Act."

In addition, it should be noted that regardless of whether or not the purported termination notice is effective, the band members will not be able to make any use of the sound recordings at issue under the plain language of paragraph 10(b) of the 1988 Agreement:

> You shall not at any time manufacture, distribute, or sell or authorize or knowingly permit the manufacture, distribution, or sale by any person, firm, or corporation other than us of phonograph records embodying … any performance rendered by you during the term of this contract.…

This provision is not a "grant or transfer or license of copyright or any right under a copyright" as section 203(a) requires, and thus it is not terminable. Clearly, the statute does not contemplate that a terminated assignment or license agreement is rescinded in toto, only that the grant of U.S. rights is terminated. The remainder of the provisions of the agreement arise under state contract law and are not affected by termination; the Copyright Act explicitly states in section 203(b)(5) that termination shall not affect "rights arising under any other Federal, State or foreign laws." Courts have consistently recognized that parties are free to contract away rights they would otherwise enjoy under the Copyright Act. See Bowers v. Baystate Technologies, 320 F.3d 1317 (Fed. Cir. 2003) (contract waiving fair use rights); Davidson Assocs. v. Jung, 422 F.3d 630 (8th Cir. 2005) (same). Accordingly, the band members would continue to be bound by their contractual obligation to refrain from exploiting the sound recordings, or permitting others to exploit them, even if the termination of any "grant" to A&M were given effect. This is not an "agreement to contrary" under §203(a)(5), because it does not prevent the band members from exercising whatever termination rights you may have.

For all these reasons, our clients continue to possess the right to exploit the sound recordings as outlined above, and the band members should thus refrain from attempting to exploit the sound recordings themselves or taking any other actions interfering with our clients' continuing rights in the sound recordings that are the subject of the termination notice.

Cowan, Liebowitz & Latman, P.C.
Messrs. Leonard Phillips, Stan Sobol and Israel Caballero
January 23, 2018
Page 5


      This letter is without prejudice to any of our clients' rights, remedies, or defenses, all of which are expressly reserved.

                          Sincerely,

                          Richard S. Mandel

cc:    Evan S. Cohen, Esq.
       1180 South Beverly Drive, Suite 510
       Los Angeles, CA 90035-1157

# EXHIBIT 16

# Certificate of Recordation



This is to certify that the attached document was recorded on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

*Maria A. Pallante*

United States Register of Copyrights and Director

July 11, 2016
_____
Date Of Recordation

9922                           131
_____
Volume                         Doc. No.

<u>VIA CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

March 1, 2016

Universal Music Group
2220 Colorado Avenue, 1ˢᵗ Floor
Santa Monica, CA 90404

As successor-in-interest to A&M Records, Inc.


**RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10**

Dear Sir or Madam

The undersigned persons are the authors of the works listed on Schedule A annexed hereto  Pursuant to 17 U S C  § 203 and 37 C.F.R. § 201.10, we are hereby serving notice of our intention to terminate the grant or transfer of copyrights and the rights of the copyright proprietor in the works listed below  To the best of our knowledge and belief, this notice has been signed by the only persons whose signatures are necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works | See Schedule A |
| Name of Author(s) | Steve Wynn, Dennis Duck, Karl Precoda, Dave Provost |
| Copyright Date | See Schedule A |
| Copyright Registration No. | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated | All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1985 between the members of the recording group called the Dream Syndicate and  A&M Records, Inc |

Name(s)/Address(es) of
Person(s) Executing Termination.

Steve Wynn
315 W, 102nd St., #5-C
New York, NY 10025
3722  80ᵗʰ  St  #51
Jackson Heights, NY 11372

David Pellish
P/K/A Dave Provost
6024 Buckingham Pkwy, #14
Culver City, CA 90230

Dennis Mehaffey
P/K/A Dennis Duck
199 S  Madison Ave , Apt 8
Pasadena, CA 91101

Karl Precoda
[Author's Address]

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

March 1, 2016

Universal Music Group
2220 Colorado Avenue, 1st Floor
Santa Monica, CA 90404

As successor-in-interest to A&M Records, Inc.

**RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10**

Dear Sir or Madam:

The undersigned persons are the authors of the works listed on Schedule A annexed hereto. Pursuant to 17 U.S.C. § 203 and 37 C.F.R. § 201.10, we are hereby serving notice of our intention to terminate the grant or transfer of copyrights and the rights of the copyright proprietor in the works listed below. To the best of our knowledge and belief, this notice has been signed by the only persons whose signatures are necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works: | See Schedule A |
| Name of Author(s). | Steve Wynn, Dennis Duck, Karl Precoda, Dave Provost |
| Copyright Date: | See Schedule A |
| Copyright Registration No: | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated: | All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1985 between the members of the recording group called the Dream Syndicate and A&M Records, Inc. |

Name(s)/Address(es) of
Person(s) Executing Termination:

Steve Wynn
3722 80th Street, Apt. 51
Jackson Heights, NY 11372

Dennis Mehaffey
P/K/A Dennis Duck
199 S. Madison Ave., Apt. 8
Pasadena, CA 91101

David Pellish
P/K/A Dave Provost
6024 Buckingham Pkwy, #14
Culver City, CA 90230

Karl Precoda
P.O. Box 650
Blacksburg, VA 24063

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

March 1, 2016

Universal Music Group
2220 Colorado Avenue, 1ˢᵗ Floor
Santa Monica, CA 90404

As successor-in-interest to A&M Records, Inc

## RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10

Dear Sir or Madam:

The undersigned persons are the authors of the works listed on Schedule A annexed hereto. Pursuant to 17 U.S.C. § 203 and 37 C.F.R. § 201.10, we are hereby serving notice of our intention to terminate the grant or transfer of copyrights and the rights of the copyright proprietor in the works listed below. To the best of our knowledge and belief, this notice has been signed by the only persons whose signatures are necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works: | See Schedule A |
| Name of Author(s): | Steve Wynn, Dennis Duck, Karl Precoda, Dave Provost |
| Copyright Date: | See Schedule A |
| Copyright Registration No· | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated: | All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1985 between the members of the recording group called the Dream Syndicate and A&M Records, Inc. |

Name(s)/Address(es) of
Person(s) Executing Termination:

Steve Wynn
315 W. 102nd St., #5-C
New York, NY 10025

Dennis Mehaffey
P/K/A Dennis Duck
[Author's Address]

_____

_____

Joel David Pellish
P/K/A Dave Provost
6024 Buckingham Pkwy #14
Culver City, CA 90230

Karl Precoda

[Author's Address]

_____

<u>VIA CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

March 1, 2016

Universal Music Group
2220 Colorado Avenue, 1ᵉ Floor
Santa Monica, CA 90404

As successor-in-interest to A&M Records, Inc.

### RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10

Dear Sir or Madam:

The undersigned persons are the authors of the works listed on Schedule A annexed hereto. Pursuant to 17 U.S.C. § 203 and 37 C.F.R. § 201.10, we are hereby serving notice of our intention to terminate the grant or transfer of copyrights and the rights of the copyright proprietor in the works listed below. To the best of our knowledge and belief, this notice has been signed by the only persons whose signatures are necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works: | See Schedule A |
| Name of Author(s): | Steve Wynn, Dennis Duck, Karl Precoda, Dave Provost |
| Copyright Date: | See Schedule A |
| Copyright Registration No: | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated: | All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1985 between the members of the recording group called the Dream Syndicate and A&M Records, Inc. |

Name(s)/Address(es) of
Person(s) Executing Termination:

Steve Wynn
3722 80th Street, Apt. 51
Jackson Heights, NY 11372

Dennis Mehaffey
P/K/A Dennis Duck
199 S. Madison Ave., Apt. 8
Pasadena, CA 91101

_____

David Pellish
P/K/A Dave Provost
6024 Buckingham Pkwy, #14
Culver City, CA 90230

Karl Precoda
P.O. Box 650
Blacksburg, VA 24063

_____

## Schedule A

| Work | Author | Publication Date | Copyright Registration No | Termination Notice Date | Effective Date of Termination |
|---|---|---|---|---|---|
| Medicine Show | Steve Wynn, Dennis Duck, Karl Precoda, David Provost | May 7, 1984 | SR0000054754 | March 1, 2016 | May 8, 2019 |

V9922 D131 P 5

## PROOF OF SERVICE

State of California )
)
County of Los Angeles )

    I, EVAN S. COHEN, am employed in the aforesaid county, State of California; I am over the age of 18 years; my business address is: 1180 South Beverly Drive, Suite 510, Los Angeles, California 90035-1157.

    On March 1, 2016, I served the foregoing **NOTICE OF TERMINATION UNDER 17 U.S.C. §203 and 37 C.F.R. §201.10** on all interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

**Business Affairs**
**Universal Music Group**
**c/o UMG Recordings, Inc.**
**2220 Colorado Avenue, First Floor**
**Santa Monica, CA  90404**

    I am readily familiar with the business's practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business. On this date, the above referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing following ordinary business practices, **via certified mail, return receipt requested.**

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 1, 2016.

 

_____
EVAN S. COHEN

# EXHIBIT 17

# Certificate of Recordation



This is to certify that the attached document was recorded on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

*Karyn A. Temple*

United States Register of Copyrights and Director

May 31, 2019

Date Of Recordation

9964                                        257

Volume                                   Doc. No.

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

June 21, 2016

Universal Music Group
2220 Colorado Avenue
Santa Monica, CA 90404

As successor-in-interest to Virgin Records America, Inc.

**RE: NOTICE OF TERMINATION UNDER 17 U.S.C. § 203 and 37 C.F.R. § 201.10**

Dear Sir or Madam:

The undersigned persons are the authors of the works listed on Schedule A annexed hereto. Pursuant to 17 U.S.C. § 203 and 37 C.F.R. § 201.10, we are hereby serving notice of our intention to terminate the grant or transfer of copyrights and the rights of the copyright proprietor in the works listed below. To the best of our knowledge and belief, this notice has been signed by the only persons whose signatures are necessary to terminate the grant under 17 U.S.C. § 203.

| | |
|---|---|
| Works: | See Schedule A |
| Name of Author(s): | Syd Straw |
| Copyright Date: | See Schedule A |
| Copyright Registration No: | See Schedule A |
| Effective Date of Termination: | See Schedule A |
| Grant Hereby Terminated: | All grants or transfers of copyright and all rights of copyright proprietor, including publication and recording rights, in and to the above sound recordings including, without limitation to the grant dated in or about 1989 between the recording artist Syd Straw and Virgin Records America, Inc. |

Name(s)/Address(es) of
Person(s) Executing Termination:     Susan Straw Harris
                                     P/K/A Syd Straw
                                     P.O. Box 3
                                     Weston, VT 05161

## Schedule A

| Work | Author | Publication Date | Copyright Registration No | Termination Notice Date | Effective Date of Termination |
|------|--------|------------------|---------------------------|-------------------------|-------------------------------|
| Surprise | Syd Straw | June 21, 1989 | SR0000105513 | June 21, 2016 | June 22, 2024 |

## PROOF OF SERVICE

State of California          )
                             )
County of Los Angeles        )

I, EVAN S. COHEN, am employed in the aforesaid county, State of California; I am over the age of 18 years; my business address is: 1180 South Beverly Drive, Suite 510, Los Angeles, California 90035-1157.

On June 21, 2016, I served the foregoing **NOTICE OF TERMINATION UNDER 17 U.S.C. §203 and 37 C.F.R. §201.10** on all interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

**Business Affairs**
**Universal Music Group**
**2220 Colorado Avenue**
**Santa Monica, CA 90404**

I am readily familiar with the business's practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business. On this date, the above referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing **(via Certified Mail, Return Receipt Requested)** following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 21, 2016.

_____
EVAN S. COHEN

# EXHIBIT 18



COWAN
LIEBOWITZ
LATMAN

Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

(212) 790-9200 Tel
(212) 575-0671 Fax
www.cll.com

Richard S. Mandel
(212) 790-9291
rsm@cll.com

December 16, 2016

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

Susan Straw Harris p/k/a Syd Straw
P.O. Box 3
Weston, VT 05161

   Re:  Syd Straw Copyright Termination Notice
       "Surprise" Album         

Dear Ms. Harris:

   We represent Capitol Records, LLC ("Capitol"), the successor to Virgin Records America, Inc. ("Virgin"), and write with reference to your Notice of Termination dated June 21, 2016 purporting to terminate Capitol's rights in sound recordings from the album "Surprise" (the "Album"). As set forth in detail below, your attempt to terminate Capitol's rights in and to these sound recordings under 17 U.S.C. § 203 is without legal or factual merit. The sound recordings at issue are works made for hire under the U.S. Copyright Act. As such, they are not terminable under § 203(a), which allows for termination of certain transfers and licenses of rights in "any work <u>other than</u> a work made for hire" (emphasis added).

   The relevant agreement governing the rights of the parties is a July 20, 1987 agreement between you and Virgin (the "1987 Agreement"). Paragraph 6(a) of the 1987 Agreement acknowledges in unequivocal language that the sound recordings created pursuant to the agreement are works made for hire owned from inception by Virgin:

      Subject to the terms of this contract, all Master Recordings recorded during the Term which embody the performances of Artist, from the inception of the recording thereof, shall for purposes of copyright law, be deemed works made for hire for us by you and all other persons rendering services in connection with those Master Recordings as our employees for hire.

Accordingly, there is no "grant" that could be terminable under § 203, but rather simply a work-for-hire relationship that was confirmed by explicit agreement.

Cowan, Liebowitz & Latman, P.C.
Susan Straw Harris p/k/a Syd Straw
December 16, 2016
Page 2

     The Copyright Act defines a work made for hire as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1); *see also* 17 U.S.C. § 201(b) (under which "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright"). The Supreme Court held in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730 (1989), that whether a person created a work as an "employee within the scope of his or her employment" under the Copyright Act is to be determined by reference to the common law of agency. The primary consideration in determining whether a hired party is an employee under the common law of agency is "the hiring party's right to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751. The contract here provided Virgin with such ultimate control, including the ability to accept or reject the masters delivered as commercially and technically satisfactory. See 1987 Agreement ¶ 4(e) ("Each Master shall be subject to our approval as commercially and technically satisfactory for the manufacture and sale of Phonograph Records, and, upon our request, you shall re-record any Musical Composition or other Selection until a Master commercially and technically satisfactory to us shall have been obtained"). Moreover, numerous other indicia of an employment relationship exist, including the fact that recording was a regular part of Virgin's business, the parties' express acknowledgement of a work for hire relationship (as referenced above) and the extended duration of the relationship. *See generally Reid*, 490 U.S. at 751. Accordingly, the sound recordings are appropriately categorized as works made for hire, regardless of any artistic control you may have exercised in the recording process. *See Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*, 2010 U.S. Dist. LEXIS 94500, *29-30 (S.D.N.Y. Sept. 10, 2010) ("The fact that [Bob] Marley may have exercised artistic control over the recording process … is legally irrelevant; what is dispositive is that Island had the contractual right to accept, reject, modify, and otherwise control the creation of the Sound Recordings.").

     The sound recordings created pursuant to the 1987 Agreement also constitute works made for hire under § 101(2) of the Copyright Act, which defines a "work made for hire" as

> a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101(2). The sound recordings were specially commissioned for use in a compilation, *i.e.*, a long-playing record album. The 1987 Agreement provided for delivery of recordings sufficient to constitute an "album" (1987 Agreement ¶ 3), with "album" in turn defined in paragraph 20(j) as "a 12-inch 33-1/3 rpm long-playing disc Phonograph Record of no fewer than thirty-five (35) and no more than forty (40) minutes in duration, or its tape equivalent …."

Cowan, Liebowitz & Latman, P.C.
Susan Straw Harris p/k/a Syd Straw
December 16, 2016
Page 3

> Such albums are compilations under the Copyright Act:

> > A "compilation" is a work formed by the collection and assembling of
> > preexisting materials or of data that are selected, coordinated, or arranged
> > in such a way that the resulting work as a whole constitutes an original
> > work of authorship. The term "compilation" includes collective works.

17 U.S.C. § 101. "An album is a collection of preexisting materials—songs—that are selected
and arranged by the author in a way that results in an original work of authorship—the album."
*Bryant v. Media Right Prods.*, 603 F.3d 135, 140-41 (2d Cir. 2010). Accordingly, "[a]n album
falls within the Act's expansive definition of compilation." *Id.* at 140.

The sound recordings selected and arranged to comprise the relevant Album were subject
to a signed, written agreement deeming Virgin to be the owner of copyright as a work made for
hire. In addition, the copyright registration for the Album states that the work is owned by
Virgin as "employer for hire." Accordingly, no indication of a transfer of copyright from you to
Virgin appears on the registration, which has also never been amended since its issuance to
reflect any such purported transfer that could potentially be subject to termination. The
registration was timely made under 17 U.S.C. § 410(c), and is thus *prima facie* evidence that the
sound recordings are works made for hire. You would bear the burden of proving otherwise and
rebutting the presumption that Virgin owned all right, title and interest in the copyright to the
sound recordings in its own name as works made for hire.

In any case, even if the sound recordings were not works made for hire, you would be
time-barred from challenging that issue. Under the three-year statute of limitations for copyright
claims, 17 U.S.C. § 507(b), claims regarding the initial ownership status of a work must be
brought within three years of creation. *See, e.g.*, *Robles Vasquez v. Torres-Negron*, 2007 U.S.
Dist. LEXIS 57872, *21 (S.D.N.Y. July 11, 2007) ("Since plaintiffs' claim … relates to a claim
of copyright ownership, the normal three-year limitations period applies."). Accordingly, in
*Aday v. Sony Music*, 44 U.S.P.Q.2d 1688 (S.D.N.Y. 1997), the recording artist Meat Loaf was
held to be time-barred when in 1997 he sought to contest the work-for-hire provision in his 1977
recording agreement with Sony after a royalty dispute. The artist sought a declaration that he
was not an employee for hire, but the Southern District of New York rejected the claim, stating
the singer "had reason to know in 1977 about any of the problems with the work-for-hire
provision that [he] now contend[s] violates the Copyright Act."

Finally, it should be noted that regardless of whether or not the purported termination
notice is effective, you will not be able to make any use of the sound recordings from the Album
under the plain language of paragraph 13(c) of the 1987 Agreement:

> You shall not at any time, manufacture, distribute or sell, or authorize or knowingly
> permit the manufacture, distribution, or sale in the Territory by any person other than

Cowan, Liebowitz & Latman, P.C.
Susan Straw Harris p/k/a Syd Straw
December 16, 2016
Page 4

us of phonograph records embodying … any performance rendered in any manner by
you during the term of this agreement….

This provision is not a "grant or transfer or license of copyright or any right under a copyright"
as section 203(a) requires, and thus it is not terminable. Clearly, the statute does not contemplate
that a terminated assignment or license agreement is rescinded *in toto*, only that the grant of U.S.
rights is terminated. The remainder of the provisions of the agreement arise under state contract
law and are not affected by termination; the Copyright Act explicitly states in section 203(b)(5)
that termination shall not affect "rights arising under any other Federal, State or foreign laws,"
such as state contract law. Courts have consistently recognized that parties are free to contract
away rights they would otherwise enjoy under the Copyright Act. *See Bowers v. Baystate
Technologies*, 320 F.3d 1317 (Fed. Cir. 2003) (contract waiving fair use rights); *Davidson
Assocs. v. Jung*, 422 F.3d 630 (8th Cir. 2005) (same). Accordingly, you would continue to be
bound by your contractual obligation to refrain from exploiting the sound recordings, or
permitting others to exploit them, even if the termination of any "grant" to Virgin were given
effect. This is not an "agreement to contrary" under §203(a)(5), because it does not prevent you
from exercising whatever termination rights you may have.

For all these reasons, Capitol continues to possess the right to exploit the sound
recordings that are the subject of your termination notice pursuant to its rights as outlined above.
You are hereby advised to refrain from attempting to exploit the sound recordings yourself or
taking any other actions interfering with Capitol's continuing rights in such sound recordings.

This letter is without prejudice to any of Capitol's rights, remedies, or defenses, all of
which are expressly reserved.

Sincerely,

Richard S. Mandel

cc:    Evan S. Cohen
       1180 South Beverly Drive, Suite 510
       Los Angeles, CA 90035-1157

2156705v.1 30057/001