UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN WAITE, etc., et al.,

  Plaintiffs,

  -against-                                         19-cv-1091 (LAK)

UMG RECORDINGS, INC., etc., et al.,

  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

  Ryan E. Cronin
  Roy W. Arnold
  David M. Perry
  Gregory M. Bordo
  BLANK ROME LLP

  Evan S. Cohen
  Maryann R. Marzano
  COHEN MUSIC LAW

  *Attorneys for Plaintiffs*

  Steven M. Bierman
  Melanie Berdecia
  Rollin A. Ransom
  Lisa M. Gilford
  Lauren De Lilly
  SIDLEY AUSTIN LLP

  Richard S. Mandel
  Thomas Kjellberg
  COWAN, LIEBOWITZ & LATMAN, P.C.

  *Attorneys for Defendant UMG Recordings, Inc.*

2

LEWIS A. KAPLAN, *District Judge*.

     In the music recording industry, artists commonly sign agreements with record labels in which the artists agree that the companies will own the copyright to sound recordings made pursuant to those agreements. These grants allow the companies to distribute and sell the artists' sound recordings.

     Section 203 of the Copyright Act of 1976 provides an author a right to terminate such a grant of copyright thirty-five years after the grant's execution, or forty years thereafter if the grant covers the right of publication, if certain conditions are met.[1] As the Court has explained previously, "[t]ermination is not automatic. The earlier grant will remain in effect absent a termination notice. . . . Upon the effective date of termination [listed in the notice], the grant is terminated and the copyright reverts to the author."[2]

     Plaintiffs allege that defendant has ignored their valid termination notices and has continued to market and sell plaintiffs' sound recordings following the effective dates of termination, thereby infringing upon their copyrights. In a prior opinion, familiarly with which is assumed, the Court granted in part and denied in part defendant's motion to dismiss the First Amended Complaint ("FAC").[3] Plaintiffs now move to amend their complaint in order to add additional parties, assert infringement claims with respect to the sound recordings identified previously in the FAC for which the effective dates of termination now have passed, "streamline

---

[1]    17 § U.S.C. 203.

[2]    *Waite v. UMG Recordings, Inc.*, No. 19-cv-1091 (LAK), 2020 WL 1530794, at *2 (S.D.N.Y. Mar. 31, 2020) (citation omitted).

[3]    *Id.* at *10.

3

and refine" their class allegations, and cure the deficiencies identified in the Court's ruling on the motion to dismiss.

Defendant objects to the following aspects of the Proposed Second Amended Complaint ("PSAC"): (1) joinder of three additional named plaintiffs, (2) joinder of Capitol Records, LLC ("Capitol"), a UMG affiliate, as a defendant, (3) allegations that plaintiffs John Waite and Joe Ely made certain grants directly, rather than through or by third parties, (4) allegations concerning Ely's 1976 agreement, known as a "gap grant," and (5) clarification of the alleged need for declaratory relief.

## I.     Legal Standards

When, as here, a party is not entitled to amend its complaint as a matter of course, it may do so "only with the opposing party's written consent or the court's leave."[4]   Under Rule 15(a), leave to amend should be "freely give[n]."[5]   The Second Circuit has instructed that a motion to amend "should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party."[6]

Undue delay may be an appropriate basis to deny an amendment where "the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the

---

[4]     FED. R. CIV. P. 15(a)(2).

[5]     *Id.*

[6]     *Aetna Cas. and Sur. Co.v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 603 (2d Cir. 2005) (citation omitted).

4

amendment would prejudice the defendant."[7]  "[A]bsent a showing of bad faith or undue prejudice,"

however, "mere delay does not provide a basis for a district court to deny the right to amend."[8]

When considering whether an amendment would be unduly prejudicial to an

opposing party, the district court should consider whether the amendment would "(I) require the

opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii)

significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely

action in another jurisdiction."[9]  However, "[t]he adverse party's burden of undertaking discovery,

standing alone, does not suffice to warrant denial of a motion to amend a pleading."[10]

"An amendment to a pleading is futile if the proposed claim could not withstand a

motion to dismiss pursuant to [Federal Rule of Civil Procedure] 12(b)(6)."[11]  This inquiry thus turns

on whether the proposed allegations state a claim upon which relief can be granted.

Defendant argues that plaintiffs' motion is governed by Rule 16 rather than by Rule

15.  Rule 16 is relevant to a motion to amend where "a scheduling order governs amendments to

the complaint, and a plaintiff wishes to amend after the deadline to do so has passed[.]"[12]  Here, the

---

[7]  *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990).

[8]  *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (citation omitted).

[9]  *Id.* (citation omitted).

[10]  *U.S. ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 889 F.2d 1248, 1255 (2d Cir. 1989).

[11]  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

[12]  *BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 859 F.3d 188, 195 (2d. Cir. 2017); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).

5

scheduling order did not establish a deadline for amending the complaint or for the joinder of additional parties.[13]  The Court thus will evaluate plaintiffs' motion against Rule 15's standard.[14]

## II.    Joinder of Additional Parties

When a proposed amendment would add new parties, Rule 21, rather than Rule 15, governs.   Under Rule 21, new parties may be added "at any time, on just terms[.]"[15]  In considering motions under Rule 21, courts apply the same liberal standard afforded to motions to amend under Rule 15(a).[16]  Similarly, while leave to add parties should be "freely given," a court's refusal to grant leave to do so "is justified on the grounds of . . . undue delay and undue prejudice."[17]

### A.    Joinder of The Dream Syndicate Members as Plaintiffs

Plaintiffs seek to join three additional individuals as named plaintiffs: Steven Wynn, Dennis Mehaffey, and David Pellish, who together performed as the band The Dream Syndicate.

---

[13]   DI 65.

[14]   *See, e.g., Contera v. Langer*, 314 F. Supp. 3d 562, 576 n.6 (S.D.N.Y. 2018)*; see also Ramsay-Nobles v. Keyser,* No. 16-cv-5778 (CM), 2018 WL 6985228, at *7 (S.D.N.Y. Dec. 18, 2018) ("Courts since *Parker* have interpreted that case to stand for the proposition that the 'good cause' standard is permitted but not mandated when a party seeks to amend its pleadings after the deadline set in the scheduling order." Therefore, "[w]hen granting leave to amend, a trial court may choose to apply the 'good cause' standard and consider only the moving party's diligence, but it also has discretion to consider factors that are typically part of the Rule 15(a) analysis.")

[15]   FED. R. CIV. P. 21.

[16]   *Sly Magazine, LLC v. Weider Publications L.L.C.*, 241 F.R.D. 527, 532 (S.D.N.Y. 2007).

[17]   *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

6

Plaintiffs contend that these additions would "serve an important role in buttressing the claims alleged by other Plaintiffs" and would "not materially change the scope of the case or the alleged classes."[18] Defendant objects to the amendment on the grounds that plaintiffs have not demonstrated "good cause," as it claims is required under Rule 16, and that defendant would be prejudiced by the additional discovery that would be required.

As a threshold matter, plaintiffs' proposed amendment is governed by Rule 21, and informed by Rule 15 for the reasons explained above.    Accordingly, plaintiffs' amendment must be considered in light of Rule 15's liberal standard, and not Rule 16's more demanding "good cause" standard.

Plaintiffs do not contest defendant's claim that they were aware of the Dream Syndicate members prior to filing the original complaint, and could have added them as plaintiffs far earlier in the litigation, rather than in proximity to the initial discovery deadline. On balance, however, this delay would not result in significant prejudice to defendant. Plaintiffs represent that the addition of the Dream Syndicate plaintiffs would require limited discovery warranting less than two days of depositions. Moreover, their joinder would not alter the scope of the claims against defendant, as they would be substantially similar to others raised already by other named plaintiffs. Finally, plaintiffs have not moved yet for class certification, and jury trials have been suspended indefinitely in this district due to the COVID-19 pandemic. In light of these considerations, and mindful of the liberal standard against which this amendment must be judged, the Court will grant plaintiffs' motion as to the joinder of the Dream Syndicate plaintiffs.

---

[18] DI 74 at 8.

7

*B.      Joinder of Capitol as a Defendant*

Plaintiffs seek to join Capitol based upon discovery and defendant's representations that Capitol is the property party with respect to certain claims.

It is undisputed that the parties first discussed adding Capitol as a defendant in December 2019, five months before this motion was filed. Plaintiffs contend that the intervening delay was due to defendant's refusal to produce documents to substantiate its contention that Capitol, rather than UMG, in some instances would be the proper party. On July 13, 2020, the Court granted plaintiffs' motion to compel production of certain documents, including those related to Capitol.[19]

Defendant consents to the addition of Capitol, subject to the conditions that (1) plaintiffs be required to plead separate classes or subclasses as to each of UMG and Capitol, and (2) the addition not disrupt the current pretrial and trial schedule or otherwise delay the case or prejudice defendant.

The conditions that defendant proposes are unnecessary and impractical. First, creating separate subclasses, if necessary, can be achieved at the class certification stage. Second, a commitment to maintaining the current trial schedule will not be feasible given the ongoing COVID-19 pandemic. Moreover, the discovery deadline has been adjusted already.[20]

Even absent these conditions, UMG would not suffer any undue prejudice from adding Capitol as a defendant. As indicated above, UMG has been aware for several months that some of plaintiffs' claims implicate Capitol. Moreover, UMG has been compelled to produce

---

[19]     DI 83.

[20]     DI 84, 86.

8

Capitol's documents. While plaintiffs perhaps should have acted more expeditiously, UMG would not be prejudiced unduly by the addition of Capitol as a defendant. Plaintiffs may amend their complaint accordingly.

III.     *Waite and Ely's Claims Involving Third Party Agreements*

Only a "grant of a transfer or license of copyright or any right under a copyright, executed by the author" is subject to termination under Section 203.[21] Thus, by the statute's terms, "third parties to a contract and loan-out companies, which 'loan' out an artist's services to employers and enter into contracts on behalf of the artist, do not have a termination right under the statute."[22]

The FAC alleged that Waite entered into agreements with the recording studios through various loan-out companies and that Ely entered into his 1979 agreement through a third party company, South Coast. These agreements granted copyright to the recording studios. In other words, in these instances, the "grant of a transfer . . . of a copyright" was made by the third party companies, thereby making the third parties the grantors and the recording studios the grantees. Accordingly, the Court dismissed plaintiffs' claims based on those third party agreements.

Those agreements contained provisions stating that works made pursuant to those agreements were "made for hire."[23] The PSAC alleges that the recording companies recognized that

---

21      17 U.S.C. § 203(a).

22      *Waite*, 2020 WL 1530794, at *8 (citing 17 U.S.C. § 203(a)).

23      PSAC [DI 74-2] ¶¶ 71, 98, 128, 187.

this language was insufficient to establish that the works were "made for hire" and therefore insisted on certain additional contractual provisions, inducement letters, and declarations in order to ensure that the recording companies received the grants.[24]    Plaintiffs contend that those documents were "direct, personal grant[s] of copyright" by Waite and Ely to the recording companies.[25]    Accordingly, plaintiffs argue that the new allegations are sufficient to bring their grants within Section 203's scope.

The relevant Waite agreements were entered into through the loan-out companies Heavy Waite, Inc., Moonwalk Music, Inc., and Diamond Strife, Inc.  The PSAC cites to a paragraph within each of those agreements by which the loan-out company agreed to "cause" Waite to execute and deliver any assignments of copyright to the recording company or agreed to "cause" Waite to execute a declaration of power of attorney.[26]

In connection with each those agreements, Waite signed inducement letters.  The PSAC alleges that Waite signed these letters "as an alternative and reliable means to effect a transfer to [the recording company] of the copyright in and to the subject sound recording."[27]    The letter associated with the Heavy Waite agreement stated that if the loan-out company "ceased to be entitled to [Waite's] recording services in accordance with the terms of the Agreement" or "fail[ed] or refus[ed] to furnish [Waite's] recording services," Waite would "do all such acts and things as

---

24

     *Id.* ¶¶ 78, 107, 135, 193.

25

     *Id.* ¶¶ 77, 106, 134, 192.

26

     *Id.* ¶¶ 73, 101, 129.

27

     *Id.* ¶¶ 74, 103.

shall give to [the recording company] the same rights, privileges and benefits as [it] would have had under the Agreement[.]"[28]  The inducement letters related to the Moonwalk Music and Diamond Strife agreements contained nearly identical language.[29]  The three loan-out companies have not been in good standing for at least twenty-eight years.[30]

The PSAC alleges also that Waite signed declarations included as exhibits with the Moonwalk Music and Diamond Strife contracts in which he agreed that "to the extent, if any, that [he] may be deemed an 'author' of any Work, [he] grant[s] and assign[s] to [the recording company] all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. § 106."[31]

Ely entered into an agreement with South Coast for Ely's recording services, and South Coast then entered into an agreement with the recording company.[32]  In connection with the latter agreement, Ely too signed an inducement letter.  One paragraph of that letter provided that "[i]f, during the Agreement [between the recording company and South Coast] or any extensions or renewals thereof, [South Coast] shall cease to be entitled to [Ely's] recording services in accordance with the terms of said Agreement, or if [South Coast] shall fail or refuse to convey any of [Ely's] recordings to [the recording company]," Ely would give the recording company the same

---

28      *Id.* ¶ 75.

29      *Id.* ¶¶ 104, 132.

30      *Id.* ¶¶ 88, 117, 145.

31      *Id.* ¶¶ 102, 130.

32      *Id.* ¶¶ 182-83.

rights, privileges, and benefits as it was entitled to receive under the South Coast Agreement.[33] Plaintiffs allege also that South Coast ceased to be in good standing as of February 20, 1984.[34]

As explained in the Court's prior opinion, the agreements at issue were between the recording company and *the third party*. And therefore it was the *third party*, not the artist, that granted the transfer of copyright. The PSAC's citation to paragraphs within those same agreements would not alter this conclusion.

Nor would the inducement letters. The PSAC cites to provisions of the letters in which Ely and Waite agreed to ensure that the recording companies maintained the privileges and benefits as set forth in the original agreements in the event that the loan-out companies or South Coast were no longer entitled to the artists' services. Even viewed in the light most favorable to plaintiffs, this is not an allegation that Waite or Ely made any direct grant of their copyrights at the time the inducement letters were signed. Rather, it was a promise of future actions if certain contingencies came to pass. And although the loan-companies and South Coast no longer are in good standing, and therefore perhaps no longer are entitled to the artists' services, this circumstance would not change the fundamental fact that Ely and Waite themselves did convey the copyright to the recording companies through their inducement letters.

The Moonwalk and Diamond Strife declarations are similarly of no avail. The prior opinion rejected the claim that the agreements between the recording company and the loan-out companies were direct grants by the artists. The PSAC's reference to a conditional grant from one paragraph of one exhibit to those agreements does not change the undisputed fact that the

---

[33]    *Id.* ¶ 191.

[34]    *Id.* ¶ 209.

12

agreements themselves were made between the loan-out companies – not the artists – and the recording company. Moreover, while the PSAC alleges that *Waite* agreed to the contents of these declarations, the declaration associated with Moonwalk Music agreement lists *Moonwalk Music* as the signatory, and is signed by "Richard B. Smith," the vice president of the company (according to the signature block).[35]   This further undermines plaintiffs' allegation that the declaration was a direct grant between the *artist* Waite and the recording company.

For the reasons set forth above, adding the amendments related to the third party agreements would be futile.

IV.   *Ely's Claims Involving the 1976 Agreement*

Regardless of when a work was created, a grant of copyright can be terminated under Section 203 only if the grant was "executed" on or after January 1, 1978.[36]   Section 304 of the Copyright Act sets forth the process for terminating grants of renewal rights executed prior to January 1, 1978 for works that were created and copyrighted prior to January 1, 1978.[37] Accordingly, a work created on or after January 1, 1978, but pursuant to an agreement made prior to January 1, 1978, falls into a "gap" that is not covered explicitly by either termination provision.

Recognizing this problem, the Copyright Office in 2011 promulgated a rule that it accepts for recordation under Section 203 termination notices for these "gap grants" with respect

---

[35]   PSAC Ex. 2. Documents attached to a complaint are appropriately considered by reference. without converting the motion into one for summary judgment. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 -53 (2d Cir. 2002).

[36]   17 U.S.C. § 203(a).

[37]   *Id.* § 304.

to works created after on or after January 1, 1978.[38]   This conclusion rested on the meaning of

"executed" within the context of Section 203.   The Copyright Office reasoned that there is no

copyright interest that can be transferred or assigned until a work is actually created.   Hence, "the

grant is not executed until the work is created."[39]  Thus, under the Copyright Office's interpretation

of Section 203, anything created ("executed") on or after January 1, 1978 comes within the

provision's scope.    Accordingly, the Copyright Office took the position that "gap grants are

terminable under Section 203."[40]   But the Office's rule pertained only to its acceptance and

recordation of gap grants.  As it explained in the publication of the final rule, its decision to record

termination notices for gap grants for works created on or after January 1, 1978 was "without

prejudice as to how a court might ultimately rule on whether the document is a notice of termination

within the scope of Section 203."[41]  In other words, the rule was not a merits-based determination,

as a matter of law, that gap grants are terminable under Section 203.[42]   Resolution of that issue, it

explained, would be left to the courts or to Congress.[43]  To date, Congress has not acted and the

Court is not aware of any courts that have considered whether gap grants are terminable under

---

[38]   37 C.F.R. § 201.10(f)(1)(ii)(c).

[39]   U.S. Copyright Office, *Analysis of Gap Grants under the Termination Provisions of Title 17*, http://copyright.gov/reports/gap-grant-analysis.pdf at 1 (Dec. 7, 2010).

[40]   Gap in Termination Provisions, 76 Fed. Reg. 32316 (June 6, 2011).

[41]   *Id.* at 32320.

[42]   *Id.*

[43]   *Id.*

14

Section 203.  The determination of whether gap grants are terminable thus falls to the courts.[44]

       A.     *Whether Gap Grants are Terminable under Section 203*

      "As with any question of statutory interpretation, we begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning."[45]  The plain meaning "does not turn solely on dictionary definitions of [the statute's] component words," but is affected also by "the specific context in which that language is used, and the broader context of the statute as a whole."[46]

      Defendant argues that "executed" within the meaning of Section 203 unambiguously means "signed."  This contention is consistent with a common and plain meaning of the word.  Further, "executed" is used synonymously with "signed" in other parts of the Copyright Act, and the legislative history reveals that Congress used "execution of the grant" and "signing"

---

[44]      To the extent that defendant suggests, in light of the Copyright Office's interpretation of "execute," that the Court must engage in a *Chevron* analysis, such an analysis would be unnecessary here.  *Chevron* requires a court to consider an agency's interpretation of a statute.  If a statute is ambiguous, the court considers whether, or to what extent, the agency's interpretation is entitled to deference.  However, the question before the Court is whether gap grants are terminable, not whether the Office's rule that it will accept and record termination notices for gap grants is a reasonable interpretation of the Copyright Act.  While the terminability of gap grants was considered by the Copyright Office in its analysis of the rule – indeed, as indicated above, the agency reached a conclusion on that issue – the rule itself was limited to the recordation of termination notices.  As the Office noted, permitting recordation of termination notices for gap grants "permits the terminating party to move forward based upon a reasonable interpretation of the statute," but "[i]f there is any dispute . . . of notices of termination of gap grants in general," that dispute "should be settled in the courts[.]"  Gap in Termination Provisions at 32320.  Accordingly, the Court must consider the statutory text of Section 203 directly, rather than through the lens of whether it should adopt the Copyright Office's interpretation.

[45]      *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012).

[46]      *Yates v. United States*, 574 U.S. 528, 537 (2015).

15

interchangeably.   Accordingly, defendant argues recordings made under Ely's grant that was "executed" (or signed) in 1976 cannot be terminated.

   While defendant correctly notes that "execute" can mean "to sign," that is not its only meaning.   It is defined also as "to perform or complete (a contract or duty)"[47] and to "put completely into effect."[48]   And in the context of Section 203's applicability to gap grants, "execute" does not unambiguously mean "to sign."   This is evident when one considers a fundamental principle of copyright law: copyright protection is bestowed upon works "fixed in any tangible medium of expression."[49]   If a work does not exist when the parties enter into a transfer or assignment agreement, there is no copyright that an artist (or third party company) can transfer, assign or, in other words, "put into effect."

   The "broader context" of Section 203 underscores why Congress did not intend for "execute," as used in that provision, to mean "sign."   It created Section 203's termination right so that an author would have an opportunity to share in the economic success of his or her works decades later.[50]   It therefore seems unlikely that Congress intended to preclude authors from having that right simply because they "signed" grants for works created in the "gap" caused by the interaction between Sections 203 and 304.   As one comment to the Copyright Office's proposed rule explained, "[t]o more closely align Congressional intent with the actual language, it would appear

---

[47]

  BLACK'S LAW DICTIONARY (11th ed. 2019).

[48]

  Merriam-Webster.com, https://www.merriam-webster.com/dictionary/execute (last visited July 14, 2020).

[49]

  17 U.S.C. § 102(a).

[50]

  H.R. Rep. No. 94-1476, 124 (Sept. 3, 1976).

16

necessary. . . to interpret the date of such 'grant' not as the date of the documentation evidencing the intent to make a future grant, but rather, when such grant achieves legal operation, namely, upon creation of the subject matter of the grant[.]"[51]

      For the foregoing reasons, the Court concludes that works created on or after January 1, 1978 pursuant to agreements entered into before that date are terminable under Section 203.[52]

### B.    *Whether the Error is Harmless*

      A termination notice must include the execution date, among other information.[53] In accordance with the 2011 rule, the Copyright Office requires that a termination notice for gap grants include as the execution date "the date on which the work was created." [54] "Sound recordings are created for purposes of the Copyright Act on the date they are 'fixed,' or recorded."[55]

---

[51]    *Analysis of Gap Grants under the Termination Provisions of Title 17* at 1.

[52]    For the sake of clarity, this is not a conclusion that "executed" is synonymous with "created" within the meaning of Section 203.  Nor does the Court's interpretation eliminate the need for there to be a signed contract in which the parties agree to a transfer for a grant of copyright.  Instead, the analysis is limited to the question of how to determine whether an execution date falls "on or after January 1, 1978."

[53]    37 C.F.R. § 201.10(b)(2).

[54]    *Id.* § 201.10(f)(1)(ii)(C).

[55]    *Mtume v. Sony Music Entertainment*, No. 18-cv-6037 (ER), 2019 WL 4805925, at *3 (S.D.N.Y. Sept. 30, 2019) (citation omitted); *see also* 17 U.S.C. § 101 ("A work is 'created' when it is fixed in a copy or phonorecord for the first time.").

A defect in a termination notice will be excused if the error is harmless.[56] An error is harmless if it was made in good faith and "without any intention to deceive, mislead or conceal relevant information" and if the error does not "materially affect the adequacy of the information required to serve the purposes of [Section 203]."[57] One such purpose is "to award artists an opportunity to obtain a more equitable share of the copyright's profits."[58] However, "the grantee must be given reasonable opportunity to identify the affected grant and work from the information given in the notice."[59]

The termination notice for Ely's works created under the terms of his 1976 agreement did not include an execution date or otherwise indicate the date on which the works were created.[60] Nor did the FAC allege when the sound recordings were created.[61] Hence, on the motion to dismiss, even under the Copyright Office's view as to gap grants, Ely's termination notice involving the 1976 agreement contained an error: it did not include the date on which the work was created.[62]

---

[56]

37 C.F.R. § 201.10(e).

[57]

*Id.*

[58]

*Waite*, 2020 WL 1530794, at *7.

[59]

*Id.* (citing Termination of Transfers and Licenses Covering Extended Renewal Term, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977)).

[60]

*Id.* at *9.

[61]

*Id.*

[62]

*Id.* at *9-10.

The Copyright Office recorded Ely's termination notice, despite this defect. PSAC ¶ 217-18. The Court takes no position on whether the notice properly was recorded, and instead

18

The analysis would have ended there, if it were not for defendant's own records, which revealed that the recordings made pursuant to Ely's 1976 agreement were created in 1977. If the 1977 creation date proffered by defendant was correct, then its omission from the termination notice would have been a harmless error because, based on its own documents, defendant reasonably could "identify the affected grant and work."[63]  However, if the 1977 creation date alleged by defendant was accurate, it would be true also that "this pre-1978 creation is not covered by Section 203, even as a gap grant."[64]  If the date was incorrect, then defendant may not have been able sufficiently to identify the relevant information, since that information was neither in its records nor alleged by plaintiffs.  Therefore, the Court dismissed "Ely's claim related to his 1976 agreement for sound recordings that were created prior to January 1, 1978."[65]

The PSAC now alleges creation dates for two sound recordings recorded under the 1976 contract.  Plaintiffs concede that defendant was correct that at least one of the sound recordings made under the 1976 agreement was created in 1977, and they no longer seek to enforce the termination notice as to that album.  However, they now allege that two other recordings made under the terms of the 1976 agreement were created "after December 31, 1977" and in February 1980.[66]

---

[63]      considers only whether the notice's defect was harmless.

Termination of Transfers and Licenses Covering Extended Renewal Term, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977).

[64]      *Waite*, 2020 WL 1530794, at *10.

[65]      *Id.*

[66]      PSAC ¶¶ 179-80.

There is no indication that the errors at issue here were made in bad faith or with any intent to deceive or conceal.  Indeed, the Copyright Office has acknowledged  that artists may find it difficult to establish the date of creation.[67]  Moreover, defendant now possesses the information it needs to identify the relevant grant well before class certification and trial.  As the Court explained previously, an error may be harmless when the recording company can "reasonably  identify the grants and works plaintiffs seek to terminate."[68]  Taken together, the error here was harmless.

Accordingly, adding the amendments related to Ely's 1976 agreement would not be futile.  Nor would defendant be prejudiced by any delay in light of the extended schedule.  Leave to amend as to these claims will be granted.

## V.    *Claim for Declaratory Relief*

District courts have broad discretion over whether to entertain a declaratory judgment action.[69]  Factors relevant to this determination include "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved" and "whether a judgment would finalize the controversy and offer relief from uncertainty."[70]

The FAC purported to bring claims on behalf of two groups of plaintiffs.  The first consisted of recording artists who had served termination notices for which the effective dates of

---

[67]    Gap in Termination Provisions at 32318.

[68]    *Waite*, 2020 WL 1530794, at *8.

[69]    *Dow Jones & Co v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

[70]    *Id*. (citation omitted).

termination had passed.  The second group was comprised of artists with sound recordings for which the effective dates of termination had not passed when the FAC filed.  The latter group sought only a declaratory judgment.

The Court dismissed the claim declaratory relief.[71]  In doing so, it explained that the relief those plaintiffs sought would not necessarily have resolved the controversy entirely. Specifically, it noted that since the requested declaratory judgment was tailored to address the various grounds defendant cited when rejecting the termination notices, the relief sought would eliminate uncertainty only insofar as "defendant never proffers new arguments as to why the termination notices are invalid or why the grants could not be terminated."[72]  Accordingly, declaratory relief "could not guarantee that UMG would accept the termination notices and cease exploitation of the sound recordings after the effective date of termination."[73]  The Court explained also that it was unclear how declaratory relief would be useful based on the singular allegation that defendant "repeatedly denied Plaintiffs' rights, and the rights of hundreds of class members, and has denied all of them the right to own the U.S. copyright in and to the sound recordings for the poster-termination period."[74]

The PSAC would seek a declaratory judgment on behalf of artists who have served termination notices with effective dates occurring on or after the date of class certification, but no

---

[71]   *Waite*, 2020 WL 1530794, at *7.

[72]   *Id.* at *6.

[73]   *Id.*

[74]   *Id.* at *7 (quoting FAC ¶ 86).

later than December 31, 2030.[75]  Members of this putative "Class B" request a declaration that (1) "their notices of termination are valid," (2) "the dates of termination in the notices are effective,"(3) "their termination rights vested," and (4) "defendants' disregard of [their rights] violates the Copyright Act."[76]  The validity of the termination notice depends in part on whether the works were "made for hire."  This is addressed more directly in their prayer for relief, which includes "declaratory relief, regarding the legal issues described in paragraphs 314-322,"[77] which relate to allegations that Class B named plaintiff Syd Straw's works were not "made for hire."

Defendant argues that the claims of Class B plaintiffs can not be resolved fully until after their effective dates of termination has passed.  Only upon these dates would those plaintiffs be able to recapture their copyrights, assuming the termination notices were recognized by defendant.  However, resolution of the issues identified in the PSAC still would not ensure that defendant would not assert additional grounds to reject the termination notices, or that defendant would (or would not) continue to exploit the sound recordings following the termination dates.  Therefore, defendant argues that the uncertainty could not be fully and finally addressed through plaintiffs' claim for declaratory relief regardless of any new allegations, .

Defendant's arguments are not without merit.  Indeed, lingering uncertainty will remain even if plaintiffs obtain the declaratory judgment they seek.  However, unlike the FAC, the

---

[75] PSAC ¶ 47. Class A is comprised of artists with sound recordings for which the respective effective dates of termination occurred on or after January 1, 2013 and prior to the date of class certification. This class asserts a copyright infringement claim. *Id.*

[76] *Id.* ¶ 328.

[77] *Id.* Prayer for Relief ¶ B.

PSAC alleges why a declaratory judgment would reduce uncertainty in a meaningful way, even though it would not offer complete relief from it.  For example, the PSAC alleges that:

> "[D]efendants' legal position is centrally dependent upon their contention that the recordings at issue are 'works made for hire[.]' If Defendants are able to prove that issue, then there is no termination right available and the Notices of Termination served by the members of Class B are invalid.  On the other hand, if Defendants are unable to prove that the recordings are 'works made for hire,' then the members of Class B seek to be protected from future infringement and potential piecemeal litigation from Defendants on the identical or substantially similar defensive positions."[78]

The PSAC alleges also that defendant has engaged in "virtually identical conduct" with respect to Classes A and B, suggesting that defendant similarly will disregard the termination notices of Class B members and allegedly infringe upon their copyrights.[79]  In addition, it alleges that defendant has been consistent in its reasons for rejecting the termination notices and has "not advanced any defenses or arguments beyond or outside of the detailed arguments" asserted in its response to plaintiffs' termination notices.[80]  Further, the new allegations go far beyond the FAC's singular allegation as to why a declaratory judgment would be useful, despite some lingering uncertainty. These include that:

- Defendant has created an actual and immediate disagreement with named plaintiff (Straw), and the putative members of Class B, "by accusing them of anticipatory breach of contract and/or asserting repudiation claims arising from defendant['s] inclusion of "work made for hire language and related representations in the underlying recording agreements";

- defendant has stated clearly its intention not to honor the notices of termination following the effective dates of termination;

---

[78] *Id.* ¶ 329.

[79] *Id.*

[80] *Id.*

- "the requested declaratory relief would determine in all material respects and/or completely the validity of the termination notices, the effective dates of termination and the vesting of termination rights,"

- without declaratory relief, the putative members of Class B will be unable to calculate the value of their rights "given the future, indeterminate litigation cloud hanging over their rights";

- class members, most of whom are "well over 60 years of age," will be "substantially aided" in developing their estate plans with respect to the rights to their sound recordings;

- "without the certainty of the requested declaratory relief, any estate or tax planning cannot be fully realized or relied upon"; and that

- permitting plaintiffs' claim for declaratory relief will avoid the need for future "piecemeal" litigation each time an effective date of termination arrives.[81]

These sufficiently allege why resolving certain legal issues prior to the effective dates of termination would be useful even if not a complete solution. Accordingly, the balance of factors affecting the exercise of the Court's discretion has shifted in favor of entertaining the declaratory relief claim. In all the circumstances, this proposed amendment would not be futile. Nor would it prejudice or delay defendant for the same reasons as explained previously. Accordingly, plaintiffs will be granted leave to assert their declaratory judgment as to Class B.

*Conclusion*

Plaintiffs' motion for leave to file a second amended complaint [DI 73] is granted to the extent that plaintiffs may amend to: (1) assert allegations to which there have been no objection, (2) add Steven Wynn, Dennis Mehaffey, and David Pellish as named plaintiffs, (2) add

---

[81] *Id.* ¶¶ 329-32.

24

Capitol as a defendant, (3) add allegations concerning sound recordings made pursuant to Ely's 1976 agreement that are alleged to have been created on or after January 1, 1978,[82] and (4) the proposed claim for declaratory relief.   Plaintiffs shall file a second amended complaint conforming to this ruling no later than August 31, 2020.

SO ORDERED.

Dated:        August 10, 2020

_____
Lewis A. Kaplan
United States District Judge

---

[82]   The PSAC references the Ely album *Hi-Res*. *Id.* ¶ 219.  However, it does not allege whether that album was recorded pursuant to the South Coast agreement or to the 1976 agreement. To the extent that it was recorded under the 1976 agreement, plaintiffs must allege a creation date.  If it was recorded pursuant to the South Coast agreement, the termination claim as to that album fails for the reasons explained above.