# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN WAITE, an individual; EARLE R. ELY, JR. p/k/a JOE ELY, an individual; KASIM SULTON, an individual; SUSAN STRAW HARRIS p/k/a SYD STRAW, an individual; LEONARD GRAVES PHILLIPS, an individual; STAN SOBOL a/k/a STAN LEE, an individual; STEVE WYNN, an individual; DENNIS MEHAFFEY p/k/a DENNIS DUCK, an individual; and DAVID PELLISH p/k/a DAVE PROVOST, an individual, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group; CAPITOL RECORDS, LLC, a Delaware limited liability company; and DOES 1 through 10,<br><br>Defendants. | Case No. 1:19-cv-01091-LAK<br><br>**CLASS ACTION SECOND AMENDED COMPLAINT FOR:**<br><br>(1) **COPYRIGHT INFRINGEMENT; AND**<br><br>(2) **DECLARATORY RELIEF**<br><br><u>**DEMAND FOR TRIAL BY JURY**</u> |

Plaintiffs EARLE R. ELY, JR. p/k/a JOE ELY ("Ely"), an individual, KASIM SULTON ("Sulton"), an individual, and SUSAN STRAW HARRIS p/k/a SYD STRAW ("Straw"), an individual, LEONARD GRAVES PHILLIPS ("Phillips"), an individual, STAN SOBOL a/k/a STAN LEE ("Lee"), an individual, STEVE WYNN ("Wynn"), an individual, DENNIS MEHAFFEY p/k/a DENNIS DUCK ("Mehaffey"), an individual, and DAVID PELLISH p/k/a DAVE PROVOST ("Pellish"), an individual, (collectively, "Plaintiffs") on behalf of themselves and all other similarly situated authors of sound recordings ("sound recordings") who have served Notices of Termination pursuant to § 203 of the Copyright Act of 1976 upon Defendants UMG Recordings, Inc. (also known as and doing business as "Universal Music Group" and "UMG") and Defendant Capitol Records, LLC ( "Capitol") and

DOES 1-10 (collectively "Defendants"), allege as follows for their Second Amended Complaint.[1]

## NATURE OF THE ACTION

1.    This class action lawsuit filed on behalf of Plaintiffs and two classes of similarly situated recording artists and other authors – a class of artist victims of Defendants' ongoing, willful copyright infringement and a class of artists who seek immediate declaratory relief – seeks to protect and vindicate the § 203 termination rights granted by Congress under the Copyright Act of 1976 that Defendants routinely seek to thwart through an integrated and systematic corporate scheme to reject valid termination notices in the hopes that the artists will surrender to, or otherwise acquiesce in, Defendants' continued and unlawful commercial exploitation of their valuable works.

2.    Since the first Copyright Act was enacted in 1790, that Act, and the several successive copyright statutes have always had a feature which allows a second chance for authors (or their heirs) to reclaim copyrights from unwise grants made by authors early on in their careers, close to the creation of the works. While the particular features of those laws, and the length of the terms and statutory scheme of the terminations involved, have changed and evolved, the strong "second chance" concept has remained. In fact, the very first act, the Copyright Act of 1790, borrowed that concept from the English Statute of Anne, enacted in 1709, the first copyright law. The theme continued in the Copyright Acts of 1831, 1870, and 1909.

3.    Likewise, § 203 of the Copyright Act of 1976 modified the Act of 1909

---

[1]    Plaintiffs hereby amend their First Amended Complaint and reserve their appellate rights with respect to the dismissal of certain claims alleged on behalf of John Waite ("Waite") and Ely. Specifically, Plaintiffs reserve all appellate rights with respect to the Court's March 31, 2020 dismissal of Waite's and Ely's "claims based on grants transferred by third parties" (Dkt. No. 24), and with respect to the further ruling on Waite's and Ely's claims in the Court's Memorandum Opinion of August 10, 2020 (Dkt. No. 89, at 8-12). While Plaintiffs have deleted the allegations of Waite from this Second Amended Complaint, Plaintiffs have not changed the caption of the case as Waite remains a party for any appeal.

substantially yet continued the "second chance" policy with full force. According to the Congressional Record, the purpose of the statute was to protect authors and their heirs from "the unequal bargaining position of authors" in dealing with unpublished works, because of "the impossibility of [an author] determining [his or her] work's prior value until it has been exploited." H.R.Rep. No. 94-1476, at 124 (1976). Section 203 provides that authors (a term that includes both songwriters and recording artists) may terminate grants of copyright ownership thirty-five (35) years after the initial grant, generally computed from the date of the publication of those works subject to the grant.

4.     While the Copyright Act confers upon authors this valuable "second chance," the authors of sound recordings have faced stubborn and unfounded disregard of their federal legal rights by Defendants and, in many instances, willful copyright infringement. In fact, Defendants have repeatedly and systematically sought to eviscerate the important protections granted by this federal termination right.

5.     Plaintiffs Ely, Sulton, Straw, Phillips, Lee, Wynn, Mehaffey, and Pellish, and hundreds of other recording artists (or their successors), have served Notices of Termination upon Defendants pursuant to the provisions set forth in 17 U.S.C. § 203, but Defendants have routinely, uniformly and systematically refused to honor them.

6.     These refusals are made, in every instance, on similar grounds, the first and foremost of which is Defendants' position that the sound recordings created by recording artists under contract with Defendants (or their affiliated or predecessor companies) are "works made for hire," and, therefore, not part of the subject matter of § 203. Defendants claim that the recordings are "works made for hire" solely because of certain contractual language that is found in every one of Defendants' recording agreements.

7.     Through this artifice, Defendants seek to intimidate and bully the

recording artists – most of whom now are well over 60 years of age – from enforcing their federal legal rights that supersede Defendants' sharp commercial practices.

8.    As a result of Defendants' policy and practices, Defendants have refused to acknowledge that *any* recording artist (or their successors) has the right to terminate and take over control of the sound recordings or enter into an agreement with a different label for the exploitation of recordings after the effective date of termination.

9.    Overwhelmingly, Defendants have continued to exploit the recordings after the effective date set forth on each Notice of Termination, thereby engaging in willful copyright infringement of the United States copyright in those recordings.

10.    As a result of Defendants' actions, Defendants have effectively stymied any chance that the Plaintiffs or the members of the Classes have of entering into a new agreement with a third party, or even exploiting the recordings themselves, as is their right under the law. In doing so, Defendants' actions have negatively impacted and/or effectively destroyed the very salability and commercial value (to Plaintiffs) of the post-termination rights in the recordings that the Copyright Act expressly guarantees.

11.    On account of Defendants' repeated, methodical, and willful copyright infringement, Plaintiffs (except Straw) seek recovery of actual and/or statutory damages on behalf of themselves and the members of Class A (as hereinafter defined below). Plaintiff Straw seeks immediate declaratory relief on behalf of Class B (as hereinafter defined below) to vindicate the rights of the recording artists for whom the effective date of the termination in the Notices of Termination will not occur prior to class certification.

12.    Plaintiffs further seek permanent injunctive relief restraining Defendants, their affiliates and all those acting in concert with them, from engaging in this systematic scheme to eviscerate and thwart all class members' valid termination rights. Therefore, Plaintiffs bring this class action for copyright

4

infringement, declaratory relief, and injunctive relief, on behalf of themselves and all similarly situated recording artists (or their successors) who have sent Notices of Termination to Defendants with an effective date of termination on or after January 1, 2013, as more precisely described in ¶ 47, below.

## THE PARTIES

13.    Plaintiff Ely is an adult individual who is a resident of Austin, Texas. Ely, an American artist, has had a long career in music as a singer, songwriter, and guitarist. Since releasing his first solo album in 1977, he has recorded a total of eighteen studio albums on several labels, including MCA, which is a predecessor to UMG/Capitol. Ely has also been a performer on numerous albums by other recording artists, including The Clash and Rosie Flores.

14.    Plaintiff Sulton is an adult individual who is an American bass guitarist, keyboardist and vocalist, and is best known for his work with Todd Rundgren's band, Utopia. Sulton has been a frequent collaborator, bassist and singer on many of Todd Rundgren's projects and solo tours, as well as a bassist and touring musician with the performer known as Meatloaf.

15.    Plaintiff Straw is an adult individual who is an American singer and songwriter. She was a member of the band called Golden Palominos, and has contributed vocals to recordings by Rickie Lee Jones, Leo Kottke, and Dave Alvin.

16.    Plaintiff Phillips is an adult individual who is the lead vocalist for the California punk rock band called The Dickies.

17.    Plaintiff Lee is an adult individual who is the guitarist and vocalist for The Dickies.

18.    Plaintiff Wynn is an adult individual who is the lead vocalist and a guitarist for the rock band called The Dream Syndicate.

19.    Plaintiff Mehaffey is an adult individual who is the drummer for The

Dream Syndicate.

20.     Plaintiff Pellish is an adult individual who was bass player for The Dream Syndicate in 1984.

21.     Wynn, Mehaffey, and Pellish constitute a majority of the authors of The Dream Syndicate works at issue, and have standing to assert their claims, pursuant to 17 U.S.C. § 203(b)(3).

22.     Defendant UMG RECORDINGS, INC. is an American global music corporation organized under Delaware law.  It is also known as and does business interchangeably as "UMG" and "Universal Music Group" (referred to herein as "UMG," "Universal Music Group" and/or "UMG/Universal Group").  It is a subsidiary of Vivendi Universal S.A. ("Vivendi"), with its principal place of business and global corporate headquarters located at 2220 Colorado Avenue, Santa Monica, California. UMG also maintains U.S. headquarters at 1755 Broadway, New York City, New York offices, where Island Records, Def Jam Recordings, Republic Records, Decca Label Group, Spinefarm Records, Geffen Records, and other of UMG's labels are headquartered.

23.     In corporate filings with the State of California, where it is registered as a foreign corporation, UMG describes its business as "manag[ing] recorded music assets."

24.     UMG utilizes the trade names "UMG" and "Universal Music Group" for its various corporate music-based operations.  It is also the successor-in-interest to several other companies and/or brands within the Universal Music Group, including, but not limited to, Chrysalis, PolyGram Records, Inc., A & M, Capitol, EMI, Motown, Def Jam, Geffen, and all of the companies to which UMG/Universal Music Group succeeded by merger, acquisition, business combination, restructuring or operation of law.

25.     Vivendi is a French mass media conglomerate headquartered in Paris,

France. According to its website, music is its most important asset through UMG/Universal Music Group, with 2019 year-end revenues of €7.19 billion. (*See* www.vivendi.com.) Vivendi recently valued Universal Music Group at approximately $30 billion when it sold a 10% stake in Universal Music to Tencent Holdings Limited for $3 billion in January 2020. Such an astronomical valuation is built upon the actual and projected revenue streams generated by the sound recordings of musical artists like the Plaintiffs and the Plaintiff class members. Such massive revenues have incentivized corporate management to vigorously reject the Plaintiffs and the Plaintiff class members' lawful attempts to reclaim their rights.

26.    UMG is considered one of the "Big Three" record labels, along with Sony Music and Warner Music Group. UMG is one of the world's largest recorded music and music publishing companies, and includes record labels such as Capitol, Motown, Def Jam and Geffen. UMG is successor to, and was formerly named, PolyGram Records, Inc.

27.    UMG is a record label, as well as a global music conglomerate, and has released music under the Universal and Mercury imprints and is the successor-in-interest to many record labels, including EMI, Capitol, Geffen, A&M, and Chrysalis imprints, among many others. In fact, UMG holds itself out to the public and musical artists as owning and controlling these record labels, including on its public website www.universalmusic.com.

28.    Moreover, according to the Universal Music Group website terms and conditions, "all notices not related to these Site Terms and Conditions should be sent to: UMG Recordings, Inc. c/o Legal Dept. 2220 Colorado Ave, Santa Monica, CA 90404." Defendants provide this instruction and directive with respect to all the labels and brands identified on the Universal Music Group website, including with respect to UMG, Capitol and the other labels and brands under the Universal Music Group "umbrella" and within the UMG/Universal Music conglomerate.

29.    In fact, when UMG responded after receipt of the Notices of Termination, UMG representatives responded on behalf of UMG and its label via correspondence on UMG letterhead regardless of the identity of the underlying record label.

30.    Defendant Capitol Records, LLC ("Capitol") is a Delaware limited liability company, and which has its principal place of business and global corporate headquarters located in Santa Monica, California, at the same address as the UMG entities. Capitol also maintains offices at 1755 Broadway, New York City, within this judicial district. Capitol originally incorporated in Delaware under the name Capitol Records, Inc., and later converted to a limited liability company. In corporate filings with the State of California, it states that its type of business is "Recorded music."

31.    Capitol utilizes the trade name "Capitol Records" for its operations, and also is the successor-in-interest to several other companies within the Universal Music Group, including, but not limited to, Chrysalis Records, Inc., EMI America Records, Inc., Virgin Records America, Inc., and Capitol Records, Inc. As used herein, the term "Capitol" includes both Capitol Records, LLC and all of the companies to which Capitol succeeded by operation of law, acquisition, business combination, restructuring or merger.

32.    In the corporate structure of the conglomerate known as the Universal Music Group, UMG functions as the corporate agent of the other business entities that are part of the Universal Music Group. UMG, through its business and legal personnel, oversees and conducts the integrated business operations servicing the relationships with the Plaintiffs and the class members, including accounting for revenues generated through digital and physical sales of sound recordings, negotiating transactions and commercially exploiting the sound recordings created by Plaintiffs and the class members.

33.   UMG and Capitol have the same business address in Santa Monica, California, so any correspondence sent to the Universal Music Group is directed, without exception, to personnel who perform legal and business affairs functions for both UMG and Capitol. UMG and Capitol share the same office space, the have substantially the same personnel, and, notably, the same in-house attorneys and business affairs staff. Put simply, notwithstanding the myriad and complex interrelationships of brands, labels, divisions and affiliates, the core servicing and music exploitation business is conducted under the trade name of Universal Music Group and/or UMG for them all through a centralized, administrative servicing and recordkeeping function.

34.   Further, consistent with the instructions on the Universal Music website, the Plaintiff recording artists and the class members sent their Notices of Termination to Defendants' business address located at 2220 Colorado Avenue in Santa Monica, California, addressed to "Universal Music Group." Universal Music Group and/or UMG function as corporate agent for, specifically, Capitol, and the Notices were received, read, and analyzed by the same business affairs staff for any matter involving either UMG or Capitol.

35.   The legal and business affairs staff of UMG has full and complete access to all relevant and pertinent documents and information relating to both UMG and Capitol, including decades-old recording agreements, correspondence, royalty statements, financial analysis, sales information, catalogue database information, so-called "metadata" for all releases (including various identification codes utilized in the music industry for tracking digital performances and sales), release dates and dates of publication, and revenue information of all kinds and nature.

36.   This access to documents and information extends not only to UMG and Capitol, but the corporations and entities that have been subsumed or merged into Capitol, including, but not limited to, Chrysalis Records, Inc., EMI America

Records, Inc., Virgin Records America, Inc., and Capitol Records, Inc.

37.     On account of this unquestionably close relationship between UMG and Capitol, Notices of Termination sent to the Universal Music Group were valid for both corporations as both companies unquestionably were put on notice of the recording artists' intent to terminate by their use of common staff and personnel.

38.     Furthermore, upon information and belief, "UMG" and "Universal Music Group" are trade names utilized by UMG Recordings, Inc., which holds itself out publicly as the owner and controller of Capitol. Both UMG and Capitol have identical or nearly identical officers and directors.

39.     The true names and capacities (whether individual, corporate, associate or otherwise) of the Defendants named herein as Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when such have been ascertained. Upon information and belief, each of the Doe Defendants herein is responsible in some manner for the occurrences herein alleged, and Plaintiffs' and class members' injuries as herein alleged were proximately caused by such Defendants' acts or omissions.

40.     Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned in this Complaint, UMG, Capitol, and each of the Doe Defendants were the agent of each other and, in doing the things alleged in this Complaint, were acting within the course and scope of such agency.

## JURISDICTION AND VENUE

41.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and also seeks declaratory relief with regard to several legal issues that arise from the language and interpretation of the Copyright Act.

42.     This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1331 and 1338(a).

43.     This Court is empowered to issue a declaratory judgment and further necessary or proper relief pursuant to 28 U.S.C. §§2201 and 2202.

44.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because both UMG and Capitol are subject to personal jurisdiction in this District and because a substantial part of the events or omissions by UMG and Capitol giving rise to the claims occurred in this District.

## CLASS ALLEGATIONS

45.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. Proc. 23 on behalf of themselves and on behalf of two classes of similarly situated recording artists, defined as follows:

> **Class A:** All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination pursuant to § 203 of the Copyright Act describing an effective date of termination for a particular work (i) occurring on or after January 1, 2013 and (ii) occurring no later than the date the Court grants class certification of Class A.

> **Class B:** All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination pursuant to § 203 of the Copyright Act, describing an effective date of termination for a particular work (i) occurring on or after the date the Court grants class certification of Class A and (ii) occurring no later than December 31, 2030.

46.     Classes A and B shall include all persons serving any Notice of

Termination on Defendants up to and including the date on which the Court rules on Plaintiffs' motion for class certification and shall not be limited to persons who served Notices of Termination as of the date of the filing of the original or any amended complaint in this action. Membership in Class A or B shall be determined based upon whether the effective date of termination occurs on or before the date the Court grants certification of Class A.

47.    Excluded from Classes A and B is any officer, director or person employed by Defendants and any recording artist who has entered into a valid written agreement with Defendants pursuant to § 203(b)(4) wherein UMG and/or Capitol have been granted "a further grant" therein.

48.    This action has been brought and may be properly maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed classes are readily and easily ascertainable and identifiable.

49.    The members of the classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe, and on that basis allege, that there are hundreds of members in the classes who can be readily located, identified from various records and databases (including those maintained by Defendants and the United States Copyright Office), and notified of this action.

50.    Plaintiffs' claims for copyright infringement, injunctive relief, and declaratory relief are typical of the claims of the members of the classes, and Plaintiffs' interests are consistent with and not antagonistic to those of the other members of the class they seek to represent.

51.    Plaintiffs and all members of Class A have sustained damages and face irreparable harm arising out of Defendants' continued infringement and disregard of the Notices of Termination as alleged herein and, thus, are entitled to recover actual damages and/or statutory damages and obtain injunctive relief to

prevent further wrongful conduct by Defendants.

52.    Plaintiffs have no interests adverse to, or conflicting with, the interests of the absent members of the classes and they are able to fairly and adequately represent and protect the interests of such a class. Plaintiffs believe strongly in the protection of the rights of recording artists and are committed to protecting such rights.

53.    Plaintiffs (except Straw) have raised viable and compelling claims for copyright infringement of the type reasonably expected to be raised by members of the classes and will diligently and vigorously pursue the infringement claims.

54.    Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action.

55.    If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to include additional class representatives to represent any class or to assert additional claims as may be appropriate.

56.    Class certification under Fed. R. Civ. Proc. 23(b)(3) is warranted because questions of fact and law (to the extent that any may exist) are common to all members of the class and would plainly predominate over any questions affecting only individual members of the class. These common legal and factual questions, to the extent that any may exist, do not vary from class member to class member, and can be determined through common proof without reference to the individual circumstances of any class member.  Said questions include (without limitation) the following:[2]

       (A)    Whether sound recordings can ever be considered "a work made

---

[2] Plaintiffs deleted from the Second Amended Complaint paragraphs 25(f), 25(g), 25(h), 82(g), 82(i), 83(f), and 83(h) in the First Amended Complaint given the Court's rulings dated March 31, 2020 and August 10, 2020.

for hire," as that term is defined in the Copyright Act, where (1) the definition of "a work made for hire" set forth in § 101 of the Copyright Act does not include sound recordings as being one of the enumerated types of "specially ordered" or "commissioned" works that can be a work made for hire, and (2) none of the recording artists in the class was ever in an employer-employee relationship with the Defendants, their affiliated or related companies, or their predecessors-in-interest.

(B)    Whether the release of sound recordings that were created by a particular recording artist in "album" form, as is typical in the music industry, constitutes a "contribution to a collective work," or creates a "compilation," as those terms are used in the definition of "a work made for hire" in § 101 of the Copyright Act;

(C)    Whether a foreign choice of law provision in a recording agreement has any effect upon the application of United States copyright law to issues relating to the application of the Copyright Act (and § 203 specifically) to the United States copyrights at issue, and whether such a clause raises viable claims of "breach of contract" against the recording artists for the act of exercising their rights under United States copyright law;

(D)    Whether the recording agreements upon which Defendants base their position regarding "work made for hire" clauses violate § 203(a)(5) of the Copyright Act;

(E)    Whether the exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, is a breach of contract by the recording artists of a clause in the recording agreement that, according to Defendants, provides that recording artists may never exploit the sound recordings themselves, and whether such a clause violates § 203(a)(5)

14

of the Copyright Act; and

   (F) The basis and method for determining and computing damages, including statutory damages.

  57. Class certification of Class B also is appropriate pursuant to Fed. R. Civ. Proc. 23(b)(2) because Defendants have acted and/or refused to act on grounds that are generally applicable to the Class, which makes declaratory and injunctive relief with respect to Plaintiffs and the Class, as a whole, appropriate.

  58. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all class members is impracticable. The claims of the individual members of the class may range from smaller sums to larger sums. Thus, for those class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually. And even if every member of the class could afford to pursue individual litigation, the court system could not be so encumbered. It would be unduly burdensome to those courts in which individual litigation of numerous cases would otherwise proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action presents few, if any, management difficulties, conserves the resources of the parties and court system, and protects the rights of each member of the class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF
### (Copyright Infringement – Against All Defendants)

59.     Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 58 above, as though fully set forth herein.

60.     Pursuant to § 203 of the Copyright Act, recording artists (or their successors) have the right to serve a Notice of Termination to terminate the grant of rights made to a record label, generally thirty-five (35) years after the publication of those recordings.

61.      The Notices of Termination have been duly and correctly served upon the current grantees, and, with regard to Plaintiffs Ely, Sulton, Straw, Phillips, Lee, Wynn, Mehaffey, and Pellish, and the members of Class A, that current grantee is either UMG and/or Capitol. [3]

### The Ely Albums

62.     Ely entered into a recording agreement with MCA Records, Inc. ("MCA"), a predecessor of UMG, in 1976 (the "MCA Agreement").

63.     In February 1979, Ely's third album, *Down on the Drag,* was released on the MCA label.[4]

64.     Ely created *Down on the Drag,* and the subsequent albums, after December 31, 1977.

65.     In February 1980, Ely recorded live recordings in London, United Kingdom, which were released on March 27, 1981, as the album entitled *Live*

---

[3] Plaintiffs reserve all appellate rights with respect to the Court's March 31, 2020 dismissal of Waite's "claims based on grants transferred by third parties" (Dkt. No. 68 at 24), and with respect to the further ruling on Waite's claim in the Court's Memorandum Opinion of August 10, 2020 (Dkt. No. 89, at pp. 8 through 12).

[4] Plaintiffs reserve all appellate rights with respect to the Court's March 31, 2020 dismissal of Ely's "claims based on grants transferred by third parties" and with respect to the further ruling on Ely's claim in the Court's Memorandum Opinion of August 10, 2020 (Dkt. No. 89, at pp. 8 through 12).s

*Shots.*

66.     Both *Down on the Drag* and *Live Shots* (collectively, the "Ely Albums") were recorded by Ely pursuant to the MCA Agreement.

67.     At the time of execution of the MCA Agreement, Ely was not an employee of MCA.

68.     In fact, Ely was not an employee of MCA, at any time during the term of the MCA Agreement.

69.     The MCA Agreement was prepared by MCA and sought to create an artifice that Ely was an employee of MCA and that the works Ely authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

70.     Nonetheless, without any bona fide employment relationship between Ely and MCA, and in an attempt to circumvent the § 203 statutory termination right, MCA sought in the MCA Agreement to create an artifice by which Ely would be deemed an employee of MCA and the works Ely would author as Artist would be characterized as employee "works made for hire."

71.     The "work made for hire" language alone, in the MCA Agreement, is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship.

72.     On December 15, 2015, Ely served a Notice of Termination (the "Ely Notice") upon UMG. In doing so, he was acting on behalf of his own termination rights afforded to him pursuant to § 203 of the Copyright Act. A true and correct copy of the Ely Notice is attached as **Exhibit 1** and incorporated by reference.

73.     Thereafter, Ely caused the Notice of Termination to be recorded in the United States Copyright Office, on August 30, 2016, as document V9921 D732 P1 through P3.

74.    The effective date of termination for three albums on the Ely Notice, namely, *Down the Drag* and *Live Shots* was December 16, 2017 (the "Ely Albums").

75.    On May 6, 2016, counsel for UMG sent Ely a letter setting forth UMG's legal positions for its claims that the Ely Notice was invalid, and, in addition, demanded that Ely "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with UMG's continuing rights in the recordings that are the subject of your termination notice." A true and correct copy of that letter is attached hereto as **Exhibit 2**.

76.    UMG failed and refused to cease the sale, distribution, and exploitation of the Ely Albums on the effective date of termination, that is, December 16, 2017, and has continued such exploitation after that date.

77.    Indeed, notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the Ely Albums and instead continue to infringe on Ely's rights with respect to the sound recording on the Ely Albums, for more than two years.

78.    Despite UMG's knowledge of the effective dates of termination, UMG has willfully infringed upon the United States copyrights belonging to Ely by continuing to exploit the sound recordings, as if the Ely Notice had not been sent at all, in complete disregard of the law. UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

79.    Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings

18

through subscription or non-subscription online digital music services.

80.    Pursuant to the Ely Notice, Ely is currently the owner of the United States copyright in and to the sound recordings comprising the Ely Albums.

81.    By willfully continuing to exploit the sound recordings comprising the Ely Albums in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon Ely's rights in those recordings, and, furthermore, unlawful reproduction and distribution of the sound recordings owned by Ely as alleged hereinabove constitutes copyright infringement under the Copyright Act.

<u>The Sulton Album</u>

82.    Sulton entered into a recording agreement with EMI America Records, Inc. ("EMI"), a predecessor to Capitol, on September 29, 1980 (the "Sulton Agreement").

83.    The Sulton Agreement was designed, drafted and intended by EMI, among other things, to secure the exclusive recording services of Sulton.

84.    At the time of execution of the Sulton Agreement, Sulton was not an employee of EMI.

85.    In fact, Sulton was not an employee of EMI at any time during the term of the Sulton Agreement.

86.    The Sulton Agreement was prepared by EMI and sought to create an artifice that Sulton was an employee of EMI and that the work Sulton authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

87.    Nonetheless, without any bona fide employment relationship between Ely and EMI, and in an attempt to circumvent the § 203 statutory termination right, EMI sought in the Sulton Agreement to create an artifice by which Sulton would be deemed an employee of EMI and the works Sulton would

author as Artist would be characterized as employee "works made for hire."

88.   EMI memorialized EMI's attempted artifice by using "work made or hire" language in paragraph 6 of the Sulton Agreement, even though EMI knew that Sulton did not have, and never had, a bona fide employment relationship with EMI.

89.   EMI knew that, notwithstanding the language in the Sulton Agreement purporting to characterize Sulton as an employee, Sulton was not at the time of execution and was not at any time thereafter a bona fide employee of EMI.

90.   EMI further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

91.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, EMI also demanded and obtained several provisions in the Sulton Agreement that effectuated a direct, personal grant by Sulton to EMI of the copyright in and to the sound recordings that Sulton agreed to record pursuant to the Sulton Agreement.

92.   Because the sound recording, once created, would constitute neither (a) constitute collections of preexisting materials or data, nor (b) be comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a contribution to a collective work nor a compilation as defined under the Copyright Act.

93.   EMI also knew that any grant of the copyright was not effective until the work was created by Sulton by fixing the work in a tangible medium of expression.

94.   Despite EMI's efforts, because Sulton was not an employee of EMI

and the works were not "works made for hire," EMI's artificial construct contained in the Sulton Agreement was ineffective and the only effective transfer of the author's copyright would be made by Sulton's direct, personal transfer.

95.    On January 11, 1982, EMI released *Kasim*, an album sound recording authored by Sulton.

96.    On July 20, 2016, Sulton served a Notice of Termination (the "Sulton Notice") upon UMG, as agent for Capitol. A true and correct copy of the Sulton Notice is attached hereto as **Exhibit 3** and incorporated by reference.

97.    Thereafter, Sulton promptly caused the Notice to be recorded in the United States Copyright Office, on July 25, 2016, as document V9924 D803 P1 through P3.

98.    The effective date of termination for *Kasim* (the "Sulton Album") was July 21, 2018.

99.    On September 20, 2016, counsel for UMG/Capitol sent Sulton a letter setting forth the legal positions of UMG and/or Capitol for their claims that the Sulton Notice was invalid, and, in addition, demanded that Sulton "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with Capitol's continuing rights in such sound recordings." A true and correct copy of that letter is attached as **Exhibit 4**.

100.    UMG and/or Capitol failed and refused to cease the sale, distribution, and exploitation of the Sulton Album on the effective date of termination, that is, July 21, 2018, and continued such exploitation in the United States after that date.

101.    Despite the knowledge of UMG and/or Capitol of the effective date, UMG and/or Capitol have willfully infringed upon the United States copyrights belonging to Sulton by continuing to exploit the sound recording, as if the Sulton Notice had not been sent at all, in complete disregard of the law.

102.    UMG/Capitol routinely markets, distributes, and sells sound

recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

103.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

104.   Pursuant to the Sulton Notice, Sulton is currently the owner of the United States copyright in and to the sound recording comprising the Sulton Album.

105.   By willfully continuing to exploit the sound recording comprising the Sulton Album in the United States after the effective date, all of which occurred within the past three years, UMG/Capitol has infringed upon Sulton's rights in the recordings, and, furthermore, unlawful reproduction and distribution of the sound recording owned by Sulton as alleged hereinabove constitutes copyright infringement under the Copyright Act.

<u>The Dickies Album</u>

106.   The members of The Dickies – Graves, Lee, Bill Remar p/k/a Billy Club ("Remar"), Bob Davis p/k/a Chuck Wagon ("Davis"), and Carlos Caballero p/k/a Karlos Kaballero ("C. Caballero") – entered into a recording agreement with A&M Records, Inc. ("A&M"), a predecessor of UMG, on April 3, 1978 (the "Dickies Agreement").

107.   The Dickies Agreement was designed, drafted and intended by A&M, among other things, to secure the exclusive recording services of The Dickies.

108.   At the time of execution of the Dickies Agreement, none of the band

members of The Dickies were employees of A&M.

109.   In fact, none of the band members of The Dickies was an employee of A&M at any time during the term of the Dickies Agreement.

110.   The Dickies Agreement was prepared by A&M and sought to create an artifice that the members of The Dickies were employees of A&M and that the works The Dickies authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

111.   Nonetheless, without any bona fide employment relationship between the members of The Dickies and A&M, and in an attempt to circumvent the § 203 statutory termination right, A&M sought in the Dickies Agreement to create an artifice by which the members of The Dickies would be deemed employees of A&M and the works that the members of The Dickies would author as Artist would be characterized as employee "works made for hire."

112.   A&M memorialized A&M's attempted artifice by using "employees for hire" language in paragraph 4 of the Dickies Agreement, even though A&M knew that the band members of The Dickies did not have, and never had, a bona fide employment relationship with MCA.

113.   A&M knew that, notwithstanding the language in the Dickies Agreement purporting to characterize band members of The Dickies as employees, The Dickies band members were not at the time of execution and were not at any time thereafter bona fide employees of A&M.

114.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, A&M also demanded and obtained several provisions in the Dickies Agreement that effectuated a direct, personal grant by the members of The Dickies to A&M of the

copyright in and to the sound recording that the members of The Dickies agreed to record pursuant to the Dickies Agreement.

115.   A&M further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

116.   Because the sound recording, once created, would neither (a) constitute collections of preexisting materials or data, nor (b) be comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a contribution to a collective work nor a compilation as defined under the Copyright Act.

117.   A&M also knew that any grant of the copyright was not effective until the work was created by the members of The Dickies by fixing the work in a tangible medium of expression.

118.   Despite A&M's efforts, because no member of The Dickies was an employee of A&M and the works were not "works made for hire," A&M's artificial construct contained in the Dickies Agreement was ineffective and the only effective transfer of the author's copyright would be made by band members' direct, personal transfers.

119.   On November 9, 1979, A&M released *Dawn of The Dickies*, an album sound recording authored by Phillips, Lee, Remar, Davis, and C. Caballero (the "Dickies Album").

120.   On September 12, 2017, Phillips, Lee, and Israel Caballero, the brother and successor of C. Caballero ("I. Caballero"), - the majority of the authors (or their successors, in the case of C. Caballero) of the Dickies Album - served a Notice of Termination (the "Dickies Notice") upon UMG.

121.   Thereafter, the majority of The Dickies caused the Dickies Notice to be recorded in the United States Copyright Office, on June 19, 2019, as document V9964 D904 P1 through P3. A true and correct copy of the recorded Dickies

Notice is attached as **Exhibit 5** and incorporated by reference.

122.   The effective date of termination for the Dickies Album was September 13, 2019.

123.   On January 23, 2018, counsel for UMG sent Phillips, Lee, and I. Caballero a letter setting forth UMG's legal positions for its claims that the Dickies Notice was invalid, and, in addition, demanded that Phillips, Lee, and I. Caballero "refrain from attempting to exploit the recordings themselves or taking any other actions interfering with our clients' continuing rights in the sound recordings that are the subject of the termination notice." A true and correct copy of the letter dated January 23, 2018 is attached as **Exhibit 6** and incorporated by reference.

124.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recording, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recording through subscription or non-subscription online digital music services.

125.   Pursuant to the Dickies Notice, the authors of the Dickies Album are the owners of the United States copyright in and to the sound recording comprising the Dickies Album, as of September 13, 2019, the effective date of termination set forth in the Dickies Notice.

126.   Indeed, notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the *Dawn of the Dickies* Album and instead continue to infringe on Phillips, Lee, and I. Caballero's rights with respect to the sound recording on the *Dawn of the Dickies* Album.

127.   Despite the knowledge of UMG of the effective date, UMG has willfully infringed upon the United States copyright belonging to the authors of the Dickies Album by continuing to exploit the sound recording, as if the Dickies

Notice had not been sent at all, in complete disregard of the law.

128.   UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

129.   Pursuant to the Dickies Notice, the authors of the Dickies Album are currently the owners of the United States copyright in and to the sound recording comprising the Dickies Album.

130.   By willfully continuing to exploit the sound recording comprising the Dickies Album in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon the recording, and, furthermore, unlawful reproduction and distribution of the sound recording owned by the authors of the Dickies Album as alleged hereinabove constitutes copyright infringement under the Copyright Act.

<u>The Dream Syndicate Album</u>

131.   The members of The Dream Syndicate entered into a recording agreement with A&M Records, Inc. ("A&M"), a predecessor of UMG, in 1984 (the "Dream Syndicate Agreement").

132.   The Dream Syndicate Agreement was designed, drafted and intended by A&M, among other things, to secure the exclusive recording services of the members of The Dream Syndicate.

133.   At the time of execution of the Dream Syndicate Agreement, none of the band members of The Dream Syndicate were employees of A&M.

134.   In fact, none of the band members of The Dream Syndicate was an employee of A&M at any time during the term of the Dream Syndicate Agreement.

135.   The Dream Syndicate Agreement was prepared by A&M and sought to create an artifice that members of The Dream Syndicate were employees of

A&M and that the works The Dream Syndicate authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

136. Nonetheless, without any bona fide employment relationship between the members of The Dream Syndicate and A&M, and in an attempt to circumvent the § 203 statutory termination right, A&M sought in the Dream Syndicate Agreement to create an artifice by which the members of The Dream Syndicate would be deemed employees of A&M and the works that the members of The Dream Syndicate would author as Artists would be characterized as employee "works made for hire."

137. A&M memorialized A&M's attempted artifice by using "work made or hire" language in the Dream Syndicate Agreement, even though A&M knew that the band members of The Dream Syndicate did not have, and never had, a bona fide employment relationship with MCA.

138. A&M knew that, notwithstanding the language in the Dream Syndicate Agreement purporting to characterize band members of The Dream Syndicate as employees, The Dream Syndicate band members were not at the time of execution and were not at any time thereafter bona fide employees of A&M.

139. Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, A&M also demanded and obtained several provisions in the Dream Syndicate Agreement that effectuated a direct, personal grant by the members of The Dream Syndicate to A&M of the copyright in and to the sound recording that the members of The Dream Syndicate agreed to record pursuant to the Dream Syndicate Agreement.

140. A&M further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

141.   Because the sound recording, once created, would neither (a) constitute collections of preexisting materials or data, nor (b) be comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a contribution to a collective work nor a compilation as defined under the Copyright Act.

142.   A&M also knew that any grant of the copyright was not effective until the work was created by the members of The Dream Syndicate by fixing the work in a tangible medium of expression.

143.   Despite A&M's efforts, because no member of The Dream Syndicate was an employee of A&M and the works were not "works made for hire," A&M's artificial construct contained in the Dream Syndicate Agreement was ineffective and the only effective transfer of the author's copyright would be made by band members' direct, personal transfers.

144.   On May 7, 1984, A&M released *Medicine Show*, an album of recording authored by Wynn, Mehaffey, Pellish, and Karl Precoda (the "Dream Syndicate Album").

145.   On March 1, 2016, all of the authors, set forth above, served a Notice of Termination (the "Dream Syndicate Notice") upon UMG.

146.   Thereafter, the four authors promptly caused the Dream Syndicate Notice to be recorded in the United States Copyright Office, on July 11, 2016, as document V9924 D131 P1 through P6. A true and correct copy of recorded the Dream Syndicate's Notice is attached as **Exhibit 7** and incorporated by reference.

147.   The effective date of termination for the Dream Syndicate Album was May 8, 2019.

148.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recording, including, but not limited to, in phonorecords, and to exploit or authorize the

exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

149.   Pursuant to the Dream Syndicate Notice, the authors of the Dream Syndicate Album are the owners of the United States copyright in and to the sound recording comprising the Dream Syndicate Album, as of May 8, 2019, the effective date of termination set forth in the Dream Syndicate Notice.

150.   Indeed, notwithstanding the filing and pendency of this action and the passage of the effective date, Defendants have not changed their position with respect to the Dream Syndicate Album and instead continue to infringe on rights the authors with respect to the sound recording on the *Medicine Show* Album.

151.   Despite the knowledge of UMG of the effective date, UMG has willfully infringed upon the United States copyright belonging to the authors of the Dream Syndicate Album by continuing to exploit the sound recording, as if the Dream Syndicate Notice had not been sent at all, in complete disregard of the law.

152.   UMG routinely markets, distributes, and sells sound recordings in digital media format (*e.g.*, permanent digital song downloads, and interactive and non-interactive song streams) of individual tracks (*i.e.*, songs) taken from the subject albums.

153.   Pursuant to the Dream Syndicate Notice, the four authors of the Dream Syndicate Album are currently the owner of the United States copyright in and to the sound recording comprising the Dream Syndicate Album.

154.   By willfully continuing to exploit the sound recording comprising the Dream Syndicate Album in the United States after the effective date, all of which occurred within the past three years, UMG has infringed upon the authors' rights in and to the recordings, and, furthermore, the unlawful reproduction and distribution of the sound recording owned by The Dream Syndicate as alleged hereinabove constitutes copyright infringement under the Copyright Act.

155.   Plaintiffs are further informed and believe, and on that basis allege, that the continued willful exploitation by UMG and/or Capitol of sound recordings of members of Class A in the United States after the effective dates set forth in the Notices of Termination that were served on UMG and/or Capitol pursuant to § 203 by or on behalf of such class members, all of which occurred within the past three years, constitutes willful infringement by UMG/Capitol. UMG/Capitol's acts of infringement have been willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs and the members of the class.

156.   As a direct and proximate result of Defendants' infringements of Plaintiffs' copyrights and the copyrights of the members of Class A, pursuant to 17 U.S.C. § 504(c), Plaintiffs and the class members are entitled to recover up to $150,000 in statutory damages for each sound recording infringed. Alternatively, at their election, pursuant to 17 U.S.C. § 504(b), Plaintiffs and the class members are entitled to their actual damages, as well as all profits attributable to the infringement, including but not limited to UMG/Capitol's profits from infringement, as will be proven at trial.

157. Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiffs, and will continue to so harm Plaintiffs unless Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, are permanently enjoined and restrained under 17 U.S.C. § 502 from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute

(i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member.

158.   Furthermore, there is no available remedy at law sufficient to make Plaintiffs and the members of Class B whole.

159.   Plaintiffs and the class members also are entitled to recover attorney's fees and costs pursuant to 17 U.S.C. § 505, and prejudgment interest according to law.

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other members of Class A, respectfully request that the Court enter judgment against Defendants, and each of them, as follows:

A.     Determining that this is a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B.     Awarding Plaintiffs actual damages according to proof, or, at Plaintiffs' election, statutory damages in an amount of $150,000 per infringed work, or according to proof;

C.     A permanent injunction enjoining and restraining Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings

available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member;

D.     For pre- and post-judgment interest;

E.     For such fees and costs (including reasonable attorney's fees) incurred herein as permitted by law; and

F.     For such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Declaratory Relief – Against All Defendants)

160.   Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 159 above, as though fully set forth herein.

<u>The Syd Straw Album</u>

161.   Straw entered into a recording agreement with Virgin Records America, Inc. ("Virgin"), a predecessor of Capitol on July 20, 1987 (the "Straw Agreement").

162.   On June 21, 1989, Virgin released *Surprise*, an album of recording authored by Straw.

163.   Straw was never an employee of Virgin, Capitol or any of the Defendants and there are no facts to establish any such employer-employee relationship.

164.   The Straw Agreement was designed, drafted and intended by Virgin, among other things, to secure the exclusive recording services of Straw.

165.   The Straw Agreement was prepared by Virgin and sought to create an artifice that Straw was an employee of Virgin and that the works Straw authored as the Artist were "works made for hire" when, in fact, no such employment relationship existed.

166.   Nonetheless, without any bona fide employment relationship

between Straw and Virgin, and in an attempt to circumvent the § 203 statutory termination right, Virgin sought in the Straw Agreement to create an artifice by which Straw would be deemed an employee of Virgin and the works Straw would author as Artist would be characterized as employee "works made for hire."

167.   EMI memorialized EMI's attempted artifice by using "work made or hire" language in paragraph 6(a) of the Straw Agreement, even though Virgin knew that Straw did not have, and never had, a bona fide employment relationship with Virgin.

168.   Virgin knew that, notwithstanding the language in the Straw Agreement purporting to characterize Straw as an employee, Straw was not at the time of execution and was not at any time thereafter a bona fide employee of Virgin.

169.   EMI further knew that the sound recording could not otherwise qualify as "work made for hire" under the governing Copyright Act definition.

170.   Contemporaneously, because the "work made for hire" language alone is insufficient to establish that a work is, in fact, made for hire and recognizing that the yet-to-be-created sound recording may not qualify as a "work made for hire" in the absence of a bona fide employment relationship, Virgin also demanded and obtained several provisions in the Straw Agreement that effectuated a direct, personal grant by Straw to Virgin of the copyright in and to the sound recording that Straw agreed to record pursuant to the Straw Agreement.

171.   Because the sound recording, once created, would neither (a) constitute collections of preexisting materials or data, nor (b) be comprised of assembled contributions constituting separate and independent works in themselves, it would be neither a contribution to a collective work nor a compilation as defined under the Copyright Act.

172.   Virgin also knew that any grant of the copyright was not effective

until the work was created by Straw by fixing the work in a tangible medium of expression.

173.   Despite Virgin's efforts, because Straw was not an employee of Virgin and the works were not "works made for hire," Virgin's artificial construct contained in the Straw Agreement was ineffective and the only effective transfer of the author's copyright would be made by Straw's direct, personal transfer.

174.   On June 21, 2016, Straw served a Notice of Termination (the "Straw Notice") upon UMG, as agent for Capitol.

175.   Thereafter, Straw promptly caused the Notice to be recorded in the United States Copyright Office, on May 31, 2019 as document V9964 D257 P1 through P3. A true and correct copy of Straw's recorded Notice is attached as **Exhibit 8** and incorporated by reference.

176.   The effective date of termination for the album on the Straw Notice, namely, *Surprise* (the "Straw Album") is June 22, 2024.

177.   On December 16, 2016, counsel for UMG sent Straw a letter setting forth UMG's legal positions for its claims that the Straw Notice was invalid, and, in addition, demanded that Straw "refrain from attempting to exploit the recordings yourself or taking any other actions interfering with Capitol's continuing rights in such sound recordings." A true and correct copy of that December 16, 2016 letter is attached as **Exhibit 9** and incorporated by reference.

178.   Under § 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription online digital music services.

179.   Pursuant to the Straw Notice, Straw will be the owner of the United States copyright in and to the sound recording comprising the Straw Album, as of

34

the effective date of termination set forth in the Straw Notice.

180.   Based upon the foregoing facts, pursuant to 28 U.S.C. §§ 2201 & 2202, a case of actual and present controversy within the jurisdiction of this court has arisen and now exists between Straw and UMG, concerning their respective rights and duties concerning the Straw Notice, as herein set forth below.

<u>Declaratory Relief Applicable to Plaintiffs and All Class B Members</u>

181.   In addition, pursuant to 28 U.S.C. §§ 2201 & 2202, a case of actual and present controversy within the jurisdiction of this court has arisen and now exists between Plaintiffs and the members of Class B on the one hand, and Defendants on the other hand, concerning their respective rights and duties, in that Plaintiffs and the members of Class B contend that:

(A)   Sound recordings cannot be considered "a work made for hire," as that term is defined in the Copyright Act, because the definition set forth in § 101 of the Copyright Act does not include sound recordings as being one of the types of works that can be "a work made for hire";

(B)   There are no facts as to Plaintiff Straw and, upon information and belief, no such facts as to the members of Class B that would establish that Straw or any class member was ever in an employer-employee relationship with Defendants, or any of their affiliated or related companies, at the time the recording artists entered into the recording agreements, or during the time that the recordings pertaining thereto were created;

(C)   The release of sound recordings that were created by a particular recording artist in "album" form, as is typical in the music industry, do not constitute a "contribution to a collective work," or a "compilation," as those terms are used in § 101 of the Copyright Act, and do not qualify the sound recordings as "works made for hire";

(D)   A foreign choice of law provision in a recording agreement has

no effect upon the application of United States copyright law, exclusively, to issues relating to the application of the Copyright Act (and § 203 specifically) to the United States copyright, and cannot support a claim of "breach of contract" by the recording artists for exercising their rights under United States law;

(E)    Defendants' position regarding "a work made for hire" clauses violates § 203(a)(5) of the Copyright Act;

(F)    Sound recordings created and delivered pursuant to a recording agreement are not "specially ordered" or "commissioned works," as such terms are used in § 101 of the Copyright Act, thereby disqualifying any sound recording as "a work made for hire";

(G)    The exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, does not constitute a breach of contract of the recording agreements; and

(H)    The assertion of rights by the recording artists under § 203 of the Copyright Act are not "time-barred" because "claims regarding the initial ownership status of a work must be brought within three years of creation."

182.    Defendants, on the other hand, contend that:

(A)    Each of the sound recordings at issue is "a work made for hire," because the recording agreements at issue contain clauses that purport to be an agreement between the parties to those agreements that the sound recordings should be so characterized;

(B)    The sound recordings at issue are "contributions to a collective work" or "compilation," *i.e.,* record albums, and so are "a work made for hire";

(C)    If a recording agreement so provides, foreign law may be applied

to the rights of recording artists in United States copyrights, and may be used to deny terminations that would be otherwise valid under the United States Copyright Act;

(D)   Defendants' position regarding "work made for hire" clauses does not violate § 203(a)(5) of the Copyright Act;

(E)   Sound recordings created and delivered pursuant to a recording agreement are "commissioned works," as that term is used in § 101 of the Copyright Act, thereby transforming each of the sound recordings into "a work made for hire";

(F)   The exercise by recording artists of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective date of termination, constitutes a breach of contract of the recording agreements; and

(G)   The assertion of rights by the recording artists under § 203 of the Copyright Act are "time-barred" because "claims regarding the initial ownership status of a work must be brought within three years of creation."

183.   Plaintiff Straw and the members of Class B desire a judicial determination of their rights and duties, and a present declaration that their Notices of Termination are valid, the dates of termination in the Notices are effective, their termination rights vested and Defendants' disregard of the rights of Plaintiff Straw and the members of Class B violates the Copyright Act.

184.   Such a prompt and immediate, judicial determination of the rights and duties of the parties is presently ripe, useful and necessary at this time, in that Defendants have repeatedly refused to honor Plaintiffs' rights, including the rights of Straw, and those of the Plaintiff class members because:

(i) Defendants have engaged in the virtually identical conduct with respect to both Classes A and B, and Defendants have shown no willingness or

intent to alter their willful behavior during this litigation absent a judicial order, judgment or declaration;

(ii) Defendants have not advanced any defenses or arguments beyond or outside of the detailed arguments asserted in their lengthy letters refusing to honor Plaintiffs and the class members' Notices of Termination and Defendants' central defense – that the sound recordings qualify as "works made for hire" – can be readily disposed of on a class-wide basis because Defendants are unable to prove the existence of bona fide employment relationships with Plaintiff Straw and the class members;

(iii) Defendants have created an actual and immediate disagreement with Plaintiff Straw and, upon information and belief, members of Class B by accusing these recording artists of anticipatory breach of contract and/or asserting repudiation claims arising from Defendants' inclusion of "work made for hire" language and related representations in the underlying recording agreements;

(iv) Defendants have stated their clear intent *not* to honor the Notices of Termination served by Plaintiffs and class members pursuant to § 203, and therefore, Plaintiffs and class members, as the rightful owners of the sound recordings that they themselves created, should not be forced to wait until a date far in the future after their effective termination dates *and* the resolution of (possibly piecemeal) litigation over the validity of their ownership rights, and in the interim lose the ability to license, exploit or otherwise monetize those valuable copyrights;

(v) Plaintiffs and class members – most of whom are well over 60 years of age – will be substantially aided in developing and implementing their estate plans with respect to their rights to the sound recordings in that there is a very real and genuine need to value the rights for purposes of their

calculation of the gift and/or estate tax exemptions, depending on whether they make an *inter vivos* gift or a testamentary bequest to a beneficiary under his or her will;

(vi) the requested declaratory relief would determine in all material respects and/or completely the validity of the termination notices, the effective dates of termination and the vesting of the termination rights; and

(vii) in that Defendants' legal position is centrally dependent upon their factual contention that the recordings at issue are "works made for hire," if Defendants are able to prove that issue, then there is no termination right available and the Notices of Termination served by the members of Class B are invalid.  On the other hand, if Defendants are unable to prove that the recordings are "works made for hire," then the members of Class B seek to be protected from future infringement and potential piecemeal litigation from Defendants on the identical or substantially similar defensive positions.

185.   In the absence of prompt and immediate declaratory relief, Plaintiff Straw and the members of Class B will continue to experience significant uncertainty with respect to their termination rights and they will be unable to accurately calculate the value of their rights given the future, indeterminate litigation cloud hanging over their rights.  They will be left to await the virtually certain future event of Defendants' infringement of their copyrights and then incur years of additional delay before gaining clarity and vindication of their rights – all while they wonder whether they will live to see their rights vindicated, or whether Defendants will profit from the unlawful exploitation of the sound recordings.

186. In the absence of prompt and immediate declaratory relief, Defendants will be allowed to destroy the value and ultimate salability of the subject sound recordings, in direct contradiction of the second chance guaranteed

by the Copyright Act. Furthermore, with regard to Plaintiff Straw and the members of Class B for which the effective dates of termination have not yet arrived, the policies, practices and actions of Defendants are injuring the interests of those class members; for instance, many, if not most, of the class members are over the age of 60 (and in many cases, many years older than 60), and are actively engaged in estate planning activities, including devising or bequeathing valuable rights in the copyrights in and to sound recordings that are the subject matter of the Notices of Termination sent to UMG and Capitol.

187.   Due to the conduct of UMG and Capitol, as described above, class members, most of whom are over 60 years of age, cannot be sure that any estate planning activities in which they engage (including, but not limited to, the drafting of wills and trusts, and tax planning and analysis; pursuant to § 203(b)(2), the post-termination rights in sound recordings become vested upon *service* of the Notices of Termination, and the right to devise or bequeath those rights are, at that point in time, within the sole power of the authors (and *not* pursuant to the succession scheme set forth in § 203(a)(2)), in many cases years before the effective dates of termination) will have the effect envisioned by § 203 of the Copyright Act, that is, full ownership of the United States copyright in and to the sound recordings set forth in the Notices of Termination and the right to collect all revenues from the United States exploitation of sound recordings, on a date certain in the future. Without this certainty, any such estate or tax planning cannot be fully realized or relied upon, causing present injury to those class members, and not just at a future time.

188.   Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiffs, and will continue to so harm Plaintiffs unless Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors,

assigns, and those acting in concert with them or at their direction, and each of them, are permanently enjoined and restrained under 17 U.S.C. § 502 from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member.

189.   Furthermore, there is no available remedy at law sufficient to make Plaintiffs and the members of Class B whole.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Straw, on behalf of herself and on behalf of all other members of Class B, respectfully requests that the Court enter judgment against Defendants and each of them, as follows:

A.   Determining that this is a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as class representatives and Plaintiffs' counsel as class counsel;

B.   For declaratory relief, regarding the legal issues described in paragraphs 181 through 189, above;

C.   A permanent injunction enjoining and restraining Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, from directly or indirectly infringing on Plaintiffs' and the class members' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled

by Plaintiffs or the members of the Plaintiff classes, including without limitation by using the internet or online media distribution system to reproduce (i.e., download) any of the sound recordings, or to distribute (i.e., upload) any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of the Plaintiff or class member;

      D.    For pre- and post-judgment interest;

      E.    For such fees and costs (including reasonable attorney's fees) incurred herein as permitted by law; and

      F.    For such other and further relief as this Court deems just and proper.

<strong>BLANK ROME LLP</strong>

Dated: August 31, 2020

         */s/Ryan E. Cronin*
Ryan E. Cronin
Roy W. Arnold (admitted pro hac vice)
David M. Perry (admitted pro hac vice)
Gregory M. Bordo (admitted pro hac vice)
BLANK ROME LLP
1271 Avenue of the America
New York, NY  10020
(212) 885-5000
RCronin@BlankRome.com
RArnold@BlankRome.com
GBordo@BlankRome.com
Perry@BlankRome.com

Evan S. Cohen (admitted pro hac vice)
Maryann R. Marzano (admitted pro hac vice)
COHEN MUSIC LAW
1180 South Beverly Drive, Suite 510
Los Angeles, CA  90035-1157
(310) 556-9800
esc@cohenmusiclaw.com
mmarzano@cohenmusiclaw.com

*Attorneys for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury of the claims alleged in this Second Amended Complaint.

**BLANK ROME LLP**

Dated:  August 31, 2020                              */s/Ryan E. Cronin*

Ryan E. Cronin
Roy W. Arnold (admitted pro hac vice)
David M. Perry (admitted pro hac vice)
Gregory M. Bordo (admitted pro hac vice)
BLANK ROME LLP
1271 Avenue of the America
New York, NY  10020
(212) 885-5000
RCronin@BlankRome.com
RArnold@BlankRome.com
GBordo@BlankRome.com
Perry@BlankRome.com

and

Evan S. Cohen (admitted pro hac vice)
Maryann R. Marzano (admitted pro hac vice)
COHEN MUSIC LAW
1180 South Beverly Drive, Suite 510
Los Angeles, CA  90035-1157
(310) 556-9800
esc@cohenmusiclaw.com
mmarzano@cohenmusiclaw.com

*Attorneys for Plaintiffs*

EVAN S. COHEN
COHEN MUSIC LAW
1180 South Beverly Drive, Suite 510
Los Angeles, CA  90035-1157
(310) 556-9800
esc@cohenmusiclaw.com

*Attorneys for Plaintiffs*