# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - -

| | | |
|---|---|---|
| JOHN WAITE, an individual; JOE ELY, an individual; KASIM SULTON, an individual; SUSAN STRAW HARRIS p/k/a SYD STRAW, an individual; LEONARD GRAVES PHILLIPS, an individual, STAN SOBOL a/k/a STAN LEE, an individual, and ISRAEL CABALLERO, an individual; and on behalf of all others similarly situated, Plaintiffs, v. UMG RECORDINGS, INC., a Delaware Corporation doing business as Universal Music Group, and DOES 1 through 10, Defendants. | : | Case No. 1:10-cv-01091 (LAK) |

- - -

Wednesday, August 18, 2021

- - -

VIDEOTAPED REMOTE DEPOSITION OF
STEVE WYNN

* * *

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Q. I'm going to go over some of the grounds rules for a deposition so that we're all on the same page. The first thing to note is that you are under oath and that is the same oath that you would take if you were testifying in a court of law.
Do you understand that you're testifying here under penalty of perjury today?
A. Yes.
Q. The other thing to note is that we have a court reporter here, Ms. Kent, and in addition to being videotaped, Ms. Kent is here to take down in type everything that we say so that your testimony is captured in a transcript. In order for her to do her job and to be able to type what we say, it's very important that you respond to my questions verbally and audibly. For example, if we were having a conversation and I asked you a question and you shrug your shoulders or shook your head or said

"uh-huh" or "uh-uh" I would know what you meant, but that's very hard to take down in a -- a transcript. So I'd ask that you respond verbally and audibly for the record, please.
Do you understand that?
A. Yes.
Q. The other thing to note is that if you don't understand one of my questions, I'd ask that you ask me for clarification.
Will you do that for me?
A. Yes.
Q. I also heard you say at the outset that you will ask for a repeat of a question if you don't hear it clearly and I'm fine repeating any of my questions so that you understand them before you begin your answer. Okay?
A. Yes, thank you.
Q. From time to time your counsel, Ms. Taylor, may object to one of my questions as is her right to create her record and interpose objections to

what I may ask you, but unless she specifically instructs you not to answer, I am entitled to a response to your question.
Do you understand?
A. Yes.
Q. Are you taking any medications currently that impair your memory or would make it difficult for you to testify here today?
A. No.
Q. Do you have any health conditions that impair your memory or would make it difficult for you to testify here today?
A. No.
Q. Is there any reason that we can't proceed with your deposition this -- this afternoon?
A. No, none.
Q. Did you do anything to prepare for your deposition?
MS. TAYLOR: Objection to the extent it calls for

attorney/client privileged communications.
Otherwise you can answer the question.
THE WITNESS: I've been -- I have read documents and been in touch with my attorneys.
BY MS. GILFORD:
Q. Besides your attorneys, did you speak with anyone else in preparation for your deposition?
A. No.
Q. Can you tell me specifically which documents you reviewed in preparation for your deposition?
A. I can't specify by name, just the ones that were presented to me.
Q. Let me -- let me ask you about specific documents that may have been presented to you.
Do you recall reviewing the Complaint in this action in preparation for your deposition? And by Complaint I mean the document that lays out your



Q. Did you ever send a letter to either UMG or Capital or cause to have sent a -- a notice to them indicating that you were seeking the rights to the Danny & Dusty album back and that their rights were terminated?
A. I am not sure.
Q. Do you allege as part of this lawsuit that UMG or Capital Recordings rights to the Danny & Dusty album are terminated?
MS. TAYLOR: Objection. Do you want to show him the document or --
MS. GILFORD: Well, that's just it, Counsel, it's not attached to the Complaint, so I'm trying to figure out what's at issue here and what he's claiming.
BY MS. GILFORD:
Q. So -- so would you please respond to the question, sir?
Are you claiming --
MS. TAYLOR: Objection.

BY MS. GILFORD:
Q. -- the Danny & Dusty albums, album, that there's a Notice of Termination for that?
MS. TAYLOR: Objection, there -- there's no requirement that the Notice of Termination for Danny & Dusty need to be attached as an exhibit to a Complaint in order for him to claim rights recaptured for the Danny & Dusty The Lost Weekend album through a Notice of Termination that has been produced in discovery.
BY MS. GILFORD:
Q. Sir, would you respond to the question, please?
A. I do not know.
Q. You don't know whether or not you're claiming that Danny & Dusty -- the rights to Danny & Dusty have been terminated?
A. I'm saying I do not know.
Q. Can you describe in your own

words what you are claiming against UMG Recordings, Inc., in the lawsuit?
A. To gain back the rights to the Medicine Show by The Dream Syndicate for our own purposes.
Q. Anything else?
A. Not to my knowledge.
Q. When you say to your own purposes, what does that mean?
A. To -- to release, exploit the music on the Medicine Show to -- to have it available to -- yeah, to -- to manufacture and stream the recordings and control -- and control -- and control the music and recordings.
MS. GILFORD: Can we put up -- Mr. Pincus, can we put up Exhibit 50, please? Which, for the record, is the operative Complaint, the Second Amended Complaint in this action.
THE WITNESS: That might be hard for me to see.
MS. TAYLOR: Can you zoom

in?
THE WITNESS: Yeah, I think you're going to have to zoom in for me. Okay.
MS. TAYLOR: Is that good.
THE WITNESS: Uh-huh.
BY MS. GILFORD:
Q. Mr. Wynn, do you recognize this as your Complaint in this case?
A. Yes, I do.
Q. In this Complaint you, in addition to bringing claims on behalf of The Dream Syndicate, seek to represent a -- a class and you seek court approval for a class action.
What is your understanding of a class action?
MS. TAYLOR: Objection to the extent it calls for a legal conclusion or attorney/client privileged communications, otherwise I would instruct you to answer.
THE WITNESS: Are you saying



otherwise you'd instruct me to answer?
MS. TAYLOR: Yes, you can answer.
THE WITNESS: I'm part of a class action against UMG for artists seeking to regain the rights to their -- their recordings that should have reverted to them.
BY MS. GILFORD:
Q. Yes, sir, I'm -- I'm asking what is your understanding of what a class action means?
A. I'm --
MS. TAYLOR: Objection, calls for a legal conclusion.
THE WITNESS: Yeah.
MS. TAYLOR: You can answer. You still have to answer.
THE WITNESS: Yeah, I -- I'm -- I can't claim to be an expert in class action suits. I know that I am part of a class

action group of musicians, group of recording artists that wants to regain the rights to their recordings.
BY MS. GILFORD:
Q. Do you understand that you're seeking court approval to be a representative of artists who are not before the court and aren't parties to this case?
MS. TAYLOR: Objection to the extent it calls for a legal conclusion.
BY MS. GILFORD:
Q. You can respond, sir.
A. Then repeat the question again, please.
Q. Sure.
Do you understand that you are seeking court approval to be a representative of artists who are not parties to the case and aren't before the court?
A. Yes.

Q. Do you have an understanding of what your duties as a representative of the class would be?
MS. TAYLOR: Objection, calls for a legal conclusion.
BY MS. GILFORD:
Q. I'm asking for your understanding, sir.
Do you -- do you know what being a class representative entails?
A. To some extent.
Q. What is -- what is your understanding?
A. I understand that I am representing the class involved in the class action suit, whether stated in this agreement I'm looking at or not, that I am a representative and I understand that.
Q. Why should the court appoint you as a representative?
MS. TAYLOR: Objection. You can answer.
THE WITNESS: Okay. Because

I am one of the artists in the class action suit who recorded for the company and has -- should have by now regained the rights to the recordings.
BY MS. GILFORD:
Q. Well, I understand you have an individual claim on behalf of The Dream Syndicate, sir. I'm asking you a different question.
Why should you be a representative of other artists?
A. Because this is a class action suit of artists that have a similar concern.
Q. Do you know any of the artists who are in the class you seek to represent?
A. I am looking right now at the -- the list on the screen and I know one in particular.
Q. Sir, the list on the screen are fellow plaintiffs such as yourself who --




A. Yes.
Q. -- have sued. I'm not asking about them. I'm not asking about the named plaintiffs, I'm asking you about the class you seek to represent.
Do you know who is in the class you seek court approval to represent?
MS. TAYLOR: Objection to the extent it calls for attorney/client privileged communications, otherwise you can answer.
THE WITNESS: I've heard some of the names.
BY MS. GILFORD:
Q. Who are the names that you've heard?
A. Like recite? I heard -- I heard -- I heard maybe a handful of names. I can't say how many -- I can't recite them all back. Some I recognized.
Q. What -- what do you remember?

A. You want me to name back some of the names I remember?
Q. Yes, yes, that's exactly what I'm asking you.
A. I remember hearing Stan Ridgeway, Tex and the Horse Heads, The Babies, The Allman Brothers, I think. I'm sorry, I can't recall all the names I heard. Vary -- various names I heard. Cool and the Gang.
Q. The -- the people whose names you've heard or anyone else who may be in the class, have you ever reviewed any of their Notices of Termination?
MS. TAYLOR: Objection.
You can answer.
THE WITNESS: No.
BY MS. GILFORD:
Q. Have you reviewed any of their recording agreements?
A. No.
Q. Do you know whether or not their recording agreements have the same or similar provisions to your recording

agreement?
MS. TAYLOR: Objection, calls for speculation.
BY MS. GILFORD:
Q. You can answer, sir.
A. No.
Q. So let's -- let me direct your attention to the named plaintiffs who are listed here.
You mentioned that you knew one of them. Who is that?
A. I didn't --
MS. TAYLOR: Objection, vague.
BY MS. GILFORD:
Q. You can respond, sir. As I said at the outset, your counsel would -- may be objecting from time to time but you're still required to respond to my questions.
A. I know Syd Straw.
Q. And in what connection do you know her?
A. Acquaintance, we've -- over

the years.
Q. Have you spoken to Ms. Straw about this lawsuit?
A. No.
Q. Other than Ms. Straw and of course your fellow band members Mr. Mehaffey and Mr. Provost, do you know anyone else on this list here?
A. Nobody.
Q. Have you had any communications with anybody on this list about this lawsuit?
MS. TAYLOR: Objection as to -- vague as to "know." Do you mean personally know?
MS. GILFORD: Yes.
BY MS. GILFORD:
Q. Did you understand the question, sir?
A. Okay. Repeat it again, please.
Q. Sure. I was asking, besides Ms. Straw, who we've already talked about, and your fellow band members, do



extent that would require you to disclose confidential attorney/ client communications I would instruct you not to answer.
THE WITNESS: No answer.
BY MS. GILFORD:
Q. Have you spoken to other members of The Dream Syndicate about what they want out of this lawsuit?
MS. TAYLOR: Objection, vague.
You can answer.
THE WITNESS: No.
BY MS. GILFORD:
Q. Would you drop this lawsuit if you got the compensation and rights that you're seeking?
A. One more time on that question, please.
Q. Would you drop this lawsuit if you got the relief that you were seeking from the court?
MS. TAYLOR: Objection.
THE WITNESS: I'm

representing a class of artists in this suit and I am respectful of that -- of being part of that process and being part of the class of artists.
BY MS. GILFORD:
Q. Do you know whether on behalf of the class of artists you're seeking actual damages or statutory damages?
MS. TAYLOR: Objection, asked and answered, calls for a legal conclusion, to the extent it would require attorney/client privileged communications, I would instruct you not to answer.
THE WITNESS: I really can't answer.
BY MS. GILFORD:
Q. Are you not answering on the basis of your client's -- your counsel's instruction?
A. I actually really can't answer.

Q. So your answer is you don't -- you don't know the answer to my question. I'm just trying to be clear about what your testimony is.
MS. TAYLOR: Objection, asked and answered, misstates testimony.
THE WITNESS: No answer.
BY MS. GILFORD:
Q. I understand that, sir. Is that because your client -- your counsel has instructed you not to answer or --
MS. TAYLOR: Objection.
BY MS. GILFORD:
Q. -- is it you don't know the answer?
MS. TAYLOR: Objection, argumentative, asked and answered.
MS. GILFORD: I don't believe I've ever received an answer to that question.
THE WITNESS: I have no answer.
BY MS. GILFORD:

Q. Why? I'm not trying to be tricky I really just want the record to be --
A. I know you're not.
Q. Yeah. So is it because your -- your counsel has instructed you not to answer or because you have no answer?
A. Because I have no answer.
Q. Thank you.
So as I -- as we discussed earlier, you're here in part because of an album entitled Medicine Show made by The Dream Syndicate.
When -- when was The Dream Syndicate formed?
A. Are you asking when the band was formed?
Q. Yes.
A. In December 1981.
Q. And what years was it active after December 1981?
A. Until the end of 1988, December 1988. For -- I will say we're



Page 58

active again, but at that point we disbanded and reformed in 2012.
Q. And so since 2012 after reforming, you've been active to the present day?
A. Yes.
Q. So just so that I have this clear for the record, the dates that the band was formed and active were 1981 to 1988, and then again from 2012 to the present, is that accurate?
A. Yes.
Q. And as I understand it, the members of the band at the time that you recorded Medicine Show were Mr. Provost, Mr. Mehaffey, yourself and Karl Precoda; is that correct?
A. Yes.
Q. Who were the members of the band when This is Not the Next Dream Syndicate album were recorded -- was recorded?
A. This is Not the New Dream Syndicate Album --

Page 59

Q. Yes.
A. -- is the title? Myself, Dennis Mehaffey, Karl Precoda and Mark Walton.
Q. And was Mr. Walton a formal member of the band at that time?
A. At that time, yes.
Q. And then you -- you also claimed to be making a claim for a Danny & Dusty album?
A. Yes.
Q. Which album again was that?
A. The Lost Weekend.
Q. The Lost Weekend. Who were the members of Danny & Dusty?
A. Myself and Dan Stuart.
Q. When was that band formed?
A. It really wasn't a band that was formed, it was a record we made and so it's hard -- it's hard to say in terms of band being formed. But I would say the project happened to the best of my recollection in early 1984.
Q. And Danny & Dusty was signed

Page 60

by A&M Records?
A. A&M Records released the record.
Q. Was Danny & Dusty signed to a label at that time?
A. No. No, I should say when we made the record, no.
Q. Okay. When you made the record, did you have a -- a release agreement for that album?
A. Please ask the question one more time.
Q. Sure. I'm looking for any agreements you may have had with A&M regarding Danny & Dusty and the record The Lost Weekend, any contracts?
A. There was a contract for the release of the record eventually, yes.
Q. When was that contract entered into?
A. When was the contract for Danny & Dusty from A&M written and signed you're asking?
Q. Yes.

Page 61

A. Early 1985.
MS. GILFORD: Mr. Pincus, could you put up the Second Amended Complaint, again, Exhibit 50? And if you would scroll down to Exhibit 7 to the Complaint, which is near the back. Scroll through, please, to the Notice of Termination and zoom in for the witness, please.
BY MS. GILFORD:
Q. Mr. Wynn, do you recognize this document?
A. Yes.
Q. And this is your Notice of Termination under 17 USC Section 203 and 37 CFR Section 201.10 which you caused to be filed on behalf of The Dream Syndicate; is that correct?
A. Yes.
MS. GILFORD: Scroll down, Mr. Pincus, please.
BY MS. GILFORD:
Q. Is that your signature at



Page 74

communications, whether speaking or through emails or otherwise, regarding either this lawsuit or the Notice of Termination for the Medicine Show album?

MS. TAYLOR: Objection, vague.

THE WITNESS: With Mr. Precoda?

BY MS. GILFORD:

Q. Yes.

A. No.

Q. Have you had any kind of communication with Mr. Precoda regarding the Notice of Termination for the This is Not The New Dream Syndicate Album, Live?

A. No.

Q. Have you had any communications with your fellow band member of Danny & Dusty regarding this lawsuit?

A. No.

Q. Have you had any communications with your fellow band member of Danny & Dusty about the Notice

Page 75

of Termination for the Danny & Dusty Lost Weekend album?

A. No.

Q. When was the last time you spoke with him or had any --

A. With Dan Stuart?

Q. Yes.

A. With Dan Stuart?

Q. With Dan Stuart or had any kind of communication with him?

A. We have periodic communication.

Q. Do you recall the last time?

A. Face-to-face speaking in any form at all or -- or any kind of voice communication, two years ago.

Q. And any other type of email or written or social media communication?

A. No email. The occasional like on Facebook. That's it.

Q. And just so that I'm clear, you have not had any communications of any site -- sort, whether verbal or in writing with Mr. Stuart about the rights

Page 76

to the Lost Weekend album, the claims in this lawsuit, or the Notice of Termination, is that -- is that accurate?

A. That's accurate.

Q. How did The Dream Syndicate come to have a relationship or get signed by A&M Records?

A. Please repeat the question.

Q. How did The Dream Syndicate come to get signed by A&M Records?

A. In approximately around April or the spring of -- of '83, we were approaching labels to put out our second album and they were one of the labels that approached us.

Q. Do you recall who specifically at A&M approached you?

A. Yes.

Q. Who was that?

A. Jeff Gold and Mark Williams in particular.

Q. And what did Mr. Gold and Mr. Williams do for A -- A&M, what were -- what were their positions?

Page 77

A. I don't remember specific -- what their spec positions were.

Q. Other than Mr. Gold and Mr. Williams, did you have any contact with representatives of A&M Records while you were under contract with them?

A. Other -- contact with other people at A&M Records?

Q. Correct.

A. Of course, they were our label.

Q. Okay. Who else did you have contact with?

A. I mean, I could -- people involved in -- in the art department and publicity and radio and artist relations and we were -- we were very visible and active on the A&M lot. We -- we -- so yes, a lot of people there.

Q. Okay. Let me -- let me try to narrow that down for you.

Do you recall a gentleman named Ken Powell?

A. That rings a bell, but I



don't remember.
Q. What about Jordan Harris?
A. Yes.
Q. What -- what did Mr. Harris do for A&M?
A. He was eventually and maybe at the time -- he -- he was the head of A&R and eventually the person I dealt with on a regular basis.
Q. And in what -- what connection did you deal with him on a regular basis? What was the involvement?
A. Primarily once I began to manage the band myself in '83 -- sorry, in '85 I dealt with him.
Q. Did Mr. -- apologies. Did you finish your -- your answer?
A. Only that, yeah, pretty much it, starting in early '85, I would deal -- I dealt with Jordan Harris on where the band was going from that point forward.
Q. Did Mr. Harris have any involvement with the Medicine Show album?

MS. TAYLOR: Objection, vague.
THE WITNESS: I'm sure he did as the label was, of course, all involved with that record. But I didn't deal with him much.
BY MS. GILFORD:
Q. Did he ever attend any of the recording sessions for the Medicine Show album?
A. Did Jordan?
Q. Yes.
A. No.
Q. Was he involved with the This is Not The New Dream Syndicate Album, Live album?
A. I can't say for sure.
Q. Do you recall a gentleman named Bob Reitman?
A. No.
Q. Did any representatives of A&M attend the recording sessions for the Medicine Show album?
A. Yes.

Q. Who were they?
A. Mark Williams and Jeff Gold flew from LA to San Francisco one evening to attend a session and have dinner with me.
Q. Anyone else?
A. Mark -- Mark Williams and Jeff Gold.
Q. Yes, I got that. Anyone else besides those two?
A. No.
Q. What about with respect to the second album, did anyone attend a recording session for that?
A. Could you tell me what the second album you're referring to?
Q. This is Not The New Dream Syndicate Album, Live?
A. That was a live record, so it was merely -- we were on tour and it was a recorded show that we played in Chicago.
Q. What about for the Danny & Dusty album, I know that it was released

by A&M Records.
Did they have any involvement when you were in the recording studio?
A. None.
Q. I understand that the Medicine Show album was produced by a gentleman named Sandy Pearlman; is that correct?
A. Yes.
Q. How did Mr. Pearlman come to be the producer of the Medicine Show?
A. Sandy was a friend of Tim Devine's and we met him when he did sound engineering for us at a concert in Passaic, New Jersey, and we -- we got along with him right away and the band were all fans of work he had done previously. So after a few meetings we decided to hire him to produce a record.
Q. And Mr. Pearlman attended the recording sessions for the Medicine Show?
A. Yes.



Q. What did he do as a producer on that album? What was his role or job function?
A. He -- like many producers he worked -- he over -- he was with us during the recording session to observe, help us move through the process of recording, make choices and work with us to get the final record that we all wanted.
Q. When you say he helped you to make choices, what, I'm sorry, I'm not -- I'm not a musician, I'm a lawyer so I'm trying to understand what that means exactly.
What -- what does it mean when you say he helped you make choices?
A. A producer, and of course it's always different, but in our -- in our case he would listen to what we were playing, the music we were playing, things that we were recording, collectively or individually, and say, I prefer one thing over another and then we

would say, Well, I don't agree or whatever. That's the process of making -- making -- performing in the studio and then saying that one performance is better than another performance and the give-and-take on that that gets you where you're going at the end.
Q. I assume since the second album was a live album there was no producer on that one, am I correct in that assumption?
A. You're correct, it was a -- it was a radio performance from a live concert. A radio -- a radio recording for WXRT in Chicago of a live concert.
Q. And what about with respect to the Danny & Dusty album, was there a producer on that one?
A. No, there was an engineer, but only to -- to record the sound.
Q. Do you recall who that was?
A. Yes, Paul B. Cutler. I should say that he might have produced

for credit on the record. I'm not 100 percent sure.
Q. What about with respect to the Medicine Show album, was there a sound engineer on that?
A. Yes, there was, and his name was Paul Mandel.
Q. How did Mr. Mandel come to be the sound engineer on Medicine Show?
A. He worked regularly with Sandy.
Q. Were there any studio musicians hired for Medicine Show?
A. Yes, there were.
Q. I have the name of a, and I'm going to get his last name wrong, but a Thomas Zvoncheck?
A. Very good, yes.
Q. Okay. Anyone else besides Mr. Zvoncheck?
A. Singers Steven McCarthy, Syd Griffin and Gavin Blair. They were -- they were -- they did backing vocals.
Q. How did Mr. Zvoncheck come

to be a studio musician?
A. He had worked with Sandy before on a record and we were looking for a keyboard player, Sandy recommended him and we liked what he did.
Q. What about with respect to the back-up singers, how did they get involved?
A. They were all friends and former band mates of mine.
Q. Mr. Zvoncheck was paid by A&M Records, correct?
MS. TAYLOR: Objection, calls for speculation.
THE WITNESS: I have to agree with that. I'm not sure that the -- I'm not sure how he was paid.
BY MS. GILFORD:
Q. Do you know how the back-up singers were paid?
A. No.
Q. Do you know how Mr. Pearlman was made?



A. Again, I'm not sure of the direct line of payment.
Q. And Mr. Mandel, do you know how he was paid?
A. The same, I'm not sure how he was paid.
Q. When was Medicine Show recorded?
A. September of '83 until March of '84.
MS. TAYLOR: I think we've been going for another hour. It might be a good time to take a break.
THE WITNESS: Sure.
MS. TAYLOR: If that's all right.
MS. GILFORD: I agree, Ms. Taylor. Just going to wrap up. Yeah, let's take -- let's take ten minutes.
MS. TAYLOR: Okay.
THE WITNESS: Sounds great.
MS. TAYLOR: Thank you.

THE WITNESS: Thank you.
THE VIDEOGRAPHER: The time is now 2:41 PM and we are going off the record.
(Recess.)
THE VIDEOGRAPHER: The time is now 3:01 PM and we are going back on the record.
MS. GILFORD: Jillian, were you going to make a statement on the record?
MS. TAYLOR: I'll wait until you're done your questioning.
MS. GILFORD: Okay.
BY MS. GILFORD:
Q. Mr. Wynn, before we took a break, I was asking you about the recording of the album Medicine Show.
Other than the studio musicians and back-up singers that we mentioned before and the band members, obviously, did anyone else participate in making the album Medicine Show?
A. Aside from the studio

musicians and Sandy Pearlman and Paul Mandel, no.
Actually, I take it back. There was another engineer on the first two weeks and I'm forgetting his name. I think it was Ed O'Brien, but I'm not sure. But one -- there was one other engineer, recording engineer involved in the first couple weeks, and also a mixing engineer brought in at the very end as well, and I believe his name was Dave Whitman, but I'm not sure. So two more recording engineers.
Q. Do you know how those two other recording engineers were paid?
MS. TAYLOR: Objection, calls for speculation.
THE WITNESS: Yeah, I -- again, like with the others, I -- I do not know for certain.
BY MS. GILFORD:
Q. With respect to the recording agreement that The Dream Syndicate had with A&M Records, the band,

during the negotiation of that agreement, was represented by Mr. Paterno, correct?
A. Yes.
Q. Do you recall the time period during which that contract was negotiated?
A. That would be summer of 1983.
Q. Did you review any drafts of the agreement as it was being negotiated?
A. Do I have any?
Q. No, did you review it at the time.
A. Oh.
MS. TAYLOR: Objection.
THE WITNESS: I'm sure I would have looked it over.
BY MS. GILFORD:
Q. Do you recall reviewing any drafts, any prior versions of the document at the time?
A. I don't remember.
BY MS. GILFORD:
Q. Did you have the opportunity



sir?
A. I do.
Q. And this is part of the agreement that you signed and agreed to.
MS. TAYLOR: Objection, the document speaks for itself.
THE WITNESS: I see it, and yes.
BY MS. GILFORD:
Q. Now, my understanding is that Medicine Show has eight tracks on it including Still Holding on to You, Daddy's Girl, Burn, Armed With an Empty Gun, Bullet With My Name on It, The Medicine Show, John Coltrane's Stereo Blues and Merrittville, is that -- is that correct?
A. Yes, that's correct.
Q. Other than these tracks, did you record any other songs for inclusion on this album?
A. No.
Q. And with respect to the second album, the This is Not The New

Dream Syndicate Album, Live, were those live recordings of the tracks on Medicine Show?
A. I believe that four of the five tracks were songs from the Medicine Show and one -- other one was from our first album. I'm -- if I'm remembering correctly, yes.
Q. Did the band make any promotional appearances at the request of A&M Records for the Medicine Show?
A. Yes.
Q. What did you do to promote the album?
A. We did interviews, radio appearances, primarily those two things.
Q. And did the label pay the costs associated with the promotional appearances?
A. To my recollection costs involved in things like that would have been all -- they would have all been things happening in LA, so it would have been just a matter of me driving to radio

stations or to the A&M lot and doing interviews in offices with some exceptions.
Q. Have you ever had any contact with anyone from UMG Recordings, Inc.?
A. With UMG?
Q. Yes.
A. No, it was entirely A&M.
Q. Do you understand why you are suing UMG?
A. Yes, yes.
Q. Why is that?
A. Why -- we -- we were signed to and recorded for release by and dealt with A&M, who were not part of UMG at the time. I understand that over time their catalog has been, for lack of a proper word, taken over by or -- or bought out by UMG.
MS. GILFORD: I'd ask Mr. Pincus to display Exhibit 52, please.
BY MS. GILFORD:

Q. And I will represent to you, Mr. Wynn, that Exhibit 52 is a copy of plaintiffs' Steve Wynn, Dennis Mehaffey and David Pellish's Objections and Responses to Defendant UMG Recording Inc. and Capital Records LLC's First Set of Requests For Production.
Do you recognize this document?
A. Yes.
Q. Was it one of the documents you reviewed in preparation for your deposition?
A. Yes.
Q. Had you seen the -- this document before preparing for your deposition?
A. I don't remember.
Q. Do you remember whether you reviewed your responses to ensure that they were accurate before this document was served on the defendants?
MS. TAYLOR: Objection, asked and answered.



THE WITNESS: Yeah, I don't understand the question.
BY MS. GILFORD:
Q. Do you recall reviewing this document for accuracy unconnected with preparing for your depo -- deposition, did you ever review this to make sure that your responses to our discovery was accurate?
MS. TAYLOR: Objection, asked and answered.
THE WITNESS: I reviewed this document.
BY MS. GILFORD:
Q. When was the first time you reviewed it, sir?
A. I don't remember.
Q. Did you ever review it for accuracy, for purposes of determining whether the responses are accurate?
MS. TAYLOR: Objection, asked and answered.
THE WITNESS: I reviewed it, so I'd have to say yes.

MS. GILFORD: I ask Mr. Pincus to pull up Exhibit 53, please.
BY MS. GILFORD:
Q. I will represent to you, Mr. Wynn, that this is a document from A&M Records dated September 8th, 1985, an agreement between A&M and Greg Edward.
Do you know Mr. Edward?
A. Yes.
Q. Who -- who is Greg Edward?
A. Greg Edwards (sic) was a recording engineer and producer that we worked with.
Q. Did you work with him on either the Medicine Show album or the This is Not The New Dream Syndicate Album, Live record?
A. No, not -- neither.
Q. Neither. Who -- what album did you work with him on or what recordings?
A. Demo recordings for what would have been our next record.

Q. Which was what?
A. Well, it would have been our third record -- our third album, which was eventually recorded as Out of the Gray. At the time it didn't have a name but we were -- we were preparing songs for a third album and these were demos to see if we would work together.
Q. Okay.
MS. GILFORD: I'd ask Mr. Pincus to pull up the Exhibit 54.
BY MS. GILFORD:
Q. I will represent to you, Mr. Wynn, that Exhibit 54 is a contract between A&M Records, Inc., dated as of February 28, 1984, with Samuel Pearlman, Inc., c/o Stanley Diamond, Esquire.
And as we discussed before, Mr. Pearlman furnished producing services on the Medicine Show album, correct?
A. Yes.
Q. And did he perform any other producing services for the band other

than for Medicine Show?
A. No.
Q. Did he perform any producing services for Danny & Dusty?
A. No.
MS. GILFORD: Let's pull up the next exhibit, Mr. Pincus, which is Exhibit 55.
BY MS. GILFORD:
Q. I will represent to you, Mr. Wynn, that this exhibit is a letter dated February 27, 1985, from Alan Oken, Director of Artist Development at A&M, to Jeffrey Osborne regarding Dream Syndicate.
Would you take a moment to review this letter, please.
MS. TAYLOR: Can you zoom out and then zoom back in just so he has the full picture of what it is. And is this the only page?
MS. GILFORD: There appears to be a second page with a check attached.



MS. TAYLOR: Okay.
THE WITNESS: Okay.
BY MS. GILFORD:
Q. Have you seen this document before, sir?
A. Sorry, one more time?
Q. Have you seen the document before?
A. Possibly then, but -- but not recently.
Q. Okay. Do you recognize Mr. Oken's name? I'm not sure I asked you about him before.
Do you know Alan Oken?
A. Yes.
Q. How do you know Mr. Oken?
A. Through him working with A&M.
Q. Did he have any involvement in the Medicine Show album?
A. No, not to my knowledge.
Q. He is listed here as Director of Artist Development at A&M at the time, at least.

Did he -- was he working with The Dream Syndicate on artist development at the time?
A. No, we were --
MS. TAYLOR: Objection, vague.
THE WITNESS: Sorry.
MS. TAYLOR: That's okay.
THE WITNESS: We were very autonomous. We -- we developed our own material, our own songs, our own direction in the studio, so there was really no involvement from A&M with us in any of those things.
BY MS. GILFORD:
Q. What connection did you know Mr. -- Mr. Oken? You said you knew him from A&M?
A. Event --
Q. How did you come to know him?
A. Eventually I got to know him over -- after the record came out.

Q. Was that because he was working in some capacity with The Dream Syndicate or involved in the record -- record's release at some -- at some point?
MS. TAYLOR: Objection, misstates testimony. Misstates testimony. You can answer.
THE WITNESS: Oh, yeah. Alan -- after the record came out, we -- while we were making the record we had very little dealing creatively with A&M. Once the record was out we dealt with them on a promotional basis because they were helping to promote the record, and Alan, in fact, traveled with us to Japan for a series of shows in December of '84.
BY MS. GILFORD:
Q. This letter indicates -- this letter from Mr. Oken to Jeffrey Osborne indicates or says:

"Please find enclosed a check in the amount of $2,000 which constitutes a partial payment to you by Dream Syndicate towards the monies that are due to you from the group. As you can see, the check is drawn on The Dream Syndicate account by their CPA, Joel Levy."
Do you know what that refers to, sir?
A. Yes.
Q. What does it refer to?
A. That refers to -- he -- Jeffrey Osborne was our live sound engineer and Jeffrey recorded the concert -- he did the -- he did the sound engineering, hence the recording of the concert that became This is Not The New Dream Syndicate Album, Live.
Q. It indicates that he's being paid for his services through A&M, correct?
A. Yes.

MAGNA LEGAL SERVICES



BY MS. GILFORD:
Q. What do they refer to?
A. J. Ruby Productions is the label we were on for our first album, Ruby Records, and this was A&M buying us out of the contract with Ruby.
Q. Thank you.
MS. GILFORD: Mr. Pincus, can you pull up Exhibit 73, please?
BY MS. GILFORD:
Q. Mr. Wynn, I will represent to you that this appears to be a termination notice sent by you or caused to be sent to you and Mr. Stuart.
A. Can you please zoom in? Thank you.
MS. TAYLOR: And can you show him the next page? Zoom -- yeah. Thank you.
THE WITNESS: Uh-huh.
BY MS. GILFORD:
Q. Do you recognize this document, sir?

A. Yes.
Q. And is that your signature on the first page?
A. Yes, it is.
Q. And is this a Notice of Termination regarding the Danny & Dusty album that we've spoken about before, the Lost Weekend?
A. Yes.
Q. And you have listed here an effective date of termination of May 4th, 2020; is that correct?
A. Yes.
Q. I don't have --
MS. GILFORD: You can take the document down.
BY MS. GILFORD:
Q. Do you claim that UMG is infringing upon the rights for the Lost Weekend?
MS. TAYLOR: Objection, calls for a legal conclusion.
BY MS. GILFORD:
Q. You can answer, sir.

A. Yes.
Q. Do you claim that UMG has exploited or offered for sale the Lost Weekend since May of 2020?
MS. TAYLOR: Objection, calls for a legal conclusion.
THE WITNESS: I am saying they prevented us from exploiting the sale and promotion of the record.
BY MS. GILFORD:
Q. I understand that that is your claim, sir, but do you have any information that UMG is offering it for sale to the public?
A. I don't know.
MS. GILFORD: I have no further questions.
MS. TAYLOR: Okay. Do you mind if we take a five to ten-minute break and then we might have just a few additional wrap-up questions.
MS. GILFORD: Okay.

MS. TAYLOR: Thank you.
THE VIDEOGRAPHER: The time is now 4:02 PM and we are going off the record.
(Recess.)
THE VIDEOGRAPHER: The time is now 4:13 PM and we are going back on the record.
MS. GILFORD: Jillian, I do have actually a few more questions unless you have some that you'd like to ask.
MS. TAYLOR: I mean, you can -- you can finish your questioning and then I'll -- I'll follow up because it might negate some of mine.
MS. GILFORD: Okay.
BY MS. GILFORD:
Q. Mr. Wynn, when did you retain Evan Cohen as your lawyer?
A. I don't remember when we started working together, actually, to be honest.



Q. Was it sometime prior to the serving Notices of Termination on UMG?
A. We'd worked together on a previous record.
Q. Okay. Can you narrow it down by a year?
A. A year.
MS. TAYLOR: Objection, calls for speculation.
THE WITNESS: I'm -- I'm sorry, I can't.
BY MS. GILFORD:
Q. Did you ever receive a response to any of the Notices of Termination from UMG?
A. No.
Q. You -- you testified that UMG is preventing you from exploiting Medicine Show Record, the This Is Not the New Dream Syndicate Album, Live, and the Danny & Dusty record.
How are they preventing you from exploiting those records?
MS. TAYLOR: Objection,

misstates testimony.
You can answer.
THE WITNESS: Once again, I have -- the band and I have not been able to -- to release or sell or promote the record in any way in the time we've been -- should have been allowed to do it which began in the spring of -- it would have begun in the spring of 2019, and at the time they were extremely active and touring and promoting newer material and -- and so that's what -- we haven't been able to do that.
BY MS. GILFORD:
Q. What about with respect to the Danny & Dusty album, have you been touring and doing any shows with respect to Danny & Dusty?
A. No, we haven't.
Q. How has UMG prevented you from exploiting the Lost Weekend?
A. Even though we're not a

performing band at this point, although we might be again in the future, but even though we're not a performing band at this point, it's still a very well loved record, a highly regarded record that could have easily been sold for sync rights and as well as reissues and sales, physical and digital.
So it's -- it's not an active band but a very popular to this day record and -- and project.
Q. I'm still unclear on your testimony as to how UMG has prevented you from exploiting those records?
A. By not reverting the rights to us so we can go out and do that.
Q. And -- and that's -- that's your -- that's your understanding based on what?
MS. TAYLOR: Objection. Calls for a legal conclusion, calls for attorney/client privileged communications, calls for speculation, asked and

answered.
THE WITNESS: No answer.
BY MS. GILFORD:
Q. Are you not answering because your -- of your counsel's instructions or because you do not have an answer or you don't know?
MS. TAYLOR: Objection, asked and answered.
THE WITNESS: I don't know. I do know that I do not have access or rights -- ability to exploit those records.
BY MS. GILFORD:
Q. What is -- what is your -- what is your basis for saying that?
MS. TAYLOR: Objection, asked and answered.
BY MS. GILFORD:
Q. What is your basis --
A. What is my basis?
Q. What is your basis for saying UMG has prevented you from exploiting those records, in what way?



MS. TAYLOR: Objection, asked and answered. You've asked this question three or four times, so...
BY MS. GILFORD:
Q. What's your answer, sir?
A. I know that by having spoken to -- to my legal representatives on these projects I have not --
MS. TAYLOR: I'm just going to stop you because we don't want you to disclose any attorney/client privileged communications.
THE WITNESS: Of course. I just know I have not had the ability to release those records.
MS. GILFORD: I have no further questions.
MS. TAYLOR: Okay.
- - -
EXAMINATION
- - -
BY MS. TAYLOR:

Q. I just have a few quick questions for you.
A. Okay.
Q. Good afternoon. This is Jillian Taylor, for the record, and I'm going to ask you just a few follow-up questions.
MS. TAYLOR: If the court reporter could please pull up Exhibit 72 and could you go to the next page. Next page. Next page. Next page. Thank you. And can you zoom in to the top half of the document?
BY MS. TAYLOR:
Q. Take a look -- minute to review this.
Do you recognize this document to be the Notice of Termination under Section 203 of the Copyright Act for Steve Wynn, Dennis Duck, Karl Precoda and Mark Walton?
A. Yes.
MS. TAYLOR: And can you

go -- can you scroll up a little bit?
BY MS. TAYLOR:
Q. Do you see your signature at the bottom of this Notice of Termination?
A. Yes.
MS. TAYLOR: Next page. Can you put Schedule A on the -- thank you.
BY MS. TAYLOR:
Q. Schedule A of this Notice of Termination shows that you are terminating the sound recordings to This is Not The New Dream Syndicate Album, Live; is that correct?
A. Yes.
Q. And you signed this document?
A. Yes.
Q. And this is the basis for your claim to recapture the rights to the sound recordings in the live album?
A. Yes.
MS. TAYLOR: You can remove

the document and put up 73, please. And zoom in to the top half of the document. Thank you.
BY MS. TAYLOR:
Q. Do you recognize this document?
A. Yes.
Q. And this is the Notice of Termination under Section 203 for Dan Stuart and Steve Wynn for the Lost Weekend; is that correct?
A. Yes.
Q. It's dated at the top February 27, 2018?
A. Yes.
MS. TAYLOR: If you can go to Schedule A.
BY MS. TAYLOR:
Q. Schedule A purports to terminate the rights to the sound recordings in The Lost Weekend for Dan Stuart and Steve Wynn; is that correct?
A. Yes.
Q. And the effective date of



termination is May 14th, 2020?

A. Yes.

Q. And this -- this Notice of Termination is the basis for your claim to recapture the rights to the sound recordings in the Lost Weekend?

A. Yes.

MS. TAYLOR: You can remove the document.

BY MS. TAYLOR:

Q. You testified that Jordan Harris was involved in Medicine Show.

What do you mean by involved?

A. Jordan Harris was, I believe -- to the best of my knowledge they had an A&R for Medicine Show, so Jordan would have been involved with our management, with Tim Devine, in setting up the recording for Medicine Show; however, Jordan was not involved at all from our end -- from -- everything involving writing the songs, choosing the songs, arranging the songs, recording

them in the studio, the process -- who we hired in the studio, which takes we used, how we mixed the records, choosing mixes, mastering the record were entirely the band. We -- the four of us made those decisions ourselves.

And the only involvement we had from A&M's A&R department was the one night Mark Williams and Jeff Gold from A&R flew to San Francisco, listened to the mixes we had been working on at the time, liked them quite a bit, took me out to dinner and left town.

So really Jordan involvement from our end as a band and creatively was none whatsoever, although I am certain he worked with Tim as far as the logistical end of things.

Jordan and I became more -- worked together more the following year when we started working on the next record.

Q. By "next record," you mean the live album?

A. No, then what would have been the next studio album that we would have done, the one we did demos from with Greg Edwards, that's when Jordan and I started working together more on a day-to-day basis.

MS. TAYLOR: Okay. I have no further questions. I just want to make one statement or the record.

MS. GILFORD: Jillian, I have some follow-up questions on what you just asked.

MS. TAYLOR: Okay. I'll make the statement and then you can go ahead.

With respect to Exhibit 4 that Ms. Gilford showed to the witness today, it's our position that the protective order prevents the use of attorney's eyes only discovery materials in depositions.

The Stefano Vranca expert

report and all its contents and attachments are marked as confidential attorney's eyes only and are meant to be maintained on a confidential attorney's eyes only basis. As such, they were not provided to any of the plaintiffs or class members, including Mr. Wynn who is being deposed today.

We hereby reserve all our rights and objections to the introduction and use of that report by Ms. Gilford in this deposition and any questions that she's asked Steve Wynn in this deposition in connection therewith, and we do not waive any rights, including any arguments that defendants may have waived any protections regarding the report and the underlying data by their improper disclosure and use of the report today.

