## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

X

JOHN WAITE, an individual; KASIM SULTON, an individual; SUSAN STRAW HARRIS p/k/a SYD STRAW, an individual; LEONARD GRAVES PHILLIPS, an individual; STAN SOBOL a/k/a STAN LEE, an individual; STEVE WYNN, an individual; DENNIS MEHAFFEY, p/k/a DENNIS DUCK, an individual; and JOEL DAVID PELLISH, p/k/a DAVID PROVOST, an individual; and on behalf of all others similarly situated,

Plaintiffs,

v.

UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group; and CAPITOL RECORDS, LLC, a Delaware limited liability company;

Defendants.

X

No. 1:19-cv-01091(LAK)

ORAL ARGUMENT REQUESTED

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY
## JUDGMENT ON DEFENDANTS' WORK MADE FOR HIRE DEFENSE

**BLANK ROME LLP**
Ryan E. Cronin
Roy W. Arnold (admitted *pro hac vice*)
Gregory M. Bordo (admitted *pro hac vice*)
David M. Perry (admitted *pro hac vice*)
Heidi G. Crikelair
Jillian Taylor (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000

**COHEN MUSIC LAW**
Evan S. Cohen (admitted *pro hac vice*)
Maryann R. Marzano (admitted *pro hac vice*)
104 West Anapamu Street, Suite K
Santa Barbara, CA 93101-3126
Telephone: (805) 837-0100

*Attorneys for Plaintiffs and the Classes*

# TABLE OF CONTENTS

I.    Preliminary Statement ................................................................. 1

II.   Statement of Undisputed Facts ..................................................... 3

    A.   Kasim Sulton ....................................................................... 3

    B.   The Dickies (Leonard Graves Phillips and Stan Sobol) ............... 5

    C.   Dream Syndicate (Steve Wynn, Dennis Mehaffey, and Joel David
        Pellish) ................................................................................ 8

    D.   Susan Straw Harris ............................................................. 10

III.  Argument ................................................................................. 12

    A.   Applicable Legal Standard ................................................... 12

    B.   The Court Should Grant Partial Summary Judgment in Favor of
        Plaintiffs and the Classes on Defendants' Purported "Works Made
        for Hire" Defense. ................................................................ 13

        1.   Defendants' Boilerplate "Work Made for Hire" Language in
            the Recording Agreements Is Legally Insufficient to Prove
            Their Defense. ............................................................... 16

        2.   Defendants Cannot Establish Plaintiffs' Sound Recordings
            Are "Works Made for Hire" under Section 101(1) Because
            Plaintiffs Were Never Employees of Defendants ................ 22

        3.   Defendants Cannot Establish Plaintiffs' and the Classes'
            Sound Recordings Are "Works Made for Hire" under Section
            101(2) Because Plaintiffs' Sound Recordings Are Not
            "Collective Works" or "Compilations." ............................ 35

IV.   Conclusion ............................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Associated Musicians of Greater Newark, Local 16,*
206 NLRB 581 (1973), *aff'd*, 512 F.2d 991 (D.C. Cir. 1975) ..................................... 32

*Aymes v. Bonelli,*
980 F.2d 857 (2d Cir. 1992) ................................................................. *passim*

*Baldwin v. EMI Feist Catalog, Inc.,*
805 F.3d 18 (2d Cir. 2015) .......................................................................... 18

*Ballas v. Tedesco,*
41 F. Supp. 2d 531 (D.N.J. 1999) ................................................... 3, 16, 36

*Brown v. Henderson,*
257 F.3d 246 (2d Cir. 2001) ....................................................................... 13

*Bryant v. Media Right Productions, Inc.,*
603 F.3d 135 (2d Cir. 2010) ....................................................................... 35

*Carter v. Helmsley-Spear, Inc.,*
71 F.3d 77 (2d Cir. 1995) ...................................................... 24, 25, 26, 27

*Celotex Corp. v. Catrett,*
477 U.S. 317, 106 S. Ct. 2548 (1986) ........................................................ 13

*Christians of California, Inc. v. Clive Christian New York, LLP,*
No. 13-CV-275 KBF, 2014 WL 4743422 (S.D.N.Y. Sept. 15, 2014) .................... 28, 29

*Cmty. for Creative Non-Violence v. Reid,*
490 U.S. 730, 109 S.Ct. 2166 (1989) ................................................... *passim*

*Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc.,*
375 F.2d 639 (2d Cir. 1967) ....................................................................... 18

*Eisenberg v. Advance Relocation & Storage, Inc.,*
237 F.3d 111 (2d Cir. 2000) ....................................................................... 23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,*
499 U.S. 340, 111 S.Ct. 1282 (1991) ........................................................ 13

*Foster v. Lee,*
93 F. Supp. 3d 223 (S.D.N.Y. 2015) ......................................................... 25

*Fred Fisher Music Co. v. M. Witmark & Sons,*
318 U.S. 643, 63 S. Ct. 773 (1943) ........................................................... 19

iii

*Golden Pac. Bancorp v. F.D.I.C.*,
  375 F.3d 196 (2d Cir. 2004) ........................................................................ 13

*Hilton Int'l Co. v. N.L.R.B.*,
  690 F.2d 318 (2d Cir. 1982) .................................................................... 27, 31

*Horror Inc. v. Miller*,
  15 F.4th 232 (2d Cir. 2021) ............................................................. 13, 27, 32

*Horror Inc. v. Miller*,
  335 F. Supp. 3d 273 (D. Conn. 2018), *aff'd*, 15 F.4th 232 (2d Cir. 2021).......... *passim*

*Johannsen v. Brown*,
  797 F. Supp. 835 (D. Or. 1992) ................................................................... 26

*Langman Fabrics v. Graff Californiawear, Inc.*,
  160 F.3d 106 (2d Cir. 1998) ................................................................ 23, 24, 25

*Lerohl v. Friends of Minn. Sinfonia*,
  322 F.3d 486 (8th Cir. 2003) .......................................................... 26, 27, 29, 32

*Lulirama Ltd. v. Axcess Broad. Servs., Inc.*,
  128 F.3d 872 (5th Cir. 1997) ...................................................................... 36

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of
  Contemp. Dance, Inc.*,
  380 F.3d 624 (2d Cir. 2004) ....................................................................... 28

*Marvel Characters, Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002) ................................................................... 18, 20

*Playboy Enters., Inc. v. Dumas*,
  53 F.3d 549 (2d Cir. 1995) ..................................................................... 36, 37

*Psihoyos v. Pearson Educ., Inc.*,
  855 F. Supp. 2d 103 (S.D.N.Y. 2012) ............................................................ 13

*Salamon v. Our Lady of Victory Hosp.*,
  No. 06-1707-CV, 2008 WL 2609712 (2d Cir. Jan. 16, 2008) .................................... 23

*SHL Imaging, Inc. v. Artisan House, Inc.*,
  117 F. Supp. 2d 301 (S.D.N.Y. 2000) ....................................................... 23, 24, 26

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) .................................................................... 37

*Smith v. Mikki More, LLC*,
  59 F. Supp. 3d 595 (S.D.N.Y. 2014) .............................................................. 29

*Staggers v. Real Authentic Sound*,
  77 F. Supp. 2d 57 (D.D.C. 1999) ................................................................. 36

154498.00601/126487223v.6

*Stewart v. Abend,*
   495 U.S. 207, 110 S.Ct. 1750 (1990) ............................................................. 19

*TD Bank N.A. v. Hill,*
   928 F.3d 259 (3d Cir. 2019) ............................................................. 15, 18, 20

*Ulloa v. Universal Music & Video Distrib. Corp.,*
   303 F. Supp. 2d 409 (S.D.N.Y. 2004) ............................................... 25, 26, 27

*Waite v. UMG Recordings, Inc.,*
   450 F. Supp. 3d 430 (S.D.N.Y. 2020) .................................................. *passim*

*Yurman Design Inc. v. PAJ, Inc.,*
   262 F.3d 101 (2d Cir. 2001) .............................................................. 13

**Statutes**

Copyright Act, 17 U.S.C. § 101 *et seq.* ................................................... *passim*

Copyright Act Section 101(2) .................................................................. *passim*

**Other Authorities**

F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of
   Motion Pictures Under U.S. Copyright Law,* 49 UCLA L. REV. 225
   (2001) ...................................................................................... 17

Federal Rule of Civil Procedure 56 .................................................... 12, 13

Menell and Nimmer, *Pooh-Poohing Copyright Law's 'Inalienable'
   Termination Rights,* 57 J. Copyright Soc'y U.S.A 799 (2010) ................... 17

*Nimmer on Copyright* ............................................................................. 20

Patrik Wikström & Robert Burnett, *Same Songs, Different Wrapping: The
   Rise of the Compilation Album,* 32 Popular Music & Soc'y 507 (2009) ............ 38

U.S. Copyright Office, *Circular 14: Copyright in Derivative Works and
   Compilations 1* (2020) .............................................................. 37, 38

William Henslee & Elizabeth Henslee, *You Don't Own Me: Why Work for
   Hire Should Not Be Applied to Sound Recordings,* 10 J. Marshall Rev.
   Intell. Prop. L. 695 (2011) ............................................................ 30, 33

154498.00601/126487223v.6

Plaintiffs Kasim Sulton, Susan Straw Harris p/k/a Syd Straw, Leonard Graves Phillips, Stan Sobol p/k/a Stan Lee, Steve Wynn, Dennis Mehaffey p/k/a Dennis Duck, and Joel David Pellish p/k/a Dave Provost ("Plaintiffs"), on behalf of themselves and on behalf of Plaintiff Classes A and B, respectfully submit this Memorandum of Law in support of their Motion for Partial Summary Judgment on the "work made for hire" defense asserted by Defendants UMG Recordings, Inc. ("UMG") and Capitol Records, LLC ("Capitol") ("Defendants").[1]

## I.      Preliminary Statement

Early in their careers, aspiring recording artists tend to have little bargaining power when negotiating arrangements with record labels that promote and commercialize the artists' sound recordings. Those recording artists often grant copyright ownership in their sound recordings "as part of the bargain they strike for promotion and commercialization." *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 432 (S.D.N.Y. 2020). Accordingly, when a sound recording turns out to be a "hit," the lion's share of the economic returns often goes to the record label that commercialized the sound recording, rather than to the recording artist who created it. *Id.* Section 203 of the Copyright Act of 1976 established an opportunity for recording artists to terminate the copyright ownership in sound recordings that they had granted to record labels decades earlier, in order to address this profound inequity. 17 U.S.C. § 203. "The idea was that termination of these rights would more fairly balance the allocation of the benefits derived from the artists' creativity." *Waite*, 450 F. Supp. 3d at 432.

---

[1]      Plaintiffs' Motion seeks summary judgment on the Defendants' work made for hire defense with respect to the Plaintiffs and any members of any certified Classes. Plaintiffs respectfully submit that the Court should first decide the Plaintiffs' Motion for Class Certification, and upon certification of the Classes, permit a period of time for notice and an opportunity to opt out, and then decide the instant summary judgment motion. Such a process will allow the Court to dispose of Defendants' work made for hire defense on a classwide basis prior to trial and avoid any one-way intervention issues.

In accordance with Section 203, Plaintiffs served Defendants with notices of termination to reclaim the rights to their sound recordings. Dkt. 95 (Plaintiffs' Second Amended Complaint) at ¶ 5. But Defendants have systematically refused to honor these notices of termination. *Id.* Plaintiffs initiated this suit to remedy that wrong.

Defendants contend that Plaintiffs' sound recordings are "works made for hire" in an attempt to avoid the protections afforded to artists by Section 203.[2] *First*, Defendants contend that those sound recordings are "works made for hire" because the recording agreements Plaintiffs signed with Defendants and their predecessor labels included boilerplate "work made for hire" language. It is well-settled, however, that such language alone is insufficient to carry ***Defendants' burden*** of proving that a work was made "for hire." *Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 319 (D. Conn. 2018), *aff'd*, 15 F.4th 232 (2d Cir. 2021). Further, the Copyright Act's termination provision – specifically Section 203(a)(5) – expressly prohibits *any* clause, contractual language, or agreement that would deprive an author of his or her termination rights. 17 U.S.C. § 203(a)(5). Indeed, those same recording agreements also contain alternative assignment language that undermines Defendants' position. Through language in those same agreements, Plaintiffs and Defendants agreed that in the event the works are determined to not be "for hire," Plaintiffs *assigned* Defendants the rights to their sound recordings – and thus remained capable of terminating those rights.

*Second*, Defendants contend that Plaintiffs' sound recordings were "works made for hire" because Plaintiffs were their "employees" when the sound recordings were created pursuant to Section 101(1) of the Copyright Act. *See* 17 U.S.C. 101(1) (defining a "work made for hire" as "[a] work prepared by an employee within the scope of his or

---

[2]     Defendants raised the "work made for hire" defense in their Answer to Plaintiffs' Second Amended Class Action Complaint. *See* Dkt. 101 (Defendants' Answer) at ¶ 182; *see also* Dkts. 95-4, 95-6, 95-9 (Defendants' Counter Notice Letters).

2

her employment."). However,  as the indisputable facts show, Defendants have not, and cannot, produce *any* evidence demonstrating that Plaintiffs were their employees under Section 101(1) and the common law agency test articulated in *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166 (1989) ("*Reid*").

*Third*, Defendants contend that Plaintiffs' sound recordings might be "works made for hire" by attempting to shoehorn them into the categories of "collective works" or "compilations." 17 U.S.C. § 101(2).  This maneuver also fails.  Section 101(2) of the Copyright Act enumerates nine specific artistic creations that may be deemed "works made for hire." *Id*.  Sound recordings are noticeably absent from that list. *See Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 (D.N.J. 1999) ("[S]ound recordings are not a work for hire under the second part of the statute because they do not fit within any of the nine enumerated categories[.]").  In light of these well-settled principles, Defendants cannot credibly suggest that Plaintiffs' sound recordings were "collective works" or "compilations" at the time they were created.

Because all three of Defendants' possible "work made for hire" theories fail as a matter of law or undisputed fact, summary judgment should be granted in favor of Plaintiffs and the Classes on this supposed defense.

## II.    Statement of Undisputed Facts

### A.    Kasim Sulton

Kasim Sulton is an American bass guitarist, keyboardist, and singer from Staten Island, New York.  Plaintiffs' Rule 56.1 Statement of Undisputed Facts ("PSOF") at ¶ 1. His illustrative music career began in 1976 as a bass guitarist with Todd Rundgren's band Utopia, and continues to this day. *Id*. at ¶¶ 2-3.  Although best known for his musical work with Utopia, Sulton also created notable solo projects and toured as a bassist with many artists such as Michael Lee Aday (p/k/a Meat Loaf). *Id*. at ¶¶ 3-4.  In the late 1970's,

3

Sulton decided to create a solo album apart from his work with Utopia. *Id*. at ¶ 5. To do so, he shopped around a demo to various labels. *Id*. at ¶ 6. He eventually signed a recording agreement with EMI America Records, Inc. ("EMI") (a predecessor of Defendant Capitol Records, LLC) on September 29, 1980, to release his first solo album (the "Sulton Recording Agreement"). *Id*. at ¶ 7.

The Sulton Recording Agreement was drafted, designated, and intended by EMI to secure the exclusive recording services of Sulton. *Id*. at ¶ 9. It provided that, for a term of eighteen months, Sulton could record two albums, the first of which would eventually be his solo album *Kasim*. *Id*. at ¶ 10. The Sulton Recording Agreement contained standard "work made for hire" language in which the recording artist must "acknowledge[] and agree[]" that each sound recording was a "work made for hire" by virtue of being "prepared within the scope of [EMI's] engagement of his personal services" or being "specially ordered by [EMI] as a contribution to a collective work." *Id*. at ¶ 11. Alternatively, the Sulton Recording Agreement contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, Sulton nonetheless "grant[ed] and assign[ed] to EMI all exclusive rights of the copyright in and to" the sound recordings. *Id*. at ¶ 12.

After signing the recording agreement, Sulton began work on his solo album. *Id*. at ¶ 13. At all times during the recording process, he maintained complete creative control. *Id*. at ¶ 14. He exclusively decided what creative direction to take, which studio musicians would perform, which producer to use, which songs would be selected, what singles would be published, and how the songs would be sequenced. *Id*. at ¶¶ 14-19. EMI did not provide any input or guidance. *Id*. at ¶ 20. EMI never told Sulton that he had to show up at a studio at a certain time, nor did EMI dictate how Sulton should create the sound recordings in any way. *Id*. at ¶ 21. During this time (or at any time), Sulton was

154498.00601/126487223v.6

never an employee of EMI (or Defendants). *Id.* at ¶ 48. EMI never paid Sulton a salary or sent him a paycheck. *Id.* at ¶¶ 49-50. EMI never withheld any income tax on Sulton's behalf. *Id.* at ¶ 50. EMI never provided Sulton with insurance or any other benefits. *Id.* at ¶¶ 52-53. EMI never provided Sulton with an office. *Id.* at ¶ 54.

On January 11, 1982, Sulton released *Kasim*, comprised of ten sound recordings. *Id.* at ¶¶ 22-23. Thereafter, EMI filed a copyright application with the U.S. Copyright Office to register *Kasim*. *Id.* at ¶ 24. The application categorized *Kasim* as a "sound recording" (and not a "compilation" or a "collective work"). *Id.* at ¶ 25. The U.S. Copyright Office issued EMI a Certificate of Registration for *Kasim* with an effective date of January 20, 1982. *Id.* at ¶ 26.

More than three decades later, on July 20, 2016, Sulton sent a notice of termination to Defendants, informing them that he sought to terminate the grant of rights to the sound recordings in *Kasim*. *Id.* at ¶ 28. Sulton's counsel subsequently caused the notice of termination to be recorded in the U.S. Copyright Office. *Id.* at ¶ 29. The effective date of termination for those sound recordings was July 21, 2018. *Id.* at ¶ 31. Defendants, however, refused to return the rights to the sound recordings in *Kasim*. *Id.* at ¶¶ 32-33. Defendants continue to retain the rights to the sound recordings in *Kasim*, and to date, have prevented Sulton from exploiting the sound recordings, well after the effective date of termination. *Id.* at ¶¶ 32-34.

## B. The Dickies (Leonard Graves Phillips and Stan Sobol)

The Dickies are a punk rock band from Los Angeles, California. *Id.* at ¶ 79. Originally formed in 1977, The Dickies are one of the longest tenured punk rock bands, and have been in continuous existence for over 45 years. *Id.* at ¶ 80. Known as the "clown princes of punk," The Dickies' music has a humorous style and is often referred to as "pop-punk" or "bubble-gum punk." *Id.*

5

The Dickies were discovered in or about late 1977 or early 1978 by music manager John Hewlett in Los Angeles, who decided to shop their demo to various record labels. *Id.* at ¶ 84. After receiving multiple offers from interested labels, The Dickies chose to sign with A&M Records Limited ("A&M Limited") (a predecessor to Defendant UMG Recordings, Inc.) because it offered the highest advance and the most creative control to The Dickies. *Id.* at ¶ 85. On April 3, 1978, the members of The Dickies – Leonard Graves Phillips, William Remar, Robert Davis, and Carlos Caballero – signed a recording agreement with A&M Limited to release an album (the "Dickies Recording Agreement"). *Id.* at ¶ 87.

The Dickies Recording Agreement was drafted, designated, and intended by A&M Limited to secure the exclusive recording services of The Dickies. *Id.* at ¶ 88. It provided that, for a one-year term, The Dickies could record one album, as well as a second album at A&M Limited's election. *Id.* at ¶ 89. The Dickies Recording Agreement contained standard "work made for hire" language. *Id.* at ¶ 90. Alternatively, The Dickies Recording Agreement contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, The Dickies nevertheless were required to "execute and deliver to [A&M Limited] any assignments of copyright (including renewals and extensions thereof) in and to such master recordings as [A&M Limited] may deem necessary." *Id.* at ¶ 91.

The Dickies recorded sound recordings pursuant to The Dickies Recording Agreement in or around 1978 and 1979. *Id.* at ¶ 92. The Dickies exercised complete artistic control over the sound recordings. *See id.* at ¶ 93 (Phillips testified that his "understanding was…that we were going to receive a budget to make an album…and that we were given complete artistic control to make it any way we wanted to make it in terms of the sounds, in terms of the sound, in terms of the imagery for the – the graphic art; that

6

sort of thing."). They unilaterally selected the producers and studio musicians. *Id.* at ¶ 94. They unilaterally hired and fired certain producers and sound engineers. *Id.* at ¶¶ 95-96. They booked the studios and rented the equipment. *Id.* at ¶¶ 148-49. They chose which sound recordings would be selected as songs on *Dawn of the Dickies*, as well as which sound recordings would be released as singles. *Id.* at ¶¶ 97-98. A&M Limited never provided The Dickies with any input or guidance regarding the sound or direction of the sound recordings. *Id.* at ¶¶ 99-100. Indeed, no one from A&M Limited ever attended any of their recording sessions. *Id.* at ¶ 120.

Phillips, Sobol, and the other members of The Dickies were never employees of A&M Limited at the time of the execution of The Dickies Recording Agreement, or at any time thereafter. *Id.* at ¶¶ 125, 133. A&M Limited never paid them a salary, withheld any income tax on their behalf, provided them with insurance or any other benefits, or provided them with an office. *Id.* at ¶¶ 125-40.

On November 9, 1979, The Dickies released *Dawn of The Dickies*, comprised of ten sound recordings. *Id.* at ¶¶ 101-02. On or about February 25, 1980, A&M Limited filed a copyright application with the U.S. Copyright Office to register *Dawn of The Dickies*. *Id.* at ¶ 103. The application categorized *Dawn of The Dickies* as a "sound recording" (and not a "compilation" or a "collective work"). *Id.* at ¶ 104. The U.S. Copyright Office issued A&M Limited a Certificate of Registration for *Dawn of The Dickies* with an effective date of February 25, 1980. *Id.* at ¶ 105.

Decades later, on September 12, 2017, The Dickies sent a notice of termination to Defendants, informing Defendants that The Dickies sought to terminate the grant of rights to the sound recordings in *Dawn of The Dickies*. *Id.* at ¶¶ 107-08. Counsel for The Dickies caused the notice of termination to be recorded in the U.S. Copyright Office, as document V9964 D904 P1-3. *Id.* at ¶ 109. The effective date of termination for those

7

sound recordings was September 13, 2019.  *Id.* at ¶ 110.  Defendants, however, refused to return the rights to the sound recordings at that time.  *Id.* at ¶¶ 111-12.  Defendants instead chose to continue to exploit the sound recordings in *Dawn of The Dickies*, and have prevented The Dickies from exploiting the sound recordings, well after the effective date of termination.  *Id.* at ¶¶ 112-13.

### C. Dream Syndicate (Steve Wynn, Dennis Mehaffey, and Joel David Pellish)

Dream Syndicate is alternative rock band from Los Angeles, California that was originally formed in 1981.  *Id.* at ¶¶ 167-68.  Dream Syndicate quickly became an influential part of the Paisley Underground music movement of the 1980's music scene in Los Angeles, which was known for mixing 1960's style psychedelic garage rock and contemporary pop music.  *Id.* at ¶ 168.  Dream Syndicate actively recorded and toured from 1981 to 1989.  *Id.* at ¶ 169.  After receiving critical acclaim for its debut album, *Days of Wine and Roses*, the band sought more creative freedom with another label.  *Id.* at ¶¶ 171-72.  Dream Syndicate eventually decided to sign with A&M Records, Inc. ("A&M Records") (a predecessor to Defendant UMG Recordings, Inc.) because it offered the band the most creative control and was considered to be an artist-driven label.  *See id.* at ¶¶ 172-73 (Pellish testified that Dream Syndicate "went with A&M because of the…artistic liberty").

On September 1, 1983, Dream Syndicate's band members – Dennis Mehaffey, Joel David Pellish, Steve Wynn, and Karl Precoda – signed a recording agreement with A&M Records to release their sophomore album called *Medicine Show* (the "Dream Syndicate Recording Agreement").  *Id.* at ¶ 175.  The Dream Syndicate Recording Agreement was drafted, designated, and intended by A&M Records to secure the exclusive recording services of Dream Syndicate.  *Id.* at ¶ 176.  It provided that, for a term of eighteen months, Dream Syndicate could record its sophomore album with the label.  *Id.* at ¶ 177.  The

8

Dream Syndicate Recording Agreement contained standard "work made for hire" language. *Id.* at ¶ 178.  Alternatively, the Dream Syndicate Recording Agreement contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, Dream Syndicate nevertheless was required to "execute and deliver to [A&M Records] any assignments of copyright (including renewals and extensions thereof) in and to such master recordings as [A&M Records] may deem necessary." *Id.* at ¶ 179.

Dream Syndicate recorded sound recordings pursuant to the Dream Syndicate Recording Agreement from September of 1983 until March of 1984, creating the sound recordings for *Medicine Show*. *Id.* at ¶ 180.  The Dream Syndicate had, and exercised, complete artistic control over the sound recordings. *Id.* at ¶ 181.  They unilaterally selected the producer, sound engineers, and studio musicians without input from A&M Records. *See id.* at ¶¶ 181-88 (Wynn testified that "everything involving writing the songs, choosing the songs, arranging the songs, recording them in the studio, the process – who we hired in the studio, which takes we used, how we mixed the records, choosing mixed, mastering the record were entirely the band. We – the four of us made those decisions ourselves.").  A&M Records never provided Dream Syndicate with any input or guidance regarding the sound or direction of the sound recordings that Dream Syndicate recorded. *See id.* at ¶¶ 187-88 (Wynn stated "We were very autonomous. We…developed our own material, our own songs, our own direction in the studio, so there was really no involvement from A&M with us in any of those things").  Dream Syndicate also selected the sound recordings that were included on *Medicine Show*, as well as the sound recordings that were released as singles. *Id.* at ¶¶ 185-86.

At the time of execution of the Dream Syndicate Recording Agreement, neither Wynn, Precoda, Pellish, nor Mehaffey were employees of A&M Records. *Id.* at ¶¶ 214,

222, 230.  At no time during the term of the Dream Syndicate Recording Agreement, or any time thereafter, were Wynn, Precoda, Pellish, or Mehaffey ever employees of A&M Records.  *Id*.  A&M Records never paid them a salary, withheld any income tax on their behalf, or provided them with insurance or any other benefits.  *Id*. at ¶¶ 214-37.

On May 7, 1984, Dream Syndicate released *Medicine Show*, comprised of eight sound recordings.  *Id*. at ¶¶ 189-90.  A&M Records subsequently filed a copyright application with the U.S. Copyright Office to register the sound recordings in *Medicine Show*, identifying the works as "sound recording[s]" (and not a "compilation" or a "collective work").  *Id*. at ¶¶ 191-92.  More than three decades later, on March 1, 2016, Dream Syndicate sent a notice of termination to Defendants, informing them that Dream Syndicate sought to terminate the grant of rights to the sound recordings in *Medicine Show*.  *Id*. at ¶ 196.  Thereafter, Dream Syndicate's counsel caused the notice of termination to be recorded with the U.S. Copyright Office, as document V9922 D131 P1-6.  *Id*. at ¶ 197.  The effective date of termination for those sound recordings was May 8, 2019.  *Id*. at ¶ 198.  However, Defendants refused to return the rights to the sound recordings to Dream Syndicate at that time.  *Id*. at ¶¶ 199-201.  Instead, Defendants continue to exploit the sound recordings in *Medicine Show*.  *Id*.

### D.     Susan Straw Harris

Susan Straw Harris, professionally known as Syd Straw ("Straw"), is an American rock singer, songwriter, and performer.  *Id*. at ¶ 271.  She began her career singing backup for Pat Benatar, and eventually took her distinct voice to the alternative music scene, joining the Golden Palominos as a singer from 1985 to 1987.  *Id*. at ¶ 272.  Thereafter, Straw sought to create a solo album, and was approached by Virgin Records America, Inc. (a predecessor of Capitol Records, LLC) ("Virgin Records").  *See id*. at ¶ 274 (Straw testified that Virgin Records "came to me and they were a very happening boutique label

at the time and they thought that I was just the kind of renegade that they'd like to promote."). On July 20, 1987, Straw signed a recording agreement with Virgin Records to release her first solo album (the "Straw Recording Agreement"). *Id.* at ¶ 276.

The Straw Recording Agreement was drafted, designated, and intended by Virgin Records to secure the exclusive recording services of Straw. *Id.* at ¶ 277. It provided that Straw could record one album, which would eventually be her first solo album *Surprise*. *Id.* at ¶ 279. The Straw Recording Agreement contained standard "work made for hire" language, which provided that "for purpose of copyright law" Straw was to be considered an "employee[] for hire." *Id.* at ¶ 280. Alternatively, the Straw Recording Agreement contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, Straw nonetheless granted and assigned to Virgin Records all exclusive rights of the copyright in and to the sound recordings, which was to "constitute an irrevocable transfer to [Virgin Records] of ownership of copyright (and all renewals and extensions) in those Master Recordings." *Id.* at ¶ 281.

Straw recorded sound recordings pursuant to the Straw Recording Agreement in or around 1988. *Id.* at ¶ 282. Straw exercised complete artistic control over the sound recordings. *Id.* at ¶ 283. She unilaterally selected the studio musicians that performed on the sound recordings and the producers that produced those recordings. *Id.* at ¶¶ 284-85. Virgin Records never provided Straw with any input or guidance regarding the sound or direction of the sound recordings that Straw recorded. *Id.* at ¶ 289. Straw also selected the sound recordings that were included on *Surprise*, as well as the sound recordings that were released as singles. *See id.* at ¶¶ 283, 287-288 ("Virgin Records let me do whatever I told them I was doing, which was very bold and brave of them to give me full range").

11

Virgin Records never told Straw that she had to show up at a studio at certain times to record the sound recordings. *Id.* at ¶ 290.

At the time of execution of the Straw Recording Agreement, Straw was not an employee of Virgin Records, and at no time during the term of the Straw Recording Agreement, or at any time thereafter, was Straw ever an employee of Virgin Records. *Id.* at ¶ 310. Virgin Records never paid Straw a salary, withheld any income tax on her behalf, provided her with insurance or any other benefits, or provided her with an office. *Id.* at ¶¶ 311-17.

On June 21, 1989, Straw released *Surprise*, comprised of eleven sound recordings. *Id.* at ¶¶ 291-92. The next day, Virgin Records filed a copyright application for *Surprise* with the U.S. Copyright Office, identifying the works as "sound recording[s]" (and not a "compilation" or a "collective work"). *Id.* at ¶¶ 293-94. Decades later, on June 21, 2016, Straw sent a notice of termination to Defendants, informing them that she sought to terminate the grant of rights to the sound recordings in *Surprise*. *Id.* at ¶ 297. Straw's counsel subsequently caused the notice of termination to be recorded in the U.S. Copyright Office, as document V9964 D257 P1 through P3. *Id.* at ¶ 298. The effective date of termination for those sound recordings has not yet passed and will occur on approximately June 22, 2024. *Id.* at ¶ 300.

## III. Argument

### A. Applicable Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment or partial summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

12

matter of law." *Id.* Rule 56(a) "mandates the entry of summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  Mere conclusory allegations or unsupported speculations are insufficient. *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004).  Rather, the non-moving party "must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Indeed, "[i]t is black letter law that a non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture.'" *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 117 (S.D.N.Y. 2012) (quoting *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)).

  **B.**  **The Court Should Grant Partial Summary Judgment in Favor of Plaintiffs and the Classes on Defendants' Purported "Works Made for Hire" Defense.**

  To prevail on a claim for copyright infringement, Plaintiffs must prove (1) ownership of a valid copyright and (2) infringement of the copyright by copying elements of the work which are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296 (1991); *Yurman Design Inc. v. PAJ, Inc.*, 262 F.3d 101, 108-09 (2d Cir. 2001).  Defendants' primary defense is that Plaintiffs do not own the United States copyright in and to their sound recordings, as of the effective date of termination, because the sound recordings are "works made for hire."  Notably, Defendants bear the burden to prove this defense. *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) ("Because a 'work made for hire' is a statutory exception to the general rule of author-ownership of copyright, the party claiming the exception bears the burden

13

of proving that the exception applies.") (citing *Woods v. Bourne Co.,* 60 F.3d 978, 993-94 (2d Cir. 1995)).

"[C]opyright ownership 'vests initially in the author or authors of the work.'" *Aymes v. Bonelli*, 980 F.2d 857, 860 (2d Cir. 1992) (quoting 17 U.S.C. § 201(a)).  "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Reid*, 490 U.S. at 737, 109 S.Ct. at 2171 (citing 17 U.S.C. § 102).  Section 101 of the Copyright Act, however, carves out an exception for "works made for hire."  17 U.S.C. § 101.  If the work is made for hire, "the employer or other person for whom the work was prepared is considered the author" and owns the copyright.  *Id*. at § 201(b).

> Section 101 of the Copyright Act defines a "work made for hire" as follows:
>
> (1) A work prepared by an employee within the scope of his or her employment; or
>
> (2) A work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

*Id*. at § 101.  Section 101(1) concerns the traditional employer-employee relationship. Section 101(2) enumerates nine separate artistic creations that may be deemed a "work made for hire," but only if the parties agree to that effect, in writing.

Throughout this litigation, Defendants have tried to suggest that Plaintiffs' sound recordings are "works made for hire" to hold onto the valuable copyrights that Plaintiffs seek to regain by unilaterally denying Plaintiffs' inalienable right to terminate their previous grants of rights in and to their artistic creations.  Defendants initially contended that Plaintiffs' sound recordings were "works made for hire" because the recording agreements Plaintiffs signed with Defendants and their predecessor labels included the

14

baseless "work made for hire" language.  But it is well-settled that such language alone is insufficient to carry Defendants' burden of proving that a work was made "for hire."  *See TD Bank N.A. v. Hill*, 928 F.3d 259, 272 (3d Cir. 2019).

The Copyright Act's termination provisions – specifically § 203(a)(5) – expressly prohibit *any* clause, contractual language, or agreement that would deprive an author of his or her termination rights.  *See* 17 U.S.C. § 203(a)(5) ("Termination of the grant may be effected ***notwithstanding any agreement to the contrary***, including an agreement to make a will or to make any future grant.") (emphasis added).  "[I]t is the relationship that actually exists between the parties, not their description of that relationship, that is determinative."  3 Nimmer § 11.02[A][2] (2022) (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290-91 (2d Cir. 2002)).  Causing further problems for Defendants, those same recording agreements upon which they so heavily rely contain equivocal assignment language undermining their "work made for hire" position.  Through language in those same agreements, Plaintiffs and Defendants agreed that in the event the works are determined to not be "for hire," Plaintiffs *assigned* Defendants the rights to their sound recordings – and thus remained capable of terminating those rights.

Recognizing that their legal arguments concerning the "work made for hire" language contained in the recording agreements will most certainly fail, Defendants try another equally unavailing tactic.  Defendants contend that the evidence proves that Plaintiffs' sound recordings were "works made for hire" under Section 101(1) because Plaintiffs were "employee[s]" of Defendants when the sound recordings were created.  But Defendants have not identified or produced *any* actual evidence during this litigation proving or even suggesting that Plaintiffs were their employees.  Indeed, the record

evidence shows exactly the opposite.  The uncontroverted evidence shows that Plaintiffs were not employees of Defendants.

With no evidence to support their Section 101(1) contentions, Defendants also assert that Plaintiffs' sound recordings might be "works made for hire" under Section 101(2) as "collective works" or "compilations."  That assertion is equally meritless.  The first requirement of Section 101(2) is that the works must be "specially ordered or commissioned," which they were not.  If they are, Section 101(2) enumerates nine specific artistic creations that may be deemed "works made for hire."  Sound recordings, which are at issue in this case, are noticeably absent from that list.  Indeed, "sound recordings are not a work for hire under the second part of the statute because they do not fit within any of the nine enumerated categories[.]"  *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 (D.N.J. 1999).  Defendants cannot overcome these well-settled principles by engaging in revisionist history to try to convert these sound recordings into "collective works" or "compilations" when they are clearly not.  As discussed in detail *infra*, all of Defendants' "work made for hire" theories fail, and summary judgment must be granted in favor of Plaintiffs on this defense.

> **1.    Defendants' Boilerplate "Work Made for Hire" Language in the Recording Agreements Is Legally Insufficient to Prove Their Defense.**

Defendants cannot rely solely on artifice "work made for hire" language in the recording agreements to prove their defense.

> *a)    Defendants' Reliance on "Work Made for Hire" Language in the Recording Agreements Is Not Supported By Law and Violates § 203(a)(5) of the Copyright Act.*

The Copyright Act's termination provisions – specifically § 203(a)(5) – expressly prohibit *any* clause, contractual language, or agreement that would deprive an author of his or her termination rights.  17 U.S.C. § 203(a)(5).  It states: "Termination of the grant

may be effected *notwithstanding any agreement to the contrary*, including an agreement to make a will or to make any future grant." *Id.* (emphasis added). "Without going out on a limb, the plain meaning of the provision is that one who holds a termination right may exercise that right notwithstanding any agreement that would stand in the way." 3 Nimmer § 11.07[E][4][a] (2022). Nimmer has identified four categories of agreements that violate Section 203(a)(5):[3] (1) an express agreement not to terminate a grant; (2) a penalty clause that acts in contravention of termination; (3) *an agreement mischaracterizing the copyrighted work so as to avoid a termination right*; and (4) a rescission and re-grant of a testamentary transfer. 3 Nimmer § 11.07 (2022); *see also* Menell and Nimmer, *Pooh-Poohing Copyright Law's 'Inalienable' Termination Rights*, 57 J. COPYRIGHT SOC'Y U.S.A. 799, 824-25 (2010). Defendants' practice of utilizing the self-serving boilerplate "work made for hire" language in the recording agreements exemplify the third category, as they attempt to evade Plaintiffs' termination rights merely by mischaracterizing the sound recordings in question as "works made for hire."

Quite notably, leading copyright scholars and courts alike have found that such contractual efforts to mischaracterize a relationship as one purporting to be a "work made for hire" "will not in itself" magically convert that relationship (and any resulting work) into one "made for hire." 1 Nimmer on Copyright § 5.03[B][1][b][ii] (2022); *see also* F. Jay Dougherty, *Not A Spike Lee Joint? Issues in the Authorship of Motion Pictures Under U.S. Copyright Law*, 49 UCLA L. REV. 225, 317-18 (2001) ("Parties cannot simply agree that works not within the scope of employment are works made for hire with the employer deemed the author.").[4] Courts are well aware that hiring parties attempt to circumvent

---

[3]    This also applies to pre-1978 works subject to Section 304(c)(5), the 1909 Act's predecessor to Section 203. *See* 3 Nimmer § 11.07 (2022).

[4]    Goldstein on Copyright § 4.3 (3d ed. 2018) (noting that, unless the work satisfies the "objective" criteria of the work-for-hire doctrine, "A's express agreement that the work

copyright law by including bare statements in a contract that a particular work is "for hire;" and they have held that such a "bare statement says nothing about the scope of an individual's employment and cannot suffice on its own to vest ownership in an employer." *TD Bank N.A. v. Hill,* 928 F.3d 259, 272-73 (3d Cir. 2019).   For example, in *Marvel Characters, Inc. v. Simon*, the Second Circuit held that "[t]he parties…may not agree that a work shall be deemed one made 'for hire' in order to avoid the termination provisions if a 'for hire' relationship…does not in fact exist between them."[5]  310 F.3d 280, 290-91 (2d Cir. 2002) (citation omitted).  In so holding, the Second Circuit invalidated an agreement containing similar "works made for hire" language as an "agreement to the contrary," precisely because giving it effect would defeat the author's termination right.  *Id.* at 292.

 Other courts are in agreement.  *See Baldwin v. EMI Feist Catalog, Inc.,* 805 F.3d 18, 32 (2d Cir. 2015) (citing Section 203(a)(5) and noting that termination rights "cannot be contracted away"); *see also Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc.,* 375 F.2d 639, 640-43 (2d Cir. 1967) (holding that a composer's work was not created as a work for hire for defendant even though his contract with defendant provided him with a drawing account during his "employment"); *Horror Inc. v. Miller,* 335 F. Supp. 3d 273, 319 (D. Conn. 2018), *aff'd*, 15 F.4th 232 (2d Cir. 2021) (citing *Marvel*, 310 F.3d at 290-91 and noting that "writers cannot waive their termination right by contract"); *TD Bank N.A. v. Hill,* 928 F.3d 259, 272-73 (3d Cir. 2019) (same).

---

prepared by A will constitute a work made for hire by B will not suffice to make the work one for hire, nor to make B the author").

[5]    The Second Circuit also cautioned that "[i]f an agreement between an author and publisher that a work was created for hire were outside the purview of § 304(c)(5), the termination provision would be rendered a nullity; litigation-savvy publishers would be able to utilize their superior bargaining position to compel authors to agree that a work was created for hire in order to get their works published."  *Marvel,* 310 F.3d at 290-291.

154498.00601/126487223v.6

This approach makes logical sense.  Congress enacted Section 203(a)(5) in the Copyright Act of 1976 to fix the termination provisions of the 1909 Act, which had been watered down by Supreme Court decisions (*e.g.*, *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 63 S. Ct. 773 (1943)) and had eroded the termination rights of artists. *See* 3 Nimmer § 11.07[A] (2022) ("After judicial interpretation of the 1909 Act frustrated this intent by upholding advance assignments of renewal terms, Congress spoke unambiguously in 1976.").    Congress did so "to safeguard 'authors against unremunerative transfers.'" *Waite*, 450 F. Supp. 3d at 438 (quoting H.R. Rep. No. 94-1476, 124 (Sept. 3, 1976)).  "These authors needed statutory protection 'because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited.'" [6]  *Id*.  The 1976 Act, therefore, created "an inalienable termination right," *Stewart v. Abend,* 495 U.S. 207, 220, 110 S.Ct. 1750, 1765 (1990), to prevent artists from waiving their termination rights by contract.[7]

---

[6]    It is intended to be "broadly applied to invalidate unlawful contracts and liberally protect termination rights."  3 Nimmer § 11.07[E](2022) (citing *Steinbeck v. McIntosh & Otis, Inc.,* 433 F. Supp. 2d 395, 398 (S.D.N.Y. 2006), *as amended* (July 18, 2006), *rev'd and remanded sub nom. Penguin Grp. (USA) Inc. v. Steinbeck,* 537 F.3d 193 (2d Cir. 2008)).

[7]    In *Petrella v. Metro-Goldwyn-Mayer, Inc.,* the Supreme Court rejected the defendant's argument that (in the laches context), it was prejudicial and unfair for courts to examine old copyright matters, sometimes from decades ago:

> [Defendant] points to the danger that evidence needed or useful to defend against liability will be lost during a copyright owner's inaction.  Recall, however, that Congress provided for reversionary renewal rights exercisable by an author's heirs, rights that can be exercised, at the earliest for pre–1978 copyrights, 28 years after a work was written and copyrighted. At that time, the author, and perhaps other witnesses to the creation of the work, will be dead. Congress must have been aware that the passage of time and the author's death could cause a loss or dilution of evidence. Congress chose, nonetheless, to give the author's family "a second chance to obtain fair remuneration."

572 U.S. 663, 683, 134 S.Ct. 1962, 1976 (2014) (citing *Stewart,* 495 U.S. at 220, 110 S.Ct. at 1759-60) (internal citations omitted).

154498.00601/126487223v.6

*See Marvel,* 310 F.3d at 290 (discussing the purposes of the termination right in the context of § 304(c)). And where, as here, "Congress has shown that it knows how to [adopt a measure] in express terms," *TD Bank N.A.*, 928 F.3d at 272-73 (citing *Kimbrough v. United States,* 552 U.S. 85, 103, 128 S.Ct. 558, 571 (2007); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452, 122 S.Ct. 941, 951 (2002)), it would be "particularly inappropriate" to ignore those express terms and permit Defendants to rely on artifice contractual language in contravention of clear statutory text and intent.

Indeed, this Court has already cautioned that Defendants' position cannot prevail because accepting it would eviscerate the purpose of § 203:

> Defendant's argument is weakened further by the music industry's practice of frequently inserting "work made for hire" language into recording contracts. Its position requires that many artists, often early in their careers, would confront a choice when presented with a "works made for hire" provision. 1 *Nimmer on Copyright* § 5.03 (2019) (noting that since sound recordings earned copyright protection in 1972, "virtually all contracts" between artists and recording companies include "work made for hire" provisions). They could refuse to sign the contract and jeopardize their chance for the record company to record or distribute the artist's music. Or the artist could sign the contract and then bring a claim within three years to dispute the effect of the "work made for hire" provision in order to protect the copyright. ***Either outcome would be inconsistent with Section 203. The first would exemplify the unequal bargaining power Section 203 sought to correct. The second would render Section 203 meaningless, as its very purpose is to provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable. Defendant's argument simply does withstand scrutiny in light of the unequivocal purpose of the termination provision.***

*Waite*, 450 F. Supp. 3d at 438 (emphasis added). Thus, Defendants cannot rely solely on artifice "work made for hire" language contained in the recording agreements as a matter of law.

20

> **b)** *The Language in the Recording Agreements Is Contradictory and Cannot Support Defendants' "Work Made for Hire" Defense*

Defendants heavily rely on the "work made for hire" language contained in the recording agreements; yet those same agreements contain contradictory language undermining their defense.

Since 1972, "virtually all contracts that artists signed with record companies" included not only boilerplate "work made for hire" language, but also contained "a backup assignment." 1 Nimmer on Copyright § 5.03[B][2][a][ii][II] (2021). Considered a "belt-and-suspenders" approach, record labels used these non-negotiable provisions together in an attempt to claim the rights to the artists' sound recordings. *See id.* ("These contracts also typically state that if a court of law finds particular works not to be 'for hire' as stipulated by the copyright law, then the works are considered to be assigned to the record company. This type of clause has almost invariably been non-negotiable."). "But one salient difference separates owning something via assignment from owning it as a work for hire: the latter continues for the life of the copyright, whereas the former is subject to statutory termination of transfers." *Id.* Accordingly, in the event that the works are found **_not_** to be "made for hire" – which is true here for Plaintiffs and the Classes – then the recording artists assigned record labels like Defendants the rights to their sound recordings and remained capable of terminating those rights.

The recording agreements at issue in this litigation are no different. Defendants and their predecessor labels included not only fictitious "work made for hire" language in the recording agreements, but also included an assignment. PSOF at ¶¶ 11-12, 90-91, 178-79, 280-81. Those provisions say basically, and in effect: "If, for some reason, these works are deemed to not be works for hire, the recording artist nevertheless assigns the

21

works to the label." *Id.* This assignment language not only contradicts Defendants' "work made for hire" language, but also fails as a basis for Defendants to prove their defense.[8]

Defendants' reliance on sham contractual language in the recording agreements is insufficient to prove their "works made for hire" defense. Accordingly, Defendants must instead prove that the sound recordings fall under one of the two definitions of a "work made for hire" as stated in the Copyright Act.

> ### 2. Defendants Cannot Establish Plaintiffs' Sound Recordings Are "Works Made for Hire" under Section 101(1) Because Plaintiffs Were Never Employees of Defendants.

Defendants also contend that Plaintiffs' sound recordings were "works made for hire" under Section 101(1) because Plaintiffs were "employee[s]" of Defendants when the sound recordings were created. But Defendants cannot identify *any* evidence in the record proving or even suggesting that Plaintiffs were their employees.[9]

In *Reid,* the Supreme Court addressed the question of when an individual is an employee under the work made for hire doctrine. According to *Reid*, a district court "first should ascertain, using principles of the general common law of agency, whether the work was prepared by an employee or an independent contractor." 490 U.S. at 751, 109 S.Ct. at 2178. The *Reid* Court then identified a non-exhaustive list of factors that the district court may weigh in making that determination:

> [(1)] the hiring party's right to control the manner and means of creation; [(2)] the skill required; [(3)] the provision of employee benefits; [(4)] the tax treatment of the hired party; [(5)] whether the hiring party has the right to assign additional projects to the hired party; [(6)] the source of the instrumentalities and tools; [(7)] the location of the work; [(8)] the duration of the relationship between the parties; [(9)] the extent of the hired party's

---

[8]      Indeed, there are some instances where the recording agreement does not contain any "work made for hire" provision at all. *See* PSOF at ¶¶ 11-12 (citing Ex. 30).

[9]      Because Defendants cannot identify *any* evidence proving Plaintiffs were their employees, it is unnecessary to go into the *Reid* analysis. Nonetheless, Plaintiffs do so here to exemplify how – uniformly and universally – Defendants *did not* treat Plaintiffs as employees.

discretion over when and how long to work; [(10)] the method of payment; [(11)] the hired party's role in hiring and paying assistants; [(12)] whether the work is part of the regular business of the hiring party; [(13)] whether the hiring party is in business;

*Id*. at 751-52, 109 S.Ct. at 2178-79; *see also Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n.1 (2d Cir. 2000) ("Other relevant factors may also be considered…so long as they are drawn from the common law of agency that *Reid* seeks to synthesize.") (citation omitted). These factors "w[ere] not intended to be applied in a mechanistic fashion[.]" *Aymes*, 980 F.2d at 861-62. Therefore, the court need only weigh those factors "that are actually indicative of agency in the particular circumstances," *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 111 (2d Cir. 1998), and may "disregard[] those that are either irrelevant or of indeterminate weight." *Salamon v. Our Lady of Victory Hosp.*, No. 06-1707-CV, 2008 WL 2609712, at *7 (2d Cir. Jan. 16, 2008) (citing *Eisenberg*, 237 F.3d at 114). The Second Circuit identified five factors that are particularly important "in virtually every situation:" "(1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 312-13 (S.D.N.Y. 2000) (quoting *Aymes*, 980 F.2d at 861). These factors "will usually be highly probative of the true nature of the employment relationship." *Aymes*, 980 F.2d at 861. An analysis of the relevant factors here supports only one conclusion: that Plaintiffs and the Class Members were not employees of Defendants. Therefore, the sound recordings at issue were not "works made for hire," and summary judgment should be granted in favor of Plaintiffs on this defense.

23

### a) Factor One: Plaintiffs' Maintained Creative Control Over Their Sound Recordings.

The first factor – a general right of control – is often at the heart of the "works made for hire" inquiry. *Reid*, 490 U.S. at 751-52, 109 S.Ct. at 2178-79. It can be indicative of both an employer-employee and employer-independent contractor relationship. *SHL Imaging, Inc.*, 117 F. Supp. 2d at 312-13 (citation omitted). When analyzing this factor, courts do not merely consider whether the hiring party "simply...directed or supervised the work, because that standard is 'hard not to meet when one is a hiring party' of any stripe." *Horror Inc. v. Miller,* 335 F. Supp. 3d 273, 302 (D. Conn. 2018), *aff'd*, 15 F.4th 232 (2d Cir. 2021) (quoting *Reid*, 490 U.S. at 750, 109 S.Ct. at 2178); *see also SHL Imaging, Inc.*, 117 F. Supp. 2d at 314 ("If inevitable, routine participation sufficed to transform the hiring party into a work-for-hire author, [*Reid*] would be eviscerated and the law would retrogress to the 'actual supervision and control' rule" rejected in [*Reid*]."). Rather, courts look to the quality and depth of control exercised. *Horror Inc.,* 335 F. Supp. 3d at 302, *aff'd*, 15 F.4th 232 (2d Cir. 2021). Thus, in order to determine whether the hired party is an employee or independent contractor in copyright cases, "there must be evidence that the hiring party actually contributed to the aesthetic [or artistic] choices." [10] *SHL Imaging, Inc.*, 117 F. Supp. 2d at 312-13.

For example, in *Langman Fabrics v. Graff Californiawear, Inc.*, the Second Circuit held that the "right to control" factor weighed in favor of work for hire status for a feather design in a fabric pattern where the hiring party "controlled the artist's work to

---

[10]    *Carter v. Helmsley-Spear, Inc.,* 71 F.3d 77, 86 (2d Cir. 1995) ("First, plaintiffs had complete artistic freedom with respect to every aspect of the sculpture's creation. Although the artists heeded advice or accepted suggestions from building engineers, architects, and others, such actions were not a relinquishment of their artistic freedom. The evidence strongly supports the finding that plaintiffs controlled the work's 'manner and means.' This fact, in turn, lent credence to their contention that they were independent contractors.") (citations omitted).

the smallest detail," including by standing over the artist during the artist's daily work at the hiring party's place of business and providing detailed instructions about "the tapering of the feathers, the size of the feathers, the overlapping, the spacing, the thickness, the relationship of one feather to another, and the overall view of all the feathers." 160 F.3d 106, 111-13 (2d Cir. 1998).

Unlike the designer in *Langman Fabrics*, Plaintiffs uniformly maintained complete artistic control over the creation of their sound recordings. *See* PSOF at ¶¶ 35-43, 114-21, 202-09, 301-06; *see also Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86 (2d Cir. 1995) ("[P]laintiffs had complete artistic freedom with respect to every aspect of the sculpture's creation."). Plaintiffs created the works on their own, without instruction from Defendants or their predecessors. *See* PSOF at ¶¶ 35-43, 114-21, 202-09, 301-06; *see also Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F. Supp. 2d 409, 415 (S.D.N.Y. 2004) (finding the plaintiff "used total discretion in creating her melody as well as the length of the vocal phrase" at issue). Plaintiffs unilaterally chose what creative direction to take, which studio musicians would perform, which producers to use, which sound recordings would be selected, how those sound recordings would be sequenced, and what singles would be published. *See* PSOF at ¶¶ 35-43, 114-21, 202-09, 301-06.

Although Defendants may argue that they retained general approval authority over the sound recordings, such general, supervisory authority is consistent with a hiring party's role in both independent contractor and employment relationships. *See Foster v. Lee*, 93 F. Supp. 3d 223, 229 (S.D.N.Y. 2015) (finding no employee relationship where the defendants' only evidence was the "bare statement that they 'retained'" the photographer). Put another way, even if Plaintiffs may have "heeded advice or accepted suggestions" from Defendants, "such actions were not a relinquishment of their artistic freedom." *Carter*, 71 F.3d at 86. It does not demonstrate, for instance, that Defendants

25

controlled the details of Plaintiffs' creative expressions in making the sound recordings, or directed the performance of Plaintiffs' daily activities. *See SHL Imaging, Inc.*, 117 F. Supp. 2d at 313 (photographer was not an employee where hiring party "passive[ly] review[ed]" the photographer's work and only reviewed the works in progress to ensure that photographer was achieving the "ultimate result that the [hiring party] desired"). Rather, the record is clear that Defendants did not contribute to the artistic choices for Plaintiffs' sound recordings. PSOF at ¶¶ 42-43, 120-21, 208-09, 305-06. Defendants did not provide input regarding the instruments that were used to prepare the sound recordings, the melodies in the sound recordings, or the order of the sound recordings in Plaintiffs' respective albums. *See id.* at ¶¶ 35-43, 114-21, 202-09, 301-06; *see also SHL Imaging, Inc.*, 117 F. Supp. 2d at 313 ("Defendants d[id] not claim that they instructed plaintiff to use any particular camera, film or equipment."). Accordingly, this factor strongly favors a finding that Plaintiffs and the Class Members were not employees of Defendants, and that their sound recordings were not works made for hire.

### b) Factor Two: Plaintiffs Were Highly Skilled Professional Artists.

The second factor – the skill required to create the works – indisputably weighs in favor of finding that Plaintiffs and Class Members were not employees of Defendants. *Reid*, 490 U.S. at 751-52. "Courts that have addressed cases where the hired party was a skilled professional artist have regularly found th[is] factor to weigh in favor of independent contractor [not employee] status." *See Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 305 (D. Conn. 2018), *aff'd*, 15 F.4th 232 (2d Cir. 2021) (author); *see also Reid*, 490 U.S. at 752, 109 S.Ct. at 2179 (sculptor); *Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 491 (8th Cir. 2003) (musicians); *Carter*, 71 F.3d at 86-87 (sculptor); *Ulloa*, 303 F. Supp. 2d at 415-16 (singer); *Johannsen v. Brown*, 797 F. Supp. 835, 841 (D. Or. 1992) (graphic artist). Plaintiffs here are "highly skilled professionals who own their own

26

instruments and need no on-the-job training other than rehearsals to perform in a variety of musical settings" *Lerohl*, 322 F.3d at 491; *see also* PSOF at ¶¶ 44-47, 112-24, 210-13, 307-09.  Their work creating, performing, and recording the sound recordings required a high level of skill.  *See id.*; *see also Hilton Int'l Co. v. N.L.R.B.,* 690 F.2d 318, 322 (2d Cir. 1982) ("All the parties acknowledged that the musicians and band leaders who perform in Association hotels are highly skilled members of a clearly distinct occupation."). Indeed, merely listening to the sound recordings in question compels the conclusion that Plaintiffs' artistic talents "exceed[] the ability of the average person." *Ulloa*, 303 F. Supp. 2d at 415.  Defendants have not, and cannot, identify *any* evidence suggesting otherwise. This factor undoubtedly favors finding that Plaintiffs and the Class Members were not employees of Defendants, and that their sound recordings were not "works made for hire."

### c) Factor Three: Defendants Did Not Provide Plaintiffs With Employee Benefits.

The third factor – employee benefits – also weighs greatly in Plaintiffs' and the Classes' favor.  *Reid*, 490 U.S. at 751-52, 109 S.Ct. at 2179.  Courts analyzing this factor look to whether traditional employee benefits were provided.  *Id.* at 753, 109 S.Ct. at 2179-80.  Those traditional employee benefits include, for example, medical insurance, life insurance, liability insurance, paid vacations, sick leave, and reimbursement for certain work-related expenses. *See Horror Inc. v. Miller,* 15 F.4th 232, 252 (2d Cir. 2021) (considering health insurance, paid vacation, workers' compensation benefits, pension plans, "or other types of benefits that courts have traditionally found probative of employee status"); *see also Aymes,* 980 F.2d at 862  (considering health, unemployment, and life insurance); *Carter*, 71 F.3d at 86 (looking at life, health, liability insurance, and paid vacations).   Indeed, one of the principal incentives for using independent contractors, rather than employees, is the avoidance of paying employee benefits, such as vacation, health insurance, and sick pay.  *Aymes*, 980 F.2d at 863.  Hiring parties that

27

avoid payment of such benefits should not be heard to later contend that for copyright purposes the hiring party is an employee.[11]  *Id.*

As is standard in the industry, Defendants and their predecessor labels universally did not provide Plaintiffs with any direct employee benefits.  PSOF at ¶¶ 48-55, 125-40, 214-37, 310-17; *see also Reid*, 490 U.S. at 753, 109 S.Ct. at 2179 (finding no employer-employee relationship where CCNV did not "provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds"); *see also Christians of California, Inc. v. Clive Christian New York, LLP,* No. 13-CV-275 KBF, 2014 WL 4743422, at *2 (S.D.N.Y. Sept. 15, 2014) ("There is also no evidence...that he was granted sick leave or vacation time; or that COC paid for his health insurance or unemployment insurance.").  They did not provide Plaintiffs with any sort of insurance, disability compensation, workers' compensation, or paid vacations.  PSOF at ¶¶ ¶¶ 48-55, 125-40, 214-37, 310-17.  *Compare Aymes*, 980 F.2d at 862 (finding no employer-employee relationship where the defendant-hiring party failed to provide the plaintiff-computer programmer with any employee benefits, such as health, unemployment, or life insurance), *with Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 380 F.3d 624, 641 (2d Cir. 2004) (finding an employer-employee relationship where the defendant-foundation provided the plaintiff-choreographer with

---

[11]     As the Second Circuit explained in *Aymes,* 980 F.2d at 862:

> The failure of Island to extend Aymes any employment benefits or to pay any of his payroll taxes is highly indicative that Aymes was considered an outside independent contractor by Island.  Indeed, these two factors constitute virtual admissions of Aymes's status by Bonelli himself.  Moreover, they also point out a basic inequity in Aymes's treatment.  Island benefitted from treating Aymes like an independent contractor when it came to providing benefits and paying a percentage of his payroll taxes.  Island should not in one context be able to claim that Aymes was an independent contractor and ten years later deny him that status to avoid a copyright infringement suit.

"employee benefits and reimbursement for personal expenses, travel, and medical benefits, and a regular salary"). Defendants' practices support only one finding – that Plaintiffs and the Class Members were not their employees.

### d) Factor Four: Defendants' Tax Treatment Proves Plaintiffs and Class Members Were Not Employees.

The fourth factor – tax treatment – also favors finding that Plaintiffs and the Class Members were not employees of Defendants. Courts have consistently held that a hiring party's failure to withhold or deduct income taxes, social security, or other comparable payments from the hired party's compensation indicates that the relationship is one of an employer-independent contractor, rather than employer-employee. *Aymes,* 980 F.2d at 862. Indeed, in virtually every case since *Reid* "that has applied the test has found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes." *Christians of California, Inc.*, 2014 WL 4743422, at *2 (citing *Aymes,* 980 F.2d at 862); *see also Smith v. Mikki More, LLC*, 59 F. Supp. 3d 595, 613 (S.D.N.Y. 2014) ("Jasper was given no employee benefits, nor did Braun treat her as an employee for tax purposes."); *Lerohl*, 322 F.3d at 492 (finding it "highly significant" that the hiring orchestra "withheld no income or FICA taxes, documented musician payments on an IRS Form 1099, and provided no employee benefits other than contributions to an independent union pension fund") (citing cases).

Here, it is undisputed that Defendants did not treat Plaintiffs or the Class Members as employees for tax purposes. PSOF at ¶¶ 56-57, 141-44, 238-43, 318-19. Defendants did not deduct or withhold any income taxes, social security, or other comparable payments from Plaintiffs' compensation, nor did they issue W-2s to Plaintiffs. *See id.*; *see also Christians of California, Inc.,* 2014 WL 4743422, at *2 ("COC paid him as they would a non-employee, as demonstrated by the fact that COC did not make withholdings for taxes from Durgin's paycheck…There is also no evidence that withholdings for social

29

security were deducted from his paycheck"); William Henslee & Elizabeth Henslee, *You Don't Own Me: Why Work for Hire Should Not Be Applied to Sound Recordings,* 10 J. MARSHALL REV. INTELL. PROP. L. 695, 712 (2011) ("Recording artists are not salaried employees with taxes withheld by the label.  The label issues 1099 forms, not W-2s."). The record shows that Defendants unequivocally chose ***not*** to treat Plaintiffs as their employees for tax purposes, so this factor weighs heavily against Defendants.

### e)    Factor Five: Defendants Could Not Assign Additional Projects to Plaintiffs Outside the Scope of the Recording Agreements.

The fifth factor – whether the hiring party has the right to assign additional projects to the hired party – weighs in favor of finding that Plaintiffs and Class Members were not employees.  *Reid*, 490 U.S. at 751-52, 109 S.Ct. 2178-79.  Defendants could not assign additional projects to Plaintiffs and Class Members outside the scope of their respective recording agreements.  PSOF at ¶¶ 58-60, 145-47, 244-46, 320-22.  Indeed, Defendants did not assign Plaintiffs and Class Members projects outside those contemplated in Plaintiffs' respective recording agreements.  *Id*. at ¶¶ 60, 147, 246, 322. This is strong evidence that Plaintiffs were independent contractors because independent contractors are typically hired only for particular projects.  *See Aymes*, 980 F.2d at 863. This factor favors Plaintiffs and the Classes.

### f)    Remaining Factors

The vast majority of the remaining factors enumerated in *Reid* demonstrate that Plaintiffs were not employees of Defendants.

### (1)    Factor Six: Plaintiffs or Third Party Studios Provided the Instruments and Tools Needed to Create the Sound Recordings.

The sixth factor – the source of the instrumentalities and tools – weighs heavily in favor of Plaintiffs and the Classes.  *Reid*, 490 U.S. at 751-52, 109 S.Ct. 2178-79.  Artists

with specialized skills usually source their own instruments and tools to create their works, and are typically considered independent contractors rather than employees. *See Hilton Int'l Co. v. N.L.R.B.,* 690 F.2d 318, 322 (2d Cir. 1982) (finding that musicians who performed at Hilton hotels were not employees of the Hilton in part because the musicians "usually provide their own instruments and their own sheet music"). Defendants did not provide Plaintiffs or the Class Members with the instruments and tools needed to record the sound recordings at issue in this case. PSOF at ¶¶ 61-62, 148-49, 247-48, 323-27. As is standard in the industry, those instruments and tools were either provided by Plaintiffs themselves, or by the third-party music studios at which Plaintiffs recorded the sound recordings. *Id.* Plaintiffs uniformly chose the studios to record and the instruments to use. *Id.* Indeed, Defendants cannot point to evidence suggesting otherwise. This factor favors finding Plaintiffs and the Class Members were not employees of Defendants.

### (2)   Factor Seven: Plaintiffs Chose Where to Create the Sound Recordings

Factor seven – the location of the work – indisputably weights in favor of finding that Plaintiffs and the Class Members were not employees of Defendants. *Reid*, 490 U.S. at 751-52, 109 S.Ct. 2178-79. Courts consistently find that where the hiring party does not dictate or control the location of the work, this factor tends to suggest that there was no employee relationship. *See id.* (sculptor "worked in his own studio in Baltimore"); *see also Horror Inc.,* 335 F. Supp. 3d at 309 (screenwriter "did not work at the hiring party's place of business," which is "characteristic[] of independent contractors"). It is incontrovertible that Plaintiffs chose where to create their sound recordings, often changing studio spaces as they saw fit. PSOF at ¶¶ 63-65, 150, 249-50, 325-27. This factor, therefore, weighs heavily in favor of finding Plaintiffs and the Class Members were not employees of Defendants.

31

### (3) Factor Eight: The Relatively Short Duration of the Relationship Between Plaintiffs and Defendants Proves Plaintiffs Were Not Employees.

Factor eight – the duration of the relationship between the parties – weighs in favor of Plaintiffs and the Class Members. *Reid*, 490 U.S. at 751-52, 109 S.Ct. 2178-79; *see also Associated Musicians of Greater Newark, Local 16*, 206 NLRB 581 (1973), *aff'd*, 512 F.2d 991 (D.C. Cir. 1975) (orchestra members who performed exclusively at banquet hall lounge for over four years not banquet hall employees). Here, the Named Plaintiffs all had a relatively short relationship with each of Defendants' predecessor labels. PSOF at ¶¶ 66-68, 151, 251, 328. This factor favors Plaintiffs and the Classes.

### (4) Factor Nine: Defendants Exercised No Discretion Over When and How Long Plaintiffs Should Work.

Factor nine – the extent of the hired party's discretion over when and how long to work – indisputably weighs in favor of finding that Plaintiffs were not employees of Defendants. *Reid*, 490 U.S. at 753,109 S.Ct. at 2179 ("Apart from the deadline for completing the sculpture, Reid had absolute freedom to decide when and how long to work."); *see also Lerohl*, 322 F.3d at 492 (finding that the plaintiff musicians "retained the discretion to perform elsewhere and to accept or reject playing in a particular concert series"). Defendants exercised *no* discretion over when Plaintiffs needed to record their sound recordings or how long they needed to spend in the recording studios to complete those recordings. PSOF at ¶¶ 69-70, 152-53, 252-53, 329-30. Plaintiffs and the Class Members were not required to come to the studios on a daily, weekly, or even monthly basis. *Id.* Nor were Plaintiffs ever required to work for a certain number of hours each day. *Id.* Rather, Plaintiffs maintained complete control over their recording schedules, choosing when to work in the studios, how long they would work in the studios, and when to leave the studios. *Cf. Horror,* 15 F.4th at 255 ("[Plaintiff's] discretion over this day-to-

32

day schedule weighs in favor of classifying him as an independent contractor."). Indeed, this is standard in the recording industry. This factor favors Plaintiffs and the Classes.

### (5)  Factor Ten: Defendants' Method of Payment Proves Plaintiffs Were Not Employees

The tenth factor – the method of payment – also indisputably demonstrates that Plaintiffs and the Class Members were not Defendants' employees. *Reid*, 490 U.S. at 751-52, 109 S.Ct. at 2178-79. Payment of a salary and regular wages is indicative of an employer-employee relationship. But payments made via lump sum, advances, royalties, or per-job are not. Instead, those types of irregular payments are typical of an employer-independent contractor relationship. *Cf. Aymes,* 980 F.2d at 863 (discussing how "payment of regular wages" indicate an employer-employee relationship, while "lump sum payments" indicate an employer-independent contractor relationship). "The method of payment can be a 'fairly important factor' when the facts point clearly one way or another." *Horror Inc*., 335 F. Supp. 3d at 309 (quoting *Aymes*, 980 F.2d at 863).

In the recording industry, the record labels' payment of artists via advances and royalties clearly point to an employer-independent contractor relationship. *See* William Henslee & Elizabeth Henslee, *You Don't Own Me: Why Work for Hire Should Not Be Applied to Sound Recordings,* 10 J. MARSHALL REV. INTELL. PROP. L. 695, 712 (2011). Artists typically receive a signing advance and recording budget from the label. All of the money advanced by the label is recoupable from the money the label earns from record sales. *Id*. After the label recoups the recording budget, the artist receives any additional royalties from record sales. However, if the label does not recoup its budget, the artist will not receive any additional money from the label. *Id*.

Defendants here acted no differently. Defendants did not provide Plaintiffs or Class Members with a salary or regular wages. PSOF at ¶¶ 71-72, 154-59, 255-62, 331-34. Instead, Defendants paid Plaintiffs and Class Members through an advance that was

charged against the royalties owed to Plaintiffs. *Id*. Plaintiffs and Class Members received royalties if, and only if, Defendants or their predecessors first recouped the costs associated with the recording of Plaintiffs' and the Classes' sound recordings. *Id*. Such a payment structure indisputably proves Plaintiffs and the Class Members were not employees of Defendants, in any traditional sense of the word.

### (6) Factor Eleven: Defendants Played Little, If Any, Role In Hiring and Paying Assistants

The eleventh factor – the hiring party's role in hiring and paying assistants – favors Plaintiffs and the Classes. *Reid*, 490 U.S. at 751-52, 109 S.Ct. at 2178-79. Like so many of the *Reid* factors discussed above, Defendants cannot point to any evidence in the record suggesting that they played a role in hiring assistants on behalf of Plaintiffs. PSOF at ¶¶ 73, 160, 263, 335. This factor favors Plaintiffs and the Classes.

### (7) Factors Twelve and Thirteen: Whether the Work Is Part of the Regular Business of the Hiring Party & Whether the Hiring Party Is in Business

The remaining factors – whether the work is part of the regular business of the hiring party and whether the hiring party is in business – carry very little weight in the *Reid* analysis. *Reid*, 490 U.S. at 751-52, 109 S.Ct. at 2178-79; *Aymes*, 980 F.2d at 863. Defendants are in the business of distributing and promoting sound recordings, while Plaintiffs are in the business of *creating* sound recordings. PSOF at ¶¶ 74-76, 161-64, 264-68, 336-38. Additionally, Defendants' predecessor labels with which Plaintiffs and the Classes contracted – *e.g*., EMI, A&M Limited, A&M Records, and Virgin Records – were acquired long ago and no longer exist as separate entities. *Id*. at ¶¶ 77-78, 165-66, 269-70, 339-40. As such, these last factors favor Plaintiffs and the Classes, but do not have much bearing in the analysis.

34

Considering all the *Reid* factors leads to only one conclusion – that Plaintiffs and the Class Members were ***not*** employees of Defendants. Summary judgment must be granted in Plaintiffs' and the Classes' favor on Defendants' work made for hire defense.

> **3.    Defendants Cannot Establish Plaintiffs' and the Classes' Sound Recordings Are "Works Made for Hire" under Section 101(2) Because Plaintiffs' Sound Recordings Are Not "Collective Works" or "Compilations."**

Defendants also contend that the sound recordings at issue are "works made for hire" under Section 101(2) of the Copyright Act as "collective works" or "compilations." But that contention is meritless, and the Court has rejected it. *See Waite*, 450 F. Supp. 3d at 435 n.23 (rejecting Defendants' notion that *Bryant v. Media Right Productions, Inc.*, 603 F.3d 135 (2d Cir. 2010) holds that an album always "falls within the Act's expansive definition of compilation," and stating that the "Circuit's conclusion in *Bryant* is thus not dispositive in the 'works for hire' context").

As discussed *supra*, because Plaintiffs and the Class Members were not employees of Defendants or their predecessor labels, none of the works at issue can be considered "works made for hire" under Section 101(1) of the Copyright Act. Therefore, the only other manner in which the sound recordings could possibly be considered "works made for hire" would be by finding that the works fit into one of the nine categories enumerated in Section 101(2) of the Copyright Act.[12] ***Courts, however, have been clear: "sound recordings are not a work for hire under the second part of the statute because they do not fit within any of the nine enumerated***

---

[12]    Section 101(2) of the Copyright Act provides that a work made for hire must constitute "a work specially ordered or commissioned for use as a contribution to one of the following nine categories: [1] for use as a contribution to a collective work, [2] as a part of a motion picture or other audiovisual work, [3] as a translation, [4] as a supplementary work, [5] as a compilation, [6] as an instructional text, [7] as a test, [8] as answer material for a test, or [9] as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101(2).

***categories.*** *Ballas*, 41 F. Supp. 2d at 541 (emphasis added); *see also Lulirama Ltd. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 878 (5th Cir. 1997) (same); *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57, 64 (D.D.C. 1999) (same). Defendants' attempts to shoehorn Plaintiffs' and the Classes' sound recordings into these very categories must fail.

### a. Plaintiffs' Sound Recordings Were Not "Specially Ordered or Commissioned."

As a threshold matter, Defendants must come forward with evidence demonstrating that Plaintiffs' sound recordings were "specially ordered or commissioned" before delving into whether those works can be categorized as "collective works" or "compilations." 17 U.S.C. § 101(2). Defendants cannot satisfy this threshold requirement here.

Typical examples of a "specially ordered or commissioned" work include a requested sculpture of a sitting president or an ordered portrait of a senior district judge. *See, e.g., Reid*, 490 U.S. at 751-52, 109 S.Ct. at 2178-79 (sculpture). They do not include flexible arrangements for recording artists to freely create original sound recordings at their own discretion, and under their own artistic direction and control. PSOF at ¶¶ 14-21, 93-100, 181-88, 283-90. Nor do they include arrangements in which recording artists bear the expenses of creating the sound recordings and may receive future royalties. PSOF at ¶¶ 71-72, 158-59, 261-62, 333-34; *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995) ("[W]here the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship.") (citation omitted). Here, Plaintiffs and the Class Members received a signing advance in the form of a recording budget from the label to be used to create their sound recordings at their own discretion. PSOF at ¶¶ 71-72, 158-59, 261-62, 333-34. The funds, however, were recoupable from the money the label earned from sales of the sound recordings. *Id.* After the label recouped the recording budget, the artists receives royalties from future

sales. *Id.* Such flexible arrangements and future payment structures demonstrate that Plaintiffs' and Class Members' sound recordings were not "specially ordered or commissioned."

> **b. Plaintiffs' Sound Recordings Are Not "Collective Works" or Compilations."**

"A 'collective work' is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. "A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." *Id.* "The term 'compilation' includes collective works." *Id.* First and foremost, Plaintiffs' original sound recordings certainly are not "collective works" or "compilations." As the statutory definition entails, a true example of a collective work or compilation is a monthly magazine containing a collection of separate and independent articles, photos, drawings, and graphic designs, made by multiple authors, photographers, artists, and graphic designers. *Id.***;** *see also* U.S. Copyright Office, *Circular 14: Copyright in Derivative Works and Compilations 1* (2020) (citing "a newspaper comprised of articles by different journalists" as an example of a collective work or compilation). Secondly and significantly, Plaintiffs' original sound recordings are not "preexisting materials." 17 U.S.C. § 101; *see also Skidmore v. Led Zeppelin,* 952 F.3d 1051, 1075 (9th Cir. 2020) ("Likewise, a protectable 'compilation' is the precise 'result[ ]' that is 'formed by the collection and assembling of preexisting materials...that are selected, coordinated, or arranged.'") (quoting 17 U.S.C. § 101). Rather, the sound recordings were created and published in the first instance. PSOF ¶¶ 22, 101, 189, 291. Third, Plaintiffs' sound recordings were not characterized as "collective works" or "compilations" in the copyright registrations issued by the U.S.

154498.00601/126487223v.6

Copyright Office.  PSOF at ¶¶ 25, 104, 192, 294.  Fourth, the custom of the music industry proves Plaintiffs' original sound recordings are not "collective works" or "compilations." Within the music industry, the terms "collective work" or "compilation" are reserved for certain types of albums that are made up of pre-published, pre-existing sound recordings from different recording artists or different albums throughout a recording artists' career. For example, a movie soundtrack, a greatest hits album, or a "top hits of 2004" album might be considered a "collective work" or "compilation" – ***but not an original album of new sound recordings***.  *See* U.S. Copyright Office, *Circular 14: Copyright in Derivative Works and Compilations 1* (2020); *see also* Patrik Wikström & Robert Burnett, *Same Songs, Different Wrapping: The Rise of the Compilation Alb*um, 32 POPULAR MUSIC & SOC'Y 507 (2009).  Put simply, the terms "collective work" and "compilation" are simply ***never*** used to describe an album of new sound recordings released by one recording artist or musical group.  Defendants cannot ignore these facts and shoehorn Plaintiffs' sound recordings into the definition of "collective works" or "compilations" in order to permanently confiscate those artistic creations from Plaintiffs.

## IV.   Conclusion

For the foregoing reasons, summary judgment should be granted in Plaintiffs' and the Classes' favor on Defendants' "work made for hire" defense.

Dated: New York, New York  
      April 15, 2022

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Ryan E. Cronin*  
Ryan E. Cronin  
Roy W. Arnold (admitted *pro hac vice*)  
Gregory M. Bordo (admitted *pro hac vice*)  
David M. Perry (admitted *pro hac vice*)  
Heidi G. Crikelair  
Jillian Taylor (admitted *pro hac vice*)  
1271 Avenue of the Americas  
New York, NY 10020  
Telephone (212) 885-5000

38

**COHEN MUSIC LAW**
Evan S. Cohen (admitted *pro hac vice*)
Maryann R. Marzano (admitted *pro hac vice*)
104 West Anapamu Street, Suite K
Santa Barbara, CA  93101-3126
Telephone: (805) 837-0100

*Attorneys for Plaintiffs and the Classes*

39

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2022, the foregoing was electronically filed through the Court's CM/ECF system and thereby served on the following recipients:

Melanie Berdecia, Esquire
mberdecia@sidley.com
Ariel Atlas, Esquire
aatlas@sidley.com
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Rollin A. Ransom, Esquire
rransom@sidley.com
Lisa M. Gilford, Esquire
lgilford@sidley.com
Adriane Peralta, Esquire
adriane.peralta@sidley.com
Lauren M. De Lilly, Esquire
ldelilly@sidley.com
Sidley Austin LLP
555 West 5th Street, Suite 4000
Los Angeles, CA 90013

Richard Stephen Mandel, Esquire
rsm@cll.com
Thomas Kjellberg, Esquire
txk@cll.com
Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

*Counsel for Defendants*

By: _/s/ Ryan E. Cronin_____
    Counsel for Plaintiffs

40

154498.00601/126487223v.6