**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN WAITE, an individual; KASIM SULTON, an individual; SUSAN STRAW HARRIS p/k/a SYD STRAW, an individual; LEONARD GRAVES PHILLIPS, an individual; STAN SOBOL a/k/a STAN LEE, an individual; STEVE WYNN, an individual; DENNIS MEHAFFEY, p/k/a DENNIS DUCK, an individual; and JOEL DAVID PELLISH, p/k/a DAVE PROVOST, an individual; and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group; and CAPITOL RECORDS, LLC, a Delaware limited liability company;<br><br>  Defendants. | Civil Action No. 1:19-cv-01091-LAK<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFF KASIM SULTON'S CLAIM FOR COPYRIGHT INFRINGEMENT**

**BLANK ROME LLP**
Ryan E. Cronin
Roy W. Arnold (admitted *pro hac vice*)
Gregory M. Bordo (admitted *pro hac vice*)
David M. Perry (admitted *pro hac vice*)
Heidi G. Crikelair
Jillian M. Taylor (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000

**COHEN MUSIC LAW**
Evan S. Cohen (admitted *pro hac vice*)
Maryann R. Marzano (admitted *pro hac vice*)
104 West Anapamu Street, Suite K
Santa Barbara, CA 93101-3126
Telephone: (805) 837-0100

*Counsel for Plaintiffs*

Plaintiffs Kasim Sulton, Susan Straw Harris, Leonard Graves Phillips, Stan Sobol, Steve Wynn, Dennis Mehaffey, and Joel David Pellish, on behalf of themselves and all others similarly situated ("Plaintiffs"), hereby oppose Defendants UMG Recordings, Inc.'s ("UMG") and Capitol Records, LLC's ("Capitol") (collectively, "Defendants") Motion for Summary Judgment as to Plaintiff Kasim Sulton's ("Sulton") Claim for Copyright Infringement (the "Motion").

## I.    INTRODUCTION

Defendants' Motion should be denied for multiple reasons. Reduced to its essence, the Motion presents the following issue for the Court to consider:

**Have Defendants engaged in conduct that constitutes actionable copyright infringement in violation of Plaintiff Kasim Sulton's exclusive rights under Section 106 by doing the following:**

**(1) wrongfully failing and refusing to relinquish the rights to Sulton in and to the sound recordings he created and as set forth in the Notice of Termination served on Defendants;**

**(2) preventing Sulton from exercising any or all of the bundle of rights enumerated in Section 106 of the United States Copyright Act ("Copyright Act") with respect to those sound recordings; and**

**(3) threatening Sulton with litigation if he attempted to exercise those rights?**

The answer to whether Defendants' conduct constitutes copyright infringement is a resounding "Yes."

Section 203 of the Copyright Act is a unique statutory scheme, specifically enacted to provide a mechanism by which artists can recapture their copyright ownership in works they created. After an artist duly serves and records a Notice of Termination, ownership of the works at issue is automatically restored by operation of law, as of the effective date of termination. That is precisely the situation presented here, with respect to Sulton, as well as the Plaintiff class. Once Sulton fulfilled the Section 203 requirements, and the July 21, 2018 termination date was reached, his copyrights reverted, and he owned them as of that date to exclusion of all others. But instead of acknowledging Sulton's ownership

rights, Defendants defied the law by improperly and unilaterally retaining rights they no longer owned, and at the same time threatened Sulton with litigation if he attempted to exercise them.

Against this factual and legislative backdrop, Defendants now try in their Motion to immunize themselves by taking the position that Sulton's infringement claim fails unless they have committed commercial exploitation of the sound recordings at issue; that is, an act of copying or distributing the sound recordings. *See, e.g.*, Dkt. 170 at 5.

To the contrary, reading Section 106 (which enumerates the bundle of rights of a copyright owner) together with Section 501 (which recites that a violation of *any* of those rights constitutes infringement) makes it obvious that Defendants' suggested interpretation is too narrow and limited and, in this context, unworkable. Such an interpretation would conflict with and defeat entirely the strong federal policy of giving authors (including recording artists) a "second chance" at regaining control of the United States copyright in and to their sound recordings, as of the effective date of termination, if Defendants could simply disregard those rights and engage in acts proscribed by Section 501 without punishment.

Section 106 of the Copyright Act grants to the owner of a copyright the possession and use of a bundle of rights that is exclusive to the owner. It logically follows that anyone who *deprives* the owner of those exclusive rights or interferes with their use thereby violates Section 501(a), whether that deprivation or interference results in an actual financial gain or not. And whether that interference is direct or indirect through an active exploitation of the sound recordings after the effective date of termination has passed, or through the intentional retention of ownership rights and wrongful refusal to relinquish them following that date, is functionally irrelevant.

Section 501(a) identifies a copyright infringer as someone who "violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118" of the statute, or who imports

copies or phonorecords in violation of Section 602. Those words have a clear and unambiguous meaning that Defendants simply ignore. "[T]he starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 165 (2d Cir. 2014) (citing *Kuhne v. Cohen & Slamowitz*, LLP, 579 F.3d 189, 193 (2d Cir.2009)). When beginning with the plain language, all undefined terms must be given their ordinary meaning. *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 141 (2d Cir. 2013). (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, ––– U.S. –––, 131 S.Ct. 1885, 1891 (2011); *United States v. Desposito*, 704 F.3d 221, 226 (2d Cir.2013); *23–34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 182 (2d Cir.2012)). And, where ambiguity is absent, the "analysis also ends with the statutory language." *Id.* (citing *Schindler Elevator Corp.*, 131 S.Ct. at 1893).

As such, defining and understanding the plain language of the Copyright Act is imperative to reaching a result that is consistent with the law's goals. Indeed, "statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *In re Hawker Beechcraft, Inc.*, 515 B.R. 416, 424 (S.D.N.Y. 2014) (citing *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir.2008)). To that end, it is essential to consider the plain language definitions of key terms in Section 501(a).

When Section 501(a) was passed by Congress, "violate" held the plain dictionary definition of "to break (a law, rule, promise, etc.); fail to observe; infringe on." *Violate*, Webster's New World Dictionary With Student Handbook. (2nd concise ed. 1975). Indeed, "violate" continues to mean "to break or disregard; to fail to show proper respect for." *Violate*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/violate (last visited May 20, 2022).  There is no doubt that that a "violation" has always been and continues to be understood as the act of not respecting

someone's rights.  Here, Defendants have more than met those prerequisites by blatantly disregarding Sulton's sole possession and exclusive ownership of the copyrights that reverted to him as of the effective date of termination over four years ago and acting in a manner expressly contrary to *all* of his rights. Whether Defendants actively exploited Sulton's sound recordings after July 21, 2018 or not, or generated any revenue as a result or not, is not the measure of culpability for infringement. Surely, as Defendants argue, active commercial exploitation of the sound recordings is one way that they may infringe on Sulton's copyrights.  But it is not the only, or exclusive way that they can violate his rights.

A finding of copyright infringement for *depriving* such artists of their rights is a necessary corollary, when such facts are presented, to the more typical and garden variety copyright infringement cases. In other words, Defendants are equally liable for copyright infringement just like any other copyright infringer described in Section 501(a) who violates or interferes with the bundle of rights that a copyright owner has under Section 106. Section 501(a) was enacted to protect copyright owners from all violations of their rights, and this Court is now presented with an opportunity to determine that the deprivation and hostile rejection of a termination notice is necessarily a violation of a copyright owner's rights under the Copyright Act. By refusing to recognize Plaintiffs' termination notices and thus either actively exploiting sound recordings after the effective date of termination has passed, or through the intentional retention of ownership right, Defendants failed to show proper respect for Plaintiffs' exclusive rights under the Copyright Act. Unequivocally, Defendants' actions constitute a violation of the Copyright Act as per Section 501(a) in every sense of what it means to "violate" a federal, statutory right.

The record before this Court demonstrates that Defendants have acted in a manner completely inconsistent with Sulton's exclusive ownership and affirmatively prevented him from enjoying the unfettered use and benefit of those rights. As this case further shows, Defendants have summarily

rejected and refused to honor every single one of the Notices of Termination they have received from all of the other Plaintiff class members, coupling each such rejection with a companion threat of litigation if any of the recording artists attempt to undertake their own exploitation of the sound recordings after the effective date.

By depriving and preventing the rightful owners from enjoying their *exclusive* rights in and to their sound recordings, Defendants have caused significant monetary damage to the artists whose sound recordings they have infringed. The recording artists are understandably unwilling to risk being the object of costly and time-consuming lawsuits from the world's largest music company should they try to exercise their rights under Section 106 in the face of the threats made by Defendants. As a result, they are forced to refrain from exploitation of their own sound recordings – whether it be by license, sale, or uploading the recordings to digital media themselves – thereby losing valuable opportunities to exploit their sound recordings as they so choose and reaping the benefit of any revenues therefrom.

Finally, Defendants' Motion ignores the fact that Sulton, like all the other Plaintiffs and potential class members, is suing for more than copyright infringement. He is seeking injunctive relief and declaratory relief, as well.  Therefore, even if this Court were to determine that Sulton's exclusive rights could be infringed upon only by active commercial exploitation, Sulton's claims for injunctive and declaratory relief remain viable, and the outcome of Defendants' Motion will have no effect on Sulton's ability to pursue such relief.

## II.    PLAINTIFFS' COUNTERSTATEMENT FACTS AS TO SULTON

While ignoring many of the most relevant and critical facts, Defendants cite to certain facts in support of their Motion that are either undisputed, disputed in part, or irrelevant to Sulton's claim of copyright infringement. Defendants also fundamentally ignore the numerous contrary and undisputed facts establishing Sulton's ownership in the subject copyrights at issue; his subsequent recapture of

those exclusive rights through the notice of termination process as provided for under Section 203; and the resulting actions by Defendants constituting infringement and causing damage to Sulton. Plaintiffs have contemporaneously filed their Counterstatement of Material Facts in Opposition to Defendants' Motion and incorporate those facts by reference.

Sulton's rightful ownership is a predicate for him, and similarly for the other members of the class in this case, to seek damages (compensatory or statutory) for copyright infringement and other relief against Defendants. [1] Plaintiffs' Rule 56 Counter Statement filed herewith sets forth the undisputed facts which establish that Sulton owns the copyrights to the ten original sound recordings he created, and which appear on the album *Kasim* released on January 11, 1982. That album had been released by EMI America Records, Inc. ("EMI"), a predecessor record label of Defendants. (*See* Plaintiffs' Rule 56 Counter Statement ("Plaintiffs' Counter Statement"), Nos. 16-18, 20, 32-35, 38-69, 71; Supplemental Declaration of Kasim Sulton (Sulton Suppl. Decl."), ¶¶ 2-19, 21; Plaintiffs' Rule 56.1 Statement of Undisputed Facts ("Plaintiffs' SJ Statement"), Dkt. 169, Nos. 22-23, 28-29, filed in support of Plaintiffs' pending Motion for Partial Summary Judgment, Dkt. 166; Declaration of Kasim Sulton (Sulton Decl."), Dkt.182.)

The undisputed facts further show that Sulton, through counsel, served a timely and valid Notice of Termination under Section 203 of the United States Copyright Act of 1976 on UMG as the agent for

---

[1]    Plaintiffs have sought partial summary judgment as to Defendants' works made for hire defense. *See* Dkt. 166.  In that Motion and companion filings in support thereof, Plaintiffs show why that defense must fail as a matter of law, and why Sulton, the Plaintiffs and the other class members are the rightful owners of their copyrights upon their respective effective dates of termination. Plaintiffs' Rule 56.1 Statement of Undisputed Facts ("Plaintiffs' SJ Statement"), Dkt. 169, sets forth in detail not only the many undisputed facts in support thereof as to Sulton, but also as to the other named Plaintiffs and the class. To the extent that Defendants attempt to argue that they retain ownership of the copyrights based on the work made for hire defense improperly on reply, Plaintiff incorporate their Motion, Brief in Support and Plaintiffs' SJ Statement and supporting evidence in opposition. *See* Dkt. 166-167, 169, 172, 182.

Capitol on July 20, 2016.  That Notice of Termination was subsequently recorded with the United States Copyright Office on July 25, 2016.  (*See* Plaintiffs' SJ Statement, Nos. 22-23, 28-29, Dkt.169 and supporting documents; Sulton Decl., Dkt. 182; Plaintiffs' Counter Statement, Nos. 17-18, 66-69; Sulton Suppl. Decl., ¶ 19.)

 Under Section 203, authors are permitted to terminate grants of copyrighted works, which is precisely what Sulton did. *Id.* Upon the effective date of termination, the copyrights became the property of Sulton, and he alone had the exclusive right to do all the things enumerated under Section 106.

Defendants also conveniently omit in their Motion any discussion of their conduct in the aftermath that followed the service of Sulton's Notice of Termination and the consequences that resulted from that conduct, all of which establishes infringement. By glossing over these important undisputed facts, Defendants mischaracterize the true state of play following termination and the way their actions constituted infringement.

The undisputed facts show that in response to Sulton's Notice of Termination, Defendants sent Sulton a letter on September 20, 2016 setting forth their contentions for their claims that his Notice was invalid, arguing in part that the subject sound recordings were works made "for hire" or "compilations" and thus not subject to termination under Section 203 of the Copyright Act. (See Plaintiffs' Counter Statement, Nos. 19, 70; Sulton Suppl. Decl., ¶ 20; Plaintiffs' SJ Statement, Dkt. 169, No. 30, Dkt. 169; Declaration of Ryan Cronin ("Cronin Decl."), Dkt. 172, Exs. 6,8.)

Defendants' September 20, 2016 denial of rights letter (on the letterhead of Defendants' legal counsel) "denied" that any aspect of Sulton's Notice of Termination was valid, and threatened to sue Sulton if Sulton were to exploit the recordings himself (or even "attempt" to do so), or if Sulton entered into an agreement with a third party that would exploit the recordings. *Id.*

The effective date of termination for Sulton's sound recordings in *Kasim* occurred on July 21, 2018. (Plaintiffs' Counter Statement, Nos. 20, 71; Sulton Suppl. Decl., ¶ 21; Plaintiffs' SJ Statement, Dkt. 169, No. 30; Cronin Decl., Dkt. 172, Ex. 6, Notice of Termination.) Accordingly, as of that date, and by operation of law, the copyright in those ten sound recordings that Sulton created automatically reverted to him, because Section 203 does not require any further action on the part of the terminating party, provided the requirements of the statute are followed.

Notwithstanding the fact that Sulton was the legal owner of the copyrights as of July 21, 2018, Defendants have not withdrawn their denial of Sulton's rights or their threats to sue him should he attempt to exercise his ownership rights in and to those copyrights. (Plaintiffs' Counter Statement, Nos. 21-22, 70-73; Sulton Suppl. Decl., ¶ 21; Plaintiffs' SJ Statement, Dkt. 169, Nos. 32-33.)

The facts are undisputed fact that Defendants failed and refused to return the copyrights to the sound recordings of the album *Kasim* to Sulton, and instead continued to assert a competing and adverse ownership claim in those same copyrights after the effective date of termination. It is also an undisputed fact that Defendants never revoked their threat of prosecution of Sulton if he attempted to exercise his rights under Section 106. In so doing, Defendants engaged in conduct infringing Sulton's rights under Section 106, by depriving him of the exclusive right and ability "to reproduce the copyrighted work, prepare derivative works based on the copyrighted work, to distribute copies of the copyrighted work to the public, to perform via digital audio transmission." (Plaintiffs' Counter Statement, Nos. 21-23, 72-94; Sulton Suppl. Decl., ¶¶ 20-32; Plaintiffs' SJ Statement, Dkt. 169, Nos. 32-33.) Furthermore, Sulton has testified at his deposition and through declarations in this case that he has been deprived of all of his exclusive rights of ownership and has suffered damage as a result thereof. (Deposition of Kasim Sulton conducted on June 29, 2020 ("Sulton Depo.") at 208:5-14; Sulton Suppl. Decl., ¶¶ 20-32; Plaintiffs' Counter Statement Nos. 23, 73-95.) He has not been free to exploit his own recordings,

sell copies or package them along with his other works. (Sulton Depo. at 212:12-15; Sulton Suppl. Decl., ¶¶ 20-32; Plaintiffs' Counter Statement Nos. 23, 73-95.) Sulton's ten sound recordings have never been exploited via digital streaming, and Defendants have prevented Sulton from doing so himself. (Sulton Supp. Decl. at ¶ 22; Plaintiffs' Counter Statement Nos. 74-75.) Sulton's recordings are not being streamed on any of the numerous streaming or other music delivery platforms and thus do not create any revenue for Sulton.  (Sulton Supp. Decl. at ¶ 22; Plaintiffs' Counter Statement No. 76.)

As a result, they are not able to be streamed on any of the numerous streaming or other music delivery platforms. (Sulton Suppl. Decl., ¶ 22; Plaintiffs' Counter Statement No. 76.)

Sulton has been precluded from distributing his subject work in any fashion and prevented from entering into licensing deals with third parties. (Sulton Depo. at 212:12-15; Sulton Suppl. Decl., ¶ 23; Plaintiffs' Counter Statement No. 77.) And he has had many missed opportunities, especially for potential sales and other merchandizing at concerts---not just his own solo concerts since 2018, but also at the many Todd Rundgren/Utopia shows since the band's reunion in 2018. (Sulton Suppl. Decl., ¶ 24; Plaintiffs' Counter Statement No. 78.) He would and could have sold or distributed *Kasim* at those concerts, or generated subsequent sales on his website, but was not able to do so because of Defendants' conduct. (Sulton Suppl. Decl., ¶ 24; Plaintiffs' Counter Statement No. 79.) In 2018, the "Todd Rundgren's Utopia" reunion tour commenced, which represented the first shows with the original musician line up in 26 years. That was a 33-date tour, and with a substantial merchandising deal negotiated for that tour. (Sulton Suppl. Decl., ¶ 25; Plaintiffs' Counter Statement No. 80.)  Having his solo album available for sale on that tour would have been beneficial and very lucrative for Sulton. (Sulton Suppl. Decl., ¶ 25; Plaintiffs' Counter Statement No. 81.)  Sulton also did his own "Kasim

Sulton's Utopia" tour in 2018 consisting of 7 shows. (Sulton Suppl. Decl., ¶ 25; Plaintiffs' Counter Statement No. 82.)

Additionally, in 2019, Sulton performed a dozen shows with Kasim Sulton's Utopia as well as 2 Todd Rundgren tours, totaling approximately 35 concert dates. (Sulton Suppl. Decl., ¶ 26; Plaintiffs' Counter Statement No. 83.) In 2020, there were 16 booked shows with Kasim Sulton's Utopia, and 6 Todd Rundgren shows in January and February, before the pandemic stopped most live shows. (Sulton Suppl. Decl., ¶ 27; Plaintiffs' Counter Statement No. 84.) Sulton managed, however, to perform a half dozen solo shows that year, one being the first ever Drive-In concert in the country in May 2020, for which Sulton received national press coverage. (Sulton Suppl. Decl., ¶ 27; Plaintiffs' Counter Statement No. 85.) Thereafter, in 2021, Sulton performed 5 solo shows plus a 27-date virtual tour with Todd Rundgren, and could have, again, advertised and offered his first solo album *Kasim* for sale at those shows. (Sulton Suppl. Decl., ¶ 28; Plaintiffs' Counter Statement No. 86.)

In 2022, Sulton performed 7 Kasim Sulton's Utopia shows. (Sulton Suppl. Decl., ¶ 29; Plaintiffs' Counter Statement No. 87.) He also performed at 24 shows on the much anticipated "The Gilmour Project" tour featuring David Gilmour's Pink Floyd repertoire. That tour is also one that Sulton sold merchandise on and could have had *Kasim* available for sale as well. (Sulton Suppl. Decl., ¶ 29; Plaintiffs' Counter Statement Nos. 88-89.) Starting July 1, 2022 through August 1, 2022, Sulton will be performing on a 20-city tour with Todd Rundgren. (Sulton Suppl. Decl., ¶ 30; Plaintiffs' Counter Statement No. 90.) All of these concerts represent missed opportunities for Sulton to have exploited his album. (Sulton Suppl. Decl., ¶¶ 24-29; Plaintiffs' Counter Statement Nos. 77-90.)

Additionally, Sulton has been engaged in a Podcast project currently available on all streaming platforms called UNSUNG. It is based loosely on his life and career as a musician with respect to touring and performing and the consequent hardships created on health and family issues. It would

have been important for Sulton to be able to use his first record (*Kasim*) in a story line but has been unable to do so because Defendants have not returned his copyright to those works. (Sulton Suppl. Decl., ¶ 31; Plaintiffs' Counter Statement Nos. 91-93.)

As Sulton has stated, Defendants' actions have, in effect, silenced his work. And every day that Defendants refuse to return his recordings prevents him from earning any revenue. (Sulton Depo. at 208:5-14; Sulton Suppl. Decl., ¶ 33; Plaintiffs' Counter Statement Nos. 94-95.)

In sum, Defendants' conduct and acts were wrongful, violated Sulton's exclusive bundle of rights and constituted copyright infringement.

## III.   THE COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BECAUSE DEFENDANTS ARE LIABLE FOR COPYRIGHT INFRINGEMENT ON SEVERAL DIFFERENT THEORIES.

### A.   Defendants' Denial of Sulton's Notice of Termination Constitutes a Violation of His Rights as a Copyright Owner Under Section 106 of the Copyright Act.

By refusing to return Sulton's copyrights, Defendants' actions contravene Section 501(a) of the Copyright Act, which unambiguously provides that "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 … is an infringer of the copyright or right of the author, as the case may be." Defendants have unequivocally and brazenly violated Sulton's rights under Section 106 by denying his notice of termination and refusing to allow him "to authorize" the exploitation of the works (instead of Defendants).

There is no obligation for recording artists to sue record companies to enforce their rights under Section 203. Rather, the termination right is *vested* upon the service of the notice of termination and the burden is on the *recipient* of a notice of termination to challenge the validity of a notice that has been duly served. 17 U.S.C. § 203(b)(2). The regulations attendant to the statute provide a remedy for a recipient of a Notices that a recipient deems to be invalid. Specifically, 37 C.F.R. § 201.10 provides that:

(4) Effect of recordation. The fact that the Office has recorded a notice is not a determination by the Office of the notice's validity or legal effect. Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal or formal requirements for effectuating termination (including the requirements pertaining to service and recordation of the notice of termination) have not been met, including before a court of competent jurisdiction.

Accordingly, the *burden is on the recipient record labels* to challenge the validity of the notice in court. Recipients like Defendants cannot be permitted to ignore the law and *unilaterally* decide the validity of Notices, or take the position that *they* continue to own the rights, without a judicial determination permitting them to do so. And Defendants' habit of threatening recording artists with legal action is well outside any legal norm.

As of the effective date of termination, therefore, the bundle of rights set forth in Section 106 belongs to the recording artists, not Defendants. It is the recording artists who have the right "to do and to authorize" the rights set forth in Section 106. The "to authorize" language of Section 106 has been applied mainly as providing support that plaintiffs in copyright infringement cases may sue for contributory infringement against defendants who have "authorized" others to exploit works. "Furthermore, as explained in [*Subafilms, Ltd. v. MGM-Pathe Communications Co.,* 24 F.3d 1088 (9th Cir. 1994)] and [*National Football League v. Primetime 24 Joint Venture*, No. 98-CV-3778, 1999 WL 163181 (S.D.N.Y. Mar. 24, 1999), Congress added the "authorize" language to Section 106 in order to avoid any confusion with regard to contributory infringers. *See Subafilms*, 24 F.3d at 1093 (quoting House Report at 57 ("Use of the phrase 'to authorize' is intended to avoid any questions as to the liability of contributory infringers.")); accord *NFL*, 1999 WL 163181, at *4." *Elektra Entertainment Group, Inc. v. Barker*, 551 F. Supp. 2d 234, 246 (S.D.N.Y. 2008). "The 'to authorize' language was added by Congress solely for the purpose of making it expressly clear that a copyright holder can assert contributory infringement as well as direct infringement. The House Report is unambiguous in this respect: "Use of the phrase 'to authorize'" is intended to avoid any questions as to the liability of

contributory infringers." H.R. Rep. No. 1476, 94th Cong., 2d Sess. 61, reprinted in 1976 U.S.C.C.A.N. 5659, 5674. *Laine v. Pride*, 09 CV 3057 (HB), 2010 WL 199927, *9 (S.D.N.Y. Jan. 15, 2010).

Notwithstanding the foregoing, the words of the statute – "to do and to authorize" – should be applied more broadly than just in the context of contributory infringement, especially in light of Defendants' pervasive rejection of the entire statutory scheme of Section 203. Although Defendants admitted that they received Sulton's Notice of Termination, Defendants thereafter refused to recognize Sulton's reclamation of his rights. Defendants' refusal to honor Sulton's Notice of Termination violates his right as the recording artist "to do and to authorize" any of the categories of Section 106 of the Copyright Act; and most notably, Section 106(3), the right to distribute. Section 106(3) provides that the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: "…(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; …". 17 U.S.C. § 106(3).

Defendants' unilateral refusal to relinquish control of the recordings, coupled with their litigation threats made against Sulton, constitute interference and infringement of his right "to authorize" third parties to exploit his works. These acts constitute actionable copyright infringement because they infringe upon the artist's right to exploit the sound recordings as he sees fit. To hold otherwise would enable record labels such as Defendants to ignore the *vested* legal effect of the Notice of Termination. Any such tacit or implicit approval of Defendants' refusal to honor and return the copyrights upon the effective date of termination would set a dangerous precedent and undermine the language and intent of Section 203, including the entire statutory scheme enacted by Congress.

Given the strong Congressional policies behind Section 203, the Court should construe Sections 106 and 501(a) as broadly as possible, that is, including Defendants' acts that unquestionably disregard and frustrate those policies, and rule that those acts constitute copyright infringement. Defendants

violated Sulton's rights under Section 106 by denying his Notice of Termination and refusing to allow

him "to authorize" the exploitation of the works (instead of them). And there is more: they not only

refused to relinquish post-termination rights back to Sulton, but also *threatened him* with litigation if

he dared to either exploit the recordings himself, or authorized others to do so, either by means of a

license, sale, or any other means. Defendants' pattern and practice of conduct in this regard has been

the same across the class member artists.

Section 203 presents a unique statutory scheme, and, with it, the equally unique potential for

abuse and manipulation by recipients of notices of termination, such as the Defendant record labels

here. A copyright owner, such as Sulton, has the right "to do and to authorize" any of the bundle of

rights set forth in Section 106. This situation is the *opposite* of the fact pattern set forth in cases like

*Elektra Entertainment Group, Inc. v. Barker*, *supra* p. 12, and *Laine v. Pride*, *supra* p. 13. Sulton is

suing Defendants for financial, declaratory and injunctive relief because they are *preventing him* from

having the free and clear right and ability to exercise all of *his* rights as a copyright owner, as set forth

in Section 106. One of these clear rights is to "to authorize" third parties to distribute *his* works via a

license that *he* may grant.

This might be viewed as a novel means of implementing and applying the "to authorize"

language to counter Defendants' copyright "hostage taking." But given that rights under Section 203

only came to fruition in 2013, *i.e.,* 35 years after the January 1, 1978, the day on which the Copyright

Act of 1976 went into effect, it is understandable that this is a case of first impression for courts to

adjudicate, just like some of the other issues that have been presented in this action.

There can be no doubt that Defendants' actions are egregious and have caused harm.

Defendants have consistently and uniformly ignored Sulton's Notice of Termination and refused to

honor his rights. It is undisputed that Defendants have claimed adverse ownership to Sulton's

copyrights and threatened him with litigation if he attempted to exercise any of his ownership rights. This not only chills Sulton's exercise of his rights but it also thwarts or discourages any third parties from entering into any licensing or other agreements with him.   The very notion of copyright assumes the existence of a bundle of valuable rights belonging to the owner.   Indeed, to the extent that Defendants somehow seek to imply that the rights to the works at issue lack economic value, then it is all the more outrageous that Defendants have withheld them from the artist and refused to abide by his clear termination right.

The totality of Defendants' conduct constitutes a complete usurpation of Sulton's rights and should be held to constitute copyright infringement, consistent with the unambiguous statutory language itself. A remedy for Defendants' misconduct is warranted and necessary, and Sulton's claim for infringement should be allowed to go forward together with his other claims for relief against the Defendants.

**B.      Defendants' Misconduct Violates Sulton's "Right to Control"
His Works, In That Sulton Is, and Has Been Since 2018,
the Owner of the United States Copyright in and to the Works.**

Defendants' conduct also violates Sulton's "right to control" his sound recordings because Sulton has been the rightful owner of the copyright in those sound recordings since the effective date of termination – July 21, 2018.  To allow Defendants to unilaterally maintain control over Sulton's sound recordings would in effect improperly grant a makeshift and unlawful license to Defendants. "In the copyright realm, it has been said that an injunction should be granted if denial would amount to a forced license to use the creative work of another." *Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir. 2004). This unlawful holdover has material consequences: (i) it makes the sound recordings at issue vulnerable to future infringement by Defendants; (ii) it usurps Sulton's right to issue his own licenses for those sound recordings; (iii) it makes the calculation of lost revenues and profits for those

sound recordings difficult to determine; and (iv) it causes substantial harm. "In our constitutional system, Congress has been empowered '[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.' U.S. Const. art. I, § 8, cl. 8." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007). Pursuant to this authority, the Copyright Act confers certain exclusive rights to Sulton in his sound recordings, such as the rights of reproduction and distribution. 17 U.S.C. §§ 106(1), (3). The exclusive right to engage in such actions also provides the copyright owner the concurrent power, through the legal system, to exclude others from engaging in such activities without authorization. *See Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 968 (8th Cir. 2005) (copyright owner has right to "control the use of its copyrighted materials"); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1216-17 (C.D. Cal. 2007) ("infringement may still occur in such a manner that it has the actual effect of irreparably harming a plaintiff's right to control the use of his/her copyrighted material.").

While this concept has been applied primarily in infringement cases involving the issuance of injunctive relief, the cases are replete with references to the fact that it is Plaintiff, not Defendants, who have the "right to control" the exploitation of the works at issue. Here, the sound recordings in the post-termination period belong to Sulton, giving him the "right to control" the use of the works, and Defendants' actions violate this right. This applies equally to all Plaintiffs. *See, e.g., Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 968 (8th Cir. 2005) ("Taylor certainly has the right to control the use of its copyrighted materials, and irreparable harm inescapably flows from the denial of that right."). It is Sulton, not Defendants, who has the "right to control" his copyright. Defendants disregarded that right at their peril and should be deemed copyright infringers.

C.     **Defendants Are Infringing Sulton's Sound Recordings by "Making Available" those Works, Regardless of Whether They Engaged In an Overt Act of Distribution.**

Defendants' argument that there can be no infringement without some sort of exploitation is wrong. Numerous courts have held that the act of "making a copyrighted work available" for exploitation by third parties without an overt act of distribution is sufficient to prove infringement. *See* Nimmer at § 8.11. Although the Second Circuit has not yet addressed the issue, many other circuits and district courts have held that this theory of "making a copyrighted work available" is sufficient. *See Noland v. Janssen,* No. 17-CV-5452 (JPO), 2019 WL 1099805, at *4 (S.D.N.Y. Mar. 8, 2019) ("There is a developing doctrine in copyright law, not yet addressed by the Second Circuit, regarding whether an unconsummated offer to distribute a copy of a work for sale can by itself constitute a 'distribution' of an unauthorized copy in violation of 17 U.S.C. § 106(3)."); *see also Grecco v. Age Fotostock Am.*, 21-cv-423 (JSR) (S.D.N.Y. Nov. 29, 2021)("This is a question that has not been resolved by the Second Circuit."). *See also UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 763-64 (W.D. Tex. 2019)("However, to the extent Grande relies on [*Atlantic Recording Corporation v. Howell*, 554 F. Supp. 2d 976 (D. Ariz. 2008)] for the proposition that contributory infringement of the reproduction right is the only viable theory against a party who makes infringing material available to the public, that reliance is misplaced because *Atlantic Recording* appears to be contrary to the great weight of the case law, including decisions of other courts in this district."); *Hotaling v. Church, Jesus Christ, Latter-Day*, 118 F.3d 199 (4th Cir. 1997); *Diversey v. Schmidly,* 738 F.3d 1196 (10th Cir. 2013); *UMG Recordings, Inc. v. Alburger*, Civil No. 07–3705, 2009 WL 3152153 (E.D. Pa. Sept. 29, 2009).

As we can see from Capitol's license to Edsel Records for the Sulton album, Defendants have made Sulton's sound recordings available for licensing. Accordingly, there is a strong inference that

Defendants are currently making the recordings available to third-party licensees, as part and parcel of Defendants' wrongful exercise of dominion and control over Sulton's recordings.[2] By analogy, these acts should be the basis for liability for copyright infringement under the "making available" theory. This is true even if Defendants are not undertaking acts that would constitute active commercial exploitation. Defendants have the ability to make the sound recordings available to third parties, whether it be by license, sale, or exploitation. Therefore, Defendants' repeated and systematic behavior of holding Sulton's sound recordings hostage under threat of litigation and preventing Sulton from exercising the panoply of rights that should be available to him under Section 106, warrants liability for infringement.

In the case of Sulton, he should have had the rights to his sound recordings restored almost four years ago – that is, after July 21, 2018, the effective date of termination. The fact that Defendants now attempt to avoid liability by withholding his sound recordings from public exploitation[3] should not be a safe haven from infringement. Defendants' misconduct must have consequences. Again, Section 203 provides that if the procedures are followed correctly, Sulton's rights revert back automatically. 17 U.S.C. § 203. Allowing Defendants to keep exploiting the sound recordings at issue, either by active commercial exploitation themselves, or by "making the works available" for use by third parties, predicated on Defendants' unilateral decision that the notices are invalid, sets a dangerous and improper precedent. Indeed, allowing such conduct would create a "makeshift license" in Defendants' favor, to Sulton's detriment. *See Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 968 (8th Cir. 2005).

---

[2]     There is a question of fact on this issue. Pointedly, Defendants do not say that they are not doing so, either in the Declaration of James Harrington ("Harrington Decl."), Dkt. 176, or otherwise, despite having had that opportunity.

[3]     That is, exploitation by Defendants themselves, as opposed to licensing the works to third parties, as they did with the 2013 Edsel Records license.

The evidence shows that Defendants are "making the works available" for use by third parties. The Edsel license is just one example of Defendants "making the works available" for third-party licensing. There could be many more, but Plaintiffs have been unable to test that. Defendants failed to disclose in any of their initial disclosures or discovery responses the identity of James Harrington as a potential witness. *See Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) (finding trial court did not abuse its discretion by striking witness affidavit where plaintiff failed to identify affiant as a fact witness and failed to amend answers to interrogatories concerning the subject matter of the affidavit). And yet his declaration has now been submitted in support of Defendants' Motion, and Harrington identifies himself as the "Senior Vice President Royalties and Copyright at UMG Recordings, Inc.," whose responsibilities include the "oversight of Defendants' systems that track and record data relating to Defendants' exploitation of sound recordings in the United States, including revenues and royalties associated with such exploitation." *See* Declaration of James Harrington ("Harrington Decl."), Dkt. 176, ¶¶1-2. Harrington states in his declaration that Defendants' systems were "queried" for data reflecting any exploitation of the album *Kasim* in the United States after July 21, 2018 but found none and found no record of "revenue activity" being generated. *See Id.*, ¶¶3-4. But that is not a complete picture of what may have occurred in connection with Sulton's works post-effective date of termination, and whether there were inquiries from third parties about Sulton's works that never came to fruition or resulted in revenues. This presents as a classic case of "hiding the ball" in the discovery process, thereby preventing Plaintiffs from the full and necessary exploration of the facts and evidence surrounding Defendants' claims as to "no exploitation" and the extent of data and documents searched for and reviewed. This is especially significant where Defendants have been vocal throughout the case as to their difficulty in searching files for information and locating documentation relevant to the class members, including Sulton, and Defendants' outright objection to discovery

requests and refusal to produce all relevant documents relating to Sulton.   Declaration of Ryan E. Cronin in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment as to Plaintiff Kasim Sulton's Claim for Copyright Infringement at ¶¶ 4-6.

Indeed, Alasdair McMullan, the Executive Vice President, Business and Legal Affairs and Head of Litigation at UMG, was presented twice for deposition as UMG's and Capitol's FRCP 30(b)(6) corporate designee, and yet was unable to provide an answer to the most basic of questions as to whether Sulton's sound recordings were even digitized and, if not, why not. *See* Deposition of Alasdair McMullan, conducted on March 11, 2022 ("McMullan 3/11/22 Depo."), p. 143, ll. 18-25; p. 144, ll. 1-6; p. 158, ll. 13-15. In addition, Harrington was identified only in passing by McMullan during his deposition but never as a potential witness with knowledge as to facts that would be relevant to the claims asserted by Sulton or anyone else. *See* Deposition of Alasdair McMullan, conducted on June 30, 2020 ("McMullan 6/30/20 Depo."), p. 26, l. 20 - p. 27, l. 9; p. 74, ll. 5-21; McMullan 3/11/22 Depo., p. 12, ll. 5-10; p. 16, ll. 22- p. 17, l. 23. Consequently, this veritable cherry-picking of self-serving information by Defendants and their failure to comply with discovery obligations by producing complete information and properly identifying witnesses should raise serious doubts about their use of Mr. Harrington in this manner.  Indeed, Defendants had Mr. McMullan verify certain interrogatory responses to hide behind claims of attorney-client privilege and work product and to avoid disclosing Mr. Harrington's role, even when they were disclosing information that supposedly came from Mr. Harrington.

As such, there is a genuine issue of material fact as to whether Defendants continue to make the sound recordings available, and in what manner. The jury should decide whether to believe the Defendant "hostage takers" when they claim that they have ceased active commercial exploitation but

threaten to sue the copyright owner if he dares to attempt to exploit the works.   Summary judgment should be denied on this basis alone.

### D.   Sulton's Other Remedies – Injunctive and Declaratory Relief – Are Equally Important and Viable.

In addition to seeking financial relief for Defendants' infringement, Sulton also is suing for injunctive and declaratory relief. *See* Second Amended Complaint ("SAC") at ¶¶ 104, 157; ¶ C of the Prayer for Relief (SAC at p. 31). The claim for injunctive relief is equally important as is the claim for declaratory relief that Defendants are, as of the effective date of termination, no longer the owners of the United States copyright in and to the works. Regardless of any financial gain or benefit, Defendants' misconduct is no less unconscionable and has resulted in injury to Sulton.

The act of exercising control over the sound recordings, when it is unlawful for Defendants to do so, should be called out for what it is: copyright infringement.   Sulton should be allowed to pursue Defendants' misconduct through all the available remedies for infringement found under Sections 504 and 505 of the Copyright Act.

Only by such an application of the infringement statutes of the Copyright Act can recording artists attempt to be made whole, and Defendants held accountable for their misconduct.   Otherwise, record labels like Defendants will be given a green light (and a free license) to continue to act in reckless disregard of the copyright laws and use their economic power to force artists into submission and to forego the right to reclaim the copyrights in the sound recordings the artists created. Section 203 was enacted to give artists a second chance to remedy the unfair advantage the record labels took over them decades ago; to allow the labels to do so yet again would be contrary to the express purpose of Section 203. It cannot seriously be argued that Defendants' copyright hostage-taking is *not* causing Sulton to lose money every day that his ownership rights are not returned to him. That damage is quantified both

in revenues Defendants are earning post-termination and in lost opportunities to Sulton if he had control over and the ability to exploit their work himself.

This Court is presented with the opportunity to fully implement and enforce Section 203 and allow the infringement claim against Defendants to go forward for their violation of Sulton's rights under that statute, and the deprivation of his rights to exploit his works under Section 106. It should do so by denying Defendants' Motion and permitting Sulton to proceed with his infringement claim.

## IV.    CONCLUSION

Defendants' Motion should be rejected as nothing more than an attempt to disregard the entire statutory scheme of Section 203 and create a "loophole" in the Copyright Act where none exists. Defendants' actions have deprived Sulton of the full enjoyment of the rights conferred by law under Sections 203 and 106. As such, those actions must be deemed an infringement, or else the intent and purpose of the Copyright Act will be nullified.

For all these reasons, Defendants' Motion to for Summary Judgment as to Kasim Sulton's Copyright Infringement Claim should be denied.

Dated: May 27, 2022                          **BLANK ROME LLP**

By:   */s/Ryan E. Cronin*

Ryan E. Cronin
Roy W. Arnold (admitted *pro hac vice*)
Gregory M. Bordo (admitted *pro hac vice*)
David M. Perry (admitted *pro hac vice*)
Heidi G. Crikelair
Jillian M. Taylor (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000

**COHEN MUSIC LAW**
Evan S. Cohen (admitted *pro hac vice*)
Maryann R. Marzano (admitted *pro hac vice*)
104 West Anapamu Street, Suite K

Santa Barbara, CA 93101-3126
Telephone: (805) 837-0100

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2022, the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion of Summary Judgment as to Plaintiff Kasim Sulton's Claim for Copyright Infringement was electronically filed through the Court's CM/ECF system and thereby served on the following recipients:

Melanie Berdecia, Esquire
mberdecia@sidley.com
Ariel Atlas, Esquire
aatlas@sidley.com
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Rollin A. Ransom, Esquire
rransom@sidley.com
Lisa M. Gilford, Esquire
lgilford@sidley.com
Adriane Peralta, Esquire
adriane.peralta@sidley.com
Lauren M. De Lilly, Esquire
ldelilly@sidley.com
Sidley Austin LLP
555 West 5th Street, Suite 4000
Los Angeles, CA 90013

Richard Stephen Mandel, Esquire
rsm@cll.com
Thomas Kjellberg, Esquire
txk@cll.com
Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

*Counsel for Defendants*

By: *_/s/ Ryan E. Cronin_____*
*Counsel for Plaintiffs*