# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN WAITE, an individual; KASIM SULTON, an individual; SUSAN STRAW HARRIS p/k/a SYD STRAW, an individual; LEONARD GRAVES PHILLIPS, an individual; STAN SOBOL a/k/a STAN LEE, an individual; STEVE WYNN, an individual; DENNIS MEHAFFEY, p/k/a DENNIS DUCK, an individual; and JOEL DAVID PELLISH, p/k/a DAVE PROVOST, an individual; and on behalf of all others similarly situated, <br><br>                    Plaintiffs, <br><br>           v. <br><br>UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group; and CAPITOL RECORDS, LLC, a Delaware limited liability company; <br><br>                    Defendants. | Civil Action No. 1:19-cv-01091-LAK <br><br> ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' RESPONSES, OBJECTIONS AND COUNTER STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO PLAINTIFF KASIM SULTON**

**BLANK ROME LLP**
Ryan E. Cronin
Roy W. Arnold (admitted *pro hac vice*)
Gregory M. Bordo (admitted *pro hac vice*)
David M. Perry (admitted *pro hac vice*)
Heidi G. Crikelair
Jillian M. Taylor (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000

**COHEN MUSIC LAW**
Evan S. Cohen (admitted *pro hac vice*)
Maryann R. Marzano (admitted *pro hac vice*)
104 West Anapamu Street, Suite K
Santa Barbara, CA 93101-3126
Telephone: (805) 837-0100

*Counsel for Plaintiffs*

Pursuant to Local Rule 56.1(b), Plaintiffs Kasim Sulton, Susan Straw Harris, Leonard Graves Phillips, Stan Sobol, Steve Wynn, Dennis Mehaffey, and Joel David Pellish, on behalf of themselves and all others similarly situated ("Plaintiffs"), hereby submit: (1) Plaintiffs' Responses, Objections, and Counter-Statement of Additional Material Facts in Opposition to Defendants' Statement of Material Facts as to Plaintiff Kasim Sulton's Claim for Copyright Infringement (ECF No. 171).

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO PLAINTIFF KASIM SULTON**

1. On September 29, 1980, Sulton and EMI America Records, Inc. ("EMI") entered into a recording agreement for Sulton's exclusive personal services as a performer on phonograph records (the "Agreement"). Declaration of Rollin A. Ransom ("Ransom Decl."), Ex. C ¶ 1; *id.*, Ex. B at 85:24-86:14, 231 (authenticating Depo. Ex. 28); *id.*, Ex. E at 3-4, 17 (responses to Request for Admission Nos. 1, 4, 5, and 60); ECF No. 95 ¶ 82.

Plaintiffs' Response to No. 1:
**Disputed in part:**

Plaintiffs admit that Sulton entered into a recording agreement with EMI on September 29, 1980 ("Recording Agreement").

Plaintiffs dispute Defendants' mischaracterization of Sulton's role as a mere "performer." To the contrary, Sulton was the author of the sound recordings, as that term is used in Section 203 of the Copyright Act. 43. Sulton alone decided what creative direction to take, which studio musicians would perform, which producer to use, which songs would be selected, what singles would be published, and how the songs would be sequenced. Ex. 1, Deposition of Kasim Sulton conducted on June 29, 2020 (Sulton Depo.") at 110:2-8, 125:11; Ex. 1, Sulton Depo. at 109:19-25; Supplemental Declaration of Kasim Sulton ("Sulton Supp. Decl."), ¶¶ 7, 17-18. Sulton selected all the musicians playing on *Kasim*, and EMI did not need

to approve them. Ex. 1, Sulton Depo. at 110:9-25, 121:20-122:7; Sulton Supp. Decl., ¶ 7. Sulton exercised complete artistic control over his sound recordings. Declaration of Kasim Sulton ("Sulton Decl."), Dkt. 182 at ¶ 11; Sulton Supp. Decl., ¶¶ 7, 17-18. Sulton personally selected the sound recordings that were included on his solo album, *Kasim*, as well as the sound recordings that were released as singles. Sulton Decl. at ¶ 13; Sulton Supp. Decl., ¶¶ 7, 17-18.

2. Capitol has since succeeded to EMI's rights and obligations under the Agreement, including ownership of the copyright to Kasim. ECF No. 95 ¶ 82.

Plaintiffs' Response to No. 2:
**Disputed in part**:

Plaintiffs admit that Sulton entered into the Recording Agreement with EMI on September 29, 1980. Plaintiffs also do not dispute that EMI is a predecessor to Capitol, and that Capitol succeeded to EMI's rights in and to the sound recordings, but only until the effective date of termination, as to the United States Copyright. As of the effective date of termination on July 21, 2018, Capitol had no further ownership in the sound recordings by operation of Section 203 of the Copyright Act.

Plaintiffs dispute Capitol's claim of continuing ownership of the United States copyright to *Kasim*. Contrary to Defendants' assertion, ownership of the United States copyrights to the ten original sound recordings on the album *Kasim* reverted to Sulton by operation of law upon the effective date of termination being reached on July 21, 2018. Ex. 2, Sulton Notice of Termination UMG 0019808- 0019811.

3. Paragraph 6(a) of the Agreement states, in part, that EMI has "the complete, unconditional, exclusive, perpetual, unencumbered and universe-wide" rights in "all results and proceeds of [Sulton]'s services and performances hereunder, including the exclusive ownership of any

and all masters and all records and reproductions made therefrom together with all universal copyrights and copyright rights[.]" Ransom Decl., Ex. C ¶ 6(a).

Plaintiffs' Response to No. 3:
**Disputed in part**:

Plaintiffs admit only the Recording Agreement contains that quoted language in Paragraph 6(a). Plaintiffs dispute that the language of Paragraph 6(a). Plaintiffs dispute Capitol's claim of continuing ownership of the United States copyright because Capitol ignores the fact that Section 203(a)(5) of the United States Copyright Act provides as follows: "Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant."

Plaintiffs dispute that EMI (or Capitol) has any continuing rights as of the effective date of termination on July 21, 2018. Upon the effective date of termination, the grant of rights terminated, and the United States copyrights reverted by operation of law to Sulton. Ex. 2, Sulton Notice of Termination UMG 0019808- 0019811.

4. On or about January 11, 1982, EMI released *Kasim*, an album embodying performances of Sulton recorded pursuant to the Agreement. Ransom Decl., Ex. B at 91:8-13; ECF No. 95 ¶ 95.

Plaintiffs' Response to No. 4:
**Disputed in part:**

Plaintiffs admit that on January 11, 1982, EMI released the album *Kasim*.

Plaintiffs dispute the Defendants' characterization of the album. *Kasim* is an album and sound recording authored by Sulton. SAC, ECF No. 95. The album *Kasim* contains ten original sound recordings that Sulton authored and created; The ten original sound recordings created

3

and authored by Sulton on *Kasim* are: (1) *Someone To Love*; (2) *Evil*; (3) *White and Red*; (4) *This Must Be Love*; (5) *Don't Break My Heart*; (6) *Drivin' Me Mad*; (7) *Roll The Dice*; (8) *Just a Little Bit*; (9) *Sweet Little Accident*; and (10) *Rock and Roll*. Ex. 1, Sulton Depo. at 91:23-92:12; Supplemental Declaration of Kasim Sulton ("Sulton Suppl. Decl."), ¶5.

5. On December 1, 2011, EMI Records Ltd. and Demon Music Group Limited ("Demon") entered into an agreement pursuant to which Demon licensed the album *Kasim* for a three-year term from February 25, 2013 to February 24, 2016 (the "License"). Declaration of Alasdair McMullan ("McMullan Decl.") ¶¶ 3-4 & Exs. A & B.

Plaintiffs' Response to No. 5:
**Undisputed.**

6. The rights licensed pursuant to the License between EMI Records Ltd. and Demon were limited to compact disc, or "CD" releases only (*i.e.*, no streaming or other digital rights), and the territory of the License was limited to the United Kingdom and Ireland. McMullan Decl. ¶¶ 3-4 & Exs. A & B.

Plaintiffs' Response to No. 6:
**Undisputed.**

7. Pursuant to the License, Demon released a compact disc re-issue of Kasim through its label Edsel Records in the United Kingdom in 2013. Ransom Decl., Ex. A.

Plaintiffs' Response to No. 7:
**Undisputed.**

8. On or about July 20, 2016, Sulton, through his representative and counsel Evan Cohen, transmitted a putative "Notice of Termination Under 17 U.S.C. § 203 and 37 C.F.R.

4

§ 201.10" to "Universal Music Group" (the "Notice"). Ransom Decl., Ex. D; id., Ex. B at 187:19-188:23, 231 (authenticating Depo. Ex. 31); ECF No. 95 ¶ 96; ECF No. 95-3.

Plaintiffs' Response to No. 8:
**Disputed in part:**

Plaintiffs admit that Sulton served a Notice of Termination on or about July 20, 2016.

Plaintiffs dispute the Defendants' characterization of the Notice of Termination as being "putative." Contrary to Defendants' characterization and particularly for purposes of Defendants' Motion, the Notice was and is valid. Defendants have failed to establish any facts that raise any issue as to the validity of the Sulton Notice of Termination.

The Notice of Termination was served by counsel for Sulton upon UMG, as agent for Capitol as the address set forth on Defendants' website. The Sulton Notice of Termination terminated "[a]ll grants or transfers of copyright and all rights of the copyright proprietor" in the album *Kasim*, "including, without limitation the grant date in or about 1981 between the recording artist Kasim [Sulton] and EMI America Records, a division of Capitol Records, Inc." Second Amended Complaint, Dkt. 95, ¶96; Dkt. 95-3; Ex. 2, Sulton Notice of Termination UMG 0019808- 0019811.

9. In the Notice, Sulton purported to terminate "[a]ll grants or transfers of copyright and all rights of the copyright proprietor" in the album *Kasim*, "including, without limitation the grant dated in or about 1981 between the recording artist Kasim [Sulton] and EMI America Records, a division of Capitol Records, Inc." Ransom Decl., Ex. D; ECF No. 95-3.

Plaintiffs' Response to No. 9:
**Disputed in part:**

Plaintiffs admit that Sulton served a Notice of Termination.

5

Plaintiffs dispute the Defendants' characterization of the Notice of Termination as being "purported." Contrary to Defendants' characterization and particularly for purposes of Defendants' Motion, the Notice was and is valid. Defendants have failed to establish any facts that raise any issue as to the validity of the Sulton Notice of Termination.

The Notice of Termination was served by counsel for Sulton upon UMG, as agent for Capitol as the address set forth on Defendants' website. The Sulton Notice of Termination terminated "[a]ll grants or transfers of copyright and all rights of the copyright proprietor" in the album *Kasim*, "including, without limitation the grant date in or about 1981 between the recording artist Kasim [Sulton] and EMI America Records, a division of Capitol Records, Inc." Second Amended Complaint, Dkt. 95, ¶96; Dkt. 95-3; Ex. 2, Sulton Notice of Termination UMG 0019808-0019811.

10. The Notice listed an "Effective Date of Termination" of July 21, 2018 for *Kasim*. Ransom Decl., Ex. D; ECF No. 95 ¶ 98; ECF No. 95-3.

Plaintiffs' Response to No. 10:
**Undisputed.**

11. On June 5, 2019, Sulton joined this action as a plaintiff asserting claims against Defendants for copyright infringement. ECF No. 45 at 1 & ¶¶ 52-61.

Plaintiffs' Response to No. 11:
**Undisputed.**

12. Sulton seeks to be appointed a class representative of a putative class of artists seeking compensatory damages for alleged copyright infringement against Capitol, defined as follows: "All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination pursuant to § 203 of the

Copyright Act describing an effective date of termination for a particular work (i) occurring on or after January 1, 2013 and (ii) occurring no later than the date the Court grants class certification of Class A." ECF No. 95 at 31 & ¶ 45.

> Plaintiffs' Response to No. 12:
> **Disputed in part:**
>
> Plaintiffs admit that Plaintiff Sulton is seeking to represent a class of similarly situated recording artists as set forth in Plaintiffs' Second Amended Complaint and their pending Motion for Class Certification. Plaintiffs also admit that Plaintiffs and Class A are seeking compensatory and/or statutory damages as allowed by the United States Copyright Act for Defendants' infringement and willful infringement. ECF Dkt. 95; ECF Dkt. Nos. 149-150.

13. Sulton contends that Defendants infringed his purported rights in *Kasim* by (1) denying the Notice and "claiming ownership of the sound recordings of the album *Kasim* from and after the effective date of termination"; (2) "as a result of exploitation of [*Kasim*] on the internet[,] . . . collecting royalties from SoundExchange, and possibly other sources"; and (3) "[w]ith regard to physical exploitation of the sound recordings[,] . . . licens[ing] [*Kasim*] to a record label based in the UK, Edsel Records, and that label, with the full knowledge of UMG, is exporting units out of the UK and importing them into the United States, at which point the units are sold in the United States, on sites such as Amazon." Ransom Decl., Ex. F at 28-32 (supplemental responses to Interrogatory Nos. 12 and 13); see also id., Ex. B at 209:10-212:3; ECF No. 95 ¶ 100-102, 105.

> Plaintiffs' Response to No. 13:
> **Disputed in part:**
>
> Plaintiffs admit that the three listed instances constitute infringement of Plaintiff Sulton's rights after the effective date of termination on July 21, 2018.

Plaintiffs dispute the Defendants' mischaracterization of Sulton's rights in *Kasim* as "purported." Ownership of the copyrights to the ten original sound recordings on the album *Kasim* reverted to Sulton by operation of law upon the effective date of termination occurring on July 21, 2018. Ex. 2, Sulton Notice of Termination UMG 0019808- 0019811.

14. Sulton contends that Defendants continued to exploit Kasim and generate revenue from such exploitation after July 21, 2018, the album's putative termination date. Ransom Decl., Ex. F at 28-32 (supplemental responses to Interrogatory Nos. 12 and 13); id., Ex. B at 209:10-17; ECF No. 95 ¶¶ 101-102, 105.

Plaintiffs' Response to No. 14:
**Undisputed.**

15. Defendants have not exploited the album Kasim in the United States on or after July 21, 2018 and have not received any revenues (digital, physical, through SoundExchange, or otherwise) associated with exploitation of Kasim in the United States after July 21, 2018. Declaration of James Harrington ¶¶ 3-4.

Plaintiffs' Response to No. 15:
**Disputed in Part:**

Plaintiffs believe that Defendants are making the sound recordings available for use by third parties. The Edsel license is just one example of Defendants "making the works available" for third-party licensing. It was entered into in 2013, and demonstrates that *Kasim* was the subject of licensing at least as recently as 2016. There could be many more, but Plaintiffs have been unable to test that. Defendants failed to disclose in any of their initial disclosures or discovery responses the identity of James Harrington as a potential witness. *See Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) (finding trial court did not

8

abuse its discretion by striking witness affidavit where plaintiff failed to identify affiant as a fact witness and failed to amend answers to interrogatories concerning the subject matter of the affidavit). In Harrington's declaration, which was submitted in support of Defendants' Motion, Harrington identifies himself as the "Senior Vice President Royalties and Copyright at UMG Recordings, Inc.," whose responsibilities include the "oversight of Defendants' systems that track and record data relating to Defendants' exploitation of sound recordings in the United States, including revenues and royalties associated with such exploitation." *See* Declaration of James Harrington ("Harrington Decl."), Dkt. 176, ¶¶1-2. Harrington states therein that Defendants' systems were "queried" for data reflecting any exploitation of the album *Kasim* in the United States after July 21, 2018 but found none and found no record of "revenue activity" being generated. *See Id*., ¶¶3-4. But that is not a complete picture of what may have occurred in connection with Sulton's works post-effective date of termination, and whether there were inquiries from third parties about Sulton's works that never came to fruition or resulted in revenues. This presents as a classic case of "hiding the ball" in the discovery process, thereby preventing Plaintiffs from the full and necessary exploration of the facts and evidence surrounding Defendants' claims as to "no exploitation" and the extent of data and documents searched for and reviewed. This is especially significant where Defendants have been vocal throughout the case as to their difficulty in searching files for information and locating documentation relevant to the class members, including Sulton, and Defendants' outright objection to discovery requests and refusal to produce all relevant documents relating to Sulton. Having refused and/or obstructed such discovery and having failed to identify this material witness, Defendants cannot now rely upon him to support their position.

**PLAINTIFFS' COUNTER-STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO PLAINTIFF KASIM SULTON**

16. Between September 29, 1980 and January 11, 1982, Sulton created the ten sound recordings that would eventually be included on the album *Kasim* released on January 11, 1982. Ex. 1, Sulton Depo., at 98:11-24 (noting that the recording process took "anywhere between 6 to 12 months"); Ex. 1, Sulton Depo. at 91:8-13; Ex. 3, UMG0026361-0026362 (Sulton Copyright Registration Certificate).

17. More than three decades after the release of *Kasim*, Sulton, through counsel, served a timely and valid Notice of Termination under Section 203 of the United States Copyright Act of 1976 on Defendant Universal Music Records, Inc. ("UMG") as the agent for Capitol on July 20, 2016. Sulton Suppl. Decl., ¶ 19; Ex. 2, UMG0019808-0019811 (Sulton Notice of Termination).

18. On July 25, 2016, counsel for Sulton recorded the Notice of Termination with the United States Copyright Office as document V9924 D803 P1 through P3. Sulton Suppl. Decl., ¶19; Ex. 4, P00093-00096 (Certificate of Recordation of the Sulton Notice of Termination with the U.S. Copyright Office).

19. On September 20, 2016, Defendants sent Sulton a letter arguing mistakenly that Sulton's notice of termination was invalid, contending that the sound recordings in *Kasim* were works made "for hire" or "compilations" not subject to termination under Section 203 of the Copyright Act. Sulton Suppl. Decl., ¶20; Ex. 5, P00097-00099 (Defendants' Counter Notice to Sulton's Notice of Termination).

20. The effective date of termination for Sulton's sound recordings in *Kasim* was July 21, 2018. Sulton Suppl. Decl., ¶21; Ex. 2, UMG0019808-0019811 (Sulton Notice of Termination).

21. Despite having knowledge that the effective date of termination was July 21, 2018, Defendants refused to honor it. Sulton Decl., ¶¶20-21; Ex. 2, UMG0019808-0019811 (Sulton Notice of Termination); Ex. 5, P00097-00099 (Defendants' Counter Notice to Sulton's Notice of Termination).

22. Defendants knowingly failed to return the rights to the sound recordings in *Kasim* to Sulton.

Sulton Suppl. Decl., ¶¶20-21; Ex. 5, P00097-00099 (Defendants' Counter Notice to Sulton's Notice of Termination); Ex. 1, Sulton Depo. at 212:12-15 ("I would just like my record back, and I'd like for everyone [in the class] to have their records back.").

23. To date, by their affirmative actions and conduct, Defendants have prevented Sulton from exploiting the sound recordings in *Kasim* well after the effective date of termination. Sulton Suppl. Decl., ¶¶21-33; Ex. 1, Sulton Depo. at 212:12-15.

24. Sulton is a highly skilled, professional musician, best known for his work as a bass guitarist, keyboardist, and vocalist. Sulton Suppl. Decl., ¶1; Ex. 1, Sulton Depo. at 106:6-13.

25. Sulton's career as a professional musician has spanned more than 35 years and continues to this day. Sulton Suppl. Decl., ¶ 1.

26. Sulton is a "multi-instrumentalist," and when creating the sound recordings in Kasim, played not only the bass guitar, but also six string guitar, piano, electric keyboards, and the synthesizer. Ex. 1, Sulton Depo. at 106:6-13, 223:2-21.

27. Sulton is an American bass guitarist, keyboardist, and singer from Staten Island, New York. Sulton Supp. Decl., ¶1.

28. Sulton's music career began in 1976 as a bass guitarist with Todd Rundgren's band Utopia and continues to this day. Sulton Supp. Decl., ¶1.

11

29. Although best known for his musical work with Utopia, Sulton has created solo projects and toured as a bassist with many artists such as Michael Lee Aday (p/k/a Meat Loaf), a musician and recording artist. Sulton Supp. Decl., ¶1.

30. In the late 1970's, Sulton decided to create a solo album apart from his work with Utopia. Ex. 1, Sulton Depo. at 63:24-64:16; Sulton Supp. Decl., ¶2.

31. Sulton shopped around a demo to various labels. Ex. 1, Sulton Depo. At 63:24-64:16: Sulton Suppl. Decl., ¶ 2.

32. Sulton eventually signed a recording agreement ("Recording Agreement") with EMI America Records, Inc. ("EMI"), which is a predecessor of Defendant Capitol Records, LLC, on September 29, 1980 to release his first solo album. Ex. 6, UMG0019812 (Recording Agreement); Sulton Supp. Decl., ¶2.

33. In the Recording Agreement Sulton signed with EMI, he agreed to provide his exclusive recording services as a recording artist. Sulton Supp. Decl., ¶ 3.

34. After signing the Recording Agreement, Sulton began work on his solo album. Sulton Supp. Decl., ¶4.

35. The Recording Agreement provided that, for a term of eighteen months, Sulton could record two albums, the first of which would eventually be his solo album *Kasim*. Sulton Supp. Decl., ¶4; Ex. 6, UMG0019812, ¶ 3.

36. The Recording Agreement contained boilerplate "work made for hire" language in which Sulton, the recording artist, was required to "acknowledge[] and agree[]" that each sound recording was a "work made for hire" by virtue of being "prepared within the scope of [EMI's] engagement of [my] personal services" or being "specially ordered by [EMI] as a contribution to a collective work." Sulton Supp. Decl., ¶4; Ex. 6, UMG0019812, ¶ 6(a)(i).

37. The Recording Agreement alternatively contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, Sulton nonetheless "grant[ed] and assign[ed] to EMI all exclusive rights of the copyright in and to" the sound recordings. Sulton Supp. Decl., ¶4; Ex. 6, UMG0019812, ¶ 6(a)(ii).

38. Sulton's solo album was ultimately released with the title *Kasim* on January 11, 1982, and was comprised of ten sound recordings: (1) *Someone To Love*; (2) *Evil*; (3) *White and Red*; (4) *This Must Be Love*; (5) *Don't Break My Heart*; (6) *Drivin' Me Mad*; (7) *Roll The Dice*; (8) *Just a Little Bit*; (9) *Sweet Little Accident*; and (10) *Rock and Roll*. Ex. 1, Sulton Depo. at 91:23-92:12; Sulton Supp. Decl., ¶5.

39. EMI filed a copyright application with the U.S. Copyright Office to register *Kasim*. Ex. 3, UMG0026361-0026362; Sulton Supp. Decl., ¶6.

40. The application categorized *Kasim* as a "sound recording" (and not a "compilation" or a "collective work"). Ex. 3, UMG0026361-0026362; Sulton Supp. Decl., ¶6.

41. The U.S. Copyright Office issued EMI a Certificate of Registration for *Kasim* with an effective date of January 20, 1982. Ex. 3, UMG0026361-0026362; Sulton Supp. Decl., ¶6.

42. Sulton always maintained complete creative control during the recording process for the album *Kasim*. Ex. 1, Sulton Depo. at 223:6-21; Sulton Supp. Decl., ¶¶7, 17-18.

43. Sulton alone decided what creative direction to take, which studio musicians would perform, which producer to use, which songs would be selected, what singles would be published, and how the songs would be sequenced. Ex. 1, Sulton Depo. at 110:2-8, 125:11; Ex. 1, Sulton Depo. at 109:19-25; Sulton Supp. Decl., ¶¶7, 17-18.

44. Sulton selected all the musicians playing on *Kasim*, and EMI did not need to approve them. Ex. 1, Sulton Depo. at 110:9-25, 121:20-122:7; Sulton Supp. Decl., ¶7.

45. It was Sulton's decision as to who was going to play on his record. Ex. 1, Sulton Depo. at 110:9-25, 121:20-122:7; Sulton Supp. Decl., ¶ 7.

46. EMI did not provide any input or guidance. Ex. 1, Sulton Depo. at 110:9-25, 121:20-122:7; Sulton Supp. Decl., ¶¶ 7, 17-18.

47. EMI never told Sulton that he had to show up at a studio at a certain time, nor did EMI dictate how he should create the sound recordings in any way. Ex. 1, Sulton Depo. at 110:9-25, 121:20-122:7; Sulton Supp. Decl., ¶ ¶15, 17.

48. During this time (or at any time), Sulton was never an employee of EMI. Ex. 1, Sulton Depo. at 223:22-24; Sulton Supp. Decl., ¶¶ 8-9.

49. EMI never paid Sulton a salary or sent him a paycheck. Ex. 1, Sulton Depo. at 223:22-24; Sulton Supp. Decl., ¶¶ 10-11.

50. EMI never withheld any income tax on Sulton's behalf. Ex. 1, Sulton Depo. at 223:6-21; Sulton Supp. Decl., ¶ 11.

51. EMI never provided Sulton with insurance or any other benefits. Ex. 1, Sulton Depo. at 223:6-21; Sulton Supp. Decl., ¶¶ 13, 16, 18.

52. EMI never provided me with an office. Ex. 1, Sulton Depo. at 223:6-21 Sulton Supp. Decl., ¶ 15.

53. Sulton has never been an employee of Defendants UMG Recordings, Inc, Capitol Records, LLC, or any of their predecessor record labels (including, but not limited to, A&M Records, A&M Records Limited, EMI America Records, Inc., and Virgin Records, America, Inc.) (collectively, "UMG" or "Defendants"). Sulton Decl., ¶ 3; Sulton Supp. Decl., ¶ 8-9.

54. As to all the Defendants, Sulton never received a salary. Sulton Decl., ¶ 4; Sulton Supp. Decl., ¶ 10.

14

55. Sulton never received a paycheck from Defendants in which Defendants withheld any income taxes, social security, or other comparable payments. Sulton Decl., ¶ 5; Sulton Supp. Decl., 10.

56. Sulton never received a W-2 from Defendants. Sulton Decl., ¶ 6; Sulton Supp. Decl., 12.

57. Sulton never received health or life insurance benefits from Defendants. Sulton Decl., ¶ 7; Sulton Supp. Decl., ¶13.

58. Defendants did not pay any unemployment insurance premiums to the State of California or any other state on Sulton's behalf. Sulton Decl., ¶ 8; Sulton Supp. Decl. ¶14.

59. Sulton was never provided with an office, secretary or any other type of assistant by Defendants. Sulton Decl., ¶ 9; Sulton Supp. Decl., ¶ 15.

60. Sulton was never told by Defendants to show up at an office or other workplace, and he never did. Sulton Decl., ¶ 9; Sulton Supp. Decl., ¶ 15.

61. Sulton never received paid vacation or sick leave time from Defendants. Sulton Decl., ¶ 10; Sulton Supp. Decl., ¶ 16.

62. Defendants never told Sulton what to record, how to record, where to record, or when to record. Sulton Decl. at ¶ 11; Sulton Supp. Decl., ¶ 17.

63. Sulton exercised complete artistic control over his sound recordings. Sulton Decl., ¶ 11; Sulton Supp. Decl., ¶¶ 7, 17-18.

64. Defendants did not assign Sulton any additional projects outside the scope of the Recording Agreement. Sulton Decl., ¶ 12; Sulton Supp. Decl., ¶ 17.

65. Sulton personally selected the sound recordings that were included on his solo album, *Kasim*, as well as the sound recordings that were released as singles. Sulton Decl., ¶ 13; Sulton Supp. Decl., ¶¶ 7, 17-18.

66. Sulton authorized Evan Cohen and his firm to serve a Notice of Termination on my behalf with respect to *Kasim*, which was done. Sulton Supp. Decl., ¶ 19.

67. More than three decades later after *Kasim* was released, that Notice of Termination was sent to Defendants, on July 20, 2016. Sulton Supp. Decl., ¶ 19.

68. The Notice of Termination informed Defendants that Sulton was seeking to terminate the grant of rights to the sound recordings in *Kasim*. Ex. 2, UMG0019808; Sulton Supp. Decl., ¶ 19.

69. Sulton understood that his counsel subsequently caused the Notice of Termination to be recorded in the U.S. Copyright Office. Sulton Supp. Decl., ¶ 19.

70. In response to Sulton's Notice of Termination, his counsel received a letter from Defendants' attorneys refusing to honor the termination notice, and instead threatening Sulton with litigation if he tried to exploit his sound recordings himself or attempted to have others to do so for him. Sulton Supp. Decl., ¶ 20.

71. The effective date of termination for the sound recordings on *Kasim* occurred on July 21, 2018. Sulton Supp. Decl., ¶ 21.

72. After July 21, 2018, Defendants still refused to return the rights to the sound recordings in *Kasim* to Sulton. Sulton Supp. Decl., ¶ 21.

73. Defendants continue to retain the rights to the sound recordings in *Kasim*, and to date, have prevented Sulton from exploiting the sound recordings, well after the effective date of termination. Sulton Supp. Decl., ¶¶ 21-33.

74. Sulton has not been free to exploit his recordings, sell copies or package them along with his other works. Sulton Supp. Decl., ¶¶ 21-33.

75. Sulton's ten sound recordings have never been exploited via digital streaming, and Defendants have prevented Sulton from doing so himself. Sulton Supp. Decl., ¶ 22.

76. Sulton's recordings are not being streamed on any of the numerous streaming or other music delivery platforms and are thus do not create any revenue for Sulton. Sulton Supp. Decl., ¶ 22.

77. Sulton has been precluded from distributing his work in any fashion and prevented from entering into licensing deals with third parties. Sulton Supp. Decl., ¶ 23.

78. There have been many missed opportunities, especially for potential sales and other merchandizing at concerts---not just Sulton's own solo concerts since 2018, but also at the many Todd Rundgren/Utopia shows since the band's reunion in 2018. Sulton Supp. Decl., ¶ 24.

79. Sulton would and could have sold or distributed *Kasim* at those concerts, or generated subsequent sales on his website, but was not able to do so because of Defendants' conduct. Sulton Supp. Decl., ¶¶ 24-30.

80. In 2018, the "Todd Rundgren's Utopia" reunion tour commenced, which represented the first shows with the original musician line up in 26 years. That was a 33-date tour, and a substantial merchandising deal was negotiated for that tour. Sulton Supp. Decl., ¶ 25.

81. Having Sulton's solo album *Kasim* available for sale on that tour would have been beneficial and very lucrative for Sulton. Sulton Supp. Decl., ¶ 25.

82. Sulton did his own "Kasim Sulton's Utopia" tour in 2018 consisting of 7 shows. Sulton Supp. Decl., ¶ 25.

83. In 2019, Sulton performed a dozen shows with Kasim Sulton's Utopia as well as 2 Todd Rundgren tours, totaling approximately 35 concert dates. Sulton Supp. Decl., ¶ 26.

84. In 2020, there were 16 booked shows with Kasim Sulton's Utopia, and 6 Todd Rundgren shows in January and February, before the pandemic stopped most live shows. Sulton Supp. Decl., ¶ 27.

85. Sulton managed to perform a half dozen solo shows in 2020, one being the first ever Drive-In concert in the country in May 2020, for which Sulton received national press coverage. Sulton Supp. Decl., ¶ 27.

86. In 2021, Sulton performed 5 solo shows plus a 27-date virtual tour with Todd Rundgren and could have advertised and offered his first solo album *Kasim* for sale at those shows. Sulton Supp. Decl., ¶ 28.

87. In 2022, Sulton performed 7 Kasim Sulton's Utopia shows. Sulton Supp. Decl., ¶ 29.

88. In 2022, Sulton also performed at 24 shows on the much anticipated "The Gilmour Project" tour featuring David Gilmour's Pink Floyd repertoire. Sulton Supp. Decl., ¶ 29.

89. "The Gilmour Project" tour is also one that Sulton sold merchandise on and could have had *Kasim* available for sale as well. Sulton Supp. Decl., ¶ 29.

90. Starting July 1, 2022 through August 1, 2022, Sulton will be performing on a 20-city tour with Todd Rundgren. Sulton Supp. Decl., ¶ 30.

91. In addition to performing at concerts, Sulton has also been engaged in a Podcast project currently available on all streaming platforms called UNSUNG. Sulton Supp. Decl., ¶ 31.

92. That Podcast project is based loosely on Sulton's life and career as a musician with respect to touring and performing and the consequent hardships created on health and family issues. Sulton Supp. Decl., ¶ 31.

93. It would have been important for Sulton to be able to use his first record, *Kasim*, in a story line, but was unable to because Defendants have not returned his copyright to those works. Sulton Supp. Decl., ¶ 31.

94. Defendants' actions have, in effect, silenced Sulton's work. Sulton Supp. Decl., ¶ 33.

95. Every day that Defendants refuse to return Sulton's recordings to him prevents Sulton from earning any revenue. Sulton Supp. Decl., ¶ 33.

96. Defendants have made Sulton's sound recordings available for licensing through Capitol's license to Edsel Records for the Sulton album, *Kasim*. Ex. 7, UMG0024383 (Principal Terms and Conditions of an agreement between EMI Records LTD. And Demon Music Group Ltd. Dated December 1, 2011); Ex. 8, UMG0024381 (Clearance Confirmation between EMI Records Ltd. And Demon Music Group Ltd.)

97. There is a strong inference that Defendants are currently making Sulton's sound recordings available to third-party licensees, as part and parcel of Defendants' wrongful exercise of dominion and control over Sulton's recordings because Defendants do not say that they are not doing so, either in the Declaration of James Harrington ("Harrington Decl."), or otherwise, despite having had that opportunity. Harrington Decl., Dkt. 176.

Dated: May 27, 2022                               **BLANK ROME LLP**

                                                  By:   */s/Ryan E. Cronin*

                                                        Ryan E. Cronin
                                                        Roy W. Arnold (admitted *pro hac vice*)
                                                        Gregory M. Bordo (admitted *pro hac vice*)
                                                        David M. Perry (admitted *pro hac vice*)
                                                        Heidi G. Crikelair
                                                        Jillian M. Taylor (admitted *pro hac vice*)
                                                        1271 Avenue of the Americas
                                                        New York, NY 10020
                                                        Telephone: (212) 885-5000

                                                        **COHEN MUSIC LAW**
                                                        Evan S. Cohen (admitted *pro hac vice*)
                                                        Maryann R. Marzano (admitted *pro hac vice*)
                                                        104 West Anapamu Street, Suite K
                                                        Santa Barbara, CA 93101-3126
                                                        Telephone: (805) 837-0100

                                                        *Counsel for Plaintiffs*