**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
                                  :

JOHN WAITE, an individual; KASIM       :   No. 1:19-cv-01091(LAK)
SULTON, an individual; SUSAN STRAW     :
HARRIS p/k/a SYD STRAW, an individual;  :
LEONARD GRAVES PHILLIPS,  an         :
individual, STAN SOBOL a/k/a STAN LEE, an :
individual, STEVE WYNN, an individual,    :
DENNIS MEHAFFEY p/k/a DENNIS DUCK,  :
an individual; and DAVID PELLISH p/k/a   :
DAVE PROVOST, an individual; and on behalf :
of all others similarly situated,          :
                                  :
               Plaintiffs,    :
                                  :
           v.                       :
                                  :
UMG RECORDINGS, INC.; CAPITOL       :
RECORDS, LLC; and DOES 1 through 10,   :
                                  :
             Defendants.   :
-----------------------------------------------------------X

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT ON DEFENDANTS' WORK MADE FOR HIRE DEFENSE**

**<u>TABLE OF CONTENTS</u>**

Page

INTRODUCTION ....................................................................................................1

BACKGROUND .....................................................................................................2

I. EMI America Records, Inc.'s Creation of the Album *Kasim*. ...................2

II. Virgin Records America, Inc.'s Creation of the Album *Surprise*.................4

III. A&M Records Limited's Creation of the Album *Dawn of the Dickies*........................6

IV. A&M Records, Inc.'s Creation of the Albums *Medicine Show* and *This is Not the New Dream Syndicate Album Live*..................................................7

LEGAL STANDARD..............................................................................................9

ARGUMENT ........................................................................................................10

I. Plaintiffs Fail to Meet Their Burden with Respect to the Putative Class. .................10

II. Genuine Disputes Exist as to Whether the Works at Issue Featuring the Named Plaintiffs are Works Made for Hire. ..........................................12

  A. Copyright Registrations For The Works At Issue Create A Genuine Dispute Precluding Summary Judgment. ...................................12

  B. Genuine Disputes As To The *Reid* Factors Preclude Summary Judgment......13

    1. Genuine Disputes Exist as to Whether Sulton Was an Employee for Hire of EMI..................................................17

    2. Genuine Disputes Exist as to Whether Straw Was an Employee for Hire of Virgin..................................................19

    3. Genuine Disputes Exist as to Whether Phillips and Sobol Were Employees for Hire of A&M Ltd..........................................21

    4. Genuine Disputes Exist as to Whether Wynn, Mehaffey, and Pellish Were Employees for Hire of A&M. ...................................23

  C. Genuine Disputes Exist As To Whether The Works At Issue Are Contributions To A Collective Work Or A Compilation...............................25

    1. Genuine Disputes as to Whether the Works at Issue Were "Specially Ordered or Commissioned" Preclude Summary Judgment. ................25

    2. Genuine Disputes as to Whether the Works at Issue Were Contributions to a Collective Work or Compilation Preclude Summary Judgment. ................................................................28

CONCLUSION......................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) ............................................................................................... 1

*Autoskill Inc. v. Nat'l Educ. Support Systems, Inc.*,
994 F.2d 1476 (10th Cir. 1993), *overruled on other grounds in TW Telecom*
*Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011) ................................ 12

*Aymes v. Bonelli*,
980 F.2d 857 (2d Cir. 1992) .................................................................................. 16

*Ballas v. Tedesco*,
41 F. Supp. 2d 531 (D.N.J. 1999) .......................................................................... 32

*Bryant v. Media Right Prods. Inc.*,
603 F.3d 135 (2d. Cir. 2010) ..................................................................... 15, 26, 33

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .............................................................................................. 33

*Carter v. Helmsley-Spear, Inc.*,
71 F.3d 77 (2d Cir. 1995) .......................................................................... 15, 16, 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................... 9, 11, 35

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ....................................................................................... *passim*

*Eisenberg v. Advance Relocation & Storage, Inc.*,
237 F.3d 111 (2d Cir. 2000) ............................................................................ *passim*

*Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.*,
No. 08 CIV 6143 (DLC), 2010 WL 3564258 (S.D.N.Y. Sept. 10, 2010) .................. 26, 27, 28

*Foster v. Lee*,
93 F. Supp. 3d 223 (S.D.N.Y. 2015) ..................................................................... 15

*Garcia v. Hartford Police Dep't*,
706 F.3d 120 (2d Cir. 2013) (per curiam) ............................................................. 9

*Giannullo v. City of New York*,
322 F.3d 139 (2d Cir. 2003) ..................................................................... 11, 34, 35

*Healthfirst, Inc. v. Medco Health Sols., Inc.*,
  No. 03 CV 5164 (RLC), 2006 WL 3711567 (S.D.N.Y. Dec. 15, 2006) ................................9

*Horror Inc. v. Miller*,
  335 F. Supp. 3d 273 (D. Conn. 2018) ........................................................................14, 15, 16

*Hoyt v. Andreucci*,
  433 F.3d 320 (2d Cir. 2006).............................................................................................25

*Jackson v. Odenat*,
  9 F. Supp. 3d 342 (S.D.N.Y. 2014) ..............................................................................30, 31

*JustMed, Inc. v. Byce*,
  600 F.3d 1118 (9th Cir. 2010) ..........................................................................................14

*Khulumani v. Barclay Nat'l Bank LTD*,
  504 F.3d 254 (2d. Cir. 2007)............................................................................................32

*Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear,*
  *Inc.*, 160 F.3d 106 (2d Cir.), *amended,* 169 F.3d 782 (2d Cir. 1998) ................................12, 13

*Leberman v. John Blair & Co.*,
  880 F.2d 1555 (2d Cir. 1989)...........................................................................................25

*Lee v. Karaoke City*,
  No. 1:18-cv-03895 (PAE) (SDA), 2020 WL 9815181 (S.D.N.Y. Dec. 18,
  2020) (R&R) ....................................................................................................................13

*Lulirama Ltd. v. Axcess Broad. Servs., Inc.*,
  128 F.3d 872 (5th Cir. 1997) ...........................................................................................32

*Martha Graham School and Dance Found., Inc. v. Martha Graham School of*
  *Contemporary Dance*, 380 F.3d 624 (2d Cir. 2004).......................................................15, 26

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013)......................................................................................9, 11, 26

*Morris v. Business Concepts, Inc.*,
  283 F.3d 502 (2d Cir. 2002).............................................................................................30

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
  558 F.2d 1090 (2d Cir. 1977)...........................................................................................12

*Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*,
  214 F.3d 132 (2d Cir. 2000)..............................................................................................1

*Playboy Enters., Inc. v. Dumas*,
  53 F.3d 549 (2d Cir. 1995)...........................................................................................11, 26

*Robertson v. Burdon*,
 No. ED CV18-00397 JAK, 2019 WL 2141971 (C.D. Cal. Apr. 3, 2019) .............................13

*SHL Imaging, Inc. v. Artisan House, Inc.*,
 117 F. Supp. 2d 301 (S.D.N.Y. 2000) ...................................................................................16

*Siniouguine v. Mediachase Ltd.*,
 No. CV 11-6113-JFW, 2012 WL 2317364 (C.D. Cal. Jun. 11, 2012) ...................................29

*Staggers v. Real Authentic Sound*,
 77 F. Supp. 2d 57 (D.D.C. 1999) ..........................................................................................32

*Stanacard, LLC v. Rubard, LLC*,
 No. 12 CIV. 5176, 2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) .............................................29

*Waite v. UMG Recordings, Inc.*,
 450 F. Supp. 3d 430 (2020) ............................................................................................29, 33

*Webster v. Fall*,
 266 U.S. 507 (1925) ...............................................................................................................32

*Zhu v. Salaam Bombay, Inc.*,
 No. 16-CV-4091 (JPO), 2017 WL 11615748 (S.D.N.Y. Dec. 21, 2017) ..................18, 19, 22

**Statutes and Rules**

17 U.S.C. § 101 ................................................................................................... *passim*

17 U.S.C. § 203(a) ..................................................................................................................10

17 U.S.C. § 410(c) .............................................................................................................12, 13

Fed. R. Civ. P. 56(a) ............................................................................................................9, 11

Local Rule 56.1 of the U.S. District Courts for the Southern and
 Eastern Districts of New York ........................................................................................11, 25

**Other Authorities**

H.R. Rep. 94-1476, 122, 1976 U.S.C.C.A.N. 5659, 5737, *available at*
 https://www.copyright.gov/history/law/clrev_94-1476.pdf.....................................................33

*Hearing Before the Subcomm. on Courts and Intellectual Property of the H.
 Comm. on the Judiciary,* 106th Cong. 151 (2000)................................................................29

*Hearing Before the Subcomm. on Courts and Intellectual Property of the H.
 Comm. on the Judiciary,* 106th Cong. 138 (2000)................................................................30

U.S. Copyright Office, Circular 14 Copyright in Derivative Works and
    Compilations Registration for Sound Recordings (revised July 2020),
    *available at* https://www.copyright.gov/circs/circ14.pdf ........................................................34

U.S. Copyright Office, Circular 34 Copyright Registration for Multiple Works
    (revised March 2021), *available at* https://www.copyright.gov/circs/circ34.pdf............ *passim*

U.S. Copyright Office, Circular 56 Copyright Registration for Sound Recordings
    (revised March 2021), *available at* https://www.copyright.gov/circs/circ56.pdf............ *passim*

Defendants UMG Recordings, Inc. ("UMG") and Capitol Records, LLC ("Capitol," and together with UMG, "Defendants") respectfully submit this Opposition to Plaintiffs' Motion for Partial Summary Judgment On Defendants' Work Made For Hire Defense (ECF No. 166).

## INTRODUCTION

Plaintiffs move for partial summary judgment on the issue of whether the sound recordings involved in this action are works made for hire under the Copyright Act.  In so doing, however, Plaintiffs ignore applicable legal standards, innumerable material fact issues, and their own burden as the moving party, all of which foreclose summary judgment in their favor. Plaintiffs' motion should therefore be denied.[1]

First, Plaintiffs purport to move for summary judgment as to the entire putative class, but beyond a chart excerpting portions of contracts, Plaintiffs have submitted *no* evidence regarding the facts and circumstances of each putative class member's relationship with Defendants or the creation of the sound recordings at issue.  As the moving party, Plaintiffs must make an affirmative evidentiary showing of the facts that entitle them to summary judgment.  Plaintiffs do not even attempt to meet this burden as to the putative class, which requires denial of their motion.

Second, Plaintiffs ignore multiple material fact issues that preclude summary judgment as it applies to the recordings featuring Plaintiffs.  Plaintiffs do not address evidence that directly contradicts their position, including evidence demonstrating that Defendants' predecessors had the right to control (and in fact exercised control over) the manner and means by which the

---

[1] As a preliminary matter, the Court should resolve Plaintiffs' motion for class certification (ECF No. 149) before ruling on Plaintiffs' motion for partial summary judgment.  This approach comports with the parties' January 14, 2022 Stipulation regarding discovery and case deadlines (ECF No. 144), which this Court entered as an Order on April 6, 2022 (ECF No. 145); that Stipulation further contemplates that if a class is certified, the Court will defer ruling on any motion for summary judgment relating to more than a single artist until after the class notice and opt out period has concluded.  The parties' proposed approach is consistent with well-established authority holding that issues relating to class certification should be decided (and any notice and opt-out periods concluded) before a decision on the merits is rendered  *See, e.g.*, *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974); *Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*, 214 F.3d 132, 135 (2d Cir. 2000).

sound recordings were created, as well as timely copyright registrations identifying Defendants'
predecessors as the authors of the recordings at issue as works made for hire, statements which,
by statute, are presumptively correct.

Third, Plaintiffs contend that sound recordings can never constitute works made for hire
as a contribution to a collective work or a compilation, but their arguments are inconsistent with
the language of the Copyright Act and the view of the U.S. Copyright Office, and rely on non-
binding and inapt cases.  In all events, Plaintiffs ignore both the applicable legal standard and
evidence that raises genuine disputes of material fact as to whether Defendants' predecessors or
affiliates specially ordered or commissioned the sound recordings as contributions to a collective
work or a compilation.

For all of these reasons, Plaintiffs are not entitled to judgment as a matter of law.  The
Court should therefore deny Plaintiffs' motion in its entirety.

## **BACKGROUND**

## I.  **EMI AMERICA RECORDS, INC.'S CREATION OF THE ALBUM *KASIM.***

On September 29, 1980, EMI America Records, Inc. ("EMI") and Plaintiff Kasim Sulton
("Sulton") entered into a recording agreement for Sulton's exclusive personal services as a
performer on phonograph records ("Sulton Agreement").  Defs.' Resp. to Pls.' Stmt. of
Undisputed Facts and Addl. Material Facts ("DRUSF Addl. Fact") Nos. 1-3.  In the Sulton
Agreement, the parties agreed that EMI has "the complete, unconditional, exclusive, perpetual,
unencumbered and universe-wide" rights in "all results and proceeds of [Sulton]'s services and
performances hereunder, including the exclusive ownership of any and all masters and all
records and reproductions made therefrom together with all universal copyrights and copyright
rights[.]"  DRUSF Addl. Fact Nos. 8, 10.  The parties further agreed that EMI was Sulton's
"employer for hire," and Sulton "acknowledge[d] and agree[d]" that any sound recording
recorded pursuant to the agreement was "prepared within the scope of [EMI]'s engagement of
[Sulton's] personal services and is a work made for hire, or . . . as part of an LP-master,

constitutes a work specially ordered by [EMI] as a contribution to a collective work and shall be considered a work made for hire." DRUSF Addl. Fact Nos. 8-9. As compensation for his exclusive services, EMI paid Sulton a $100,000 advance plus royalties. DRUSF Addl. Fact Nos. 13, 18.

EMI had broad rights under the Sulton Agreement to control the creation of the sound recordings recorded thereunder. For instance, among others, EMI had the right to approve in writing all material aspects of the procedures for recording the masters before any such recording could commence, including the individual producer, the recording studio, and the budget. DRUSF Addl. Fact Nos. 7, 14. EMI also had the right to designate times and places for recording sessions; the right to require Sulton to re-record any musical compositions until a sound recording acceptable to EMI was obtained; the sole authority to approve any sound recording as satisfactory; the right to exercise options to extend the term of the agreement; and the right to request that Sulton undertake additional actions such as assisting with promotional and marketing efforts or to perform at sessions for the purpose of embodying Sulton's performances on film or tape. DRUSF Addl. Fact Nos. 4, 7, 11, 12, 15.

Furthermore, and consistent with its rights of control under the Sulton Agreement, EMI engaged, approved, and/or paid producers that contributed to the creation of the sound recordings that would be assembled into the album *Kasim* including Bruce Fairbairn, Roy Thomas Baker, and Willie Wilcox. DRUSF Addl. Fact Nos. 19-22. EMI also engaged, approved, and/or paid for sideman performers that contributed to the sound recordings such as Elliot Easton, Roger Powell, Buck Dharma, and Jim Steinman. DRUSF Addl. Fact Nos. 23-26. EMI purchased and/or rented equipment, and paid for the costs of recording, tour support, Sulton's personal expenses, and for the costs of manufacturing and packaging phonograph copies of *Kasim*, and at least one EMI executive attended recording sessions. DRUSF Addl. Fact Nos. 27-10, 33. Finally, EMI even paid for the rent of a home in Los Angeles for Sulton while *Kasim* was being recorded. DRUSF Addl. Fact No. 32.

On January 11, 1982, EMI released *Kasim*, an album containing ten individual sound recordings embodying Sulton's performances.  DRUSF Addl. Fact No. 34.  EMI also released certain individual tracks from *Kasim* as singles.  DRUSF Addl. Fact No. 35.  Shortly thereafter on January 20, 1982, and consistent with its ownership rights under the Sulton Agreement, EMI obtained a registration for the copyright in *Kasim*.  DRUSF Addl. Fact No. 36.  The copyright registration states that EMI is the author of *Kasim* as a "work made for hire."  DRUSF Addl. Fact No. 37.  Capitol thereafter succeeded to EMI's rights under the Sulton Agreement, including ownership of the copyright in *Kasim*.  DRUSF Addl. Fact No. 38.

## II.    VIRGIN RECORDS AMERICA, INC.'S CREATION OF THE ALBUM *SURPRISE*.

On July 20, 1987, Virgin Records America, Inc. ("Virgin") entered into an exclusive recording agreement with Plaintiff Susan Straw Harris ("Straw") for the purpose of creating sound recordings embodying Straw's performances ("Straw Agreement").  DRUSF Addl. Fact Nos. 39, 41-42, 55.  Virgin became interested in Straw as a recording artist and approached her about joining the label as a solo artist.  DRUSF Addl. Fact No. 40.  In the Straw Agreement, the parties agreed that all sound recordings created pursuant to the Agreement "shall be entirely [Virgin's] property, free of any claims whatsoever by [Straw]," and that Virgin has "the exclusive right to obtain registration of copyright (and all renewals and extensions)" in those sound recordings, "in [Virgin's] name, as the owner and author therefor."  DRUSF Addl. Fact No. 52.  The parties also expressly acknowledged their work-for-hire relationship:

> [A]ll Master Recordings recorded during the Term which embody the Performances of the Artist, from the inception of the recording thereof, shall for purposes of copyright law, be deemed works made for hire for us by you and all other persons rendering services in connection with those Master Recordings as our employees for hire.

DRUSF Addl. Fact 51.  As compensation for her exclusive recording services, Virgin paid Straw advances, including a $35,000 advance, plus royalties.  DRUSF Addl. Fact Nos. 54, 58.

The Straw Agreement also granted Virgin broad rights of control over creation of the sound recordings, including, *inter alia*, the right to approve all sound recordings as commercially and technically satisfactory; the right to require Straw to re-record any music selection until a sound recording commercially acceptable to Virgin had been obtained; the right to control the timing for delivery of all sound recordings; the right to designate the producer of the sound recordings and the studios at which the recordings would be recorded; the right to have Virgin representatives attend all recording sessions; the right to exercise options to extend the term of the agreement; and the right to request that Straw assist with promotional and marketing projects. DRUSF Addl. Fact Nos. 44, 46-49, 56-57, 69.

Consistent with its authority under the Straw Agreement, Virgin approved of and paid Anthony Moore and Van Dyke Parks as producers of the sound recordings that would ultimately be included in the album *Surprise*, further approved Michael Stipe as a vocalist to perform on one of the recordings on the album, and paid other musicians to perform on the sound recordings as well. DRUSF Addl. Fact Nos. 59-67. In addition, Virgin controlled a recording fund and paid for all recording costs. DRUSF Addl. Fact Nos. 53, 68. Virgin also requested that Straw make promotional appearances for *Surprise*, which Straw did. DRUSF Addl. Fact No. 69. When *Surprise* was completed, Virgin made the decision to postpone the release date of the album multiple times. DRUSF Addl. Fact No. 70.

On June 21, 1989, Virgin released *Surprise*, an album containing eleven individual sound recordings embodying Straw's performances. DRUSF Addl. Fact No. 71. Virgin also released certain individual tracks from *Surprise* as singles. DRUSF Addl. Fact No. 72. Shortly thereafter on June 27, 1989, Virgin obtained a registration for the copyright in *Surprise*. DRUSF Addl. Fact No. 73. The copyright registration states that Virgin is the author of *Surprise* as a "work made for hire." DRUSF Addl. Fact No. 74. In 1980, Virgin terminated the term of the Straw Agreement after Straw failed to timely deliver the second album contemplated by the agreement. DRUSF Addl. Fact No. 75. Capitol thereafter succeeded to Virgin's rights under the Straw Agreement, including ownership of the copyright in *Surprise*. DRUSF Addl. Fact No. 76.

III.   **A&M RECORDS LIMITED'S CREATION OF THE ALBUM *DAWN OF THE DICKIES.***

On April 3, 1978, A&M Records Limited ("A&M Ltd.") entered into an exclusive recording agreement with William Remar, Robert Davis, Carlos Caballero, and Plaintiffs Leonard Phillips ("Phillips") and Stan Sobol ("Sobol"), who were members of a band called The Dickies, for the purpose of creating sound recordings embodying The Dickies' performances ("The Dickies Agreement").  DRUSF Addl. Fact Nos. 77-79.  A&M Ltd. and The Dickies agreed that all sound recordings recorded under The Dickies Agreement would be "entirely [A&M Ltd.'s] property" from inception, that A&M Ltd. has "the sole and exclusive right to copyright such master recordings . . . in [A&M Ltd.'s] name as the owner and author thereof," and that The Dickies were A&M Ltd.'s "employees for hire."  DRUSF Addl. Fact No. 85.  A&M Ltd. paid The Dickies a $100,000 advance plus royalties as compensation for their exclusive services.  DRUSF Addl. Fact Nos. 88-89.

The Dickies Agreement also granted A&M Ltd. broad rights to control the creation of the sound recordings.  For example, A&M Ltd. had the right to designate the producer of the sound recordings and in fact approved Earl Mankey as the engineer and co-producer and John Hewlett as the other co-producer for the initial sound recordings to be recorded under the agreement.[2] DRUSF Addl. Fact No. 83.  A&M Ltd. also had the right to approve any sound recordings as technically satisfactory; the right to require The Dickies to re-record, re-mix, or otherwise alter any sound recording until a recording technically satisfactory to A&M Ltd. was obtained; the right to exercise options to renew the contract; the right to request that The Dickies appear and perform for the purpose of filming or taping their performances; and the right to request that The Dickies make promotional appearances.  DRUSF Addl. Fact Nos. 84, 86-87, 90, 98.

A&M Ltd. also paid for all material aspects of creation of the sound recordings that would ultimately be compiled into *Dawn of The Dickies*.  For instance, A&M Ltd. paid for the

---

[2] The initial sound recordings recorded under The Dickies Agreement were compiled into an album titled *The Incredible Shrinking Dickies*, which is not at issue in this litigation.  ECF No. 95 ¶¶ 106-130.

services of Robin Cable to produce the sound recordings.  DRUSF Addl. Fact No. 91.  A&M

Ltd. further paid for the recording sessions and equipment necessary to create the sound

recordings, as well as salary, payroll, and tour costs, and provided written approval of recording

studio costs and the dates and times of recording sessions.  DRUSF Addl. Fact Nos. 92-95.

A&M Ltd. also paid related health and welfare costs.  DRUSF Addl. Fact No. 94.  A&M Ltd.

managed and facilitated the release of singles of individual sound recordings from *Dawn of The*

*Dickies.*  DRUSF Addl. Fact No. 97.  Finally, The Dickies made promotional appearances for the

album at the request of A&M Ltd.  DRUSF Addl. Fact No. 98.

On November 9, 1979, A&M Ltd. released *Dawn of The Dickies*, an album containing

ten individual sound recordings embodying The Dickies' performances.  DRUSF Addl. Fact No.

99.  A&M Ltd. also released certain individual tracks from *Dawn of The Dickies* as singles.

DRUSF Addl. Fact No. 100.  As contemplated by The Dickies Agreement, on February 25,

1980, A&M Ltd.'s U.S. affiliate and UMG predecessor A&M Records, Inc. ("A&M") obtained a

registration for the U.S. copyright in *Dawn of The Dickies*.  DRUSF Addl. Fact No. 101.  The

copyright registration identifies A&M as the author of *Dawn of The Dickies* as a "work made for

hire."  DRUSF Addl. Fact No. 102.

IV.   **A&M RECORDS, INC.'S CREATION OF THE ALBUMS *MEDICINE SHOW*
      AND *THIS IS NOT THE NEW DREAM SYNDICATE ALBUM LIVE.***

On September 1, 1983, A&M entered into an exclusive recording agreement with Karl

Precoda and Plaintiffs Steve Wynn ("Wynn"), Dennis Mehaffey ("Mehaffey"), and David

Pellish ("Pellish"), who were members of a band called Dream Syndicate, for the purpose of

creating sound recordings embodying Dream Syndicate's performances ("Dream Syndicate

Agreement").  DRUSF Addl. Fact Nos. 103, 106-107.  In the Dream Syndicate Agreement, the

parties agreed that A&M was the "owner and author" of all sound recordings created pursuant to

the agreement and all related copyrights, that all such sound recordings were "works made for

hire," and that the members of Dream Syndicate were A&M's "employees for hire."  DRUSF

Addl. Fact No. 115.  The A&M Agreement provided that A&M would pay Dream Syndicate for

their exclusive recording services, including payment of a $150,000 advance for the initial period plus royalties.  DRUSF Addl. Fact No. 118-119.

A&M had substantial rights to exercise control over the creation of the sound recordings contemplated by the Dream Syndicate Agreement.  Among others, A&M had the following rights to control the process for creating the sound recordings:  the right to approve the producer of the sound recordings (and A&M in fact approved Sandy Pearlman as the producer for the first album to be recorded under the agreement and paid him for his services); the right to approve any sound recording as technically satisfactory and to require Dream Syndicate to re-record any musical selections until a sound recording technically satisfactory to A&M had been obtained; the right to approve in writing the recording budget, and no recording activity could commence until A&M had provided such approval; and final decision-making authority over which sound recordings would be included on single releases.  DRUSF Addl. Fact Nos. 112-114, 116, 120.

In addition to engaging and paying Mr. Pearlman, A&M also paid for the services of other contributors, such as paying sound engineer Jeffrey Osbourne for recording the live concert that would ultimately become *This Is Not The New Dream Syndicate Album Live*.  DRUSF Addl. Fact No. 121.  All recording sessions were conducted under A&M's union recording license, A&M paid for the recording studio and costs associated with the recording, and representatives from A&M attended recording sessions for *Medicine Show*.  DRUSF Addl. Fact Nos. 114, 122-123.  Furthermore, at the request of A&M, Dream Syndicate made promotional appearances for *Medicine Show*, such as interviews and radio appearances.  DRUSF Addl. Fact Nos. 117, 124.

On May 7, 1984, A&M released *Medicine Show*, an album consisting of eight individual sound recordings embodying the performances of Dream Syndicate.  DRUSF Addl. Fact No. 125.  A&M also released certain individual tracks from *Medicine Show* as singles.  DRUSF Addl. Fact No. 126.  On June 1, 1984, and consistent with its ownership rights under the agreement, A&M obtained a registration for the copyright in *Medicine Show*.  DRUSF Addl. Fact No. 127.  The copyright registration identifies A&M as the author of *Medicine Show* as a "work made for hire."  DRUSF Addl. Fact No. 127.

The album *This Is Not The New Dream Syndicate Album Live* was recorded live for broadcast on July 7, 1984 in Chicago, Illinois.  DRUSF Addl. Fact No. 129.  The songs performed live by Dream Syndicate and recorded during that broadcast were subsequently released by A&M that same year as the album *The Is Not The New Dream Syndicate Album Live*, which consisted of five individual sound recordings.  DRUSF Addl. Fact No. 130.  On November 19, 1984, A&M obtained a registration for the copyright in *This Is Not The New Dream Syndicate Album Live*.  DRUSF Addl. Fact No. 131.  The copyright registration identifies A&M as the author of the album as "employer for hire."  DRUSF Addl. Fact No. 132.  UMG thereafter succeeded to A&M's rights under the Dream Syndicate Agreement, including ownership of the copyrights in *Medicine Show* and *This Is Not The New Dream Syndicate Album Live*.  DRUSF Addl. Fact No. 133.

## LEGAL STANDARD

A party seeking summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Only when the movant meets its initial burden of demonstrating the absence of a genuine issue of material fact does the burden shift to the non-moving party to set out specific material facts showing a genuine issue for trial.  *Celotex*, 477 U.S. at 331.  When deciding a motion for summary judgment, the court "'must resolve all ambiguities and draw all inferences against the moving party.'"  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) (*quoting Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126-27 (2d Cir. 2013) (per curiam)); *see also Healthfirst, Inc. v. Medco Health Sols., Inc.*, No. 03 CV 5164 (RLC), 2006 WL 3711567, at *5 (S.D.N.Y. Dec. 15, 2006) ("In addressing a motion for summary judgment, 'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'") (citations omitted).

## ARGUMENT

By its plain language, the termination right under Section 203 is not available for all works; instead, the statute specifically excludes "work[s] made for hire" from its scope: "In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, . . . is subject to termination . . . ." 17 U.S.C. § 203(a).  Plaintiffs move for partial summary judgment on the work made for hire issue, contending that Plaintiffs and the putative class were not employees of Defendants' predecessors or affiliates, and separately, that the works at issue were not specially ordered or commissioned for use as contributions to a collective work or a compilation.[3]  ECF No. 166.  Plaintiffs primarily assert that "work made for hire" language in recording agreements alone does not establish that the albums at issue are works made for hire, Mot. at 14-15, 16-22—an argument never advanced by Defendants—and proceed to ignore both applicable legal standards and an abundance of evidence beyond recording agreements that the sound recordings at issue are "works made for hire."  As there are multiple genuine disputes of material fact respecting these issues, Plaintiffs' motion must be denied.

## I.      PLAINTIFFS FAIL TO MEET THEIR BURDEN WITH RESPECT TO THE PUTATIVE CLASS.

As an initial matter, Plaintiffs purport to move for partial summary judgment as to the entire putative class, Mot. at 1 n.1, but fall woefully short of satisfying their burden as the moving party.

---

[3] Defendants do not need to establish that the sound recordings at issue meet both of the relevant Copyright Act definitions of "work made for hire," *i.e.*, a work created by an employee within the scope of his or her employment (Section 101(1)) *and* a work specially ordered or commissioned as a contribution to a collective work or a compilation (Section 101(2)).  Instead, these are independent bases for establishing that a work is a work made for hire.  Accordingly, genuine issues of material fact as to *either* of them requires denial of Plaintiffs' motion (though Defendants have demonstrated genuine issues of material fact as to *both*).

Whether any particular work is a work made for hire under the Copyright Act is a fact-intensive inquiry.  *See, e.g.*, *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 115 (2d Cir. 2000) (explaining that courts evaluate whether a work is a "work made for hire" under Section 101(1) of the Copyright Act using the factors from *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), and that "determination as to 'the presence or absence' of each *Reid* factor is a finding of fact"); *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 562 (2d Cir. 1995) (explaining that courts evaluate whether a work is a work made for hire under Section 101(2) of the Copyright Act of 1976 based in part on the "instance and expense" test of the Copyright Act of 1909); *cf. Marvel Characters*, 726 F.3d at 140 (explaining that under the Copyright Act of 1909, "[w]hether the instance and expense test is satisfied turns on the parties' creative and financial arrangement as revealed by the record in each case").  Beyond submitting a chart excerpting limited language from absent putative class members' recording agreements, Plaintiffs did not submit ***any*** evidence from any absent putative class members in support of their motion and did not include ***any*** purportedly undisputed facts regarding putative class members in their Rule 56.1 Statement of Undisputed Facts.  *See generally* ECF No. 169.  In other words, the Court has no facts before it regarding the absent putative class members' respective relationships with Defendants or the creation of the sound recordings embodying their performances.  By failing to submit such evidence, Plaintiffs cannot meet their burden on summary judgment, *i.e.*, to demonstrate the absence of a genuine dispute as to any material fact regarding the "work made for hire issue" as it applies to each and every putative class member.  Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.  "[W]here the movant 'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied[.]"  *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003)

## II.    GENUINE DISPUTES EXIST AS TO WHETHER THE WORKS AT ISSUE FEATURING THE NAMED PLAINTIFFS ARE WORKS MADE FOR HIRE.

### A.    Copyright Registrations For The Works At Issue Create A Genuine Dispute Precluding Summary Judgment.

In their motion, Plaintiffs briefly mention—but then ignore—a crucial piece of evidence that directly contradicts their argument that the works at issue featuring their performances are not "works made for hire" (and which thereby create a genuine dispute of material fact):  the copyright registration for each of those works affirmatively states that Defendants' predecessors were authors of the works as works made "for hire."  DRUSF Addl. Fact Nos. 36-37, 73-74, 101-102, 127-128, 131-132.

Section 410(c) of the Copyright Act states that "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of . . . the facts stated in the certificate." 17 U.S.C. § 410(c); *see also Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 111 (2d Cir.), *amended,* 169 F.3d 782 (2d Cir. 1998) (party was entitled to the statutory presumption that it was the author of a design as a work made for hire because such facts were stated in the party's copyright registration); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 n.1 (2d Cir. 1977); *cf. Autoskill Inc. v. Nat'l Educ. Support Systems, Inc.*, 994 F.2d 1476, 1487-88 (10th Cir. 1993) (explaining that the statutory presumption that "facts stated in the certificate" are accurate "include the identification of the author and the statement that the entire work was made for hire"), *overruled on other grounds in TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495, 496-97 (10th Cir. 2011).

Here, the copyright registrations for each of the albums at issue was obtained within months of publication of each work, and identifies one of Defendants' predecessors as the "author" of each album as a "work made for hire" or the equivalent.  DRUSF Addl. Fact No. 37 (identifying "EMI America Records, a division of Capitol Records Inc.," a predecessor of Capitol, as the "author" of *Kasim* as a "work made for hire"); *id.* Addl. Fact No. 128 (identifying A&M Records, Inc., a predecessor of UMG, as the "author" of *Medicine Show* as a "work made

for hire"); *id.* Addl. Fact No. 132 (identifying A&M Records, Inc., a predecessor of UMG, as the "author" of *This Is Not the New Dream Syndicate Album Live* as "employer for hire"); *id.* Addl. Fact No. 102 (identifying A&M Records, Inc., a predecessor of UMG, as the "author" of *Dawn of the Dickies* as a "work made for hire"); *id.* Addl. Fact No. 74 (identifying Virgin Records America Inc., a predecessor of Capitol, as the "author" of *Surprise* as a "work made for hire").

The registrations thus constitute prima facie evidence of the fact that each of the works at issue was a work made for hire,[4] and the existence of this evidence alone creates a genuine dispute of material fact precluding summary judgment. *See Lee v. Karaoke City*, No. 1:18-cv-03895 (PAE) (SDA), 2020 WL 9815181, at *4 (S.D.N.Y. Dec. 18, 2020) (R&R) (denying cross motions for summary judgment due to genuine issues of material fact created in part by plaintiff's copyright registration); *Robertson v. Burdon*, No. ED CV18-00397 JAK (SHKx), 2019 WL 2141971, at *9 (C.D. Cal. Apr. 3, 2019) (information contained in defendant's copyright registration created factual dispute regarding the sufficiency of the plaintiff's infringement claim).

### B.        Genuine Disputes As To The *Reid* Factors Preclude Summary Judgment.

Even in the absence of the copyright registrations, however, summary judgment is inappropriate. The first definition of "work made for hire" under Section 101 is "a work prepared by an employee within the scope of his or her employment," 17 U.S.C. § 101(1), and genuine issues of material fact abound as to whether the works at issue meet this standard.

To evaluate whether a party is an "employee" within the meaning of Section 101(1), the Supreme Court has held that courts must "consider the hiring party's right to control the manner and means by which the product is accomplished," relying on the general common law of agency. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740-41, 751-52 (1989). Other factors relevant to this inquiry include:

---

[4] Contrary to Plaintiffs' contention that *Defendants* must prove that the sound recordings at issue are works made for hire, Mot. at 22, the sound recordings are presumptively works made for hire. *See* 17 U.S.C. § 410(c); *Langman Fabrics*, 160 F.3d at 111. *Plaintiffs* bear the burden to rebut that presumption, which, for all of the reasons explained herein, they have failed to do.

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52 (internal footnotes omitted).  Although no single factor is dispositive, the "right to control" factor is "entitled to…added weight because, under the common law of agency, an employer-employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and the 'manner and means' by which the purported employee brings about the result." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000) (internal quotations and citation omitted).  Furthermore, courts should "disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of 'indeterminate' weight—that is, factors that . . . do not meaningfully cut in favor of either the conclusion that the worker is an employee or the conclusion that he or she is an independent contractor."[5]  *Id.*

In their brief, Plaintiffs improperly focus on the actual exercise of creative control as determinative of whether a work is a work made for hire under Section 101(1).  Mot. at 24-26.

---

[5] One such factor here is "the skill required."  Plaintiffs contend that because they are "highly skilled professional artists," this factor weighs in their favor, Mot. at 26-27, but Plaintiffs then ignore both the context in which the sound recordings were created and the relevant law.  In occupations that require specialized skills that are part of the hiring party's regular business, this factor is treated as either less probative or weighing *in favor* of a work made for hire relationship. *See, e.g.*, *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1128 (9th Cir. 2010) (holding that a computer programmer was an employee at a startup company in part because the startup company's "regular business require[d] it to employ programmers," such that the programmer's skill was less probative in the *Reid* analysis); *Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 311 (D. Conn. 2018) (finding that screenwriting was part of a filmmaker's regular business, weighing in favor of screenwriter's employee status).  It is undisputed that the regular business of Defendants' predecessors and affiliates included making and distributing recorded music (which requires them to engage the services of recording artists) and that the services provided by Plaintiffs were within the scope of that regular business.  DRUSF Addl. Fact Nos. 1-2, 39-41, 77-78, 103-104, 106.  As such, that Plaintiffs may be "highly skilled" does not support their position; if anything, it supports Defendants. *See Eisenberg*, 237 F.3d at 114; *JustMed*, 600 F.3d at 1128; *Horror*, 335 F. Supp. 3d at 311.

Of course, that Plaintiffs may have exercised some creative control during the recording process is not dispositive. *See Martha Graham School and Dance Found., Inc. v. Martha Graham School of Contemporary Dance*, 380 F.3d 624, 634, 642 (2d Cir. 2004) (explaining that "[i]t is true that the Center did not *exercise* much control over Graham, but the absence of a hiring party's exercise of control does not mean that an artist is not an employee where other factors weigh in favor of finding an employment relationship" and upholding district court determination that dances at issue were works made for hire) (emphasis in original). More fundamentally, Plaintiffs' argument ignores the actual language of *Reid*, which specifically and primarily considers "the hiring party's *right* to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751 (emphasis added); *see also Eisenberg*, 237 F.3d at 114 (noting that an employee relationship exists "if the purported employer controls *or has the right to control*" the work) (emphasis added). It also ignores substantial evidence, discussed further below, that Defendants' predecessors or their affiliates, in fact, *exercised* such control.

For these and other reasons, Plaintiffs' authorities are easily distinguished. For instance, Plaintiffs cite *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86-87 (2d Cir. 1995), but in that case, the defendants had *no* right to control the plaintiffs' work; on the contrary, the parties' agreement gave the plaintiffs "full authority in design, color and style" and "complete artistic freedom with respect to every aspect of the sculpture's creation." *Id.* at 80, 86. Here, in contrast, Defendants have proffered substantial evidence that their predecessors or affiliates had, by contract, the substantial right to control—and in fact exercised such control—over the creation of the sound recordings at issue. *See infra* Argument § II.B.1-II.B.4. Plaintiffs also rely on *Foster v. Lee*, 93 F. Supp. 3d 223 (S.D.N.Y. 2015), but it that case, unlike here, the parties had no written agreement affording the defendants a right of control, and also unlike here, the sole evidence of control the defendants offered was a "bare statement that they 'retained'" the photographer, *id.* at 229. Plaintiffs also rely on other cases in which the parties did not have an agreement respecting the right to control the manner and means by which the work was undertaken (much less the ultimate question of copyright ownership), such as *Horror Inc. v. Miller*, 335 F. Supp. 3d 273,

15

295 (D. Conn. 2018), *Aymes v. Bonelli*, 980 F.2d 857, 860 (2d Cir. 1992), and *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 312 (S.D.N.Y. 2000).[6]  Here, in contrast, each Plaintiff expressly agreed that Defendants' predecessors or affiliates are owners and/or authors of the sound recordings at issue as works made for hire; multiple provisions in those agreements evidence that Defendants' predecessors or their affiliates had robust rights to control the entirety of the creation of the sound recordings at issue; and there is robust evidence of the actual exercise of that control.  *See infra* Argument § II.B.1-II.B.4.  All of these facts raise genuine disputes about the parties' relationships that preclude summary judgment.

Notably, each of the *Reid* factors reflects a fundamentally factual inquiry, *Eisenberg*, 237 F.3d at 115 ("determination as to 'the presence or absence' of each *Reid* factor is a finding of fact"); *Carter*, 71 F. 3d at 85 (the *Reid* factors "are weighed by referring to the facts of a given case"), and here, genuine disputes of material fact exist with respect to virtually all of the *Reid* factors as to each Plaintiff.

---

[6] These case are distinguishable for other notable reasons as well.  In *Horror*, the hiring party had no right to assign the hired party additional projects, the hired party worked on the screenplay for approximately two months, the hired party supplied his own tools and worked from his home at his own pace, and the nature of the screenwriting project did not lend itself to hiring additional contributors, none of which are analogous to the facts at issue here, including because Defendants' predecessor or affiliates paid for all recording-related costs and Plaintiffs' recording agreements required Plaintiffs to record and deliver albums within a specified time period.  DRUSF Addl. Fact Nos. 4-5, 27, 43, 45, 68, 80-81, 92, 108, 110, 122.  *Horror*, 335 F. Supp. 3d at 308-11; *infra* Argument § II.B.1-II.B.4.  Similarly in *Aymes*, and contrary to Plaintiffs' position here, the court found that both the right to control and right to assign additional projects factors weighed in *favor* of employee status, and several of the factors that are relevant here – such as duration of the relationship, provision of tools and instrumentalities, location of the work, and when to work – were found irrelevant or indeterminate, given the specific circumstances of that case.  *Aymes*, 980 F.2d at 862-64.  Likewise distinguishable is *SHL Imaging*, 117 F. Supp. 2d  at 303-04, 313-14, given the abundant evidence in the record here showing that Defendants' predecessors exercised control over the creative aspects of the recording process by approving contributors such as producers, side musicians, and vocalists, provided various benefits to Plaintiffs, designated the work locations and when to work, had the right to assign, and in fact assigned, additional projects to Plaintiffs, and the parties' relationships all lasted longer than a year with options to further extend the relationship.  *Infra* Argument § II.B.1-II.B.4.

      **1.**      **Genuine Disputes Exist as to Whether Sulton Was an Employee for Hire of EMI.**

The record is replete with evidence raising a genuine dispute that Sulton was an employee for hire of EMI.  Although Plaintiffs claim Sulton controlled the creative process without input from EMI, the record is to the contrary.  For instance, Plaintiffs argue that Sulton chose which producers and side musicians to work with, but it was *EMI* that actually approved, engaged, and/or paid these contributors to provide services for the creation of *Kasim*.  DRUSF Addl. Fact Nos. 14, 19-26; *see Reid*, 490 U.S. at 751-52 (considering which party was responsible for "hiring and paying assistants").  EMI engaged, approved, and/or paid producers Bruce Fairbairn, Roy Thomas Baker, and Willie Wilcox, and also obtained clearances for (*i.e.*, obtained the consent of another record label to allow an artist signed exclusively to that label to perform for EMI for a specific project) and/or paid side musicians such as Elliot Easton, Roger Powell, Buck Dharma, and Jim Steinman.  DRUSF Addl. Fact Nos. 19-26.  Indeed, Sulton conceded EMI's authority in this regard by, for example, testifying during his deposition that EMI agreed to hire Bruce Fairbairn as a producer and that "***if EMI didn't agree to it, . . . I wouldn't have been in the studio with Mr. Fairbairn***."  DRUSF Addl. Fact No. 19 (emphasis added).  Plaintiffs also claim that EMI did not provide Sulton with an office, tools, or employee benefits, but the record reflects a genuine dispute as to this claim:  in fact, EMI paid for recording studio sessions, purchased or rented equipment, paid for Sulton's personal expenses, and rented a home in Los Angeles for Sulton while *Kasim* was being recorded.  DRUSF Addl. Fact Nos. 27-28, 30, 32.

Furthermore, several provisions of the Sulton Agreement also evidence EMI's "right to control" the creation of *Kasim*, including:

- EMI had the right to approve in writing all material aspects of the procedures for recording the sound recordings before any such recording could commence, including the individual producer, the recording studio, and the budget.  DRUSF Addl. Fact No. 14.

- EMI had the right to designate times and places for recording sessions, and to request that Sulton re-record any musical compositions until an acceptable sound recording was obtained.  DRUSF Addl. Fact No. 7.

- EMI had the sole authority to approve any sound recording as satisfactory for the manufacture and sale of phonograph records.  DRUSF Addl. Fact No. 7.

- EMI had the right to request that Sulton confer and consult with EMI regarding Sulton's performances rendered under the recording agreement.  DRUSF Addl. Fact No. 11.

Other evidence in the record regarding the parties' relationship and creation of *Kasim* raises additional genuine disputes as to the remaining *Reid* factors.  For example, EMI had the right to assign additional projects to Sulton, including that EMI had discretion to exercise four separate, consecutive, and irrevocable options to extend the term of the agreement, and EMI had the right to have Sulton undertake additional actions, including to (1) appear at photographic sessions; (2) appear for interviews; (3) make personal appearances on radio and television, and other for other general public relations or promotional purposes; and (4) perform at sessions for the purposes of embodying Sulton's performances on tape or film.  DRUSF Addl. Fact Nos. 4, 6, 11-12, 15; *see Carter*, 71 F.3d at 86 (finding that the hiring party had the right to assign the hired party additional projects because the parties' agreement "stated that, in addition to installing a sculpture, artists were bound to 'render such other related services and duties as may be assigned to [them] from time to time . . . .' and that "[b]y the very terms of the contract[,] the [hiring party] . . . had the right to assign other related projects to the artists").  Plaintiffs also assert that the parties had relatively short relationships, but EMI's contract with Sulton engaged his exclusive services for an initial period of eighteen months with options to extend the term of the contract.  DRUSF Addl. Fact Nos. 2, 4.  *Cf. Eisenberg*, 237 F.3d at 117 (explaining that the fact that the hired party only worked for the hiring party for 28-35 days ordinally would imply that the hired party was an independent contractor, but holding that the balance of *Reid* factors nonetheless weighed in favor of employee status); *Zhu v. Salaam Bombay, Inc.*, No. 16-CV-4091 (JPO), 2017 WL 11615748, *3 (S.D.N.Y. Dec. 21, 2017) (finding an employment relationship

under New York labor law where, among other factors, the hired party "was not free to engage in other employment"). And although Sulton was compensated for his exclusive recording services in part through royalties, he was also paid a $100,000 lump sum advance. DRUSF Addl. Fact Nos. 13, 18. Finally, it is also undisputed that the making and distributing of recorded music was a regular part of EMI's business (a business that continues to this day through EMI's successor Capitol) and that at least one EMI executive attended recording sessions for *Kasim*. DRUSF Addl. Fact Nos. 1, 33.[7]

### 2. Genuine Disputes Exist as to Whether Straw Was an Employee for Hire of Virgin.

Ample evidence also supports that Virgin and Straw had an employee for hire relationship. With respect to the primary *Reid* factor, the right to control, Straw conceded that Virgin had ultimate control over both the recording fund and the decision to release *Surprise* and when. DRUSF Addl. Fact Nos. 68 (Straw testifying that when she was prepared to commence work on the album, she could not immediately do so because Virgin would not release the recording funds, "which they controlled," and that Virgin paid for all recording costs); *id.* Addl. Fact No. 70 (Straw testifying that when *Surprise* was completed and despite Straw wanting the album to be released immediately, Virgin decided to postpone releasing the album multiple times). In addition to Straw's concessions, the Straw Agreement has several provisions evidencing Virgin's right to control, including:

- Virgin controlled the timing for delivery of all sound recordings, and had the right to terminate the Straw Agreement for Straw's failure to timely deliver the recordings. DRUSF Addl. Fact No. 49.

- Virgin had the right to designate the producer of the sound recordings and the studios at which the sound recordings would be recorded, and in fact approved "any generally first

---

[7] Plaintiffs' position is also directly refuted by an assignment agreement and artist's declaration that Sulton himself entered into with a third-party company that he apparently controlled (he signed for both parties) following execution of his recording agreement with EMI. In that agreement, Sulton separately affirmed that the sound recordings created pursuant to his recording agreement were owned by EMI as works made for hire. DRUSF Addl. Fact Nos. 16-17.

class recording studio in the continental United States for recording the Masters."
DRUSF Addl. Fact No. 46.

- Virgin had the right to have its representatives attend all recording sessions.  DRUSF Addl. Fact No. 48.

- Virgin had the right to approve any sound recordings "as commercially and technically satisfactory for the manufacture and sale of Phonograph records," and the right to require Straw to re-record any music selection "until a Master commercially and technically satisfactory to [Virgin] shall have been obtained."  DRUSF Addl. Fact No. 49.

- Virgin had the right to discontinue recording if it reasonably appeared to Virgin that the recording costs would exceed the recording fund.  DRUSF Addl. Fact No. 47.

Genuine disputes also exist as to the other *Reid* factors as applied to Straw.  The recording fund provided by Virgin, which Straw concedes Virgin "controlled," paid for all material aspects of creating *Surprise*, including recording costs and recording studio sessions, thereby evidencing that Virgin provided the tools and instrumentalities and the location of the work.  DRUSF Addl. Fact Nos. 53, 68.  Furthermore, Plaintiffs claim that Virgin did not have the right to assign and did not assign Straw additional projects, but the record readily demonstrates genuine disputes as to this claim.  The Straw Agreement reflects that Virgin had the right to exercise four separate, consecutive, and irrevocable options to extend the term of the agreement after the initial period and the right to have Straw assist with the marketing, advertising, and promotion of any recordings created under the agreement, such as engaging in interviews, participating in press conferences, posing at photography sessions, appearing on television and radio shows, and performing for the purpose of being filmed for promotional and other purposes in connection with exploitation of the sound recordings.  DRUSF Addl. Fact Nos. 44, 56-57.  Furthermore, Straw conceded during her deposition that she in fact made promotional appearances at the request of Virgin.  DRUSF Addl. Fact No. 69.

Plaintiffs also contend that Straw selected the producers and side performers on *Surprise*, but it was Virgin that actually approved and paid Anthony Moore and Van Dyke Parks as

producers for *Surprise* as Virgin's employees for hire, further approved in writing Michael Stipe as a vocalist for one of the recordings on the album, and paid for other musicians to perform on the album. DRUSF Addl. Fact Nos. 46, 59-67. Although Straw entered into the agreements with Moore, Parks, and Stipe those agreements merely confirm her understanding that all sound recordings would be created under Virgin's recording license, would be owned by Virgin, and that Straw and the other contributors were Virgin's employees for hire. DRUSF Addl. Fact Nos. 60-61, 63-64, 66. Virgin also engaged Straw's exclusive recording services for the term of the Straw Agreement, and paid Straw advances, including a $35,000 signing advance, as well as royalties, and made available a $150,000 recording fund. DRUSF Addl. Fact Nos. 41, 43, 53-55, 58. Finally, making and distributing sound recordings was a regular part of Virgin's business, which continues to this day through Virgin's successor Capitol. DRUSF Addl. Fact Nos. 39, 76.

### 3.    Genuine Disputes Exist as to Whether Phillips and Sobol Were Employees for Hire of A&M Ltd.

Genuine disputes also exist as to whether Phillips and Sobol were A&M Ltd.'s employees for hire. Although Plaintiffs claim that A&M Ltd. did not treat The Dickies as employees for tax purposes or provide The Dickies with employee benefits, there is contrary evidence in the record, creating a genuine dispute. Among other things, the evidence reflects that The Dickies submitted W-4 forms to A&M Ltd., and that A&M Ltd. paid both payroll and health and welfare costs associated with recording *Dawn of The Dickies*.[8] DRUSF Addl. Fact Nos. 94, 96. A&M Ltd. also paid for the recording sessions and equipment necessary to create the sound recordings that would ultimately be compiled into *Dawn of The Dickies* and tour support, and provided written approval of recording studio costs and the dates and times of the recording sessions, all of which supports that A&M Ltd. provided the location of the work, designated the times of work, and provided tools and instrumentalities for the work. DRUSF Addl. Fact Nos. 92-93, 95. Furthermore, A&M Ltd. had the right to assign The Dickies

---

[8] Plaintiffs claim that Defendants' predecessors or their affiliates did not provide Plaintiffs with any employee benefits "[a]s is standard in the industry," but cite no evidence of industry standards for this assertion, and it is contradicted by the evidence cited above.

additional projects, including the discretion to exercise four separate, consecutive options to extend the term of the agreement after the initial period, and A&M in fact exercised at least one option under the contract.  DRUSF Addl. Fact Nos. 87, 90.  A&M Ltd. also had the right to request that The Dickies make promotional appearances and appear on dates and at locations designated by A&M Ltd. for the filming or taping of their performances, and Phillips and Sobol admitted that they in fact made promotional appearances at the request of A&M Ltd.  DRUSF Addl. Fact Nos. 86-87, 98.

The Dickies Agreement also evidences that A&M Ltd. had the right to control the process of creating *Dawn of The Dickies*.  For instance, under the terms of the agreement, A&M Ltd. had the right to approve any sound recordings as technically satisfactory, and the right to require The Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained."  DRUSF Addl. Fact No. 84 A&M Ltd. also had the contractual right to mutually designate the producer of the sound recordings.  DRUSF Addl. Fact No. 83.  Consistent with these control rights, and contrary to Plaintiffs' contention that The Dickies made all such decisions, A&M Ltd. in fact approved Earl Mankey as the engineer and co-producer and John Hewlett as the other co-producer for the initial sound recordings to be recorded under the agreement.  *Id.*  Plaintiffs also claim that The Dickies selected the sound recordings to be released as singles, but evidence demonstrates that this did not occur and could not have occurred without A&M Ltd.'s approval and active participation, as A&M Ltd. actually managed and facilitated the release of singles of individual sound recordings from *Dawn of The Dickies.*  DRUSF Addl. Fact No. 97.

Additional evidence in the record further supports that A&M Ltd. and The Dickies had an employment for hire relationship, including, for example, that A&M Ltd. paid for the services of Robin Cable, who ultimately produced the sound recordings that would become part of *Dawn of The Dickies*.  DRUSF Addl. Fact No. 91.  It is also undisputed that making and distributing sound recordings was a regular part of A&M Ltd.'s business.  DRUSF Addl. Fact No. 77. Pursuant to The Dickies Agreement, A&M Ltd. engaged The Dickies' exclusive recording

services, and was obligated to pay The Dickies a $100,000 advance (and in fact paid the advance) for the agreement's initial term, as well as royalties.  DRUSF Addl. Fact Nos. 88-89.

### 4. Genuine Disputes Exist as to Whether Wynn, Mehaffey, and Pellish Were Employees for Hire of A&M.

Evidence also supports that A&M and Dream Syndicate had an employment for hire relationship and that the sound recordings for *Medicine Show* and *This Is Not The New Dream Syndicate Album Live* were created within the scope of that relationship.  The Dream Syndicate Agreement evidences A&M's substantial right to control the creation of the sound recordings, including that:

- A&M had the right to approve the producer of the sound recordings, and in fact approved, contracted with, and paid Sandy Pearlman as the producer for *Medicine Show*. DRUSF Addl. Fact Nos. 112, 120.

- If A&M disapproved of any recording procedure for which A&M had the right to exercise approval, Dream Syndicate was required to promptly submit to A&M proposed substitutes and recording would be postponed until A&M approved.  DRUSF Addl. Fact No. 114.

- A&M had the right to approve any sound recording as technically satisfactory and had the right to require Dream Syndicate to re-record any musical selections until a sound recording technically satisfactory to A&M had been obtained.  DRUSF Addl. Fact No. 113.

- A&M had the right to approve in writing the recording budget, and no recording activity could commence until A&M had provided such approval.  DRUSF Addl. Fact No. 114.

- A&M had final decision-making authority over which sound recordings would be included on single releases.  DRUSF Addl. Fact No. 116.

In addition to the rights to control described above, A&M also had the right to assign Dream Syndicate additional projects, including the discretion to exercise three separate, consecutive options to extend the term of the agreement for additional contract periods, and the

right to request that Dream Syndicate appear on dates and at film studios or other locations

designated by A&M for the filming or taping of Dream Syndicate's performances, and had the

right to mutually designate the selections to be performed for such purposes.  DRUSF Addl. Fact

Nos. 109, 117.  Indeed, Wynn testified during his deposition that Dream Syndicate in fact

undertook the additional action of making promotional appearances for *Medicine Show* at the

request of A&M, such as interviews and radio appearances.  DRUSF Addl. Fact No. 124.  As

mentioned, A&M approved, engaged, and paid producer Sandy Pearlman, but A&M also paid

sound engineer Jeffrey Osbourne for his services recording the live concert that would ultimately

become *This Is Not The New Dream Syndicate Album Live*.  DRUSF Addl. Fact No. 121.

A&M was also responsible for providing the location of the work and tools for

instrumentalities for the work, as all recording sessions were conducted under A&M's union

recording license and A&M paid for the studio sessions and costs associated with recording.

DRUSF Addl. Fact Nos. 114, 122.  Representatives from A&M also attended recording sessions

for *Medicine Show*.  DRUSF Addl. Fact No. 123.  Furthermore, making sound recordings was a

regular part of A&M's business, which continues to this day under A&M's successor UMG.

DRUSF Addl. Fact No. 103.  Finally, A&M engaged and paid Dream Syndicate for their

exclusive recording services for an initial period of eighteen months, including a $150,000

advance for the initial period, royalties, and a $10,000 advance for their tour.  DRUSF Addl. Fact

Nos. 118-119.

*     *     *

As made clear above, substantial evidence supports that Defendants' predecessors or their

affiliates had the right to control, and in fact exercised control over, the manner and means in

which each of the sound recordings and albums at issue were created and supports the existence

of an employee for hire relationship as to each Plaintiff.  Moreover, this and the other evidence

discussed above creates multiple genuine disputes of material fact as to several of the *Reid*

factors.  Plaintiffs' motion should therefore be denied.

**C.** **Genuine Disputes Exist As To Whether The Works At Issue Are Contributions To A Collective Work Or A Compilation.**

Summary judgment is also inappropriate because there are genuine disputes of material fact as to whether the sound recordings at issue are "work[s] made for hire" under the second definition of that phrase in Section 101 of the U.S. Copyright Act, namely:

> a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101(2).[9]  In arguing that the albums at issue do not meet this definition, Plaintiffs ignore the language of the statute, the holdings of other courts, well-established statements of the U.S. Copyright Office, and the factual record in this case, all of which require denial of their motion.

**1.** **Genuine Disputes as to Whether the Works at Issue Were "Specially Ordered or Commissioned" Preclude Summary Judgment.**

Plaintiffs argue that the albums at issue were not "specially ordered or commissioned" under Section 101(2) because "specially ordered or commissioned" works ostensibly "do not include flexible arrangements for recording artists to freely create original sound recordings at their own discretion, and under their own artistic direction and control."  Mot. at 36.  Plaintiffs

---

[9] It is undisputed that the third element of a work made for hire under Section 101(2) – "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire" – is met as to each Plaintiff, as Plaintiffs concede that each of their recording agreements reflect that the sound recordings recorded thereunder are works made for hire.  *See* Pls. Rule 56.1 Stmt. of Undisputed Facts (ECF No. 169), Nos. 11, 50, 178, 280. Plaintiffs nonetheless contend that the language of the recording agreements is "contradictory" and cannot support a work made for hire defense because the agreements also contain assignment language.  Mot. at 21-22.  In so claiming, Plaintiffs effectively argue that the contracts are ambiguous, which—even if true—merely creates additional fact issues that require denial of their motion.  *See, e.g.*, *Hoyt v. Andreucci*, 433 F.3d 320, 331 (2d Cir. 2006) ("Where, as here, the meaning of a particular contractual provision is ambiguous and the intent of the parties cannot be determined from the contractual language itself, the ambiguity presents a question of fact to be resolved by a jury."); *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989) ("When a written contract is ambiguous, a triable issue of fact exists as to its interpretation, thus precluding the entry of summary judgment.").

cite no authority for this proposition, but instead fall back on their Section 101(1) arguments.  *Id.* at 36-37.  Those arguments are inapposite here, however, because the standard for whether a work was "specially ordered or commissioned" within the meaning of Section 101(2) is different than the standard for works made for hire under Section 101(1).  *See Playboy*, 53 F.3d at 555 (explaining that the district court used the "wrong test" in applying *Reid* factors to determine whether the paintings at issue were works made for hire under Section 101(2)).

Contrary to Plaintiffs' suggestion, "the hiring party ***need not possess or exercise artistic control*** over the product for a work to be 'specially ordered or commissioned' within the meaning of § 101(2)."  *Playboy*, 53 F.3d at 562 (emphasis added).  Instead, in the Second Circuit, the phrase "specially ordered or commissioned" has "essentially the same meaning as 'instance and expense,'" as those terms have been interpreted under the Copyright Act of 1909. *Id.*  The "instance and expense" test, in turn, is met "when the 'motivating factor in producing the work was the employer who induced the creation.'"  *Id.* at 554.  The "expense" requirement is satisfied "where a hiring party simply pays an independent contractor a sum certain for his or her work," *id.* at 555, and the "instance" requirement is satisfied "when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out," *Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.*, No. 08 CIV 6143 (DLC), 2010 WL 3564258, *8 (S.D.N.Y. Sept. 10, 2010).  However, "[t]he *right* to direct and supervise the manner in which work is created need never be exercised."  *Martha Graham School and Dance Found.*, 380 F.3d at 634-35 (finding that dances were works made for hire under "instance and expense" test) (emphasis in original); *see also Playboy*, 53 F.3d at 554 ("[T]he hallmark of 'an employment for hire' is whether the employer ***could have*** exercised the requisite power to control or supervise the creator's work.") (citations omitted and emphasis added).  As with the analysis of the *Reid* factors, the "instance and expense" test is a fact-intensive inquiry. *See Marvel Characters*, 726 F.3d at 140 ("Whether the instance and expense test is satisfied turns on the parties' creative and financial arrangement as revealed by the record in each case.").

Plaintiffs do not mention these standards, likely because they doom Plaintiffs' motion—Plaintiffs cannot establish as a matter of law that the works at issue were *not* specially ordered or commissioned (*i.e.*, created at the "instance and expense" of Defendants' predecessors or their affiliates). As explained above, creation of the albums at issue was indisputably at the "expense" of Defendants' predecessors or their affiliates, who paid for all material aspects of the works' actual creation, including but not limited to paying Plaintiffs both lump sum advances and royalties for their services, and paying for equipment rentals, recording studio session time, producers, engineers, side musicians, vocalists, the manufacture of the phonograph records, and even rent for a home for Sulton to live in while *Kasim* was being recorded. *See supra* Argument § II.B. Plaintiffs claim that "specially ordered or commissioned" works do not include "arrangements in which recording artists bear the expenses of creating the sound recordings and may receive future royalties," Mot. at 36, but courts have found to the contrary, concluding that payment of advances against royalties are sufficient to satisfy the "expense" prong, *see Fifty-Six Hope Road Music*, 2010 WL 3564258, at *10 ("The fact that Island paid Bob Marley advances against royalties for the creation of the Sound Recordings, combined with the fact that Island advanced the recording costs for the albums that would only be recouped if the albums were successful, is sufficient to satisfy the expense prong of the instance and expense test.").

Ample evidence also supports that the albums at issue were created at the "instance" of Defendants' predecessors. Defendants' predecessors or their affiliates had the right to and did supervise the creation of the sound recordings, including having the sole discretion to approve or reject any sound recordings as satisfactory. *See supra* Argument § II.B; *Fifty-Six Hope Road Music*, 2010 WL 3564258, at *10 (finding record label's rights to accept, reject, modify, and otherwise control the creation of sound recordings "dispositive" that sound recordings were created at record label's "instance"). Defendants' predecessors or their affiliates also engaged Plaintiffs for the express purpose of creating sound recordings for record albums. DRUSF Addl. Fact No. 2 (EMI "does hereby engage the exclusive personal services of [Sulton] as a performer on phonograph records"); *id.* Addl. Fact No. 41 (Virgin engaged Straw's "exclusive services . . .

27

for the purpose of recording and delivering to [Virgin] Masters"); *id.* Addl. Fact No. 78 (A&M Ltd. engaged The Dickies to "record[] for [A&M Ltd.] . . . master recordings embodying [The Dickies'] performances"); *id.* Addl. Fact No. 106 (A&M engaged Dream Syndicate to "produc[e], record[], and deliver[] to [A&M]  . . . master sound recordings . . . embodying [Dream Syndicate's] performances"); *see also Fifty-Six Hope Road Music*, 2010 WL 3564258, at *8 (finding that sound recordings were prepared at the record label's "instance" because "[e]ach of the agreements obligated Bob Marley to produce 'sufficient acceptable recordings' to comprise a specific number of albums for [the record label] within the term of each agreement"). Furthermore, Straw testified during her deposition that ***Virgin approached her*** about creating an album, and that she "knew that [she] was going out into the world to make a record for Virgin Records America."  DRUSF Addl. Fact No. 40.  Similarly, Mehaffey and Wynn testified during their depositions that ***A&M approached Dream Syndicate*** and was interested in having the band join the label.  DRUSF Addl. Fact No. 104.  To that end, A&M paid Dream Syndicate's former label J. Ruby Productions to release the band from their contract with J. Ruby Productions so that A&M could work with the band.  DRUSF Addl. Fact No. 105.  That Defendants' predecessors actively sought out Plaintiffs also supports the "instance" requirement.

Contrary to Defendants' showing, Plaintiffs have not offered evidence demonstrating that Defendants' predecessors or affiliates were not a primary motivating factor in creating the sound recordings at issue or that Plaintiffs had the ability to do so without the support and financial backing of Defendants' predecessors or their affiliates.  On this record, Plaintiffs cannot establish as a matter of law that the works at issue were not "specially ordered or commissioned."

### 2. Genuine Disputes as to Whether the Works at Issue Were Contributions to a Collective Work or Compilation Preclude Summary Judgment.

Plaintiffs also argue that the sound recordings at issue do not constitute works made for hire under the second requirement of Section 101(2), ostensibly because (a) "sound recordings" are not specifically listed in the nine enumerated categories of Section 101(2); and (b) the recordings do not constitute contributions to collective works or compilations.  Mot. at 35-38.

Neither of these arguments is supported by the law or the record, and in all events, both raise genuine disputes of material fact that preclude summary judgment.[10]

First, courts have recognized that works not specifically identified in Section 101(2) may nonetheless come within its scope if they fall within one of the other broad categories listed. *See, e.g.*, *Stanacard, LLC v. Rubard, LLC*, No. 12 CIV. 5176, 2016 WL 462508, at *7 (S.D.N.Y. Feb. 3, 2016) (holding that source code for each computer program in a new software system was a contribution to a collective work within the meaning of Section 101(2)); *Siniouguine v. Mediachase Ltd.*, No. CV 11-6113-JFW (AGRx), 2012 WL 2317364, at *5 (C.D. Cal. Jun. 11, 2012) (same). Plaintiffs ignore that collective works and compilations are umbrella terms that may encompass a variety of different types of works, so long as the works meet the definitions of those terms. *See, e.g.*, 17 U.S.C. § 101 (defining a "collective work" as "a work . . . in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole," and defining a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship"); *see also United States Copyright Office and Sound Recordings as Work Made for Hire: Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary,* 106th Cong. 151 (2000) (statement of Prof. Marci Hamilton) ("Some of the [§ 101(2)] categories . . . are generic in the sense that they could include types of works otherwise not named. For example, 'contributions to collective works' could include a collection of short stories, even though literary works are not included in the list.").

---

[10] Plaintiffs also assert that this Court previously "rejected" the contention that sound recordings are works made for hire under Section 101(2). Mot. at 35. This is incorrect. As the Court itself acknowledged, the merits of Defendants' work made for hire argument was neither before the Court nor resolved in ruling on UMG's prior motion to dismiss. *See Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 435 (2020) ("[D]efendant, for purposes of the motion to dismiss, argues only that the 'works made for hire' language is relevant to the question of when the statute of limitations began to run on plaintiffs' claims. The Court therefore need not resolve, for purposes of this motion, whether the agreements conferred 'for hire' status on the works.").

Here, a record album consisting of a collection of individual sound recordings, or tracks, constitutes a "collective work"—such an album is, by definition, "a work . . . in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole," and each individual track on the album is, by definition, a contribution to that collective work.  *See* 17 U.S.C. § 101; *see also United States Copyright Office and Sound Recordings as Work Made for Hire: Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary,* 106th Cong. 138 (2000) (statement of Prof. Paul Goldstein) ("The contribution of an individual sound recording as one of several selections on a CD or other album will typically constitute a 'contribution to a collective work' under the terms of [§ 101](2), with the result that it will qualify as a work for hire if the parties so expressly agree in a signed instrument.").  ***Indeed, the U.S. Copyright Office has so stated***.  The Copyright Office has expressly recognized that sound recordings constitute a "collective work" if "they have been assembled together into a collective whole, such as a digital album or compact disc." U.S. Copyright Office, Circular 56 Copyright Registration for Sound Recordings at 5 (revised March 2021) ("Circular 56"), *available at* https://www.copyright.gov/circs/circ56.pdf. Consistent with Circular 56, the Copyright Office has identified "[a]n album containing multiple sound recordings that embody multiple musical works" as an example of a collective work, and identified "[a] song included on an album" as an example of "separate and independent works within a collective work."  U.S. Copyright Office, Circular 34 Copyright Registration for Multiple Works at 2 (revised March 2021) ("Circular 34"), *available at* https://www.copyright.gov/circs/circ34.pdf.  Notably, courts in this circuit have routinely relied on circulars from the Copyright Office, including Circular 56, in interpreting and applying the Copyright Act.  *See, e.g.*, *Morris v. Business Concepts, Inc.*, 283 F.3d 502, 505-06 (2d Cir. 2002) (relying on Circular 62); *Jackson v. Odenat*, 9 F. Supp. 3d 342, 351, 368 (S.D.N.Y. 2014) (relying on Circular 56).

Plaintiffs do not even mention Circulars 56 or 34 in their motion, but they plainly apply to each of the works at issue here.  Each of the Plaintiffs' recording agreements obligates

Plaintiffs to record and deliver one or more albums consisting of a specific number of sound

recordings, and consistent with that obligation, define the terms "album" or "long-playing

album" as consisting of a specific number of individual sound recordings.  The parties thus

recognized both the fact of and the distinction between the individual sound recordings and the

album into which those sound recordings would ultimately be assembled.  DRUSF Addl. Fact

No. 5 (Sulton Agreement providing for delivery of a "minimum number of satisfactory studio-

originated single record sides . . . as shall constitute . . . long-playing phonograph record(s)

('Albums' or 'LPs')")[11]; *id.* Addl. Fact Nos. 45, 50 (Straw Agreement providing for delivery of

"a sufficient number of Masters . . . to constitute the number of albums" set forth in the

agreement, that each master consist of a single "Musical Composition," and that each album

"embody no fewer than eight (8) and no more than ten (10) Musical Compositions"); *id.* Addl.

Fact Nos. 81-82 (The Dickies Agreement providing for delivery of "at a minimum, fourteen (14)

Masters plus additional Masters . . . sufficient to constitute one . . . long-playing record" and

"[e]ach LP recorded hereunder shall embody no less than eight (8) and no more than twelve (12)

musical compositions"); *id.* Addl. Fact Nos. 110-111 (Dream Syndicate Agreement providing for

delivery of sound recordings sufficient to constitute an "LP," that each sound recording consist

of a single musical composition, and that each album "embody no fewer than eight (8) and no

more than ten (10) Musical Compositions").

Unsurprisingly, then, certain Plaintiffs admitted during their depositions that they were

engaged to create a sufficient number of individual sound recordings to compile into albums.

*See* DRUSF Addl. Fact Nos. 45, 81, 111.  Moreover, there is no question that these individual

tracks "constitute[e] separate and independent works in themselves."  17 U.S.C. § 101 (definition

---

[11] Indeed, the Sulton Agreement expressly states that "[Sulton] acknowledges and agrees that
each master recorded hereunder embodying the results and proceeds of his services . . . as part of
an LP-master constitutes a work specially ordered by [EMI] as a contribution to a collective
work and shall be considered a work made for hire."  DRUSF Addl. Fact No. 9.  The producers
EMI engaged to create the master sound recordings that would ultimately be assembled into
*Kasim* (Roy Baker and Bruce Fairbairn) similarly acknowledged in their contracts that their
services were for contributions to a collective work.  DRUSF Addl. Fact No. 21.

of "collective work").  As to each Plaintiff, certain individual tracks from the albums at issue

were released separately as singles, DRUSF Addl. Fact Nos. 35, 72, 100, 126, and Plaintiffs'

own damages expert has calculated statutory damages on a track-by-track (and not merely

album-by-album) basis, ECF No. 150 at 39 (explaining that Plaintiffs' putative damages expert

Stefano Vranca used a statutory damages methodology that calculates statutory damages on per

work or per track basis).

Rather than contend with Circulars 56 and 34 and the facts on record, Plaintiffs rely on

non-binding and inapt authorities.  Plaintiffs cite *Ballas v. Tedesco*, 41 F. Supp. 2d 531 (D.N.J.

1999), but in that case, the parties did not have a written agreement, rendering Section 101(2)

inapplicable in any event.  *Id.* at 541.  Furthermore, the court did not even consider whether a

record album could constitute a collective work.  *See id.*  For similar reasons, *Lulirama Ltd. v.

Axcess Broad. Servs., Inc.*, 128 F.3d 872 (5th Cir. 1997) is unavailing.  In that case, because the

defendant argued only that the jingles at issue were commissioned "as part of a motion picture or

other audiovisual work," the Fifth Circuit made clear that "this is the ***only*** potential avenue to

work for hire status that we address."  *Id.* at 878 (emphasis added).  To that end, the court held

only that the district court erred by finding that jingles without a visual component could

constitute "audiovisual works" within the meaning of Section 101(2).  *Id.*  It is axiomatic that

"[q]uestions which merely lurk in the record, neither brought to the attention of the court nor

ruled upon, are not to be considered as having been so decided as to constitute precedents."

*Khulumani v. Barclay Nat'l Bank LTD*, 504 F.3d 254, 321 (2d. Cir. 2007) (*citing Webster v. Fall*,

266 U.S. 507, 511 (1925)).  *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57 (D.D.C. 1999),

is equally unpersuasive because the district court relied solely on *Ballas* and *Lulirama*—neither

of which, as noted above, is actually applicable—to conclude without analysis that sound

recordings do not come within the "specially ordered or commissioned" categories of Section

101(2).  *Id.* at 63.  On all fronts, Plaintiffs' non-binding cases are unpersuasive in the face of

express guidance from the Copyright Office stating that sound recordings assembled into album form constitute a collective work.[12]

Plaintiffs next contend that the albums at issue are not "collective works" or "compilations" because "a true example" of such works would be "a monthly magazine containing a collection of separate and independent articles, photos, drawings, and graphic designs, made by multiple authors, photographers, artists, and graphic designers." Mot. at 37. Neither the definition of "collective work" nor the definition of "compilation" limits the scope of those terms to any particular type of work or requires multiple authors, *see* 17 U.S.C. 101, and the legislative history is directly to the contrary, *see* H.R. REP. 94-1476, 122, 1976 U.S.C.C.A.N. 5659, 5737, *available at* https://www.copyright.gov/history/law/clrev_94-1476.pdf (explaining that "[e]xamples of 'collective works' would ordinarily include . . . collections of the discrete writings *of the same authors* . . . .") (emphasis added).  At most, the definition of a "collective work" includes works "***such as*** a periodical issue, anthology, or encyclopedia," 17 U.S.C. 101 (emphasis added), but nonexclusive constructions like "such as" followed by a list are to be interpreted as nonexhaustive, *id.* ("The terms 'including' and 'such as' are illustrative and not limitative."); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (same).  The U.S. Copyright Office's Circular 14 also does not support Plaintiffs because that circular provides only "[s]ome examples of compilations," and does not exclude all others beyond the examples

---

[12] The albums also constitute compilations under the plain language of the Copyright Act's definition of that term, as the Second Circuit has previously recognized. *Bryant v. Media Right Prods. Inc.*, 603 F.3d 135, 140-41 (2d. Cir. 2010) ("An album falls within the Act's expansive definition of compilation. An album is a collection of preexisting materials — songs — that are selected and arranged by the author in a way that results in an original work of authorship — the album.").  This Court previously suggested that "this classification was considered for purposes of statutory damages," and "thus not dispositive in the 'works for hire' context." *Waite,* 450 F. Supp. 3d at 435 n.23.  While it is true that the ultimate issue in *Bryant* involved statutory damages, the Second Circuit referenced and relied upon the definition of "compilation" as it appears in Section 101, not a different definition uniquely applicable in the statutory damages context. *Bryant*, 603 F.3d at 140.  Defendants submit that the Second Circuit's holding in *Bryant* is therefore both applicable and binding in the present case, which likewise relies upon the definition of "compilation" as it appears in Section 101.

identified.  U.S. Copyright Office, Circular 14 Copyright in Derivative Works and Compilations Registration for Sound Recordings at 1-2 (revised July 2020) ("Circular 14"), *available at* https://www.copyright.gov/circs/circ14.pdf.  Indeed, it is unsurprising that Circular 14 does not contain the type of blanket exclusion Plaintiffs propose here, given that Circular 56 expressly states that sound recordings constitute a "collective work" if—as here—"they have been assembled together into a collective whole, such as a digital album or compact disc."  Circular 56 at 5; *see also* Circular 34 at 2 (identifying "[a] song on an album" as a contribution to a collective work).

Plaintiffs next claim that the works at issue cannot constitute "collective works" or "compilations" because their elements were ostensibly not "preexisting," Mot. at 37, even though each individual track was recorded—and some released as singles—before the collections of those individual tracks were released as the albums contemplated by the operative agreements, DRUSF Addl. Fact Nos. 35, 72, 100, 126.  Notably, Plaintiffs cite no authority for this narrow and unsupportable construction, which is reason enough to reject it.  In all events, Plaintiffs' argument is again inconsistent with the statements of the U.S. Copyright Office. Circular 56 provides the following example reflecting that ***newly*** recorded sound recordings compiled into a ***new*** record album can constitute a collective work, and that the resulting copyright will apply to both the album as a whole ***and*** the component individual tracks, where (as here) both are owned by the same party:

> ABC Records, Inc., publishes a new album containing twelve new tracks that were never before published. ABC Records owns the copyright in both the album and the individual tracks. ABC Records may register the album as a collective work. The registration will cover both the album and the sound recordings because the copyright in both the sound recordings and the album are owned by the same party.

Circular 56 at 6.  In short, Plaintiffs' argument is squarely inconsistent with the Copyright Office's own teachings.[13]

---

[13] Plaintiffs make the superficial argument that the albums at issue were not characterized as "collective works" or "compilations" in their copyright registrations, Mot. at 37-38, but cite no evidence that the copyright application forms permitted or required such a characterization.

Finally, Plaintiffs claim that "the custom of the music industry" reserves the terms "collective work" or "compilation" solely for albums comprised of pre-published, pre-existing sound recordings from different recording artists or different albums from a single recording artist, and "not an original album of new sound recordings." Mot. at 38. This assertion is both irrelevant, as it conflicts with the Copyright Act and the statements of the Copyright Office, *see* 17 U.S.C. § 101 (definition of "collective work"); Circular 56 at 6; Circular 34 at 2, and lacks any evidentiary support. Accordingly, it cannot carry Plaintiffs' burden at summary judgment. *See Celotex*, 477 U.S. at 331; *Giannullo*, 322 F.3d at 140. In all events, even if Plaintiffs had provided evidentiary support for such alleged "music industry custom", Defendants have adduced contrary evidence of any such music industry custom, and evidence supporting that original sound recordings arranged into a new album may properly be characterized as a collective work or a compilation. Decl. of Lisa Gilford in Support of Defs.' Opps. to Pls.' Mots. for Class Certification and Partial Summ. J., Ex. A ¶¶ 10, 15-26. At a minimum, Defendants' evidence raises genuine disputes such that Plaintiffs' motion should be denied. *See* DRUSF, Pls.' Fact Nos. 18-19, 40-41, 97-98, 118-119, 185-186, 206-207, 287-288, 303-304.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for partial summary judgment.

Dated:  New York, New York                                     Respectfully submitted,
        May 27, 2022


                                                               SIDLEY AUSTIN LLP


                                                               By: */s/ Ariel Atlas*
                                                               Ariel Atlas
                                                               aatlas@sidley.com

---

Moreover, to the extent Plaintiffs are intending to argue that the copyright registrations are dispositive, their motion should be summarily denied, as the copyright registration for each of the albums at issue unequivocally states that Defendants' predecessors (and now Defendants) are authors of the albums as works made for hire. *See supra* Argument § II.A.

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

Rollin A. Ransom
rransom@sidley.com
Lisa M. Gilford
lgilford@sidley.com
Lauren M. De Lilly
ldelilly@sidley.com
SIDLEY AUSTIN LLP
555 West 5th Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Richard S. Mandel
rsm@cll.com
Thomas Kjellberg
txk@cll.com
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, NY 10036-1525
Telephone:  (212) 790-9200
Facsimile:  (212) 575-0671

*Attorneys for Defendants UMG Recordings,
Inc. and Capitol Records, LLC*