**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X
                       :
JOHN WAITE, an individual; KASIM     :  No. 1:19-cv-01091(LAK)
SULTON, an individual; SUSAN STRAW  :
HARRIS p/k/a SYD STRAW, an individual; :
LEONARD GRAVES PHILLIPS,  an     :
individual, STAN SOBOL a/k/a STAN LEE, an :
individual, STEVE WYNN, an individual,  :
DENNIS MEHAFFEY p/k/a DENNIS DUCK, :
an individual; and DAVID PELLISH p/k/a  :
DAVE PROVOST, an individual; and on behalf :
of all others similarly situated,       :
                       :
          Plaintiffs,     :
                       :
        v.         :
                       :
UMG RECORDINGS, INC.; CAPITOL   :
RECORDS, LLC; and DOES 1 through 10,  :
                       :
          Defendants.   :
---------------------------------------------------------X

**DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF**
**UNDISPUTED FACTS**

Pursuant to Local Rule 56.1, Defendants UMG Recordings, Inc. ("UMG") and Capitol

Records, LLC ("Capitol," and together with UMG, "Defendants") respectfully submit this

response to Plaintiffs' Rule 56.1 Statement of Undisputed Facts (ECF No. 169), and Defendants'

additional material facts.

## DEFENDANTS' RESPONSE TO PLAINTIFFS' ALLEGED UNDISPUTED FACTS

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 1. Plaintiff Kasim Sulton is an American professional musician, best known for his work as a bass guitarist, keyboardist, and vocalist. Declaration of Kasim Sulton ("Sulton Decl.") at ¶ 1.; Ex. 1, Sulton Dep. Tr. at 106:6-13. | Undisputed. |
| 2. His professional music career began in 1976 when he joined the band Utopia as a bass guitarist. Ex. 1, Sulton Dep. Tr. at 18:19-21. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Declaration of Ryan Cronin [ECF No. 193] ("Cronin Decl."), Ex. 1 [ECF No. 193-1] at 18:19-21 (no reference to Sulton joining Utopia "as a bass guitarist"). |
| 3. His career as a professional musician has spanned more than 35 years and continues to this day. Sulton Decl. at ¶ 1. | Undisputed. |
| 4. Throughout his career, Sulton has created notable solo records and toured as a bass guitarist with many artists, such as the late artist Michael Lee Aday p/k/a Meatloaf. Sulton Decl. at ¶ 1. Ex. 1, Sulton Dep. Tr. at 22:25-23:22. | Undisputed. |
| 5. In the late 1970s, Sulton decided to create a solo album. Ex. 1, Sulton Dep. Tr. at 63:24-64:16. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 1 at 63:24-64:16 (no reference to the time period of "late 1970s"). |
| 6. To do so, he shopped around a demo to various record labels. Ex. 1, Sulton Dep. Tr. at 63:24-64:16, 83:11-19. | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 7.     Sulton entered into a recording agreement with EMI America Records, Inc. (a predecessor of Defendant Capitol Records, LLC) on September 29, 1980, to release his first solo project  Ex. 1, Sulton Dep. Tr. at 80:24-81:6.  Ex. 2, UMG0019812-0019863 (Sulton Recording Agreement).  Ex. 3, UMG0026361-0026362 (Sulton Copyright Registration Certificate) (noting that EMI America Records, Inc. was "a division of Capitol Records, Inc."). | Undisputed that EMI America Records, Inc. (a predecessor of Capitol) entered into a recording agreement with Sulton on September 29, 1980.  To the extent "his own solo project" is a reference to the album *Kasim*, disputed that Sulton is the owner of that album or released it.<br><br>Defendants' Controverting Evidence:<br>Second Amended Complaint ("SAC") [ECF No. 95] ¶¶ 31, 82, 95 (alleging that EMI is a predecessor of Capitol and "[o]n January 11, 1982, EMI released *Kasim*"); Declaration of Alasdair McMullan in Support of Defendants' Oppositions to Plaintiffs' Motion for Class Certification and Motion for Partial Summary Judgment ("McMullan Decl."), Ex. 1 ¶¶ 1, 4 (reflecting that EMI engaged Sulton's exclusive recording services as a performer on phonograph records for an initial term); ¶ 2 (reflecting that EMI had the right to exercise four separate, consecutive, and irrevocable options to renew and extend Sulton's recording agreement); *id.* ¶ 3 (reflecting that all sound recordings were "subject to the sole approval of [EMI] as to whether [they] are satisfactory for the manufacture and sale of phonograph records"; that EMI had the right to control the time and location of all recording sessions; and that Sulton "agree[d] to appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]" and to "comply with [EMI]'s instructions until an acceptable master recording is obtained."); *id.* ¶ 3 ("The individual producer(s) of each album to be recorded hereunder shall be [m]utually designated by [EMI] and [Sulton]."); *id.* ¶ 6(a) (reflecting EMI owns all rights in all sound recordings recorded under the agreement, and Sulton's acknowledgement and agreement that EMI was Sulton's "employer for hire" and entitled to all rights concerning the sound recordings recorded |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | under the Sulton agreement, and Sulton's "acknowledg[ment] and agree[ment] that each master recorded hereunder . . . is prepared within the scope of [EMI]'s engagement of [Sulton's] personal services and is a work made for hire, or . . . constitutes a work specially ordered by [EMI] as a contribution to a collective work."); *id.* ¶ 6(b) (providing that EMI "shall have the exclusive, perpetual and unlimited right . . . to make, manufacture, sell, lease, license, distribute, advertise, exploit or otherwise use or dispose of or deal in such masters" and further providing that the initial release of each album would be in the U.S. on EMI's top-line label); *id.* ¶ 8 (providing that EMI could request that Sulton participate in marketing and promotional activities, such as appearing at photographic sessions, interviews, on radio and television, and other for other general public relations or promotional purposes); *id.* ¶ 9 (reflecting EMI's obligation to pay Sulton $100,000 advance for the initial period of the recording agreement, and royalties); *id.* ¶ 12 (reflecting EMI's obligation to pay for all costs incurred in the manufacturing of phonograph records, and the packaging and promotion of same, all of which are non-recoupable costs); *id.* ¶ 22 (providing that EMI could request that Sulton perform at sessions for the purposes of embodying Sulton's performances on tape or film); Declaration of Lisa Gilford in Support of Defendants' Oppositions to Plaintiffs' Motion for Class Certification and Motion for Partial Summary Judgment ("Gilford Decl."), Ex. E at 110:24-25, 111:19-112:13 (EMI paid for studio sessions for the recording of *Kasim*, for the actual recording costs of the sound recordings, for the costs incurred in manufacturing the phonographic records of *Kasim*, and paid for the costs incurred in packaging and promoting *Kasim*); *id.* at 101:22-102:6, 124:23-125:19 (Sulton testifying that EMI agreed to Bruce Fairbairn |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
|  | as producer for *Kasim* and that "if EMI didn't agree to it, Mr. Fairbairn would not – I wouldn't have been in the studio with Mr. Fairbairn"); *id.* at 101:2-109:18 (Sulton testimony describing all of the contributors to the creation of *Kasim*); *id.* at 113:11-21 (Sulton testifying that an EMI representative attended recording sessions for the sound recordings that were compiled in *Kasim*); *id.* at 116:7-16 (Sulton testifying that EMI paid for rent on a home for him as "part of the recording, pars [sic] and parcel of the recording"); Declaration of Rollin A. Ransom ("Ransom Decl."), Ex. A at 15, 16 (responses to Request for Admission Nos. 50 and 53, in which Sulton admits that Bruce Fairbairn and Roy Baker were producers on *Kasim*); McMullan Decl., ¶ 2 (EMI's regular business involved making and distributing recorded music); *id.*, Ex. 24 (reflecting that EMI is the "author" of *Kasim* as a "work made for hire"); *id.*, Exs. 3-4 (reflecting EMI's payment of advances to Sulton); *id.*, Exs. 8, 12-19 (reflecting that EMI engaged, approved, and/or paid producers for the recording of *Kasim* such as Bruce Fairbairn, Roy Thomas Baker, and Willie Wilcox); *id.*, Ex. 1, 20-23 (reflecting that EMI engaged, approved, and/or paid sidemen for the recording of *Kasim* such as Elliot Easton, Roger Powell, Buck Dharma, and Jim Steinman); *id.*, Exs. 1, 3, 5, 10-11(reflecting that EMI paid for recording equipment, tour support, and Sulton's personal expenses); *id.*, Ex. 1, 6, 7, 9 (reflecting that EMI paid for the lease and rent on a home for Sulton during the recording of *Kasim*); *id.*, Ex. 2 (Sulton's assignment of the Sulton recording agreement to IDCA, reflecting Sulton's acknowledgement that the sound recordings created thereunder are works made for hire and were specially ordered or commissioned by EMI for use as contributions to a collective work). |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 8.      EMI no longer exists as a separate entity apart from Defendants.  Ex. 4, UMG Recordings, Inc. Rule 30(b)(6) Deposition of Alasdair J. McMullan ("McMullan Dep. I Tr.") at 36:5-10, 37:14-19.  Ex. 5, P03016-03018 (Defendant UMG's Webpage Showing "Our Labels & Brands"). | Disputed as vague and ambiguous as to "separate entity apart from Defendants."  EMI was merged into Capitol, which succeeded to EMI's rights and obligations and continues the same business of making and distributing recorded music.  Defendants' Controverting Evidence: SAC ¶¶ 31, 82; McMullan Decl. ¶¶ 6, 9. |
| 9.      The Sulton Recording Agreement was designed, drafted, and intended by EMI to secure the exclusive recording services of Sulton.  Ex. 2, UMG0019812-0019863 (Sulton Recording Agreement at ¶ 1).  Ex. 1, Sulton Dep. Tr. at 89:13-90:11 (Q: What were you contracted to do for EMI? … A: To the best of my knowledge, I wasn't doing anything for EMI. I was doing my record. I was recording my record, which is the recording contract for my solo record. Q: But EMI was commissioning that record from you; correct? A: EMI was facilitating the recording of the record and distribution of the record.). | Undisputed that EMI entered into a recording agreement with Sulton to engage Sulton's exclusive services as a recording artist. Disputed that EMI alone "designed" or "drafted" the recording agreement.  Defendants' Controverting Evidence: Gilford Decl., Ex. E at 81:20-82:10 (Sulton testifying that he was represented by Bernard Fischbach in connection with negotiations with EMI, and that Sulton reviewed the final contract before he signed it; Ransom Decl., Ex. A at 4 (responses to Request for Admission Nos. 3 through 7, in which Sulton admits that he was represented by counsel in connection with his recording agreement, had the opportunity to consult with counsel with respect to the recording agreement before signing it, and that Sulton reviewed the recording agreement before he signed it). |
| 10.      The Sulton Recording Agreement provided that for a term of eighteen months, Sulton could create master sound recordings for two albums  Ex. 2, UMG0019812-0019863 (Sulton Recording Agreement at ¶¶ 2-3).  Ex. 1, Sulton Dep. Tr. at 90:16-21. | Disputed, including because the cited evidence does not support the purported fact.  Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 2 (providing that the "initial term" of the recording agreement was for eighteen months, and that EMI was granted four separate, consecutive, and irrevocable options to renew and extend the term of the agreement for periods of one year each); *id.* ¶ 3 (obligating Sulton to record for EMI a sufficient number of sound recordings to constitute two long-playing albums during the agreement's "initial term"); *see also supra* |

6

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Defendants' Response and controverting evidence to No. 7. |
| 11.     The Sulton Recording Agreement contained standard "work made for hire" language in which the recording artist must "acknowledge[] and agree[]" that each sound recording was a "work made for hire" by virtue of being "prepared within the scope of [EMI's] engagement of his personal services" or being "specially ordered by [EMI] as a contribution to a collective work."  Ex. 2, UMG0019812-0019863 (Sulton Recording Agreement at ¶ 6(a)(i)).  Ex. 30 (Recording Agreement Summary Exhibit) (for a discussion of the relevant excerpts of the Class Members' recording agreements). | Undisputed that Sulton's recording agreement reflects Sulton's acknowledgement and agreement that each sound recording created thereunder constitutes a "work made for hire" "prepared within the scope of [EMI's] engagement of [Sulton's] personal services" or "constitutes a work specially ordered by [EMI] as a contribution to a collective work." Disputed that this contractual provision "contained standard 'work made for hire' language." <br><br> Defendants' Controverting Evidence: *Compare* McMullan Decl., Ex. 1 ¶ 6(a)(i), *with* Cronin Decl., Ex. 30 [ECF No. 193-30] (reflecting variations in the purported "standard 'work made for hire' language" for example:  (1) "work made for hire" and "employer for hire" (both used in the Sulton agreement); (2) "works made for hire" and "employee for hire" (both used in the Straw, Dream Syndicate, and Vinnie Vincent agreements); (3) "maker . . . and the owner" (used in Pearl Harbor and Shriekback agreements); and (4) no "'work made for hire' language" (Danny and Dusty, Buggles, Gino Vannelli, Green on Red, Musical Youth, Loretta Lynn)). |
| 12.     The Sulton Recording Agreement contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, Sulton nonetheless "grant[ed] and assign[ed] to EMI all exclusive rights of the copyright in and to" the sound recordings. Ex. 2, UMG0019812-0019863 (Sulton Recording Agreement at ¶ 6(a)(ii)).  Ex. 30 (Recording Agreement Summary Exhibit) (for a discussion of the relevant excerpts of the Class Members' recording agreements). | Undisputed that Sulton's recording agreement reflects that he agreed to assign to EMI "all exclusive rights of copyright in and to" the sound recordings created thereunder. Disputed that this contract provision "contained generic assignment language." <br><br> Defendants' Controverting Evidence: *Compare* McMullan Decl., Ex. 1 ¶ 6(a)(ii), *with* Cronin Decl., Ex. 30 (reflecting variations in the purported "generic assignment language," for example: (1) "execute and deliver to us such instruments of transfer and other documents |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | regarding our rights in the Master recordings subject to this agreement as we may reasonably request to carry out the purpose of this agreement" (Alexander O'Neal agreement); (2) "will execute and deliver to Company a written assignment . . . of all sound recording copyright rights" (Asia and agreement); (3) "To the extent, if any, that I may be deemed an 'author' of any Work, I hereby grant and assign to Company all rights of any nature whatsoever (including but not limited to the exclusive copyrights therein and thereto)" (Bill Medley agreement) and (4) no "assignment language" referenced in Ex. 30 (Beat Rodeo, Blue Angel, Sa-Fire, and Let's Active agreements)). |
| 13.     Between September 29, 1980 and January 11, 1982, Sulton created the sound recordings that would eventually be included in Kasim.  Ex. 1, Sulton Dep. Tr. at 98:11-24 (noting that the recording process took "anywhere between 6 to 12 months"). | Undisputed that *Kasim* was created during the specified time period.  Disputed that Sulton created the sound recordings that would eventually be included in *Kasim*.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 7. |
| 14.     At all times during the recording process, Sulton maintained complete creative control, without input from EMI.  Sulton Decl. at ¶ 11.  Ex. 1, Sulton Dep. Tr. at 223:2-21 ("Q: Mr. Sulton, did you have complete artistic control over the recording of the album Kasim? A: Yes.<br>Q: Did you exercise complete artistic control in the recording of the album Kasim? A: Yes.<br>Q: Did you exclusively choose the direction the Kasim album would take? A: Yes."). | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 7. |
| 15.     Sulton chose which session musician(s) to work with.  Ex. 1, Sulton Dep. Tr. at 223:13-15 ("Q: Did you choose the musicians who performed on the Kasim album? A: Yes.").  Ex. 1, Sulton Dep. Tr. at 109:12-25 ("Q: Did EMI approve of all those musicians playing on Kasim? A: EMI did not | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| have to approve them. That was my decision. They were going to play on my record."). | [EMI]'s officers."); *id.*, Exs. 20-23 (reflecting that EMI engaged, approved, and/or paid sidemen for the recording of *Kasim* such as Elliot Easton, Roger Powell, Buck Dharma, and Jim Steinman). |
| 16.       Sulton chose what producer(s) to work with.  Ex. 1, Sulton Dep. Tr. at 98:5-101:15, 223:2-21.  Ex. 1, Sulton Dep. Tr. at 125:11 ("I picked the producer."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); Gilford Decl., Ex. E at 101:22-102:6, 124:23-125:19 (Sulton testifying that EMI approved Bruce Fairbairn as producer for *Kasim* and that "if EMI didn't agree to it, Mr. Fairbairn would not – I wouldn't have been in the studio with Mr. Fairbairn"); McMullan Decl., Exs. 8, 12-19 13, 14, 15, 16, 17, 18, 19 (reflecting that EMI engaged, approved, and/or paid producers for the recording of *Kasim* such as Bruce Fairbairn, Roy Thomas Baker, and Willie Wilcox). |
| 17.       Sulton chose what sound engineer(s) to work with.  Ex. 1, Sulton Dep. Tr. at 104:15-106:1, 110:2-8, 223:2-21. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."). |
| 18.       Sulton chose which sound recordings would be selected and how they would be sequenced on Kasim.  Sulton Decl. at ¶ 13. Ex. 1, Sulton Dep. Tr. at 223:16-21 ("Q: Did you select the songs that to be included on the Kasim album? A: Yes.<br>Q: Did you select the sequencing of those songs on the Kasim album? A: Yes."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1¶ 3 (providing that all recordings were "subject to the sole approval of [EMI] as to whether [they] are satisfactory for the manufacture and sale of phonograph records"); *id.* ¶ 6(b) (providing that EMI "shall have the perpetual and unlimited right . . . to make, manufacture, sell, lease, license, |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | distribute, advertise, exploit, or otherwise use or dispose of or deal in such masters" and further providing that the initial release of each album would be in the U.S. on EMI's top-line label); *see* Gilford Decl., Ex. A¶ 25-26. |
| 19.     Sulton chose which sound recordings would be released as singles. Ex. 1, Sulton Dep. Tr. at 183:12-184:9. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1¶ 3 (providing that all recordings were "subject to the sole approval of [EMI] as to whether [they] are satisfactory for the manufacture and sale of phonograph records"); *id.* ¶ 6(b) (providing that EMI "shall have the perpetual and unlimited right . . . to make, manufacture, sell, lease, license, distribute, advertise, exploit, or otherwise use or dispose of or deal in such masters" and further providing that the initial release of each album would be in the U.S. on EMI's top-line label); Gilford Decl., Ex. Eat 183:12-184:9 (Sulton testifying that it was his decision to release one particular single); *see id.*, Ex. A ¶¶ 25-26 ; Ransom Decl., Exs. E-F. |
| 20.     EMI did not provide any input or guidance regarding the sound or direction of the sound recordings Sulton created.  Ex. 1, Sulton Dep. Tr. at 109:19-25, 223:2-21. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 7. |
| 21.     EMI never told Sulton that he had to show up at a studio at a certain time to create the sound recordings.  Sulton Decl. at ¶ 11.  Ex. 1, Sulton Dep. Tr. at 110:9-25.  Ex. 1, Sulton Dep. Tr. at 121:20-122:7 ("You know, [EMI] never required me to be at any recording session. [The recording agreement] says that, but I was never told by EMI to show up at the studio tomorrow at 10 a.m.").  Ex. 1, Sulton Dep. Tr. at 123:22-25 ("EMI never required me to be at any recording sessions."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 3 (reflecting Sulton's agreement to "appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]" and to "rehearse, record, and re-record the elected musical compositions and [] comply with [EMI]'s instructions until an acceptable master recording is obtained. Each recording shall be subject to the sole approval of [EMI] as to whether it is satisfactory for the manufacture and sale of phonograph |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | records."); Gilford Decl., Ex. E at 110:24-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 22.     On January 11, 1982, Sulton released Kasim.  Ex. 1, Sulton Dep. Tr. at 91:9-13. Ex. 3, UMG0026361-0026362 (Sulton Copyright Registration Certificate). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 1 at 91:10-13 (no reference to Sulton releasing Kasim); SAC ¶ 95 (alleging that EMI released *Kasim*); McMullan Decl., Ex. 24 (reflecting that EMI published *Kasim*; Gilford Decl., Ex. E at 33:7-15. |
| 23.     Kasim contains ten original sound recordings created by Sulton: (1) Someone To Love; (2) Evil; (3) White and Red; (4) This Must Be Love; (5) Don't Break My Heart; (6) Drivin' Me Mad; (7) Roll The Dice; (8) Just a Little Bit; (9) Sweet Little Accident; and (10) Rock and Roll.  Ex. 1, Sulton Dep. Tr. at 91:23-92:12. | Undisputed that *Kasim* contains the listed sound recordings.  Disputed that Sulton created the sound recordings.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 7. |
| 24.     On or around January 20, 1982, EMI filed a copyright application with the U.S. Copyright Office to register Kasim.  Ex. 3, UMG0026361-0026362 (Sulton Copyright Registration Certificate). | Undisputed. |
| 25.     The copyright application categorized Kasim as a "sound recording" (and not as a "compilation" or "collective work").  Ex. 3, UMG0026361-0026362 (Sulton Copyright Registration Certificate). | Undisputed that the copyright registration for *Kasim* identifies it as a sound recording. Disputed that the copyright application forms in use at the time permitted or required such a characterization, and further disputed because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 24 (identifying *Kasim* as a "work made for hire"; no indication that the copyright application permitted or required EMI to characterize the album as a collective work or a compilation). |
| 26.     The U.S. Copyright Office issued EMI a Certificate of Registration for Kasim with an effective date of January 20, 1982.  Ex. 3, | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| UMG0026361-0026362 (Sulton Copyright Registration Certificate). | |
| 27.      Shortly after the release of Kasim, EMI notified Sulton that the record label wanted to go "in a different direction" and dropped him from the label.  Ex. 1, Sulton Dep. Tr. at 92:19-94:25. | Undisputed. |
| 28.      More than three decades after the release of Kasim, on July 20, 2016, Sulton served a notice of termination upon Defendant Universal Music Recordings, Inc. ("UMG") as an agent for Capitol.  Ex. 6, UMG0019808-0019811 (Sulton Notice of Termination). | Disputed.<br><br>Defendants' Controverting Evidence: SAC ¶ 22 (identifying UMG Recordings, Inc. as a defendant); McMullan Decl., Ex. 25 (reflecting Sulton's termination notice was served upon "Universal Music Group"); *id.*, Ex. 24. |
| 29.      On July 25, 2016, counsel for Sulton recorded the notice of termination with the United States Copyright Office as document V9924 D803 P1 through P3.  Ex. 7, P00093-00096 (Certificate of Recordation of the Sulton Notice of Termination with the U.S. Copyright Office). | Undisputed. |
| 30.      On September 20, 2016, Defendants sent Sulton a letter setting forth their contentions for their claims that Sulton's notice of termination was invalid, arguing in part that the sound recordings in Kasim were works made "for hire" or "compilations" not subject to termination under Section 203 of the Copyright Act.  Ex. 8, P00097-00099 (Defendants' Counter Notice to Sulton's Notice of Termination). | Undisputed that Capitol sent Sulton the referenced letter.  Disputed that "Defendants" sent Sulton the referenced letter.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 26 (reflecting that the letter was sent on behalf of Capitol). |
| 31.      The effective date of termination for Sulton's sound recordings in Kasim was July 21, 2018.  Ex. 6, UMG0019808-0019811 (Sulton Notice of Termination). | Undisputed that Sulton's putative termination notice lists a putative termination date of July 21, 2018.  Disputed that any purported termination or termination date was "effective."<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 7. |
| 32.      Despite having knowledge that the effective date of termination was July 21, | Disputed, including to the extent that the phrase "Defendants refused to honor it" is |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 2018, Defendants refused to honor it.  Ex. 6, UMG0019808-0019811 (Sulton Notice of Termination).  Ex. 8, P00097-00099 (Defendants' Counter Notice to Sulton's Notice of Termination). | intended to suggest that Defendants exploited *Kasim* after the putative termination date.<br><br>Defendants' Controverting Evidence:<br>SAC ¶¶ 31, 82 (alleging that Capitol is the successor of EMI); McMullan Decl. ¶¶ 6, 9 (Capitol succeeded to EMI's rights and obligations, including ownership of the copyright in *Kasim*); Declaration of James Harrington ("Harrington Decl.") ¶ 3(a) (reflecting that Defendants have no record of having exploited *Kasim* in the United States on or after July 21, 2018, and likewise have no record of any revenue activity associated with exploitation of *Kasim* in the United States after July 21, 2018); *see also supra* Defendants' Response and controverting evidence to No. 7. |
| 33.      Instead, Defendants knowingly failed to return the rights to the sound recordings in Kasim to Sulton.  Ex. 8, P00097-00099 (Defendants' Counter Notice to Sulton's Notice of Termination).  Ex. 1, Sulton Dep. Tr. at 212:12-15 ("I would just like my record back, and I'd like for everyone [in the class] to have their records back."). | Disputed, including to the extent that the phrase "knowingly failed to return the rights to the sound recordings in *Kasim*" is intended to suggest that Defendants exploited *Kasim* after the putative termination date.<br><br>Defendants' Controverting Evidence:<br>SAC ¶¶ 31, 82 (alleging that Capitol is the successor of EMI); McMullan Decl. ¶¶ 6, 9 (Capitol succeeded to EMI's rights and obligations, including ownership of the copyright in *Kasim*); Harrington Decl. ¶ 3(a) (reflecting that Defendants have no record of having exploited *Kasim* in the United States on or after July 21, 2018, and likewise have no record of any revenue activity associated with exploitation of *Kasim* in the United States after July 21, 2018); *see also supra* Defendants' Response and controverting evidence to No. 7. |
| 34.      To date, Defendants have prevented Sulton from exploiting the sound recordings in Kasim well after the effective date of termination.  Ex. 1, Sulton Dep. Tr. at 212:12-15. | Disputed, including to the extent that the purported fact is intended to suggest that  that Defendants exploited *Kasim* after the putative termination date and because the cited evidence does not support the purported fact. |

13

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Defendants' Controverting Evidence: Cronin Decl., Ex. 1 at 212:12-15 (no reference to Defendants preventing Sulton from exploiting *Kasim*); SAC ¶¶ 31, 82 (alleging that Capitol is the successor of EMI); McMullan Decl. ¶¶ 6, 9 (Capitol succeeded to EMI's rights and obligations, including ownership of the copyright in *Kasim*); Harrington Decl. ¶ 3(a) (reflecting that Defendants have no record of having exploited *Kasim* in the United States on or after July 21, 2018, and likewise have no record of any revenue activity associated with exploitation of *Kasim* in the United States after July 21, 2018); *see also supra* Defendants' Response and controverting evidence to No. 7. |
| 35.    Sulton had complete creative control over the creation of the sound recordings in Kasim, without input from EMI.  Sulton Decl. at ¶ 11.  Ex. 1, Sulton Dep. Tr. at 223:2-21. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 3 (reflecting Sulton's agreement to "rehearse, record, and re-record the selected musical compositions and [] comply with [EMI]'s instructions until an acceptable master recording is obtained. Each recording shall be subject to the sole approval of [EMI] as to whether it is satisfactory for the manufacture and sale of phonograph records."); Gilford Decl., Ex. E at 101:22-109:18 (describing all of the contributors to the creation of *Kasim*); Ransom Decl., Ex. A at 15, 16 (response to Request for Admission Nos. 50 and 53, in which Sulton admits that Fairbairn and Baker were producers on *Kasim*); McMullan Decl., Exs. 8, 12-19 (reflecting that EMI engaged, approved, and/or paid producers for the recording of *Kasim* such as Bruce Fairbairn, Roy Thomas Baker, and Willie Wilcox); *id.*, Exs. 1, 20-23(reflecting that EMI engaged, approved, and/or paid sidemen for the recording of *Kasim* such as Elliot Easton, Roger Powell, Buck Dharma, and Jim Steinman); *see also supra* Defendants' |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Response and controverting evidence to No. 7. |
| 36.     Sulton chose which session musician(s) to work with.  Ex. 1, Sulton Dep. Tr. at 223:13-15 ("Q: Did you choose the musicians who performed on the Kasim album? A: Yes.").  Ex. 1, Sulton Dep. Tr. at 109:12-25 ("Q: Did EMI approve of all those musicians playing on Kasim? A: EMI did not have to approve them. That was my decision. They were going to play on my record."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Exs. 1, 20-23(reflecting that EMI engaged, approved, and/or paid sidemen for the recording of *Kasim* such as Elliot Easton, Roger Powell, Buck Dharma, and Jim Steinman); *id.*, Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); Gilford Decl., Ex. E at 110:24-25, 111:19-112:13 (EMI paid for studio sessions for the recording of *Kasim*, for the actual recording costs of the sound recordings). |
| 37.     Sulton chose what producer(s) to work with.  Ex. 1, Sulton Dep. Tr. at 98:5-101:15, 223:2-21.  Ex. 1, Sulton Dep. Tr. at 125:11 ("I picked the producer."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); Gilford Decl., Ex. E at 101:22-102:6, 124:23-125:19 (Sulton testifying that EMI agreed to Bruce Fairbairn as producer for *Kasim* and that "if EMI didn't agree to it, Mr. Fairbairn would not – I wouldn't have been in the studio with Mr. Fairbairn"); McMullan Decl., Exs. 8, 12-19 (reflecting that EMI engaged, approved, and/or paid producers for the recording of *Kasim* such as Bruce Fairbairn, Roy Thomas Baker, and Willie Wilcox). |
| 38.     In fact, Sulton decided to fire the first producer he chose for the sound recordings in Kasim due to disagreements they had.  Ex. 1, Sulton Dep. Tr. at 98:5-101:15. | Undisputed that Roy Baker, the first producer, was terminated.  Disputed that Mr. Baker's termination was solely at Sulton's discretion.<br><br> Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); *id.*, Exs. 16-17(reflecting that EMI engaged Roy Baker). |
| 39.      Sulton chose what sound engineer(s) to work with.  Ex. 1, Sulton Dep. Tr. at 104:15-106:1, 110:2-8, 223:2-21. | Disputed. \n\n Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."). |
| 40.      Sulton chose which sound recordings would be selected and how they would be sequenced on Kasim. Sulton Decl. at ¶ 13. Ex. 1, Sulton Dep. Tr. at 223:16-21 ("Q: Did you select the songs that to be included on the Kasim album? A: Yes. Q: Did you select the sequencing of those songs on the Kasim album? A: Yes."). | Disputed. \n\n Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 3 (providing that all recordings were "subject to the sole approval of [EMI] as to whether [they] are satisfactory for the manufacture and sale of phonograph records"); *id.* ¶ 6(b) (providing that EMI "shall have the exclusive, perpetual and unlimited right . . . to make, manufacture, sell, lease, license, distribute, advertise, exploit, or otherwise use or dispose of or deal in such masters" and further providing that the initial release of each album would be in the U.S. on EMI's top-line label); *see* Gilford Decl., Ex. A ¶¶ 25-26 |
| 41.      Sulton chose which sound recordings would be released as singles.  Sulton Decl. at ¶ 13. Ex. 1, Sulton Dep. Tr. at 183:12-184:9. | Disputed, including because the cited evidence does not support the purported fact. \n\n Defendants' Controverting Evidence: McMullan Decl., Ex. 2 ¶ 3 (providing that all recordings were "subject to the sole approval of [EMI] as to whether [they] are satisfactory for the manufacture and sale of phonograph records"); *id.* ¶ 6(b) (providing that EMI "shall have the perpetual and unlimited right . . . to make, manufacture, sell, lease, license, distribute, advertise, exploit, or otherwise use |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | or dispose of or deal in such masters" and further providing that the initial release of each album would be in the U.S. on EMI's top-line label); Gilford Decl., Ex. E at 183:12-184:9 (Sulton testifying that it was his decision to release one particular single); *see id.*, Ex. A ¶¶ 25-26 ; Ransom Decl., Exs. E-F. |
| 42.     EMI did not provide any input or guidance regarding the sound or direction of the sound recordings Sulton created.  Ex. 1, Sulton Dep. Tr. at 109:19-25, 223:2-21. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 7. |
| 43.     EMI never told Sulton that he had to show up at a studio at a certain time to create the sound recordings.  Sulton Decl. at ¶ 11. Ex. 1, Sulton Dep. Tr. at 110:9-25.  Ex. 1, Sulton Dep. Tr. at 121:20-122:7 ("You know, [EMI] never required me to be at any recording session. [The recording agreement] says that, but I was never told by EMI to show up at the studio tomorrow at 10 a.m.").  Ex. 1, Sulton Dep. Tr. at 123:22-25 ("EMI never required me to be at any recording sessions."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 3 (reflecting Sulton's agreement to "appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]" and to "rehearse, record, and re-record the elected musical compositions and [] comply with [EMI]'s instructions until an acceptable master recording is obtained. Each recording shall be subject to the sole approval of [EMI] as to whether it is satisfactory for the manufacture and sale of phonograph records."); Gilford Decl., Ex. E at 110:24-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 44.     Sulton is a highly-skilled professional musician, best known for his work as a bass guitarist, keyboardist, and vocalist.  Sulton Decl. at ¶ 1.  Ex. 1, Sulton Dep. Tr. at 106:6-13. | Undisputed. |
| 45.     His career as a professional musician has spanned more than 35 years and continues to this day.  Sulton Decl. at ¶ 1. | Undisputed. |
| 46.     He has created notable solo records and toured as a bass guitarist with many artists, such as the late artist Michael Lee Aday p/k/a Meatloaf.  Ex. 1, Sulton Dep. Tr. at 22:25-23:22. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Cronin Decl., Ex. 1 at 22:25-23:22 (no reference to Sulton "creating notable solo records and touring as a bass guitarist with many artists"). |
| 47.      He is a "multi-instrumentalist," and when creating the sound recordings in Kasim, played not only the bass guitar, but also six string guitar, piano, electric keyboards, and the synthesizer.  Ex. 1, Sulton Dep. Tr. at 106:6-13, 223:2-21. | Undisputed that Sulton plays the multiple instruments referenced.  Disputed that Sulton created *Kasim*.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 7. |
| 48.      Sulton has never been an employee of EMI or Defendants.  Sulton Decl. at ¶ 3. | Disputed.<br><br>Defendants' Controverting Evidence:<br>SAC ¶¶ 31, 82 (alleging that Capitol is the successor of EMI); McMullan Decl. ¶ 6 (Capitol succeeded to EMI's rights and obligations, including ownership of the copyright in *Kasim*); *see also supra* Defendants' Response and controverting evidence to No. 7. |
| 49.      Sulton never received a salary from EMI or Defendants.  Sulton Decl. at ¶¶ 4-5. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Exs. 1, 3 (reflecting EMI's payment of advances to Sulton); *id.*, Ex. 1 ¶ 9 (reflecting EMI's obligation to pay Sulton $100,000 advance for the initial period of the recording agreement followed by royalties). |
| 50.      Sulton never received a paycheck from EMI or Defendants in which they withheld any income taxes, social security, or other comparable payments.  Ex. 1, Sulton Dep. Tr. at 223:22-24. | Undisputed. |
| 51.      Sulton never received a W-2 from EMI or Defendants.  Sulton Decl. at ¶ 6. | Undisputed. |
| 52.      Sulton never received health or life insurance benefits from EMI or Defendants.  Sulton Decl. at ¶¶ 7-8. | Undisputed. |
| 53.      Sulton never received paid vacation or sick leave from EMI or Defendants.  Sulton Decl. at ¶ 10. | Undisputed. |
| 54.      Sulton was never provided with an office by EMI or Defendants  Sulton Decl. at | Disputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| ¶ 9.  Ex. 1, Sulton Dep. Tr. at 114:23-115:5 ("Q: You mentioned that you visited EMI's offices. Did you have an office or work space there? A: No."). | Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ; Gilford Decl., Ex. E at 115:6-116:16, 167:7-171:6 (EMI entered into and paid for a lease on a house in Los Angeles for Sulton during the recording of *Kasim*); Gilford Decl., Ex. E at 110:24-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 55.      Sulton was never provided with a secretary or any other type of assistant by EMI or Defendants.  Sulton Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); Gilford Decl., Ex. E at 101:22-102:6, 124:23-125:19 (Sulton testifying that EMI agreed to Bruce Fairbairn as producer for *Kasim* and that "if EMI didn't agree to it, Mr. Fairbairn would not – I wouldn't have been in the studio with Mr. Fairbairn"); McMullan Decl., Exs. 8, 12-19 (reflecting that EMI engaged, approved, and/or paid producers for the recording of *Kasim* such as Bruce Fairbairn, Roy Thomas Baker, and Willie Wilcox). |
| 56.      EMI did not deduct or withhold income taxes, social security, or other comparable payments on behalf of Sulton. Sulton Decl. at ¶¶ 5-6. | Undisputed. |
| 57.      EMI did not issue W-2 tax forms to Sulton.  Sulton Decl. at ¶¶ 5-6. | Undisputed. |
| 58.      The Sulton Recording Agreement provided that Sulton could create sound recordings for two albums.  Ex. 2, UMG0019812-0019863 (Sulton Recording Agreement at ¶¶ 2-3). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 2 (providing that the "initial term" of the recording agreement was for eighteen months, and that EMI was granted four separate, consecutive, and irrevocable options to renew and extend the term of the agreement for periods of one year |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | each); *id.* ¶ 3 (obligating Sulton to record for EMI a sufficient number of sound recordings to constitute two long-playing albums during the agreement's "initial term"); *see also supra* Defendants' Response and controverting evidence to No. 7. |
| 59.     The Sulton Recording Agreement did not give EMI any authority to assign additional projects outside of that agreement. Ex. 2, UMG0019812-0019863 (Sulton Recording Agreement at ¶¶ 2-3). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 2 (providing that the "initial term" of the recording agreement was for eighteen months, and that EMI was granted four separate, consecutive, and irrevocable options to renew and extend the term of the agreement for periods of one year each); *id.* ¶ 8 (providing that EMI could request that Sulton participate in marketing and promotional activities, such as appearing at photographic sessions, interviews, on radio and television, and other for other general public relations or promotional purposes); *id.* ¶ 22 (providing that EMI could request that Sulton perform at sessions for the purposes of embodying Sulton's performances on tape or film). |
| 60.     EMI did not assign additional projects to Sulton outside of the Sulton Recording Agreement.  Sulton Decl. at ¶ 12. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 2 (providing that the "initial term" of the recording agreement was for eighteen months, and that EMI was granted four separate, consecutive, and irrevocable options to renew and extend the term of the agreement for periods of one year each); *id.* ¶ 8 (providing that EMI could request that Sulton participate in marketing and promotional activities, such as appearing at photographic sessions, interviews, on radio and television, and other for other general public relations or promotional purposes); *id.* ¶ 22 (providing that EMI could request that Sulton perform at sessions for the purposes of his Sulton's performances on tape or film). |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 61.      EMI did not provide Sulton with instruments and tools needed to create the sound recordings.  Sulton Decl. at ¶ 11.  Ex. 1, Sulton Dep. Tr. at 110:9-25. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Exs. 1, 3, 5, 11 (reflecting that EMI paid for recording equipment, tour support, and Sulton's personal expenses); Gilford Decl., Ex. E at 110:24-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 62.      The instruments and tools were either provided by Sulton himself or the third-party music studios at which he created the sound recordings.  Sulton Decl. at ¶ 11.  Ex. 1, Sulton Dep. Tr. at 110:9-25. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Exs. 1, 3, 5, 11 (reflecting that EMI paid for recording equipment, tour support, and Sulton's personal expenses); Gilford Decl., Ex. E at 110:24-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 63.      Sulton chose where to create the sound recordings in Kasim without any input from EMI.  Sulton Decl. at ¶ 11.  Ex. 1, Sulton Dep. Tr. at 110:9-110:25, 223:2-21. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); *id.*, ¶ 3 ("[Sulton] agrees to appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]."); Gilford Decl., Ex. E at 110:9-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 64.      Sulton chose to record the sound recordings in Kasim in studios in and around Los Angeles, California.  Sulton Decl. at ¶ 11. Ex. 1, Sulton Dep. Tr. at 110:9-110:25. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); *id.* ¶ 3 ("[Sulton] agrees |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | to appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]."); Gilford Decl., Ex. E at 110:9-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 65.    EMI never approved of those studio location choices, but it did pay for the studio time. Ex. 1, Sulton Dep. Tr. at 110:9-110:25, 120:25-123:25. | Undisputed that EMI paid for the recording studio time for the recording of *Kasim*. Disputed that EMI did not approve of studio location choices.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); *id.* ¶ 3 ("[Sulton] agrees to appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]."); Gilford Decl., Ex. E at 110:9-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 66.    Sulton had a relatively short relationship with EMI.  Ex. 1, Sulton Dep. Tr. at 90:16-21 (Sulton says to the best of his recollection, the length of the contract with EMI "wasn't more than 18 months, 12 to 18 months"). | Disputed as vague and ambiguous as to the meaning of "relatively short relationship."<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 2 (providing that the "initial term" of the recording agreement was for eighteen months, and that EMI was granted four separate, consecutive, and irrevocable options to renew and extend the term of the agreement for periods of one year each). |
| 67.    Between September 29, 1980 and January 11, 1982, Sulton created the sound recordings that would eventually be included in *Kasim*.  Ex. 1, Sulton Dep. Tr. at 91:8-13. | Undisputed that *Kasim* was created during the specified time period.  Disputed that Sulton created the sound recordings that would eventually be included in *Kasim*.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | *See supra* Defendants' Response and controverting evidence to No. 7. |
| 68.     Shortly thereafter, EMI dropped Sulton from the label and terminated the Sulton Recording Agreement.  Ex. 1, Sulton Dep. Tr. at 92:19-94:17. | Undisputed. |
| 69.     EMI exercised no discretion over when and for how long Sulton should work. Sulton Decl. at ¶ 11.  Ex. 1, Sulton Dep. Tr. at 121:20-122:7 ("You know, [EMI] never required me to be at any recording session. [The recording agreement] says that, but I was never told by EMI to show up at the studio tomorrow at 10 a.m.").  Ex. 1, Sulton Dep. Tr. at 123:22-25 ("EMI never required me to be at any recording sessions."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 2 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); *id.* ¶ 3 (reflecting that all sound recordings were "subject to the sole approval of [EMI] as to whether [they are] satisfactory for the manufacture and sale of phonograph records"; that EMI had the right to control the time and location of all recording sessions; that "[Sulton] agrees to appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]; and that Sulton would "re-record the selected musical compositions and will comply with [EMI]'s instructions until an acceptable master recording is obtained"); Gilford Decl., Ex. E at 110:9-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 70.     Sulton chose when and where to create the sound recordings in *Kasim*.  Sulton Decl. at ¶ 11.  Ex. 1, Sulton Dep. Tr. at 110:9-23. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 2 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); *id.* ¶ 3 (reflecting that all sound recordings were "subject to the sole approval of [EMI] as to whether [they are] satisfactory for the manufacture and sale of phonograph records"; that EMI had the right |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
|  | to control the time and location of all recording sessions; that "[Sulton] agrees to appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]; and that Sulton would "re-record the selected musical compositions and will comply with [EMI]'s instructions until an acceptable master recording is obtained"); Gilford Decl., Ex. E at 110:9-25, 111:19-23 (EMI paid for studio sessions for the recording of *Kasim* and for the actual recording costs of the sound recordings). |
| 71.     EMI did not pay Sulton a salary or provide him with a regular paycheck.  Sulton Decl. at ¶¶ 4-5.  Ex. 1, Sulton Dep. Tr. at 223:22-24. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Exs. 3-4 (reflecting EMI's payment of advances to Sulton); *id.*, Ex. 1 ¶ 9 (reflecting EMI's obligation to pay Sulton $100,000 advance for the initial period of the recording agreement followed by royalties). |
| 72.     Instead, Sulton received an advance in connection with the Sulton Recording Agreement, which was recoupable.  Ex. 2, UMG0019812-0019863 (Sulton Recording Agreement at ¶ 9).  Ex. 1, Sulton Dep. Tr. at 111:8-18. | Undisputed that EMI paid Sulton an advance pursuant to the Sulton recording agreement. Disputed to the extent the purported fact suggests that an advance does not constitute a salary.<br><br>Defendants' Controverting Evidence: McMullan Decl., Exs. 3-4 (reflecting EMI's payment of advances to Sulton); *id.*, Ex. 1 ¶ 9 (reflecting EMI's obligation to pay Sulton $100,000 advance for the initial period of the recording agreement followed by royalties). |
| 73.     EMI did not play any role in hiring any assistants for Sulton.  Sulton Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 1 ¶ 11(a) ("No artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers."); Gilford Decl., Ex. E at 101:22-102:6, 124:23-125:19 (Sulton testifying that EMI agreed to Bruce Fairbairn as producer for *Kasim* and that "if EMI didn't |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | agree to it, Mr. Fairbairn would not – I wouldn't have been in the studio with Mr. Fairbairn"); McMullan Decl., Exs. 8, 12-19 (reflecting that EMI engaged, approved, and/or paid producers for the recording of *Kasim* such as Bruce Fairbairn, Roy Thomas Baker, and Willie Wilcox). |
| 74.    Sulton is a professional musician, best known for his work as a bass guitarist, keyboardist, and vocalist.  Sulton Decl. at ¶ 1. Ex. 1, Sulton Dep. Tr. at 106:6-13. | Undisputed. |
| 75.    As a professional musician, Sulton creates sound recordings.  Sulton Decl. at ¶ 1. Ex. 1, Sulton Dep. Tr. at 106:6-13. | Disputed to the extent "Sulton creates sound recordings" is intended to suggest that Sulton created the album *Kasim*.  Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 7. |
| 76.    EMI did not itself create sound recordings. Rather, EMI was in the business of distributing and promoting sound recordings.  Ex. 1, Sulton Dep. Tr. at 89:13-90:11. | Disputed, including on the ground that the cited evidence does not support the purported fact.  Defendants' Controverting Evidence: Cronin Decl., Ex. 1 at 89:13-90:11 (Sulton testifying that EMI facilitated the recording of *Kasim*); McMullan Decl. ¶¶ 5, 9 (EMI's regular business involved making and distributing sound recordings). |
| 77.    EMI is a predecessor of Defendant Capitol Records, LLC.  Ex. 5, P03016-03018 (Defendant UMG's Webpage Showing "Our Labels & Brands"). | Undisputed. |
| 78.    EMI no longer exists as a separate entity apart from Defendants  Ex. 4, McMullan Dep. I Tr. at 36:5-10, 37:14-19. Ex. 5, P03016-03018 (Defendant UMG's Webpage Showing "Our Labels & Brands"). | Disputed as vague and ambiguous as to "separate entity apart from Defendants."  EMI was merged into Capitol, which succeeded to EMI's rights and obligations and continues the same business of making and distributing recorded music.  Defendants' Controverting Evidence: SAC ¶¶ 31, 82; McMullan Decl. ¶¶ 6, 9. |
| 79.    The Dickies are a punk rock band from Los Angeles, California.  Declaration of | Undisputed |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| Leonard Graves Phillips ("Phillips Decl.") at ¶ 1.  Declaration of Stan Sobol p/k/a/ Stan Lee ("Sobol Decl.") at ¶ 1.  Ex. 9, Phillips Dep. Tr. at 39:1-3, 61:16-24. | |
| 80.      Originally formed in 1977, The Dickies are one of the longest tenured punk rock bands, and have been in continuous existence for over 45 years.  Phillips Decl. at ¶ 1.  Sobol Decl. at ¶ 1. Ex. 9, Phillips Dep. Tr. at 39:1-3, 61:16-24.  Ex. 10, Sobol Dep. Tr. at 13:18-19. | Undisputed. |
| 81.      The founding members of The Dickies were Plaintiff Leonard Graves Phillips, Plaintiff Stan Sobol (p/k/a Stan Lee), Carlos Caballero (p/k/a Karlos Kaballero), William "Bill" Remar (p/k/a Billy Club), and Robert "Bob" Davis (p/k/a Chuck Wagon).  Ex. 9 , Phillips Dep. Tr. at 39:1-7.  Ex. 10, Sobol Dep. Tr. at 13:15-23. | Undisputed. |
| 82.      Plaintiff Leonard Graves Phillips is the lead vocalist of The Dickies.  Phillips Decl. at ¶ 1.  Ex. 9, Phillips Dep. Tr. at 42:3-43:7. | Undisputed. |
| 83.      Plaintiff Stan Sobol is a guitarist and vocalist in The Dickies.  Sobol Decl. at ¶ 1.  Ex. 10, Sobol Dep. Tr. at 12:9-14. | Undisputed. |
| 84.      The Dickies were discovered in or about late 1977 or early 1978 by music manager John Hewlett, who decided to shop their demo to various labels.  Ex. 9, Phillips Dep. Tr. at 44:20- 45:12.  Ex. 10, Sobol Dep. Tr. at 20:6-20. | Undisputed. |
| 85.      The Dickies eventually decided to sign with A&M Records, Limited ("A&M Limited") because it offered the highest advance and the most creative control to The Dickies.  Ex. 9, Phillips Dep. Tr. at 46:2-49:5 ("So the idea that A&M would be the most lucrative deal as far as the best budget was concerned was one consideration, but they also offered us complete artistic control, which was very – you know, a very prized aspect of a contract to have that."). | Disputed to the extent the purported fact is intended to suggest that The Dickies exercised exclusive or substantial control over the creation of the sound recordings at issue in this action, or to the extent it is intended to suggest that A&M Records Limited ("A&M Ltd.") did not have the right to exercise such control and/or did not exercise such control.

Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | *See infra* Defendants' Response and controverting evidence to No. 87. |
| 86.    A&M Limited is a predecessor of Defendant UMG Recordings, Inc. It no longer exists as a separate entity apart from Defendants.  Ex. 9, Phillips Dep. Tr. at 125:8-15.  Ex, 10, Sobol Dep. Tr. at 102:15-24. | Disputed because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 9 [ECF No. 193-9] at 125:8-15 (Phillips testifying that he "could only speculate" as to the relationship between A&M Ltd. and UMG); SAC ¶¶ 24, 106; McMullan Decl. ¶¶ 8, 9. |
| 87.    On April 3, 1978, the members of The Dickies – Leonard Graves Phillips, William Remar, Robert Davis, and Carlos Caballero – signed a recording agreement with A&M Limited to release an album.  Ex, 9, Phillips Dep. Tr. at 49:6-10.  Ex. 10, Sobol Dep. Tr. at 13:15-23. | Undisputed that A&M Ltd. entered into a recording agreement with members of The Dickies on April 3, 1978.  To the extent "an album" is a reference to the album *Dawn of The Dickies*, disputed that The Dickies released that album.<br><br>Defendants' Controverting Evidence: SAC ¶ 119 (alleging that "[o]n November 9, 1979, A&M released *Dawn of The Dickies*"); McMullan Decl., Ex. 38 at 1 & ¶ 10(a) (reflecting that A&M Ltd. engaged the exclusive recording services of The Dickies for an initial term of one year); *id.* ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]. [A&M Ltd.] approve[s] Earl Mankey as the engineer and co-producer for recording sessions for the first fourteen (14) Masters to be recorded hereunder and we also approve John Hewlett as the other co-producer of such Masters. Each Master shall be subject to [A&M Ltd.'s] approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon [A&M Ltd.'s] request, [The Dickies] shall re-record, re-mix, or otherwise alter any Master recording until a Master technically satisfactory to [A&M Ltd.] shall have been obtained. Upon [The Dickies'] delivery of each Master, [A&M Ltd.] shall have the right |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | to determine whether or not [A&M Ltd.] shall accept such Master in partial fulfillment of [The Dickies'] recording commitment. If [A&M Ltd.] shall not accept any Master, such Master shall not apply in reduction of [The Dickies'] recording commitment."); *id.* ¶ 4 ("All master recordings recorded by [The Dickies] during the term hereof, from the inception of the recording thereof . . . shall be entirety [A&M Ltd.'s] property, free of any claims whatsoever by [The Dickies] . . . . [A&M Ltd.] shall, accordingly, have the sole and exclusive right to copyright such master recordings . . . in [A&M Ltd.'s] name, as the owner and author thereof, and to secure any and all renewals and extensions of such copyrights (it being understood that for such purposes [The Dickies] and all other persons rendering services in connection with such master recordings shall be [A&M Ltd.'s] employees for hire)."); *id.* (providing that A&M Ltd. shall have the right "to release phonograph records or other reproductions embodying such master recordings"); *id.* ¶ 6 (reflecting A&M Ltd.'s obligation to pay The Dickies royalties); *id.* ¶ 14 (reflecting A&M Ltd.'s right to request that The Dickies appear on dates and at locations designated by A&M Ltd. for the filming or taping of The Dickies' performances); *id.* ¶ 19 (reflecting A&M Ltd.'s right to exercise four separate, consecutive options to renew the term of the recording agreement); *id.* ¶ 25 (reflecting A&M Ltd.'s obligation to pay The Dickies an $100,000 advance "promptly" after execution of the recording agreement); Gilford Decl., Ex. D at 101:5-9 (Phillips testifying that he was aware when he signed The Dickies agreement that A&M Ltd. would own the sound recordings created thereunder); *id.* at 86:3-5, 135:15-24 (Phillips testifying that A&M Ltd. paid The Dickies an $100,000 advance of which the band used in part to book the recording studio and to otherwise |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | record *Dawn of The Dickies*); *id.* at 67:1-16 (Phillips testifying that he understood A&M Ltd. engaged The Dickies to make an album that consisted of a series of songs); *id.* at 63:6-21 (Phillips testifying that producer Robin Cable assisted with engineering for *Dawn of The Dickies* and that "he made . . . sure that stuff was recorded well and sounded good"); *id.*, Ex. C at 67:1-14, 107:11-14 (Sobol testifying that he knew A&M Ltd. owned the sound recordings recorded pursuant to The Dickies' agreement and the copyrights in those recordings); *id.* at 62:17-63:13, 64:4-11 (Sobol testifying that under the recording agreement, A&M Ltd. had the right to approve the sound recordings as technically satisfactory to them, and that A&M had the right to reject non-compliant sound recordings); *id.* at 46:25-47:18, 49:2-6 (Sobol testifying that The Dickies recorded individual sound recordings under the agreement, and that The Dickies were to deliver enough sound recordings to constitute an album); *id.* at 60:7-61:24 (Sobol testifying that producer Robin Cable "made us sound good. [Cable] brought his expertise in as an engineer and a guy that knows music, I guess."); Ransom Decl., Ex. B at 15-16 (responses to Request for Admission Nos. 56, 57, and 58, which Phillips and Sobol admit that Phillips, Sobol, and Cabellero made promotional appearances at the request of A&M Ltd.); McMullan Decl. ¶ 5 (A&M Ltd.'s regular business involved making and distributing recorded music); *id.*, Ex. 60 (reflecting that A&M is the "author" of *Dawn of The Dickies* as a "work made for hire"); *id.*, Ex. 39 (reflecting that A&M exercised its option for the first renewal term of The Dickies recording agreement); *id.*, Exs. 41, 48 (examples of advances paid by A&M Ltd. to The Dickies); *id.*, Ex. 42 (reflecting that A&M Ltd. paid "payroll" and "health and welfare" costs related to The Dickies); *id.*, |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Exs. 40, 49 (reflecting that A&M Ltd. paid for tour support for The Dickies); *id.*, Exs. 40, 49 (reflecting that The Dickies submitted form W-4s to A&M Ltd.); *id.*, Ex. 44 (reflecting that A&M Ltd. reimbursed The Dickies for payments they made to producer Robin Cable); *id.*, Ex. 59  (reflecting that A&M Ltd. managed and facilitated the release of singles from *Dawn of The Dickies*); *id.*, Ex. 50 (reflecting that A&M Ltd. provided written approval of recording studio for The Dickies, including the price per hour and the dates and times of recording); *id.*, Exs. 47, 52 (reflecting that A&M Ltd's paid for recording equipment for The Dickies); *id.*, Exs. 42, 43, 45, 46, 54, 53, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio and sessions costs for The Dickies). |
| 88.      The Dickies Recording Agreement was designed, drafted, and intended by A&M to secure the exclusive recording services of The Dickies.  Ex. 11, UMG0000731-0000763 (Dickies Recording Agreement). | Undisputed that A&M Ltd. entered into a recording agreement with The Dickies to engage The Dickies' exclusive services as a recording artist.  Disputed that A&M Ltd. alone "designed" or "drafted" the recording agreement.<br><br>Defendants' Controverting Evidence:<br>Gilford Decl., Ex. D at 51:1-5, 64:13-25, 89:14-18 (Phillips testifying that The Dickies were represented by counsel in connection with their recording agreement, that Phillips reviewed the recording agreement and had an opportunity to ask his counsel questions before he signed it); *id.*, Ex. C at 23:19-25, 42:25-43:6, 43:17-44:7, 72:11-16 (Sobol testifying that The Dickies were represented by counsel in connection with negotiation of the recording agreement, and that he had an opportunity to review the agreement, consult with counsel, and ask counsel questions before he signed it); Ransom Decl., Ex. B at 4-7 (responses to Request for Admission Nos. 7-11, 13-14, 16-17, 19-20, in which Phillips and Sobol admit that they were represented by counsel in connection with their recording |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | agreement, had the opportunity to review the agreement and consult with counsel before signing it, and reviewed the agreement before signing it). |
| 89.    It provided that, for a one-year term, The Dickies could record one album, as well as a second album at A&M Limited's election.  Ex. 11, UMG0000731-0000763 (Dickies Recording Agreement at ¶ 1-2). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 1 ("The term of this contract shall consist of an initial term commencing as of the date hereof and continuing for one (1) year, and of the additional renewal term or terms hereinafter provided."); *id.* ¶ 2(a)(i) (obligating The Dickies "to record for and deliver to [A&M Ltd.], at a minimum, fourteen (14) Masters"); *id.* ¶ 19 (granting A&M Ltd. the right to exercise four separate, consecutive options to renew the term of the contract for an eighteen month term); *see also supra* Defendants' Response and controverting evidence to No. 87. |
| 90.    The Dickies Recording Agreement contained standard "work made for hire" language.  Ex. 11, UMG0000731-0000763 (Dickies Recording Agreement at ¶ 4).  Ex. 30 (Recording Agreement Summary Exhibit) (for a discussion of the relevant excerpts of the Class Members' recording agreements). | Undisputed that The Dickies' recording agreement reflects the parties' agreement that A&M Ltd. was the "owner and author" of all sound recordings and that The Dickies were A&M's "employees for hire."  Disputed that this contractual provision "contained standard 'work made for hire' language."<br><br>Defendants' Controverting Evidence: *Compare* McMullan Decl., Ex. 38 ¶ 4, *with* Cronin Decl., Ex. 30 (reflecting variations in the purported "standard 'work made for hire' language" for example:  (1) "work made for hire" and "employer for hire" (both used in the Sulton agreement); (2) "works made for hire" and "employee for hire" (both used in the Straw, Dream Syndicate, and Vinnie Vincent agreements); (3) "employees for hire" (used in The Dickies agreement); (4) "maker . . . and the owner" (used in Pearl Harbour and Shriekback agreements); (5) "we hereby employ the personal services of you |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | and such musicians" (used in the Freddie Hubbard agreement); and (6) no "'work made for hire' language" (Danny and Dusty, Buggles, Gino Vannelli, Green on Red, Musical Youth, Loretta Lynn)). |
| 91.    Alternatively, The Dickies Recording Agreement contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, The Dickies nevertheless were required to "execute and deliver to [A&M Limited] any assignments of copyright (including renewals and extensions thereof) in and to such master recordings as [A&M Limited] may deem necessary." Ex. 11, UMG0000731-0000763 (Dickies Recording Agreement at ¶ 4). Ex. 30 (Recording Agreement Summary Exhibit) (for a discussion of the relevant excerpts of the Class Members' recording agreements). | Undisputed that The Dickies' recording agreement reflects that they agreed to assign to A&M Ltd. "any assignments of copyright . . . in and to" the sound recordings created thereunder. Disputed that this contract provision "contained generic assignment language." <br><br> Defendants' Controverting Evidence: *Compare* McMullan Decl., Ex. 38 ¶ 4, *with* Cronin Decl., Ex. 30 (reflecting variations in the purported "generic assignment language," for example: (1) "execute and deliver to us such instruments of transfer and other documents regarding our rights in the Master recordings subject to this agreement as we may reasonably request to carry out the purpose of this agreement" (Alexander O'Neal agreement); (2) "will execute and deliver to Company a written assignment . . . of all sound recording copyright rights" (Asia and Atlantic Starr agreements); (3) "To the extent, if any, that I may be deemed an 'author' of any Work, I hereby grant and assign to Company all rights of any nature whatsoever (including but not limited to the exclusive copyrights therein and thereto)" (Bill Medley agreement) and (4) no "assignment language" referenced in Ex. 30 (Beat Rodeo, Blue Angel, Sa-Fire, and Let's Active agreements)). |
| 92.    Between April 3, 1978 and November 9, 1979, The Dickies created sound recordings in Dawn of the Dickies. Ex. 9, Phillips Dep. Tr. at 126:7-23. | Undisputed that *Dawn of The Dickies* was created during the specified time period. Disputed that The Dickies created the sound recordings that would eventually be included in *Dawn of The Dickies*. <br><br> Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | *See supra* Defendants' Response and controverting evidence to No. 87. |
| 93.      The Dickies exercised complete artistic control over the sound recordings. Phillips Decl. at ¶ 11. Sobol Decl. at ¶ 11. Ex. 9, Phillips Dep. Tr. at 65:23-66:25 ("[M]y understanding was…that we were going to receive a budget to make an album…and that we were given complete artistic control to make it any way we wanted to make it in terms of the sounds, in terms of the sound, in terms of the imagery for the – the graphic art; that sort of thing.").  Ex. 10, Sobol Dep. Tr. at 120:17-121:15 (Sobol says he loves the album, wants it back, and A&M "had nothing to do with telling us what to do or anything about that"). | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The musical compositions or other selections which shall be embodied in the Masters shall be designated by you upon notice to us."); *id.* (providing that each master sound recording was subject to approval by A&M Ltd. and that A&M Ltd. had the right to require The Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained"); *id.* ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters, shall be mutually designated by [The Dickies] and [A&M Ltd.]"); Gilford Decl., Ex. D at 63:6-21 (Phillips testifying that producer Robin Cable assisted with engineering for *Dawn of The Dickies* and that "he made . . . sure that stuff was recorded well and sounded good"); *id.*, Ex. C at 62:17-63:13, 64:4-11 (Sobol testifying that under the recording agreement, A&M Ltd. had the right to approve the sound recordings as technically satisfactory to them, and that A&M had the right to reject non-compliant sound recordings); *id.* at 60:7-61:24 (Sobol testifying that producer Robin Cable "made us sound good. [Cable] brought his expertise in as an engineer and a guy that knows music, I guess."); *see also supra* Defendants' Response and controverting evidence to No. 87. |
| 94.      The Dickies chose what session musician(s) to work with.  Ex. 10, Sobol Dep. Tr. at 123:6-124:8. | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | shall be mutually designated by [The Dickies] and [A&M Ltd.]"). |
| 95.      The Dickies chose what producer(s) to work with.  Ex. 9, Phillips Dep. Tr. at 62:2-63:15 ("[B]eing as we had complete artistic control, it was our decision who would – you know, who we could have in the studio."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]" and reflecting that A&M approved Earl Mankey and John Hewlett as co-producers for the initial master sound recordings); *id.*, Ex. 44 (reflecting that A&M paid for the services of producer Robin Cable); Gilford Decl., Ex. D at 97:21-98:7, 98:17-99:14, 99:22-100:25 (Phillips testifying that he could not recall how The Dickies became connected with producer Robin Cable, and that he could only speculate as to whether Mr. Cable had a contract with A&M, and that he did not know who was responsible for Mr. Cable coming on board to produce *Dawn of The Dickies*). |
| 96.      The Dickies chose what sound engineer(s) to work with.  Ex. 9, Phillips Dep. Tr. at 62:2-63:15. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]" and reflecting that A&M approved Earl Mankey and John Hewlett as co-producers for the initial sound recordings); *id.* Ex. 44 (reflecting that A&M paid for the services of Robin Cable); Gilford Decl., Ex. D at 97:21-98:7, 98:17-99:14, 99:22-100:25 (Phillips testifying that he could not recall how The Dickies became connected with producer Robin Cable, and that he could only speculate as to whether Mr. Cable had a contract with A&M, and that he did not know |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | who was responsible for Mr. Cable coming on board to produce *Dawn of The Dickies*). |
| 97.      The Dickies selected the sound recordings that were included in Dawn of the Dickies.  Phillips Decl. at ¶ 12.  Sobol Decl. at ¶ 12. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 38 ¶ 2(b) ("The musical compositions or other selections which shall be embodied in the Masters shall be designated by you upon notice to us."); *id.* (providing that each sound recording was subject to approval by A&M Ltd. and that A&M Ltd. had the right to require The Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained"); *id.* ¶ 4 (providing that A&M Ltd. "shall have the exclusive worldwide right in perpetuity to manufacture, sell, distribute, and advertise phonograph records . . . embodying such master recordings, to lease, license, convey or otherwise use or dispose of such master recordings . . . [and] to release phonograph records or other reproductions embodying such master recordings"); *see* Gilford Decl., Ex. A ¶¶ 25-26 . |
| 98.      The Dickies selected the sound recordings that were released as singles. Phillips Decl. at ¶ 12.  Sobol Decl. at ¶ 12. Ex. 9, Phillips Dep. Tr. at 106:15-107:25. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 9 at 106:15-107:25 (no reference to The Dickies selecting the sound recordings there were released as singles); McMullan Decl., Ex. 38 ¶ 2(b) ("The musical compositions or other selections which shall be embodied in the Masters shall be designated by you upon notice to us."); *id.* (providing that each master sound recording was subject to approval by A&M Ltd. and that A&M Ltd. had the right to require The Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained"); *id.* ¶ 4 (providing that A&M Ltd. "shall have the exclusive worldwide right in |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | perpetuity to manufacture, sell, distribute, and advertise phonograph records . . . embodying such master recordings, to lease, license, convey or otherwise use or dispose of such master recordings . . . [and] to release phonograph records or other reproductions embodying such master recordings"); Ransom Decl., Exs. I-J; *see* Gilford Decl., Ex. A  ¶¶ 25-26 . |
| 99.      A&M Limited never provided The Dickies with any input or guidance regarding the sound or direction of the sound recordings The Dickies created.  Ex. 9, Phillips Dep. Tr. at 92:8-22, 105:12-14. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 87. |
| 100.      A&M Limited never told the members of The Dickies that they had to show up at a studio at a certain time to create the sound recordings.  Phillips Decl. at ¶ 11. Sobol Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("Each Master shall be subject to [A&M Ltd.'s] approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon [A&M Ltd.'s] request, [The Dickies] shall re-record, re-mix, or otherwise alter any Master recording until a Master technically satisfactory to [A&M Ltd.] shall have been obtained."); *id.*, Ex. 50 (reflecting that A&M Ltd. provided written approval of recording studio for The Dickies, including the price per hour and the dates and times of recording); *id.*, Exs. 42, 43, 45, 46, 53, 54, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio and sessions costs for The Dickies). |
| 101.      On November 9, 1979, A&M Limited released Dawn of the Dickies.  Ex. 9, Phillips Dep. Tr. at 126:7-23.  Ex. 10, Sobol Dep. Tr. at 99:19-25.  Ex. 12, UMG0024425-0024426 (Dickies Copyright Registration Certificate). | Undisputed. |
| 102.      The Dawn of the Dickies album contains ten original sound recordings created by The Dickies: (1) Where Did His Eye Go?; (2) Fan Mail; (3) Manny, Moe and Jack; (4) Infidel Zombie; (5) I'm a Chollo; (6) Nights in White Satin; (7) (I'm Stuck In a Pagoda | Undisputed that *Dawn of The Dickies* contains the listed sound recordings. Disputed that The Dickies created the sound recordings.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| With) Tricia Toyota; (8) I've Got a Splitting Headache; (9) Attack of the Mole Men; and (10) She Loves Me Not. Ex. 10, Sobol Dep. Tr. at 98:12-99:4. | *See supra* Defendants' Response and controverting evidence to No. 87. |
| 103. Shortly thereafter, A&M Limited filed a copyright application with the U.S. Copyright Office to register Dawn of the Dickies. Ex. 12, UMG0024425-0024426 (Dickies Copyright Registration Certificate). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 12 (reflecting that U.S. copyright registration was secured in the name of A&M Ltd.'s U.S. affiliate A&M Records Inc.). |
| 104. The copyright application categorized Dawn of the Dickies as a "sound recording" (and not a "compilation" or "collective work"). Ex. 12, UMG0024425-0024426 (Dickies Copyright Registration Certificate). | Undisputed that the copyright registration for *Dawn of The Dickies* identifies it as a sound recording. Disputed that the copyright application forms permitted or required such a characterization, and further disputed because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 60 (identifying *Dawn of The Dickies* as a "work made for hire"; no indication that the copyright application form permitted or required A&M to characterize the album as a collective work or a compilation). |
| 105. The U.S. Copyright Office issued A&M Limited a Certificate of Registration for Dawn of the Dickies with an effective date of February 25, 1980. Ex. 12, UMG0024425-0024426 (Dickies Copyright Registration Certificate). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 12 (reflecting that U.S. copyright registration was secured in the name of A&M Ltd.'s U.S. affiliate A&M Records Inc.). |
| 106. In October 1980, A&M Limited dropped The Dickies from the label. Ex. 9, Phillips Dep. Tr. at 129:11-130:25. | Undisputed. |
| 107. On September 12, 2017, a majority of the authors of the sound recordings on Dawn of the Dickies served a Notice of Termination upon Defendant UMG, as A&M Limited's successor-in-interest. Ex. 13, UMG0000764-0000766 (Dickies Notice of Termination). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 61 (reflecting The Dickies' termination notice was served upon "Universal Music Group"); *id.*, Ex. 60. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 108.    Phillips, Sobol, and Israel Caballero (as Carlos Caballero's heir) make up a majority of the authors of the Dawn of the Dickies for purposes of termination. Ex. 13, UMG0000764-0000766 (Dickies Notice of Termination). | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 87.  Moreover, this "fact" itself establishes that Israel Caballero is not an "author" (as opposed to an heir), and thus Phillips, Sobol, and Israel Caballero do not and cannot "make up a majority of the *authors* of the Dawn of the Dickies." |
| 109.    Counsel for The Dickies caused the notice of termination to be recorded in the U.S. Copyright Office, as document V9964 D904 P1-3. Ex. 13, UMG0000764-0000766 (Dickies Notice of Termination). | Undisputed. |
| 110.    The effective date of termination for The Dickies sound recordings in Dawn of the Dickies was September 13, 2019. Ex. 13, UMG0000764-0000766 (Dickies Notice of Termination). | Undisputed that The Dickies' putative termination notice lists a putative termination date of September 13, 2019.  Disputed that any purported termination or termination date was "effective."<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 87. |
| 111.    On January 23, 2018, Defendants sent The Dickies a letter setting forth their contentions for their claims that The Dickies' notice of termination was invalid, arguing in part that the sound recordings in Dawn of the Dickies were works made "for hire" or "compilations" not subject to termination under Section 203 of the Copyright Act.  Ex. 14, P00110-00117 (Defendants' Counter Notice to The Dickies' Notice of Termination). | Undisputed that UMG sent the Dickies the referenced letter.  Disputed that "Defendants" sent The Dickies the referenced letter.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 62 (reflecting that the letter was sent on behalf of UMG). |
| 112.    Despite having knowledge of the effective date of termination, Defendants have refused to honor it. Ex. 13, UMG0000764-0000766 (Dickies Notice of Termination). Ex. 14, P00110-00117 (Defendants' Counter Notice to The Dickies' Notice of Termination). | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 87. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 113.    Instead, Defendants knowingly failed to return the rights to the sound recordings in Dawn of the Dickies well after the effective date of termination.  Ex. 10, Sobol Dep. Tr. at 76:10 15.  Ex. 10, Sobol Dep. Tr. at 120:17-121:15 (Sobol testified that he "loved" the album, wants it back, and that A&M "had nothing to do with telling us what to do or anything about that"). | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 87. |
| 114.    The Dickies exercised complete artistic control over the sound recordings.  Phillips Decl. at ¶ 11.  Sobol Decl. at ¶ 11.  Ex. 9, Phillips Dep. Tr. at 65:23-66:25 ("[M]y understanding was…that we were going to receive a budget to make an album…and that we were given complete artistic control to make it any way we wanted to make it in terms of the sounds, in terms of the sound, in terms of the imagery for the – the graphic art; that sort of thing.").  Ex. 10, Sobol Dep. Tr. at 120:17-121:15 (Sobol says he loves the album, wants it back, and A&M "had nothing to do with telling us what to do or anything about that"). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The musical compositions or other selections which shall be embodied in the Masters shall be designated by you upon notice to us."); *id.* (providing that each sound recording was subject to approval by A&M Ltd. and that A&M Ltd. had the right to require The Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained"); *id.* ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]"); Gilford Decl., Ex. D at 63:6-21 (Phillips testifying that producer Robin Cable assisted with engineering for *Dawn of The Dickies* and that "he made . . . sure that stuff was recorded well and sounded good"); *id.*, Ex. C at 62:17-63:13, 64:4-11 (Sobol testifying that under the recording agreement, A&M Ltd. had the right to approve the sound recordings as technically satisfactory to them, and that A&M had the right to reject non-compliant sound recordings); *id.* at 60:7-61:24 (Sobol testifying that producer Robin Cable "made us sound good. [Cable] brought his expertise in as an engineer and a guy that knows music, I guess."); *see also supra* Defendants' Response and controverting evidence to No. 87. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 115.    The Dickies chose what session musician(s) to work with.  Ex. 10, Sobol Dep. Tr. at 123:6-124:8. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]"). |
| 116.    The Dickies chose what producer(s) to work with.  Ex. 9, Phillips Dep. Tr. at 62:2-63:15 ("[B]eing as we had complete artistic control, it was our decision who would – you know, who we could have in the studio"). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]" and reflecting that A&M approved Earl Mankey and John Hewlett as co-producers for the initial sound recordings); *id.*, Ex. 44 (reflecting that A&M paid for the services of producer Robin Cable); Gilford Decl., Ex. D at 97:21-98:7, 98:17-99:14, 99:22-100:25 (Phillips testifying that he could not recall how The Dickies became connected with producer Robin Cable, and that he could only speculate as to whether Mr. Cable had a contract with A&M, and that he did not know who was responsible for Mr. Cable coming on board to produce *Dawn of The Dickies*). |
| 117.    The Dickies chose what sound engineer(s) to work with.  Ex. 9, Phillips Dep. Tr. at 62:2-63:15. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]" and reflecting that A&M approved Earl Mankey and John Hewlett as co-producers for the initial sound recordings); *id.*, Ex. 44 (reflecting that A&M paid for the services of Robin Cable); Gilford Decl., Ex. D at 97:21-98:7, 98:17-99:14, 99:22-100:25 |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | (Phillips testifying that he could not recall how The Dickies became connected with producer Robin Cable, and that he could only speculate as to whether Mr. Cable had a contract with A&M, and that he did not know who was responsible for Mr. Cable coming on board to produce *Dawn of The Dickies*). |
| 118.    The Dickies selected the sound recordings that were included in Dawn of the Dickies.  Phillips Decl. at ¶ 12.  Sobol Decl. at ¶ 12.  Ex. 10, Sobol Dep. Tr. at 127:12-21. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 38 ¶ 2(b) ("The musical compositions or other selections which shall be embodied in the Masters shall be designated by you upon notice to us."); *id.* (providing that each sound recording was subject to approval by A&M Ltd. and that A&M Ltd. had the right to require The Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained"); *id.* ¶ 4 (providing that A&M Ltd. "shall have the exclusive worldwide right in perpetuity to manufacture, sell, distribute, and advertise phonograph records . . . embodying such master recordings, to lease, license, convey or otherwise use or dispose of such master recordings . . . [and] to release phonograph records or other reproductions embodying such master recordings"); *see* Gilford Decl., Ex. A ¶¶ 25-26 . |
| 119.    The Dickies selected the sound recordings that were released as singles.  Phillips Decl. at ¶ 12.  Sobol Decl. at ¶ 12.  Ex. 9, Phillips Dep. Tr. at 106:15-107:25. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 9 at 106:15-107:25 (no reference to The Dickies selecting the sound recordings there were released as singles)' McMullan Decl., Ex. 38 ¶ 2(b) ("The musical compositions or other selections which shall be embodied in the Masters shall be designated by you upon notice to us."); *id.* (providing that each sound recording was subject to approval by A&M Ltd. and that A&M Ltd. had the right to require The |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained"); *id.* ¶ 4 (providing that A&M Ltd. "shall have the exclusive worldwide right in perpetuity to manufacture, sell, distribute, and advertise phonograph records . . . embodying such master recordings, to lease, license, convey or otherwise use or dispose of such master recordings . . . [and] to release phonograph records or other reproductions embodying such master recordings"); Ransom Decl., Exs. I-J; *see* Gilford Decl., Ex. A  ¶¶ 25-26 . |
| 120.    A&M Limited never provided The Dickies with any input or guidance regarding the sound or direction of the sound recordings The Dickies created.  Ex. 9, Phillips Dep. Tr. at 92:8-22, 105:12-14 (stating that no one from A&M Limited ever attended any recording sessions for Dawn of the Dickies). Ex. 10, Sobol Dep. Tr. at 127:12-21. | Disputed.

Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 87. |
| 121.    A&M Limited never told the members of The Dickies that they had to show up at a studio at a certain time to create the sound recordings.  Phillips Decl. at ¶ 11. Sobol Decl. at ¶ 11.   Ex. 9, Phillips Dep. Tr. at 85:8-19. Ex. 10, Sobol Dep. Tr. at 130:4-7. | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("Each Master shall be subject to [A&M Ltd.'s] approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon [A&M Ltd.'s] request, [The Dickies] shall re-record, re-mix, or otherwise alter any Master recording until a Master technically satisfactory to [A&M Ltd.] shall have been obtained."); *id.*, Ex. 50 (reflecting that A&M Ltd. provided written approval of recording studio for The Dickies, including the price per hour and the dates and times of recording); *id.*, Exs. 42, 43, 45, 46, 53, 54, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio and sessions costs for The Dickies). |
| 122.    Phillips has been the lead vocalist and frontman of The Dickies for over 45 years. Phillips Decl. at ¶ 1.  Ex. 9, Phillips Dep. Tr. at 42:3-43:7. | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 123.    Sobol has been a professional a guitarist and vocalist in The Dickies for over 45 years.  Sobol Decl. at ¶ 1.  Ex. 10, Sobol Dep. Tr. at 12:9-14. | Undisputed. |
| 124.    Phillips and Sobol are highly skilled professional musicians.  Phillips Decl. at ¶ 1.  Sobol Decl. at ¶ 1.  Ex. 9, Phillips Dep. Tr. at 39:1-3, 61:16-24.  Ex. 10, Sobol Dep. Tr. at 13:18-19. | Undisputed. |
| 125.    Phillips has never been an employee of A&M Limited or Defendants.  Phillips Decl. at ¶ 3. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 87. |
| 126.    Phillips has never received a salary from A&M Limited or Defendants.  Phillips Decl. at ¶ 4. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 6 (reflecting A&M Ltd.'s obligation to pay The Dickies royalties); Gilford Decl., Ex. D at 86:3-5, 135:12-24 (Phillips testifying that A&M paid The Dickies a $100,000 advance, and that it was used to record *Dawn of The Dickies*). |
| 127.    Phillips never received a paycheck from A&M Limited or Defendants in which they withheld any income taxes, social security, or other comparable payments.  Phillips Decl. at ¶ 5. | Undisputed. |
| 128.    Phillips never received a W-2 from A&M Limited or Defendants.  Phillips Decl. at ¶ 6. | Undisputed. |
| 129.    Phillips never received health or life insurance benefits from A&M Limited or Defendants.  Phillips Decl. at ¶ 7. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 42 (reflecting that A&M Ltd. paid "payroll" and "health and welfare" costs for The Dickies). |
| 130.    Phillips never received paid vacation or sick leave from A&M Limited or Defendants.  Phillips Decl. at ¶ 10. | Undisputed. |
| 131.    Phillips was never provided with an office by A&M Limited or Defendants.  Phillips Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | McMullan Decl., Exs. 43, 45, 46, 53, 54, 55, 56, 57, 58, , , ,, (reflecting that A&M Ltd. paid for recording studio sessions for *Dawn of The Dickies*); Gilford Decl., Ex. C at 55:3-56:1 (Sobol testifying that The Dickies recorded at "A&M Recording Studios"). |
| 132.     Phillips was never provided with a secretary or any other type of assistant by A&M Limited or Defendants.  Phillips Decl. at ¶ 9. | Disputed. Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]" and reflecting that A&M Ltd. approved Earl Mankey and John Hewlett as co-producers for the initial sound recordings); *id.*, Ex. 44 (reflecting that A&M paid for the services of producer Robin Cable). |
| 133.     Sobol has never been an employee of A&M Limited or Defendants.  Sobol Decl. at ¶ 3. | Disputed. Defendants' Controverting Evidence: Gilford Decl., Ex. C at 68:23-69:21; *see also supra* Defendants' Response and controverting evidence to No. 87. |
| 134.     Sobol has never received a salary from A&M Limited or Defendants.  Sobol Decl. at ¶ 4. | Disputed. Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 6 (reflecting A&M Ltd.'s obligation to pay The Dickies royalties); Gilford Decl., Ex. D at 86:3-5, 135:12-24 (Phillips testifying that A&M paid The Dickies a $100,000 advance, and that it was used to record *Dawn of The Dickies*). |
| 135.     Sobol never received a paycheck from A&M Limited or Defendants in which they withheld any income taxes, social security, or other comparable payments.  Sobol Decl. at ¶ 5. Sobol Dep. Tr. at 129:4-8. | Disputed, including because the cited evidence does not support the purported fact. Defendants' Controverting Evidence: Cronin Decl., Ex. 5 at 129:4-8 (Sobol testifying that A&M did not send him paychecks; no reference to withholdings); Gilford Decl., Ex. C at 71:5-11 (Sobol testifying that he  did not remember whether |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | A&M Ltd. would deduct required taxes as part of his recording deal with the label). |
| 136.    Sobol never received a W-2 from A&M Limited or Defendants. Sobol Decl. at ¶ 6. | Undisputed. |
| 137.    Sobol never received health or life insurance benefits from A&M Limited or Defendants.  Sobol Decl. at ¶ 7.  Sobol Dep. Tr. at 129:19-130:1. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 42 (reflecting that A&M Ltd. paid "payroll" and "health and welfare" costs for The Dickies); Gilford Decl., Ex. C at 133:1-9 (Sobol testifying that he did not know whether A&M Ltd. paid any health or retirement remittances for him). |
| 138.    Sobol never received paid vacation or sick leave from A&M Limited or Defendants. Sobol Decl. at ¶ 10. | Undisputed. |
| 139.    Sobol was never provided with an office by A&M Limited or Defendants. Sobol Decl. at ¶ 9.  Ex. 10, Sobol Dep. Tr. at 130:2-7 ("Q: Did…A&M provide you with an office? A: No."). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Exs. 43, 45, 46, 53, 54, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio sessions for *Dawn of The Dickies*); Gilford Decl., Ex. C at 55:3-56:1 (Sobol testifying that The Dickies recorded at "A&M Recording Studios"). |
| 140.    Sobol was never provided with a secretary or any other type of assistant by A&M Limited or Defendants.  Sobol Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]" and reflecting that A&M Ltd. approved Earl Mankey and John Hewlett as co-producers for the initial sound recordings); *id.*, Ex. 44 (reflecting that A&M paid for the services of producer Robin Cable). |
| 141.    A&M Limited did not deduct or withhold income taxes, social security, or other comparable payments on behalf of Phillips.  Phillips Decl. at ¶¶ 5-6. | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 142.    A&M Limited did not issue W-2 tax forms to Phillips.  Phillips Decl. at ¶¶ 5-6. | Undisputed. |
| 143.    A&M Limited did not deduct or withhold income taxes, social security, or other comparable payments on behalf of Sobol. Sobol Decl. at ¶¶ 5-6. | Undisputed. |
| 144.    A&M Limited did not issue W-2 tax forms to Sobol.  Sobol Decl. at ¶¶ 5-6. | Undisputed. |
| 145.    The Dickies Recording Agreement provided that, for a one-year term, The Dickies could create sound recordings for an initial album, as well as a second album at A&M Limited's election.  Ex. 12, UMG0000731-0000763 (Dickies Recording Agreement at ¶¶ 1-2). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 1 ("The term of this contract shall consist of an initial term commencing as of the date hereof and continuing for one (1) year, and of the additional renewal term or terms hereinafter provided."); *id.* ¶ 2(a)(i) (obligating The Dickies "to record for and deliver to [A&M Ltd.], at a minimum, fourteen (14) Masters"); *id.* ¶ 19 (granting A&M Ltd. the right to exercise four separate, consecutive options to renew the term of the contract for an eighteen month term); *see also supra* Defendants' Response and controverting evidence to No. 87. |
| 146.    The Dickies Recording Agreement did not give A&M Limited any authority to assign additional projects outside of that agreement.  Ex. 12, UMG0000731-0000763 (Dickies Recording Agreement at ¶¶ 1-2). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 19 (providing that A&M Ltd. had the right to exercise four separate, consecutive options to renew the agreement after the initial period); *id.* ¶ 14 (providing that A&M Ltd. had the right to request that The Dickies appear on dates and at locations designated by A&M Ltd. for the filming or taping or The Dickies' performances); *id.*, Ex. 39 (reflecting that A&M in fact exercised an option under The Dickies recording agreement to extend the term of the agreement); Ransom Decl., Ex. B at 15-16 (responses to Request for Admission Nos. 56, 57, and 58, in which Phillips and Sobol admit that they in fact made |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | promotional appearances at the request of A&M Ltd.). |
| 147.    A&M Limited did not assign additional projects to The Dickies outside of The Dickies Recording Agreement.  Phillips Decl. at ¶ 11.  Sobol Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 19 (providing that A&M Ltd. had the right to exercise four separate, consecutive options to renew the agreement after the initial period); *id.* ¶ 14 (providing that A&M Ltd. had the right to request that The Dickies appear on dates and at locations designated by A&M Ltd. for the filming or taping or The Dickies' performances); *id.*, Ex. 39 (reflecting that A&M in fact exercised an option under The Dickies recording agreement to extend the term of the agreement); Gilford Decl., Ex. B at 15-16 (responses to Request for Admission Nos. 56, 57, and 58, in which Phillips and Sobol admit that they in fact made promotional appearances at the request of A&M Ltd.). |
| 148.    A&M Limited did not provide The Dickies with instruments and tools needed to create the sound recordings.  Ex. 9, Phillips Dep. Tr. at 85:8-19 (Phillips states that "the band booked the studio and the equipment"). Ex. 10, Sobol Dep. Tr. at 96:1-14. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Exs. 43, 45, 46, 53, 54, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio sessions for *Dawn of The Dickies*); *id.*, Exs. 43, 45, 47, 52 (reflecting that A&M Ltd. paid for equipment rentals for recording); Gilford Decl., Ex. C at 55:3-56:1 (Sobol testifying that The Dickies recorded at "A&M Recording Studios"). |
| 149.    The instruments and tools were either provided by The Dickies or the third-party music studios where they created the sound recordings. Ex. 9, Phillips Dep. Tr. at 85:8-19.  Ex. 10, Sobol Dep. Tr. at 96:1-14. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Exs. 43, 45, 46, 53, 54, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio sessions for *Dawn of The Dickies*); *id.*, Exs. 43, 45, 47, 52 (reflecting that A&M Ltd. paid for equipment rentals for recording); Gilford Decl., Ex. C at 55:3-56:1 (Sobol testifying that The Dickies recorded at "A&M Recording Studios"). |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 150.    The Dickies chose where to create the sound recordings in Dawn of the Dickies, without any input from A&M Limited. Phillips Decl. at ¶ 11.  Sobol Decl. at ¶ 11 Ex. 9, Phillips Dep. Tr. at 105:12-14. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Exs. 43, 45, 46, 53, 54, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio sessions for *Dawn of The Dickies*); Gilford Decl., Ex. C at 55:3-56:1 (Sobol testifying that The Dickies recorded at "A&M Recording Studios"). |
| 151.    The Dickies were under contract with A&M Limited from September 1, 1983 to approximately October 24, 1980 (approximately two years).  Ex. 12, UMG0000731-0000763 (Dickies Recording Agreement). Ex. 9, Phillips Dep. Tr. at 129:11-130:25. | Disputed, including because the purported fact is vague, ambiguous, and illogical, and is not supported by the cited evidence.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 at 1 (reflecting that A&M Ltd. and The Dickies entered into a recording agreement on April 3, 1978); Cronin Decl., Ex. 9 at 129:11-130:25 (Phillips testifying that he did not know when The Dickies recording agreement was terminated); *id.*, Ex. 12 (copyright registration for *Dawn of The Dickies*, not The Dickies' recording agreement). |
| 152.    A&M Limited exercised no discretion over when and for how long The Dickies should work.  Phillips Decl. at ¶ 11.  Sobol Decl. at ¶ 11. Ex. 10, Sobol Dep. Tr. at 130:4-7. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) (providing that A&M Ltd. had the right to approve any sound recordings as technically satisfactory, and had the right to require The Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained," and that if A&M rejected a sound recording it would not apply towards The Dickies' recording commitment); *id.*, Exs. 43, 45, 46, 53, 54, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio sessions for *Dawn of The Dickies*). |
| 153.    The Dickies chose when and where to create the sound recordings in Dawn of the Dickies.  Phillips Decl. at ¶ 11.  Sobol Decl. at ¶ 11. Ex. 9, Phillips Dep. Tr. at 85:8-19 | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) (providing that A&M Ltd. had the right to approve any sound |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| (Phillips states that "the band booked the studio and the equipment"). | recordings as technically satisfactory, and had the right to require The Dickies to re-record, re-mix, or otherwise alter any recording "until a Master technically satisfactory to [A&M Ltd.] shall have been obtained," and that if A&M rejected a sound recording it would not apply towards The Dickies' recording commitment); *id.*, Exs. 43, 45, 46, 53, 54, 55, 56, 57, 58 (reflecting that A&M Ltd. paid for recording studio sessions for *Dawn of The Dickies*); Gilford Decl., Ex. C at 55:3-56:1 (Sobol testifying that The Dickies recorded at "A&M Recording Studios"). |
| 154.   Phillips never received a salary from A&M Limited or Defendants.  Phillips Decl. at ¶¶ 5-6. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 6 (reflecting A&M Ltd.'s obligation to pay The Dickies royalties); Gilford Decl., Ex. D at 86:3-5, 135:12-24 (Phillips testifying that A&M paid The Dickies a $100,000 advance, and that it was used to record *Dawn of The Dickies*). |
| 155.   Phillips never received a paycheck from A&M Limited or Defendants in which they withheld any income taxes, social security, or other comparable payments. Phillips Decl. at ¶¶ 5-6. | Undisputed. |
| 156.   Sobol never received a salary from A&M Limited or Defendants.  Sobol Decl. at ¶¶ 5-6. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 6 (reflecting A&M Ltd.'s obligation to pay The Dickies royalties); Gilford Decl., Ex. D at 86:3-5, 135:12-24 (Phillips testifying that A&M paid The Dickies a $100,000 advance, and that it was used to record *Dawn of The Dickies*). |
| 157.   Sobol never received a paycheck from A&M Limited or Defendants in which they withheld any income taxes, social security, or other comparable payments.  Sobol Decl. at ¶¶ 5-6. | Undisputed. |
| 158.   Instead, A&M Limited provided the members of The Dickies with an advance | Undisputed that A&M Ltd. paid The Dickies an advance pursuant to The Dickies' recording agreement.  Disputed to the extent |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| which was recoupable.  Ex. 10, Sobol Dep. Tr. at 129:10-16. | the purported fact suggests that an advance does not constitute a salary.<br><br>Defendants' Controverting Evidence: Gilford Decl., Ex. D at 86:3-5, 135:12-24 (Phillips testifying that A&M paid The Dickies a $100,000 advance, and that it was used to record *Dawn of The Dickies*). |
| 159.    The Dickies used the advance to create the sound recordings in Dawn of the Dickies.  Ex. 10, Sobol Dep. Tr. at 129:10-16. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 87. |
| 160.    The Dickies were not provided with any secretary or assistant by A&M Limited or Defendants.  Phillips Decl. at ¶ 9.  Sobol Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 38 ¶ 2(b) ("The individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters shall be mutually designated by [The Dickies] and [A&M Ltd.]" and reflecting that A&M Ltd. approved Earl Mankey and John Hewlett as co-producers for the initial sound recordings); *id.*, Ex. 44 (reflecting that A&M paid for the services of producer Robin Cable). |
| 161.    Phillips is the lead vocalist of The Dickies.  Ex. 9, Phillips Dep. Tr. at 42:3-43:7. | Undisputed. |
| 162.    Sobol is a guitarist and vocalist in The Dickies.  Ex. 10, Sobol Dep. Tr. at 12:9-14. | Undisputed. |
| 163.    Together and as members of The Dickies, Phillips and Sobol created sound recordings  Phillips Decl. at ¶ 11.  Sobol Decl. at ¶ 11.  Ex. 9, Phillips Dep. Tr. at 42:3-43:7. Ex. 10, Sobol Dep. Tr. at 12:9-14. | Disputed to the extent "Phillips and Sobol created sound recordings" is intended to suggest that The Dickies created the album *Dawn of The Dickies*.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 87. |
| 164.    A&M Limited does not itself create sound recordings. Rather, A&M Limited was in the business of distributing and promoting sound recordings.  Ex. 9, Phillips Dep. Tr. at 125:8-15. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Cronin Decl., Ex. 9 at 125:8-15 (Phillips testifying that he "could only speculate" as to the relationship between A&M Ltd. and UMG; no reference to A&M Ltd. purportedly not creating sound recordings); McMullan Decl. ¶ 5 (A&M Ltd.'s regular business included making and distributing recorded music). |
| 165.    A&M Limited is a predecessor of Defendant UMG Recordings, Inc.  Ex. 9, Phillips Dep. Tr. at 125:8-15.  Ex. 10, Sobol Dep. Tr. at 102:15-24. | Disputed because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 9 [ECF No. 193-9] at 125:8-15 (Phillips testifying that he "could only speculate" as to the relationship between A&M Ltd. and UMG); SAC ¶¶ 24, 106. |
| 166.    A&M Limited no longer exists as a separate entity apart from Defendants.  Ex. 9, Phillips Dep. Tr. at 125:8-15.  Ex. 10, Sobol Dep. Tr. at 102:15-24. | Disputed as vague and ambiguous as to "separate entity apart from Defendants," and because the cited evidence does not support the purported fact.  A&M Ltd. was merged into UMG, which succeeded to A&M Ltd.'s rights and obligations and continues the same business of making and distributing recorded music.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 9 [ECF No. 193-9] at 125:8-15 (Phillips testifying that he "could only speculate" as to the relationship between A&M Ltd. and UMG); SAC ¶¶ 24, 106. |
| 167.    Dream Syndicate is an alternative rock band from Los Angeles, California. Declaration of Steve Wynn ("Wynn Decl.") at ¶¶ 1-2.  Declaration of Dennis Mehaffey p/k/a Dennis Duck ("Mehaffey Decl.") at ¶ 1.  Declaration of Joel David Pellish p/k/a Dave Provost ("Pellish Decl.") at ¶ 1.  Ex. 15, Pellish Dep. Tr. at 18:11-19:14 (Pellish discusses joining Dream Syndicate in Los Angeles, California). | Undisputed. |
| 168.    Dream Syndicate was originally formed in 1981, and quickly became part of the Paisley Underground music movement of the 1980's, which was known for mixing | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 1960's style psychedelic garage rock and contemporary pop music.  Wynn Decl. at ¶¶ 1-2. Mehaffey Decl. at ¶ 1. Ex. 16, Wynn Dep. Tr. at 57:15-20. | Declaration of Steve Wynn [ECF No. 183] ¶¶ 1-2 (no reference to Paisley Underground movement being from "the 1980s" or "known for missing 1960's style psychedelic garage rock and contemporary pop music); Declaration of Dennis Mehaffey [ECF No. 173] ¶ 1 (same); Cronin Decl., Ex. 16 at 57:15-20 (same). |
| 169.    Dream Syndicate actively recorded and toured from 1981 to 1989.  Wynn Decl. at ¶¶ 1-2.  Mehaffey Decl. at ¶ 1.  Ex. 16, Wynn Dep. Tr. at 57:17-58:12.  Ex. 15, Pellish Dep. Tr. at 19:22-20:9.  Ex. 17, Mehaffey Dep. Tr. at 59:14-25. | Undisputed. |
| 170.    Dream Syndicate re-formed in 2012 and remains active to this day. Wynn Decl. at ¶¶ 1-2.  Mehaffey Decl. at ¶ 1.  Ex. 16, Wynn Dep. Tr. at 57:17-58:12. | Undisputed. |
| 171.    Dream Syndicate released a debut album, Days of Wine and Roses, with J. Ruby Productions (also known as Ruby Records).  (The sound recordings in this album are not at issue in this case.)  Ex. 16, Wynn Dep. Tr. at 130:2-6. | Undisputed. |
| 172.    After receiving critical acclaim for their debut album, the members of the Dream Syndicate – Steve Wynn, Dennis Mehaffey, Joel David Pellish, and Karl Precoda – sought more creative freedom with another record label. Ex. 16, Wynn Dep. Tr. at 76:9-15. Ex. 15, Pellish Dep. Tr. at 26:4-17 ("We were very visible at that time and there were a few labels that were interested in us, and…A&M was one of them. They had a great reputation, as far as the kind of act that we were, as far as dealing with bands that were self-contained and they were known for – for not being overly hands-on as far as their artists. So we felt that we had a lot more freedom with A&M."). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 16 at 76:9-15 (no reference to Dream Syndicate "receiving critical acclaim for their debut album"); id., Ex. 15 (same). |
| 173.    Dream Syndicate eventually decided to sign with A&M Records, Inc. ("A&M Records") because it offered the band the | Disputed.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| most creative control and was considered to be an artist-driven label.  Ex. 15, Pellish Dep. Tr. at 26:4-17.  Ex. 15, Pellish Dep. Tr. at 74:24-75:3 ("We went with A&M because of the…artistic liberty.")  Ex. 17, Mehaffey Dep. Tr. at 45:9-14. | Gilford Decl., Ex. H at 76:9-21 (Wynn testifying that A&M Records, Inc. ("A&M") approached Dream Syndicate about joining the label); *id.*, Ex. G at 26:4-17 (Pellish testifying that A&M was interested in Dream Syndicate); *id.*, Ex. F at 45:9-14 (Mehaffey testifying that "a representative from [A&M] came to one of our shows and was interested and that led to an offer on the label and we accepted").  To the extent the purported fact is intended to suggest that Dream Syndicate exercised exclusive or substantial control over the creation of the sound recordings at issue in this action, or to the extent it is intended to suggest that A&M did not have the right to exercise such control and/or did not exercise such control, *see infra* Defendants' Response and controverting evidence to Nos. 175, 181. |
| 174.     A&M Records is a predecessor of Defendant UMG Recordings, Inc. It no longer exists as a separate entity.  Ex. 16, Wynn Dep. Tr. at 108:4-20. | Disputed as vague and ambiguous as to "no longer exists as a separate entity," and further disputed because the cited evidence does not support the purported fact.  A&M was merged into UMG, which succeeded to A&M's rights and obligations, and continues the business of making and distributing recorded music.

Defendants' Controverting Evidence: SAC ¶¶ 27, 131; McMullan Decl. ¶¶ 8, 9; Cronin Decl., Ex. 16 at 108:4-20 (no reference to A&M "no longer exist[ing] as a separate entity"). |
| 175.     On September 1, 1983, the members of the Dream Syndicate – Steve Wynn, Dennis Mehaffey, Joel David Pellish, and Karl Precoda – signed a recording agreement with A&M Records to release their sophomore album.  Ex. 18, UMG0019665-0019717 (Dream Syndicate Recording Agreement). | Undisputed that A&M entered into a recording agreement with the referenced members of Dream Syndicate on September 1, 1983.  To the extent "their sophomore album" is a reference to the album *Medicine Show*, disputed that Dream Syndicate is the owner of that album or released it, and further disputed because the cited evidence does not support the purported fact.

Defendants' Controverting Evidence: Cronin Decl., Ex. 18 at 1 (reflecting that A&M engaged Dream Syndicate to |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | "produc[e], "record[], and deliver[] to [A&M] during the term of this contract master recordings . . . embodying [Dream Syndicate's] performances"); SAC ¶ 144 (alleging that "[o]n May 7, 1984, A&M released *Medicine Show*"); McMullan Decl., Ex. 63 ¶ 4(a) (reflecting the parties' agreement that all sound recordings recorded during the term of the agreement and all copyrights therein are owned by A&M, that all such sound recordings are "works made for hire," and that the members of Dream Syndicate are A&M's "employees for hire"); *id.* at 1 & ¶¶ 1(a)(i), 11(a) (reflecting that A&M engaged Dream Syndicate's exclusive recording services); *id.* ¶ 2(a)(i) ("The musical compositions or other selections which shall be embodied in the Masters, all individuals (other than the individual producer of the Masters) rendering services in connection with the recording of the Masters, the studio or studios at which the Masters shall be recorded, and the dates of recording shall be designated by [Dream Syndicate] after consultation with us."); *id.* ("The individual producer of the Masters, shall be designated by [Dream Syndicate] and shall be subject to [A&M's] reasonable approval" and reflecting that A&M approved Sandy Pearlman as the producer for the first album to be recorded under the agreement); *id.* ¶ 2(a)(ii) (providing that in the event A&M disapproved of any recording procedure for which A&M had the right to exercise approval, Dream Syndicate was required to promptly submit to A&M proposed substitutes and recording would be postponed until A&M approved); *id.* ("Each Master shall be subject to [A&M's] approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon [A&M's] request and at [Dream Syndicate's] expense, [Dream Syndicate] shall re-record any musical compositions or other selections until |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | a Master technically satisfactory to [A&M] shall have been obtained."); *id.* ¶ 3(a)(i) (providing that recording sessions for the sound recordings "shall be conducted under [A&M's] recording license" and that "[n]o recording sessions shall be commenced hereunder nor shall any commitments be made or costs incurred in connection therewith unless and until a proposed recording budget for the Masters to be recorded at such sessions shall have been submitted by [Dream Syndicate] in writing and approved in writing by one of [A&M's] officers[.]"); *id.* ¶ 4(c)(vii) (reflecting that A&M had authority to select the sound recordings to be included on singles); *id.* ¶ 1(a)(ii) (providing that A&M had the right to exercise three separate, consecutive options to renew the agreement after the initial period); *id.* ¶ 15(a) (reflecting that A&M had the right to request that Dream Syndicate appear on dates and at film studios or other locations designated by A&M for the filming or taping of Dream Syndicate's performances, and had the right to mutually designate the selections to be performed for such purposes); *id.* ¶¶ 6, 23-25 (reflecting A&M's obligation to pay Dream Syndicate advances, including a $150,000 advance for the initial period and a $10,000 advance for tour support, and royalties); Gilford Decl., Ex. H at 116:22-117:24 (Wynn testifying that A&M paid for the services of sound engineer Jeffrey Osbourne for recording the live concert that would ultimately become *This Is Not The New Dream Syndicate Album Live*); *id.* at 79:21-80:5 (Wynn testifying that A&M representatives attended recording sessions for *Medicine Show*); *id.* at 102:14-103:10 (Wynn testifying that A&M provided the recording fund for *Medicine Show*); *id.* at 107:9-16 (Wynn testifying that Dream Syndicate made promotional appearances for *Medicine Show* at the request of A&M, such |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | as interviews and radio appearances); *id.* at 76:9-21 (Wynn testifying that A&M approached Dream Syndicate about joining the label); *id.* at 128:20-130:6 (Wynn testifying that A&M paid Dream Syndicate's former label J. Ruby Productions to release the band from their contract with J. Ruby Productions); *id.*, Ex. 72; *id.*, Ex. 73; *id.*, Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording *Medicine Show*); *id.* at 53:2-5 (Mehaffey testifying that *Medicine Show* is an album made up of several individual songs); *id.* at 45:9-14 (Mehaffey testifying that an A&M representative came to a Dream Syndicate show and was interested in them, which led to an offer to Dream Syndicate to join A&M); *id.*, Ex. G at 59:11-14 (Pellish testifying that he understood the LP to be recorded under his recording agreement would consist of individual songs ); Ransom Decl., Ex. M (identifying A&M as the "author" of *This Is Not the New Dream Syndicate Album Live* as "employer for hire"); McMullan Decl. ¶ 5(A&M's regular business involved making and distributing sound recordings); *id.*, Ex. 76 (identifying A&M as the "author" of *Medicine Show* as a "work made for hire"); *id.*, Exs. 64, 65, 66, 70 (examples of advances A&M paid to Dream Syndicate); *id.*, Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services; that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M; that A&M had the right to approve all individuals rendering services in connection with recording the sound recordings that A&M had the right to have its representatives attach recording sessions; that each sound recording was subject to A&M's approval as technically |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | satisfactory; that at A&M's request, Pearlman was obligated to re-produce any musical selection until a sound recording technically satisfactory to A&M was obtained); *id.* ¶ 4 (reflecting A&M and Sandy Pearlman's agreement that all sound recordings are owned by A&M and that Pearlman was A&M's "employee[] for hire"); *id.*, Exs. 69, 70] (reflecting that A&M paid Sandy Pearlman for his services); *id.*, Ex. 71 (reflecting that A&M paid for the services of Tom Zvoncheck, keyboard player on *Medicine Show*); *id.*, Ex. 72 (reflecting that A&M paid for the services of Jeffrey Osbourne, sound engineer on *This Is Not The New Dream Syndicate Album Live*); *id.*, Ex. 67 (reflecting that A&M paid for equipment). |
| 176.    The Dream Syndicate Recording Agreement was drafted, designated, and intended by A&M Records to secure the exclusive recording services of Dream Syndicate.  Ex. 18, UMG0019665-0019717 (Dream Syndicate Recording Agreement). | Undisputed that A&M entered into a recording agreement with Dream Syndicate to engage their exclusive recording services. Disputed that A&M alone "designated" or "drafted" the agreement, including because the term "designated" is vague and ambiguous.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 at 1 (reflecting that Dream Syndicate was represented by Peter Paterno, Esq. of Manatt, Phelps, Rothenberg & Tunney); Gilford Decl., Ex. G at 32:7-22, 33:8-12, 53:23-54:21 (Pellish testifying that Dream Syndicate was represented by Peter Paterno in connection with their recording agreement, and that he had an opportunity to ask Mr. Paterno about the agreement before he signed it); *id.*, Ex. F at 44:3-9, 48:2-7 (same, and Mehaffey further testifying that he reviewed the recording agreement before he signed it); *id.*, Ex. H at 70:5-12, 88:22-89:17, 91:17-92:7 (same). |
| 177.    The Dream Syndicate Recording Agreement provided an initial term of eighteen months during which Dream Syndicate could record the sound recordings | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| for their sophomore album. Ex. 18, UMG0019665-0019717 (Dream Syndicate Recording Agreement at ¶ 1(a)(i)). | McMullan Decl., Ex. 63 ¶ 1(a) ("The initial period of the term of this contract shall commence as of the date hereof and continue until the later of eighteen (18) months after the commencement of such initial period of the date one hundred twenty (120) days following the date of your completion of delivery of those Masters which are you are required to produce, record and deliver in response of such contract period," and granting A&M three separate, consecutive options to renew the agreement); *id.* ¶¶ 1(b)(i), 2(a)(i), 19 (obligating Dream Syndicate to record and deliver sound recordings sufficient to constitute an "LP," and that providing each sound recording consist of a single musical composition, and that each album "embody no less than eight (8) and no more than ten (10) musical compositions"); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 178.    The Dream Syndicate Recording Agreement contained standard "work made for hire" language, which provided that the members of Dream Syndicate were to be considered "employees for hire."  Ex. 18, UMG0019665-0019717 (Dream Syndicate Recording Agreement at ¶¶ 4(a)) ("you and all other persons rendering services in connection with such master recordings shall be deemed to be our 'employees for hire' and all such master recordings shall be 'works made for hire.'").  Ex. 30 (Recording Agreement Summary Exhibit) (for a discussion of the relevant excerpts of the Class Members' recording agreements). | Undisputed that Dream Syndicate's recording agreement reflects the parties' agreement that all sound recordings created thereunder constitute "works made for hire" and that the members of Dream Syndicate were A&M's "employees for hire."  Disputed that this contractual provision "contained standard 'work made for hire' language."<br><br>Defendants' Controverting Evidence:<br>*Compare* McMullan Decl., Ex. 63 ¶ 4(a), *with* Declaration of Ryan Cronin ("Cronin Decl.") [ECF No. 193], Ex. 30 (reflecting variations in the purported "standard 'work made for hire' language" for example:  (1) "work made for hire" and "employer for hire" (both used in the Sulton agreement); (2) "works made for hire" and "employee for hire" (both used in the Straw, Dream Syndicate, and Vinnie Vincent agreements); (3) "employees for hire" (used in The Dickies agreement); (4) "maker . . . and the owner" (used in Pearl |

58

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Harbour and Shriekback agreements); (5) "we hereby employ the personal services of you and such musicians" (used in the Freddie Hubbard agreement); and (6) no "'work made for hire' language" (Danny and Dusty, Buggles, Gino Vannelli, Green on Red, Musical Youth, Loretta Lynn)). |
| 179.    Alternatively, the Dream Syndicate Recording Agreement contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, Dream Syndicate nevertheless was required to "execute and deliver to [A&M Records] any assignments of copyright (including renewals and extensions thereof) in and to such master recordings as [A&M Records] may deem necessary." Ex. 18, UMG0019665-0019717 (Dream Syndicate Recording Agreement at ¶ 4(a)). Ex. 30 (Recording Agreement Summary Exhibit) (for a discussion of the relevant excerpts of the Class Members' recording agreements). | Undisputed that Dream Syndicate's recording agreement contains the referenced language. Disputed that this contractual provision contained "generic assignment language." <br><br> Defendants' Controverting Evidence: *Compare* McMullan Decl., Ex. 63 ¶ 4(a), *with* Declaration of Ryan Cronin ("Cronin Decl.") [ECF No. 193], Ex. 30 (reflecting variations in the purported "generic assignment language," for example:  (1) "execute and deliver to us such instruments of transfer and other documents regarding our rights in the Master recordings subject to this agreement as we may reasonably request to carry out the purpose of this agreement"  (Alexander O'Neal agreement); (2) "will execute and deliver to Company a written assignment . . . of all sound recording copyright rights" (Asia and Atlantic Starr agreements); (3) "To the extent, if any, that I may be deemed an 'author' of any Work, I hereby grant and assign to Company all rights of any nature whatsoever (including but not limited to the exclusive copyrights therein and thereto)" (Bill Medley  agreement) and (4) no "assignment language" referenced in Ex. 30 (Beat Rodeo, Blue Angel, Sa-Fire, and Let's Active agreements)). |
| 180.    Dream Syndicate created the sound recordings in their sophomore album, Medicine Show, from September 1983 to March 1984. Ex. 16, Wynn Dep. Tr. at 86:7-10. | Undisputed that *Medicine Show* was created during the referenced time frame.  Disputed that Dream Syndicate is the owner of that album, and further disputed because the cited evidence does not support the purported fact. <br><br> Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Cronin Decl., Ex. 16 at 86:7-10 (no reference to Dream Syndicate creating or owning *Medicine Show*); *see supra* Defendants' Response and controverting evidence to No. 175. |
| 181.    Dream Syndicate exercised complete artistic control over the sound recordings. Wynn Decl. at ¶ 13.  Mehaffey Decl. at ¶ 11. Pellish Decl. at ¶ 11.  Ex. 16, Wynn Dep. Tr. at 114:14-116:20 ("We were very autonomous. We…developed our own material, our own songs, our own direction in the studio, so there was really no involvement from A&M with us in any of those things."). Ex. 16, Wynn Dep. Tr. at 142:11-144:6 ("everything involving writing the songs, choosing the songs, arranging the songs, recording them in the studio, the process – who we hired in the studio, which takes we used, how we mixed the records, choosing mixed, mastering the record were entirely the band. We – the four of us made those decisions ourselves."). | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶ 2(a)(i) ("The musical compositions or other selections which shall be embodied in the Masters, all individuals (other than the individual producer of the Masters) rendering services in connection with the recording of the Masters, the studio or studios at which the Masters shall be recorded, and the dates of recording shall be designated by [Dream Syndicate] after consultation with us."); *id.* ("The individual producer of the Masters, shall be designated by [Dream Syndicate] and shall be subject to [A&M's] reasonable approval" and reflecting that A&M approved Sandy Pearlman as the producer for the first album to be recorded under the agreement); *id.* ¶ 2(a)(ii) (providing that in the event A&M disapproved of any recording procedure for which A&M had the right to exercise approval, Dream Syndicate was required to promptly submit to A&M proposed substitutes and recording would be postponed until A&M approved); *id.* ("Each Master shall be subject to [A&M's] approval as technically satisfactory for the manufacture and sale of phonograph records, and upon [A&M's] request and at [Dream Syndicate's] expense, [Dream Syndicate] shall re-record any musical compositions or other selections until a Master technically satisfactory to [A&M] shall have been obtained."); *id.* ¶ 3(a)(i) (providing that recording sessions for the sound recordings "shall be conducted under [A&M's] recording license" and that "[n]o recording sessions shall be commenced hereunder nor shall any commitments be made or costs incurred in connection therewith unless and until a proposed recording budget for the Masters to be recorded at such sessions shall have been submitted by [Dream Syndicate] in writing |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | and approved in writing by one of [A&M's] officers[.]"); *id.* ¶ 4(c)(vii) (reflecting that A&M had authority to select the sound recordings to be included on singles); Gilford Decl., Ex. H at 116:22-117:24 (Wynn testifying that A&M paid for the services of sound engineer Jeffrey Osbourne for recording the live concert that would ultimately become *This Is Not The New Dream Syndicate Album Live*); *id.* at 79:21-80:5 (Wynn testifying that A&M representatives attended recording sessions for *Medicine Show*); *id.* at 81:6-84:23  (Wynn describing other musicians and vocalists that contributed to the recording of *Medicine Show*); *id.* at 102:14-103:10 (Wynn testifying that A&M provided the recording fund for *Medicine Show*); *id.*, Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording *Medicine Show*); *id.* at 62:21:63:14 (Mehaffey describing other musicians that contributed to the recording of *Medicine Show*); *id.*, Ex. G at 84:1-85:23 (Pellish describing other musicians that contributed to the recording of *Medicine Show*); McMullan Decl., Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services; that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M; that A&M had the right to approve all individuals rendering services in connection with recording the sound recordings  that A&M had the right to have its representatives attend recording sessions; that each sound recording was subject to A&M's approval as technically satisfactory; that at A&M's request, Pearlman was obligated to re-produce any musical selection until a sound recording technically satisfactory to A&M was obtained); *id.*, Exs. 69, 70 (reflecting that A&M paid Sandy Pearlman for his services); *id.*, Ex. 71 (reflecting that A&M paid for the services of Tom Zvoncheck, keyboard player on *Medicine Show*); *id.*, Ex. 72 (reflecting that A&M paid for the services of Jeffrey Osbourne, sound engineer on *This Is Not The New Dream Syndicate Album Live*); *id.*, Ex. 67 (reflecting that A&M paid for equipment); |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 182.    Dream Syndicate chose what session musician(s) to work with.  Ex. 16, Wynn Dep. Tr. at 84:3-85:10, 142:11-144:6.  Ex. 17, Mehaffey Dep. Tr. at 63:8-14 (Mehaffey testified that Dream Syndicate hired a keyboard player). | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 181. |
| 183.    Dream Syndicate chose what producer(s) to work with. Ex. 16, Wynn Dep. Tr. at 81:11-24, 142:11-144:6.  Ex. 17, Mehaffey Dep. Tr. at 50:15-51:1. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 16 at 81:11-224, 142:11-144:6 (no reference to Dream Syndicate choosing which producer to work with); Ex. 17 at 50:15-51:1 (no reference to Dream Syndicate choosing which producer to work with, and Mehaffey admitting that he "do[es]n't know all the mechanics of" how Sandy Pearlman became the producer for *Medicine Show*); *see also supra* Defendants' Response and controverting evidence to No. 181. |
| 184.    Dream Syndicate chose what sound engineer(s) to work with.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 16 at 142:11-144:6 (no reference to Dream Syndicate choosing which sound engineers to work with); *see also supra* Defendants' Response and controverting evidence to No. 181. |
| 185.    Dream Syndicate selected the sound recordings that were included on *Surprise.* Wynn Decl. at ¶ 14.  Mehaffey Decl. at ¶ 12.  Pellish Decl. at ¶ 12.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6. | Disputed, including because the album *Surprise* does not embody any performances of Dream Syndicate.  To the extent this purported fact intended to reference the album *Medicine Show*, it is still disputed.<br><br>Defendants' Controverting Evidence:<br>SAC ¶¶ 161-162 (alleging that the album *Surprise* contains sound recordings embodying performances of Straw); McMullan Decl., Ex. 35 (reflecting that the |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
|  | album *Surprise* was performed by Straw); *id.*, Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to consult regarding the musical selections that would be embodied in the sound recordings recorded by Dream Syndicate); *id.* ¶ 2(a)(ii) (providing that A&M had the right to approve any sound recording as technically satisfactory and had the right to require Dream Syndicate to re-record any musical selections until a sound recording technically satisfactory to A&M had been obtained); *see* Gilford Decl., Ex. A ¶¶ 25-26 . |
| 186.     Dream Syndicate selected the sound recordings that were released as singles. Wynn Decl. at ¶ 14.  Mehaffey Decl. at ¶ 12. Pellish Decl. at ¶ 12.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to approve the musical selections that would be embodied in the sound recordings recorded by Dream Syndicate); *id.* ¶ 4(c)(vii) (providing that "[A&M] shall consult with [Dream Syndicate] in each instance concerning the choice of Masters to be included on singles"); Ransom Decl., Ex. H (reflecting that A&M released singles from *Medicine Show*); *see* Gilford Decl., Ex. A ¶¶ 25-26 ; Cronin Decl., Ex. 16 at 142:11-144:6 (no reference to Dream Syndicate selecting which sound recordings would be released as singles). |
| 187.     A&M Records never provided Dream Syndicate with any input or guidance regarding the sound or direction of the sound recordings Dream Syndicate created.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 175. |
| 188.     A&M Records never told the members of Dream Syndicate that they had to show up at a studio at a certain time to create the sound recordings.  Wynn Decl. at ¶ 13 . Mehaffey Decl. at ¶ 11.  Pellish Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to consult regarding the studios at which the sound recordings would be recorded, and the dates on which recording would take place); *id.* ¶ 2(a)(ii) |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | (providing that A&M had the right to approve any sound recording as technically satisfactory and had the right to require Dream Syndicate to re-record any musical selections until a sound recording technically satisfactory to A&M had been obtained); Gilford Decl., Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording fund for *Medicine Show*); *id.*, Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording *Medicine Show*); *id.*, Ex. G at 83:15-24 (Pellish testifying that he does not know who selected the recording studio where Medicine Show was recorded); McMullan Decl., Ex. 68 ¶¶ 2(a), 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services; that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M; that A&M had the right to approve all individuals rendering services in connection with recording the sound recordings that A&M had the right to have its representatives attend recording sessions; that each sound recording was subject to A&M's approval as technically satisfactory; that at A&M's request, Pearlman was obligated to re-produce any musical selection until a sound recording technically satisfactory to A&M was obtained); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 189.    On May 7, 1984, Dream Syndicate released *Medicine Show*.  Ex. 19, UMG0024459-0024460 (Copyright Registration Certificate).  Ex. 15, Pellish Dep. Tr. at 89:22-24. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 19 (reflecting that A&M published *Medicine Show*); *id.*, Ex. 15 (no reference to Dream Syndicate releasing *Medicine Show*); SAC ¶ 177 (alleging that A&M released *Medicine Show*). |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 190.     Medicine Show contains eight original sound recordings created by Dream Syndicate: *(1) Still Holding on to You; (2) Daddy's Girl; (3) Burn; (4) Armed with an Empty Gun; (5) Bullet with my Name on It; (6) The Medicine Show; (7) John Coltrane Stereo Blues; and (8) Merrittville.*  Ex. 16, Wynn Dep. Tr. at 106:10-22. | Undisputed that *Medicine Show* contains the listed sound recordings.  Disputed that Dream Syndicate created the sound recordings.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 175. |
| 191.     Shortly thereafter, A&M Records filed a copyright application with the U.S. Copyright Office to register *Medicine Show*.  Ex. 19, UMG0024459-0024460 (Copyright Registration Certificate). | Undisputed |
| 192.     The copyright application categorized *Medicine Show* as a "sound recording" (and not as a "compilation" or "collective work").  Ex. 19, UMG0024459-0024460 (Copyright Registration Certificate). | Undisputed that the copyright registration for *Medicine Show* identifies it as a sound recording.  Disputed that the copyright application forms permitted or required such a characterization, and further disputed because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 76 (identifying *Medicine Show* as a "work made for hire"; no indication that the copyright application form permitted or required A&M to characterize the album as a collective work or a compilation). |
| 193.     The U.S. Copyright Office issued A&M Records a Certificate of Registration for *Medicine Show*.  Ex. 19, UMG0024459-0024460 (Copyright Registration Certificate). | Undisputed. |
| 194.     While on tour, Dream Syndicate recorded one of their shows in Chicago, Illinois, and created a third album called *This Is Not the Dream Syndicate Live!*, which was released on October 24, 1984.  Ex. 16, Wynn Dep. Tr. at 80:15-22.  Ex. 18, UMG0018156-0018165 (Dream Syndicate Notice of Termination II). | Undisputed that a live show performed by Dream Syndicate was recorded in Chicago, Illinois and became the album *This Is Not the Dream Syndicate Live*.  Disputed that Dream Syndicate created or released that album, and further disputed as to the album's purported title.<br><br>Defendants' Controverting Evidence: Ransom Decl., Ex. K (reflecting that A&M released *This Is Not the New Dream* |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | *Syndicate Album . . . Live!* in 1984); McMullan Decl., Exs. 74, 75 (reflecting that A&M published *This Is Not the New Dream Syndicate Album . . . Live!*); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 195.    A few months later in or around December 4, 1985, A&M Records ended the relationship with Dream Syndicate. Ex. 21, UMG0021231 (Letter Releasing Dream Syndicate from A&M Records). | Undisputed. |
| 196.    More than three decades later, on March 1, 2016, Dream Syndicate served a notice of termination upon Defendant UMG, informing it that Dream Syndicate sought to terminate the grant of rights to the sound recordings in *Medicine Show*.  Ex. 22, UMG0018148-0018155 (Dream Syndicate Notice of Termination). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 22 (reflecting Dream Syndicate's putative termination notice was served upon "Universal Music Group" as "successor-in-interest to A&M Records, Inc."); McMullan Decl., Ex. 76. |
| 197.    Dream Syndicate's counsel subsequently caused the notice of termination to be recorded in the U.S. Copyright Office, as document V9922 D131 P1-6.  Ex. 22, UMG0018148-0018155 (Dream Syndicate Notice of Termination). | Undisputed. |
| 198.    The effective date of termination for Dream Syndicate's sound recordings in Medicine Show was May 8, 2019.  Ex. 22, UMG0018148-0018155 (Dream Syndicate Notice of Termination). | Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 175. |
| 199.    Despite having knowledge that the effective date of termination was May 8, 2019, Defendants have refused to honor it. Ex. 16, Wynn Dep. Tr. at 131:18-132:10 ("I am saying that they prevented us from exploiting the sale and promotion of the record.").  Ex. 16, Wynn Dep. Tr. at 134:17-135:15 (explains that Dream Syndicate would have released, sold, and toured with the sound recordings in Medicine Show if they had the rights back). | Disputed.<br><br>Defendants' Controverting Evidence: Gilford Decl., Ex. F at 59:20-61:15 (explaining that since 2012, Dream Syndicate has been touring together, that during shows on tour they sometimes played songs from the *Medicine Show* and *This Is Not the New Dream Syndicate Album Live* albums, and that he was not aware of ever being restricted by the record company from playing music from those albums in any of those shows); *see also* |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | *supra* Defendants' Response and controverting evidence to No. 175. |
| 200.   Instead, Defendants knowingly failed to return the rights to the sound recordings in Medicine Show well after the effective date of termination. Ex. 16, Wynn Dep. Tr. at 131:18-132:10. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 16 at 131:18-132:18 (Wynn testifying that UMG has prevented Dream Syndicate from exploiting the sale and promotion of the album *Lost Weekend* (not *Medicine Show*), and that Wynn does not know whether UMG is offering the album *Lost Weekend* for sale to the public); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 201.   To date, Defendants continue to exploit the sound recordings in Medicine Show. Ex. 16, Wynn Dep. Tr. at 131:18-132:10. | Disputed, including because the underlying evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 16 at 131:18-132:18 (Wynn testifying that UMG has prevented Dream Syndicate from exploiting the sale and promotion of the album *Lost Weekend* (not *Medicine Show*), and that Wynn does not know whether UMG is offering the album *Lost Weekend* for sale to the public). |
| 202.   Dream Syndicate exercised complete artistic control over the sound recordings in Medicine Show, without input from A&M Records. Ex. 16, Wynn Dep. Tr. at 80:21-81:5. Ex. 16, Wynn Dep. Tr. at 114:14-116:20 ("We were very autonomous. We…developed our own material, our own songs, our own direction in the studio, so there was really no involvement from A&M with us in any of those things"). Ex. 16, Wynn Dep. Tr. at 142:11-144:6 ("everything involving writing the songs, choosing the songs, arranging the songs, recording them in the studio, the process – who we hired in the studio, which takes we used, how we mixed the records, choosing mixed, mastering the record were entirely the band. We – the four of us made those decisions ourselves."). | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 181. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 203.    Dream Syndicate chose what session musician(s) to work with. Ex. 16, Wynn Dep. Tr. at 84:3-85:10, 142:11-144:6.  Ex. 17, Mehaffey Dep. Tr. at 63:8-14 (Mehaffey testified that Dream Syndicate hired a keyboard player). | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 181. |
| 204.    Dream Syndicate chose what producer(s) to work with. Ex. 16, Wynn Dep. Tr. at 81:11-24, 142:11-144:6. Ex. 17, Mehaffey Dep. Tr. at 50:15-51:1. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 16 at 81:11-224, 142:11-144:6 (no reference to Dream Syndicate choosing which producer to work with); Ex. 17 at 50:15-51:1 (no reference to Dream Syndicate choosing which producer to work with, and Mehaffey admitting that he "do[es]n't know all the mechanics of" how Sandy Pearlman became the producer for *Medicine Show*); *see also supra* Defendants' Response and controverting evidence to No. 181. |
| 205.    Dream Syndicate chose what sound engineer(s) to work with. Ex. 16, Wynn Dep. Tr. at 142:11-144:6. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 16 at 142:11-144:6 (no reference to Dream Syndicate choosing which sound engineers to work with); *see also supra* Defendants' Response and controverting evidence to No. 181. |
| 206.    Dream Syndicate selected the sound recordings that were included on Surprise. Wynn Decl. at ¶ 14. Mehaffey Decl. at ¶ 12. Pellish Decl. at ¶ 12. Ex. 16, Wynn Dep. Tr. at 142:11-144:6. | Disputed, including because the album *Surprise* does not embody any performances of Dream Syndicate.  To the extent this purported fact intended to reference the album *Medicine Show*, it is still disputed.<br><br>Defendants' Controverting Evidence:<br>SAC ¶¶ 161-162 (alleging that the album *Surprise* contains sound recordings embodying performances of Straw); McMullan Decl., Ex. 35 (reflecting that the album *Surprise* was performed by Straw); *id.*, Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to consult regarding the musical |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | selections that would be embodied in the sound recordings recorded by Dream Syndicate); *id.* ¶ 2(a)(ii) (providing that A&M had the right to approve any sound recording as technically satisfactory and had the right to require Dream Syndicate to re-record any musical selections until a sound recording technically satisfactory to A&M had been obtained); *see* Gilford Decl., Ex. A ¶¶ 25-26 . |
| 207.    Dream Syndicate selected the sound recordings that were released as singles. Wynn Decl. at ¶ 14. Mehaffey Decl. at ¶ 12. Pellish Decl. at ¶ 12. Ex. 16, Wynn Dep. Tr. at 142:11-144:6. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to consult regarding the musical selections that would be embodied in the sound recordings recorded by Dream Syndicate); *id.* ¶ 4(c)(vii) (providing that "[A&M] shall consult with [Dream Syndicate] in each instance concerning the choice of Masters to be included on singles"); Ransom Decl., Ex. H (reflecting that A&M released singles from *Medicine Show*); *see* Gilford Decl., Ex. A  ¶¶ 25-26 ; Cronin Decl., Ex. 16 at 142:11-144:6 (no reference to Dream Syndicate selecting which sound recordings would be released as singles). |
| 208.    A&M Records never provided Dream Syndicate with any input or guidance regarding the sound or direction of the sound recordings Dream Syndicate created. Ex. 16, Wynn Dep. Tr. at 142:11-144:6. | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 175. |
| 209.    A&M Records never told they members of Dream Syndicate that they had to show up at a studio at a certain time to create the sound recordings. Wynn Decl. at ¶ 13. Mehaffey Decl. at ¶ 11. Pellish Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to consult regarding the studios at which the sound recordings would be recorded, and the dates on which recording would take place); *id.* ¶ 2(a)(ii) (providing that A&M had the right to approve any sound recording as technically satisfactory and had the right to require Dream Syndicate to re-record any musical |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | selections until a sound recording technically satisfactory to A&M had been obtained); Gilford Decl., Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording fund for *Medicine Show*); *id.*, Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording *Medicine Show*); *id.*, Ex. G at 83:15-24 (Pellish testifying that he does not know who selected the recording studio where Medicine Show was recorded); McMullan Decl., Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services; that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M; that each sound recording was subject to A&M's approval as technically satisfactory; that at A&M's request, Pearlman was obligated to re-produce any musical selection until a sound recording technically satisfactory to A&M was obtained); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 210.    Plaintiff Wynn has been a professional singer, songwriter, and guitarist for over four decades. He is one of the founding members of Dream Syndicate. Wynn Decl. at ¶ 1. | Undisputed. |
| 211.    Plaintiff Mehaffey has been a professional musician and drummer for over four decades. He is one of the founding members of Dream Syndicate. Mehaffey Decl. at ¶ 1. Ex. 15, Pellish Dep. Tr. at 19:6-14 (noting that, at the time he joined the band, Pellish was "very aware of Dennis [Mehaffey] because he [wa]s…a high profile player."). | Undisputed. |
| 212.    Plaintiff Pellish has been a professional musician and bassist for several decades. Pellish Decl. at ¶ 1. | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 213.    Plaintiffs Wynn, Mehaffey, and Pellish are highly skilled professional musicians who, with Karl their remaining band member Karl Precoda, created the sound recordings in *Medicine Show*. Wynn Decl. at ¶ 1. Mehaffey Decl. at ¶ 1 Pellish Decl. at ¶ 1. | Undisputed. |
| 214.    Plaintiff Wynn has been a professional singer, songwriter, and guitarist for over four decades. He is one of the founding members of Dream Syndicate. Wynn Decl. at ¶ 1. | Undisputed |
| 215.    Wynn has never received a salary from A&M Records or Defendants. Wynn Decl. at ¶ 6. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶¶ 6, 23, 24, 25 (reflecting that A&M paid Dream Syndicate a $150,000 advance for the initial period, royalties, and a $10,000 advance for tour support for their exclusive recording services); *id.*, Exs. 64, 65, 66. |
| 216.    Wynn never received a paycheck from A&M Records or Defendants in which they withheld any income taxes, social security, or other comparable payments. Wynn Decl. at ¶ 7. | Undisputed. |
| 217.    Wynn never received a W-2 from A&M Records or Defendants. Wynn Decl. at ¶ 8. | Undisputed |
| 218.    Wynn never received health or life insurance benefits from A&M Records or Defendants. Wynn Decl. at ¶ 9. | Undisputed. |
| 219.    Wynn never received paid vacation or sick leave from A&M Records or Defendants. Wynn Decl. at ¶ 12. | Undisputed. |
| 220.    Wynn was never provided with an office by A&M Records or Defendants. Wynn Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶2(a)(i) (providing that "the studio or studios at which the Masters shall be recorded, and the dates of recording shall be designated by [Dream Syndicate] after consultation with [A&M]"); *id.* ¶ 3(a)(i) (providing that "[r]ecording |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"). |
| 221.    Wynn was never provided with a secretary or any other type of assistant by A&M Records or Defendants. Wynn Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 181. |
| 222.    Mehaffey has never been an employee of A&M Records or Defendants. Mehaffey Decl. at ¶ 3. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 175. |
| 223.    Mehaffey has never received a salary from A&M Records or Defendants. Mehaffey Decl. at ¶ 4. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶¶ 6, 23, 24, 25 (reflecting that A&M paid Dream Syndicate a $150,000 advance for the initial period, royalties, and a $10,000 advance for tour support for their exclusive recording services); *id.*, Exs. 64, 65, 66. |
| 224.    Mehaffey never received a paycheck from A&M Records or Defendants in which they withheld any income taxes, social security, or other comparable payments. Mehaffey Decl. at ¶ 5. | Undisputed. |
| 225.    Mehaffey never received a W-2 from A&M Records or Defendants. Mehaffey Decl. at ¶ 6. | Undisputed. |
| 226.    Mehaffey never received health or life insurance benefits from A&M Records or Defendants. Mehaffey Decl. at ¶ 7. | Undisputed. |
| 227.    Mehaffey never received paid vacation or sick leave from A&M Records or Defendants. Mehaffey Decl. at ¶ 10. | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 228.    Mehaffey was never provided with an office by A&M Records or Defendants. Mehaffey Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 63 ¶2(a)(i) (providing that "the studio or studios at which the Masters shall be recorded, and the dates of recording shall be designated by [Dream Syndicate] after consultation with [A&M]"); *id.* ¶ 3(a)(i) (providing that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"). |
| 229.    Mehaffey was never provided with a secretary or any other type of assistant by A&M Records or defendants. Mehaffey Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 181. |
| 230.    Pellish has never been an employee of A&M Records or Defendants. Pellish Decl. at ¶ 3. | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 175. |
| 231.    Pellish has never received a salary from A&M Records or Defendants. Pellish Decl. at ¶ 4. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 63 ¶¶ 6, 23, 24, 25 (reflecting that A&M paid Dream Syndicate a $150,000 advance for the initial period, royalties, and a $10,000 advance for tour support for their exclusive recording services); *id.*, Exs. 64, 65, 66. |
| 232.    Pellish never received a paycheck from A&M Records or Defendants in which they withheld any income taxes, social security, or other comparable payments. Pellish Decl. at ¶ 5. | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 233.     Pellish never received a W-2 from A&M Records or Defendants. Pellish Decl. at ¶ 6. | Undisputed. |
| 234.     Pellish never received health or life insurance benefits from A&M Records or Defendants.  Pellish Decl. at ¶ 7. | Undisputed. |
| 235.     Pellish never received paid vacation or sick leave from A&M Records or Defendants. Pellish Decl. at ¶ 10.. | Undisputed. |
| 236.     Pellish was never provided with an office by A&M Records or Defendants. Pellish Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶2(a)(i) (providing that "the studio or studios at which the Masters shall be recorded, and the dates of recording shall be designated by [Dream Syndicate] after consultation with [A&M]"); *id.* ¶ 3(a)(i) (providing that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"); *id.*, Ex. G at 83:15-24 (Pellish testifying that he does not know who selected the recording studio where *Medicine Show* was recorded). |
| 237.     Pellish was never provided with a secretary or any other type of assistant by A&M Records or Defendants. Pellish Decl. at ¶ 9. Ex. 15, Pellish Dep. Tr. at 29:9-15. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 181. |
| 238.     A&M Records did not deduct or withhold income taxes, social security, or other comparable payments on behalf of Wynn. Wynn Decl. at ¶¶ 7-8. | Undisputed. |
| 239.     A&M Records did not issue W-2 tax forms to Wynn. Wynn Decl. at ¶¶ 7-8. | Undisputed. |
| 240.     A&M Records did not deduct or withhold income taxes, social security, or | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| other comparable payments on behalf of Mehaffey. Mehaffey Decl. at ¶¶ 5-6. | |
| 241.    A&M Records did not issue W-2 tax forms to Mehaffey. Mehaffey Decl. at ¶¶ 5-6. | Undisputed. |
| 242.    A&M Records did not deduct or withhold income taxes, social security, or other comparable payments on behalf of Mehaffey. Pellish Decl. at ¶¶ 5-6. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Declaration of David Pellish [ECF No. 178] ("Pellish Decl.") ¶¶ 5-6 (no reference to Mehaffey). |
| 243.    A&M Records did not issue W-2 tax forms to Mehaffey. Pellish Decl. at ¶¶ 5-6. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Pellish Decl. ¶¶ 5-6 (no reference to Mehaffey). |
| 244.    The Dream Syndicate Recording Agreement provided that Dream Syndicate could create sound recordings for an initial album. Ex. 18, UMG0019665-0019717 (Dream Syndicate Recording Agreement at ¶ 1(a)(i)). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶¶ 1(b)(i), 2(a)(i), 19 (obligating Dream Syndicate to record and deliver sound recordings sufficient to constitute an "LP," and that providing each sound recording consist of a single musical composition, and that each album "embody no less than eight (8) and no more than ten (10) musical compositions"); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 245.    The Dream Syndicate Recording Agreement did not give A&M Records any authority to assign additional projects outside of that agreement. Ex. 18, UMG0019665-0019717 (Dream Syndicate Recording Agreement at ¶ 1(a)(i)). | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶ 1(a)(ii) (providing that A&M had the right to exercise three separate, consecutive options to renew the term of the agreement for additional contract periods); *id.* ¶ 15(a) (providing that A&M had the right to request that Dream Syndicate appear on dates and at film studios or other locations designated by A&M for the filming or taping of Dream Syndicate's |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | performances); Gilford Decl., Ex. H at 107:9-16 (Wynn testifying that Dream Syndicate made promotional appearances for *Medicine Show* at the request of A&M, such as interviews and radio appearances). |
| 246.    A&M Records did not assign additional projects to Dream Syndicate outside of the Dream Syndicate Recording Agreement. Wynn Decl. at ¶ 13,  Mehaffey Decl. at ¶ 11, Pellish Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 63 ¶ 1(a)(ii) (providing that A&M had the right to exercise three separate, consecutive options to renew the term of the agreement for additional contract periods); *id.* ¶ 15(a) (providing that A&M had the right to request that Dream Syndicate appear on dates and at film studios or other locations designated by A&M for the filming or taping of Dream Syndicate's performances); Gilford Decl., Ex. H at 107:9-16 (Wynn testifying that Dream Syndicate made promotional appearances for *Medicine Show* at the request of A&M, such as interviews and radio appearances). |
| 247.    A&M Records did not provide Dream Syndicate with instruments and tools needed to create the sound recordings. Ex. 16, Wynn Dep. Tr. at 142:11-144:6, Ex. 17, Mehaffey Dep. Tr. at 55:9-12. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 63 ¶2(a)(i) (providing that "the studio or studios at which the Masters shall be recorded, and the dates of recording shall be designated by [Dream Syndicate] after consultation with [A&M]"); *id.* ¶ 3(a)(i) (providing that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"); McMullan Decl., Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services; that recording sessions for the sound recordings recorded pursuant to the agreement |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | were to be conducted under A&M's recording license at times and locations designated by A&M); *id.*, Ex. 71 (reflecting that A&M paid for the services of Tom Zvoncheck, keyboard player on *Medicine Show*); *id.*, Ex. 72 (reflecting that A&M paid for the services of Jeffrey Osbourne, sound engineer on *This Is Not The New Dream Syndicate Album Live*); *id.*, Ex. 67 (reflecting that A&M paid for equipment); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 248.    The instruments and tools were either provided by Dream Syndicate or the third-party music studios where they created the sound recordings.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6.  Ex. 17, Mehaffey Dep. Tr. at 55:9-12.  Ex. 15, Pellish Dep. Tr. at 83:1-4. | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶ 2(a)(i) (providing that "the studio or studios at which the Masters shall be recorded, and the dates of recording shall be designated by [Dream Syndicate] after consultation with [A&M]"); *id.* ¶ 3(a)(i) (providing that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"); McMullan Decl., Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services; that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M); *id.*, Ex. 71 (reflecting that A&M paid for the services of Tom Zvoncheck, keyboard player on *Medicine Show*); *id.*, Ex. 72 (reflecting that A&M paid for the services of Jeffrey Osbourne, sound engineer on *This Is Not The New Dream Syndicate Album Live*); *id.*, Ex. 67 (reflecting that A&M paid for equipment); *see also supra* Defendants' |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Response and controverting evidence to No. 175. |
| 249.    Dream Syndicate chose where to create the sound recordings in Surprise without any input from A&M Records. Wynn Decl. at ¶ 13.  Mehaffey Decl. at ¶ 11. Pellish Decl. at ¶ 11.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6.  Ex. 17, Mehaffey Dep. Tr. at 55:9-12. | Disputed, including because the album *Surprise* does not embody any performances of Dream Syndicate.  To the extent this purported fact intended to reference the album *Medicine Show*, it is still disputed.

Defendants' Controverting Evidence: SAC ¶¶ 161-162 (alleging that the album *Surprise* contains sound recordings embodying performances of Straw); McMullan Decl., Ex. 35 (reflecting that the album *Surprise* was performed by Straw); *id.*, Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services and that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M); *id.*, Ex. 63 ¶ 2(a)(i) (providing that "the studio or studios at which the Masters shall be recorded, and the dates of recording shall be designated by [Dream Syndicate] after consultation with [A&M]"); *id.* ¶ 3(a)(i) (providing that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 250.    Dream Syndicate chose to create the sound recordings in Surprise in San Francisco, California.  Ex. 17, Mehaffey Dep. Tr. at 55:9-12.  Ex. 15, Pellish Dep. Tr. at 83:1-4. | Disputed, including because the album *Surprise* does not embody any performances of Dream Syndicate.  To the extent this purported fact intended to reference the album *Medicine Show*, it is still disputed.

Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | McMullan Decl., Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to consult regarding the studios at which the sound recordings would be recorded, and the dates on which recording would take place); *id.* ¶ 3(a)(i) (providing that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"); McMullan Decl., Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services and that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M); *see supra* Defendants' Responses and controverting evidence to Nos. 175 and 249. |
| 251.    Dream Syndicate was under contract with A&M Records from September 1, 1983 to approximately December 4, 1985 (approximately two years).  Ex. 18, UMG0019665-0019717 (Dream Syndicate Recording Agreement).  Ex. 21, UMG0021231 (Letter Releasing Dream Syndicate from A&M Records). | Undisputed. |
| 252.    A&M Records exercised no discretion over when and for how long Dream Syndicate should work.  Wynn Decl. at ¶ 13.  Mehaffey Decl. at ¶ 11.  Pellish Decl. at ¶ 11.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6.  Ex. 17, Mehaffey Dep. Tr. at 55:9-12. | Disputed.

Defendants' Controverting Evidence:
McMullan Decl., Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to consult regarding the studios at which the sound recordings would be recorded, and the dates on which recording would take place); *id.* ¶ 2(a)(ii) (providing that A&M had the right to approve any sound recording as technically satisfactory and had the right to require Dream Syndicate to re-record any musical selections until a sound recording technically |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | satisfactory to A&M had been obtained); *id.* ¶ 3(a)(i) (providing that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"); McMullan Decl., Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer Sandy Pearlman for his services and that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M); *see also supra* Defendants' Response and controverting evidence to No. 175. |
| 253.     Dream Syndicate chose when and where to create the sound recordings in Surprise. Wynn Decl. at ¶ 13.  Mehaffey Decl. at ¶ 11.  Pellish Decl. at ¶ 11.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6.  Ex. 17, Mehaffey Dep. Tr. at 55:9-12. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶ 2(a)(i) (providing that A&M had the right to consult regarding the studios at which the sound recordings would be recorded, and the dates on which recording would take place); *id.* ¶ 2(a)(ii) (providing that A&M had the right to approve any sound recording as technically satisfactory and had the right to require Dream Syndicate to re-record any musical selections until a sound recording technically satisfactory to A&M had been obtained); *id.* ¶ 3(a)(i) (providing that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"); Gilford Decl., Ex. F at 55:13-16 (Mehaffey testifying that A&M paid for the recording studio and the costs associated with recording); *id.*, Ex. H at 102:14-103:10 (Wynn testifying that A&M provided the recording budget, which covered studio costs and "all the costs involved in making the record"); McMullan Decl., Ex. 68 ¶ 3(a) (reflecting that A&M engaged producer |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
|  | Sandy Pearlman for his services and that recording sessions for the sound recordings recorded pursuant to the agreement were to be conducted under A&M's recording license at times and locations designated by A&M); *see also supra* Defendants' Response and controverting evidence to Nos. 175 and 209. |
| 254.    During the entirety of the recording process, representatives from A&M Records visited Dream Syndicate only one time, and had no input in the recording process whatsoever.  Ex. 16, Wynn Dep. Tr. at 142:11-144:6 ("[T]he only involvement we had from A&M's A&R department was the one night Mark Williams and Jeff Gold from A&R flew to San Francisco, listened to the mixes we had been working on at the time, liked them quite a bit, took me out to dinner and left town...."). | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 175. |
| 255.    Wynn never received a salary from A&M Records or Defendants.  Wynn Decl. at ¶¶ 6-7. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶¶ 6, 23, 24, 25 (reflecting that A&M paid Dream Syndicate a $150,000 advance for the initial period, royalties, and a $10,000 advance for tour support for their exclusive recording services); *id.*, Exs. 64, 65, 66. |
| 256.    Wynn never received a paycheck from A&M Records or Defendants in which they withheld any income taxes, social security, or other comparable payments.  Wynn Decl. at ¶¶ 6-7. | Undisputed. |
| 257.    Mehaffey never received a salary from A&M Records or Defendants.  Mehaffey Decl. at ¶¶ 4-5. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶¶ 6, 23, 24, 25 (reflecting that A&M paid Dream Syndicate a $150,000 advance for the initial period, royalties, and a $10,000 advance for tour support for their exclusive recording services); *id.*, Exs. 64, 65, 66. |
| 258.    Mehaffey never received a paycheck from A&M Records or Defendants in which | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| they withheld any income taxes, social security, or other comparable payments. Mehaffey Decl. at ¶¶ 4-5. | |
| 259.    Pellish never received a salary from A&M Records or Defendants.  Pellish Decl. at ¶¶ 4-5. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶¶ 6, 23, 24, 25 (reflecting that A&M paid Dream Syndicate a $150,000 advance for the initial period, royalties, and a $10,000 advance for tour support for their exclusive recording services); *id.*, Exs. 64, 65, 66. |
| 260.    Pellish never received a paycheck from A&M Records or Defendants in which they withheld any income taxes, social security, or other comparable payments. Pellish Decl. at ¶¶ 4-5. | Undisputed. |
| 261.    Instead, A&M Records provided the members of the Dream Syndicate with an advance, which was recoupable.  Ex. 16, Wynn Dep. Tr. at 127:17-128:3.  Ex. 15, Pellish Dep. Tr. at 90:18-91:3. | Undisputed that A&M paid Dream Syndicate a recoupable advance pursuant to the recording agreement.  Disputed to the extent the purported fact suggests that an advance does not constitute a salary.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 63 ¶¶ 6, 23, 24, 25 (reflecting that A&M paid Dream Syndicate a $150,000 advance for the initial period, royalties, and a $10,000 advance for tour support for their exclusive recording services); *id.*, Exs. 64, 65, 66. |
| 262.    Dream Syndicate used the advance to create the sound recordings in Medicine Show. Ex. 16, Wynn Dep. Tr. at 127:17-128:3. Ex. 15, Pellish Dep. Tr. at 90:18-91:3. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 175. |
| 263.    Dream Syndicate was not provided with any secretary or assistant by A&M Records or Defendants.  Wynn Decl. at ¶ 11. Mehaffey Decl. at ¶ 9.  Pellish Decl. at ¶ 9. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 181. |
| 264.    Wynn has been a professional singer, songwriter, and guitarist for over four decades. He is one of the founding members of Dream Syndicate.  Wynn Decl. at ¶ 1. | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 265.     Mehaffey has been a professional musician and drummer for over four decades. He is one of the founding members of Dream Syndicate.  Mehaffey Decl. at ¶ 1.  14 (noting that, at the time he joined the band, Pellish was "very aware of Dennis [Mehaffey] because he [wa]s…a high profile player."). | Undisputed. |
| 266.     Pellish has been a professional musician and bassist for several decades. Pellish Decl. at ¶ 1. | Undisputed. |
| 267.     Together and as members of Dream Syndicate, Wynn, Mehaffey, and Pellish created sound recordings.  Wynn Decl. at ¶ 1.  Mehaffey Decl. at ¶ 1.  Pellish Decl. at ¶ 1. | Disputed to the extent the purported fact is intended to suggest that Dream Syndicate created *Medicine Show* or *This Is Not the New Dream Syndicate Album Live.*<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to Nos. 175 and 181. |
| 268.     A&M Records itself did not create sound recordings. Rather, A&M Records was in the business of distributing and promoting sound recordings. Ex. 16, Wynn Dep. Tr. at 107:9-16, 108:4-20. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 16 at 107:9-16, 108:4-20 (no indication that A&M's business did not include creating sound recordings); McMullan Decl. ¶¶ 5, 9 (A&M's regular business involved making and distributing sound recordings). |
| 269.     A&M Records is a predecessor of Defendant UMG Recordings, Inc.  Ex. 16, Wynn Dep. Tr. at 108:4-20. | Undisputed. |
| 270.     A&M Records no longer exists as a separate entity apart from Defendants. Ex. 16, Wynn Dep. Tr. at 108:4-20. | Disputed as vague and ambiguous as to "no longer exists as a separate entity apart from Defendants" and further disputed because the cited evidence does not support the purported fact.  A&M was merged into UMG, which succeeded to A&M's rights and obligations, and continues the business of making and distributing recorded music.<br><br>Defendants' Controverting Evidence: SAC ¶¶ 27, 131; McMullan Decl. ¶¶ 8, 9; Cronin Decl., Ex. 16 at 108:4-20 (no |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | reference to A&M "no longer exist[ing] as a separate entity apart from Defendants"). |
| 271.   Susan Straw Harris, professionally known as Syd Straw ("Straw"), is an American rock singer, songwriter, and performer.  Declaration of Susan Straw Harris p/k/a/ Syd Straw ("Straw Decl.") at ¶ 1.  Ex. 23, Straw Dep. Tr. at 27:8-24. | Undisputed. |
| 272.   She began her career singing backup for Pat Benatar, and eventually took her distinct voice to the alternative music scene, joining the Golden Palominos as a singer from 1985 to 1987.  Straw Decl. at ¶ 1.  Ex. 23, Straw Dep. Tr. at 27:8-28:2. | Undisputed. |
| 273.   After receiving critical acclaim for her work with the Golden Palominos, Straw sought to create a solo album.  Ex. 23, Straw Dep. Tr. at 27:8-24. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 23 at 27:8-24 (no reference to Straw receiving critical acclaim). |
| 274.   Virgin Records America, Inc. ("Virgin Records") approached Straw about creating a solo album.  Ex. 23, Straw Dep. Tr. at 27:8-24.  Ex. 23, Straw Dep. Tr. at 24:24-25:10 ("Q: How did you come to have a relationship with Virgin Records? A: They came to me. I didn't chase after any virgins. They came to me and they were a very happening boutique label at the time and they thought that I was just the kind of renegade that they'd like to promote."). | Undisputed. |
| 275.   Virgin Records is a predecessor of Defendant Capitol Records, LLC. It no longer exists as a separate entity apart from Defendants.  Ex. 5, P03016-03018 (Defendant UMG's Webpage Showing "Our Labels & Brands").  Ex. 23, Straw Dep. Tr. at 24:10-21. | Disputed as vague and ambiguous as to "separate entity apart from Defendants." Virgin was merged into Capitol, which succeeded to Virgin's rights and obligations and continues the same business of making and distributing recorded music.<br><br>Defendants' Controverting Evidence: SAC ¶¶ 31, 161; McMullan Decl. ¶¶ 7, 9. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 276.    On July 20, 1987, Straw signed a recording agreement with Virgin Records to release her first solo album.  Ex. 24, UMG0027890-0027935  (the "Straw Recording Agreement"). | Undisputed that Virgin entered into a recording agreement with Straw on July 20, 1987.  To the extent "her first solo album" is a reference to the album *Surprise*, disputed that Straw is the owner of that album or released it, and further disputed because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 24 at 1 (reflecting that Virgin engaged Straw's "exclusive services . . . for the purpose of recording and delivering to [Virgin] Masters"); SAC ¶¶ 162 (alleging that "[o]n or around June 21, 1989, Virgin released *Surprise*"); McMullan Decl., Ex. 27 ¶ 6(a) (reflecting the parties' agreement that all master sound recordings recorded during the term of the agreement are "works made for hire" and that Straw is Virgin's "employee[] for hire"); *id.* ¶ 1, 13(a) (reflecting that Virgin engaged Straw's exclusive recording services); *id.* ¶¶ 3, 4(e), 18(b) (reflecting that Straw was required "to deliver to [Virgin] the Masters promptly after their completion" and that Virgin had the right to terminate the agreement if Straw failed "to record for and deliver to [Virgin] Masters within the time periods set forth" in the agreement); *id.* ¶ 4(a) (providing that "[Straw] and [Virgin] shall mutually designate the producer of each of the Masters, the Musical Compositions or other selections which shall be embodied in those Masters and the studios at which those Masters shall be recorded"); *id.* ¶ 4(d) ("[Virgin]'s representatives may attend recording sessions for the Masters."); *id.* ¶ 4(e) (providing that Virgin had the right to approve any sound recordings "as commercially and technically satisfactory for the manufacture and sale or Phonograph records," and the right to require Straw to re-record any music selection "until a Master commercially and technically satisfactory to [Virgin] shall have been |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | obtained"); *id.* ¶ 2 (providing that Virgin had the right to exercise four separate, consecutive, and irrevocable options to renew the agreement after the initial period); *id.* ¶ 23(l) (providing that Virgin had the right to request that Straw assist with the marketing, advertising, and promotion of any recordings created under the agreement, such as engaging in interviews, participating in press conferences, posing at photography sessions, and appearing on television and radio shows); *id.* ¶ 28 (providing that Virgin had the right to request that Straw perform for the purpose of being filmed for promotional and other purposes in connection with exploitation of the sound recordings); *id.* ¶ 25 (providing that Virgin had the final authority to determine the U.S. marketing and promotion approach for all albums recorded under the agreement); *id.* ¶¶ 8, 9 (reflecting Virgin's obligation to pay Straw advances, including a $35,000 signing advance and the option to obtain all or part of a $150,000 recording fund advance, plus royalties); Gilford Decl., Ex. I at 28:22-29:23 (authenticating Dep. Ex. 74); *id.* at 45:17-21 (Straw testifying that she understood Virgin had the right to exercise four separate options to extend the contract period); *id.* at 75:10-22 (Straw testifying that she "knew [she] was going out into the world to make a record for Virgin Records America); *id.* at 55:17-56:3, 63:3-23 (Straw testifying that when she was prepared to commence work on the album, she could not immediately do so because Virgin would not release the recording funds, "which they controlled," and that Virgin paid for all recording costs); *id.* at 64:17-65:12, 92:6-93:22 (Straw testifying that Virgin paid for the producers and musicians through the recording fund for the album); *id.* at 52:4-53:4, 54:8-15 (Straw testifying that when *Surprise* was completed and Straw wanted the record to be released, *Virgin* made the decision to hold back releasing the album |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | multiple times due to other priorities at the record label); *id.* at 83:6-23, 84:4-15, 86:8-89:2, 92:6-97:3 (Straw testifying regarding the various contributors such as musicians, vocalists, and musicians that contributed to the creation of the sound recordings in *Surprise*, and that they were paid from recording fund provided by Virgin); *id.* at 98:7-10 (Straw testifying that she made promotional appearances at Virgin's request); SAC ¶¶ 31, 161 (alleging that Capitol is the successor of Virgin); McMullan Decl. ¶ 5 (Virgin's regular business involved making and distributing sound recordings); *id.*, Ex. 35 (reflecting that Virgin is the "author" or *Surprise* as a "work made for hire"); *id.*, Exs. 28-31 (examples of royalty statements issued to Straw); *id.*, Ex. 32 ¶¶ 3(a), 4 (reflecting agreement between Straw and producer Anthony Moore that recording sessions would be conducted under Virgin's recording license, that times and locations of recording the sound recordings were to be mutually designated by Virgin and Straw, and that Moore and Straw were Virgin's "employee for hire"); *id.*, Ex. 33 ¶¶ 3(a), 4 (reflecting agreement between Straw and producer Van Dyke Parks that recording sessions would be conducted under Virgin's recording license, that times and locations of recording the sound recordings were to be mutually designated by Virgin and Straw, and that Park and Straw were Virgin's "employee for hire"); *id.*, Ex. 34 (reflecting Virgin's approval of Straw engaging Michael Stipe as a vocalist for one of the sound recordings on *Surprise* and agreement to pay Stipe); *id.*, Ex. 27 (reflecting Virgin's termination of Straw's recording agreement after she failed to timely deliver an album). |
| 277.   The Straw Recording Agreement was drafted, designated, and intended by Virgin Records to secure the exclusive recording | Undisputed that Virgin entered into a recording agreement with Straw to engage her exclusive recording services.  Disputed that Virgin alone "designated" or "drafted" the |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| services of Straw.  Ex. 24, UMG0027890-0027935 (Straw Recording Agreement at ¶ 1). | agreement, including because the term "designated" is vague and ambiguous.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 27 ¶ 22 (providing that all notices to Straw required under the agreement shall be sent to Stuart Silfen, P.C.); Gilford Decl., Ex. I at 31:4-20, 43:7-18 (Straw testifying that she was represented by a lawyer in connection with her recording agreement, and that she had an opportunity to ask him questions about the agreement before she signed it); Ransom Decl., Ex. C at 4-5 (responses to Request for Admission Nos. 1 through 6, in which Straw admits she was represented by counsel in connection with her recording agreement, and reviewed the agreement before she signed it). |
| 278.    The Straw Recording Agreement provided an initial term of twelve months for the delivery of the sound recordings for Straw's first album, and eight additional months thereafter. Ex. 24, UMG0027890-0027935 (Straw Recording Agreement at ¶ 2). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 27 ¶ 2 ("The Term shall consist of an initial period commencing as of the date hereof and shall continue until the later of (i) the date twelve (12) months after the date hereof and (ii) the date eight (8) months after [Straw's] delivery of the First Album."); *see also supra* Defendants' Response and controverting evidence to No. 276. |
| 279.    The Straw Recording Agreement provided that Straw could create sound recordings for an initial album.  Ex. 24, UMG0027890-0027935 (Straw Recording Agreement at ¶ 1). | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 27 ¶ 2 (providing for an "initial" term of "the later of (i) the date twelve (12) months after the date hereof and (ii) the date eight (8) months after [Straw's] delivery of the First Album" and that Virgin was granted four separate, consecutive, and irrevocable options to renew the agreement); *id.* ¶ 3 (obligating Straw to record and deliver to Virgin a sufficient number of sound recordings to constitute one album during the |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | agreements "initial period"); *see also supra* Defendants' Response and controverting evidence to No. 276. |
| 280.    The Straw Recording Agreement contained standard "work made for hire" language, which provided that "for purposes of copyright law" Straw was to be considered an "employee[] for hire."  Ex. 24, UMG0027890-0027935 (Straw Recording Agreement at ¶ 6(a)).  Ex. 30 (Recording Agreement Summary Exhibit) (for a discussion of the relevant excerpts of the Class Members' recording agreements). | Undisputed that Straw's recording agreement reflects the parties' agreement that all sound recordings created thereunder constitute "works made for hire" and that Straw was Virgin's "employee[] for hire."   Disputed that this contractual provision "contained standard 'work made for hire' language."<br><br>Defendants' Controverting Evidence:<br>*Compare* McMullan Decl., Ex. 27 ¶ 6(a), *with* Cronin Decl., Ex. 30 (reflecting variations in the purported "standard 'work made for hire' language" for example:  (1) "work made for hire" and "employer for hire" (both used in the Sulton agreement); (2) "works made for hire" and "employee for hire" (both used in the Straw, Dream Syndicate, and Vinnie Vincent agreements); (3) "employees for hire" (used in The Dickies agreement); (4) "maker . . . and the owner" (used in Pearl Harbour and Shriekback agreements); (5) "we hereby employ the personal services of you and such musicians" (used in the Freddie Hubbard agreement); and (6) no "'work made for hire' language" (Danny and Dusty, Buggles, Gino Vannelli, Green on Red, Musical Youth, Loretta Lynn)). |
| 281.    Alternatively, the Straw Recording Agreement contained generic assignment language, which provided that in the event the sound recordings were not considered works made for hire, Straw nonetheless granted and assigned to Virgin Records all exclusive rights of the copyright in and to the sound recordings, which was to "constitute an irrevocable transfer to us of ownership of copyright (and all renewals and extensions) in those Master Recordings."  Ex. 24, UMG0027890-0027935 (Straw Recording Agreement at ¶ 6(a)).  Ex. 30 (Recording | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 27 ¶ 6(a) ("If [Virgin] shall be deemed not to be the author of those Master Recordings, this Contract shall constitute an irrevocable transfer to [Virgin] of ownership of copyright . . . in those Master Recordings."). *Compare id.*, *with* Cronin Decl., Ex. 30 (reflecting variations in the purported "generic assignment language," for example:  (1) "execute and deliver to us such |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| Agreement Summary Exhibit) (for a discussion of the relevant excerpts of the Class Members' recording agreements). | instruments of transfer and other documents regarding our rights in the Master recordings subject to this agreement as we may reasonably request to carry out the purpose of this agreement"  (Alexander O'Neal agreement); (2) "will execute and deliver to Company a written assignment . . . of all sound recording copyright rights" (Asia and Atlantic Starr agreements); (3) "To the extent, if any, that I may be deemed an 'author' of any Work, I hereby grant and assign to Company all rights of any nature whatsoever (including but not limited to the exclusive copyrights therein and thereto)" (Bill Medley agreement) and (4) no "assignment language" referenced in Ex. 30 (Beat Rodeo, Blue Angel, Sa-Fire, and Let's Active agreements)). |
| 282.    Straw created sound recordings in Surprise in or around 1988.  Ex. 23, Straw Dep. Tr. at 49:2-20 (noting that creating the sound recordings in Surprise only "only took the better part of a year" and were completed "before Christmas of that year, 1988"). | Undisputed that *Surprise* was created during the specified time period. Disputed that Straw created the sound recordings, including because the purported fact is vague and ambiguous as to the meaning of "created sound recordings in *Surprise*."<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 276. |
| 283.    Straw exercised complete artistic control over the sound recordings. Straw Decl. at ¶ 10.  Ex. 23, Straw Dep. Tr. at 167:10-168:4. Ex. 23, Straw Dep. Tr. at 61:11-62:10 (Referring to Virgin Records, Straw testified that "all they controlled was the recording fund. I did everything else"). Ex. 23, Straw Dep. Tr. at 63:15-23 ("Again, all [Virgin Records] did was pay the bills for the people that I decided to work with.").  Ex. 23, Straw Dep. Tr. at 97:4-98:6 (Straw testified that "Virgin Records let me do whatever I told them I was doing, which was very bold and brave of them to give me full range"). | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 27 ¶ 4(a) (providing that "[Straw] and [Virgin] shall mutually designate the producer of each of the Masters, the Musical Compositions or other selections which shall be embodied in those Masters, and the studios at which those Masters shall be recorded"); *id.* ¶ 4(d) ("[Virgin]'s representatives may attend recording sessions for the Masters."); *id.* ¶ 4(e) (providing that Virgin had the right to approve any sound recordings "as commercially and technically satisfactory for the manufacture and sale of Phonograph Records," and the right to require |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | Straw to re-record any music selection "until a Master commercially and technically satisfactory to [Virgin] shall have been obtained"); Gilford Decl., Ex. 1 at 64:17-65:12, 92:6-93:22 (Straw testifying that Virgin paid for the producers and musicians through the recording fund for the album); *id.* at 83:6-23, 84:4-15, 86:8-89:2, 92:6-97:3 (Straw testifying regarding the various contributors such as musicians, vocalists, and musicians that contributed to the creation of the sound recordings in *Surprise*, and that they were paid from recording fund provided by Virgin); McMullan Decl., Ex. 32 ¶¶ 3(a), 4 (reflecting agreement between Straw and producer Anthony Moore that recording sessions would be conducted under Virgin's recording license, that times and locations of recording the sound recordings were to be mutually designated by Virgin and Straw, and that Moore and Straw were Virgin's "employee for hire"); *id.*, Ex. 33 ¶¶ 3(a), 4 (reflecting agreement between Straw and producer Van Dyke Parks that recording sessions would be conducted under Virgin's recording license, that times and locations of recording the sound recordings were to be mutually designated by Virgin and Straw, and that Park and Straw were Virgin's "employee for hire"); *id.*, Ex. 34 (reflecting Virgin's approval of Straw engaging Michael Stipe as a vocalist for one of the sound recordings on *Surprise* and agreement to pay Stipe). |
| 284.    Straw chose what session musician(s) to work with.  Ex. 23, Straw Dep. Tr. at 63:15-23, 167:10-168:4.  Ex. 23, Straw Dep. Tr. at 61:11-62:10 ("I already had sessions organized and all the musicians organized and people waiting for me to show up and record my songs, so I was ready to go, but [Virgin Records was] not.").  Ex. 23, Straw Dep. Tr. at 92:17-93:8 (Straw "hired" Anton Fier "to play drums on two tracks," and Richard Thompson "to play guitar"). | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 283. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 285.  Straw chose what producer(s) to work with.  Ex. 23, Straw Dep. Tr. at 61:11-62:10, 63:15-23, 66:3-23, 167:10-168:4. | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 283. |
| 286.  Straw chose what sound engineer(s) to work with.  Ex. 23, Straw Dep. Tr. at 61:11-62:10, 63:15-23, 167:10-168:4. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 23 at 61:11-62:10, 63:15-23, 167:10-168:4 (no reference to Straw selecting any sound engineers for the recording of *Surprise*); *see also supra* Defendants' Response and controverting evidence to No. 283. |
| 287.  Straw selected the sound recordings that were included on Surprise. Straw Decl. at ¶ 12.  Ex. 23, Straw Dep. Tr. at 97:4-98:6, 119:1-121:7, 167:10-168:4. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 27 ¶ 4(e) (providing that Virgin had the right to approve any sound recordings "as commercially and technically satisfactory for the manufacture and sale of Phonograph Records," and the right to require Straw to re-record any music selection "until a Master commercially and technically satisfactory to [Virgin] shall have been obtained"); *see* Gilford Decl., Ex. A ¶¶ 25-26. |
| 288.  Straw selected the sound recordings that were released as singles.  Straw Decl. at ¶ 12.  Ex. 23, Straw Dep. Tr. at 97:4-98:6 (when referring to the sound recordings Think Too Hard and Future 40s, Straw testified that she chose them as singles because she "just thought that they were the most effective, catchy songs for immediate public consumption to announce my solo artist arrival into the world"). | Disputed.<br><br>Defendants' Controverting Evidence:<br>Gilford Decl., Ex. I at 97:18-98:6 (Straw testifying that Virgin agreed with the sound recordings to be released as singles); *see id.*, Ex. A ¶¶ 25-26; Ransom Decl., Exs. F-G (reflecting that Virgin released singles from *Surprise*). |
| 289.  Virgin Records never provided Straw with any input or guidance regarding the sound or direction of the sound recordings Straw created.  Straw Decl. at ¶ 10.  Ex. 23, | Disputed.<br><br>Defendants' Controverting Evidence: |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| Straw Dep. Tr. at 167:10-168:4.  Ex. 23, Straw Dep. Tr. at 61:11-62:10 (Referring to Virgin Records, Straw testified that "all they controlled was the recording fund. I did everything else").  Ex. 23, Straw Dep. Tr. at 63:15-23 ("Again, all [Virgin Records] did was pay the bills for the people that I decided to work with.").  Ex. 23, Straw Dep. Tr. at 97:4-98:6 (Straw testified that "Virgin Records let me do whatever I told them I was doing, which was very bold and brave of them to give me full range"). | *See supra* Defendants' Response and controverting evidence to No. 276. |
| 290.    Virgin Records never told Straw that she had to show up at a studio at a certain time to create the sound recordings.  Straw Decl. at ¶ 10. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 4(a) (providing that Virgin had the right to designate the studios at which the sound recordings would be recorded); *id.* ¶ 4(e) (providing that Virgin had the right to approve any sound recordings "as commercially and technically satisfactory for the manufacture and sale of Phonograph Records," and the right to require Straw to re-record any music selection "until a Master commercially and technically satisfactory to [Virgin] shall have been obtained"); *id.*, Ex. 33 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *id.*, Ex. 32 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *see also supra* Defendants' Response and controverting evidence to No. 276. |
| 291.    On June 21, 1989, Straw released *Surprise*.  Ex. 23, Straw Dep. Tr. at 54:16-55:1.  Ex. 25, UMG0028535-0028536 (Copyright Registration Certificate). | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Cronin Decl., Ex. 23 at 54:16-55:1 (no reference to who released *Surprise*); SAC ¶ 162 (alleging that Virgin released *Surprise*); McMullan Decl., Ex. 35 (reflecting that Virgin published *Surprise*); Gilford Decl., Ex. I at 52:4-53:4, 54:8-15 (Straw testifying that when *Surprise* was completed and Straw |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | wanted the record to be released, Virgin made the decision to hold back releasing the album multiple times due to other priorities at the record label). |
| 292.     Surprise contains eleven original sound recordings created by Straw: *(1) Think Too Hard; (2) Heart of Darkness; (3) Chasing Vapor Trails (His Turn to Cry); (4) Almost Magic; (5) Crazy American; (6) Hard Times; (7) Future 40's (String of Pearls); (8) The Unanswered Question; (9) Sphinx; (10) Racing To The Ruins; and (11) Golden Dreams.* Ex. 23, Straw Dep. Tr. at 47:9-49:1. | Undisputed that *Surprise* contains the listed sound recordings.  Disputed that Straw created the sound recordings.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 276. |
| 293.     Shortly thereafter, Virgin Records filed a copyright application with the U.S. Copyright Office to register Surprise.  Ex. 25, UMG0028535-0028536 (Copyright Registration Certificate). | Undisputed. |
| 294.     The copyright application categorized Surprise as a "sound recording" (and not as a "compilation" or "collective work").  Ex. 25, UMG0028535-0028536 (Copyright Registration Certificate). | Undisputed that the copyright registration for *Surprise* identifies it as a sound recording. Disputed that the copyright application forms permitted or required such a characterization, and further disputed because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 35 (identifying *Surprise* as a "work made for hire"; no indication that the copyright application form permitted or required Virgin to characterize the album as a collective work or a compilation). |
| 295.     The U.S. Copyright Office issued Virgin Records a Certificate of Registration for Surprise.  Ex. 25, UMG0028535-0028536 (Copyright Registration Certificate). | Undisputed. |
| 296.     On December 5, 1990, Virgin Records terminated the Straw Recording Agreement and ended its relationship with Straw.  Ex. 26, UMG0027938 (Letter Terminating Straw Recording Agreement). | Undisputed. |
| 297.     More than three decades after the release of Surprise, on June 21, 2016, Straw served a notice of termination upon | Disputed, including because the cited evidence does not support the purported fact. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| Defendant Universal Music Recordings, Inc. ("UMG") as an agent for Capitol.  Ex. 27, UMG0027939-0027941 (Straw Notice of Termination). | Defendants' Controverting Evidence: McMullan Decl., Ex. 36 (reflecting Straw's putative termination notice was served upon "Universal Music Group" as "successor-in-interest to Virgin Records America, Inc."); *id.*, Ex. 35; Gilford Decl., Ex. I at 110:22-111:20 (authenticating Dep. Ex. 77). |
| 298.    Straw's counsel subsequently caused the notice of termination to be recorded in the U.S. Copyright Office, as document V9964 D257 P1 through P3.  Ex. 28, P03585-03594 (Certificate of Recordation of the Straw Notice of Termination with the U.S. Copyright Office). | Undisputed. |
| 299.    On December 16, 2016, Defendants sent Straw a letter setting forth their contentions for their claims that Straw's notice of termination was invalid, arguing in part that the sound recordings in Surprise were works made "for hire" or "compilations" not subject to termination under Section 203 of the Copyright Act.  Ex. 29, UMG0027873-0027881 (Defendants' Counter Notice to Straw's Notice of Termination). | Disputed that "Defendants" sent Straw the referenced letter. <br><br> Defendants' Controverting Evidence: McMullan Decl., Ex. 37 (reflecting that the letter was sent on behalf of Capitol). |
| 300.    The effective date of termination for Straw's sound recordings in Surprise is approximately June 22, 2024.  Ex. 28, UMG0027939-0027941 (Straw Notice of Termination). | Disputed, including because the purported fact is vague and ambiguous as to the meaning of "approximately June 22, 2024." <br><br> Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 276; McMullan Decl., Ex. 36 (identifying June 22, 2024 as the putative "Effective Date of Termination" for *Surprise*). |
| 301.    Straw exercised complete artistic control over the sound recordings in Surprise, without input from Virgin Records.  Straw Decl. at ¶ 10.  Ex. 23, Straw Dep. Tr. at 167:10-168:4.  Ex. 23, Straw Dep. Tr. at 61:11-62:10 (Referring to Virgin Records, Straw testified that "all they controlled was the recording fund. I did everything else"). Ex. 23, Straw Dep. Tr. at 63:15-23 ("Again, all [Virgin Records] did was pay the bills for | Disputed. <br><br> Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 283. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| the people that I decided to work with."). Ex. 23, Straw Dep. Tr. at 97:4-98:6 (Straw testified that "Virgin Records let me do whatever I told them I was doing, which was very bold and brave of them to give me full range"). | |
| 302.    Straw chose what session musician(s) to work with. Ex. 23, Straw Dep. Tr. at 63:15-23, 167:10-168:4.  Ex. 23, Straw Dep. Tr. at 61:11-62:10 ("I already had sessions organized and all the musicians organized and people waiting for me to show up and record my songs, so I was ready to go, but [Virgin Records was] not.").  Ex. 23, Straw Dep. Tr. at 92:17-93:8 (Straw "hired" Anton Fier "to play drums on two tracks," and Richard Thompson "to play guitar"). | Disputed. Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 283. |
| 303.    Straw selected the sound recordings that were included on Surprise.  Straw Decl. at ¶ 12.  Ex. 23, Straw Dep. Tr. at 97:4-98:6, 119:1-121:7, 167:10-168:4. | Disputed. Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 6(a) ("[Virgin] . . . shall have the exclusive, perpetual Territorywide right to manufacture, sell, distribute, and advertise Phonograph Records and other reproductions embodying those Master Recordings . . . (it being understood that [Virgin's] initial United States release of each Single and LP . . . shall be on our "top-line" label . . . and to lease, license, convey and otherwise exploit and use those Master Recordings by any method . . . all upon such terms as we may approve[.]"); *see* Gilford Decl., Ex. A ¶¶ 25-26. |
| 304.    Straw selected the sound recordings that were released as singles.  Straw Decl. at ¶ 12.  Ex. 23, Straw Dep. Tr. at 97:4-98:6 (when referring to the sound recordings Think Too Hard and Future 40s, Straw testified that she chose them as singles because she "just thought that they were the most effective, catchy songs for immediate public consumption to announce my solo artist arrival into the world"). | Disputed. Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 6(a) ("[Virgin] . . . shall have the exclusive, perpetual Territorywide right to manufacture, sell, distribute, and advertise Phonograph Records and other reproductions embodying those Master Recordings . . . (it being understood that [Virgin's] initial United States release of each Single and LP . . . shall be on our "top- |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | line" label . . . and to lease, license, convey and otherwise exploit and use those Master Recordings by any method . . . all upon such terms as we may approve[.]");Gilford Decl., Ex. I at 97:18-98:6 (Straw testifying that Virgin agreed with the sound recordings to be released as singles); *see id.*, Ex. A ¶¶ 25-26; Ransom Decl., Exs. F-G. |
| 305.    Virgin Records never provided Straw with any input or guidance regarding the sound or direction of the sound recordings Straw created.  Straw Decl. at ¶ 10.  Ex. 23, Straw Dep. Tr. at 167:10-168:4.  Ex. 23, Straw Dep. Tr. at 61:11-62:10 (Referring to Virgin Records, Straw testified that "all they controlled was the recording fund. I did everything else").  Ex. 23, Straw Dep. Tr. at 63:15-23 ("Again, all [Virgin Records] did was pay the bills for the people that I decided to work with.").  Straw Dep. Tr. at 97:4-98:6 (Straw testified that "Virgin Records let me do whatever I told them I was doing, which was very bold and brave of them to give me full range"). | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 276. |
| 306.    Virgin Records never told Straw that she had to show up at a studio at a certain time to create the sound recordings.  Straw Decl. at ¶ 10. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 4(a) (providing that Virgin had the right to designate the studios at which the sound recordings would be recorded); *id.* ¶ 4(e) (providing that Virgin had the right to approve any sound recordings "as commercially and technically satisfactory for the manufacture and sale of Phonograph Records," and the right to require Straw to re-record any music selection "until a Master commercially and technically satisfactory to [Virgin] shall have been obtained"); McMullan Decl., Ex. 33 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *id.*, Ex. 32 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"). |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 307.    Straw has been a singer, songwriter, and performer for over four decades. Straw Decl. at ¶ 1. Ex. 23, Straw Dep. Tr. at 27:8-24. | Undisputed. |
| 308.    Throughout her career, Straw received critical acclaim for her vocal performances with the Golden Palominos and released numerous solo projects.  Straw Decl. at ¶ 1. | Disputed, including because the cited evidence does not support the purported fact.<br><br>Defendants' Controverting Evidence: Declaration of Susan Straw Harris in support of Pls.' Mot. for Class Cert. and Mot. for Partial Summ. J. [ECF No. 181] ("Straw Decl.") ¶ 1 (no reference to Straw receiving "critical acclaim for her vocal performances with the Golden Palominos"). |
| 309.    Straw is a highly skilled professional musician. Ex. 23, Straw Dep. Tr. at 27:8-24. | Undisputed. |
| 310.    Straw has never been an employee of Virgin Records or Defendants.  Straw Decl. at ¶ 2. Ex. 23, Straw Dep. Tr. at 77:2-6 ("I see the misleading language including 'employees for hire,' which I certainly never was."). | Disputed.<br><br>Defendants' Controverting Evidence: See supra Defendants' Response and controverting evidence to No. 276. |
| 311.    Straw never received a salary from Virgin Records or Defendants.  Straw Decl. at ¶ 3. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶¶ 8, 9 (reflecting that Virgin paid Straw advances, including a $35,000 signing advance and the option to obtain all or part of a $150,000 recording fund advance, plus royalties, for her exclusive recording services); id., Exs. 28, 29, 31 (examples of royalty statements issued to Straw). |
| 312.    Straw never received a paycheck from Virgin Records or Defendants in which they withheld any income taxes, social security, or other comparable payments.  Straw Decl. at ¶ 4. | Undisputed. |
| 313.    Straw never received a W-2 from Virgin Records or Defendants.  Straw Decl. at ¶ 5. | Undisputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 314.    Straw never received health or life insurance benefits from Virgin Records or Defendants.  Straw Decl. at ¶ 6. | Undisputed. |
| 315.    Straw never received paid vacation or sick leave from Virgin Records or Defendants.  Straw Decl. at ¶ 9. | Undisputed. |
| 316.    Straw was never provided with an office by Virgin Records or Defendants. Straw Decl. at ¶ 8. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 4(a) (providing that Virgin had the right to designate the studios at which the sound recordings would be recorded); *id.* ¶ 4(e) (providing that Virgin had the right to approve any sound recordings "as commercially and technically satisfactory for the manufacture and sale of Phonograph Records," and the right to require Straw to re-record any music selection "until a Master commercially and technically satisfactory to [Virgin] shall have been obtained"); *id.*, Ex. 33 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *id.*, Ex. 32 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); Gilford Decl., Ex. I at 55:17-56:3, 63:3-23 (Straw testifying that Virgin provided and "controlled" the recording fund, and that Virgin paid for all recording costs). |
| 317.    Straw was never provided with a secretary or any other type of assistant by Virgin Records or Defendants.  Straw Decl. at ¶ 8. | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 283. |
| 318.    Virgin Records did not deduct or withhold income taxes, social security, or other comparable payments on behalf of Straw.  Straw Decl. at ¶¶ 4-5. | Undisputed. |
| 319.    Virgin Records did not issue W-2 tax forms to Straw.  Straw Decl. at ¶¶ 4-5. | Undisputed. |
| 320.    The Straw Recording Agreement provided that Straw could create sound | Disputed. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| recordings for an initial album. Ex. 24, UMG0027890-0027935 (Straw Recording Agreement at ¶ 1). | Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 2 (providing for an "initial" term of "the later of (i) the date twelve (12) months after the date hereof and (ii) the date eight (8) months after [Straw's] delivery of the First Album" and that Virgin was granted four separate, consecutive, and irrevocable options to renew the agreement); *id.* ¶ 3 (obligating Straw to record and deliver to Virgin a sufficient number of sound recordings to constitute one album during the agreements "initial period"). |
| 321.    The Straw Recording Agreement did not give Virgin Records any authority to assign additional projects outside of that agreement. Ex. 24, UMG0027890-0027935 (Straw Recording Agreement at ¶¶ 1, 3). | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 2 (providing that Virgin had the right to four separate, consecutive, and irrevocable options to renew the agreement after the initial period); *id.* ¶ 23(l) (providing that Virgin had the right to request that Straw assist with the marketing, advertising, and promotion of any recordings created under the agreement, such as engaging in interviews, participating in press conferences, posing at photography sessions, and appearing on television and radio shows); *id.* ¶ 28 (providing that Virgin had the right to request that Straw perform for the purpose of being filmed for promotional and other purposes in connection with exploitation of the sound recordings); Gilford Decl., Ex. I at 45:17-21 (Straw testifying that it was her understanding that part of the recording agreement included that Virgin could renew the agreement for four additional contract periods); *id.* at 98:7-10 (Straw testifying that she made promotional appearances at Virgin's request). |
| 322.    Virgin Records did not assign additional projects to Straw outside of the Straw Recording Agreement. Straw Decl. at ¶ 10. | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 2 (providing that Virgin had the right to four separate, consecutive, and irrevocable options to renew |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
|  | the agreement after the initial period); *id.* ¶ 23(l) (providing that Virgin had the right to request that Straw assist with the marketing, advertising, and promotion of any recordings created under the agreement, such as engaging in interviews, participating in press conferences, posing at photography sessions, and appearing on television and radio shows); *id.* ¶ 28 (providing that Virgin had the right to request that Straw perform for the purpose of being filmed for promotional and other purposes in connection with exploitation of the sound recordings); Gilford Decl., Ex. I at 45:17-21 (Straw testifying that it was her understanding that part of the recording agreement included that Virgin could renew the agreement for four additional contract periods); *id.* at 98:7-10 (Straw testifying that she made promotional appearances at Virgin's request). |
| 323.   Virgin Records did not provide Straw with instruments and tools needed to create the sound recordings.  Straw Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 27 ¶ 8 (reflecting Virgin's obligation to pay Straw advances, including a $35,000 signing advance and the option to obtain all or part of a $150,000 recording fund advance); Gilford Decl., Ex. I at 55:17-56:3, 63:3-23 (Straw testifying that Virgin providing recording funds, "which [Virgin] controlled," and that Virgin paid for all recording costs). |
| 324.   The instruments and tools were either provided by Straw herself or the third-party music studios where she created the sound recordings.  Straw Decl. at ¶ 11. | Disputed.<br><br>Defendants' Controverting Evidence:<br>McMullan Decl., Ex. 27 ¶ 8 (reflecting Virgin's obligation to pay Straw advances, including a $35,000 signing advance and the option to obtain all or part of a $150,000 recording fund advance); Gilford Decl., Ex. I at 55:17-56:3, 63:3-23 (Straw testifying that Virgin providing recording funds, "which |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | [Virgin] controlled," and that Virgin paid for all recording costs). |
| 325.    Straw chose where to create the sound recordings in Surprise without any input from Virgin Records.  Straw Decl. at ¶ 10.  Ex. 23, Straw Dep. Tr. at 167:10-168:4.  Ex. 23, Straw Dep. Tr. at 61:11-62:10 ("I already had sessions organized and all the musicians organized and people waiting for me to show up and record my songs, so I was ready to go, but [Virgin Records was] not."). | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 4(a) (providing that Virgin had the right to designate the studios at which the sound recordings would be recorded); *id.*, Ex. 33 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *id.*, Ex. 32 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *see also supra* Defendants' Response and controverting evidence to No. 276. |
| 326.    Straw chose to create the sound recordings in Surprise in studios across the United States, including New Orleans, Louisiana.  Straw Decl. at ¶ 10. Ex. 23, Straw Dep. Tr. at 88:11-89:1. | Disputed.

Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 4(a) (providing that Virgin had the right to designate the studios at which the sound recordings would be recorded); *id.*, Ex. 33 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *id.*, Ex. 32 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *see also supra* Defendants' Response and controverting evidence to No. 276. |
| 327.    Virgin Records never approved of those studio location choices, but it did pay for the studio time out of the recording fund. Straw Decl. at ¶ 10.  Ex. 23, Straw Dep. Tr. at 61:11-62:10.  Ex. 23, Straw Dep. Tr. at 63:15-23 ("Again, all [Virgin Records] did was pay the bills for the people that I decided to work with."). | Undisputed that Virgin paid for all studio session time.  Disputed that Virgin "never approved of those studio location choices."

Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 4(a) (providing that Virgin had the right to designate the studios at which the sound recordings would be recorded); *id.*, Ex. 33 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *id.*, Ex. 32 ¶ 3(a) (providing that times and locations |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| | of recording "shall be designated by [Virgin] and [Straw]"). |
| 328.    Straw was under contract with Virgin Records from July 20, 1987 to December 5, 1990 (approximately three years).  Ex. 24, UMG0027890-0027935 (Straw Recording Agreement).  Ex. 26, UMG0027938 (Letter Terminating Straw Recording Agreement). | Undisputed. |
| 329.    Virgin Records exercised no discretion over when and for how long Straw should work.  Straw Decl. at ¶ 10. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 4(a) (providing that Virgin had the right to designate the studios at which the sound recordings would be recorded); *id.* ¶ 4(e) (providing that Virgin had the right to approve any sound recordings "as commercially and technically satisfactory for the manufacture and sale of Phonograph Records," and the right to require Straw to re-record any music selection "until a Master commercially and technically satisfactory to [Virgin] shall have been obtained"); *id.*, Ex. 33 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *id.*, Ex. 32 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *see also supra* Defendants' Response and controverting evidence to No. 276. |
| 330.    Straw chose when and where to create the sound recordings in *Surprise*.  Straw Decl. at ¶ 10.  Ex. 23, Straw Dep. Tr. at 61:11-62:10, 167:10-168:4. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶ 4(a) (providing that Virgin had the right to designate the studios at which the sound recordings would be recorded); *id.*, Ex. 33 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *id.*, Ex. 32 ¶ 3(a) (providing that times and locations of recording "shall be designated by [Virgin] and [Straw]"); *see also supra* Defendants' Response and controverting evidence to No. 276. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 331.    Straw never received a salary from Virgin Records or Defendants.  Straw Decl. at ¶¶ 4-5. | Disputed.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶¶ 8, 9 (reflecting that Virgin paid Straw advances, including a $35,000 signing advance and the option to obtain all or part of a $150,000 recording fund advance, plus royalties, for her exclusive recording services); *id.*, Exs. 28, 29, 31 (examples of royalty statements issued to Straw). |
| 332.    Straw never received a paycheck from Virgin Records or Defendants in which they withheld any income taxes, social security, or other comparable payments. Straw Decl. at ¶¶ 4-5. | Undisputed. |
| 333.    Instead, Virgin Records provided Straw with an advance in the form of a recording fund, which was recoupable. Ex. 24, UMG0027890-0027935 (Straw Recording Agreement at ¶ 8). | Undisputed that Virgin paid Straw a recoupable advance pursuant to the recording agreement.  Disputed to the extent the purported fact suggests that an advance does not constitute a salary.<br><br>Defendants' Controverting Evidence: McMullan Decl., Ex. 27 ¶¶ 8, 9 (reflecting that Virgin paid Straw advances, including a $35,000 signing advance and the option to obtain all or part of a $150,000 recording fund advance, plus royalties, for her exclusive recording services); *id.*, Exs. 28, 29, 31 (examples of royalty statements issued to Straw). |
| 334.    Straw used the recording fund to create the sound recordings in *Surprise*. Ex. 23, Straw Dep. Tr. at 58:11-65:12. Ex. 23, Straw Dep. Tr. at 58:11-22 (Straw testified that the recording funds were "the money that [Virgin Records] contractually promised to me to go out into the world and record my first album"). Ex. 23, Straw Dep. Tr. at 58:23-59:6 ("[O]nce I decided and got everyone organized, then I would bill Virgin Records for my expenses, and that came out of the recording fund which [Virgin Records] held onto.") | Disputed.<br><br>Defendants' Controverting Evidence: *See supra* Defendants' Response and controverting evidence to No. 276. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
| 335.    Straw was not provided with any secretary or assistant by Virgin Records or Defendants.  Straw Decl. at ¶ 8. | Disputed.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 283. |
| 336.    Straw is a singer, songwriter, and performer.  Straw Decl. at ¶ 1.  Ex. 23, Straw Dep. Tr. at 27:8-24. | Undisputed. |
| 337.    As a singer, songwriter, and performer, Straw creates sound recordings.  Straw Decl. at ¶¶ 1, 10.  Ex. 23, Straw Dep. Tr. at 27:8-24. | Disputed to the extent "Straw creates sound recordings" is intended to suggest that Straw created the album *Surprise*.<br><br>Defendants' Controverting Evidence:<br>*See supra* Defendants' Response and controverting evidence to No. 276. |
| 338.    Virgin Records itself did not create sound recordings. Rather, Virgin Records was in the business of distributing and promoting sound recordings.  Ex. 4, McMullan Dep. I Tr. at 55:5-19.  Ex. 23, Straw Dep. Tr. at 25:24-25:7, 98:7-10. | Disputed, including because the cited evidence does not support the purported fact. The citation to "Ex. 23, Straw Dep. Tr. at 25:24-25:7" is illogical; to the extent Plaintiffs intended to cite pages 24:24-25:7, the cited evidence still does not support the purported fact.  Plaintiffs did not submit page 55 of "Ex. 4, McMullan Dep. I Tr." with their motion.<br><br>Defendants' Controverting Evidence:<br>Cronin Decl., Ex. 23 at 24:24-25:7, 25:24-25:7, 98:7-10 (no indication that Virgin's business did not include creating sound recordings); McMullan Decl. ¶¶ 5, 9 (Virgin's regular business involved making and distributing recorded music). |
| 339.    Virgin Records is a predecessor of Defendant Capitol Records, LLC.  Ex. 5, P03016-03018 (Defendant UMG's Webpage Showing "Our Labels & Brands"). | Undisputed. |
| 340.    Virgin Records no longer exists as a separate entity apart from Defendants.  Ex. 5, P03016-03018 (Defendant UMG's Webpage Showing "Our Labels & Brands").  Ex. 23, Straw Dep. Tr. at 24:10-21. | Disputed as vague and ambiguous as to "separate entity apart from Defendants." Virgin was merged into Capitol, which succeeded to Virgin's rights and obligations and continues the same business of making and distributing recorded music. |

| Plaintiffs' Alleged Undisputed Facts | Defendants' Response |
|---|---|
|  | <u>Defendants' Controverting Evidence:</u><br>SAC ¶¶ 31, 161; McMullan Decl. ¶¶ 7, 9. |

**DEFENDANTS' ADDITIONAL MATERIAL FACTS**

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 1.      EMI America Records, Inc. ("EMI") was in the business of making and distributing recorded music. | McMullan Decl. ¶¶ 5, 9. |
| 2.      On September 29, 1980, EMI and Plaintiff Kasim Sulton ("Sulton") entered into a recording agreement for Sulton's exclusive personal services as a performer on phonograph records ("Sulton Agreement"). | McMullan Decl., Ex. 1 at ¶ 1 (reflecting that EMI "does hereby engage the exclusive personal services of [Sulton] as a performer on phonograph records"); *id.* ¶¶ 1, 4. |
| 3.      Sulton was represented by counsel in connection with negotiating the Sulton Agreement. | Gilford Decl., Ex. E at 81:20-82:10 (Sulton testifying that he was represented by Bernard Fischbach in connection with negotiations with EMI, and that Sulton reviewed the final contract before he signed it; Ransom Decl., Ex. A at 4 (responses to Request for Admission Nos. 3 through 7, in which Sulton admits that he was represented by counsel in connection with his recording agreement, had the opportunity to consult with counsel with respect to the recording agreement before signing it, and that Sulton reviewed the recording agreement before he signed it). |
| 4.      The initial term of the Sulton Agreement was for eighteen months, and Sulton agreed to "grant to [EMI] four (4) separate, consecutive and irrevocable options to renew and extend the term of this agreement for periods of one (1) year(s) each." | McMullan Decl., Ex. 1 ¶ 2. |
| 5.      The Sulton Agreement obligated Sulton "to record for [EMI] that minimum number of satisfactory studio-originated single record sides containing only material not previously recorded by [Sulton] ("Masters") as shall constitute two (2) long-playing phonograph record(s) ('Albums' or 'LP's') or the equivalent thereof in playing time, during the initial term of this agreement." | McMullan Decl., Ex. 1 ¶ 3. |
| 6.      The Sulton Agreement states that EMI "may at its option, during each option period, | McMullan Decl., Ex. 1 ¶ 3. |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| require [Sulton] to record sufficient masters as to constitute one (1) additional album or the equivalent thereof in playing time." | |
| 7.      The Sulton Agreement states that Sulton "agrees to appear at all recording sessions required by [EMI] at times and places and in studios designated by [EMI]," that "[t]he individual producer(s) of each album to be recorded hereunder shall be [m]utually  designated by [EMI] and [Sulton]," that Sulton "agrees to render his services hereunder to the best of his ability, and he will make proper preparations for such sessions and will rehearse, record, and re-record the selected musical compositions and will comply with [EMI]'s instructions until an acceptable master recording is obtained," and that "[e]ach recording shall be subject to the sole approval of [EMI] as to whether it is satisfactory for the manufacture and sale of phonograph records." | McMullan Decl., Ex. 1 ¶ 3. |
| 8.      Under the Sulton Agreement, EMI has "the complete, unconditional, exclusive, perpetual, unencumbered and universe-wide" rights in "all results and proceeds of [Sulton]'s services and performances hereunder, including the exclusive ownership of any and all masters and all records and reproductions made therefrom together with all universal copyrights and copyright rights" and that EMI shall be "deemed [Sulton]'s employer for hire." | McMullan Decl., Ex. 1 ¶ 6(a) . |
| 9.      The Sulton Agreement further states that Sulton "acknowledges and agrees" that any sound recording recorded pursuant to the agreement was "prepared within the scope of [EMI]'s engagement of [Sulton]'s personal services and is a work made for hire, or . . . as part of an LP-master, constitutes a work specially ordered by [EMI] as a contribution to a collective work and shall be considered a work made for hire." | McMullan Decl., Ex. 1 ¶ 6(a)(i). |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 10.     The Sulton Agreement also states that "[Sulton] further acknowledges that [EMI] is the exclusive owner of copyright with respect to each such master and any 'sound recording' or 'phonorecord' or 'copy' manufactured therefrom . . . and that [EMI] has the right to exercise all rights of the copyright proprietor thereto, including but not limited to:  all exclusive rights specified in 17 U.S.C. Section 106 and the exclusive right to register copyright in the name of [EMI]." | McMullan Decl., Ex. 1 ¶ 6(a)(i). |
| 11.     The Sulton Agreement states that Sulton "will, from time to time, at [EMI]'s request . . . appear for photography, art work and similar reasons under the direction of [EMI] or its duly authorized agent; appear for interviews . . . ; and confer and consult with [EMI] regarding [Sulton]'s performance hereunder and other matters which may concern the parties hereto." | McMullan Decl., Ex. 1 ¶ 8. |
| 12.     The Sulton Agreement also provided that Sulton "will also, if requested by [EMI] . . . make personal appearances on radio and television and elsewhere, and record taped interviews, spot announcements, trailers and electrical transcriptions, all for the purpose of advertising, promoting, publicizing and exploiting phonograph records recorded by [Sulton] hereunder and for other general public relations or promotional purposes related to the business of [EMI]." | McMullan Decl., Ex. 1 ¶ 8. |
| 13.     The Sulton Agreement obligated EMI to pay Sulton a $100,000 advance plus royalties. | McMullan Decl., Ex. 1 ¶ 9. |
| 14.     The Sulton Agreement provides that "[n]o artist, masters, recording studios or other personnel or facilities for the recording sessions hereunder shall be engaged except pursuant to a written authorization signed by one of [EMI]'s officers.  The written authorization to conduct such session or sessions shall indicate that a maximum amount which may be expended for the | McMullan Decl., Ex. 1 ¶ 11(a). |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| session or sessions authorized (the 'Authorized Budget Amount'). [EMI] shall pay the actual recording costs incurred for the sessions hereunder up to the Authorized Budget Amount." | |
| 15.      The Sulton Agreement provides that EMI "may request [Sulton] to perform at sessions for the purposes of embodying his performances on videotape and/or film[.]" | McMullan Decl., Ex. 1 ¶ 22. |
| 16.      Sulton assigned the Sulton Agreement to ICDA, Inc. | McMullan Decl., Ex. 2. |
| 17.      Sulton's assignment of the Sulton Agreement to ICDA provides that Sulton and ICDA "acknowledge that EMI is the exclusive owner of all rights of copyright in records embodying the results and proceeds of [Sulton's] services, including the exclusive right to copyright same as 'sound recordings' in the name of EMI, . . . (it being agreed that for this purpose that [Sulton and] all persons rendering services in connection with the recording of master recordings pursuant to the [Sulton] Agreement . . . is deemed EMI's employee for hire), and to exercise all rights of the copyright proprietor thereunder." | McMullan Decl., Ex. 2, Artist Decl. ¶ 1(f) & ¶ 1. |
| 18.      EMI paid Sulton advances for his services. | McMullan Decl., Exs. 3, 4. |
| 19.      EMI contracted with, approved, and paid Bruce Fairbairn to provide producer services for the album *Kasim*. | McMullan Decl., Ex. 1 ¶ 11(a); *id.*, Exs. 12-15; Gilford Decl., Ex. E at 101:22-102:6; *id.* at 124:23-125:19 (Sulton testifying that "if EMI didn't agree to it, Mr. Fairbairn would not—I wouldn't have been in the studio with Mr. Fairbairn."). |
| 20.      EMI engaged, approved, and paid Roy Thomas Baker to provide producer services on the album *Kasim*. | McMullan Decl., Ex. 1 ¶ 11(a); *id.*, Exs. 17, 21, 29. |
| 21.      The producers EMI engaged to create the master sound recordings that would ultimately be assembled into *Kasim* (Roy Baker and Bruce Fairbairn) acknowledged in their contracts that their services were for contributions to a collective work. | McMullan Decl., Ex. 12 ¶ 3(b)(i); *id.*, Ex. 16 ¶ 3(b)(i). |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 22.     EMI approved and paid Willie Wilcox to provide producer services for the album *Kasim*. | McMullan Decl., Ex. 1 ¶ 11(a); *id.*, Exs.  18, 19. |
| 23.     EMI approved, engaged, obtained clearances for (*i.e.*, obtained the consent of another record label to allow an artist signed exclusively to that label to perform for EMI for a specific project) and paid Elliot Easton to provide sideman performances on the album *Kasim*. | McMullan Decl., Ex. 1 ¶ 11(a); *id.*, Ex. 23. |
| 24.     EMI approved, engaged, and obtained a clearance for Roger Powell to provide sideman performances on the album *Kasim*. | McMullan Decl., Ex. 1 ¶ 11(a); *id.*, Ex.  20. |
| 25.     EMI approved, engaged, and obtained a clearance for Buck Dharma to provide sideman performances on the album *Kasim*. | McMullan Decl., Ex. 1 ¶ 11(a); *id.*, Ex.  21. |
| 26.     EMI approved, engaged, and obtained a clearance for Jim Steinman to provide sideman performances on the album *Kasim*. | McMullan Decl., Ex. 1 ¶ 11(a); *id.*, Ex. 22. |
| 27.     EMI paid for the recording costs, including studio costs, for the album *Kasim*. | Gilford Decl., Ex. E at 110:24-25; 111:19-23. |
| 28.     EMI purchased or rented equipment for Sulton. | McMullan Decl., Ex. 3. |
| 29.     EMI paid for the costs of manufacturing and packaging phonograph copies of *Kasim*, and for costs to promote the album. | Gilford Decl., Ex. E at 111:24-112:13; McMullan Decl.,, Ex. 1 ¶ 12. |
| 30.     EMI paid for Sulton's personal expenses. | McMullan Decl., Ex. 11. |
| 31.     EMI paid for tour support related to the album *Kasim*. | McMullan Decl., Exs. 3, 5. |
| 32.     EMI entered into a leasing agreement and paid the rent for a home in Los Angeles for Sulton to reside in while *Kasim* was being recorded. | McMullan Decl., Exs. 6, 7, 9. |
| 33.     At least one EMI executive attended recording sessions for *Kasim*. | Gilford Decl., Ex. E at 113:11-21. |
| 34.     On January 11, 1982, EMI released *Kasim*, an album containing ten individual sound recordings embodying Sulton's performances. | SAC ¶ 95; Gilford Decl., Ex. E at 91:8-13. |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 35.     EMI released certain individual tracks from *Kasim* as singles. | Ransom Decl., Exs. D, E. |
| 36.     On January 20, 1982, EMI obtained a registration for the copyright in *Kasim*. | McMullan Decl., Ex. 24. |
| 37.     The copyright registration states that EMI is the author of *Kasim* as a "work made for hire." | McMullan Decl., Ex. 24. |
| 38.     Capitol thereafter succeeded to EMI's rights and obligations under the Sulton Agreement, including ownership of the copyright in *Kasim*. | McMullan Decl. ¶ 6. |
| 39.     Virgin Records America, Inc. ("Virgin") was in the business of making and distributing recorded music. | McMullan Decl. ¶¶ 5, 9. |
| 40.     Virgin became interested in Plaintiff Susan Straw Harris ("Straw") as a recording artist and approached her about joining the label as a solo artist. | Gilford Decl., Ex. I at 24:22-25:18, 27:13-24; *id.* at 75:10-22 (Straw testifying that she "knew that [she] was going out into the world to make a record for Virgin Records America."). |
| 41.     On July 20, 1987, Virgin entered into an exclusive recording agreement with Straw for the purpose of creating sound recordings embodying Straw's performances ("Straw Agreement"). | McMullan Decl., Ex. 27 ¶ 1 ("During the term of this contract . . . [Straw] shall . . . furnish to [Virgin] [Straw's] . . . exclusive services . . . for the purpose of recording and delivering to [Virgin] Masters."); *id.* 13(a). |
| 42.     Straw was represented by counsel in connection with negotiating the Straw Agreement. | McMullan Decl., Ex. 27 ¶ 22 (providing that all notices to Straw required under the agreement shall be sent to Stuart Silfen, P.C.); Gilford Decl., Ex. I at 31:4-20, 43:7-18 (Straw testifying that she was represented by a lawyer in connection with her recording agreement, and that she had an opportunity to ask him questions about the agreement before she signed it); Ransom Decl., Ex. C at 4-5 (responses to Request for Admission Nos. 1 through 6, in which Straw admits she was represented by counsel in connection with her recording agreement, and reviewed the agreement before she signed it). |
| 43.     The initial term of the Straw Agreement "commenc[ed] as of the date hereof and shall continue until the later of (i) the date twelve (12) months after the date hereof and (ii) the date eight (8) months after | McMullan Decl., Ex. 27 ¶ 2. |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| [Straw's] delivery to [Virgin] of the First Album." | |
| 44.      The Straw Agreement states that Straw "hereby grant[s] to [Virgin] four (4) separate, consecutive and irrevocable options, each to renew this Contract for a period commencing consecutively upon the expiration of the proceeding period." | McMullan Decl., Ex. 27 ¶ 2; Gilford Decl., Ex. I at 45:17-21. |
| 45.      The Straw Agreement obligated Straw "[d]uring the initial period of the Term and each option period, if applicable" to "record and deliver to [Virgin] a sufficient number of Masters . . . embodying [Straw's] performances to constitute the number of albums set forth" in the Straw Agreement. | McMullan Decl., Ex. 27 ¶ 3(a); Gilford Decl., Ex. I at 46:24-47:7. |
| 46.      The Straw Agreement states that Virgin and Straw "shall mutually designate the producer of each of the Masters, the Musical Compositions or other selections which shall be embodied in those Masters, and the studios at which those Masters shall be recorded. . . . [Virgin] hereby acknowledge[s] [its] approval of any generally recognized first class recording studio in the continental United States for the recording of the Masters." | McMullan Decl., Ex. 27 ¶ 4(a). |
| 47.      The Straw Agreement provides that Virgin's authorization and approval of recording budgets "shall be entirely within [Virgin's] discretion" and that "if it reasonably appears to [Virgin] that the recording costs will exceed the advance therefor . . . [Virgin] shall have the right to require [Straw] to discontinue recording unless [Straw] can establish to [Virgin's] reasonable satisfaction that [Straw] can and will pay or reimburse [Virgin] for any recording costs in excess of such advance." | McMullan Decl., Ex. 27 ¶ 4(b)(ii). |
| 48.      The Straw Agreement further provided that Virgin's "representatives may attend recording session for the Masters." | McMullan Decl., Ex. 27 ¶ 4(d). |
| 49.      The Straw Agreement required that Straw "deliver to [Virgin] the Masters | McMullan Decl., Ex. 27 ¶¶ 4(e), 18(b). |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| promptly after their completion," that "[e]ach Master shall be subject to [Virgin's] approval as commercially and technically satisfactory for the manufacture and sale of Phonograph Records, and, upon [Virgin's] request, [Straw] shall re-record any Musical Composition or other Selection until a Master commercially and technically satisfactory to [Virgin] shall have been obtained," and that Virgin had the right to terminate the recording agreement if Straw failed to timely deliver the recordings. | |
| 50.      The Straw Agreement also provided that "[e]ach LP shall embody no fewer than eight (8) and no more than ten (10) Musical Compositions." | McMullan Decl., Ex. 27 ¶ 4(f). |
| 51.      The Straw Agreement states that "[a]ll Master Recordings recorded during the Term which embody the Performances of [Straw], from the inception of the recording thereof, shall for purposes of copyright law, be deemed works made for hire for [Virgin] by [Straw] and all other persons rendering services in connection with those Master Recordings as [Virgin's] employees for hire." | McMullan Decl., Ex. 27 ¶ 6(a). |
| 52.      The Straw Agreement states all sound recordings created pursuant to the Agreement "shall be entirely [Virgin's] property, free of any claims whatsoever by [Straw]," and that Virgin has "the exclusive right to obtain registration of copyright (and all renewals and extensions)" in those sound recordings, "in [Virgin's] name, as the owner and author therefor." | McMullan Decl., Ex. 27 ¶ 6(a). |
| 53.      The Straw Agreement states that Virgin would provide a $150,000 recording fund for the first album to be recorded under the agreement. | McMullan Decl., Ex. 27 ¶ 8(a). |
| 54.      The Straw Agreement obligated Virgin to pay Straw advances, including a $35,000 signing advance, plus royalties. | McMullan Decl., Ex. 27 ¶¶ 8(d), 9. |
| 55.      The Straw Agreement further states that, during its term, Straw "shall not perform | McMullan Decl., Ex. 27¶ 13(a)(i). |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| for the purpose of making phonograph records for distribution or sale in the Territory by or for any other person than [Virgin]." | |
| 56.      The Straw Agreement states that "[u]pon [Virgin's] reasonable notice," Straw "shall render your services, at [Virgin's] sole expense, at such times and places as [Virgin] may reasonably designate for the purpose of assisting [Virgin] in the marketing, advertising and promotion of Phonograph Records hereunder." | McMullan Decl., Ex. 27 ¶ 23(l). |
| 57.      The Straw Agreement states that Virgin had the right to request that Straw perform for the purpose of being filmed "for promotional and other purposes in connection with exploitation of" the sound recordings recorded under the agreement. | McMullan Decl., Ex. 27 ¶ 28. |
| 58.      Virgin paid Straw advances and royalties for her services. | McMullan Decl., Ex. 27 ¶¶ 8(a), (d), 9; id., Exs. 28-31. |
| 59.      Virgin approved of and paid Anthony Moore to serve as producer for the sound recordings that would ultimately be included in the album *Surprise*. | McMullan Decl., Ex.  27 ¶ 4(a); id., Ex. 32 ¶ 3(a); Gilford Decl., Ex. I at 64:17-65:12. |
| 60.      Straw's contract with Moore provided that "recording sessions for the Masters shall be conducted . . . under [Virgin's] recording license at such times and locations as shall be designated by [Virgin] and [Straw], after consultation with [Moore] and [Virgin and Straw]"; that [a]ll individuals rendering services in connection with the recording of the Masters shall be subject to [Moore's], [Straw's], and [Virgin's] mutual approval"; that "[Virgin] shall have the right and opportunity to have it's [sic] representatives attend each such recording session"; that "[e]ach Master . . .  shall be subject to [Virgin's] approval as commercially and technically satisfactory for the manufacture and sale of phonograph records"; and that "the parties acknowledge that [Virgin] has approved the Masters." | McMullan Decl., Ex. 32 ¶ 3(a). |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 61.      Straw's contract with Moore further provided that "[a]ll master recordings produced by [Moore] from the inception of the recording thereof . . . shall be entirely [Virgin's] property" and "[Virgin] shall . . . have the sole and exclusive right to copyright such master recordings, phonograph records, or other reproductions, in [Virgin's] name, as the owner and author thereof . . . (it being understood that for such purposes [Moore] and all other person rendering services in connection with such master recordings shall be [Virgin's] employees for hire)." | McMullan Decl., Ex. 32 ¶ 4. |
| 62.      Virgin approved of and paid Van Dyke Parks to serve as producer for the sound recordings that would ultimately be included in the album *Surprise*. | McMullan Decl., Ex. 27 ¶ 4(a); *id.*, Ex. 33 ¶ 3(a); Gilford Decl., Ex. I at 64:17-65:12. |
| 63.      Straw's contract with Parks provided that "recording sessions for the Master shall be conducted . . . under [Virgin's] recording license at such times and locations as shall be designated by [Virgin] and [Straw], after consultation with [Parks] and [Virgin and Straw]"; that [a]ll individuals rendering services in connection with the recording of the Master shall be subject to [Park's], [Straw's], and [Virgin's] mutual approval"; that "[Virgin] shall have the right and opportunity to have it's [sic] representatives attend each such recording session"; and that "[t]he Master . . .  shall be subject to [Virgin's] approval as commercially and technically satisfactory for the manufacture and sale of phonograph records." | McMullan Decl., Ex. 33 ¶ 3(a). |
| 64.      Straw's contract with Parks further provided that "[a]ll master recordings produced by [Parks] from the inception of the recording thereof . . . shall be entirely [Virgin's] property" and "[Virgin] shall . . . have the sole and exclusive right to copyright such master recordings, phonograph records, or other reproductions, in [Virgin's] name, as the owner and author thereof . . . (it being understood that for such purposes [Parks] and | McMullan Decl., Ex. 33 ¶ 4. |

116

| **Defendants' Additional Material Facts** | **Supporting Evidence** |
|---|---|
| all other person rendering services in connection with such master recordings shall be [Virgin's] employees for hire." | |
| 65.      Virgin approved of and paid Michael Stipe to perform as a vocalist on one of the sound recordings that would ultimately be included in the album *Surprise*. | McMullan Decl., Ex. 27 ¶ 4(a); *id.*, Ex. 34 at 2; Gilford Decl., Ex. I at 93:17-22 (Straw testifying at deposition that to her knowledge, "[e]veryone got paid . . . from the recording fund."). |
| 66.      Straw's contract with R.E.M. Athens Ltd. for the services of Stipe as a vocalist provided that "[t]he master from the inception of the recording thereof . . . shall be entirely [Virgin's] property" and "[Virgin] shall . . . have the sole and exclusive right to copyright and exploit the Master, phonograph records, or other reproductions, in [Virgin's] name, as the owner and author thereof . . . (it being understood that for such purposes [Stipe] and all other person rendering services in connection with such master recordings shall be [Virgin's] employees for hire." | McMullan Decl., Ex. 34 ¶ 2(a). |
| 67.      Virgin also paid other musicians to perform on the sound recordings that would ultimately be included in the album *Surprise*. | Gilford Decl., Ex. I at 64:17-65:12, 92:6-93:22. |
| 68.      Virgin controlled the recording fund for *Surprise* and paid for all recording costs. | Gilford Decl., Ex. I at 55:17-56:3 (Straw testifying that "there was a delay in letting me get started on the record.  I was ready to go and [Virgin] would not release my recording funds, which they controlled); *id.* at 63:3-23 (Straw testifying that Virgin was "in charge" of the recording fund, and that the recording fund paid for all recording costs). |
| 69.      Virgin also requested that Straw make promotional appearances for *Surprise*, which Straw did. | Gilford Decl., Ex. I at 98:7-10. |
| 70.      When *Surprise* was completed, Virgin made the decision to postpone releasing the album multiple times. | Gilford Decl., Ex. I at 52:4-53:4, 54:8-15 (Straw testifying that when *Surprise* was completed and despite Straw wanting the album to be released immediately, Virgin decided to postpone releasing the album multiple times). |
| 71.      On June 21, 1989, Virgin released *Surprise*, an album containing eleven | SAC ¶ 162; Gilford Decl., Ex. I at 54:22-55:1; 118:7-11. |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| individual sound recordings embodying Straw's performances. | |
| 72.     Virgin released certain individual tracks from *Surprise* as singles. | Ransom Decl., Exs. F, G. |
| 73.     On June 27, 1989, Virgin obtained a registration for the copyright in *Surprise*. | McMullan Decl., Ex. 35. |
| 74.     The copyright registration states that Virgin is the author of *Surprise* as a "work made for hire." | McMullan Decl., Ex. 35. |
| 75.     In 1980, Virgin terminated the Straw Agreement after Straw failed to timely deliver the second album contemplated by the agreement. | McMullan Decl., Ex. 27. |
| 76.     Capitol thereafter succeeded to Virgin's rights and obligations under the Straw Agreement, including ownership of the copyright in *Surprise*. | McMullan Decl. ¶ 7. |
| 77.     A&M Records Limited ("A&M Ltd.") was in the business of making and distributing recorded music. | McMullan Decl. ¶ 5. |
| 78.     On April 3, 1978, A&M Ltd. entered into an exclusive recording agreement with William Remar, Robert Davis, Carlos Caballero, and Plaintiffs Leonard Phillips ("Phillips") and Stan Sobol ("Sobol"), who were members of a band called The Dickies, for the purpose of creating sound recordings embodying The Dickies' performances ("The Dickies Agreement"). | McMullan Decl., Ex. 38 ¶ 1 (reflecting that A&M Ltd. engaged The Dickies to "record[] for [A&M Ltd.] . . . master recordings embodying [The Dickies'] performances"). |
| 79.     The Dickies were represented by counsel in connection with negotiating The Dickies Agreement. | Gilford Decl., Ex. D at 51:1-5, 64:13-25, 89:14-19 (Phillips testifying that The Dickies were represented by counsel in connection with their recording agreement, that Phillips reviewed the recording agreement and had an opportunity to ask his counsel questions before he signed it); *id.*, Ex. C at 23:19-25, 42:25-43:6, 43:17-44:7, 72:11-16 (Sobol testifying that The Dickies were represented by counsel in connection with negotiation of the recording agreement, and that he had an opportunity to review the agreement, consult with counsel, and ask counsel questions before he signed it); Ransom Decl., Ex. B at |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| | 4-7 (responses to Request for Admission Nos. 7-11, 13-14, 16-17, 19-20, in which Phillips and Sobol admit that they were represented by counsel in connection with their recording agreement, had the opportunity to review the agreement and consult with counsel before signing it, and reviewed the agreement before signing it). |
| 80.     The initial term of The Dickies Agreement "commenc[ed]" as of the date hereof and continuing for one (1) year[.]" | McMullan Decl., Ex. 38 ¶ 1. |
| 81.     For the "initial term," The Dickies Agreement obligated The Dickies to "record for and deliver to [A&M Ltd.], at a minimum, fourteen (14) Masters plus additional Masters, at [The Dickies'] and [A&M's] mutual election," and that during "the first renewal term hereof," obligated The Dickies to "record for and deliver to [A&M Ltd.] at a minimum sufficient Masters to constitute one . . . . long-playing record[.]" | McMullan Decl., Ex. 38 ¶ 2(a)(i)-(ii); *see also* Gilford Decl., Ex. D at 67:1-16 (Phillips testifying during deposition that The Dickies were engaged to create sound recordings that would be compiled into an album); *id.*, Ex. C at 46:25-47:18, 49:2-6 (Sobol testifying during deposition as to same). |
| 82.     The Dickies Agreement provided that "[e]ach LP recorded hereunder shall embody no less than eight (8) and no more than twelve (12) musical compositions." | McMullan Decl., Ex. 38 ¶ 2(b). |
| 83.     The Dickies Agreement provided A&M Ltd. the mutual right to designate the producer of the sound recordings, and A&M Ltd. in fact approved Earl Mankey as the engineer and co-producer and John Hewlett as the other co-producer for the initial sound recordings to be recorded under the agreement. | McMullan Decl., Ex. 38 ¶ 2(b). |
| 84.     The Dickies Agreement further provided that "[e]ach master shall be subject to [A&M Ltd.'s] approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon [A&M Ltd.'s] request, [The Dickies] shall re-record, re-mix, or otherwise alter any Master recording until a Master technically satisfactory to [A&M Ltd.] shall have been obtained." | McMullan Decl., Ex. 38 ¶ 2(b); Gilford Decl., Ex. C  at 62:17-63:13, 64:4-11. |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 85.    The Dickies Agreement states that all sound recordings recorded under The Dickies Agreement would be "entirely [A&M Ltd.'s] property" from inception, that A&M Ltd. has "the sole and exclusive right to copyright such master recordings . . . in [A&M Ltd.'s] name as the owner and author thereof," and that The Dickies were A&M Ltd.'s "employees for hire." | McMullan Decl., Ex. 38 ¶ 4; *see also* Gilford Decl., Ex. C at 67:1-14, 107:11-14; *id.*, Ex. D at 101:5-9. |
| 86.    The Dickies Agreement provided that The Dickies "shall, upon [A&M Ltd.'s] request, appear on dates and at film studios or other locations designated by us subject to [The Dickies'] reasonable approval and upon reasonable notice to [The Dickies] for the filming, taping, or other permanent fixation of audio-visual reproductions of your performances[.]" | McMullan Decl., Ex. 38 ¶ 14. |
| 87.    The Dickies Agreement provided that The Dickies "grant to [A&M Ltd.] four (4) separate options, each to renew the term of this contract for an eighteen month term, such renewal terms to run consecutively beginning at the expiration of the initial term, all upon the same terms and conditions applicable to the initial term except as otherwise specified[.]" | McMullan Decl., Ex. 38 ¶ 19. |
| 88.    The Dickies Agreement provided that A&M Ltd. would pay The Dickies a $100,000 advance plus royalties. | McMullan Decl., Ex. 38 ¶¶ 6, 7, 25. |
| 89.    A&M Ltd. paid The Dickies advances for their services. | McMullan Decl., Exs. 41, 48; Gilford Decl., Ex. D at 86:3-5, 135:15-24. |
| 90.    A&M Ltd. in fact exercised at least one option to renew The Dickies Agreement. | McMullan Decl., Ex. 39. |
| 91.    A&M Ltd. paid for the services of Robin Cable to produce the sound recordings that would ultimately be included in the album *Dawn of The Dickies*. | McMullan Decl., Exs. 43-44; Gilford Decl., Ex. D at 55:9-12. |
| 92.    A&M Ltd. paid for the recording sessions and equipment necessary to create the sound recordings for *Dawn of The Dickies*. | McMullan Decl., Exs. 43, 45-47, 52-58; Gilford Decl., Ex. D at 86:3-8. |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 93.    A&M Ltd. also provided written approval of recording studio costs and the dates and times of recording sessions for *Dawn of The Dickies*. | McMullan Decl., Ex. 50. |
| 94.    A&M Ltd. paid for salary, payroll, and health and welfare costs related to recording *Dawn of the Dickies*. | McMullan Decl., Exs. 42, 43 . |
| 95.    A&M Ltd. paid for tour support related to *Dawn of The Dickies*. | McMullan Decl., Ex. 51. |
| 96.    The Dickies submitted W-4 Forms to A&M Ltd. | McMullan Decl., Ex. 40, 49. |
| 97.    A&M Ltd. managed and facilitated the release of singles of individual sound recordings from *Dawn of The Dickies*. | McMullan Decl., Ex. 59. |
| 98.    The Dickies made promotional appearances for *Dawn of The Dickies* at the request of A&M Ltd. | Ransom Decl., Ex. B at 15-16 (responses to Request for Admission Nos. 56, 57, and 58). |
| 99.    On November 9, 1979, A&M Ltd. released *Dawn of The Dickies*, an album containing ten individual sound recordings embodying The Dickies' performances. | SAC ¶ 119; Gilford Decl., Ex. C at 47:6-23. |
| 100.    A&M Ltd. released certain individual tracks from *Dawn of The Dickies* as singles. | Ransom Decl., Exs. I, J, L. |
| 101.    As contemplated by The Dickies Agreement, on February 25, 1980, A&M Ltd.'s U.S. affiliate and UMG predecessor A&M Records, Inc. ("A&M") obtained a registration for the U.S. copyright in *Dawn of The Dickies*. | McMullan Decl., Ex. 60. |
| 102.    The copyright registration identifies A&M as the author of *Dawn of The Dickies* as a "work made for hire." | McMullan Decl., Ex. 60. |
| 103.    A&M was in the business of marking and distributing recorded music. | McMullan Decl. ¶¶ 5, 9. |
| 104.    A&M approached Dream Syndicate because it was interested in having the band join the label. | Gilford Decl., Ex. F at 45:9-14; *id.*, Ex. H at 76:9-21. |
| 105.    A&M paid Dream Syndicate's former label J. Ruby Productions to release the band from their contract with J. Ruby Productions so that A&M could work with the band. | Gilford Decl., Ex. H at 128:20-130:16; *id.*, Ex. 73 (Wynn Dep. Ex. 67). |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 106.     On September 1, 1983, A&M entered into an exclusive recording agreement with Karl Precoda and Plaintiffs Steve Wynn ("Wynn"), Dennis Mehaffey ("Mehaffey"), and David Pellish ("Pellish"), the members of Dream Syndicate, for the purpose of creating sound recordings embodying Dream Syndicate's performances ("Dream Syndicate Agreement"). | McMullan Decl., Ex. 63 ¶ 1 (reflecting that A&M engaged Dream Syndicate to "produc[e], record[], and deliver[] to [A&M] . . . master sound recordings . . . embodying [Dream Syndicate's] performances"; *id.* ¶ 11(a). |
| 107.     Dream Syndicate was represented by counsel in connection with negotiating the Dream Syndicate Agreement. | McMullan Decl., Ex. 63 ¶ 1 (reflecting that Dream Syndicate was represented by Peter Paterno, Esq. of Manatt, Phelps, Rothenberg & Tunney); Gilford Decl., Ex. G at 32:7-22, 33:8-12, 53:23-54:21 (Pellish testifying that Dream Syndicate was represented by Peter Paterno in connection with their recording agreement, and that he had an opportunity to ask Mr. Paterno about the agreement before he signed it); *id.*, Ex. F at 44:3-9, 48:2-7 (same, and Mehaffey further testifying that he reviewed the recording agreement before he signed it); *id.*, Ex. H at 70:5-12, 88:22-89:17 91:17-92:7 (same). |
| 108.     The initial period of the Dream Syndicate Agreement "commenc[ed] as of the date hereof and continue[d] until the later of eighteen (18) months after the commencement of such initial period or the date one hundred twenty (120) days following the date of [Dream Syndicate's] completion of delivery of the" sound recordings to be recorded thereunder. | McMullan Decl., Ex. 63 ¶ 1(a)(i). |
| 109.     Under the Dream Syndicate Agreement, Dream Syndicate "grant[ed] to [A&M] three (3 separate, consecutive options, each to renew the term of this agreement for a further contract period[.]" | McMullan Decl., Ex. 63¶ 1(a)(ii). |
| 110.     For the initial period, the Dream Syndicate Agreement obligated Dream Syndicate to deliver "one (1) LP . . . embodying solely Masters." | McMullan Decl., Ex. 63 ¶ 1(b)(i). |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| 111.     The Dream Syndicate Agreement provided that "[e]ach LP recorded hereunder shall embody no less than eight (8) and no more than ten (10) musical compositions." | McMullan Decl., Ex. 63 ¶ 2 (a)(i); *see also* Gilford Decl., Exs. F at 53:2-5; *id.*, Ex. G at 59:11-14. |
| 112.     The Dream Syndicate Agreement further provided that "[t]he individual producer of the Masters, shall be designated by [Dream Syndicate] and shall be subject to [A&M's] reasonable approval." | McMullan Decl., Ex. 63 ¶ 2(a)(i). |
| 113.     The Dream Syndicate Agreement further provided that "[e]ach Master shall be subject to [A&M's] approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon [A&M's] request and at [Dream Syndicate's] expense, [Dream Syndicate] shall re-record any musical compositions or other selections until a Master technically satisfactory to us shall have been obtained." | McMullan Decl., Ex. 63 ¶ 2(a)(ii). |
| 114.     The Dream Syndicate Agreement provided that if A&M disapproved of any recording procedure for which A&M had the right to exercise approval, Dream Syndicate was required to promptly submit to A&M proposed substitutes and recording would be postponed until A&M approved; that "[r]ecording sessions for the Masters shall be conducted under [A&M's] recording license"; that "[n]o recording sessions shall be commenced hereunder nor shall any commitments be made or costs incurred in connection therewith unless and until a proposed recording budget for the Masters to be recorded at such sessions shall have been submitted by [Dream Syndicate] in writing to approved in writing by one of [A&M's] officers"; and that Dream Syndicate was obligated to submit the proposed recording budget to A&M no later than fourteen days prior to the recording session. | McMullan Decl., Ex. 63 ¶¶ 2(a)(ii), 3(a)(i). |
| 115.     The Dream Syndicate Agreement provided that A&M was the "owner and author" of all sound recordings created | McMullan Decl., Ex. 63 ¶ 4(a). |

| **Defendants' Additional Material Facts** | **Supporting Evidence** |
|---|---|
| pursuant to the agreement and all related copyrights, that all such sound recordings were "works made for hire," and that the members of Dream Syndicate were A&M's "employees for hire." | |
| 116.     The Dream Syndicate Agreement further provided A&M with "the final decision" "concerning the choice of Masters to be included on singles, and with respect to any special sales programs in the U.S. in excess of two (2) per calendar year." | McMullan Decl., Ex. 63 ¶ 4(c)(vii). |
| 117.     The Dream Syndicate Agreement provided that Dream Syndicate "shall, upon [A&M's] request, appear on dates and at film studios or other locations designated by [A&M] upon reasonable notice to [Dream Syndicate] for the filming, taping, or other permanent fixation of audio-visual reproductions of your performances[.]" | McMullan Decl., Ex. 63 ¶ 15(a). |
| 118.     The Dream Syndicate Agreement obligated A&M to pay Dream Syndicate for their exclusive recording services, including a $150,000 advance for the initial period plus royalties, and a $10,000 advance for Dream Syndicate's tour. | McMullan Decl., Ex. 63 ¶¶ 6, 23, 24, 25(a). |
| 119.     A&M paid Dream Syndicate advances for their services. | McMullan Decl., Exs. 64-66, 70. |
| 120.     A&M approved, engaged, and paid Sandy Pearlman for his services as producer of *Medicine Show*. | McMullan Decl., Ex. 63 ¶ 2(a)(i); *see also id.*, Exs. 63, 68-70, . |
| 121.     A&M paid sound engineer Jeffrey Osbourne for recording the live concert that would ultimately become *This Is Not The New Dream Syndicate Album Live*. | Gilford Decl., Ex. H at 116:22-117:24; McMullan Decl., Ex. 72. |
| 122.     A&M paid for the recording studio and costs associated with the recording of Medicine *Show*. | Gilford Decl., Ex. F at 55:13-16; *id.*, Ex. H at 102:14-103:10. |
| 123.     Representatives from A&M attended recording sessions for *Medicine Show*. | Gilford Decl., Ex. H at 79:21-80:5. |
| 124.     At the request of A&M, Dream Syndicate made promotional appearances for | Gilford Decl., Ex. H at 107:9-16. |

| Defendants' Additional Material Facts | Supporting Evidence |
|---|---|
| *Medicine Show*, such as interviews and radio appearances. | |
| 125.    On May 7, 1984, A&M released *Medicine Show*, an album consisting of eight individual sound recordings embodying the performances of Dream Syndicate. | SAC ¶ 144; Gilford Decl., Ex. H at 106:10-18. |
| 126.    A&M released certain individual tracks from *Medicine Show* as singles. | Ransom Decl., Ex. H |
| 127.    On June 1, 1984, A&M obtained a registration for the copyright in *Medicine Show*. | McMullan Decl., Ex. 76. |
| 128.    The copyright registration identifies A&M as the author of *Medicine Show* as a "work made for hire." | McMullan Decl., Ex. 76. |
| 129.    The album *This Is Not The New Dream Syndicate Album Live* was recorded live for broadcast on July 7, 1984 in Chicago, Illinois. | Ransom Decl., Ex. K. |
| 130.    The songs performed live by Dream Syndicate and recorded during that broadcast were subsequently released by A&M that same year as the album *The Is Not The New Dream Syndicate Album Live*, which consisted of five individual sound recordings. | Ransom Decl., Ex. K. |
| 131.    On November 19, 1984, A&M obtained a registration for the copyright in *This Is Not The New Dream Syndicate Album Live*. | Ransom Decl., Ex. M. |
| 132.    The copyright registration identifies A&M as the author of *This Is Not The New Dream Syndicate Album Live* as "employer for hire." | Ransom Decl., Ex. M. |
| 133.    UMG thereafter succeeded to A&M's rights and obligations under the Dream Syndicate Agreement, including ownership of the copyrights in *Medicine Show* and *This Is Not The New Dream Syndicate Album Live*. | McMullan Decl. ¶ 8. |

Dated:  May 27, 2022

SIDLEY AUSTIN LLP

By:  ___/s/ Ariel Atlas_____
Ariel Atlas
aatlas@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300

Rollin A. Ransom
rransom@sidley.com
Lisa M. Gilford
lgilford@sidley.com
Lauren M. De Lilly
ldelilly@sidley.com
SIDLEY AUSTIN LLP
555 West 5th Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000

Richard S. Mandel
rsm@cll.com
Thomas Kjellberg
txk@cll.com
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, NY 10036-1525
Telephone:  (212) 790-9200

*Attorneys for Defendants UMG Recordings, Inc.
and Capitol Records, LLC*