UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN WAITE, an individual, et al.,

                Plaintiffs,

      -against-                             19-cv-01091 (LAK)

UMG RECORDINGS, INC., et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

                  Roy W. Arnold
                  Ryan E. Cronin
                  Gregory M. Bordo
                  David M. Perry
                  Heidi G. Crikelair
                  Jillian M. Taylor
                  BLANK ROME LLP

                  Evan S. Cohen
                  Maryann R. Marzano
                  COHEN MUSIC LAW

                  *Attorneys for Plaintiffs*

                  Ariel Atlas
                  Rollin A. Ransom
                  Lisa M. Gilford
                  Lauren M. De Lilly
                  SIDLEY AUSTIN LLP

2

Richard S. Mandel
Thomas Kjellberg
COWAN, LIEBOWITZ & LATMAN, P.C.

*Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge*.

 When Victor Willis co-wrote the lyrics to the "Y.M.C.A.," he did not expect it to become a cultural icon that would be honored one day as a work of historical significance in the Library of Congress's National Recording Registry.[1] For decades, most of the profits went to the record labels to which Willis transferred his copyright in exchange for their publishing and commercializing the song.[2] Years later, however, Willis regained ownership of the copyright

---

[1]  Neely Tucker, *National Recording Registry: It's Victor Willis, Mr. "Y.M.C.A"!*, Library of Congress, Mar. 25, 2020, https://blogs.loc.gov/loc/2020/03/national-recording-registry-its-victor-willis-mr-y-m-c-a/.

[2]  Larry Rohter*, A Village Person Tests the Copyright Law*, N.Y. Times, Aug. 16, 2011, https://www.nytimes.com/2011/08/17/arts/music/village-people-singer-claims-rights-to-ymca.html; *see also Scorpio Music S.A. v. Willis*, No. 11-cv-1557 (BTM) (RBB), 2012 WL 1598043, at *1 (S.D. Cal. May 7, 2012).

pursuant to Section 203 of the Copyright Act of 1976, which established a limited opportunity for authors and other creators of copyrighted material[3] to terminate their prior transfers of copyright.[4]

The recording artists in this putative class action aspire to the same.  Plaintiffs are professional musicians who served written notices of termination on UMG Recordings, Inc. ("UMG") and Capitol Records, LLC ("Capitol") (collectively, "Defendants") pursuant to Section 203 to reacquire copyrights in sound recordings they transferred to Defendants' predecessors in exchange for the predecessors' agreements to market and sell the recordings.[5]  Upon the effective date of termination in a notice, the grantee becomes the owner of the copyright and holds the exclusive right to reproduce and distribute the recordings.[6]  Plaintiffs allege that Defendants are infringing their copyrights (and those of other artists who also have served termination notices) by continuing to market and sell recordings for which the effective dates of termination have passed. They seek actual and statutory damages and an injunction prohibiting Defendants from infringing on their copyrights.[7]  With respect to recordings for which the effective date of termination has not

---

[3]

Under the Copyright Act, audiovisual, literary, musical, dramatic, pantomimic, choreographic, pictorial, graphic, sculptural, and architectural works, as well as sound recordings, are included among "[w]orks of authorship" in which copyright protection may subsist.  17 U.S.C. § 102(a).  For ease of expression, this decision refers to all creators of works subject to copyright protection as "authors," regardless of the media in which they expressed themselves.

[4]

Larry Rohter, *A Copyright Victory, 35 Years Later*, N.Y. Times, Sept. 10, 2013, https://www.nytimes.com/2013/09/11/arts/music/a-copyright-victory-35-years-later.html.

[5]

Dkt 95 at 3.

[6]

17 U.S.C. § 106.

[7]

Dkt 95 at 31.

4

yet been reached, Plaintiffs seek a similar injunction plus a declaration of certain legal rights and duties of the parties.[8]

The matter is before the Court on Plaintiffs' motion for class certification, their appointment as class representatives, and the appointment of class counsel.[9]

### Background

Leonard Graves Phillips, Stan Sobol, Steve Wynn, Dennis Mehaffey, Joel David Pellish, and Susan Straw Harris (collectively, "Plaintiffs") are musicians, singers, and songwriters who entered into recording agreements with Defendants' predecessors in the 1970s and '80s.[10] Phillips and Sobol, founding members of the punk rock band "The Dickies," signed a recording agreement in 1978 with A&M Records Limited ("A&M"), a predecessor of UMG, for their album "Dawn of The Dickies," which consisted of ten sound recordings.[11] Wynn, Mehaffey, and Pellish, members of the alternative rock band "Dream Syndicate," signed a recording agreement, also with A&M, in 1983 for their album "Medicine Show," which consisted of eight sound recordings.[12]

---

[8]

Dkt 95 at 41.

[9]

Dkt 149.

[10]

Dkt 95 at 16-35. Kasim Sulton, originally another plaintiff and proposed class representative in Plaintiffs' motion for class certification (Dkt 150 at 3), is not listed as such here because this Court granted summary judgment dismissing Sulton's copyright infringement claim after Plaintiffs' motion for class certification was filed.  Dkt 247.

[11]

Dkt 150 at 9.

[12]

Id. at 12.

Straw Harris ("Straw"), a rock singer and songwriter, signed a recording agreement in 1987 with Virgin Records, a predecessor of Capitol, for her first solo album "Surprise," which consisted of eleven sound recordings.[13] Each of these agreements granted copyrights in the sound recordings to A&M and Virgin Records, which were passed to UMG and Capitol, respectively.

Such deals are common in the music industry. In theory, artists who wish to release and market their music may do so on their own, without the assistance of record labels. In reality, however, it is impractical for most artists to proceed independently of record labels, which offer the means and resources to market and promote artists' works and are better positioned to accept the risk that the works might not succeed commercially.[14] Many artists, especially those just starting out in their careers, accordingly tend to have little negotiating power and often relinquish copyright in their works to record labels as part of the bargains they strike for promotion and commercialization. As a result, when a work turns out to be a "hit," the lion's share of the profits – along with the exclusive rights to reproduce, distribute, and perform – usually belong to the record label rather than the artist who authored or performed the piece.[15]

Recognizing the "the unequal bargaining position of authors," which results "in part from the impossibility of determining a work's value until it has been exploited," Congress enacted

---

[13]  *Id.* at 16.

[14]  Berklee College of Music, *What does a Recording Artist (or Group) do?*, https://www.berklee.edu/careers/roles/recording-group-or-band#:~:text=The%20definiti on%20of%20a%20recording,that%20records%20and%20releases%20music (last accessed December 19, 2022).

[15]  17 U.S.C. § 106.

Section 203 in the 1976 amendments to the Copyright Act.[16]  That provision entitles an author of a work created on or after January 1, 1978 to terminate a transfer of copyright thirty-five years from the date of the transfer or, in certain circumstances, forty years after the transfer's execution if the transfer covers the right to publication.[17]  The termination right is not automatic.  Instead, an author must serve a written notice of termination that meets certain regulatory requirements, is recorded with the Copyright Office, and is served upon the grantee prior to the effective date of termination. Where those requirements are satisfied, the grant is terminated and the copyright reverts to the author.[18]

Pursuant to Section 203, Plaintiffs and other recording artists served written notices of termination on Defendants.  But Defendants dispute their effectiveness.  They point to the fact that the Section 203 termination right does not apply to a "work made for hire," which is defined as:

> "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."[19]

---

[16] H.R. Rep. No. 94-1476, 124 (Sept. 3, 1976).

[17] 17 U.S.C. § 203(a)(3) ("Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant; or, if the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier.").

[18] 17 U.S.C. § 203(a)(4), (b).

[19] 17 U.S.C. § 101.

Defendants contend that all of Plaintiffs' works fall within this exception.

As an initial matter, Defendants rely on the agreements by which the Plaintiffs transferred their copyrights in the first place.  All of them contain language stating that the artists were "employees for hire" of the record labels and/or that the artists' recordings were "works made for hire."[20]  Plaintiffs argue that these clauses do not suffice to establish that the works were made for hire.[21]  Indeed, Defendants do not contend that the contractual language alone suffices.[22]  Rather, they argue that the sound recordings were made for hire because Plaintiffs produced the recordings as employees acting within the scope of their employment and/or that the recordings were "specially ordered or commissioned for use" as one of the enumerated categories in Section 101(2).[23]  Plaintiffs reject that argument.  They argue their notices of termination are effective and that Defendants are infringing their copyrights and those of other artists who also served termination notices pursuant to Section 203 by failing to honor their termination notices.

---

[20]

Dkt 214, Defs.' Response to Pls.' Rule 56.1 Statement of Undisputed Facts, at 31 (Defendants do not dispute that "[t]he Dickies' recording agreement reflects the parties' agreement that A&M Ltd. was the 'owner and author' of all sound recordings and that The Dickies were A&M's 'employees for hire."); *id.* at 58 (Defendants do not dispute that "Dream Syndicate's recording agreement reflects the parties' agreement that all sound recordings created thereunder constitute 'works made for hire' and that the members of Dream Syndicate were A&M's 'employees for hire.'"); *id.* at 89 (Defendants do not dispute that "Straw's recording agreement reflects the parties' agreement that all sound recordings created thereunder constitute 'works made for hire' and that Straw was Virgin's 'employee[] for hire.'").

[21]

Dkt 150 at 19.

[22]

Dkt 213 at 10.

[23]

Dkt 205-1 at 25-31.

Plaintiffs now move for an order certifying two proposed classes.  The first, "Class A," seeks actual and statutory damages, and is defined as:

> "All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination pursuant to the United States Copyright Act, 17 U.S.C. § 203, describing an effective date of termination for a particular sound recording (i) occurring on or after January 1, 2013, and (ii) occurring no later than the date the Court grants certification of Class A."[24]

The second, "Class B," seeks declaratory relief, and is defined as:

> "All recording artists (and statutory heirs and personal representatives of those recording artists, if applicable) who have served Defendants with Notices of Termination pursuant to the United States Copyright Act, 17 U.S.C. § 203, describing an effective date of termination for a particular sound recording (i) occurring on or after the date the Court grants certification of Class A, and (ii) occurring no later than December 31, 2031."[25]

Plaintiffs seek also to enjoin Defendants from infringing the copyrights of artists who served termination notices between January 1, 2013 and December 31, 2031, regardless of whether the effective dates of termination have been reached – *i.e.*, members of both proposed classes.[26] Plaintiffs move to appoint Phillips, Sobol, Wynn, Mehaffey, and Pellish as class representatives of Class A, Straw as class representative of Class B, and counsel for Plaintiffs as class counsel.[27]

---

[24]   Dkt 149 at 2.

[25]   *Id.*

[26]   Dkt 95 at 31, 41.

[27]   Dkt 149 at 1-2; Dkt 95 at 4.

### *Discussion*

A district court may certify a class only if it determines that the class satisfies each requirement of Rule 23(a) and at least one of the four criteria set out in Rule 23(b).[28]   The party moving for certification bears the burden of demonstrating that the proposed class meets these criteria by a preponderance of the evidence.[29]

Defendants argue that Plaintiffs have failed to meet their burden on multiple grounds. But the crux of their opposition is their contention that the need for individualized proof – especially with respect to the work-made-for-hire defense – precludes certification of the proposed classes. Based on the individualized nature of the relevant inquires and the evidence in the record, the Court agrees.

*Proposed Class A - Rule 23(b)(3)*

A proposed class seeking money damages, like Class A, must satisfy the requirements of Rule 23(b)(3).   A class may be certified under Rule 23(b)(3) only if:

> "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the

---

[28]   *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 464 (2d Cir. 2013).

[29]   *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

particular forum; (D) the difficulties likely to be encountered in the management of a class action."[30]

Questions of law or fact "predominate" if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[31] Predominance does not require the absence of individual issues.[32] Instead, the requirement focuses on whether liability can be determined on a class-wide basis by relying on common proof, even when damages issues may be individualized.[33] The predominance test is a qualitative, rather than quantitative, assessment,[34] and "calls upon courts to give careful scrutiny to the relation between common and individual questions."[35]

---

[30]     Fed. R. Civ. P. 23(b)(3).

[31]     *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

[32]     *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015).

[33]     *Id.*

[34]     *In re Petrobras Sec.*, 862 F.3d 250, 271 (2d Cir. 2017).

[35]     *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

*Work-Made-For-Hire Defense*

As this Court previously acknowledged, "Defendants' position that the works at issue were 'made for hire' is central to this lawsuit."[36]  If an artist's work was made for hire, the artist's copyright infringement claim is not legally viable because the artist does not have a termination right pursuant to Section 203.  Defendants argue their work-made-for-hire defense defeats predominance because its determination requires "a fact-intensive inquiry based on various fact-based tests that cannot be resolved based on common proof."[37]

*Employment Relationship - The* Reid *Test*

The first "fact-based test" is the multi-factor test set forth in *Cmty. for Creative Non-Violence v. Reid*[38] to determine whether an author was an employee and produced the work while acting within the scope of his or her employment.[39]  *Reid* "created an enduring framework for distinguishing between an employee and a non-employee author in matters of copyright."[40]  Built on common law principles of agency to distinguish between employees and independent contractors,

---

[36]
    *Waite v. UMG Recordings, Inc.*, No. 19-cv-1091 (LAK), 2020 WL 3959185, at *2 (S.D.N.Y. July 13, 2020).

[37]
    Dkt 205-1 at 26.

[38]
    490 U.S. 730 (1989).

[39]
    *Horror Inc. v. Miller*, 15 F.4th 232, 243 (2d Cir. 2021).

[40]
    *Id.*

the *Reid* test consists of thirteen non-exhaustive factors to consider in determining whether an author was an employee and produced the work within the scope of his or her employment:

> "(1) the hiring party's right to control the manner and means by which the work is accomplished; (2) the skill required to create the work; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; [and] (13) the tax treatment of the hired party."[41]

Of the thirteen factors, there are "five core considerations" that "will almost always be relevant . . . and should be given more weight in the analysis": "(1) the hiring party's right to control the manner and means of creation; (2) the skill required [of the hired party]; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party."[42]  Courts are "cautioned against applying the *Reid* factors 'in a mechanistic fashion,'" and instead must determine the weight, if any, to accord each factor "in light of the facts of a particular case."[43]

Applying the *Reid* test to the artists in proposed Class A requires evaluating evidence unique to each artist.  Whether and to what degree a record label had the right to control the manner and means of creation depends on the record label's involvement in the development of the sound

---

[41]    *Id* (citing *Reid*, 490 U.S. at 751-53).

[42]    *Id.* at 249 (quoting *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992)).

[43]    *Id.* at 248 (quoting *Aymes*, 980 F.2d at 862).

recording.[44]  For some artists, the record label's involvement may have been limited to "big picture

approval authority" that typically weighs against a right to control.[45]  For other artists, the record

label may have been more involved in the creative process.  Evidence in the record of at least some

involvement by the record labels raises artist-specific questions such as: Did the record label agree

on the lyrics and music with the artist?  Did the record label select the producers and sound engineers

to work on the sound recordings?[46]  What level of substantive artistic feedback, if any, did the record

label provide during the making of the recordings?[47]  Individualized evidence also is required to

determine whether the record label had the "right to assign additional and distinct projects during

the term of the engagement"[48] and assigned additional "work not of the artist['s] choosing."[49]  The

---

[44]     *Id.* at 250-51 (evaluating evidence to determine hiring party's involvement in the artist's creative process and the nature of the hiring party's supervision of the artist's work).

[45]     *Id.* at 250 (quoting *Horror Inc. v. Miller*, 335 F. Supp. 273, 303 (D. Conn. 2018)).

[46]     Dkt 214, Defs.' Response to Pls.' Rule 56.1 Statement of Undisputed Facts, at 34 ("Phillips testif[ied] that he could not recall how The Dickies became connected with producer Robin Cable, and that he could only speculate as to whether Mr. Cable had a contract with A&M, and that he did not know who was responsible for Mr. Cable coming on to produce *Dawn of The Dickies*.") (citing Dkt 211, Declaration of Lisa Gilford, Ex. D, Excerpts of Deposition of Leonard G. Phillips, at 97:21-98:7, 98:17-99:14, 99:22-100:25).

[47]     *Id.* at 55 ("Wynn testif[ied] that A&M representatives attended recording sessions for Medicine Show.").

[48]     *Horror Inc.*, 15 F.4th at 234.

[49]     *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86 (2d Cir. 1995).

record label's tax treatment of the artist[50] and whether the record label provided any employee benefits is another factor the Court would need to weigh on a case-by-case basis in its analysis of the "totality of the parties' relationship."[51]

  Plaintiffs do not argue that the Court can assess the *Reid* factors for the proposed class based on common proof.  They assert that "Defendants[] lack . . . any evidence of the indicia of employment,"[51] but fail to address the evidence in the record, which includes recording agreements with material differences and contributions by the record labels to certain artists' health insurance premiums and retirement pensions.[52]  Rather than demonstrating that Defendants' *Reid* defense is capable of resolution based on generalized proof, Plaintiffs contend that the artists in the proposed class "are not and never have been employees of the record labels that signed them."[53]

  Plaintiffs' conclusory response to Defendants' argument is unresponsive with respect to the predominance analysis, which is concerned not with the answer to the question as to each

---

50  Although certain artists, such as The Dickies, submitted Internal Revenue Service W-4 Forms to the record label, counsel for Defendants admitted during argument that they do not have copies of any W-2 tax withholding forms for proposed class members.  The fact that the record labels did not withhold taxes weighs against a finding that there was an employment relationship, but is not dispositive under *Reid* and its progenies.

51  *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 312 (S.D.N.Y. 2000); *see also Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 231 (2d Cir. 2008), as amended (Apr. 22, 2008) (commenting while applying *Reid* in a non-copyright context that "the analysis of any employment relationship is fact-specific").

51  Dkt 220 at 13.

52  Dkt 208-119-24 (contributions by record labels to artists' health insurance premiums and pension plans); Dkt 207-29 ("payroll" and "health and welfare" payments to The Dickies).

53  Dkt 220 at 13 (emphasis omitted).

individual artist but with whether "evidence that varies from member to member" is required to answer that question.[54] The Court makes no determination at this stage as to whether any Plaintiff or proposed class member was an employee of the relevant record label. It merely concludes that this determination will depend on facts peculiar to each proposed class member.

*Section 101(2) - Specially Commissioned Works*

The second work-for-hire test, whether the works were "specially commissioned" pursuant to Section 101(2) of the Copyright Act, also requires a highly individualized inquiry. Section 101(2) provides that a work was made for hire if it was: (1) "specially ordered or commissioned," (2) "for use as" one of nine enumerated categories, and (3) "if the parties expressly agree[d] in a written instrument signed by them that the work shall be considered a work made for hire."[55] Defendants argue that whether the sound recordings were specially commissioned "as a 'contribution to a collective work' or 'compilation,'" two of the nine enumerated categories, is "heavily fact-dependent and not subject to common proof."[56]

To determine whether a work was "specially ordered or commissioned," the "instance and expense" test applies.[57] This "turns on the parties' creative and financial arrangement *as*

---

[54] *Tyson Foods, Inc.*, 577 U.S. at 453.

[55] 17 U.S.C. § 101(2).

[56] Dkt 205-1 at 29.

[57] *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 562 (2d Cir. 1995) ("It appears, therefore, that the phrase 'specially ordered or commissioned' has essentially the same meaning as 'instance and expense.'").

*revealed by the record in each case.*"[58]  "'Instance' refers to the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work."[59] The "'expense' component refers to the resources the hiring party invest[ed] in the creation of the work" and in some cases focuses on the nature of the payment; payments of a sum certain weigh in favor of a work-for-hire relationship while royalty payments do not.[60]  Similar to the *Reid* test, the instance and expense analysis requires understanding for each artist the circumstances in which the recordings were produced, the creative involvement, if any, of the record label, and the types of resources and payments the record label provided to the artist.

  Plaintiffs do not dispute that the instance and expense assessment is an individualized inquiry.  Instead, they argue the Section 101(2) defense is unavailable to Defendants because "the sound recordings at issue in this action were not commissioned as contributions to 'collective works' or 'compilations.'"[61]  Although "sound recordings" are not listed in Section 101(2), "something that happens to be a sound recording may still be eligible as a specially commissioned work, as long as it simultaneously qualifies under one of the statutorily enumerated categories."[62]

---

[58]  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 140 (2d Cir. 2013) (emphasis added).

[59]  *Id.* at 139.

[60]  *Id.* at 139-40.

[61]  Dkt. 220 at 13.

[62]  1 NIMMER ON COPYRIGHT (hereinafter "NIMMER") § 5.03, n.121.4; *see also Stanacard, LLC v. Rubard, LLC*, No. 12-cv-5176, 2016 WL 462508, at *8 (S.D.N.Y. Feb. 3, 2016) ("[C]ourts have held that computer programs used together as a software system qualify as 'compilations' or 'collective works' within the meaning of § 101(2).").

Whether a sound recording qualifies as a contribution to a collective work or compilation is a fact-intensive question that requires investigating the circumstances in which the sound recording was produced and released.[63] A "collective work" is a "work . . . in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole," and may include a CD or album consisting of sound recordings.[64] "The term 'compilation' includes collective works."[65] A sound recording that is part of an album may qualify as a contribution to a collective work "depend[ing] on the facts of the putting of an album together."[66] For example, did the album "result[] from the efforts of *bona fide* employees of record labels as sound engineers?"[67] Were the producers of the album hired by the record label? As one

---

[63]

NIMMER § 5.03 ("Only massive excavation into the circumstances under which all sound recordings were prepared during the two decades beginning in 1978 could answer th[e] question [whether pre-1999 sound recordings, as a factual matter, routinely qualified as contributions to collective works].").

[64]

17 U.S.C. § 101.

[65]

A "compilation" is "formed by the collection and assembling of preexisting materials . . . that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." *Id.* I discuss only contributions to collective works here because a "contribution to a compilation . . . will not qualify as a work made for hire" unless the "compilation . . . also constitutes a collective work." NIMMER § 5.03, n.115.

[66]

United States Copyright Office and Sound Recordings as Work Made For Hire: Hearing Before the Subcomm. On Cts. and Intell. Prop. of the Comm. On the Judiciary H.R., 106 Cong. 101 (2000) (statement of Marybeth Peters, Register of Copyrights of the United States Copyright Office); *see also id.* 106 Cong. 98 (statement of Rep. Howard Berman) ("It could very well be that the courts will find, when they start ruling on these cases, that in 2013 some sound recordings are works made for hire and other sound recordings aren't works made for hire and some sound recordings are contributions to a collective works or a compilation and others aren't.").

[67]

NIMMER § 5.03.

senator commented during proceedings on an amendment to remove, effective as of 1999, sound recordings from the works that may be made for hire, "the facts can vary so widely – some albums are primarily the product of the producer, some of one artist, some of a group, many have hired musicians or technicians who contribute but do so as part of their normal employment . . . ."[68]

Plaintiffs have not provided any evidence to demonstrate that the threshold question of whether the artists' sound recordings qualify as contributions to collective works can be resolved based on common proof. As a result, even if the requirement that the parties agreed in writing that the works were made for hire could be ascertained easily from each artist's recording agreement, determining whether each sound recording was a contribution to a collective work and made at the instance and expense of the record label would require individualized inquiries that undermine predominance.

*Other Individual Issues - Validity of Termination Notices*

Defendants raise a number of other issues that, they argue, preclude a finding of predominance, including the validity of an artist's termination notice. For a termination notice to be valid, it must contain "clear identification" of certain information:

> "(i) A statement that the termination is made under section 203; (ii) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made; (iii) The date of execution of the grant being terminated and, if the grant covered the right of publication of a work, the date of publication of the work under the grant; (iv) For each work to which the notice of termination applies, the title of the work and the name of the author or, in the case of a joint work, the authors who executed the grant

---

[68] *Making Certain Corrections in Copyright Law: Senate Proceeding on H.R. 5107*, 106th Cong. 2, 146 Cong. Rec. S10498-01, S10498 (2000) (Statement of Senator Orrin Hatch).

being terminated; and, if possible and practicable, the original copyright registration number; (v) A brief statement reasonably identifying the grant to which the notice of termination applies; (vi) The effective date of termination; and [(additional requirements in cases where the author has died)]."[69]

Even if some of this information is missing or incorrect, a termination notice still may be valid if the errors are harmless and "do not materially affect the adequacy of the information required to serve the purposes of [Section 203]" and/or were made in good faith "without any intention to deceive, mislead or conceal relevant information."[70]

The validity of an artist's termination notice requires individualized evaluation. For each termination notice that contains defects,[71] the Court would need to assess whether those defects constitute harmless errors, which may necessitate fact-finding as to the artists's good faith and intent. This Court previously recognized that whether an omitted execution date is fatal to the validity of a termination notice depends on the circumstances.[72] Defendants identify several termination notices submitted by proposed class members that are missing material information, such as the creation date of a work where the grant was executed before 1978, each of which would require an individualized

---

[69]     37 C.F.R. § 201.10(b)(1).

[70]     *Id.* § 201.10(e).

[71]     *See* Dkt 205-1 at 11-20 (Defendants' descriptions of various possible defects in proposed class members' termination notices).

[72]     *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 440 (S.D.N.Y. 2020) ("While perhaps in other circumstances an omitted execution date could be fatal to the validity of a termination notice . . . .").

harmless-error analysis.[73] Plaintiffs dispute this, insisting that "[a]ll of the [n]otices of [t]ermination are more than sufficient to reasonably inform the Defendants of all essential information."[74] That argument, however, mistakenly focuses on the merits rather than demonstrating how the answer to the question as to the validity of each termination notice can be reached through evidence common to the class.

The work-made-for-hire defense and the validity of termination notices "go to the heart of [D]efendants' liability"[75] and demand complicated individualized inquiries, precluding a finding of predominance.[76]

*Proposed Class B - Rule 23(b)(2)*

A class seeking injunctive and/or declaratory relief may be certified under Rule 23(b)(2).  Although Plaintiffs move to certify only proposed Class B under Rule 23(b)(2), they seek

---

[73]  Dkt 119, Order.

[74]  Dkt 220 at 16.

[75]  *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 146 (2d Cir. 2015).

[76]  Finding it unnecessary, the Court does not address each issue Defendants raise.  I note however that some of the issues are easily resolvable or too minor to defeat predominance. Copyright grants executed by loan-out or furnishing companies or other third parties, as well as artists' claims that have been settled, withdrawn, or otherwise resolved, are expressly excluded from the definitions of the proposed classes. Dkt 149 at 2.  Issues of co-ownership of sound recordings, potential application of foreign law to certain recording agreements, and statute-of-limitations, waiver, and estoppel defenses can be resolved by amending the class definitions and/or "could be determined in individual hearings after common questions are resolved for the class." *Johnson*, 780 F.3d at 146.

21

injunctive relief also on behalf of artists in proposed Class A.[77]   The Court accordingly assesses

whether Plaintiffs have satisfied the requirements of Rule 23(b)(2) as to each proposed class.

A class may be certified under Rule 23(b)(2) only if "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole."[78]   The crux of a

(b)(2) class is:

> "'the indivisible nature of the injunctive or declaratory remedy warranted—the notion
> that the conduct is such that it can be enjoined or declared unlawful only as to all of
> the class members or as to none of them.' In other words, Rule 23(b)(2) applies only
> when a single injunction or declaratory judgment would provide relief to each
> member of the class. It does not authorize class certification when each individual
> class member would be entitled to a different injunction or declaratory judgment
> against the defendant. '"[79]

Although there is no predominance requirement in Rule 23(b)(2), the party moving to certify a Rule

23(b)(2) class must demonstrate that the class is "cohesive" – "that the class's claims are common

and that adjudication of the case will not devolve into consideration of myriad individual issues."[80]

---

[77]

Dkt 95 at 31, 41.

[78]

Fed. R. Civ. P. 23(b)(2).

[79]

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (quoting Richard A. Nagareda,
*Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

[80]

2 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 4:34 (6th ed. 2022).

The issues that defeat predominance under Rule 23(b)(3) also counsel in this case against certifying a class pursuant to Rule 23(b)(2).[81]  In addition to those issues, Plaintiffs have not demonstrated that Defendants have acted on grounds generally applicable to the class.  To be liable for copyright infringement, Defendants must continue to exploit the sound recordings commercially after the effective dates of termination.[82]  This Court's discussion of whether Defendants continued to exploit former plaintiff Kasim Sulton's exclusive rights following the effective date of termination in his notice is illustrative.  Implicit in my rejection of Plaintiffs' theory that Defendants' contention that Sulton's termination notice was invalid constituted copyright infringement was that such denials or failures to honor termination notices do not *per se* constitute infringement.[83]  As with Sulton, Plaintiffs have offered no evidence that Defendants have exploited all proposed class members' sound recordings after the effective dates of termination.[84]

---

[81]

    *In re Rezulin Prod. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002) ("[T]he individual issues that defeat the predominance requirement of Rule 23(b)(3) also pose an obstacle to class certification in the Rule 23(b)(2) context.").

[82]

    *Waite v. UMG Recordings, Inc.*, No. 19-cv-1091 (LAK), 2022 WL 4227300, at *3 (S.D.N.Y. Sept. 13, 2022).

[83]

    *Id.*

[84]

    The declaratory judgment Plaintiffs seek for proposed Class B fails to satisfy the requirements of Rule 23(b)(2) largely for the same reasons that the Rule 23(b)(3) class fails to satisfy the predominance requirement.  A declaration, for example, that the class members' "Notices of Termination are valid . . . and Defendants' disregard of the rights of Plaintiff Straw and the members of Class B violates the Copyright Act" requires the same individualized analyses described above that plague class certification under Rule 23(b)(3).

23

For this reason and for the individual issues discussed above in the (b)(3) section, certification pursuant to Rule 23(b)(2) is inappropriate. I have considered Plaintiffs' other arguments in support of class certification and found them all unpersuasive.

## *Conclusion*

Plaintiffs' claims raise issues of fairness in copyright law that undoubtedly extend beyond their own grievances. However, the individualized evidence and case-by-case evaluations necessary to resolve those claims make this case unsuitable for adjudication on an aggregate basis.[85]

Plaintiffs' motion for class certification (Dkt 149) is denied in all respects.

SO ORDERED.

Dated: January 27, 2023

Lewis A. Kaplan
United States District Judge

---

[85] As Judge Louis Stanton has remarked:

"Generally speaking, copyright claims are poor candidates for class-action treatment. They have superficial similarities. The nature of their legal requirements and analyses are similar: plaintiff must prove ownership of a copyright and the copyrighted work infringed [by Defendants] . . . . But that merely identifies some of the issues, each of which must be resolved upon facts which are particular to that single claim of infringement, and separate from all the other claims. Thus, accumulation of all the copyright claims, and claimants, into one action will not simplify or unify the process of their resolution, but multiply its difficulties over the normal one-by-one adjudications of copyright cases." *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 65–66 (S.D.N.Y. 2013).